# EXHIBIT "A"







For Immediate Release
Office of the Press Secretary
December 17, 2005

## President's Radio Address
The Roosevelt Room



In Focus: Homeland Security
en Español

10:06 A.M. EST

THE PRESIDENT: Good morning.

As President, I took an oath to defend the Constitution, and I have no greater responsibility than to protect our people, our freedom, and our way of life. On September the 11th, 2001, our freedom and way of life came under attack by brutal enemies who killed nearly 3,000 innocent Americans. We're fighting these enemies across the world. Yet in this first war of the 21st century, one of the most critical battlefronts is the home front. And since September the 11th, we've been on the offensive against the terrorists plotting within our borders.

One of the first actions we took to protect America after our nation was attacked was to ask Congress to pass the Patriot Act. The Patriot Act tore down the legal and bureaucratic wall that kept law enforcement and intelligence authorities from sharing vital information about terrorist threats. And the Patriot Act allowed federal investigators to pursue terrorists with tools they already used against other criminals. Congress passed this law with a large, bipartisan majority, including a vote of 98-1 in the United States Senate.

Since then, America's law enforcement personnel have used this critical law to prosecute terrorist operatives and supporters, and to break up terrorist cells in New York, Oregon, Virginia, California, Texas and Ohio. The Patriot Act has accomplished exactly what it was designed to do: it has protected American liberty and saved American lives.

Yet key provisions of this law are set to expire in two weeks. The terrorist threat to our country will not expire in two weeks. The terrorists want to attack America again, and inflict even greater damage than they did on September the 11th. Congress has a responsibility to ensure that law enforcement and intelligence officials have the tools they need to protect the American people.

The House of Representatives passed reauthorization of the Patriot Act. Yet a minority of senators filibustered to block the renewal of the Patriot Act when it came up for a vote yesterday. That decision is irresponsible, and it endangers the lives of our citizens. The senators who are filibustering must stop their delaying tactics, and the Senate must vote to reauthorize the Patriot Act. In the war on terror, we cannot afford to be without this law for a single moment.

To fight the war on terror, I am using authority vested in me by Congress, including the Joint Authorization for Use of Military Force, which passed overwhelmingly in the first week after September the 11th. I'm also using

1

constitutional authority vested in me as Commander-in-Chief.

In the weeks following the terrorist attacks on our nation, I authorized the National Security Agency, consistent with U.S. law and the Constitution, to intercept the international communications of people with known links to al Qaeda and related terrorist organizations. Before we intercept these communications, the government must have information that establishes a clear link to these terrorist networks.

This is a highly classified program that is crucial to our national security. Its purpose is to detect and prevent terrorist attacks against the United States, our friends and allies. Yesterday the existence of this secret program was revealed in media reports, after being improperly provided to news organizations. As a result, our enemies have learned information they should not have, and the unauthorized disclosure of this effort damages our national security and puts our citizens at risk. Revealing classified information is illegal, alerts our enemies, and endangers our country.

As the 9/11 Commission pointed out, it was clear that terrorists inside the United States were communicating with terrorists abroad before the September the 11th attacks, and the commission criticized our nation's inability to uncover links between terrorists here at home and terrorists abroad. Two of the terrorist hijackers who flew a jet into the Pentagon, Nawaf al Hamzi and Khalid al Mihdhar, communicated while they were in the United States to other members of al Qaeda who were overseas. But we didn't know they were here, until it was too late.

**ARCHIVES**

### ↓ Radio Address

- 2006
- 2005
- 2004
- 2003
- 2002
- 2001

### ↓ Radio Interviews

- 2005
- 2004

The authorization I gave the National Security Agency after September the 11th helped address that problem in a way that is fully consistent with my constitutional responsibilities and authorities. The activities I have authorized make it more likely that killers like these 9/11 hijackers will be identified and located in time. And the activities conducted under this authorization have helped detect and prevent possible terrorist attacks in the United States and abroad.

The activities I authorized are reviewed approximately every 45 days. Each review is based on a fresh intelligence assessment of terrorist threats to the continuity of our government and the threat of catastrophic damage to our homeland. During each assessment, previous activities under the authorization are reviewed. The review includes approval by our nation's top legal officials, including the Attorney General and the Counsel to the President. I have reauthorized this program more than 30 times since the September the 11th attacks, and I intend to do so for as long as our nation faces a continuing threat from al Qaeda and related groups.

The NSA's activities under this authorization are thoroughly reviewed by the Justice Department and NSA's top legal officials, including NSA's general counsel and inspector general. Leaders in Congress have been briefed more than a dozen times on this authorization and the activities conducted under it. Intelligence officials involved in this activity also receive extensive training to ensure they perform their duties consistent with the letter and intent of the authorization.

This authorization is a vital tool in our war against the terrorists. It is critical to saving American lives. The American people expect me to do everything in my power under our laws and Constitution to protect them and their civil liberties. And that is exactly what I will continue to do, so long as I'm the President of the United States.

Thank you.

END 10:13 A.M. EST

**Return to this article at:**
http://www.whitehouse.gov/news/releases/2005/12/20051217.html

 CLICK HERE TO PRINT

# EXHIBIT "B"





For Immediate Release
Office of the Press Secretary
December 19, 2005

## Press Briefing by Attorney General Alberto Gonzales and General Michael Hayden, Principal Deputy Director for National Intelligence

James S. Brady Briefing Room

8:30 A.M. EST

MR. McCLELLAN: Good morning, everybody. I've got with me the Attorney General and General Hayden here this morning to brief you on the legal issues surrounding the NSA authorization and take whatever questions you have for them on that. The Attorney General will open with some comments and then they'll be glad to take your questions.

And with that, I'll turn it over to General Gonzales.

ATTORNEY GENERAL GONZALES: Thanks, Scott.

The President confirmed the existence of a highly classified program on Saturday. The program remains highly classified; there are many operational aspects of the program that have still not been disclosed and we want to protect that because those aspects of the program are very, very important to protect the national security of this country. So I'm only going to be talking about the legal underpinnings for what has been disclosed by the President.

The President has authorized a program to engage in electronic surveillance of a particular kind, and this would be the intercepts of contents of communications where one of the -- one party to the communication is outside the United States. And this is a very important point -- people are running around saying that the United States is somehow spying on American citizens calling their neighbors. Very, very important to understand that one party to the communication has to be outside the United States.

Another very important point to remember is that we have to have a reasonable basis to conclude that one party to the communication is a member of al Qaeda, affiliated with al Qaeda, or a member of an organization affiliated with al Qaeda, or working in support of al Qaeda. We view these authorities as authorities to confront the enemy in which the United States is at war with -- and that is al Qaeda and those who are supporting or affiliated with al Qaeda.

What we're trying to do is learn of communications, back and forth, from within the United States to overseas with members of al Qaeda. And that's what this program is about.

Now, in terms of legal authorities, the Foreign Intelligence Surveillance Act provides -- requires a court order before engaging in this kind of surveillance that I've just discussed and the President announced on Saturday, unless there is somehow -- there is -- unless otherwise authorized by statute or by Congress. That's what the law requires. Our position is, is that the authorization to use force, which was passed by the Congress in the days following September 11th, constitutes that other authorization, that other statute by Congress, to engage in this kind of signals intelligence.

Now, that -- one might argue, now, wait a minute, there's nothing in the authorization to use force that specifically mentions electronic surveillance. Let me take you back to a case that the Supreme Court reviewed this past -- in 2004, the Hamdi decision. As you remember, in that case, Mr. Hamdi was a U.S. citizen who was contesting his detention by the United States government. What he said was that there is a statute, he said, that specifically prohibits the detention of American citizens without permission, an act by Congress -- and he's right, 18 USC 4001a requires that the United States government cannot detain an American citizen except by an act of Congress.

1

We took the position -- the United States government took the position that Congress had authorized that detention in the authorization to use force, even though the authorization to use force never mentions the word "detention." And the Supreme Court, a plurality written by Justice O'Connor agreed. She said, it was clear and unmistakable that the Congress had authorized the detention of an American citizen captured on the battlefield as an enemy combatant for the remainder -- the duration of the hostilities. So even though the authorization to use force did not mention the word, "detention," she felt that detention of enemy soldiers captured on the battlefield was a fundamental incident of waging war, and therefore, had been authorized by Congress when they used the words, "authorize the President to use all necessary and appropriate force."

For the same reason, we believe signals intelligence is even more a fundamental incident of war, and we believe has been authorized by the Congress. And even though signals intelligence is not mentioned in the authorization to use force, we believe that the Court would apply the same reasoning to recognize the authorization by Congress to engage in this kind of electronic surveillance.

I might also add that we also believe the President has the inherent authority under the Constitution, as Commander-in-Chief, to engage in this kind of activity. Signals intelligence has been a fundamental aspect of waging war since the Civil War, where we intercepted telegraphs, obviously, during the world wars, as we intercepted telegrams in and out of the United States. Signals intelligence is very important for the United States government to know what the enemy is doing, to know what the enemy is about to do. It is a fundamental incident of war, as Justice O'Connor talked about in the Hamdi decision. We believe that -- and those two authorities exist to allow, permit the United States government to engage in this kind of surveillance.

The President, of course, is very concerned about the protection of civil liberties, and that's why we've got strict parameters, strict guidelines in place out at NSA to ensure that the program is operating in a way that is consistent with the President's directives. And, again, the authorization by the President is only to engage in surveillance of communications where one party is outside the United States, and where we have a reasonable basis to conclude that one of the parties of the communication is either a member of al Qaeda or affiliated with al Qaeda.

Mike, do you want to -- have anything to add?

GENERAL HAYDEN: I'd just add, in terms of what we do globally with regard to signals intelligence, which is a critical part of defending the nation, there are probably no communications more important to what it is we're trying to do to defend the nation; no communication is more important for that purpose than those communications that involve al Qaeda, and one end of which is inside the homeland, one end of which is inside the United States. Our purpose here is to detect and prevent attacks. And the program in this regard has been successful.

Q General, are you able to say how many Americans were caught in this surveillance?

ATTORNEY GENERAL GONZALES: I'm not -- I can't get into the specific numbers because that information remains classified. Again, this is not a situation where -- of domestic spying. To the extent that there is a moderate and heavy communication involving an American citizen, it would be a communication where the other end of the call is outside the United States and where we believe that either the American citizen or the person outside the United States is somehow affiliated with al Qaeda.

Q General, can you tell us why you don't choose to go to the FISA court?

ATTORNEY GENERAL GONZALES: Well, we continue to go to the FISA court and obtain orders. It is a very important tool that we continue to utilize. Our position is that we are not legally required to do, in this particular case, because the law requires that we -- FISA requires that we get a court order, unless authorized by a statute, and we believe that authorization has occurred.

The operators out at NSA tell me that we don't have the speed and the agility that we need, in all circumstances, to deal with this new kind of enemy. You have to remember that FISA was passed by the Congress in 1978. There have been tremendous advances in technology --

Q But it's been kind of retroactively, hasn't it?

2

ATTORNEY GENERAL GONZALES: -- since then. Pardon me?

Q It's been done retroactively before, hasn't it?

ATTORNEY GENERAL GONZALES: What do you mean, "retroactively"?

Q You just go ahead and then you apply for the FISA clearance, because it's damn near automatic.

ATTORNEY GENERAL GONZALES: If we -- but there are standards that have to be met, obviously, and you're right, there is a procedure where we -- an emergency procedure that allows us to make a decision to authorize -- to utilize FISA, and then we go to the court and get confirmation of that authority.

But, again, FISA is very important in the war on terror, but it doesn't provide the speed and the agility that we need in all circumstances to deal with this new kind of threat.

Q But what -- go ahead.

GENERAL HAYDEN: Let me just add to the response to the last question. As the Attorney General says, FISA is very important, we make full use of FISA. But if you picture what FISA was designed to do, FISA is designed to handle the needs in the nation in two broad categories: there's a law enforcement aspect of it; and the other aspect is the continued collection of foreign intelligence. I don't think anyone could claim that FISA was envisaged as a tool to cover armed enemy combatants in preparation for attacks inside the United States. And that's what this authorization under the President is designed to help us do.

Q Have you identified armed enemy combatants, through this program, in the United States?

GENERAL HAYDEN: This program has been successful in detecting and preventing attacks inside the United States.

Q General Hayden, I know you're not going to talk about specifics about that, and you say it's been successful. But would it have been as successful -- can you unequivocally say that something has been stopped or there was an imminent attack or you got information through this that you could not have gotten through going to the court?

GENERAL HAYDEN: I can say unequivocally, all right, that we have got information through this program that would not otherwise have been available.

Q Through the court? Because of the speed that you got it?

GENERAL HAYDEN: Yes, because of the speed, because of the procedures, because of the processes and requirements set up in the FISA process, I can say unequivocally that we have used this program in lieu of that and this program has been successful.

Q But one of the things that concerns people is the slippery slope. If you said you absolutely need this program, you have to do it quickly -- then if you have someone you suspect being a member of al Qaeda, and they're in the United States, and there is a phone call between two people in the United States, why not use that, then, if it's so important? Why not go that route? Why not go further?

GENERAL HAYDEN: Across the board, there is a judgment that we all have to make -- and I made this speech a day or two after 9/11 to the NSA workforce -- I said, free peoples always have to judge where they want to be on that spectrum between security and liberty; that there will be great pressures on us after those attacks to move our national banner down in the direction of security. What I said to the NSA workforce is, our job is to keep Americans free by making Americans feel safe again. That's been the mission of the National Security Agency since the day after the attack, is when I talked -- two days after the attack is when I said that to the workforce.

There's always a balancing between security and liberty. We understand that this is a more -- I'll use the word

3

"aggressive" program than would be traditionally available under FISA. It is also less intrusive. It deals only with international calls. It is generally for far shorter periods of time. And it is not designed to collect reams of intelligence, but to detect and warn and prevent about attacks. And, therefore, that's where we've decided to draw that balance between security and liberty.

Q Gentlemen, can you say when Congress was first briefed, who was included in that, and will there be a leaks investigation?

ATTORNEY GENERAL GONZALES: Well of course, we're not going to -- we don't talk about -- we try not to talk about investigations. As to whether or not there will be a leak investigation, as the President indicated, this is really hurting national security, this has really hurt our country, and we are concerned that a very valuable tool has been compromised. As to whether or not there will be a leak investigation, we'll just have to wait and see.

And your first question was?

Q When was Congress first briefed --

ATTORNEY GENERAL GONZALES: I'm not going to -- I'm not going to talk about -- I'll let others talk about when Congress was first briefed. What I can say is, as the President indicated on Saturday, there have been numerous briefings with certain key members of Congress. Obviously, some members have come out since the revelations on Saturday, saying that they hadn't been briefed. This is a very classified program. It is probably the most classified program that exists in the United States government, because the tools are so valuable, and therefore, decisions were made to brief only key members of Congress. We have begun the process now of reaching out to other members of Congress. I met last night, for example, with Chairman Specter and other members of Congress to talk about the legal aspects of this program.

And so we are engaged in a dialogue now to talk with Congress, but also -- but we're still mindful of the fact that still -- this is still a very highly classified program, and there are still limits about what we can say today, even to certain members of Congress.

Q General, what's really compromised by the public knowledge of this program? Don't you assume that the other side thinks we're listening to them? I mean, come on.

GENERAL HAYDEN: The fact that this program has been successful is proof to me that what you claim to be an assumption is certainly not universal. The more we discuss it, the more we put it in the face of those who would do us harm, the more they will respond to this and protect their communications and make it more difficult for us to defend the nation.

Q Mr. Attorney General --

Q -- became public, have you seen any evidence in a change in the tactics or --

ATTORNEY GENERAL GONZALES: We're not going to comment on that kind of operational aspect.

Q You say this has really hurt the American people. Is that based only on your feeling about it, or is there some empirical evidence to back that up, even if you can't --

ATTORNEY GENERAL GONZALES: I think the existence of this program, the confirmation of the -- I mean, the fact that this program exists, in my judgment, has compromised national security, as the President indicated on Saturday.

Q I'd like to ask you, what are the constitutional limits on this power that you see laid out in the statute and in your inherent constitutional war power? And what's to prevent you from just listening to everyone's conversation and trying to find the word "bomb," or something like that?

ATTORNEY GENERAL GONZALES: Well, that's a good question. This was a question that was raised in some

4

of my discussions last night with members of Congress. The President has not authorized -- has not authorized blanket surveillance of communications here in the United States. He's been very clear about the kind of surveillance that we're going to engage in. And that surveillance is tied with our conflict with al Qaeda.

You know, we feel comfortable that this surveillance is consistent with requirements of the 4th Amendment. The touchstone of the 4th Amendment is reasonableness, and the Supreme Court has long held that there are exceptions to the warrant requirement in -- when special needs outside the law enforcement arena. And we think that that standard has been met here. When you're talking about communications involving al Qaeda, when you -- obviously there are significant privacy interests implicated here, but we think that those privacy interests have been addressed; when you think about the fact that this is an authorization that's ongoing, it's not a permanent authorization, it has to be reevaluated from time to time. There are additional safeguards that have been in place -- that have been imposed out at NSA, and we believe that it is a reasonable application of these authorities.

Q Mr. Attorney General, haven't you stretched --

Q -- adequate because of technological advances? Wouldn't you do the country a better service to address that issue and fix it, instead of doing a backdoor approach --

ATTORNEY GENERAL GONZALES: This is not a backdoor approach. We believe Congress has authorized this kind of surveillance. We have had discussions with Congress in the past -- certain members of Congress -- as to whether or not FISA could be amended to allow us to adequately deal with this kind of threat, and we were advised that that would be difficult, if not impossible.

Q If this is not backdoor, is this at least a judgment call? Can you see why other people would look at it and say, well, no, we don't see it that way?

ATTORNEY GENERAL GONZALES: I think some of the concern is because people had not been briefed; they don't understand the specifics of the program, they don't understand the strict safeguards within the program. And I haven't had a discussion -- an opportunity to have a discussion with them about our legal analysis. So, obviously, we're in that process now. Part of the reason for this press brief today is to have you help us educate the American people and the American Congress about what we're doing and the legal basis for what we're doing.

Q Al, you talk about the successes and the critical intercepts of the program. Have there also been cases in which after listening in or intercepting, you realize you had the wrong guy and you listened to what you shouldn't have?

GENERAL HAYDEN: That's why I mentioned earlier that the program is less intrusive. It deals only with international calls. The time period in which we would conduct our work is much shorter, in general, overall, than it would be under FISA. And one of the true purposes of this is to be very agile, as you described.

If this particular line of logic, this reasoning that took us to this place proves to be inaccurate, we move off of it right away.

Q Are there cases in which --

GENERAL HAYDEN: Yes, of course.

Q Can you give us some idea of percentage, or how often you get it right and how often you get it wrong?

GENERAL HAYDEN: No, it would be very -- no, I cannot, without getting into the operational details. I'm sorry.

Q But there are cases where you wind up listening in where you realize you shouldn't have?

GENERAL HAYDEN: There are cases like we do with regard to the global SIGIN system -- you have reasons to go after particular activities, particular communications. There's a logic; there is a standard as to why you

would go after that, not just in a legal sense, which is very powerful, but in a practical sense. We can't waste resources on targets that simply don't provide valuable information. And when we decide that is the case -- and in this program, the standards, in terms of re-evaluating whether or not this coverage is worthwhile at all, are measured in days and weeks.

Q Would someone in a case in which you got it wrong have a cause of action against the government?

ATTORNEY GENERAL GONZALES: That is something I'm not going to answer, Ken.

Q I wanted to ask you a question. Do you think the government has the right to break the law?

ATTORNEY GENERAL GONZALES: Absolutely not. I don't believe anyone is above the law.

Q You have stretched this resolution for war into giving you carte blanche to do anything you want to do.

ATTORNEY GENERAL GONZALES: Well, one might make that same argument in connection with detention of American citizens, which is far more intrusive than listening into a conversation. There may be some members of Congress who might say, we never --

Q That's your interpretation. That isn't Congress' interpretation.

ATTORNEY GENERAL GONZALES: Well, I'm just giving you the analysis --

Q You're never supposed to spy on Americans.

ATTORNEY GENERAL GONZALES: I'm just giving the analysis used by Justice O'Connor -- and she said clearly and unmistakenly the Congress authorized the President of the United States to detain an American citizen, even though the authorization to use force never mentions the word "detention" --

Q -- into wiretapping everybody and listening in on --

ATTORNEY GENERAL GONZALES: This is not about wiretapping everyone. This is a very concentrated, very limited program focused at gaining information about our enemy.

Q Now that the cat is out of the bag, so to speak, do you expect your legal analysis to be tested in the courts?

ATTORNEY GENERAL GONZALES: I'm not going to, you know, try to guess as to what's going to happen about that. We're going to continue to try to educate the American people and the American Congress about what we're doing and the basis -- why we believe that the President has the authority to engage in this kind of conduct.

Q Because there are some very smart legal minds who clearly think a law has been broken here.

ATTORNEY GENERAL GONZALES: Well, I think that they may be making or offering up those opinions or assumptions based on very limited information. They don't have all the information about the program. I think they probably don't have the information about our legal analysis.

Q Judge Gonzales, will you release then, for the reasons you're saying now, the declassified versions of the legal rationale for this from OLC? And if not, why not? To assure the American public that this was done with the legal authority that you state.

ATTORNEY GENERAL GONZALES: We're engaged now in a process of educating the American people, again, and educating the Congress. We'll make the appropriate evaluation at the appropriate time as to whether or not additional information needs to be provided to the Congress or the American people.

Q You declassified OLC opinions before, after the torture -- why not do that here to show, yes, we went through

a process?

ATTORNEY GENERAL GONZALES: I'm not confirming the existence of opinions or the non-existence of opinions. I've offered up today our legal analysis of the authorities of this President.

Q Sir, can you explain, please, the specific inadequacies in FISA that have prevented you from sort of going through the normal channels?

GENERAL HAYDEN: One, the whole key here is agility. And let me re-trace some grounds I tried to suggest earlier. FISA was built for persistence. FISA was built for long-term coverage against known agents of an enemy power. And the purpose involved in each of those -- in those cases was either for a long-term law enforcement purpose or a long-term intelligence purpose.

This program isn't for that. This is to detect and prevent. And here the key is not so much persistence as it is agility. It's a quicker trigger. It's a subtly softer trigger. And the intrusion into privacy -- the intrusion into privacy is significantly less. It's only international calls. The period of time in which we do this is, in most cases, far less than that which would be gained by getting a court order. And our purpose here, our sole purpose is to detect and prevent.

Again, I make the point, what we are talking about here are communications we have every reason to believe are al Qaeda communications, one end of which is in the United States. And I don't think any of us would want any inefficiencies in our coverage of those kinds of communications, above all. And that's what this program allows us to do -- it allows us to be as agile as operationally required to cover these targets.

Q But how does FISA --

GENERAL HAYDEN: FISA involves the process -- FISA involves marshaling arguments; FISA involves looping paperwork around, even in the case of emergency authorizations from the Attorney General. And beyond that, it's a little -- it's difficult for me to get into further discussions as to why this is more optimized under this process without, frankly, revealing too much about what it is we do and why and how we do it.

Q If FISA didn't work, why didn't you seek a new statute that allowed something like this legally?

ATTORNEY GENERAL GONZALES: That question was asked earlier. We've had discussions with members of Congress, certain members of Congress, about whether or not we could get an amendment to FISA, and we were advised that that was not likely to be -- that was not something we could likely get, certainly not without jeopardizing the existence of the program, and therefore, killing the program. And that -- and so a decision was made that because we felt that the authorities were there, that we should continue moving forward with this program.

Q And who determined that these targets were al Qaeda? Did you wiretap them?

GENERAL HAYDEN: The judgment is made by the operational work force at the National Security Agency using the information available to them at the time, and the standard that they apply -- and it's a two-person standard that must be signed off by a shift supervisor, and carefully recorded as to what created the operational imperative to cover any target, but particularly with regard to those inside the United States.

Q So a shift supervisor is now making decisions that a FISA judge would normally make? I just want to make sure I understand. Is that what you're saying?

GENERAL HAYDEN: What we're trying to do is to use the approach we have used globally against al Qaeda, the operational necessity to cover targets. And the reason I emphasize that this is done at the operational level is to remove any question in your mind that this is in any way politically influenced. This is done to chase those who would do harm to the United States.

Q Building on that, during --

7

Q Thank you, General. Roughly when did those conversations occur with members of Congress?

ATTORNEY GENERAL GONZALEZ: I'm not going to get into the specifics of when those conversations occurred, but they have occurred.

Q May I just ask you if they were recently or if they were when you began making these exceptions?

ATTORNEY GENERAL GONZALEZ: They weren't recently.

MR. McCLELLAN: The President indicated that those -- the weeks after September 11th.

Q What was the date, though, of the first executive order? Can you give us that?

GENERAL HAYDEN: If I could just, before you ask that question, just add -- these actions that I described taking place at the operational level -- and I believe that a very important point to be made -- have intense oversight by the NSA Inspector General, by the NSA General Counsel, and by officials of the Justice Department who routinely look into this process and verify that the standards set out by the President are being followed.

Q Can you absolutely assure us that all of the communications intercepted --

Q Have you said that you -- (inaudible) -- anything about this program with your international partners -- with the partners probably in the territories of which you intercept those communications?

ATTORNEY GENERAL GONZALEZ: I'm not aware of discussions with other countries, but that doesn't mean that they haven't occurred. I simply have no personal knowledge of that.

Q Also, is it only al Qaeda, or maybe some other terrorist groups?

ATTORNEY GENERAL GONZALEZ: Again, with respect to what the President discussed on Saturday, this program -- it is tied to communications where we believe one of the parties is affiliated with al Qaeda or part of an organization or group that is supportive of al Qaeda.

Q Sir, during his confirmation hearings, it came out that now-Ambassador Bolton had sought and obtained NSA intercepts of conversations between American citizens and others. Who gets the information from this program; how do you guarantee that it doesn't get too widely spread inside the government, and used for other purposes?

Q And is it destroyed afterwards?

GENERAL HAYDEN: We report this information the way we report any other information collected by the National Security Agency. And the phrase you're talking about is called minimization of U.S. identities. The same minimalizationist standards apply across the board, including for this program. To make this very clear -- U.S. identities are minimized in all of NSA's activities, unless, of course, the U.S. identity is essential to understand the inherent intelligence value of the intelligence report. And that's the standard that's used.

Q General, when you discussed the emergency powers, you said, agility is critical here. And in the case of the emergency powers, as I understand it, you can go in, do whatever you need to do, and within 72 hours just report it after the fact. And as you say, these may not even last very long at all. What would be the difficulty in setting up a paperwork system in which the logs that you say you have the shift supervisors record are simply sent to a judge after the fact? If the judge says that this is not legitimate, by that time probably your intercept is over, wouldn't that be correct?

GENERAL HAYDEN: What you're talking about now are efficiencies. What you're asking me is, can we do this program as efficiently using the one avenue provided to us by the FISA Act, as opposed to the avenue provided to us by subsequent legislation and the President's authorization.

Our operational judgment, given the threat to the nation that the difference in the operational efficiencies between those two sets of authorities are such that we can provide greater protection for the nation operating under this authorization.

Q But while you're getting an additional efficiency, you're also operating outside of an existing law. If the law would allow you to stay within the law and be slightly less efficient, would that be --

ATTORNEY GENERAL GONZALEZ: I guess I disagree with that characterization. I think that this electronic surveillance is within the law, has been authorized. I mean, that is our position. We're only required to achieve a court order through FISA if we don't have authorization otherwise by the Congress, and we think that that has occurred in this particular case.

Q Can you just give us one assurance before you go, General?

ATTORNEY GENERAL GONZALEZ: It depends on what it is. (Laughter.)

Q Can you assure us that all of these intercepts had an international component and that at no time were any of the intercepts purely domestic?

GENERAL HAYDEN: The authorization given to NSA by the President requires that one end of these communications has to be outside the United States. I can assure you, by the physics of the intercept, by how we actually conduct our activities, that one end of these communications are always outside the United States of America.

END 9:02 A.M. EST

---

**Return to this article at:**
http://www.whitehouse.gov/news/releases/2005/12/20051219-1.html

 CLICK HERE TO PRINT

# EXHIBIT "C"

4 of 6 DOCUMENTS

Copyright 2007 Congressional Quarterly, Inc. All Rights Reserved. CQ Transcriptions
"All materials herein are protected by United States copyright law and may not be
reproduced, distributed, transmitted, displayed, published or broadcast without the prior
written permission of CQ Transcriptions. You may not alter or remove any trademark,
copyright or other notice from copies of the content."

**May** 15, 2007 Tuesday

**TYPE:** COMMITTEE HEARING

**LENGTH:** 15636 words

**COMMITTEE:** SENATE JUDICIARY COMMITTEE

**HEADLINE:** SEN. PATRICK J. LEAHY HOLDS A HEARING ON THE U.S. ATTORNEY FIRINGS

**SPEAKER:**
SEN. PATRICK J. LEAHY, CHAIRMAN

**LOCATION:** WASHINGTON, D.C.

**WITNESSES:**

FORMER DEPUTY ATTORNEY GENERAL **JAMES** B. **COMEY**

**BODY:**


U.S. SENATE JUDICIARY COMMITTEE HOLDS A HEARING ON THE
U.S. ATTORNEY FIRINGS

MAY 15, 2007

SPEAKERS:
SEN. PATRICK J. LEAHY, D-VT.
CHAIRMAN
SEN. EDWARD M. KENNEDY, D-MASS.
SEN. JOSEPH R. BIDEN JR., D-DEL.
SEN. HERB KOHL, D-WIS.
SEN. DIANNE FEINSTEIN, D-CALIF.
SEN. RUSS FEINGOLD, D-WIS.
SEN. CHARLES E. SCHUMER, D-N.Y.
SEN. RICHARD J. DURBIN, D-ILL.
SEN. SHELDON WHITEHOUSE, D-R.I.
SEN. BENJAMIN L. CARDIN, D-MD.

SEN. ARLEN SPECTER, R-PA.

SEN. PATRICK J. LEAHY HOLDS A HEARING ON THE U.S. ATTORNEY FIRINGS CQ Transcriptions"All materials herein are protected by United States copyright law and may not be reproduced, distributed, tran

RANKING MEMBER
SEN. ORRIN G. HATCH, R-UTAH
SEN. CHARLES E. GRASSLEY, R-IOWA
SEN. JON KYL, R-ARIZ.
SEN. JEFF SESSIONS, R-ALA.
SEN. LINDSEY GRAHAM, R-S.C.
SEN. JOHN CORNYN, R-TEXAS
SEN. SAM BROWNBACK, R-KAN.
SEN. TOM COBURN, R-OKLA.


        *

    SCHUMER: I have a brief opening statement.  I'm sure Senator Specter does.  And then we'll get right into the questions.

    First, I want to thank and commend Chairman Leahy for his continued leadership on the critically important issue of the politicization of the Justice Department.  This is our committee's fifth hearing in four months focusing on the mass firing of almost 10 percent of our country's top federal prosecutors.

    At our last hearing, on April 19th, Attorney General Gonzales attempted to justify the dismissals, explain his role, and put the matter behind him.  He failed miserably in that attempt.

    Indeed, four weeks later, the dismissals remain unexplained, the attorney general's role is murkier than ever, and with each new revelation, retraction and resignation the issue remains planted on the front pages, hobbling the department's ability to get its important work done.

    Let me briefly review some of the developments since the attorney general's ill-fated appearance before this committee on April 19th.

    Since April 19th, the former deputy attorney general, who is here today, has contradicted other DOJ officials by testifying that most of the fired U.S. attorneys performed well. We will be hearing more about that today.

    Since April 19th, former Missouri U.S. attorney Todd Graves has come forward to say that he was also asked to resign in 2006.  That brings the number of dismissals to at least nine and counting, not the eight that Mr. Gonzales testified to.

    We'll be hearing more about that situation when the committee considers authorizing Chairman Leahy to subpoena Mr. Graves and his replacement, Bradley Schlozman.

    Since April 19th, we've learned that a political corruption case involving Republicans in Arizona may have been slow-walked until after the 2006 election, as the Wall Street Journal has reported.

    U.S. Attorney Paul Charlton's unhappiness with the pace of approvals from Washington may have led to his ouster. We'll be hearing more about that if and when the department responds to our request for information and documents.

    And since April 19th, we have learned that one of the attorney general's top advisers, Monica Goodling, may have been doing the unthinkable: imposing a political and ideological litmus test in the hiring of career-level prosecutors and department lawyers.

    We'll be hearing more about that when Ms. Goodling soon testifies under a grant of immunity.

    And, of course, just yesterday, we learned of the latest and most high-ranking casualty of the current imbroglio.

SEN. PATRICK J. LEAHY HOLDS A HEARING ON THE U.S. ATTORNEY FIRINGS CQ Transcriptions"All
materials herein are protected by United States copyright law and may not be reproduced, distributed, tran

Mr. Comey's successor to the number two position at the department, Paul McNulty, announced his resignation.

The attorney general could almost wallpaper his office with the resignation letters of those who he was supposed to
be supervising.

SCHUMER: The majority of people in his top circle are now no longer at the Justice Department.

Kyle Sampson, who was responsible for putting together the final firing list, has resigned. Monica Goodling, who
helped with the list and served as the department's liaison to the White House, has resigned. Mike Battle, who was
ordered to fire seven U.S. attorneys last December 7th, has resigned. And, of course, now the deputy attorney general
himself has decided to resign.

I heard today that Attorney General Gonzales was trying to assign blame to Paul McNulty for the firings of the U.S.
attorneys, saying that he relied on McNulty's advice. That's ironic, because Paul McNulty came clean with this
committee and gave us some valuable information while the attorney general stonewalled.

The attorney general is trying to make Mr. McNulty into the next Scooter Libby, but we all know the buck stops
with the attorney general.

Mr. Gonzales said at this hearing -- at that these -- Mr. Gonzales said in this hearing room that he accepts
responsibility for the firings. Well, he should live up to his words and not keep pointing the finger today at Mr.
McNulty.

There's been a -- there's long been reason to be concerned about Attorney General Gonzales given his close
connection with the White House and his apparent misconception of this current role. He seems to many in this country
to embody a disrespect for the rule of law and intolerance of independence at the Justice Department.

He's presided over a Justice Department where being a, quote, "loyal Bushie" seems to be more important than
being a seasoned professional, where what the White House wants is more important than what the law requires or what
prudence dictates.

The current scandal merely crystallizes this problem, namely that loyalty to the White House trumps allegiance to
the law, the truth and common sense.

For example, Attorney General Gonzales' former chief of staff has testified that one of the principal reasons the
A.G. was upset after listening to Mr. McNulty's testimony on February 6th was that Mr. McNulty had talked too much
about the White House's role in appointing Karl Rove's deputy as U.S. attorney in Arkansas.

SCHUMER: Specifically, Mr. Sampson said Gonzales was upset that McNulty had, quote, "put so much emphasis
on the White House's role in Griffin being promoted in favor of Cummins," unquote. Gonzales was upset because Mr.
McNulty, quote -- said, quote -- Gonzales was upset because Mr. McNulty, quote, "had really brought the White
House's role in Griffin into the public sphere."

So it appears that the attorney general was apparently not upset that Mr. McNulty had overstated the White House's
role or misstated that role. He was only upset that he had exposed it. And now it appears that Mr. McNulty is gone
because of it.

We've only begun to understand the White House's role in the firings and the attorney general's role in
accomplishing the White House's bidding. So far, however, we know this at least.

It was the White House that initially raised the prospect of firing all 93 U.S. attorneys.

It was the White House that promoted the idea of removing Bud Cummins in favor of a former aide to Karl Rove.

SEN. PATRICK J. LEAHY HOLDS A HEARING ON THE U.S. ATTORNEY FIRINGS CQ Transcriptions"All materials herein are protected by United States copyright law and may not be reproduced, distributed, tran

It was the White House that was upset at the department's belated rejection of a plan to bypass homestate senators in Arkansas to keep Tim Griffin installed indefinitely as U.S. attorney.

It was the White House that had the best opportunity to correct the record of its own involvement in the firing at a March 5th meeting attended by Karl Rove before Mr. Moschella gave incomplete testimony to Congress.

It was the White House that entertained complaints from Republican Party officials about David Iglesias which apparently led to his ouster.

It was the White House that had brought overblown complaints about voter fraud prosecutions to the attention of the Justice Department.

There'll be time for us to hear from those White House witnesses who can shed light on what transpired here, and I hope the day comes soon.

Senator Specter?

SPECTER: Thank you, Mr. Chairman.

I join in the welcome of you, Mr. Comey.

SPECTER: It is ironic in a sense that the former deputy attorney general should be with the Judiciary Committee today, on the same day that we learn of the resignation of the present deputy attorney general.

Earlier today, I wrote to Deputy Attorney General Paul McNulty congratulating him on his service with the Department of Justice, and wishing him well in his new career.

I did not say in the note to him what I'm about to say, but I think he found it difficult -- really, impossible -- to continue to serve in the Department of Justice as a professional, which Paul McNulty is, because it's embarrassing for a professional to work for the Department of Justice today.

We had the attorney general before a hearing. The testimony he gave was hard to understand, incredible in a sense -- to say that he was not involved in discussions and not involved in deliberations, when his three top deputies said he was and the documentary evidence supported that.

It is the decision of Mr. Gonzales as to whether he stays or goes. But it is hard to see how the Department of Justice can function and perform its important duties with Mr. Gonzales remaining where he is. And beyond Mr. Gonzales's decision, it's a matter for the president as to whether the president will retain the attorney general or not.

I think that the operation of the executive branch is a decision for the president. I don't want him telling me how to vote in the Senate on separation of powers, and I'm not going to tell him or make a recommendation to him as to what he ought to do with Mr. Gonzales.

SPECTER: But I think the resignation of Mr. McNulty is another significant step and evidence that a department really cannot function with the continued leadership or lack of leadership of Attorney General Gonzales.

As I view the situation, we really don't know yet what has happened, whether it is politicization or whether it is an ideological bent or what. There is no doubt that the president has the authority to fire all the attorneys general -- pardon me -- in order to fire the attorney general; Freudian slips are sometimes more revealing than the planned statements.

The president does have the authority to replace all of the 93 U.S. attorneys, as President Clinton did when he took office.

SEN. PATRICK J. LEAHY HOLDS A HEARING ON THE U.S. ATTORNEY FIRINGS CQ Transcriptions"All materials herein are protected by United States copyright law and may not be reproduced, distributed, tran

And prosecutions for voter fraud are very, very important.  When I was district attorney of Philadelphia, I prosecuted both Republicans and Democrats for voter fraud: have a lot of it in Philadelphia.

In 1972, the Democrats and Republicans made a deal in South Philadelphia, a spot where many deals are made, to give the Republicans the top of the ticket -- President Nixon running for reelection -- and the Democrats the rest of the ticket.

A common pleas judge signed in at city hall at 6 a.m. that morning as evidenced by the registry roll, issued injunctions barring all of the McGovern poll watchers from the polling places.  He was prosecuted, as were many other top city officials.

So, voter fraud prosecutions are very, very important.

SPECTER: But you can't bring a prosecution unless you have a case.

And now we have to determine if there was chicanery, whether there were efforts at voter prosecutions -- vote fraud prosecutions for investigations when there was no basis for doing so.

It may well be that when we get to the end of the rainbow we will find the explanation may be as simple as outright incompetence -- outright incompetence.  To consider firing Peter Fitzgerald, which is what Kyle Sampson testified to, is patently ridiculous.

It is my hope that we will finish these investigations soon, because the continuing investigations are a harm to the -- we have to do our job.  But the sooner we finish, the sooner the Department of Justice can return to its work.

If we had a new attorney general and concluded this investigation, made our findings public, it would be very important. Because those U.S. attorneys perform enormously important functions on fighting drugs and crime and terrorism and the administration of both civil and criminal justice in this country.

And I'm glad to see you're here today, Mr. Comey, because I know you can shed some additional light on this important subject.

Thank you, Mr. Chairman.

SCHUMER: Thank you, Senator Specter.

It's now my privilege to introduce our witness today, **James** B. **Comey.**

He is almost a man who needs no introduction.  He's well known to this committee, which has twice favorably considered his nomination for important offices: first for the U.S. attorney in the Southern District of New York in 2002, then as deputy attorney general of the United States in 2003.

SCHUMER: Mr. Comey was educated at the College of William and Mary and the University of Chicago Law School.  After law school, he served as a law clerk for then-U.S. District Judge John M. Walker Jr. in Manhattan.  After that he spent most of the next 20 years as a dedicated public servant in the Justice Department.

Besides serving ably as U.S. attorney and deputy attorney general, Mr. Comey earned a reputation as a hard-nosed prosecutor in a number of high-profile and important cases, including Khobar Towers terrorist bombing case arising out of the June 1996 attack on a U.S. military facility in Saudi Arabia in which 19 airmen were killed.

Mr. Comey is currently the senior vice president and general counsel of the Lockheed Martin Corporation.

Now, I know it is not easy for you, Mr. Comey, to be here and talk about some of the recent travails at the

SEN. PATRICK J. LEAHY HOLDS A HEARING ON THE U.S. ATTORNEY FIRINGS CQ Transcriptions"All materials herein are protected by United States copyright law and may not be reproduced, distributed, tran

department which you hold so dear.

I especially appreciate Mr. Comey's coming to testify here without the formality of a subpoena. In order to secure Mr. Comey's presence, I would have moved for consideration of a subpoena by the committee, but I'm glad that wasn't necessary because of your cooperation.

As far as I'm concerned, when the Justice Department lost Jim Comey, it lost a towering figure. And I don't say that because he stands 6'8" tall.

When Jim left the department, we lost a public servant of the first order, a man of unimpeachable integrity, honestly, character and independence.

And now I'd like to administer the oath of office. Would you please rise?

I sorry. I wish we were administering the oath of office.

(LAUGHTER)

The oath.

Do you affirm that the testimony you are about to give before the committee will be the truth, the whole truth and nothing but the truth so help you, God?

COMEY: I do.

SCHUMER: Thank you.

OK, we're going to get right into the questioning because Mr. Comey does not have an opening statement.

SCHUMER: As I said in my opening remarks, many have been concerned that Alberto Gonzales has made the Justice Department a mere extension of the White House where independence takes a back seat to service to the White House, where the rule of law takes a back seat to the political needs of the president's party.

Before we get to the other issues, I want to go back to an incident from the time that Mr. Gonzales served as White House counsel.

There have been media reports describing a dramatic visit by Alberto Gonzales and Chief of Staff Andrew Card to the hospital bed of John Ashcroft in March 2004, after you, as acting attorney general, decided not to authorize a classified program.

First, can you confirm that a night-time hospital visit took place?

COMEY: Yes, I can.

SCHUMER: OK.

Can you remember the date and the day?

COMEY: Yes, sir, very well. It was Wednesday, March the 10th, 2004.

SCHUMER: And how do you remember that date so well?

COMEY: This was a very memorable period in my life; probably the most difficult time in my entire professional life. And that night was probably the most difficult night of my professional life. So it's not something I'd forget.

SEN. PATRICK J. LEAHY HOLDS A HEARING ON THE U.S. ATTORNEY FIRINGS CQ Transcriptions"All materials herein are protected by United States copyright law and may not be reproduced, distributed, tran

SCHUMER: Were you present when Alberto Gonzales visited Attorney General Ashcroft's bedside?

COMEY: Yes.

SCHUMER: And am I correct that the conduct of Mr. Gonzales and Mr. Card on that evening troubled you greatly?

COMEY: Yes.

SCHUMER: OK.

Let me go back and take it from the top.

You rushed to the hospital that evening. Why?

COMEY: I'm only hesitating because I need to explain why.

SCHUMER: Please. I'll give you all the time you need, sir.

COMEY: I've actually thought quite a bit over the last three years about how I would answer that question if it was ever asked, because I assumed that at some point I would have to testify about it.

The one thing I'm not going to do and be very, very careful about is, because this involved a classified program, I'm not going to get anywhere near classified information. I also am very leery of, and will not, reveal the content of advice I gave as a lawyer, the deliberations I engaged in. I think it's very important for the Department of Justice that someone who held my position not do that.

SCHUMER: In terms of privilege.

COMEY: Yes, sir.

SCHUMER: Understood.

COMEY: Subject to that, I -- and I'm uncomfortable talking about this...

SCHUMER: I understand.

COMEY: ... but I'll answer the question.

I -- to understand what happened that night, I, kind of, got to back up about a week.

SCHUMER: Please.

COMEY: In the early part of 2004, the Department of Justice was engaged -- the Office of Legal Counsel, under my supervision -- in a reevaluation both factually and legally of a particular classified program. And it was a program that was renewed on a regular basis, and required signature by the attorney general certifying to its legality.

And the -- and I remember the precise date. The program had to be renewed by March the 11th, which was a Thursday, of 2004. And we were engaged in a very intensive reevaluation of the matter.

And a week before that March 11th deadline, I had a private meeting with the attorney general for an hour, just the two of us, and I laid out for him what we had learned and what our analysis was in this particular matter.

And at the end of that hour-long private session, he and I agreed on a course of action. And within hours he was stricken and taken very, very ill...

SEN. PATRICK J. LEAHY HOLDS A HEARING ON THE U.S. ATTORNEY FIRINGS CQ Transcriptions"All materials herein are protected by United States copyright law and may not be reproduced, distributed, tran

SCHUMER: (inaudible) You thought something was wrong with how it was being operated or administered or overseen.

COMEY: We had -- yes.  We had concerns as to our ability to certify its legality, which was our obligation for the program to be renewed.

The attorney general was taken that very afternoon to George Washington Hospital, where he went into intensive care and remained there for over a week.  And I became the acting attorney general.

And over the next week -- particularly the following week, on Tuesday -- we communicated to the relevant parties at the White House and elsewhere our decision that as acting attorney general I would not certify the program as to its legality and explained our reasoning in detail, which I will not go into here.  Nor am I confirming it's any particular program.

That was Tuesday that we communicated that.

COMEY: The next day was Wednesday, March the 10th, the night of the hospital incident.  And I was headed home at about 8 o'clock that evening, my security detail was driving me.  And I remember exactly where I was -- on Constitution Avenue -- and got a call from Attorney General Ashcroft's chief of staff telling me that he had gotten a call...

SCHUMER: What's his name?

COMEY: David Ayers.

That he had gotten a call from Mrs. Ashcroft from the hospital. She had banned all visitors and all phone calls.  So I hadn't seen him or talked to him because he was very ill.

And Mrs. Ashcroft reported that a call had come through, and that as a result of that call Mr. Card and Mr. Gonzales were on their way to the hospital to see Mr. Ashcroft.

SCHUMER: Do you have any idea who that call was from?

COMEY: I have some recollection that the call was from the president himself, but I don't know that for sure. It came from the White House.  And it came through and the call was taken in the hospital.

So I hung up the phone, immediately called my chief of staff, told him to get as many of my people as possible to the hospital immediately. I hung up, called Director Mueller and -- with whom I'd been discussing this particular matter and had been a great help to me over that week -- and told him what was happening.  He said, "I'll meet you at the hospital right now."

Told my security detail that I needed to get to George Washington Hospital immediately.  They turned on the emergency equipment and drove very quickly to the hospital.

I got out of the car and ran up -- literally ran up the stairs with my security detail.

SCHUMER: What was your concern?  You were in obviously a huge hurry.

COMEY: I was concerned that, given how ill I knew the attorney general was, that there might be an effort to ask him to overrule me when he was in no condition to do that.

SCHUMER: Right, OK.

SEN. PATRICK J. LEAHY HOLDS A HEARING ON THE U.S. ATTORNEY FIRINGS CQ Transcriptions"All
materials herein are protected by United States copyright law and may not be reproduced, distributed, tran

COMEY: I was worried about him, frankly.

And so I raced to the hospital room, entered. And Mrs. Ashcroft was standing by the hospital bed, Mr. Ashcroft was lying down in the bed, the room was darkened. And I immediately began speaking to him, trying to orient him as to time and place, and try to see if he could focus on what was happening, and it wasn't clear to me that he could. He seemed pretty bad off.

SCHUMER: At that point it was you, Mrs. Ashcroft and the attorney general and maybe medical personnel in the room. No other Justice Department or government officials.

COMEY: Just the three of us at that point.

I tried to see if I could help him get oriented. As I said, it wasn't clear that I had succeeded.

I went out in the hallway. Spoke to Director Mueller by phone. He was on his way. I handed the phone to the head of the security detail and Director Mueller instructed the FBI agents present not to allow me to be removed from the room under any circumstances. And I went back in the room.

I was shortly joined by the head of the Office of Legal Counsel assistant attorney general, Jack Goldsmith, and a senior staffer of mine who had worked on this matter, an associate deputy attorney general.

So the three of us Justice Department people went in the room. I sat down...

SCHUMER: Just give us the names of the two other people.

COMEY: Jack Goldsmith, who was the assistant attorney general, and Patrick Philbin, who was associate deputy attorney general.

I sat down in an armchair by the head of the attorney general's bed. The two other Justice Department people stood behind me. And Mrs. Ashcroft stood by the bed holding her husband's arm. And we waited.

And it was only a matter of minutes that the door opened and in walked Mr. Gonzales, carrying an envelope, and Mr. Card. They came over and stood by the bed. They greeted the attorney general very briefly. And then Mr. Gonzales began to discuss why they were there -- to seek his approval for a matter, and explained what the matter was -- which I will not do.

And Attorney General Ashcroft then stunned me. He lifted his head off the pillow and in very strong terms expressed his view of the matter, rich in both substance and fact, which stunned me -- drawn from the hour-long meeting we'd had a week earlier -- and in very strong terms expressed himself, and then laid his head back down on the pillow, seemed spent, and said to them, "But that doesn't matter, because I'm not the attorney general."

SCHUMER: But he expressed his reluctance or he would not sign the statement that they -- give the authorization that they had asked, is that right?

COMEY: Yes.

And as he laid back down, he said, "But that doesn't matter, because I'm not the attorney general. There is the attorney general," and he pointed to me, and I was just to his left.

The two men did not acknowledge me. They turned and walked from the room. And within just a few moments after that, Director Mueller arrived. I told him quickly what had happened. He had a brief -- a memorable brief exchange with the attorney general and then we went outside in the hallway.

SEN. PATRICK J. LEAHY HOLDS A HEARING ON THE U.S. ATTORNEY FIRINGS CQ Transcriptions"All materials herein are protected by United States copyright law and may not be reproduced, distributed, tran

SCHUMER: OK.

Now, just a few more points on that meeting.

First, am I correct that it was Mr. Gonzales who did just about all of the talking, Mr. Card said very little?

COMEY: Yes, sir.

SCHUMER: OK.

And they made it clear that there was in this envelope an authorization that they hoped Mr. Ashcroft -- Attorney General Ashcroft would sign.

COMEY: In substance. I don't know exactly the words, but it was clear that's what the envelope was.

SCHUMER: And the attorney general was -- what was his condition? I mean, he had -- as I understand it, he had pancreatitis. He was very, very ill; in critical condition, in fact.

COMEY: He was very ill. I don't know how the doctors graded his condition. This was -- this would have been his sixth day in intensive care. And as I said, I was shocked when I walked in the room and very concerned as I tried to get him to focus.

SCHUMER: Right.

OK. Let's continue.

What happened after Mr. Gonzales and Card left? Did you have any contact with them in the next little while?

COMEY: While I was talking to Director Mueller, an agent came up to us and said that I had an urgent call in the command center, which was right next door. They had Attorney General Ashcroft in a hallway by himself and there was an empty room next door that was the command center.

And he said it was Mr. Card wanting to speak to me.

COMEY: I took the call. And Mr. Card was very upset and demanded that I come to the White House immediately.

I responded that, after the conduct I had just witnessed, I would not meet with him without a witness present.

He replied, "What conduct? We were just there to wish him well."

And I said again, "After what I just witnessed, I will not meet with you without a witness. And I intend that witness to be the solicitor general of the United States."

SCHUMER: That would be Mr. Olson.

COMEY: Yes, sir. Ted Olson.

"Until I can connect with Mr. Olson, I'm not going to meet with you."

He asked whether I was refusing to come to the White House. I said, "No, sir, I'm not. I'll be there. I need to go back to the Department of Justice first."

And then I reached out through the command center for Mr. Olson, who was at a dinner party. And Mr. Olson and

SEN. PATRICK J. LEAHY HOLDS A HEARING ON THE U.S. ATTORNEY FIRINGS CQ Transcriptions"All
materials herein are protected by United States copyright law and may not be reproduced, distributed, tran

the other leadership of the Department of Justice immediately went to the department, where we sat down together in a
conference room and talked about what we were going to do.

And about 11 o'clock that night -- this evening had started at about 8 o'clock, when I was on my way home.  At 11
o'clock that night, Mr. Olson and I went to the White House together.

SCHUMER: Just before you get there, you told Mr. Card that you were very troubled by the conduct from the
White House room (ph), and that's why you wanted Mr. Olson to accompany you.

Without giving any of the details -- which we totally respect in terms of substance -- just tell me why.  What did
you tell him that so upset you?  Or if you didn't tell him just tell us.

COMEY: I was very upset.  I was angry.  I thought I just witnessed an effort to take advantage of a very sick man,
who did not have the powers of the attorney general because they had been transferred to me.

I thought he had conducted himself, and I said to the attorney general, in a way that demonstrated a strength I had
never seen before.  But still I thought it was improper.

And it was for that reason that I thought there ought to be somebody with me if I'm going to meet with Mr. Card.

SCHUMER: Can you tell us a little bit about the discussion at the Justice Department when all of you convened?  I
guess it was that night.

COMEY: I don't think it's appropriate for me to go into the substance of it.  We discussed what to do.  I recall the
associate attorney general being there, the solicitor general, the assistant attorney general in charge of the Office of
Legal Counsel, senior staff from the attorney general, senior staff of mine.  And we just -- I don't want to reveal the
substances of those...

SCHUMER: I don't want you to reveal the substance.

They all thought what you did -- what you were doing was the right thing, I presume.

COMEY: I presume.  I didn't ask people.  But I felt like we were a team, we all understood what was going on, and
we were trying to do what was best for the country and the Department of Justice.  But it was a very hard night.

SCHUMER: OK.

And then did you meet with Mr. Card?

COMEY: I did.  I went with Mr. Olson driving -- my security detail drove us to the White House.  We went into the
West Wing.  Mr. Card would not allow Mr. Olson to enter his office.  He asked Mr. Olson to please sit outside in his
sitting area.  I relented and went in to meet with Mr. Card alone.  We met, had a discussion, which was much more --
much calmer than the discussion on the telephone.

After -- I don't remember how long, 10 or 15 minutes -- Mr. Gonzales arrived and brought Mr. Olson into the room.
And the four of us had a discussion.

SCHUMER: OK.

And was Mr. -- were you and Mr. Card still in a state of anger at one another at that meeting, or is it a little calmer,
and why?

COMEY: Not that we showed.

SEN. PATRICK J. LEAHY HOLDS A HEARING ON THE U.S. ATTORNEY FIRINGS CQ Transcriptions"All materials herein are protected by United States copyright law and may not be reproduced, distributed, tran

SCHUMER: Right.

COMEY: It was much more civil than our phone conversation, much calmer.

SCHUMER: Why?  Why do you think?

COMEY: I don't know.  I mean, I had calmed down a little bit. I'd had a chance to talk to the people I respected. Ted Olson I respect enormously.

SCHUMER: Right.  OK.

Was there any discussion of resignations with Mr. Card?

COMEY: Mr. Card was concerned that he had heard reports that there were to be a large number of resignations at the Department of Justice.

SCHUMER: OK.  OK.

And the conversations, the issue, whatever it was, was not resolved.

COMEY: Correct.  We communicated about it.  I communicated again the Department of Justice's view on the matter.  And that was it.

SCHUMER: Right.

And you stated that the next day, Thursday, was the deadline for reauthorization of the program, is that right?

COMEY: Yes, sir.

SCHUMER: OK.

Can you tell us what happened the next day?

COMEY: The program was reauthorized without us and without a signature from the Department of Justice attesting as to its legality. And I prepared a letter of resignation, intending to resign the next day, Friday, March the 12th.

SCHUMER: OK.

And that was the day, as I understand it, of the Madrid train bombings.

COMEY: Thursday, March 11th, was the morning of the Madrid train bombings.

SCHUMER: And so, obviously, people were very concerned with all of that.

COMEY: Yes.  It was a very busy day in the counterterrorism aspect.

SCHUMER: Yet, even in light of that, you still felt so strongly that you drafted a letter of resignation.

COMEY: Yes.

SCHUMER: OK.

And why did you decide to resign?

SEN. PATRICK J. LEAHY HOLDS A HEARING ON THE U.S. ATTORNEY FIRINGS CQ Transcriptions"All materials herein are protected by United States copyright law and may not be reproduced, distributed, tran

COMEY: I just believed...

SCHUMER: Or to offer your resignation, is a better way to put it?

COMEY: I believed that I couldn't -- I couldn't stay, if the administration was going to engage in conduct that the Department of Justice had said had no legal basis.  I just simply couldn't stay.

SCHUMER: Right.  OK.

Now, let me just ask you this.  And this obviously is all troubling.

As I understand it, you believed that others were also prepared to resign, not just you, is that correct?

COMEY: Yes.

SCHUMER: OK.

Was one of those Director Mueller?

COMEY: I believe so. You'd have to ask him, but I believe so.

SCHUMER: You had conversations with him about it.

COMEY: Yes.

SCHUMER: OK.

How about the associate attorney general, Robert McCallum?

COMEY: I don't know.  We didn't discuss it.

SCHUMER: How about your chief of staff?

COMEY: Yes.  He was certainly going to go when I went.

SCHUMER: Right.

How about Mr. Ashcroft's chief of staff?

COMEY: My understanding was that he would go as well.

SCHUMER: And how...

COMEY: I should say...

SCHUMER: Please.

COMEY: ... to make sure I'm accurate, I...

SCHUMER: This is your surmise, not...

COMEY: Yes.

I ended up agreeing -- Mr. Ashcroft's chief of staff asked me something that meant a great deal to him, and that is that I not resign until Mr. Ashcroft was well enough to resign with me.  He was very concerned that Mr. Ashcroft was

SEN. PATRICK J. LEAHY HOLDS A HEARING ON THE U.S. ATTORNEY FIRINGS CQ Transcriptions"All materials herein are protected by United States copyright law and may not be reproduced, distributed, tran

not well enough to understand fully what was going on.  And he begged me to wait until -- this was Thursday that I was making this decision -- to wait til Monday to give him the weekend to get oriented enough so that I wouldn't leave him behind, was his concern.

SCHUMER: And it was his view that Mr. Ashcroft was likely to resign as well?

COMEY: Yes.

SCHUMER: So what did you do when you heard that?

COMEY: I agreed to wait.  I said that what I would do is -- that Friday would be last day.  And Monday morning I would resign.

SCHUMER: OK.

Anything else of significance relevant to this line of questioning occur on Thursday the 11th, that you can recall?

COMEY: No, not that I recall.

SCHUMER: Thank you.

Now, let's go to the next day, which was March 12.  Can you tell us what happened then?

COMEY: I went to the Oval Office -- as I did every morning as acting attorney general -- with Director Mueller to brief the president and the vice president on what was going on on Justice Department's counterterrorism work.

We had the briefing.  And as I was leaving, the president asked to speak to me, took me in his study and we had a one-on-one meeting for about 15 minutes -- again, which I will not go into the substance of.  It was a very full exchange.  And at the end of that meeting, at my urging, he met with Director Mueller, who was waiting for me downstairs.

He met with Director Mueller again privately, just the two of them.  And then after those two sessions, we had his direction to do the right thing, to do what we...

SCHUMER: Had the president's direction to do the right thing?

COMEY: Right.

We had the president's direction to do what we believed, what the Justice Department believed was necessary to put this matter on a footing where we could certify to its legality.

And so we then set out to do that.  And we did that.

SCHUMER: OK.

So let me just (inaudible) -- this is an amazing story, has an amazing pattern of fact that you recall.

SPECTER: Mr. Chairman, could you give us some idea when your first round will conclude?

SCHUMER: As soon as I ask a few questions here.  Fairly soon.

(OFF-MIKE)

SCHUMER: Yes.

SEN. PATRICK J. LEAHY HOLDS A HEARING ON THE U.S. ATTORNEY FIRINGS CQ Transcriptions"All materials herein are protected by United States copyright law and may not be reproduced, distributed, tran

And, Senator Specter, you will get the same amount of time.

SCHUMER: I thought with Mr. Comey's telling what happened...

(CROSSTALK)

SPECTER: Just may the record show that you're now 16 minutes and 35 seconds over the five minutes and...

SCHUMER: I think the record will show it.

SPECTER: Well, it does now.

(LAUGHTER)

SCHUMER: OK, thank you.

And I think most people would think that those 16:35 minutes were worth hearing.

SPECTER: Well, Mr. Chairman, we do have such a thing as a second round, and there are a lot of senators waiting...

SCHUMER: Yes, OK.

Let me ask you these few questions...

SPECTER: ... including a Republican.

SCHUMER: I'm glad you're here, Senator Specter.  I know you're concerned with the issue.

SPECTER: Lonely, but here.

(LAUGHTER)

SCHUMER: Let me ask you this: So in sum, it was your belief that Mr. Gonzales and Mr. Card were trying to take advantage of an ill and maybe disoriented man to try and get him to do something that many, at least in the Justice Department, thought was against the law? Was that a correct summation?

COMEY: I was concerned that this was an effort to do an end-run around the acting attorney general and to get a very sick man to approve something that the Department of Justice had already concluded -- the department as a whole -- was unable to be certified as to its legality.  And that was my concern.

SCHUMER: OK.

And you also believe -- and you had later conversations with Attorney General Ashcroft when he recuperated, and he backed your view?

COMEY: Yes, sir.

SCHUMER: Did you ever ask him explicitly if he would have resigned had it come to that?

COMEY: No.

SCHUMER: OK.

But he backed your view over that what was being done, or what was attempting to being done, going around what

SEN. PATRICK J. LEAHY HOLDS A HEARING ON THE U.S. ATTORNEY FIRINGS CQ Transcriptions"All
materials herein are protected by United States copyright law and may not be reproduced, distributed, tran

you had recommended, was wrong, against the law?

COMEY: Yes.

And I already knew his view from the hour we had spent together going over it in great detail a week before the
hospital incident.

SCHUMER: Yes.

And the FBI director, Mueller, backed your view over that of Mr. Gonzales as well -- is that right? -- in terms of
whether the program could continue to be implemented the way Counsel Gonzales wanted it to be.

COMEY: The only reason I hesitate is it was never Director Mueller's job or position to be drawing a legal
conclusion about the program; that he was very supportive to me personally.  He's one of the finest people I've ever met
and was a great help to me when I felt a tremendous amount of pressure and felt a bit alone at the Department of Justice.

But it was not his role to opine on the legality.

SCHUMER: How about Jack Goldsmith, the head of the Office of Legal Counsel?  Did he opine on the legality?

COMEY: Yes.  He had done a substantial amount of work on that issue.  And it was largely OLC, the Office of
Legal Counsel's work, that I was relying upon in drawing my -- in making my decision.

SCHUMER: OK.  Just two other questions.

Have you ever had the opportunity to recall these events on the record in any other forum?

COMEY: No.

SCHUMER: OK.  And...

COMEY: I should...

SCHUMER: Go ahead.

COMEY: I was interviewed by the FBI and discussed these events in connection with a leak investigation the FBI
was conducting.

SCHUMER: And you gave them these details then.

COMEY: Yes.

SCHUMER: Thank you.

COMEY: But not -- by forum I've never testified about it.

SCHUMER: And after you stood your ground in March of 2004, did you suffer any recriminations or other
problems at the department?

COMEY: I didn't.  Not that I'm aware of.

SCHUMER: OK.

Well, let me just say this, and then I'll call on Senator Specter who can have as much time as he thinks is

SEN. PATRICK J. LEAHY HOLDS A HEARING ON THE U.S. ATTORNEY FIRINGS CQ Transcriptions"All materials herein are protected by United States copyright law and may not be reproduced, distributed, tran

appropriate.

The story is a shocking one.  It makes you almost gulp.

And I just want to say, speaking for myself, I appreciate your integrity and fidelity to rule of law.  And I also appreciate Attorney General Ashcroft's fidelity to the rule of law as well, as well as the men and women who worked with you and stuck by you in this.

When we have a situation where the laws of this country -- the rules of law of this country are not respected because somebody thinks there's a higher goal, we run askew of the very purpose of what democracy and rule of law are about.

SCHUMER: And this -- again, this story makes me gulp.

Senator Specter?

SPECTER: May the record now show that we're 21 minutes and 22 seconds beyond the five-minute allocation.

And I raise it not to in any way suggest that the questioning hasn't been very important, but only to suggest that we have a practice for having a five-minute round.  And it is exceeded on some occasions.  I've only been here 27 years; I can't remember it being exceeded by about 23 minutes.

And we do have second rounds.  And we do have eight -- seven Democrats here.  It is now 9:48 -- 10:48.  And at the start of this hearing I asked my colleagues among the Republicans to join me here.

I repeat that request now, since it's televised -- internally, at least -- that my colleagues should know that there are seven Democrats here who will all have turns asking questions.  And it would be appropriate to have a little balance here, if some Republicans would show up to participate in this hearing.  It would be helpful if we had some balance, if some other Republicans would show up to participate in this hearing.

Mr. Comey, I join Senator Schumer in commending you for what you did here.  The terrorist surveillance program has been the subject of quite a number of hearings in this committee: strenuous efforts to bring the issue before the Foreign Intelligence Surveillance Court, efforts at changing legislation; some of it is now pending, co- sponsored by Senator Feinstein and myself.  The matter is wending its way through the federal courts, and it's the 6th Circuit now.

So this is a very important, substantive matter.

SPECTER: And as the acting attorney general, you were doing exactly what you should do in standing up for your authority and to stand by your guns and to do what you thought was right.

It has some characteristics of the Saturday Night Massacre, when the other officials stood up and they had to be fired in order to find someone who would -- deputy attorney general and others would not fire the special prosecutor. So that was commendable.

When you finally got to the place where the buck doesn't stop, when you got to the president -- as I understand your testimony -- the president told you to do what you thought was right.  Is that correct?

COMEY: Yes, sir.

SPECTER: So the president backed you up.  And it was necessary to make changes in the terrorist surveillance program to get the requisite certification by the acting attorney general -- that is you?

COMEY: And I may be being overly cautious, but I'm not comfortable confirming what program it was that this

SEN. PATRICK J. LEAHY HOLDS A HEARING ON THE U.S. ATTORNEY FIRINGS CQ Transcriptions"All materials herein are protected by United States copyright law and may not be reproduced, distributed, tran

related to.

And I should be clear.  The direction -- as I said, I met with the president first, the Director Mueller did.

COMEY: And it was Director Mueller who carried to me the president's direction to do what the Department of Justice thinks is right to get this where the department believes it ought to be.  And we acted on that direction.

SPECTER: Director Mueller told you to -- the president said to do what you thought was right?

COMEY: Correct.

SPECTER: Well, how about what the president himself told you?

COMEY: I don't want to get into what -- the reason I hesitate, Senator Specter, is the right thing was done here, in part -- in large part because the president let somebody like me and Bob Mueller meet with him alone.

And if I talk about that meeting, I worry that the next president who encounters this is not going to let the next me get close to them to talk about something this important.

So I'm -- I want to be very careful that I don't talk about what the president and I talked about.

I met with the president.  We had a full and frank discussion, very informed.  He was very focused.

Then Director Mueller met with the president alone.  I wasn't there.

Director Mueller carried to me the president's direction that we do what the Department of Justice wanted done to put this on a sound legal footing.

SPECTER: So you met first with the president alone for 15 minutes?

COMEY: Yes, sir.

SPECTER: And then Director Mueller met separately with the president for 15 minutes?

COMEY: I don't remember exactly how long it was.  It was about the same length as my meeting.  I went down and waited for him, as he...

SPECTER: And then Director Mueller, as you've testified, said to you, the president told Director Mueller to tell you to do what the Department of Justice thought was right?

COMEY: Correct.

SPECTER: Well -- but you won't say whether the president told you to do what the Department of Justice said was right?

COMEY: Yes, I...

SPECTER: You're not slicing hair.  There's no hair there.

COMEY: You're a good examiner.

And that...

SPECTER: Well, thank you.

SEN. PATRICK J. LEAHY HOLDS A HEARING ON THE U.S. ATTORNEY FIRINGS CQ Transcriptions"All materials herein are protected by United States copyright law and may not be reproduced, distributed, tran

COMEY: Yes.  I -- the president and I -- I don't think the conversation was finished.  We discussed the matter in some detail.  And then I urged him to talk to Bob Mueller about it.

And I don't know the content of Director Mueller's communication with him, except that Director Mueller -- the president didn't give me that -- I can answer that question.

The president didn't give me that direction at the end of our 15 minutes.

SPECTER: He did not?

COMEY: He did not.  Instead, he said, "I'll talk to Director Mueller," as I had suggested.

Director Mueller came and met with him, then Director Mueller came to me and said that, "The president told me that the Department of Justice should get this where it wants to be, to do what the department thinks is right."

And I took that mandate and set about to do that, and accomplished that.

SPECTER: I thought you testified, in response to Senator Schumer's questions, that after meeting with the president for 15 minutes, he told you to do what you thought was right.

COMEY: If I did, I misspoke, because that direction came from the president to Director Mueller to me.

SPECTER: Well, when you had the discussions with Chief of Staff Card, what did he say to you by way of trying to pressure you, if, in fact, he did try to pressure you, to give the requisite certification?

COMEY: Again, I'm reluctant to talk about the substance of those kind of deliberative discussions.  We discussed...

SPECTER: And I'm not asking about the substance, carefully not. I'm going to, but not yet.

What did he say which constituted what you thought was pressure?

COMEY: I don't know that he tried to pressure me, other than to engage me on the merits and to make clear his strong disagreement with my conclusion.

SPECTER: So then Mr. Card ultimately left it up to you to decide whether to give the certification or not?

COMEY: I don't know that he left it up to me.  I had already made a decision and communicated it on that Tuesday, that I was not going to.  And it didn't change in the course of my discussions with Mr. Card.

SPECTER: Did not change?

COMEY: Did not change.

SPECTER: Well, he didn't threaten to fire you, did he?  I'm going to have to lead the witness now, Mr. Comey.

COMEY: Right.

SPECTER: I'm -- I haven't led you up until now.  And now I'm going to have to lead you.

COMEY: That's fine.

SPECTER: He didn't threaten to fire you?

COMEY: No, he didn't.

SEN. PATRICK J. LEAHY HOLDS A HEARING ON THE U.S. ATTORNEY FIRINGS CQ Transcriptions"All materials herein are protected by United States copyright law and may not be reproduced, distributed, tran

And Mr. Card, as I said, was very civil to me in our face-to-face meeting. The only time...

SPECTER: Well, you can suggest being fired and be civil about it.

COMEY: Right.

Either civilly or uncivilly, he never suggested that to me.

SPECTER: Attorney General Gonzales could be fired in a civil way. No incivility in suggesting you're going to be replaced as acting attorney general.

Well, all right then. That substance -- I don't want to question you as long as Senator Schumer did, notwithstanding my rights here. But the long and short of it was, he didn't threaten you.

COMEY: No, sir. I didn't feel threatened. Nor did he say anything that I thought could reasonably be read...

SPECTER: And when you talked to White House Counsel Gonzales, did he try to pressure you to reverse your judgment?

COMEY: No.

He disagreed, again, on the merits of the decision. And we had engaged on that, had full discussions about that.

But he never tried to pressure me, other than to convince me that I was wrong.

SPECTER: Well, Mr. Comey, did you have discussions with anybody else in the administration who disagreed with your conclusions?

COMEY: Yes, sir.

SPECTER: Who else?

COMEY: Vice president.

SPECTER: Anybody else?

COMEY: Members of his staff.

SPECTER: Who on his staff?

COMEY: Mr. Addington disagreed with the conclusion. And I'm sure there were others who disagreed, but...

SPECTER: Well, I don't want to know who disagreed. I want to know who told you they disagreed.

COMEY: OK.

SPECTER: Addington?

COMEY: Mr. Addington. The vice president told me that he disagreed. I don't remember any other White House officials telling me they disagreed.

SPECTER: OK. So you've got Card, Gonzales, Vice President Cheney and Addington who told you they disagreed with you.

COMEY: Yes, sir.

SEN. PATRICK J. LEAHY HOLDS A HEARING ON THE U.S. ATTORNEY FIRINGS CQ Transcriptions"All materials herein are protected by United States copyright law and may not be reproduced, distributed, tran

SPECTER: Did the vice president threaten you?

COMEY: No, sir.

SPECTER: Did Addington threaten you?

COMEY: No, sir.

SPECTER: So all these people told you they disagreed with you?

Well, why in this context, when they say they disagreed with you and you're standing by your judgment, would you consider resigning? You were acting attorney general. They could fire you if they wanted to. The president could replace you. But why consider resigning?

You had faced up to Card and Gonzales and Vice President Cheney and Addington, had a difference of opinion. You were the acting attorney general, and that was that. Why consider resigning?

COMEY: Not because of the way I was treated but because I didn't believe that as the chief law enforcement officer in the country I could stay when they had gone ahead and done something that I had said I could find no legal basis for.

SPECTER: When they said you could find no legal basis for?

COMEY: I had reached a conclusion that I could not certify as...

SPECTER: Well, all right, so you could not certify it, so you did not certify it.

But why resign? You're standing up to those men. You're not going to certify it. You're the acting attorney general. That's that.

COMEY: Well, a key fact is that they went ahead and did it without -- the program was reauthorized without my signature and without the Department of Justice. And so I believed that I couldn't stay...

SPECTER: Was the program reauthorized without the requisite certification by the attorney general or acting attorney general?

COMEY: Yes.

SPECTER: So it went forward illegally.

COMEY: Well, that's a complicated question. It went forward without certification from the Department of Justice as to its legality.

SPECTER: But the certification by the Department of Justice as to legality was indispensable as a matter of law for the program to go forward, correct?

COMEY: I believed so.

SPECTER: Then it was going forward illegally.

COMEY: Well, the only reason I hesitate is that I'm no presidential scholar.

But if a determination was made by the head of the executive branch that some conduct was appropriate, that determination -- and lawful -- that determination was binding upon me, even though I was the acting attorney general,

SEN. PATRICK J. LEAHY HOLDS A HEARING ON THE U.S. ATTORNEY FIRINGS CQ Transcriptions"All
materials herein are protected by United States copyright law and may not be reproduced, distributed, tran

as I understand the law.

And so, I either had to go along with that or leave.  And I believed that I couldn't stay -- and I think others felt this way as well -- that given that something was going forward that we had said we could not certify as to its legality.

SPECTER: Well, I can understand why you would feel compelled to resign in that context, once there had been made a decision by the executive branch, presumably by the president or by the president, because he was personally involved in the conversations, that you would resign because something was going forward which was illegal.

The point that I'm trying to determine here is that it was going forward even though it was illegal.

COMEY: And I know I sound like I'm splitting hairs, but...

SPECTER: No, I don't think there's a hair there.

COMEY: Well, something was going forward without the Department of Justice's certification as to its legality.  It's a very complicated matter, and I'm not going to go into what the program was or what the dimensions of the program...

SPECTER: Well, you don't have to.

If the certification by the Department of Justice as to legality is required as a matter of law, and that is not done, and the program goes forward, it's illegal.  How can you -- how can you contest that, Mr. Comey?

COMEY: The reason I hesitate is I don't know that the Department of Justice's certification was required by statute -- in fact, it was not, as far as I know -- or by regulation, but that it was the practice in this particular program, when it was renewed, that the attorney general sign off as to its legality.

There was a signature line for that.  And that was the signature line on which was adopted for me, as the acting attorney general, and that I would not sign.

So it wasn't going forward in violation of any -- so far as I know -- statutory requirement that I sign off.  But it was going forward even though I had communicated, "I cannot approve this as to its legality."

And given that, I just -- I couldn't, in good conscience, stay.

SPECTER: Well, Mr. Comey, on a matter of this importance, didn't you feel it necessary to find out if there was a statute which required your certification or a regulation which required your certification or something more than just a custom?

COMEY: Yes, Senator.  And I...

SPECTER: Did you make that determination?

COMEY: Yes, and I may have understated my knowledge.  I'm quite certain that there wasn't a statute or regulation that required it, but that it was the way in which this matter had operated since the beginning.

I don't -- I think the administration had sought the Department of Justice, the attorney general's certification as to form and legality, but that I didn't know, and still don't know, the source for that required in statute or regulation.

SPECTER: OK.  Then it wasn't illegal.

COMEY: That's why I hesitated when you used the word "illegal."

SPECTER: Well, well, OK.

SEN. PATRICK J. LEAHY HOLDS A HEARING ON THE U.S. ATTORNEY FIRINGS CQ Transcriptions"All materials herein are protected by United States copyright law and may not be reproduced, distributed, tran

Now I want your legal judgment.  You are not testifying that it was illegal.  Now, as you've explained that there's no statute or regulation, but only a matter of custom, the conclusion is that even though it violated custom, it is not illegal.

It's not illegal to violate custom, is it?

COMEY: Not so far as I'm aware.

SPECTER: OK.  So what the administration, executive branch of the president, did was not illegal.

COMEY: I'm not saying -- again, that's why I kept avoiding using that term.  I had not reached a conclusion that it was.

The only conclusion I reached is that I could not, after a whole lot of hard work, find an adequate legal basis for the program.

SPECTER: OK.

Well, now I understand why you didn't say it was illegal.  What I don't understand is why you now won't say it was legal.

COMEY: Well, I suppose there's an argument -- as I said, I'm not a presidential scholar -- that because the head of the executive branch determined that it was appropriate to do, that that meant for purposes of those in the executive branch it was legal.

I disagreed with that conclusion.  Our legal analysis was that we couldn't find an adequate legal basis for aspects of this matter.  And for that reason, I couldn't certify it to its legality.

SPECTER: OK.

I will not ask you -- I have a rule never to ask the same question more than four times...

(LAUGHTER)

... so I will not ask you again whether necessarily from your testimony the conclusion is that what the president did was legal -- not illegal.

Let me move on.  I only have 35 minutes left.

(LAUGHTER)

How long did you continue to serve as deputy attorney general after this incident?

COMEY: Until August of 2005, so almost a year and a half, 16 months.

SPECTER: And during the course of that continued service, you got along OK with the president and the vice president and Card and Addington and all the rest of those fellows in the White House?

COMEY: I think so.  I mean, we didn't have much contact with them other than professional matters.  But I think so.

SPECTER: But they weren't out to get you because you stood out to them?

COMEY: I hope not.  I don't have any reason to believe...

SEN. PATRICK J. LEAHY HOLDS A HEARING ON THE U.S. ATTORNEY FIRINGS CQ Transcriptions"All
materials herein are protected by United States copyright law and may not be reproduced, distributed, tran

SPECTER: Well, never mind hoping.  They didn't do anything to be out to get you or to make your life
uncomfortable, or make it difficult for you to perform your duties as deputy attorney general?

COMEY: No.

SPECTER: There was some speculation that -- well, I'll eliminate the word "speculation."

Did you have any sense that you were not considered to be permanent attorney general on Mr. Ashcroft's departure
because of your having stood up to the White House on this issue?

COMEY: No.

And I don't have any reason to believe I was ever considered.  But I certainly have no reason to believe that there
was any connection between consideration of who would be the next attorney general and this matter.

SPECTER: Well, on this issue, Mr. Comey, I commend you again. You did exactly the right thing.

SPECTER: And I think the president did the right thing.  In effect, he overruled Card and he overruled Vice
President Cheney and he overruled Addington and he overruled Gonzales.  And when it came to him -- came to the
president's desk where the buck stops he said to Mueller to tell you, "Follow your conscience.  Do the right thing." And
that was that.

Mr. Comey, it's my hope that we will have a closed session with you to pursue the substance of this matter further.
Because your standing up to them is very important, but it's also very important what you found on the legal issue on
this unnamed subject, which I infer was the terrorist surveillance program.  And you're not going to comment about it.  I
think you could.

I think you could even tell us what the legalisms were.  Doesn't involve a matter of your advice or what the
president told you, et cetera.

But I'm going to discuss it with Senator Leahy later and see about pursuing that question to try to find out about it.

Now, Mr. Comey, on to the subject of the hearing.  You have been reported as commenting on a number of U.S.
attorneys who were asked to resign.  You thought they were doing a good job.  One was U.S. Attorney David (sic)
Bogden of Nevada.

What judgment did you -- do you have as to his capabilities as U.S. attorney?

COMEY: Dan Bogden was an excellent U.S. attorney.  He was a career guy who had become U.S. attorney, and I
thought very highly of him.

SPECTER: Do you have any insights as to why he was asked to resign?

COMEY: I don't.  I've read things in the paper, but I certainly have no personal knowledge of why he was asked to
resign.  When I left in August of 2005, I couldn't have thought of a reason why he should be asked to resign.

SPECTER: And as to John McKay, do you have a judgment as to the quality, the competency of his performance?

COMEY: Yes.  Again, it was excellent in my experience.  I had worked with him, as with the others, as a peer
when I was U.S. attorney in Manhattan and then as the deputy attorney general.  So I had a very positive sense of John
McKay.

SPECTER: And as to Paul Charlton, Arizona U.S. attorney, what is your view as to his competence?

SEN. PATRICK J. LEAHY HOLDS A HEARING ON THE U.S. ATTORNEY FIRINGS CQ Transcriptions"All materials herein are protected by United States copyright law and may not be reproduced, distributed, tran

COMEY: The same.  I don't want to make it sound like I love everybody, but I did like him a great deal.

(LAUGHTER)

He was very strong.

SPECTER: Well, since you don't want to sound like you love everybody, anybody you didn't love who you thought should have been replaced?

(LAUGHTER)

LEAHY: Outside of members of the committee.

COMEY: There was one U.S. attorney...

(CROSSTALK)

SPECTER: I'd like to ask you about that now that Senator Leahy has opened the door.  Which members of the committee don't you love?

(LAUGHTER)

COMEY: You're asking Senator Leahy, I hope.

SPECTER: Start with the chairman.

(LAUGHTER)

LEAHY: Careful.  We may be bringing (ph) the clock back again.

SPECTER: What you think of Charlton?

COMEY: Very strong, very strong U.S. attorney.

SPECTER: And David Iglesias, U.S. attorney for New Mexico?

COMEY: Same thing.  I had dealt with him quite a bit, both as a peer and as his supervisor, and had a high opinion of him.  I thought he did a very good job.

SPECTER: What did you make of Kyle Sampson's testimony that he had recommended calling for the resignation of Peter Fitzgerald?

COMEY: Of Patrick Fitzgerald.

SPECTER: Patrick Fitzgerald.  Peter Fitzgerald was the senator.

(UNKNOWN): No relation.

SPECTER: No relation.

COMEY: I only know about that what I read in the newspaper.  I was surprised by it, would be a fair description.

SPECTER: And what did you think of the competency of Kyle Sampson?

COMEY: I thought Kyle was very smart.  My dealings with him had always been pleasant.  He seemed to work

SEN. PATRICK J. LEAHY HOLDS A HEARING ON THE U.S. ATTORNEY FIRINGS CQ Transcriptions"All materials herein are protected by United States copyright law and may not be reproduced, distributed, tran

very, very hard.

SPECTER: What did you think of the competency or smarts of Kyle Sampson after you heard he wanted to ask for the resignation of Patrick Fitzgerald?

COMEY: Well, I don't think that was an exercise of good judgment, if it's something he really meant.  It...

SPECTER: Can you give us an illustration of an exercise in good judgment by Kyle Sampson?

I withdraw that question.

Can you give us an example of an exercise of good judgment by Alberto Gonzales?

Let the record show a very long pause.

COMEY: It's hard -- I mean, I'm sure there are examples.  I'll think of some.

I mean, it's hard when you look back.  We worked together for eight months.

SPECTER: That's a famous statement of President Eisenhower about Vice President Nixon: "Say something good."  "Give me two weeks."

COMEY: Right.

I -- in my experience with Attorney General Gonzales, he was smart and engaged.  And I had no reason to question his judgment during our time together at the Department of Justice.

We had a good working relationship.  He seemed to get issues.  I would make a recommendation to him.  He would discuss it with me and make a decision.

As I sit here today, I'll probably five minutes from now think of an example.  But I did not have reason to question his judgment as attorney general.

SPECTER: Are you sufficiently familiar with what happened in the issue of the U.S. attorneys resignations to give an evaluation of Attorney General Gonzales' statement that he was no involved in discussions or deliberations, in the context of being contradicted by three of his top deputies and the documentary evidence on the e-mails?

COMEY: I am probably more versed in this than the average person, because I've read what's in the newspaper and looked at some of the documents online.

But I gather he's corrected that statement that he originally made about not being involved in deliberations or discussions.

But I'm not -- I don't know the facts as well as members of this committee, and haven't studied it.  So I don't think I have a...

SPECTER: No, I don't think he has corrected that.  I think he continues to say that he was involved in a -- his words are "limited" -- quote, "limited," unquote.

SPECTER: That's what he has said.

I think that -- and I've said this to Mr. Gonzales privately and publicly -- that if he would tell us what the reasons were for asking these U.S. attorneys to resign, that it would shed considerable light on what's going on here, on how the program got started, and what the aims of the program were, and what his involvement was.

SEN. PATRICK J. LEAHY HOLDS A HEARING ON THE U.S. ATTORNEY FIRINGS CQ Transcriptions"All materials herein are protected by United States copyright law and may not be reproduced, distributed, tran

That can -- that can all be -- this proceeding is still in midstream.  He can recant all of what he's said and come forward.

Well, Mr. Chairman, I'm going to yield the balance of my minutes. Thank you.

SCHUMER: Thank you, Mr. Chairman.  And you went about, I think, a minute more than I did.

SPECTER: Oh, no I didn't.  I'm at 21:35.

SCHUMER: OK.  I just...

LEAHY: So we can get on to others, I'm also -- as a member of this committee, let me just go back to the time.  I'm not going to use a great deal of time so that...

SPECTER: Senator Schumer and I didn't either, Senator Leahy.

LEAHY: ... so that -- God love you -- so that others here can.

Just one question comes to mind.

Senator Specter spoke to you about legal or illegal.  Did it comply with the FISA law?

COMEY: If I -- I've tried, Senator, not to confirm that I'm talking about any particular program.  I just don't feel comfortable in an open forum...

LEAHY: OK.

Then on that -- with that answer, I think I agree with -- if I could have Senator Specter's attention just for a moment. With that answer -- and I can understand.  I'm well aware of the program, well aware of what happened.  And I can understand your reluctance -- very appropriately, your reluctance to answer that specifically.

We will have a closed-door hearing on this.  Senator Specter and I are about to have a briefing on aspects of this.

LEAHY: I am very, very troubled by what the Department of Justice is going today -- not on your watch, Mr. Comey, but they're doing today.  We have several members of the Intelligence Committee on this committee on both sides.  And they will also be looking at it.

Mr. Comey, I have a lot of respect for you.  I have less and less respect for the way the Department of Justice is being handled today. This is a dysfunctional Department of Justice. It is being run like a political arm of the White House.  That is highly inappropriate.

I've been here for 32 years.  I've seen good attorneys general and poor attorneys general.  I have always thought that there would at least be the understanding that the professionals in the Department of Justice have to be allowed to do a professional job.  And when I see them being overridden time and time again.

Now, I realize there are some things you cannot go into in this session.  But you know and I know that there is the overriding of the professional judgment of good men and women in that department to do things that are not proper. And I think this is wrong.

One of my first experiences in the Department of Justice was as a young law clerk working while a student at Georgetown here meeting with the then-attorney general.  The then-attorney general was a close to the president as anyone could.  He was his brother. This was Attorney General Robert Kennedy.

But I remember what he said to several of the students who were there, because he was hoping we were a cadre,

SEN. PATRICK J. LEAHY HOLDS A HEARING ON THE U.S. ATTORNEY FIRINGS CQ Transcriptions"All materials herein are protected by United States copyright law and may not be reproduced, distributed, tran

because of our grades and whatnot, he wanted to recruit for the Department of Justice. And he emphasized over and over again on significant matters -- civil rights, criminal, (inaudible) areas and whatnot -- that neither the White House nor his brother would be allowed to influence the professional judgment.

That always stuck in my mind.

LEAHY: And I've seen that happen over and over again. We saw it with Elliot Richardson and Archibald Cox. We saw it with you.

And I am very, very frustrated. I won't go into further questions, because the questions I do want to ask you will be in closed session.

But I hope -- I hope somebody will wake up at the White House at the terrible, terrible precedent they are starting and have started. And I hope whoever the next president is will make a solemn vow never, never, never to allow this politicization of the Department of Justice. Because it hurts every one of us.

It's not the secretary of justice. It's not a member of the president's staff that should be running that. It is the attorney general of the United States. And this attorney general is doing an abysmal job.

SCHUMER: Thank you, Mr. Chairman.

Senator Kohl?

Senator Feinstein was next. I apologize.

FEINSTEIN: Thank you very much, Mr. Chairman.

And thank you very much, Mr. Comey.

I read the transcript of your testimony before the House. And it's clear that you're a very straight shooter and very well respected. And I, for one, really appreciate your point of view.

If I can, I'd like to go back to the event in the hospital room for just a minute. You felt -- and you were presented with something that you had to sign to certify a certain program. That program was initially done outside of the existing law, which is the Foreign Intelligence Surveillance Act, which provides -- which says it's the exclusive authority for all electronic surveillance.

The president used his Article II powers. He said he used the authorization to use military force as the definitive basis for his action, to essentially move outside the law.

However, you were faced -- and the president said when this all came to light that he asked the program -- asked that the program be authorized every 45 days, or certified by the attorney general.

What did you actually have to sign to certify it? What were you confronted with?

COMEY: Senator, I want to be careful in this forum, again, that I'm not confirming the existence of any particular program or that this dispute...

FEINSTEIN: I'm not asking you to. I'm asking you, what piece of paper did you have to sign?

COMEY: It was a signature line on a presidential order.

FEINSTEIN: OK. All right.

SEN. PATRICK J. LEAHY HOLDS A HEARING ON THE U.S. ATTORNEY FIRINGS CQ Transcriptions"All
materials herein are protected by United States copyright law and may not be reproduced, distributed, tran

And you said that the program was later changed so that it could be signed.  But it went ahead at that time without your certification on it.

COMEY: Yes.

FEINSTEIN: And what was the elapsed period of time from that meeting, the denial of DOJ to certify the program and the time when it was essentially certified?

COMEY: It was reauthorized on Thursday, March the 11th, without the department's -- without my signature, without the department's approval.

And it was the next day -- so less than 24 hours later -- that we received the direction from the president to make it right.

And then we set about -- I don't remember exactly how long it was -- over the next few weeks making changes so that it accorded with our judgment about what could be certified as to legality.

And so it was really only that period from Thursday, when it was reauthorized, until I got the direction from the president the next day that it operated outside the Department of Justice's approval.

FEINSTEIN: For approximately two weeks?

COMEY: I don't remember exactly.  It was two or three weeks I think that it took us to get the analysis done and make the changes that needed to be made.

FEINSTEIN: And then who signed for DOJ?

COMEY: It was either the attorney general, Ashcroft, or myself who signed. I may have signed that first one after the hospital incident.

FEINSTEIN: OK.

And you then became satisfied that the program conformed with what, essentially?

COMEY: That it was operated consistently with the Office of Legal Counsel's judgment about what was lawful.  So we were in a position -- given OLC's opinion, the attorney general and I were in a position to certify the program as to its legality.

FEINSTEIN: Mr. Chairman, it would be very interesting if we could obtain those legal opinions.  Because the program we're talking about was originally done outside of law.  The executive order of the president was really the prevailing authority.

But even so, I'm a little puzzled because the program was changed.  And I'd be very interested in what the legal advise on that program was if that would be possible for us to request.

SCHUMER: I'm sure if the senator makes the request we can make it part of the record.

FEINSTEIN: Fine, I've made that request...

(CROSSTALK)

SCHUMER: I think to the Office of Legal Counsel, which had already stated its opinion on this particular issue.

(CROSSTALK)

SEN. PATRICK J. LEAHY HOLDS A HEARING ON THE U.S. ATTORNEY FIRINGS CQ Transcriptions"All materials herein are protected by United States copyright law and may not be reproduced, distributed, tran

FEINSTEIN: Thank you. Thank you.

If I can, I'd like to move on to the United States attorneys.

To the best of your knowledge, has there been any time in the history of our country when as many U.S. attorneys have been fired at one time?

COMEY: The only other incident I know of was during the change of administrations from Bush I to President Clinton's administration.

FEINSTEIN: Which is fairly typical...

(CROSSTALK)

COMEY: Right, it was a change out...

(CROSSTALK)

FEINSTEIN: With a change. But I'm talking during the term of a president has there been any time when a number of U.S. attorneys had been selected and summarily fired without cause?

COMEY: I'm not aware of a similar-size removal of U.S. attorneys.

FEINSTEIN: Thank you very much.

As you know, we've had the EARS reports. Are you familiar with those reports?

COMEY: Yes.

FEINSTEIN: And they have described the performance of U.S. attorneys -- and I gather there's a panel of people that go in and put these reports together. They have subsequently been -- we've been told that they're very, very perfunctory.

Are they, in fact, a document that's utilized within DOJ?

COMEY: Oh, yes.

(LAUGHTER)

And they're not perfunctory. They come -- big team of people.

When I was U.S. attorney in New York, I think 30 or more people came from all over the country -- experienced people, civil lawyers and prosecutors -- and they basically live with you in your office for a couple of weeks and go stem to stern, inspect the whole place. There's an out-briefing.

It's very much like an audit by a big accounting firm, except they audit not just your numbers, but your conduct of cases and your priorities. So it's from top to bottom, and then they issue a detailed report.

FEINSTEIN: Well, let me ask you this question: How then could they be fired for performance reasons if at least seven -- excuse me -- six out of the seven terminated on December 7th had excellent EARS reports?

COMEY: I don't know. I was not aware at the time I left, in August of 2005, of performance-related issues with most of these U.S. attorneys.

SEN. PATRICK J. LEAHY HOLDS A HEARING ON THE U.S. ATTORNEY FIRINGS CQ Transcriptions"All
materials herein are protected by United States copyright law and may not be reproduced, distributed, tran

FEINSTEIN: And you've said that.  You said that today.  You said that in your testimony before the House.  And I appreciate it.

Can you ever remember any discussion where an individual U.S. attorney's loyalty or political instincts were questioned?

COMEY: I don't remember ever discussing or having it discussed in my presence the loyalty or political instincts of a U.S. attorney, no.

FEINSTEIN: Now, there was apparently a list put together.

FEINSTEIN: And Mr. Sampson had indicated that he was the aggregator of the list.  He put the list together.

But everyone that we've asked in the higher levels of the department have said they did not put the names on the list.  Mr. Battle, Mr. Ellston, Mr. Sampson -- virtually everyone we have asked have denied placing a name on that list.

If that is in fact the case, where would you surmise the list would come from?

COMEY: I wouldn't know.  It came from someplace, but I don't know from where.

FEINSTEIN: I'd like to just clear the air with one thing.

You had two meetings with Carol Lam, I believe -- one about the Project Neighborhood program, the other about gun cases.  Were you satisfied with her responses to your questions?

COMEY: Yes.

I think I had one meeting that was about Project Safe Neighborhoods, which was the name given to our gun program.  And I think it was on the telephone.  I spoke to -- I think by telephone -- to each of the 10 U.S. attorneys whose districts on a per capita basis were at the bottom end of our gun prosecutions.

And I thought she understood.  And, again, I wasn't telling her to do cases for the sake of doing cases.  I was saying, "This is important.  I think this saves lives.  If there's a difference you can make that the local prosecutors are not making in your jurisdiction, look for an opportunity to make it."

And she said she got it.  And that was the end of it.

FEINSTEIN: Were any of the other 10 people with whom you communicated fired?

COMEY: No, not to my knowledge.

FEINSTEIN: So if someone had an excellent performance report, it's very difficult for me to figure out a reason other than dissatisfaction with a case they were either going to file or not file if the severance is not performance-related.

Would that be a fair assumption on my part?

COMEY: I suppose so.  Right.  If there's no reasons that are apparent -- performance-related reasons -- it's hard to understand why.

FEINSTEIN: Thank you very much, Mr. Comey.  Appreciate it.

Thank you.

SEN. PATRICK J. LEAHY HOLDS A HEARING ON THE U.S. ATTORNEY FIRINGS CQ Transcriptions"All materials herein are protected by United States copyright law and may not be reproduced, distributed, tran

SCHUMER: Senator Kohl?

KOHL: Thank you, Mr. Chairman.

Mr. Comey, you're a person of course who has been very close to law enforcement in our country for many years. And obviously, you're here today as a person who was the second-ranking person in the department from 2003 to 2005.

KOHL: And no question about your concern for the fair administration of justice in our country. And with the kind of experience you have, your opinions matter more than the opinions of most others. And I'm sure you've thought about this; would you give us your opinion?

Would our country be well-served if we could start fresh tomorrow with an attorney general who was not in any way as tainted as this present attorney general? Would we be better off as a country?

You must have an opinion. Would you care to share that opinion with us?

COMEY: I would very much like not to.

(LAUGHTER)

KOHL: But would you, please?

COMEY: I would hope -- there are a lot of things I miss about government. A lot of things I love about being a private citizen.

I would hope you wouldn't care what my opinion is.

I appreciate what you said, Senator. I'm not here to dump on Attorney General Gonzales. I...

KOHL: Well, this isn't a question of jumping on -- we're talking about our country and its future and the importance of law, the importance of the Department of Justice. And you have been closer than most.

And you are here to serve your country; that's why you're here today.

And that's a very important question, obviously. And your opinion matters much more than most, because of who you are and your experience.

And I'm sure, or I presume, you do have an opinion. Would you share that opinion with us today?

COMEY: I do have an opinion. I would prefer not to share it. I'm just not sure that -- it makes me very uncomfortable to express my opinion about something, especially now that I'm outside of government and that I have not followed this as closely as many people have.

I have formulated an opinion, but I would ask the senator's indulgence not to make me give it. I just don't think that's my place.

KOHL: Well, I'm concluding -- and correct me if I'm incorrect -- I'm concluding that your unwillingness to express an opinion that you do say -- you say that you have -- is an indication that you believe we would be better served. I think that's a clear inference from what you're saying.

COMEY: I appreciate that, Senator.

COMEY: If I could, I'd like not to offer that.

SEN. PATRICK J. LEAHY HOLDS A HEARING ON THE U.S. ATTORNEY FIRINGS CQ Transcriptions"All
materials herein are protected by United States copyright law and may not be reproduced, distributed, tran

KOHL: To me, you have expressed that opinion.  I mean, without having expressed it, you expressed it.

Mr. Comey, when you testified in the House a few weeks ago, you were asked about the U.S. attorney for the
Eastern District of Wisconsin, Steve Biskupic.  At that time, you said that Mr. Biskupic was, quote, "an absolutely
straight guy," unquote.

When you were asked whether you knew that Mr. Biskupic was on a list for weak performers and potentially slated
for dismissal, you said -- and I quote -- "No, and I think very highly of him."

Having had time to reflect on your testimony, do you have anything to add to what you said at that time?  Do you
know why he was put on a list of weak performers, and why he came off the list?

Did it have anything to do with the prosecution of voter fraud cases that he was taken off the list, or the prosecution
of Georgia Thompson, an employee of the Democratic governor's administration at that time?

COMEY: I don't know from firsthand knowledge that he was on a list.  I can't imagine why he would be put on a
list (inaudible).

I think very highly of him, as you quoted.  I think he is what you want in a U.S. attorney.  And I'm not saying that
because he's tall and skinny...

(LAUGHTER)

... but he is a very solid person, who is as honest as the day is long, cares passionately about the independence of
the Department of Justice.  I know this from talking to him.

So I can't imagine -- I know he's gotten beat on because a case he prosecuted was reversed in the 7th Circuit Court
of Appeals.  I tried to explain to somebody who asked me about that -- not in a hearing, but a private citizen.

I said, "It happens.  And it's not an indictment of the good faith of the prosecutor, of the district judge who denied a
motion for a directed verdict or the jury that convicted.  Sometimes appeals courts disagree about the inferences to be
drawn from the evidence and reverse a conviction.  That doesn't tell you that the prosecutor is a bad guy. In fact, I know
this one, and this is a good guy."

KOHL: Mr. Comey, yesterday's Washington Post reported that White House and Republican Party concerns
regarding voter fraud prosecutions were the cause of many of the U.S. attorney dismissals.  Can you confirm this?

During the time you served as deputy attorney general were you aware of concerns from the White House that U.S.
attorneys were not active enough in prosecuting voter fraud cases?  Did the White House exert any effort to encourage
the Justice Department to remove U.S. attorneys whom it believed were not prosecuting voter fraud cases vigorously
enough?

COMEY: I'm not aware of any issue that came to my attention regarding voter fraud when I was deputy attorney
general, complaints or otherwise.

KOHL: While you served at the Justice Department, were you aware of any pressure from the White House to
bring voter fraud cases?

COMEY: No, sir.

KOHL: Thank you so much.

COMEY: Thank you, Senator.

SEN. PATRICK J. LEAHY HOLDS A HEARING ON THE U.S. ATTORNEY FIRINGS CQ Transcriptions"All materials herein are protected by United States copyright law and may not be reproduced, distributed, tran

KOHL: Mr. Chairman, thank you.

SCHUMER: Senator Feingold?

FEINGOLD: Mr. Chairman, first, I want to praise you for your questioning. It was very long. I hope you don't make it a habit.

But I'll tell you something: I think it was some of the most important and valuable questioning that I've heard from a senator in the years that I've been here. And I just want to thank you for your leadership on this.

Mr. Comey, I want to commend you for your service, for your courage, for your testimony, some of the most dramatic testimony that I've heard in 25 years that I've been a legislator. Your courage at the time and today in defense of the rule of law is truly admirable.

Let me add, your account of Attorney General Ashcroft is the same.

FEINGOLD: This has been my experience with Mr. Ashcroft, despite our fundamental differences.

And I have great disagreement with this administration. But there's a difference in this administration between people like you and Attorney General Ashcroft, who do fundamentally respect the rule of law, and many others who have shown some of the most blatant disrespect for the rule of law I think in American history.

So I think it's only fair that we make these distinctions. And I know that's not your purpose in being here. But I simply want it noted in the record that here's somebody that literally stood tall for the rule of law. And I praise you for it.

I want to highlight one point you alluded to in answer to a question from Senator Specter.

This reauthorization process and the need for certification from the attorney general was only an internal control, not a statutory requirement. I think that that testimony makes it all the more clear that this committee must pursue this issue, and must be supplied with the relevant documents.

So, Mr. Comey, are you aware of any documents produced by the White House Counsel's Office with regard to this program?

COMEY: Not specifically. Yes, not specifically. I don't remember...

FEINGOLD: You don't recall reviewing any...

COMEY: I don't remember reviewing any from the White House Counsel's Office that related to this. I mean, it's possible. But I don't remember it.

FEINGOLD: What about documents from the Office of the Vice President? Do you know if any such documents exist regarding this program?

COMEY: I don't, no.

FEINGOLD: Did Mr. Gonzales or Mr. Card indicate -- ever indicate that they were acting on the direction or the knowledge of the president when they came to see the attorney general in the hospital?

COMEY: Not that I recall. I don't think so.

FEINGOLD: They never stated that, to your recollection.

SEN. PATRICK J. LEAHY HOLDS A HEARING ON THE U.S. ATTORNEY FIRINGS CQ Transcriptions"All materials herein are protected by United States copyright law and may not be reproduced, distributed, tran

COMEY: I don't think so.

FEINGOLD: Did something in particular occur that led to this issue coming to a head in March of 2004?  Why not at an earlier point, in connection to one of the earlier reauthorizations?

COMEY: It was simply the pace at which the work went on in the Office of Legal Counsel.

We had a new assistant attorney general as of, I think, October of 2003.  And there were a number of issues that he was looking at. And this reevaluation, this particular program was among those issues. And the work got done in the beginning part of 2004.  And that's what brought it to a head with this particular...

FEINGOLD: So it was at this point that the office was able to get around to these concerns, these legal concerns and these internal concerns?

COMEY: I think that's right.

Concerns had reached the ears of the new assistant attorney general.  And he undertook an examination -- with my approval and Attorney General Ashcroft's approval -- of this matter.

FEINGOLD: You made quite a moving farewell address to your colleagues in the department in August of 2005. In it, you thanked some of your colleagues for being, quote, "people committed to getting it right and to doing the right thing, whatever the price," unquote, and stated that some of those people, quote, "did pay a price for their commitment to right," unquote.

What were you referring to?

COMEY: I had in mind one particular senior staffer of mine who had been in the hospital room with me and had been blocked from promotion, I believed, as a result of this particular matter.

FEINGOLD: And so you were, in fact, referring to this incident in the hospital and somebody who was there and consequences that accrued to this person as a result of that?

COMEY: Yes.

FEINGOLD: Is that Mr. Goldsmith?

COMEY: No, it's Mr. Philbin.

FEINGOLD: Thank you, Mr. Chairman.

SCHUMER: Senator Specter wants to make a concluding statement or...

SPECTER: Well, I just wanted to confirm with you, Mr. Chairman, that we're not going to have a second round.

SCHUMER: We're not going to have -- I have one question, which I've showed you, and that's it.

SPECTER: There's a vote scheduled in five minutes, so I'm going to go to the floor at this point.

And I conclude by thanking you for your service, Mr. Comey.  And I thank you for standing up.  That's in the finest tradition of the Department of Justice and I hope we can reinstate it.  Thank you.

COMEY: Thank you, Senator.

SCHUMER: Well said.

SEN. PATRICK J. LEAHY HOLDS A HEARING ON THE U.S. ATTORNEY FIRINGS CQ Transcriptions"All
materials herein are protected by United States copyright law and may not be reproduced, distributed, tran

Senator Whitehouse?

WHITEHOUSE: Thank the chairman.

Mr. Comey, good morning.  It's still morning.

I'd like to ask you -- you are obviously a person who cares very deeply about the Department of Justice and its
institutions.  And I worry about some of the institutional legacy of what we've been through.

In particular, I'd like to ask you for your thoughts on where the standards should be of what is proper versus what is
improper in the context of bringing political influence or partisan influence into the Department of Justice.  And while
you -- that's, sort of, the framing part of the question.

More specifically, I've been very concerned at some of the statements that have come out of the Department of
Justice that have been the department's efforts to define that level of impropriety.

And I'll tell you, it began first with Kyle Sampson who told this committee that, "The limited category of improper
reasons for these dismissals would include an effort to interfere with or influence the investigation or prosecution of a
particular case for political or partisan advantage."

And then, not too much later, Attorney General Gonzales came before us, and in nearly verbatim words, he said
that, "It would be improper to ask for a resignation of any individual in order to interfere with or influence a particular
prosecution for partisan political gain."

And in the wake of the attorney general's testimony in the House, the Justice Department issued a statement saying
that, "It is clear that the attorney general" -- again, defining the standard of what's improper -- "did not ask for the
resignation of any individual in order to interfere with or influence a particular prosecution for partisan political gain."

WHITEHOUSE: Now, when I read those things I hearken back to the elements of obstruction of justice, which I
recall as being three. One is the awareness of a particular case.  Two is the effort to influence or interfere with it.  And
three is that that be done for a corrupt or improper motive, such as partisan political gain.

Let me ask it to you two ways.

The first way would be, if it became clear to you that somebody in the department had tried to interfere with or
influence a particular prosecution for partisan political gain, would you consider that to be the basis for opening -- at
least opening an obstruction of justice investigation?

And if the facts were proven, would that not even be the basis for a conviction for criminal obstruction of justice?

COMEY: I think it potentially could be, yes -- certainly for looking at the matter.

WHITEHOUSE: Yes.

And in that context, do you think that is where the bar should be set for what is improper versus not improper in
terms of political influence coming into the Department of Justice? Is that the right standard?

COMEY: No.  If the standard is whether we're running afoul of the obstruction of justice statute, I think it's set way
too low.

Senator, as you know...

WHITEHOUSE: What should be?  You've had the chance to think about this.  You care about this department

SEN. PATRICK J. LEAHY HOLDS A HEARING ON THE U.S. ATTORNEY FIRINGS CQ Transcriptions"All materials herein are protected by United States copyright law and may not be reproduced, distributed, tran

deeply.  You've shown through what is probably a difficult experience for you that you're willing to think about these things without bias and really try to get to the right answer.

How would you phrase where the standard for what is improper should be in terms of where and when the department should allow political influence to enter into its deliberations or its conduct?

COMEY: I think that you have to talk about it in two pieces. One is main Justice and the other is the U.S. attorneys.

And although both of those parts of the institution are led by political appointees, I think they are -- have to be different in terms of what political means.

I think it is the job of the Department of Justice to be responsive to the policy priorities of the president, who's elected and who has appointed the folks to run the department.

COMEY: But I think it is main Justice's job to see to it that U.S. attorneys can operate in an environment where there is a little or no politics -- big P or little p -- at all entering into their considerations.

I think once they walk through the door and become the U.S. attorney, although they're politically appointed, they've got to call, as someone said, balls and strikes without regard to whether the person in the dock is a Democrat or a Republican or a Green or a who cares?  They have to make the judgment the judgment on the facts.

I think the job of the department is, to the extent that there are complaints or their political issues, to receive those and figure out what to do about them without polluting the work of the U.S. attorney.  And that's why I think they're different.

I think the hard thing to define in the abstract is certainly not obstruction of justice as the standard.  I think the department needs to make its decisions about what to do with political interests or information by looking at what is the mission of the Department of Justice.

WHITEHOUSE: And do you agree with me that this standard that they've been articulating about efforts to interfere with or influence a particular prosecution for partisan political gain effectively restate the standard for a criminal obstruction of justice?

COMEY: It sounds like it does.  And that's certainly something that should be avoided at all costs.

But I think it sets the bar a little too low in terms of what the department's mission is in protecting the historical autonomy of the entire department, especially the U.S. attorneys.

WHITEHOUSE: Mr. Chairman, my time has expired.

Thank you, Mr. Comey.

SCHUMER: Thank you, Senator Whitehouse.

Mr. Comey, I just want to follow up on one final question.  I showed it to Senator Specter ahead of time because he had to leave.

But he was asking about legality/illegality, within law/not (ph). The key point here is isn't it the Office of Legal Counsel that makes a determination about whether something is within the law or not within the Justice Department?

COMEY: Yes.  And its opinions are binding throughout the executive branch.

SCHUMER: And didn't that office make a decision and advise you that what was attempting to be done was not

SEN. PATRICK J. LEAHY HOLDS A HEARING ON THE U.S. ATTORNEY FIRINGS CQ Transcriptions"All materials herein are protected by United States copyright law and may not be reproduced, distributed, tran

within the law?

COMEY: The conclusion was that they could not find an adequate legal basis for...

SCHUMER: OK.  Let's put it that way.

COMEY: Yes.

SCHUMER: So they could not find an adequate legal basis for doing it that way?

COMEY: Correct.

SCHUMER: And you felt that if they couldn't, you couldn't preside over the Department of Justice if you were going to be overruled by the White House to do it anyway.

COMEY: Yes.

SCHUMER: I think that's OK.

Let me conclude, then, by just thanking you.  You are a profile in courage.  You are what our government is all about.  In this case, it has nothing to do with Democrat, Republican, liberal, conservative. It has to do with doing a job well and caring about the rule of law.

And I would say what happened in that hospital room crystallized Mr. Gonzales' view about the rule of law: that he holds it in minimum low regard.

And it's hard for me to understand -- I'm going to say something that you won't say: It's hard to understand after hearing this story how Attorney General Gonzales could remain as attorney general, how any president, Democrat, Republican, liberal, conservative, could allow him to continue.

But I want to thank you for being here.  I know it wasn't easy. I know that if we didn't have the power of subpoena you wouldn't be here.  I know you have a conscience that obviously you've wrestled with in all this and it's very difficult to be here.

But a profile in courage, by definition, is difficult.  And I think I speak on behalf of almost every American: We thank you for being here and having the courage to speak the truth.

(APPLAUSE)

END

**NOTES:**
[????] - Indicates Speaker Unknown
   [--] - Indicates could not make out what was being said.[off mike] - Indicates could not make out what was being said.

**LOAD-DATE:** May 15, 2007

# EXHIBIT "D"

**Written Questions to**
**Former Deputy Attorney General James B. Comey**
**Submitted by Senator Patrick Leahy**
**May 22, 2007**

1.     You testified that the Department of Justice ("DoJ") completed a factual and legal evaluation of "a particular classified program" in 2004, and this review was conducted by, among others, the Office of Legal Counsel ("OLC").

   **a.**   When was this review started?

   **I believe some time in late fall 2003.**

   **b.**   Why was the review started?  Was the review started at the request of any individual or entity?  If so, who or what entity**?**

   **I believe it was started at the initiative of Jack Goldsmith and Patrick Philbin.**

   c.   Who participated in the review?  Other than OLC, did any other division, section, or unit at DoJ participate in the review?

   **Goldsmith and Philbin were the principal participants, as I recall.  I believe they were assisted from time to time by James Baker from the Office of Intelligence Policy and Review and my chief of staff, Chuck Rosenberg.  There may have been other DOJ lawyers who assisted them.**

   d.   Did any individual or entity from outside DoJ participate in the review?  Were there any individuals from the White House, the Department of Defense ("DoD"), or other federal agency who participated in the review?  If so please identify those individuals and/or entities?

   **I believe Goldsmith and Philbin coordinated their effort with lawyers in the intelligence community.**

   e.   Did the review assess the full duration of the classified program and, if not, what time frame was reviewed?

   **The review focused on current operations during late 2003 and early 2004, and the legal basis for the program.**

   f.   As a result of the review, did any individual or entity at DoJ, or any other agency, prepare a legal opinion or memorandum related to the classified program, and, if so, who or what entity prepared the legal opinion or memorandum?

   **OLC prepared legal memoranda concerning the matter, some of which would have been drafts.  I also prepared at least one memorandum.**

   g.   Were the results of this review shared with the Federal Bureau of Investigation ("FBI"), and, if so, who at the FBI and when?

**It is my understanding that Goldsmith and Philbin discussed their work with officials from the General Counsel's office at the FBI, including the General Counsel, Valerie Caproni. I discussed the matter privately with FBI Director Mueller and FBI Deputy Director John Pistole.**

h.  Other than the White House or individuals at the White House, were the results of this review shared with any individual, entity, or federal agency outside DoJ, and, if so, who or what entity and when?

**The matter was discussed with lawyers and non-lawyers in the intelligence community. I am uncomfortable going into more detail in an unclassified setting.**

2.  In your testimony, you stated that the views of DoJ related to the classified program were communicated to the White House prior to the evening of March 10, 2004.

a.  How were these views communicated to the White House? Please identify whether the communications were made orally, in writing, by electronic communication, or other means; and to whom and when the communications were made. Please identify if any of the documents responsive to Question 1 above were included in this communication.

**The views were communicated orally prior to March 10, 2004, including at a March 9 meeting I attended at the White House. I also believe that Goldsmith and Philbin had a variety of contacts with officials at the White House in the preceding weeks or months as the review was conducted. Those contacts may have involved their sharing written materials, but I am not sure. I recall sending one memorandum to the White House, after March 10, which I believe attached a memorandum written by Goldsmith.**

b.  Without disclosing the substance of the classified program or any legal advice, did these views include the understanding that the Attorney General, or you as Acting Attorney General, would not certify the classified program?

**Yes.**

c.  Did you or others at DoJ receive any response to these views from the White House? If so, please identify whether the responses were made orally, in writing, by electronic communication, or other means; and to whom and when was the response was made.

**I directly received oral responses during discussions at the White House on March 9, 2004. I know there were a variety of discussions in early 2004 in which I did not participate but that involved Jack Goldsmith and Patrick Philbin.**

d.  Did the response include any legal opinion or memorandum from the White House, or any other federal agency related to the classified program? If so, please identify what individual(s) or entities prepared and reviewed the legal opinion or memorandum.

**I am not aware of any other such memorandum or legal opinion prior to March 10, 2004. Some time shortly after March 10, I received a memorandum from White House Counsel Gonzales.**

2

3.      You testified that after you arrived at the George Washington Hospital in Washington, D.C., on the evening of March 10, 2004, White House Counsel Alberto Gonzales and White House Chief of Staff Andrew Card came to Attorney General John Ashcroft's hospital room and spoke to him relating to the authorization of a classified program.

a.  Did any individual(s) come with Mr. Gonzales or Mr. Card to the hospital, and if so, who?  Were those individuals present for the conversation between Mr. Ashcroft and Mr. Gonzales?

**I do not know with whom Mr. Gonzales and Mr. Card arrived; only the two of them entered the room.**

b.  Upon arriving in the hospital room, did Mr. Gonzales say anything to you, either before or after his conversation with Mr. Ashcroft, and if so, what did he say?

**He did not speak to me at any time.**

c.  Did Mr. Card speak to Mr. Ashcroft or you in the hospital room and if so, what did he say?

**Mr. Card did not speak to me.  I believe he said, "Be well," to Attorney General Ashcroft as he turned to depart.**

d.  To your knowledge, did Mr. Gonzales or Mr. Card consult with Mr. Ashcroft's physician or any medical staff prior to entering the hospital room?

**Not to my knowledge.**

e.  In your presence, did Mr. Gonzales or Mr. Card ask Mr. Ashcroft questions to elicit his state of mind and/or medical condition prior to discussing their request for authorization of the classified program?

**I believe Mr. Gonzales began the conversation by asking, "How are you General?" to which the Attorney General replied, "Not well."**

f.  To your knowledge, did Mr. Gonzales or Mr. Card take any steps to ensure that facts related to the classified program were not disclosed to individuals without proper clearances or an actual need to know who were present in the hospital room?

**Not to my knowledge.**

4.      In your testimony, you stated that FBI Director Robert Mueller also arrived at the George Washington Hospital that night.

a.  To your knowledge, did Mr. Mueller have any conversation with Mr. Gonzales or Mr. Card at the hospital that night?  If so, what was that conversation?

**Not to my knowledge.**

b.  In your testimony, you indicated that Mr. Mueller had a "memorable" exchange with Mr. Ashcroft after Mr. Gonzales and Mr. Card left.  Please describe that exchange.

**It was a private conversation in which Mr. Mueller expressed his admiration for the Attorney General's conduct that evening.**

5.  You testified that the President met with you privately, and then, at your urging, he also met with Mr. Mueller privately, on the morning of March 12, 2004 following your daily counter-terrorism briefing.  After these discussions, you stated that the President indicated to Mr. Mueller that you were now authorized to make changes to the classified program in response to the Department of Justice's views.

    a.  Following your meetings, did the President direct you or Mr. Mueller to discontinue or suspend any portion of classified program immediately until the appropriate changes were made to bring it into legal compliance?

    **No.**

    b.  How long did the classified program continue without legal certification from DoJ?

    **I don't recall exactly, but believe it was approximately several weeks.**

6.  You testified that you discussed DoJ's views on the classified program with Vice President Dick Chaney and members of his staff, including his Chief of Staff David Addington.

    a.  Where and when did those discussions take place?

    **March 9, 2004 at the White House.**

    b.  Who else was present for those discussions?

    **Jack Goldsmith, Patrick Philbin, Vice President Cheney, Mr. Addington, Mr. Card, Mr. Gonzales, and members of the intelligence community.**

    c.  If those discussions were on or before March 10, 2004, was the Vice President and/or his staff aware of DoJ's decision not to certify the classified program?  If so, how were they aware?

    **Yes.  The Vice President was aware of DOJ's decision to not certify the program, because I had communicated this orally during a March 9 meeting.  That meeting was a culmination of ongoing dialogue between DOJ and the White House.**

    d.  If those discussions were on or before March 10, 2004, was the Vice President and/or his staff aware of your intention to resign if the classified program was authorized without DoJ certification?  If so, how were they aware?

    **No.  I had not made a decision to resign yet.**

    e.  To your knowledge, did the Vice President or his staff have any role in the decision to have Mr. Card and Mr. Gonzales visit Mr. Ashcroft in the hospital?  If so, what role did they have and what is the source for your information?

**I have no knowledge about that.**

7.   You testified that Mr. Philbin, who was with you in the hospital, was "blocked from promotion," as a result of the position taken by DoJ related to this classified program.

a.   Did any individual or individuals from the White House have any input into his potential promotion at DoJ?  If so who, and in relation to what promotion?

**Mr. Philbin was considered for principal Deputy Solicitor General after Paul Clement became Solicitor General.  It was my understanding that the Vice President's office blocked that appointment.**

b.   Who was involved in blocking Mr. Philbin's promotion, and what did they do?

**I understood that someone at the White House communicated to Attorney General Gonzales that the Vice President would oppose the appointment if the Attorney General pursued the matter.  The Attorney General chose not to pursue it.**

8.   When did the Administration first conclude that the Authorization for Use of Military Force ("AUMF") authorized warrantless electronic surveillance of the type involved in what the Administration has called the "terrorism surveillance program" or TSP?  If you do not recall a specific date, please provide as close an approximation as is possible.

**I don't think it is appropriate for me to discuss legal advice by the Department of Justice or any particular classified program.**

9.   What legal standard for intercepting communications was the National Security Agency ("NSA") applying in its warrentless electronic surveillance program before March 2004?  Was it a "probably cause" standard?  What standard was the NSA applying when the program was first authorized?  What standard was applied after March 2004?

**I don't think it is appropriate for me to discuss legal advice by the Department of Justice or any particular classified program.**

10.   Has the warrantless electronic surveillance program always required before authorizing interception of a communication that at least one party to the communication be located outside of the United States?  If not, approximately when did this become a requirement?

**I don't think it is appropriate for me to discuss legal advice by the Department of Justice or any particular classified program.**

11.   Has the warrantless electronic surveillance program always required before authorizing interception of a communication that at least one party to the communication be a member or agent of Al Queda or an affiliate terrorist organization?  If not, approximately when did this become a requirement?

**I don't think it is appropriate for me to discuss legal advice by the Department of Justice or any particular classified program.**

# EXHIBIT "E"

59 of 170 DOCUMENTS

Copyright 2006 The Federal News Service, Inc.
Federal News Service

**February** 6, 2006 Monday

**SECTION:** PRESS CONFERENCE OR SPEECH

**LENGTH:** 39300 words

**HEADLINE:** AFTERNOON SESSION OF A HEARING OF THE SENATE **JUDICIARY** COMMITTEE

 SUBJECT: "WARTIME EXECUTIVE POWER AND THE NATIONAL SECURITY AGENCY'S SURVEILLANCE AUTHORITY"

 CHAIRED BY: SENATOR ARLEN SPECTER (R-PA)

 WITNESS: U.S. ATTORNEY GENERAL ALBERTO **GONZALES**

 LOCATION: 216 HART SENATE OFFICE BUILDING, WASHINGTON, D.C.

**BODY:**

 SEN. SPECTER:  (Sounds gavel.)  It's 1:45.  The committee prides itself on being prompt.  And we thank you, Mr. Attorney General, for being prompt coming back.

 I think the hearings have been very productive.  And we have had full attendance, almost full attendance.  And I think the other senators who could not be here earlier -- it is unusual to have a Monday morning session for the United States Senate.  And we have done that because this committee has been so busy.  And we have asbestos reform legislation which Senator Leahy and I are co-sponsoring, which is coming to the floor later today, and we've had a full platter with the confirmation of Justice Alito.  And we wanted to have this hearing at an early date, and this was the earliest we could do, which, given  the intervening holidays after the program was announced back on December 16th, we have proceeded.

 We anticipated a full day of hearings and at least two rounds, and it's apparent to me at this point that we're not going to be able to finish today within a reasonable time.  Senator Feingold's nodding in the affirmative.  That's the first time I've gotten him to nod in the affirmative today.  So you see, we're making some progress.

 But I do believe there will be a full second round.  And we don't function too well into the evening.  If we have to, we do, but it's difficult for the witness.  And I've conferred with the attorney general, who has graciously consented to come back on a second day.

 So we will proceed through until about 5:00 this afternoon, and then we will schedule another day.  By that time, everybody will have had a full -- a first round, and it will give us time to digest what we have heard, and we will proceed on a second day.

 Senator Feingold, you're recognized.

 SEN. RUSSELL FEINGOLD (D-WI):  Good afternoon, Mr. Attorney General.

AFTERNOON SESSION OF A HEARING OF THE SENATE JUDICIARY COMMITTEE SUBJECT: "WARTIME EXECUTIVE POWER AND THE NATIONAL SECURITY AGENCY'S SURVEILLANCE AUTHORITY" CHAIRED BY: SENATOR ARLEN S

Mr. Chairman, let me say of course we have a disagreement, Mr. Chairman, about whether this witness should have been sworn, and that is a serious disagreement. But let me nod in an affirmative way about your Pittsburgh Steelers, first of all. (Laughter.)

SEN. SPECTER: (Chuckles.)

SEN. FEINGOLD: Secondly, let me say --

SEN. SPECTER: Green Bay --

SEN. FEINGOLD: Green Bay will be back, Mr. Chairman.

SEN. SPECTER: With Green Bay out of it, why not root for the Steelers, Senator Feingold?

SEN. LEAHY: That's why we didn't have the hearing last night.

SEN. FEINGOLD: Well, I understood that. I was curious about that.

Mr. Chairman --

SEN. SPECTER: Re-set the clock at 10 minutes. (Laughter.)

SEN. FEINGOLD: (Laughs.)

SEN. SPECTER: I was only kidding. (Laughter.)

SEN. FEINGOLD: Let me also say, Mr. Chairman, despite our disagreement about the swearing-in issue, that I praise you for your candor and your leadership on this issue and for holding this hearing and the other hearings you may be holding.

I also want to compliment some of my colleagues on the other side of the aisle for their candor on this issue already publicly. People like Senator DeWine, Senator Graham, Senator Brownback. Maybe they don't want me to mention their names, but the fact is they have publicly disputed this fantasy version of the justification of this based on the Afghanistan resolution. It is a fantasy version that no senator, I think, can actually believe that we authorized this wiretapping.

So the fact is this can and should be a bipartisan issue. I see real promise for this being a bipartisan issue, and it should be. But the problem here is that the -- what the administration has said is that when it comes to national security, the problem is that the Democrats have a pre-9/11 view of the world. But let me tell you what I think the problem is. The real problem is that the president seems to have a pre-1776 view of the world. That's the problem here. All of us are committed to defeating the terrorists who threaten our country, Mr. Attorney General. It is without a doubt our top priority. In fact, I just want to read again what you said. "As the president has said, if you talking with al Qaeda, we want to know what you're saying." Absolutely right. No one in this committee, I think no one in this body believes anything other than that, and I want to state it as firmly as I can.

But I believe that we can and must do that without violating the Constitution or jeopardizing the freedoms on which this country was founded. Our forefathers fought a revolution -- a revolution to be free from rulers who put themselves above the law. And I got to say, Mr. Chairman, I think this administration has been violating the law and is misleading the American people to try to justify it.

This hearing is not just a hearing about future, possible solutions. That is fine to be part of the answer and part of the hearing. This hearing, Mr. Chairman, is also an inquiry into possible wrongdoing.

AFTERNOON SESSION OF A HEARING OF THE SENATE JUDICIARY COMMITTEE SUBJECT: "WARTIME EXECUTIVE POWER AND THE NATIONAL SECURITY AGENCY'S SURVEILLANCE AUTHORITY" CHAIRED BY: SENATOR ARLEN S

Mr. Attorney General, there have already been a few mentions today of your testimony in January of '05 -- your confirmation hearing. I'm going to ask you a few quick simple and factual questions, but I want to make it clear that I don't think this hearing is about our exchange or about me or what you said to me in particular. I am concerned about your testimony at that time because I do believe it was materially misleading. But I am even more concerned about the credibility of your administration, and I'm even more concerned than that about the respect for the rule of law in this country. So that is the spirit of my questions.

Mr. Attorney General, you served as White House Counsel from January 2001 until you became attorney general in 2005. On January 6th, 2005, you had a confirmation hearing for the attorney general position before this committee. Mr. Attorney General, you testified under oath at that hearing, didn't you?

ATTY GEN. **GONZALES:**  Yes, sir.

SEN. FEINGOLD:  And sir, I don't mean to belabor the point, but just so the record is clear, do you or anyone in the administration ask Chairman Specter or his staff that you not be put under oath today?

ATTY GEN. **GONZALES:**  Senator, I've already indicated for the record the chairman asked my views about being sworn in, and I said I had no objection.

SEN. FEINGOLD:  But did anyone -- you or anyone in the administration ask the chairman to not have you sworn?

ATTY GEN. **GONZALES:**  Sir, not to my knowledge.

SEN. FEINGOLD:  Okay.

SEN. SPECTER:  The answer's no.

SEN. FEINGOLD:  At the time -- that's fine.

At the time you testified in January of '05, you were fully aware of the NSA program, were you not?

ATTY GEN. **GONZALES:**  Yes, sir.

SEN. FEINGOLD:  You were also fully aware at the time you testified that the Justice Department had issued a legal justification for the program. Isn't that right?

ATTY GEN. **GONZALES:**  Yes, I had the legal analysis performed by the Department of Justice.

SEN. FEINGOLD:  And you, as White House counsel, agreed with that legal analysis, didn't you?

ATTY GEN. **GONZALES:**  I agree with the legal analysis, yes.

SEN. FEINGOLD:  And you had signed off on the program, right?

ATTY GEN. **GONZALES:**  Yes, I do believe the president -- I did believe at the time the president has the authority to authorize these kind of --

SEN. FEINGOLD:  And you had signed off on that legal opinion.

And yet when I specifically asked you at the January 2005 hearing whether, in your opinion, the president can authorize warrantless surveillance, notwithstanding the foreign intelligence statutes of this country, you didn't tell us yes. Why not? Why not?

ATTY GEN. **GONZALES:**  Sir, I believe your question -- the hypothetical you pose -- and I do consider a

AFTERNOON SESSION OF A HEARING OF THE SENATE JUDICIARY COMMITTEE SUBJECT: "WARTIME EXECUTIVE POWER AND THE NATIONAL SECURITY AGENCY'S SURVEILLANCE AUTHORITY" CHAIRED BY: SENATOR ARLEN S

hypothetical -- which is whether or not -- had the president authorized activity in -- specific electronic surveillance in violation of the laws. And I have tried to make clear today that in the legal analysis in the white paper, the position of the administration is that we -- the president has authorized electronic surveillance in a manner that's totally consistent -- not in violation, not in -- not overriding provisions of FISA, but totally consistent with FISA.

SEN. FEINGOLD: Well, Mr. -- General, certainly it was not a hypothetical, as we now know.

ATTY GEN. **GONZALES:** Your -- Senator, your question was whether or not the president had authorized certain conduct in violation of law. That was a hypothetical.

SEN. FEINGOLD: My question was whether the president could have authorized this kind of wiretapping.

ATTY GEN. **GONZALES:** In violation of the criminal statutes. And our position is and has been -- is that no, this is not in violation of the criminal statutes. FISA cannot --

SEN. FEINGOLD: You said that was your -- you said the question was merely hypothetical, and that -- look, this is what you said: "It's not the policy or the agenda of this president to authorize actions that would be in contravention of our criminal statutes." And when you said that, you knew about this program. In fact, you just told me that you had approved it and you were aware of the legal analysis to justify it.

You wanted this committee and the American people to think that this kind of program was not going on, but it was, and you knew that. And I think that's unacceptable.

ATTY GEN. **GONZALES:** Senator -- Senator, your question was whether or not the president had authorized conduct in violation of law, and I've laid out --

SEN. FEINGOLD: The question was whether the --

ATTY GEN. **GONZALES:** I have --

SEN. FEINGOLD: -- Mr. Attorney General, my question was whether the president would have the power to do that.

ATTY GEN. **GONZALES:** And, Senator, the president has not authorized conduct in violation of our criminal statutes. We've laid out a 42-page analysis of our legal position here. The authority the president has exercised are totally consistent with the criminal provision -- the primary criminal provision in FISA, Section 109.

SEN. FEINGOLD: I've heard all your arguments, but I want to get back to your testimony, which, frankly, Mr. Attorney General, anybody that reads it basically realizes you were misleading this committee. You could have answered the question truthfully. You could have told the committee that, yes, in your opinion, the president has that authority. By simply saying the truth that you believe the president has the power to wiretap Americans without a warrant would not have exposed any classified information.

And my question wasn't whether such illegal wiretapping was going on. Like almost everyone in Congress, I didn't know, of course, about the program then. It wasn't even about whether the administration believed that the president has this authority. It was a question about your view of the law -- about your view of the law --

ATTY GEN. **GONZALES:** Senator --

SEN. FEINGOLD: -- during the confirmation on your nomination to be attorney general. So, of course, if you had told the truth, maybe that would have jeopardized your nomination. You wanted to be confirmed, and so you let a misleading statement about one of the central issues of your confirmation, your view of executive power, stay on the record until The New York Times revealed the program.

AFTERNOON SESSION OF A HEARING OF THE SENATE JUDICIARY COMMITTEE SUBJECT: "WARTIME EXECUTIVE POWER AND THE NATIONAL SECURITY AGENCY'S SURVEILLANCE AUTHORITY" CHAIRED BY: SENATOR ARLEN S

ATTY GEN. **GONZALES:** Senator, I've told the truth then. I'm telling the truth now. You asked about a hypothetical situation of the president of the United States authorizing electronic surveillance in violation of our criminal statutes. That has not occurred.

SEN. FEINGOLD: Mr. Chairman, I think the witness has taken mincing words to a new high, and there it is no question in my mind that when you answered the question that was a hypothetical, you knew it was not a hypothetical, and you were under oath at the time.

Let me switch to some other misrepresentations.

SEN. SPECTER: Wait a minute. Did you care to answer that, Attorney General **Gonzales?**

ATTY GEN. **GONZALES:** Senator, as I've stated before, what I said was the truth then. It is the truth today. The president of the United States has not authorized electronic surveillance in violation of our criminal statutes. We have laid out in great detail our position that the activities are totally consistent with the criminal statute.

SEN. FEINGOLD: All you had to do, Mr. Attorney General, was indicate that it was view that it was legal. That was what my question was. I would have disagreed with your conclusion. But that's not what you said, and you referred to this as merely a hypothetical.

Mr. Attorney General, the administration officials have been very misleading in their claims in justifying the spying program. To make matters worse, last week in the State of the Union, the president repeated some of these claims. For one thing, the president said that his predecessors have used the same constitutional authority that he has. Isn't it true that the Supreme Court first found that phone conversations are protected by the Fourth Amendment in the 1967 Katz case?

ATTY GEN. **GONZALES:** Yes. In the 1967 Katz case, the Supreme Court did find that telephone conversations would be -- are covered by the Fourth Amendment.

SEN. FEINGOLD: So when the Justice Department points to Presidents Wilson and Roosevelt's actions, those are really irrelevant, aren't they?

ATTY GEN. **GONZALES:** Absolutely not, Senator. I think that they're important in showing that presidents have relied upon their constitutional authority to engage in warrantless surveillance of the enemy during a time of war. Feb 06, 2006 16:43 ET .EOF

The fact that the Fourth Amendment may apply doesn't mean that a warrant is necessarily required in every case, as you know. There is a jurisprudence of the Supreme Court regarding special needs normally in the national security context, outside of the ordinary criminal law context, where because of the circumstances, searches without warrants would be justified.

SEN. FEINGOLD: Mr. Chairman, my time's up. I'll continue this line of questioning later.

SEN. SPECTER: Thank you very much, Senator Feingold.

Senator Graham.

SEN. LINDSEY GRAHAM (R-SC): Thank you, Mr. Chairman. I would like to congratulate you also for having these hearings. I think what we're talking about is incredibly important for the country in terms of the future conduct of wars and how we relate constitutionally to each other, and personally how we relate. I find your testimony honest, straightforward; your legal reasoning is well articulated; I don't agree with it all.

About hiding something about this program, is it not true that the Congress has been briefed extensively, at least a

AFTERNOON SESSION OF A HEARING OF THE SENATE JUDICIARY COMMITTEE SUBJECT: "WARTIME EXECUTIVE POWER AND THE NATIONAL SECURITY AGENCY'S SURVEILLANCE AUTHORITY" CHAIRED BY: SENATOR ARLEN S

small group of congressmen and senators, about this program?

ATTY GEN. **GONZALES:**  Senator, I have not been present, as I've testified before, at all of the briefings, but in the briefings that I have been present, the briefings were extensive, the briefings were detailed.  Members who were present at the briefing were given an opportunity to ask questions, to voice concerns.

SEN. GRAHAM:  And if any member of this body believed that you've done something illegal, they could put in legislation to terminate this program, couldn't they?  Isn't that our power?

ATTY GEN. **GONZALES:**  Certainly, Senator, it --

SEN. GRAHAM:  Well, I would think if you believed that our president was breaking the law, you'd have the courage of your convictions and you'd bring -- you'd stop funding for it.

Now, it seems to me there's two ways we can do this.  We can argue what the law.  We can argue if it was broken.  We can play a  political dance of shirts versus skins.  Or we can find consensus as to what the law should be.  And I associate myself with Senator DeWine as to what I think it should be.  In a dangerous and difficult time for our country, I chose inquiry versus inquisition, collaboration versus conflict.

To me, there's two big things that this Congress faces and this president faces.  In all honesty, Mr. Attorney General, the statutory force resolution argument that you're making is very dangerous in terms of its application for the future, because if you overly interpret the force resolution -- and I'll be the first to say when I voted for it, I never envisioned that I was giving to this president or any other president the ability to go around FISA carte blanche. And you're right, it is not my -- my intent is the letter of the resolution.  What I'm saying is that if you came back next time, or the next president came back to this body, there would be a memory bank established here.  And I would suggest to you, Mr. Attorney General, it would be harder for the next president to get a force resolution if we take this too far, and the exceptions may be a mile long.

Do you share my concern?

ATTY GEN. **GONZALES:**  I understand your concern, Senator.

SEN. GRAHAM:  Thank you.  And that's -- I appreciate that.  So that's just a comment about the practical application of where we could go one day if we overinterpret.

Because the offer's on the table.  Let's make sure we have the same understanding.  Because if we have the same understanding between the executive, the legislative and the judicial branch, our enemy is weaker and we're stronger.

Now to the inherent authority argument.  Taken to its logical conclusion, it concerns me that it could basically neuter the Congress and weaken the courts, and I'd like to focus a minute on the inherent authority of the president during a time of war concept.

Let me give you a hypothetical, and you can answer it if you choose to, and I understand if you won't.  There's a detainee in our charge, an enemy prisoner, a high-value target.  We reasonably believe that this person possesses information that could save millions or thousands of American lives.  The president, as the commander in chief, tells the military authorities in charge, "You have my permission, my authority, and I'm ordering you, do all things necessary, and these five things I'm authorizing.  Do it because I'm commander in chief and we got to protect the country."

There's a pre-existing statute on the book passed by the Congress called the Uniform Code of Military Justice, and it tells our troops that if you have a prisoner in your charge, you're not to do these things, and they're the same five things.  What do we do?

ATTY GEN. **GONZALES:**  Well, of course, Senator, the president has already said that we're not going to engage

AFTERNOON SESSION OF A HEARING OF THE SENATE JUDICIARY COMMITTEE SUBJECT: "WARTIME EXECUTIVE POWER AND THE NATIONAL SECURITY AGENCY'S SURVEILLANCE AUTHORITY" CHAIRED BY: SENATOR ARLEN S

in torture.  He has made that -- that is a categorical statement by the president.

As to whether or not the statute that you referred to would be constitutional, these kinds of questions are very, very difficult. One could make the argument, for example, that the provision in the Constitution that talks about Congress under Section 8 of Article I giving Congress the specific authority to make rules regarding captures -- that that would give Congress the authority to legislate in this area.  Now, there is some disagreement amongst scholars about --

SEN. GRAHAM:  And I tell you this -- it's talking about ships. It's not talking about people.  But it's clear to me that the Congress has the authority to regulate the military, to fund the military, and the Uniform Code of Military Justice is a statutory scheme providing guidance, regulation and punishment to the military that the Congress passes.

ATTY GEN. **GONZALES:**  That would -- I think most scholars would say that fall under -- that's the clause in Section 8 of Article I giving the Congress the authority to pass rules regarding government and regulation of the armed forces.

SEN. GRAHAM:  And I would agree with those scholars.  And the point I'm trying to say is that we can tell our military, "Don't you do this to a detainee."  And you as commander in chief can tell the military, "We got to win the war.  We got to protect ourselves."  Now what I'm trying to say is that the -- I'm worried about the person in the middle here, because if we adopted the reasoning of the Bybee memo -- has been repudiated, appropriately -- the point I was trying to make at your confirmation hearing is that the legal reasoning used in determining what torture would be under the convention of torture or the torture statute not only was strained, that made me feel uncomfortable; it violated an existing body of law that was already on the books called the Uniform Code of Military Justice.  If a military member had engaged in the conduct outlined by the Bybee memo, they could have been prosecuted for abusing a detainee because it's a crime in the military, Mr. Attorney General, for a guard to slap a prisoner, much less have something short of major organ failure.

 This is really a big deal for the people fighting the war.  And if you take your inherent-authority argument too far, then I am really concerned that there is no check and balance.  And when the nation's at war, I would argue, Mr. Attorney General, you need checks and balances more than ever, because within the law, we put a whole group of people in jail who just looked like the enemy.

ATTY GEN. **GONZALES:**  Senator, if I could just respond.  I'm not -- maybe I haven't been as precise with my words as I might have been. I don't think I've talked about inherent exclusive authority, I've talked about inherent authority under the Constitution in the commander in chief.  Congress, of course, and I've said in response to other questions, they have a constitutional role to play also during a time of war.

SEN. GRAHAM:  We coexist.

Now, can I get to the FISA statute in two minutes here?  And Mr. -- I hope we do have another round, because this is very important. I'm not here to accuse anyone of breaking the law; I want to create law that will help people fighting the war know what they can and can't do.

The FISA statute, if you look at the legislative language, they made a conscious decision back in 1978 to resolve this two-lane debate.  There's two lanes you can go down as commander in chief.  You can act with the Congress and you can have inherent authority as commander in chief.  The FISA statute said basically this is the exclusive means to conduct foreign surveillance where American citizens are involved, and the Congress, seems to me, gave you a one-lane highway, not a two-lane highway.  They took the inherent- authority argument, they thought about it, they debated it, and they passed a statute, if you look at the legislative language, saying this shall be the exclusive means.  And it's different than 1401.

So I guess what I'm saying, Mr. Attorney General, if I buy our argument about FISA, I can't think of a reason you wouldn't have the ability, if you chose to, to set aside the statute on torture if you believed it impeded the war effort.

AFTERNOON SESSION OF A HEARING OF THE SENATE JUDICIARY COMMITTEE SUBJECT: "WARTIME EXECUTIVE POWER AND THE NATIONAL SECURITY AGENCY'S SURVEILLANCE AUTHORITY" CHAIRED BY: SENATOR ARLEN S

ATTY GEN. **GONZALES:**  Well, Senator, whether or not we set aside a statute, of course, is not --

SEN. GRAHAM:  That inherent authority sets aside the statute.

ATTY GEN. **GONZALES:**  That's not what we're talking about here. We don't need to get to that tough question.

SEN. GRAHAM:  If you don't buy the force resolution argument, if we somehow magically took that off the table, that's all you're left with, is the inherent authority.  And Congress could tomorrow change that resolution, and that's dangerous for the country if we get in a political fight over that.

All I'm saying is the inherent-authority argument in its application, to me, seems to have no boundaries when it comes to executive decisions in a time of war.  It deals the Congress out, it deals the courts out.  And Mr. Attorney General, there is a better way, and on our next round of questioning, we will talk about that better way.

ATTY GEN. **GONZALES:**  Sir, can I simply make one quick response?

SEN. GRAHAM:  You may.  You may respond, Attorney General.

ATTY GEN. **GONZALES:**  Well, the fact that the president, again, may have inherent authority doesn't mean that Congress has no authority in a particular area.  And we look at the words of the Constitution and there are clear grants of authority to the Congress in a time of war.  And so if you're talking about competing constitutional interests, that's when you get into sort of the third part of the Jackson analysis.

SEN. GRAHAM:  That's where we're at right now.

ATTY GEN. **GONZALES:**  I don't believe that's where we're at right now.

SEN. GRAHAM:  That's where you're at with me.  (Laughs.)

ATTY GEN. **GONZALES:**  Sir, even under the third part of the Jackson analysis -- again, I haven't done the detailed work that obviously these kinds of questions require; these are tough questions, but I believe that the president does have the authority under the Constitution.

SEN. SPECTER:  Thank you, Senator Graham.  Senator Schumer.

SEN. CHARLES SCHUMER (D-NY):  Thank you, Mr. Chairman.  And General **Gonzales,** I just want to make a couple of points that are important to keep in mind as we ask you questions.

First, we all support a strong, robust and vigorous national- security program.  Like everyone else in this room, I want the president to have all the legal tools he needs as we work together to keep our nation safe and free, including wiretapping.  And I appreciate the difficult job you and the president have, balancing security and liberty.  That is not an easy one.

But I firmly believe that we can have both security and rule of law.  And I'm sure you agree with that, General **Gonzales,** don't you?

ATTY GEN. **GONZALES:**  Yes, Senator.

SEN. SCHUMER:  And that's what distinguishes us from so many other nations, including our enemies.  Is that correct?

ATTY GEN. **GONZALES:**  That is correct.

SEN. SCHUMER:  Okay.  Now, the first job of government is to protect our security, and everyone on this

AFTERNOON SESSION OF A HEARING OF THE SENATE JUDICIARY COMMITTEE SUBJECT: "WARTIME EXECUTIVE POWER AND THE NATIONAL SECURITY AGENCY'S SURVEILLANCE AUTHORITY" CHAIRED BY: SENATOR ARLEN S

committee supports that. But another important job of government is to enforce the rule of law, because the temptation to abuse the enormous power of the government is very real. And that's why we have checks and balances. They're at the fulcrum of our democracy. You agree with that.

ATTY GEN. **GONZALES:** I agree with that, Senator.

SEN. SCHUMER: I have to say, by the way, that's why I'm disappointed that Chairman Specter wouldn't let us show the clip of the president's speech. Senator Specter said that the transcript speaks for itself. But seeing the speech with its nuances is actually very different from reading the record. And when you watch the speech, it seems clear that the president isn't simply talking about roving wiretaps. He's talking about all wiretaps, because the fact that you don't wiretap citizens without a warrant has been a bedrock of American principles for decades.

Nonetheless, having said that, I am gratified that these hearings have been a lot less partisan than the previous ones we held in this room. And many Republican colleagues have voiced concerns about the administration policy. I want to salute my Republican colleagues for questioning some of these policies -- Chairman Specter and Senator DeWine, Senator Brownback, Senator Graham and others.

But it's not just Republican senators who seriously question the NSA program, but very high-ranking officials within the administration itself. Now, you've already acknowledged that there were lawyers in the administration who expressed reservations about the NSA program. There was dissent. Is that right?

ATTY GEN. **GONZALES:** Of course, Senator. As I indicated, this program implicates very difficult issues. The war on terror has generated several issues that are very, very complicated.

SEN. SCHUMER: Understood.

ATTY GEN. **GONZALES:** Lawyers disagree.

SEN. SCHUMER: I concede all those points. Let me ask you about some specific reports. It's been reported by multiple news outlets that the former number two man in the Justice Department, the premier terrorism prosecutor, Jim Comey, expressed grave reservations about the NSA program, and at least once refused to give it his blessing. Is that true?

ATTY GEN. **GONZALES:** Senator, here's a response that I feel that I can give with respect to recent speculation or stories about disagreements. There has not been any serious disagreement, including -- and I think this is accurate -- there's not been any serious disagreement about the program that the president has confirmed.

There have been disagreements about other matters regarding operations, which I cannot get into. I will also say --

SEN. SCHUMER: But there was some -- I'm sorry to cut you off. But there was some dissent within the administration, and Jim Comey did express at some point -- that's all I asked you -- some reservation.

ATTY GEN. **GONZALES:** The point I want to make is that, to my knowledge, none of the reservations dealt with the program that we're talking about today. They dealt with operational capabilities that we're not talking about today.

SEN. SCHUMER: I want to ask you again about -- I'm just -- we have limited time.

ATTY GEN. **GONZALES:** Yes, sir.

SEN. SCHUMER: It's also been reported that the head of the Office of Legal Counsel, Jack Goldsmith, a respected lawyer and professor at Harvard Law School, expressed reservations about the program. Is that true?

ATTY GEN. **GONZALES:** Senator, rather than going individual by individual --

AFTERNOON SESSION OF A HEARING OF THE SENATE JUDICIARY COMMITTEE SUBJECT: "WARTIME EXECUTIVE POWER AND THE NATIONAL SECURITY AGENCY'S SURVEILLANCE AUTHORITY" CHAIRED BY: SENATOR ARLEN S

SEN. SCHUMER:  No, I think we're -- this is --

ATTY GEN. **GONZALES:**  -- let me just say that I think differing views that have been the subject of some of these stories does not -- did not deal with the program that I'm here testifying about today.

SEN. SCHUMER:  But you are telling us that none of these people expressed any reservations about the ultimate program.  Is that right?

ATTY GEN. **GONZALES:**  Senator, I want to be very careful here, because, of course, I'm here only testifying about what the president has confirmed.  And with respect to what the president has confirmed, I believe -- I do not believe that these DOJ officials that you're identifying had concerns about this program.

SEN. SCHUMER:  Did you -- there are other reports -- I'm sorry; you're not giving me a yes or no answer here.  I understand that. Newsweek reported that several Department of Justice lawyers were so concerned about the legal basis for the NSA program that they went so far as to line up private lawyers.  Do you know if that's true?

ATTY GEN. **GONZALES:**  I do not know if that's true.

SEN. SCHUMER:  Now, let me just ask you a question here.  You mentioned earlier that you had no problem with Attorney General Ashcroft, someone else -- I didn't want to ask you about him; he's your predecessor -- people have said had doubts.  But you said that you had no problem with him coming before this committee and testifying when Senator Specter asked.  Is that right?

ATTY GEN. **GONZALES:**  Senator, who the chairman chooses to call as a witness is up to the chairman.

SEN. SCHUMER:  The administration doesn't object to that. Correct?

ATTY GEN. **GONZALES:**  Obviously the administration, by saying that we would have no objection, doesn't mean that we would waive any privileges that might exist.

SEN. SCHUMER:  I understand.  I got that.  But I assume they're the same -- the same would go for Mr. Comey, Mr. Goldsmith, and any other individuals.  Assuming you didn't waive executive privilege, you wouldn't have an objection to them coming before this committee.

ATTY GEN. **GONZALES:**  Attorney-client privilege, deliberative privilege, to the extent that there are privileges, it is up to the chairman to decide who he wants to call as a witness.  But let me just say that if we're engaged in a debate about what the law is and the position of the administration, that is my job and that's what I'm doing here today.

SEN. SCHUMER:  I understand.  And you are doing your job.  And that's why I am requesting, as I have in the past, but renewing it here today, reaffirmed even more strongly by your testimony and everything else, that we invite these people, that we invite former Attorney General Ashcroft, Deputy Attorney General Comey, OLC Chair Goldsmith, to this hearing and actually compel them to come if they won't on their own.  And as for privilege --

SEN. SPECTER:  If I might interrupt you for just one moment --

SEN. SCHUMER:  Please.

SEN. SPECTER:  You'll have extra time.

SEN. SCHUMER:  Yes, thank you.

SEN. SPECTER:  I think the record was in great shape where I left it.  If you bring in Attorney General Ashcroft, that's a critical step.

AFTERNOON SESSION OF A HEARING OF THE SENATE JUDICIARY COMMITTEE SUBJECT: "WARTIME EXECUTIVE POWER AND THE NATIONAL SECURITY AGENCY'S SURVEILLANCE AUTHORITY" CHAIRED BY: SENATOR ARLEN S

SEN. SCHUMER:  Right.

SEN. SPECTER:  It wasn't that I hadn't thought of Mr. Comey, Mr. Goldsmith and other people.  But I sought to leave the record with the agreement of the attorney general to bring in former Attorney General Ashcroft.

SEN. SCHUMER:  Well, Mr. Chairman, I respect that.  I think others are important as well.  But I want to get to the issue of privilege here.

SEN. SPECTER:  I'm not saying they aren't important.  I'm just saying, what's the best way to get them here?

SEN. SCHUMER:  Okay.  Well, whatever way we can, I'd be all for.

On privilege -- because that's going to be the issue, even if they come here, as I'm sure you will acknowledge, Mr. Chairman -- I take it you'd have no problem with them talking about their general views on the legality of this program, just as you are talking about those -- not to go into the specific details of what happened back then, but their general views on the legality of these programs.  Do you have any problem with that?

ATTY GEN. **GONZALES:**  The general views of the program that the president has confirmed.  Senator, that's -- again, if we're talking about the general views of --

SEN. SCHUMER:  I just want them to be able to testify as freely as you've testified here, because it wouldn't be fair, if you're an advocate of administration policies, you have one set of rules, and if you're an opponent or possible opponent of administration policies, you have another set of rules.  That's not unfair, is it?

ATTY GEN. **GONZALES:**  Sir, it's up to the chairman to --

SEN. SCHUMER:  No, but would you or the administration -- you as the chief legal officer -- have any problem with them testifying in the same way you did about general legal views of the program?

ATTY GEN. **GONZALES:**  I would defer to the chairman --

SEN. SCHUMER:  I'm not asking you, sir -- in all due respect, I'm not asking you what the chairman thinks.  He's doing a good job here, and I don't begrudge that one bit.

ATTY GEN. **GONZALES:**  Sir, my answer is I defer to the chairman.

SEN. SCHUMER:  I'm asking you what the administration would think in terms of exercising any claim of privilege.  You're not going to have -- I'm sorry here -- you're not going to have different rules for yourself, an administration advocate, than for these people, who might be administration dissenters in one way or another, are you?

ATTY GEN. **GONZALES:**  Sir, I don't know if you're asking what are they going to say.

SEN. SCHUMER:  I'm not asking you that.  Would the rules be the same?  I think you can answer that yes or no.

ATTY GEN. **GONZALES:**  If they came to testify?

SEN. SCHUMER:  Correct.

ATTY GEN. **GONZALES:**  Well, sir, the client here is the president of the United States.  I'm not sure it's in my place to offer --

SEN. SCHUMER:  Or his chief --

ATTY GEN. **GONZALES:**  -- offer up a position or my recommendation to you about what I might recommend to

AFTERNOON SESSION OF A HEARING OF THE SENATE JUDICIARY COMMITTEE SUBJECT: "WARTIME EXECUTIVE POWER AND THE NATIONAL SECURITY AGENCY'S SURVEILLANCE AUTHORITY" CHAIRED BY: SENATOR ARLEN S

the president of the United States.  It would not be appropriate here.

SEN. SCHUMER:  But what would be -- I just am asking you, as a very fine, well-educated lawyer, should or could the rules be any different for what you are allowed to say, with privilege hovering over your head, and what they are allowed to say with those same privileges hovering over their heads?  Should the rules be any different?  If you can't say yes to that, you know, then that's fundamentally unfair.  It's saying that these hearings -- it's saying, really, that the administration doesn't have the confidence to get out the whole truth.

ATTY GEN. **GONZALES:**  Sir, my hesitation is, quite frankly, I haven't thought recently about the issue about former employees coming to testify about their legal analysis or their legal recommendations to their client.  And that is the source of my hesitation.

SEN. SCHUMER:  Okay, I was just -- my time --

SEN. SPECTER:  Senator Schumer, take two more minutes from my interruption --

SEN. SCHUMER:  Well, thank you, Mr. Chairman.

SEN. SPECTER:  -- providing you move to another subject. (Laughter.)

SEN. SCHUMER:  Well, okay.  I just -- again, I think this is very important, Mr. Chairman.

SEN. SPECTER:  Oh, I do too.

SEN. SCHUMER:  And I think you would agree.  Okay.

SEN. SPECTER:  If this were a courtroom, I'd move to strike all your questions and his answers, because the record was so much better off before.  (Laughter.)

SEN. SCHUMER:  Yeah.  Well, I don't buy that, Mr. Chairman.

SEN. SPECTER:  But take two more minutes on the condition stated.

SEN. SCHUMER:  I don't buy that.  I think we have to try to tie down as much as we can here, okay?

Let me go to another bit of questions here.  You said, Mr. Attorney General, that the AUMF allowed the president -- that's one of  the legal justifications, the Constitution -- to go ahead with this program.  Now, under your legal theory, could the government, without ever going to a judge or getting a warrant, search an American's home or office?

ATTY GEN. **GONZALES:**  Well, of course, Senator, any authorization or activity by the president would be subject to the Fourth Amendment. And what you're talking about -- I presume you're talking about a law enforcement effort.  This is not a law enforcement --

SEN. SCHUMER:  Let me interrupt for a minute.  Aren't wiretaps subject to the Fourth Amendment as well?

ATTY GEN. **GONZALES:**  Of course.  Of course they are.

SEN. SCHUMER:  Okay.  So they're both subject.  What would prevent the president's theory, your theory, from, given the danger, given maybe some of the difficulties, from going this far?

ATTY GEN. **GONZALES:**  Well, sir, it's hard to answer a hypothetical question in the way that you pose it in terms of how far do the president's authorities extend.  However far they may extend, Senator, they clearly extend so far as to allow the president of the United States to engage in electronic surveillance of the enemy during a time of war.

SEN. SCHUMER: Could he engage in electronic surveillance when the phone calls both originated and ended in the United States, if there were al Qaeda suspects?

ATTY GEN. **GONZALES:** I think that question was asked earlier. I've said that I don't believe that we've done the analysis on that.

SEN. SCHUMER: I didn't ask that. I asked, what do you think the theory is?

ATTY GEN. **GONZALES:** That's a different situation, Senator. And, again, these kind of constitutional questions -- I could offer up a guess, but these are hard questions.

SEN. SCHUMER: Has this come up? Has it happened?

ATTY GEN. **GONZALES:** Sir, what the president has authorized is only international phone calls.

SEN. SCHUMER: I understand. Has there been a situation brought to your attention where there were al Qaeda called -- someone suspected of being part of al Qaeda or another terrorist group calling someone from the United States, to the United States?

ATTY GEN. **GONZALES:** Sir, now you're getting into sort of operations, and I'm not going to respond to that.

SEN. SCHUMER: I'm not asking any specific. I'm asking ever.

ATTY GEN. **GONZALES:** You're asking about how this program has operated. And I'm not going to answer that question, sir.

SEN. SCHUMER: Thank you, Mr. Chairman.

SEN. SPECTER: Thank you, Senator Schumer. Senator Cornyn.

SEN. JOHN CORNYN (R-TX): Thank you, Mr. Chairman. I think your comments, Mr. Chairman, about this not being a court of law are apt, because I don't think we're going to get resolution about the disagreement among lawyers as to what the legal answer is. But I do believe it's important to have the hearing and to air the various points of view.

But I would hope, and I trust is along the lines of what Senator Schumer stated, is that there would be consensus on the committee and throughout the Congress that we should use all legal means available to us to gather actual intelligence that has the potential of saving American lives. You certainly would agree with that, wouldn't you, General **Gonzales?**

ATTY GEN. **GONZALES:** Yes, Senator.

SEN. CORNYN: And some have stated the question like this. They've said, "Well, has the Foreign Intelligence Surveillance Act," which was passed in 1978, "authorized the president to conduct this particular program?"

I have a couple of problems with that question stated that way. Number one, the technology has surpassed what it was in 1978, so our capacity to gain actual intelligence has certainly changed. And the very premise of the question suggests that the president can only exercise the authority that Congress confers.

And when people talk about the law, the law that pertains to this particular question is not just the Foreign Intelligence Surveillance Act, but it includes the Constitution and the authorization for use of military force. Would you agree with that, General **Gonzales?**

ATTY GEN. **GONZALES:** Senator, you raise a very important point. People focus on the Foreign Intelligence

AFTERNOON SESSION OF A HEARING OF THE SENATE JUDICIARY COMMITTEE SUBJECT: "WARTIME EXECUTIVE POWER AND THE NATIONAL SECURITY AGENCY'S SURVEILLANCE AUTHORITY" CHAIRED BY: SENATOR ARLEN S

Surveillance Act and say, "This is what the words say, and that's the end of it.  If you're not following it in total, you're obviously in violation of the law."

That is only the beginning of the analysis.  You have to look and see what Congress has done subsequent to that.  And then, of course, you have to look at the Constitution.  There have been many statements today about "No one is above the law."  And I would simply remind -- and I know this doesn't need to be stated -- but no one is above the Constitution either, not even the Congress.

SEN. CORNYN:  And clearly the Supreme Court, in the Hamdi case, said what we all know to be the fact, and that is, no president is above the law; no person in this country, regardless of how exalted their position may be or how relatively modest their position may be, we're all governed by the Constitution and laws of the United States.

ATTY GEN. **GONZALES:**  During my confirmation hearings, I talked about Justice O'Connor's statement from Hamdi, that a state of war is not a blank check for the president of the United States.  And I said in my hearing that I agreed with that.

SEN. CORNYN:  General **Gonzales,** I regret to say that when I was, just a few minutes ago, watching the crawler or the caption in a cable news network, it referred to domestic surveillance, which strikes me as a fundamental error in the accuracy of the reporting of what's going on here.  You've made clear that what's been authorized here is not domestic surveillance; that is, starting from and ending in the United States.  This is an international surveillance with known al Qaeda operatives.  Correct?

ATTY GEN. **GONZALES:**  I think people who call this a domestic surveillance program are doing a disservice to the American people. It would be like flying from Texas to Poland and saying that's a domestic flight.  We know that's not true.  That would be an international flight.  And what we're talking about are international communications.  And so I agree with your point, Senator.

SEN. CORNYN:  With regard to the authorization of the use of military force, some have questioned whether it was actually discussed in Congress whether surveillance of international phone calls between al Qaeda overseas and here, whether that was actually in the minds of individual members of Congress when they voted to support the authorization of the use of military force.

It strikes me as odd to say that Congress authorized the commander-in-chief to capture, to detain, to kill, if necessary, al Qaeda, but we can't listen to their phone calls and we can't gather intelligence to find out what they're doing so we can prevent future attacks against the American people.

Now, you've explained your legal analysis with regard to the Hamdi decision and explaining that intelligence is a fundamental incident of war.  And I think that makes good sense.  And here again, I realize we have some very fine lawyers on the committee and there are a lot of lawyers around the country who've opined on this, some who have been negative, some who have been positive.

I was struck by the fact that John Schmidt, who was associate attorney general during the Clinton Justice Department, wrote what I thought was an eloquent op-ed piece for the Chicago Tribune dated December the 21st, 2005, agreeing with the administration's point of view.  That's only to point out that lawyers, regardless of their party affiliation, will have perhaps differing views.

But again, I would hope that what we're not engaged in is either a partisan debate or even an ideological debate, but a legal

But again, I would hope that what we're not engaged in is either a partisan debate or even an ideological debate, but a legal debate on what the constitutional laws of the United States provide for.

AFTERNOON SESSION OF A HEARING OF THE SENATE JUDICIARY COMMITTEE SUBJECT: "WARTIME EXECUTIVE POWER AND THE NATIONAL SECURITY AGENCY'S SURVEILLANCE AUTHORITY" CHAIRED BY: SENATOR ARLEN S

Let me turn to another subject that's caused me a lot of concern and that is our espionage laws and the laws that criminalize the intentional leaking of classified information. It's my understanding from the news reports that the Department of Justice has undertaken an investigation to see whether those who actually leaked this program to the New York Times or any other media outlet, might have violated our espionage laws. Is that correct?

ATTY GEN. **GONZALES:** I can confirm, Senator, that an investigation has been initiated.

SEN. CORNYN: Does that investigation also include any potential violation for publishing that information?

ATTY GEN. **GONZALES:** Senator, I'm not going to get into specific laws that are being looked at, but obviously, our prosecutors are going to look to see all the laws that have been violated and if the evidence is there, they're going to prosecute those violations.

SEN. CORNYN: Well, you may give me the same answer to this next question, but I'm wondering, is there any exclusion or immunity for the New York Times or any other person to receive information from a lawbreaker seeking to divulge classified information? Is there any explicit protection in the law that says that if you receive that and you publish it, you are somehow immune from a criminal investigation?

ATTY GEN. **GONZALES:** Senator, I'm sure the New York Times has their own great set of lawyers and I would hate in this public forum to provide them my views as to what would be a legitimate defense.

SEN. CORNYN: Well, it's -- there's a lot of very strange circumstances surrounding this initial report in the New York Times, including the fact that the New York Times apparently sat on the story for a year and then, of course, the coincidence -- some might say -- that the story was broken on the date that Congress was going to vote -- the Senate was going to vote on reauthorization of the Patriot Act. But we'll leave that, perhaps, for another day.

SEN. CORNYN: I believe I will yield the rest of my time back. Thank you, Mr. Chairman.

SEN. SPECTER: Thank you very much, Senator Cornyn.

SEN. RICHARD DURBIN (D-IL): Thank you very much, Mr. Chairman. Thank you, Attorney General, for being here.

During the course of this hearing, you have referred to FISA several times as a useful tool -- a useful tool in wiretapping and surveillance. And I've thought about that phrase, because it's a phrase that's been used by the White House, too. Referring to FISA as a useful tool in wiretapping is like referring to speed limits and troopers with radar guns as useful tools on a motoring trip.

I think FISA is not there as a useful tool to the administration. It is there as a limitation on the power of a president when it comes to wiretapping. And I think your use of that phrase, useful tool, captures the attitude of this administration toward this law -- we'll use it when it doesn't cause a problem. We'll ignore it when we have to and I think that's why we're here today.

And I'm just -- I'm curious, Mr. Attorney General, as we get into this and I look back on some of your previous testimony and what you said to this committee in confirmation hearings and the like, how far will this administration go under the theories which you stated today to ignore or circumvent laws like FISA? I asked you during the course of the last -- your confirmation hearing -- the question of this whole power of the commander in chief. I wish I could play it to you here, but there's a decision made by the committee that we aren't going to allow that sort of thing to take place. But I do believe that if I could play, you would be asked to explain your answer to a question, which I posed to you.

And the question was this -- Mr. Attorney General, has this president ever invoked that authority as commander in chief or otherwise to conclude that a law was unconstitutional and refused to comply with it? Mr. **Gonzales** -- I believe

AFTERNOON SESSION OF A HEARING OF THE SENATE JUDICIARY COMMITTEE SUBJECT: "WARTIME
EXECUTIVE POWER AND THE NATIONAL SECURITY AGENCY'S SURVEILLANCE AUTHORITY"
CHAIRED BY: SENATOR ARLEN S

that I stated in my June briefing about these memos that the president has not exercised that authority.

You said to us today, several times, that the president is claiming his power for this domestic spying -- whatever
you want to call it -- terrorist surveillance program -- because of the president's inherent powers, his core constitutional
authority of the executive branch.  And so I have to ask you point blank, as Senator Feingold asked you earlier, you
knew when you answered my question that this administration had decided that it was going to basically find away
around the FISA law based on the president's -- as you called it -- inherent constitutional powers.

So how can your response be valid today in light of what we now know?

ATTY GEN. **GONZALES:**  Oh, it's absolutely valid, Senator.  The -- and this is going to sound repetitious -- but it
has never been our position that we are circumventing or ignoring FISA -- quite the contrary.  The president has
authorized activities that are totally consistent with FISA, with what FISA contemplates.

I have indicated that I believe that putting aside the question of the authorization to use military force, that while it's
a tough legal question as to whether or not Congress has the authority under the Constitution to cabin or to limit the
president's constitutional authority to engage in an electronic surveillance of the enemy.  that is not -- that is not a
question that we even need to get to.  It has always been our position that FISA can be and must be read in a way that it
doesn't infringe upon the president's constitutional authority.

SEN. DURBIN:  So let me read to you what your own Justice Department just issued within the last few weeks --
in relation to the president's authority, the NSA program and FISA.  Because the president -- I quote -- "Because the
president also has determined that NSA activities are necessary in the defense of the United States from a subsequent
terrorist attack and armed conflict with al Qaeda," I quote, "FISA would impermissible interfere with the president's
most solemn constitutional obligation -- to defend the United States against foreign attack."  You can have it both ways.

ATTY GEN. **GONZALES:**  And that's why --

SEN. DURBIN:  You can't tell me that you're not circumventing it and then publish this and say that FISA
interferes with the president's constitutional authority.

ATTY GEN. **GONZALES:**  And that's why you have to interpret FISA in a way where you don't T-up that very
difficult constitutional question.

SEN. DURBIN:  What you can't do --

ATTY GEN. **GONZALES:**   -- constitutional (avoidance ?).

SEN. DURBIN:  What you have to do is take out the express language in FISA which says it is the exclusive means
-- it is exclusive.  And the way you take it out is by referring to -- and I think you've said it over and over again -- you
just have to look at that phrase, you say, except as otherwise authorized by statute.

Senator Feinstein and I were struggling.  We're looking through FISA -- where is that phrase, except as otherwise
authorized by statute?  It's not in FISA.  It's not in the FISA law.  You may find it in the criminal statute and may want
to adopt it by reference, but this FISA law signed by a president and the law of the land is the exclusive way that a
president can wiretap.

And I want to ask you, if this is exclusive, why didn't you take advantage of the fact that you had and the president
had such a strong bipartisan support for fighting terrorism that we gave the president the Patriot Act with only one
dissenting vote?  We've supported this president with every dollar he's asked for to fight terrorism.  Why didn't you
come to this Congress and say, there are certain things we need to change, which you characterize as cumbersome and
burdensome in FISA.  Why didn't you work with us to make the law better and strong and more effective when you

AFTERNOON SESSION OF A HEARING OF THE SENATE JUDICIARY COMMITTEE SUBJECT: "WARTIME EXECUTIVE POWER AND THE NATIONAL SECURITY AGENCY'S SURVEILLANCE AUTHORITY" CHAIRED BY: SENATOR ARLEN S

knew that you had a bipartisan consensus behind you?

ATTY GEN. **GONZALES:** Senator, the primary criminal code -- criminal provision in FISA, Section 109, 50 USC 180 -- it is page 179 in one of these books -- provides that a person is guilty of an offense if he intentionally engages in electronic surveillance under cover of law accept as authorized by statute.

This provision means that you have to engage in electronic surveillance as provided here, accept as otherwise provided by statute. And this is the provision that we're relying upon. It's in the Foreign Intelligence Surveillance Act.

SEN. DURBIN: It's Title 18. But let me just tell you, what you don't want to read to us --

ATTY GEN. **GONZALES:** Sir, it's not Title 18.

SEN. DURBIN: A Foreign Intelligence Surveillance Act of 1978 shall be the exclusive means by which electronic surveillance -- as defined in Section 101 as to check, interception of domestic wire electronic communication may be conducted.

And so what you said is, well, when you authorized the war you must have known that we were going to really expand beyond FISA. I've got the book here. You can look through it if you like. There's not a single reference in our passing -- that AUMF that we talk about -- Authorized Use of Military Force -- not a single reference to surveillance and intelligence in the manner in which you described it.

ATTY GEN. **GONZALES:** Sir, there's probably not a single reference to detainment of American citizens, but the Supreme Court has said that that is exactly what you've authorized because it is a fundamental incident of waging war.

SEN. DURBIN: So since you've quoted that repeatedly, let me read what that court has said, we conclude -- Hamdi Decision -- we conclude the detention of individuals falling into the limited category we are considering for the duration of the particular conflict in which they are captured is so fundamental and accepted an incident to war to be an exercise of necessary and appropriate force.

ATTY GEN. **GONZALES:** No question. That case was not about electronic surveillance. I will concede that.

SEN. DURBIN: But I'll tell you something else, Mr. Attorney General, if you would then read, I think, the fine reasoning of Justice O'Connor, she comes to a point which brings us here today -- and I thank the chairman for allowing us to be here today -- and this is what she says in the course of this decision: It is during our most challenging and uncertain moments that our nation's commitment to due process is most severely tested. And it is in those times that we must preserve our commitment at home to the principles for which we fight abroad.

We have said repeatedly as nominees for the Supreme Court have come here, do you accept the basis of Hamdi? That a war is not a blank check for a president? They have said, yes, that's consistent with Jackson and Youngstown. Now what we hear from you is that you are going to take this decision in Hamdi, and build it into a way to avoid the most basic statute when it comes to electronic surveillance in America. A statute which describes itself as the exclusive means by which this government can legally do this.

ATTY GEN. **GONZALES:** Senator, I think that in reading that provision you just decided to -- you have to consider Section 109. Section 109 contemplates an additional authorization by the Congress. Congress provided that additional authorization when it authorized the use of military force following the attacks of 9/11.

SEN. DURBIN: Well, the last thing I'd like to say -- and I only have a minute to go -- is the greatest fear that we have is that what this president is now claiming is going to go far beyond what you've described today. What you've described today is something we would all join in on a bipartisan basis to support -- use every wiretap capacity you have to stop dangerous terrorists from hurting Americans.

AFTERNOON SESSION OF A HEARING OF THE SENATE JUDICIARY COMMITTEE SUBJECT: "WARTIME EXECUTIVE POWER AND THE NATIONAL SECURITY AGENCY'S SURVEILLANCE AUTHORITY" CHAIRED BY: SENATOR ARLEN S

If you came to Capitol Hill and asked us to change a law in a reasonable way to reach that goal, you'd have the same bipartisan support.  Our concern is what this president is asking for will allow this administration to comb through thousands of ordinary Americans e- mails and phone calls.  In the audience today is Richard Fleischer (sp) of Willowbrook, Illinois.  I don't know if Mr. Fleischer (sp) is still here.  Mr. Fleischer (sp) wrote to the NSA and asked if he had been wiretapped because he had has conversations with people overseas.  And after several letter that he sent back and forth, the best he could get from the National Security Administration is that they would neither confirm nor deny the existence of records responsive to his request.

Ordinary Americans wondering of their telephone calls, if their e-mails overseas have been wiretapped and there is no safeguard for their liberty and freedom.  What we have today is your announcement that career professionals and experts will watch out for the freedoms of America.  Career professionals and experts, sadly, in our nation's history have done things in the past that we're not proud of.  Career professionals have made bad decisions -- Japanese internment camps, enemies list.  What we really rely on is the rule of law and the Constitution -- safeguards we can trust by people we can see.  And when it comes to some person working at NSA, I don't think it gives us much comfort.

SEN. SPECTER:  Thank you, Senator Durbin.

Before yielding to Senator Brownback, I want to announce that I'm going to excuse myself for just a few minutes.  We're starting on floor debate this afternoon at 3:00 on the Asbestos Reform Bill on which Senator Leahy and I are cosponsors, and I am scheduled to start the debate at 3:00 and I will return as soon as I have made a floor statement.  And in the interim, Senator Hatch has agreed to chair the hearing.

Senator Brownback, you're recognized.

SEN. SAM BROWNBACK (R-KS):  Thank you, Mr. Chairman.  I appreciate the hearing.  Attorney General, thank you for being here.

I want to look at the reason we're in this war on terrorism.  I want to talk about the length of time we may be in the war on terrorism and then I want to look at FISA's use forward from this point in the war on terrorism.

I don't need to remind the attorney general -- but I certainly would my colleagues -- that we are very actively engaged in a war on terrorism today.  January 19th of this year, Osama bin Laden in a tape says this, quote, "The reason why we didn't have such an operation will take place and you will see such operations, by the grace of God."  And by that he's talking about more 9/11's and that was January 19th, 2006.

Al-Zawahiri -- number two person -- January 30th of this year says this, Bush, do you know where I am?  Among the Muslim masses enjoying their care with God's blessings and sharing with them their holy war against you until we defeat you, God willing.  The lion of Islam, Sheik Osama bin Laden, may God protect him, offered you a decent exit from your dilemma, but your leaders who are keen to accumulate wealth insist on throwing you in battles and killing your souls in Iraq and Afghanistan and, God willing, on your own land.

I just want to remind people that as we get away from 9/11 and 2001, we not forget that we're still very much in a war on terrorism and people are very much at war against us.

And we're talking about probably one of the lead techniques we can use in this war, which I would note recent testimony of General Hayden said this about the technique of the information you're using right now.  He said, quote, "Had this program been in effect prior to 9/11, it's my professional judgment that we would have detected some of the 9/11 al Qaeda operatives in the United States and we would have identified them as such."

Mr. Attorney General, I don't know if you have a different opinion from General Hayden on that, but --

ATTY GEN. **GONZALES:**  I never have a different opinion from General Hayden on the intel capabilities that

AFTERNOON SESSION OF A HEARING OF THE SENATE JUDICIARY COMMITTEE SUBJECT: "WARTIME EXECUTIVE POWER AND THE NATIONAL SECURITY AGENCY'S SURVEILLANCE AUTHORITY" CHAIRED BY: SENATOR ARLEN S

we're talking about here.  Both he and Director Muller have recently testified about the importance of the terrorist surveillance program.  Now General Hayden did say it's been very successful, that we've gotten information we would not have otherwise gotten, that it has helped us, I think he said, deter and detect attacks here and abroad.  FBI Director Muller said it was a valuable tool, had helped identify would-be terrorists in the United States, and helped identified individuals providing material support to terrorists.  So those are the experts saying how valuable this tool has been.

SEN. BROWNBACK:  Having said that, we're -- and I've read through most of your white paper material and I've looked at a great deal of it.  I'm -- I'm struck and I'm -- I'm -- I think we have an issue we need to deal with.  Part of what we're working off of is a war declaration dated September 18th, 2001 and a war declaration on Afghanistan, and a war declaration October 16th, 2002 on the use of military force in Iraq.  And all necessary force and all necessary -- "the president is authorized to use all necessary and appropriate force against those nations, organizations or persons he determines planned, authorized, committed or aided the terrorist attacks."

It strikes me that we're going to be in this war on terrorism possibly for decades.  Maybe not, but this could be the Cold War of our generation. Maybe it doesn't go that period of time, but it has the possibilities of going for some extended period of time.  And I share Senator DeWine's concern that we should look then at the FISA law and make sure that as we move forward in this, that we're not just depending upon these authorizations of war to say that that puts us in a superior position under the Article II powers, but that to maintain the support of the American public, to have another set of eyes also looking at this surveillance technique is an important thing in maintaining the public's support for this.

And so I want to look and direct you to looking at the FISA law in particular.  And you've made some comments here this morning, I think have been -- today that have been very well -- very well stated and thought through.  You've talked at one point not well -- the FISA law was not well structured to the needs of today's terrorist war effort.  That law was passed, what, 27 years ago or something of that nature, and certainly didn't contemplate a war on terrorism like we're in today.  And I want to look specifically at how we could amend that FISA law, looking at a possible decades-long war on terrorism.

Now one of the areas you've talked about that's cumbersome is the 72-hour provision within the law, if I'm -- if I'm gathering what you're saying correctly.  Congress extended this period from 24 to 72 hours in 2001.  Just looking narrowly at what would need to be done to use the FISA authority more broadly and still be able to stop terrorists, if that is extended further, would it make it more likely that you would use the FISA process if that's extended beyond 72 hours?

ATTY GEN. **GONZALES:**  It's hard to say, Senator because it's -- you know, whether it's 24, 72, whatever, I have got to make a determination under the law that at the time I grant emergency authorization that all the requirements of FISA are met.  I think General Hayden said it best yesterday:  this is not a 72-hour sort of hall pass.  I've got to know when I grant that authorization whether I then have 24 or 72 hours to submit a written application to the court. I've got to know at the time I say yes, go forward, that all the requirements of FISA are met.  That's -- that's the problem.

If I could just also make one final point --

SEN. BROWNBACK:  Fair enough.

ATTY GEN. **GONZALES:**  -- there was not a war declaration, either in connection with -- with al Qaeda or in Iraq.  It was an authorization to use military force.  I only want to clarify that because there are implications.  Obviously, when you talk about a war declaration, you're possibly talking about effecting treaties, diplomatic relations.  And so there is -- there is a distinction in law and in practice, and we're not talking about a war declaration. This is an authorization only to use military force.

SEN. BROWNBACK:  Looking forward in the war on terrorism and the use of FISA and this committee's desire I believe to have the administration whereever possible and more frequently use FISA -- and you've noted you've used it

AFTERNOON SESSION OF A HEARING OF THE SENATE JUDICIARY COMMITTEE SUBJECT: "WARTIME EXECUTIVE POWER AND THE NATIONAL SECURITY AGENCY'S SURVEILLANCE AUTHORITY" CHAIRED BY: SENATOR ARLEN S

more this past year than the year before -- what specific areas would make this decision on your part easier, more likely to use the FISA process?

ATTY GEN. **GONZALES:** Well, Senator, if you're talking about domestic surveillance in a peacetime situation, for other kinds of terrorists beyond al Qaeda --

SEN. BROWNBACK: No, I'm talking about --

ATTY GEN. **GONZALES:** -- I'm not sure --

SEN. BROWNBACK: -- the war on terrorism.

ATTY GEN. **GONZALES:** Sir, I would like the opportunity to think about that and maybe talk to the experts in the department. I think it would have a better sense about what kind of specific things -- I can say that -- that the Patriot Act includes a provision which allows these orders to stay a long -- stay in place a longer period of time before they're renewed. It is quite burdensome. The fact that these things expire, we then have to go back and get it renewed, I just -- that just places an additional burden on our staff. But I would like to have the opportunity to get back to you about what other kinds of specific changes might be helpful.

SEN. BROWNBACK: Well if -- if you could because I think we're going to be in this for a period of time and we're going to be in it for succeeding administrations in this war on terrorism. And probably our most valuable tool that we have is information, early information, to be able to cut this off. So the American public I think clearly wants us to be able to get as much information as we can, and yet I think we need to provide a process that has as much security to the American public that there's no abuse in this -- in this system. This is about us trying to protect people and protect people in the United States.

And I want to know, too, presidential authority that you're protecting -- this has been talked about by Clinton administration attorney general before, many others; it's not just this administration at all, as others have specifically quoted. But I do think as this wears on, we really need to have -- have those thoughts at how we can make the FISA system work better.

ATTY GEN. **GONZALES:** Senator, we are as likewise concerned about ensuring that we protect the rights of all Americans.

SEN. BROWNBACK: And I'm sure you are, and I -- and I appreciate that. I want you to protect us from security attacks, too. And bin Laden has -- to my knowledge, when he normally makes a threat, he has followed through on these. This is a very active and live area. So I want to see if we can make that law change where it can work for a long-term war on terrorism.

Thank you, Mr. Chairman.

SEN. SPECTRE: Senator Leahy?

SEN. PATRICK LEAHY (D-VT): Thank you, Mr. Chairman.

You know, incidentally, Senator Brownback rightfully pointed out the date when FISA was enacted. But of course, we have updated it five times since 9/11, two of those when I was chairman. The year 2000, the last year of the Clinton administration, they used the FISA court one hundred and -- I mean, 1,005 times. The year of 1911 -- I mean, September 11 -- your administration there actually used it less times even than the Clinton administration used it before.

I'm just curious. You know, I started this morning -- I asked you a very straightforward question. I told you I'd come back to it, so I'm sure you've had time to check for the answer during the lunch hour. So I come to you again with it. When did the Bush administration come to the conclusion that the congressional resolution authorizing the use of

AFTERNOON SESSION OF A HEARING OF THE SENATE JUDICIARY COMMITTEE SUBJECT: "WARTIME
EXECUTIVE POWER AND THE NATIONAL SECURITY AGENCY'S SURVEILLANCE AUTHORITY"
CHAIRED BY: SENATOR ARLEN S

military force against al Qaeda also authorized warrant-less wire tapping of Americans inside the United States?

ATTY GEN. **GONZALES:** Sir, the, the authorization of this program began --

SEN. LEAHY:  Can't hear you.  Could you pull your mic a little bit closer?

ATTY GEN. **GONZALES:**  Pardon me.  The authorization regarding the terrorist surveillance program occurred subsequent to the authorization to use military force and prior to the Patriot Act.

SEN. LEAHY:  Okay.  So what you call "terrorist surveillance" I'm going to call the breaking of the Foreign Intelligence Security -- I'm asking, when -- when did you decide -- when did you decide that the authorization for use of military force gave you the power to do this? I mean, you were -- you were White House counsel then.  What date did it give you the power?

ATTY GEN. **GONZALES:**  Well, sir, I can't give you specific dates about when --

SEN. LEAHY:  That's what I asked you this morning, and you had the time to go and look.  I mean, you -- you had to sign that or sign off on that before the president -- when did you have -- when did you reach the conclusion --

ATTY GEN. **GONZALES:**  Sir, I -- I --

SEN. LEAHY:  -- that you didn't have to follow FISA?

ATTY GEN. **GONZALES:**  Sir, I'm not going to give an exact date as to when that -- the program actually commenced.

SEN. LEAHY:  Why not?

ATTY GEN. **GONZALES:**  But it has always been -- it's always been the case -- because that's an operational detail, sir.  I've already indicated the chairman has invited me -- the committee has invited me here today to talk about the legal analysis of what the president authorized.

SEN. LEAHY:  We're asking for the legal analysis.  I mean, obviously you had to -- you had to make a determination that you had right to do this.  When did you make -- when did you make the determination --

ATTY GEN. **GONZALES:**  From the very --

SEN. LEAHY:  -- that the AUMF gave you the right to do this?

ATTY GEN. **GONZALES:**  From the very outset, before the program actually commenced, it has always been the position that -- that FISA cannot be interpreted in a way that infringes upon the present constitutional authority -- that FISA must be interpreted, can be interpreted in a way that --

SEN. LEAHY:  Did you tell anybody that when you were up here seeking the Patriot Act and seeking the changes in FISA?  Did you tell anybody you had already determined -- it was your testimony here today that you made the determination virtually immediately that you had this power without using FISA.

ATTY GEN. **GONZALES:**  Well, sir, the fact -- the fact that -- that we were having discussions about the Patriot Act and there wasn't a specific mention about electronic surveillance with respect to this program -- I would remind the committee that there was also discussion about detention in connection with the Patriot Act discussions. Justice Souter in the Hamdi decision made that as an argument, that clearly Congress did not authorize --

SEN. LEAHY:  (Judge ?) **Gonzales,** I'm not asking about what happens when you catch somebody on a battlefield

AFTERNOON SESSION OF A HEARING OF THE SENATE JUDICIARY COMMITTEE SUBJECT: "WARTIME EXECUTIVE POWER AND THE NATIONAL SECURITY AGENCY'S SURVEILLANCE AUTHORITY" CHAIRED BY: SENATOR ARLEN S

and detain them. I'm not asking about what you do in the battlefield in our failed attempt to catch Osama bin Laden, which is what we were actually asking the administration to do. I'm not asking about what happens in that battlefield. I'm asking, why did you feel that this -- now your testimony is that virtually immediately you determined you had the power to do this warrant-less wire tapping because of AUMF. You didn't ask anybody up here. Did you tell anybody that you needed something more than FISA?

ATTY GEN. **GONZALES:** Sir I don't, I don't recall -- did I tell anyone in Congress or tell --

SEN. LEAHY: Congress. Let's take Congress first.

ATTY GEN. **GONZALES:** Sir, I don't recall having conversations with anybody in Congress about it.

SEN. LEAHY: All right. Do you recall anybody on this committee, which actually is the one that would be amending FISA, was told?

ATTY GEN. **GONZALES:** Sir, I have no personal knowledge that anyone in this committee was told.

SEN. LEAHY: Now apparently, then, according to your interpretation, Congress -- and a lot of Republicans and a lot of Democrats disagree with you on this -- when we voted for authorization for military force, that we're authorizing warrant-less wiretapping. Did we -- were we authorizing you to go into people's medical records here in the United States by your interpretation?

ATTY GEN. **GONZALES:** Senator, I -- whatever the limits of the president's authority given by -- under the authorization to use military force and his inherent authority as commander in chief in a time of war, it clearly includes electronic surveillance of the enemy.

SEN. LEAHY: Well, just let it note that you did not answer my question. But here you also said we've had discussions with the Congress in the past, certain members of Congress, as to whether or not FISA could be amended to allow us to adequately deal with this kind of threat, were advised them that would be difficult if not impossible. That's your statement. All right. Who told you that?

ATTY GEN. **GONZALES:** Senator, there was -- there was discussion with a bipartisan group of Congress -- leaders in Congress, leaders of the Intel Committee -- to talk about legislation. And the consensus was that obtaining such legislation, the legislative process is such that it could not be successfully accomplished without compromising the program.

SEN. LEAHY: When did -- when did they -- when did they give you that advice?

ATTY GEN. **GONZALES:** Sir, that was sometime in 2004.

SEN. LEAHY: Ah. Two years later? I mean, you've been doing this wiretapping for three years and then suddenly you come up here and say, oh, by the way guys, could we have a little bit of authorization for this? Is that what you're saying?

ATTY GEN. **GONZALES:** Sir, it's always been our position that the president has the authority under the authorization to use military force and --

SEN. LEAHY: It's always been your position --

ATTY GEN. **GONZALES:** -- under the Constitution.

SEN. LEAHY: -- but, frankly, it flies in the face of the statute, Mr. Attorney General. And I doubt very much, if one single person of Congress would have known that was your position, had you not known the newspapers were

AFTERNOON SESSION OF A HEARING OF THE SENATE JUDICIARY COMMITTEE SUBJECT: "WARTIME
EXECUTIVE POWER AND THE NATIONAL SECURITY AGENCY'S SURVEILLANCE AUTHORITY"
CHAIRED BY: SENATOR ARLEN S

going to print what you were doing -- not that anybody up here knew it.  When you found out the newspapers were going to print it, you came up here.

Did you talk to any member of the **Judiciary** Committee that would actually write it?  And let me ask you this:  did any member of this committee -- this **Judiciary** Committee that has to write the law -- did anybody here tell you we couldn't write a law that would allow you to go after al Qaeda in the way you're talking about?

ATTY GEN. **GONZALES:**  Sir, I don't believe there were any discussions with any members of the **Judiciary** Committee about --

SEN. LEAHY:  Oh, even though we're the ones that have to write the law, and you're saying that you were told by members of Congress we couldn't write a law that would fit it, and now you tell us that the committee that has to write the law never was asked?

ATTY GEN. **GONZALES:**  We had discussions --

SEN. LEAHY:  Does this sound like a CYA on your part?  It does to me.

ATTY GEN. **GONZALES:**  We had discussions with a bipartisan leadership of the Congress about this program.

SEN. LEAHY:  But not in front of this committee.  We have both Republicans and Democrats on this Committee, you know.

ATTY GEN. **GONZALES:**  Yes sir, I do know that.

SEN. LEAHY:  And this committee has give you twice under my -- twice under my chairmanship, we have given you five amendments to FISA because you requested it.  But this, you never came to us.

Mr. Attorney General, can you see why I have ever reason to believe we never would have found out about this if the press hadn't?  Now it's been talked about, well, let's go prosecute the press.

Heavens, thank God we have a press that at least tells us what the heck you guys are doing, because you're obviously not telling us.

ATTY GEN. **GONZALES:**  Sir, we have advised the bipartisan leadership of the Congress and the intel committees about this program.

SEN. LEAHY:  Well, did you tell them that before the passage of the U.S.A. Patriot Act?

ATTY GEN. **GONZALES:**  Senator, I don't recall when the first briefing occurred.  But it was shortly -- my recollection is that it was shortly after the program was initiated.

SEN. LEAHY:  Okay, well, let me ask you this then.  You say several years after it started you came up here and talked to some group of members of Congress.  The press reported that the president's program of spying on Americans without warrants was shut down for some time in 2004.  That sounds like the time you were up here.  So if the president believed the program was necessary and legally justified, why did he cut it -- why did he shut it down?

ATTY GEN. **GONZALES:**  Sir, you're asking me about the operations of the program, and I'm not going to get into that.

SEN. LEAHY:  Of course.  I'm sorry, Mr. Attorney General.  I forgot: you can't answer any questions that might be relevant to this. (Laughter.)  Well, if the president has that authority, does he also have the authority to wiretap Americans' domestic calls and e-mails under this -- let me finish -- under this authority, if he feels it involves al Qaeda

AFTERNOON SESSION OF A HEARING OF THE SENATE JUDICIARY COMMITTEE SUBJECT: "WARTIME EXECUTIVE POWER AND THE NATIONAL SECURITY AGENCY'S SURVEILLANCE AUTHORITY" CHAIRED BY: SENATOR ARLEN S

activity?  I'm talking about within this country. Under this authority you've talked about, does he have the power, under your authority, to wiretap Americans within the United States if they're involved in al Qaeda activity?

ATTY GEN. **GONZALES:**  Sir, I've been asked this question several times --

SEN. LEAHY:  I know, and you've had somewhat of a vague answer, so I'm asking again.

ATTY GEN. **GONZALES:**  And I've said that that presents a different legal question, a possibly tough constitutional question, and I'm -- I am not comfortable, just off the cuff, talking about  whether or not such -- such activity would in fact be constitutional. I will say that that is not what we're talking about here.

SEN. LEAHY:  Are you doing that?

ATTY GEN. **GONZALES:**  That is not what the president has authorized.

SEN. LEAHY:  Are you doing that?

ATTY GEN. **GONZALES:**  I can't give you assurances.  That is not what the president has authorized through this program.

SEN. LEAHY:  Are you doing that?  Are you doing that?

ATTY GEN. **GONZALES:**  Senator, you're asking again about operations, what are we doing.

SEN. LEAHY:  Thank you.

SEN. HATCH:  Throughout this process, you don't know when it began, but at least eight members of Congress have been informed about this -- about what has been disclosed by people who have violated the law in disclosing it, and by the media that has printed the disclosures.  Is that correct?

ATTY GEN. **GONZALES:**  That is generally correct, sir.  Yes, sir.

SEN. HATCH:  Did you have one complaint about the program from any of the eight -- and that was bipartisan, by the way, those eight people.

ATTY GEN. **GONZALES:**  It was a bipartisan briefing.

SEN. HATCH:  They were Democrats -- four Democrat leaders in the Congress and four Republican leaders in the Congress; is that right?

ATTY GEN. **GONZALES:**  It was a bipartisan briefing, yes, sir.

SEN. HATCH:   Did you have any gripes or complaints about what was disclosed to them, to the best of your recollection?

ATTY GEN. **GONZALES:**  Well, again, I want to be careful about speaking for members, but --

SEN. HATCH:  I'm not asking you to state for members.  I'm asking if you had any gripes or complaints.

ATTY GEN. **GONZALES:**  I think -- and again, I wasn't present --

SEN. HATCH:   Or suggestions --

ATTY GEN. **GONZALES:**  I wasn't present at all the briefings, but for briefings that I was present at, they

AFTERNOON SESSION OF A HEARING OF THE SENATE JUDICIARY COMMITTEE SUBJECT: "WARTIME EXECUTIVE POWER AND THE NATIONAL SECURITY AGENCY'S SURVEILLANCE AUTHORITY" CHAIRED BY: SENATOR ARLEN S

received very detailed briefings about these operations.  They were given ample opportunity to ask questions, they were given ample opportunity to express concern.

SEN. HATCH:  Now, you were somewhat criticized here in some of the questions that -- that your argument that the authorized use of military force is a faulty argument, because the FISA Act does not really talk about -- except as authorized by statute.  But you've pointed out that Section 109 or, if you want to be more specific, Section 1809 of Title 50, Chapter 36 of Chapter 1-1809 -- it does say that a person is guilty of an offense if he intentionally engages in electronic surveillance under color of law, except as authorized by statute.

ATTY GEN. **GONZALES:**  And that is the main criminal prohibition in engaging -- against engaging in electronic surveillance, except as otherwise provided for by a statute or except -- I mean, except as otherwise provided by FISA, or except as otherwise provided by a statute.

SEN. HATCH:  Now this authorized use of military force enables you, quote, "to use all necessary and appropriate force against the national -- against the nations, organizations and persons the president determines planned, authorized, committed or aided the terrorist attacks."  Is that correct?

ATTY GEN. **GONZALES:**  This is a very important point, Senator. Think about it:  the authorization doesn't identify the -- it never mentions the word al Qaeda.  It authorizes the president to engage in all necessary and appropriate force to identify those HE determines -- who the president determines, and the president is not able to do that without information, without intelligence, without the kind of electronic surveillance we're talking about today.

SEN. HATCH:  That's right.  As someone who helped to write the Patriot Act, the original Patriot Act, I can't help but express the awareness of those of us around here that here we are, well over a month after the expiration of the Patriot Act, and we keep renewing it from month to month because we can't get Congress to really agree on what the changes should be.  Is that a fair assessment?

ATTY GEN. **GONZALES:**  Well, what I will say is I think the tools of the Patriot Act are important, and I hope that they are reauthorized quickly.

SEN. HATCH:  But the reason -- the reason I'm bringing that up is because at one time, at least one report was is that one of these eight members was asked, who had the program disclosed to them, or at  least remarked, that he didn't think that a statute could be passed to resolve these issues.

ATTY GEN. **GONZALES:**  I don't want to attribute to any particular member that statement.  What I will say --

SEN. HATCH:  You don't have to do that.  But is that true?

ATTY GEN. **GONZALES:**  It was a consensus that pursuing the legislative process would result, likely, in compromising the program.

SEN. HATCH:  In other words, it's not easy to get things through 535 members of Congress -- 435 in the House and 100 in the Senate.  Now, I know that you love the Congress and will not find any fault with any of us.

ATTY GEN. **GONZALES:**  Sir, you've been at this a little bit longer than I have, but it's only been my experience that it's sometimes difficult.

SEN. HATCH:  Yeah, it is.

Is it not true that one check on the president's power to operate the NSA's surveillance program is the Congress's power over the purse, as listed in Article I, Section 8 of the Constitution.

ATTY GEN. **GONZALES:**  Absolutely.  I think even those who have served in the pro-executive camp in terms of

AFTERNOON SESSION OF A HEARING OF THE SENATE JUDICIARY COMMITTEE SUBJECT: "WARTIME EXECUTIVE POWER AND THE NATIONAL SECURITY AGENCY'S SURVEILLANCE AUTHORITY" CHAIRED BY: SENATOR ARLEN S

the allocation of constitutional powers in a time of war would have to concede that the power of the purse is an extremely strong check on the president, the commander in chief.

SEN. HATCH:   Well, I've noticed that while many in Congress have sharply criticized the president and the NSA program that we've been discussing here, I am not aware of any member of Congress introducing legislation to end the program, through either an authorization or an appropriations mechanism.  But from what we know about the intent of the program today, I expect a few members of either the House or the Senate would vote to eliminate this program or cut off its funding.  And the reason I state that is because all of us are concerned about this battle that we're waging, that this is not an easy battle.  This is a war unlike any war we've ever had before, and it's a very secret war on their side. And I think the administration has taken a position that we've got to be very careful about disclosures on our side as well.  Is it not true that the disclosures that have occurred have very definitely hurt our ability to gather intelligence?

ATTY GEN. **GONZALES:**  The director of the CIA, I believe, has publicly commented that it has hurt us.

SEN. HATCH:   Well, it's important, General, to bring up that President Clinton's administration ordered several warrantless searches on the home and property of a domestic spy, Aldrich Ames. That's true, isn't it?

ATTY GEN. **GONZALES:**  That is correct, sir.

SEN. HATCH:   That was a warrantless set of searches.

ATTY GEN. **GONZALES:**  That is correct, sir.

SEN. HATCH:   Isn't -- and the Clinton administration also authorized a warrantless search of the Mississippi home of a suspected terrorist financier.  Is that correct?

ATTY GEN. **GONZALES:**  I think that is correct, sir.

SEN. HATCH:   The Clinton Justice Department authorized these searches because it was the judgment of Deputy Attorney General Jamie Gorelick, somebody I have great admiration for, that -- and let me quote her.  It has been quoted before, but I think it's worth quoting it again.  This is the deputy attorney general of the United States under the -- in the Clinton administration:

"The president," quote -- she said: "The president has inherent authority to conduct warrantless physical searches for foreign  intelligence purposes."  Now, this was against the domestic people. "And the rules and methodologies for criminal searches are inconsistent with the collection of foreign intelligence and would unduly frustrate the president in carrying out his foreign intelligence responsibilities."

You're aware of that quote?

ATTY GEN. **GONZALES:**  I am aware of it, yes, sir.

SEN. HATCH:   Well, if the president has inherent ability to surveil American citizens in national security cases during peacetime, I guess what's bothering me:  How could it be that president Bush is precluded, as some have argued, from surveilling al Qaeda sources by intercepting foreign calls into this country to people who may be al Qaeda or affiliated with al Qaeda or affiliated with somebody who is affiliated with al Qaeda?  How can that be?

ATTY GEN. **GONZALES:**  Senator, I think that the president's authority as commander in chief obviously is stronger during a time of war.  If the authorization to use military force did not exist or were repealed, or were not interpreted in the way we're advocating, then it seems to me you're teeing up a fairly difficult constitutional question as to whether or not Congress can constitutionally limit the president's ability to engage in electronic surveillance of the enemy during a time of war.

AFTERNOON SESSION OF A HEARING OF THE SENATE JUDICIARY COMMITTEE SUBJECT: "WARTIME EXECUTIVE POWER AND THE NATIONAL SECURITY AGENCY'S SURVEILLANCE AUTHORITY" CHAIRED BY: SENATOR ARLEN S

SEN. HATCH:  Well, we were aware of the Clinton administration's approaches.  I don't know of any Republicans who raised Cain about that.  Walter Dellinger, the former head of the Office of Legal Counsel under President Clinton, in a final opinion published on July 14th, 1994, wrote, quote:  "Specifically we believe that the prohibition on destruction of aircraft would not apply to the actions of United States military forces acting on behalf of the United States during a state of hostility.  We note specifically that the application of the provision to acts of the United States military personnel in a state of hostilities could lead to absurdities.  For example, it could mean in some circumstances that military personnel would not be able to engage in reasonable self defense without subjecting themselves to the risk of criminal prosecution."

General, do you believe Walter -- that Walter Dellinger, who is now a critic of the president's authorization of wartime surveillance of al Qaeda, was correct in 1994?

ATTY GEN. **GONZALES:**  Sir, I haven't studied that opinion in a while, but it sounds like it would be correct, in my judgment.

SEN. HATCH:  All right.

Let me just bring up again, as I understand it, just so we can repeat it one more time -- the administration takes the position that a firmer statute on top of the Section 109, the FISA Act, would also  complement the act, and the authorized use of the military force, granted by Congress, is an acceptable legitimate statute that goes to the point that I made earlier, to use all necessary and appropriate force against the nations, organizations or persons the president determines planned, authorized, committed, or aided the terrorists' attacks, and that that justifies doing what you can to interdict these foreign terrorists who are calling into our country to people who may also be affiliated.

As I understand it, that's part of it.  The second part of it is the fact that you are citing that the president does have inherent powers under Article II of the Constitution to -- to engage in these activities.  And thirdly, that you have not violated the Fourth Amendment of the Constitution, because the position you're taking under these circumstances, with the obligation to protect this country, are reasonable searches and seizures?

ATTY GEN. **GONZALES:**  I think clearly these searches are reasonable given the circumstances -- the fact that we have been attacked by enemy here within this country.  I think it would fall within the special means jurisprudence of the Supreme Court that would allow warrantless searches.

Let me just say that an important component of our arguments relies upon the canon of constitutional avoidance, because there are -- I heard some members of Congress -- some members of the committee say they're not sure they buy the authorization to use military force analysis.  If our interpretation is simply, fairly possible -- if it is only fairly possible, and the court has held that that interpretation must be adopted if it means that we can avoid a tough constitutional issue.

SEN. HATCH:  Thank you, sir, my time is done.

SEN. SPECTER:  Senator Feinstein.

SEN. DIANNE FEINSTEIN (D-CA):  Thank you, Mr. Chairman.

Mr. Chairman, I want to respond to you on the Jamie Gorelick- Aldrich Ames situation, because, in fact, the law was changed directly after the Aldrich Ames case.  I called -- because I heard you say this before, so I called Jamie Gorelick, and I asked her to put this in writing.  She has done so, and I have it before me now.

And she points out in this letter that her '94 testimony arose in context of congressional consideration of an extension of FISA to cover physical searches.  And at the time, FISA covered only electronic surveillance such as wiretaps.  In 1993 the attorney general had authorized foreign intelligence physical searches in the investigation of

AFTERNOON SESSION OF A HEARING OF THE SENATE JUDICIARY COMMITTEE SUBJECT: "WARTIME
EXECUTIVE POWER AND THE NATIONAL SECURITY AGENCY'S SURVEILLANCE AUTHORITY"
CHAIRED BY: SENATOR ARLEN S

Aldrich Ames, whose counsel thereafter raised legal challenges to those searches.  Point: There wasn't a law at that time.

Then she goes on to say that the Clinton administration believed, quote, "It would be better if there were congressional authorization and judicial oversight of such searches.  My testimony did not address inherent president authority to conduct electronic surveillance, which was already covered by FISA."

I would ask that this letter, and her testimony, be entered into the record.

SEN. HATCH:  Without question, it will be entered into the record.

SEN. FEINSTEIN:  Thank you.  You know, I respect you greatly, but I think that's a bit of a red herring.

SEN. HATCH:  But you need to also quote -- in the same letter she said, "My testimony did not address whether there would be inherent authority to conduct physical searches if FISA were extended to cover physical searches."  And she goes on -- but we'll put it into the record.

SEN. SESSIONS:  Mr. Chairman, could I just raise one point?  Just one point?

SEN. FEINSTEIN:  If I have extra time.

SEN. HATCH:  You will have extra time.  You will have extra time.

SEN. SESSIONS:  The attorney general explained that when I asked him.  He narrowed my question when I raised it and made that qualification.  Perhaps you weren't here when he did that.

SEN. FEINSTEIN:  Right.

And Mr. Attorney General, I'd also like -- it's my view that the briefings of the big eight essentially violate the law as well.  I believe that is a second violation of law, because I believe that Section 502 of 5 USC 413(a)(1) and (2) and (b)(1) and (2) specifically say how the intelligence committee should be notified.

I was present in the intelligence committee in December of 2001 when this was considered.  And Senator Graham was chairman of the committee.  And the committee really wanted all sensitive intelligence reported in writing, and what this did was set up a mechanism for that.

So, in my view, it was very clear that what the intelligence committee wanted at that time was all sensitive intelligence outside of covert to be reported to the committee, and this set up the format.

Now let me just move on, if I can.

ATTY GEN. GONZALEZ:  Senator, can I respond to that?

SEN. FEINSTEIN:  Sure.  Sure, of course.

ATTY GEN. GONZALEZ:  Because I disagree.  First of all, both Chairman Roberts and Chairman Hoekstra disagree.  They believe that we have provided notice as required by the law to the intel committees. And they both take the position that nowhere in the law does it require that each individual member of the intel committee be briefed.

The section that you provided that I think you quoted to -- and I must tell you, sometimes it gets kind of confusing to read these (B)(b)s and 1-1s; it gets kind of confusing.  I think you are referring to a section which imposes an obligation on the president to ensure that agencies within the administration meet the notice requirements.

If you go to the actual notice requirements, however, under 413(A)(a), and 413(B)(b), those impose the obligations

AFTERNOON SESSION OF A HEARING OF THE SENATE JUDICIARY COMMITTEE SUBJECT: "WARTIME EXECUTIVE POWER AND THE NATIONAL SECURITY AGENCY'S SURVEILLANCE AUTHORITY" CHAIRED BY: SENATOR ARLEN S

to provide -- to make sure that the intel committees are currently and fully informed.

However, (A)(a), which deals with non-covert action, and (B)(b) which deals with covert action, both have a proviso that to the extent it doesn't it doesn't mean compromising -- and I'm paraphrasing here -- sources and methods and especially sensitive matters.  So I think we've been acting consistent with the law, based upon these provisions  that I just recited to you.  There has been a long practice of giving briefings only to the chair and ranking or the certain limited subset of the intel committees.

And again, I would just simply remind the chairman that -- I mean remind the senator.  Chairmen, I know, guard their prerogatives jealously.  And both the chairman of the intel committee, Senate and House -- both chairmen have said we have met our obligations to provide briefings to the intel committee.

SEN. FEINSTEIN:  Well, my reading of the law -- I disagree.  I still disagree.  I recognize we have a difference of opinion.  I will propose an amendment to strengthen it in the next authorization bill. To me, and I remember being there -- I remember the discussion.

Anyway, I'd like to move on.  I am puzzled, and I want to go back to why you didn't come for a change in FISA.  Let me just read off a few of the changes that we have made to FISA.  We extended the emergency exemption from 24 to 72 hours.  We lowered the legal standard for surveillance to the significant purpose test.  We allowed for John Doe roving wiretaps.  We lowered the standard for FISA pin traps.  We expanded their scope to include Internet routing information.  We extended the scope of business records that can be sought under FISA. We extended the duration of FISA warrants.  We broadened FISA to enable the surveillance of lone-wolf terrorists. And we made the director of national intelligence the lead authority.

Now, in view of the changes we have made, I cannot understand why you didn't come to the committee, unless the program was much broader and you believed it would not be authorized.  That is the only reason I can figure you didn't come to the committee.  Because if the program is as the president has said and you have said, to this date, you haven't briefed the intelligence committee; you haven't let us ask the question, what is a link?  What is an affiliate?  How many people are covered?  What are the precise -- and I don't believe in the briefings those questions were asked -- what are the precise numbers?  What happens to the data?  How long is it retained in the database?  When are innocent people taken out of the database?

I can only believe, and this is my honest view, that this program is much bigger and much broader than you want anyone to know.

ATTY GEN. GONZALEZ:  Well, Senator, of course I cannot talk about aspects that are beyond what the president has already confirmed.  What I can say is that those members of Congress who have received briefings know -- I think they know -- of course, I don't know what they actually know, but they have been briefed on all the details about all the activities.  So they know what's going on.

SEN. FEINSTEIN:  I understand your point of view.

Let me go to -- this morning I asked you whether there was any supreme case -- this goes to precedent -- that has held that the president can wiretap Americans since the Congress passed the FISA law.  And you responded In re: Sealed case.

ATTY GEN. GONZALEZ:  Which, of course, is not a Supreme Court case.

SEN. FEINSTEIN:  That's right.  I was going to bring that -- which is not a Supreme Court case.

ATTY GEN. GONZALEZ:  I apologize if I was unclear.

AFTERNOON SESSION OF A HEARING OF THE SENATE JUDICIARY COMMITTEE SUBJECT: "WARTIME EXECUTIVE POWER AND THE NATIONAL SECURITY AGENCY'S SURVEILLANCE AUTHORITY" CHAIRED BY: SENATOR ARLEN S

SEN. FEINSTEIN:  I just wanted to come back at you.

ATTY GEN. **GONZALES:**  Yes, ma'am.

SEN. FEINSTEIN:  So it is pure dicta, and --

ATTY GEN. **GONZALES:**  It was not -- absolutely --

SEN. FEINSTEIN:  I want to go back to the question that you might not like, but I'm going to ask it anyway:  At the time of the In re: Sealed Case, did the Department of Justice or other administration officials tell the FISA court that warrantless domestic electronic wiretapping was going on?

ATTY GEN. GONZALEZ:  At the -- in connection with that litigation, not to my knowledge, Senator.

SEN. FEINSTEIN:  Okay.  And since the passage of FISA, has any court spoken specifically to the president's authority to conduct warrantless domestic electronic surveillance?

ATTY GEN. GONZALEZ:  Since the passage of FISA, a Supreme Court -- the Supreme Court -- I do not believe so.  I think the last word on this by the Supreme Court is the Keef (sp) case, the 1972 case -- and I think that year is right.  And there the court dealt with domestic security surveillance.  And the court was very clear -- went out of its way, I believe, to make it clear that they were not talking about electronic surveillance for foreign intelligence purposes.

SEN. FEINSTEIN:  Was the program mentioned to the court in the Hamdi case?

ATTY GEN. GONZALEZ:  I do not know the answer to that question, Senator.

SEN. FEINSTEIN:  I'd appreciate it if you could find the answer and let us know.

SEN. HATCH:  Senator, take another two minutes because of our interruptions.

SEN. FEINSTEIN:  Oh, thank you very much.

This morning you said, and I quote:  "Presidents throughout our history have authorized the warrantless surveillance of the enemy during wartime, " end quote.  Has any president ever authorized warrantless surveillance in the face of a statute passed by the Congress which prohibits that surveillance?

ATTY GEN. GONZALEZ:  I think, actually, I think there was a statute on the books in connection with the order by President Roosevelt.  I want to confirm that, but it is my recollection that that is in fact the case, that even though there was a statute on the books -- and maybe even a Supreme Court case; I can't remember now -- President Roosevelt ordered electronic surveillance.

SEN. FEINSTEIN:  I'd be very interested to know that.  If I understand your argument, it's that if one doesn't agree that the resolution to authorize military force provides a statutory exception to FISA, then FISA is unconstitutional.

ATTY GEN. GONZALEZ:  No -- well, if that's the impression I gave, I don't want to leave you with that impression.  That tees up, I think, a difficult constitutional issue.

I think the -- it's an easier issue for the executive branch side than the facts that were dealt with under Youngstown v. Sawyer because there you were talking about the president of the United States exercising dominion over part of our domestic industry, the steel industry.

Here you're talking about what I think is a much more core constitutional right of the commander in chief.  I believe that the president -- that a statute that would infringe upon that I think would have some -- there would be some

AFTERNOON SESSION OF A HEARING OF THE SENATE JUDICIARY COMMITTEE SUBJECT: "WARTIME
EXECUTIVE POWER AND THE NATIONAL SECURITY AGENCY'S SURVEILLANCE AUTHORITY"
CHAIRED BY: SENATOR ARLEN S

serious constitutional questions there.

But I'm not prepared at this juncture to say absolutely that if our AUMF argument doesn't work here that FISA is unconstitutional as applied.  I'm not saying that.

SEN. FEINSTEIN:  You sidestepped FISA using the plenary authority as the commander in chief.  The problem there as I see it is that section -- Article I Section 8 gives the Congress the authority to make the regulations for the military.

NSA is part of DOD; therefore, the Congress has the right to make those regulations.

ATTY GEN. **GONZALES:**  I think that the clause you're referring to is the clause in Section 8 of Article I which clearly gives to the Congress the authority and power to make rules regarding the government and regulation of our armed forces.

And then the question is well, is electronic surveillance.  Is that part of the government and regulation of our armed forces?  There are many scholars who believe that there we're only talking about through the internal administration of our military, like court martials, like Selective Service.

And so I think there would be a question, a good debate and discussion about whether or not -- what does that clause mean and does it give to the Congress under the Constitution the authority to impose regulations regarding electronic surveillance?

I'm not saying that it doesn't.  I'm just saying that I think that's obviously a question that would have to be resolved.

SEN. HATCH:  Senator, your time is up.

Senator Grassley?

SEN. FEINSTEIN:  Thank you.  Thank you, Mr. Attorney General.

SEN. CHARLES GRASSLEY (R-IA):  Thank you.

It appears to me that FISA generally requires that if surveillance is initiated under the emergency authorization provisions and an order is not obtained from the FISA court, that the judge must, quote, "cause to be served on any U.S. person named in the application and on such other U.S. persons subject to electronic surveillance as the judge and the court both believes warranted."

The fact of the application, two the period of the surveillance and three the fact that during the period information was or was not obtained.

So that brings these questions if that is the factual reading of the statute.

Does this explain the caution and the care and the time that is used when deciding whether to authorize 72-hour emergency surveillance?

And let me follow up.  And then the possibility that if you got it wrong, could you wind up tipping off an enemy, in this case we're worried about al Qaeda terrorists?

Would this interfere with the president's ability to establish this vital early warning system under FISA?

And is this one of the reasons then, and this is the last question, is this one of the reasons why FISA is not as nimble and quick a tool as you need to combat terrorist threats and that members of this committee think ought to be used to a

AFTERNOON SESSION OF A HEARING OF THE SENATE JUDICIARY COMMITTEE SUBJECT: "WARTIME EXECUTIVE POWER AND THE NATIONAL SECURITY AGENCY'S SURVEILLANCE AUTHORITY" CHAIRED BY: SENATOR ARLEN S

greater extent?

ATTY GEN. **GONZALES:**  Senator, those are all very, very good questions.

The reason we're careful about our work in seeking a FISA is because we want to get it right.  We absolutely want to get it right in every case and we have career professionals working hard on these kinds of issues and we want to get it right.

It is true that if I authorize an emergency -- if I give an emergency authorization and an order is not obtained, my reading of the statute, my understanding of the statute is that the presumption is that the judge will then notify the target of that surveillance during that 72-hour period.

We would have the opportunity to make arguments as to why the judge should not do that, but in making those arguments, we may have  to disclose information, certainly to the target.  And if we fail, the judge may very well notify the target that they were under surveillance.

And if we fail, the judge may very well notify the target that they were under surveillance.  And that would be damaging.  That could possibly tip off a member of al Qaeda or someone working with al Qaeda that -- and we have reason to be concerned about their activities.

And so it is one of the many reasons why we take such great care to ensure that when I grant an emergency authorization that all the requirements of FISA are met.

The reason we have such a high approval rate at the FISA court is not because the FISA court is a rubber stamp.  It's because we do our work at ensuring that those applications are going to meet the requirements of the statute.

SEN. GRASSLEY:  What we know about al Qaeda and their method of operation, which I think at the very least we think that they -- involves the placement of sleeper cells in our country for months or -- they look way ahead; it could even be for years for a planned attack.

And the need to rely upon electronic communication network to convey instructions to those cells from command structures that would be located for al Qaeda outside the country.  The surveillance program authorized by the president was tailored precisely to meet the natures of the threat that we face as a nation, particularly with sleeper cells.

Would that be right?

ATTY GEN. **GONZALES:**  It is a narrowly-tailored program and, of course, that helps us in the Fourth Amendment analysis as to whether or not are these reasonable searches.  And we believe that under the special needs jurisprudence, given the fact that we have been attacked from folks from al Qaeda within our country, we believe that these would satisfy the requirements of the Fourth Amendment.

SEN. GRASSLEY:  I think in your opening statement, didn't you make a reference to bin Laden about his recent speech two weeks ago? And that's obviously a reiteration of the threat and he said that these attacks, future attacks, could dwarf the 9/11 magnitude.

If that is true, is it in some sense incredible to you that we're sitting here having this discussion today about whether the president acted lawfully and appropriately in authorizing a program narrowly targeted at communication that could lead, well lead, to a disruption or a prevention of such an attack?

ATTY GEN. **GONZALES:**  Senator, I think that we should all be concerned to ensure that all branches of government are operating within the limits of the Constitution.  And so I certainly -- I can't disagree with this hearing and the discussions, the questions in these hearings.

AFTERNOON SESSION OF A HEARING OF THE SENATE JUDICIARY COMMITTEE SUBJECT: "WARTIME EXECUTIVE POWER AND THE NATIONAL SECURITY AGENCY'S SURVEILLANCE AUTHORITY" CHAIRED BY: SENATOR ARLEN S

I think we have a good story to tell from the administration viewpoint.  I wish there were more that we could tell because it's not simply a coincidence that the United States of America has not been hit again since 9/11.  It's because of the brilliant and wonderful work of our men and women in the military overseas.  It's because of  tools like the Patriot Act.  It's because of tools like the terrorist surveillance program.

SEN. GRASSLEY:  Howard Dean, the chairman of the Democratic Party, was quoted recently as equating the terrorist surveillance program authorized by President Bush to, quote, "abuses of power during the dark days of the Nixon administration."

You're awful young, but does that have a fair comparison to you? And if it isn't a fair comparison, why or why not?

ATTY GEN. **GONZALES:**  Well, it is not a fair comparison.  I would direct you and the other members of the committee to Chairman Roberts' response to Mr. Dean in terms of making it clear that what's going on here is much more a kin to the directive by President Roosevelt to the Attorney General Jackson in terms of authorizing the department to -- authorizing his administration to initiate warrant-less surveillance of the enemy.

And so this is, again, this is not domestic surveillance.  This is not going after our political enemies.  This is about international communications.  This is about going after al Qaeda.

SEN. GRASSLEY:  I wonder if you'd discuss the nature of the threat posed by al Qaeda to our country because al Qaeda operates not under the rules of law, but disregard and contempt for conventional warfare.

In combating al Qaeda, can we afford to rely purely upon conventional law enforcement techniques, such as those traditionally used to combat organized crime groups or narcotic traffickers?

And if we were to do that, what would be the result?

ATTY GEN. **GONZALES:**  The president expects us to use all the tools available under the Constitution.  Obviously, we have strong law enforcement tools that we have been using and will continue to use.

But this is also a very serious military campaign and we're going to exercise and use all the tools, again, that are available to us in fighting this new kind of threat and this new kind of war.

SEN. GRASSLEY:  I think we had some discussion from you about the review that goes on every 45 days, or approximately every 45 days. But the president himself said, quote, "carefully reviewed approximately every 45 days to ensure its ongoing propriety."

The surveillance is then re-authorized only after the president signs off on it.  So I want to ask you a few questions about this review process.  I want to ask these questions because it's important that the American people know whether the president has instituted appropriate procedures to guard against abuses.

Is the justice -- in the 42-page legal memorandum from your department, it's noted about the program, quote, "reviewed for legality by the Department of Justice and are monitored by the general counsel and the inspector general of the NSA to ensure that civil liberties are being protected."

I'd like to give you the opportunity to explain to the fullest extent possible -- without compromising the programs, the whats, who, when, why, where and how -- the period review.

What can you tell us about the periodic review and reauthorization of the surveillance program?

What assurances can you give the American people about their constitutional rights being zealously guarded against abuses?

AFTERNOON SESSION OF A HEARING OF THE SENATE JUDICIARY COMMITTEE SUBJECT: "WARTIME EXECUTIVE POWER AND THE NATIONAL SECURITY AGENCY'S SURVEILLANCE AUTHORITY" CHAIRED BY: SENATOR ARLEN S

ATTY GEN. **GONZALES:**  There's a lot there in that question, Senator.  I will do my best to respond.

Obviously, this is a periodic review approximately every 45 days or so.  And we have people from the intelligence community evaluate whether or not al Qaeda -- what is the level of threat that continues to be posed by al Qaeda?

And during that period of time, we have monthly meetings out at NSA where people who are involved in the program, senior officials, they get together, sit down, talk about how the program is operating, ensuring that the program is being operated in a way that's consistent with the president's authorization.

In connection with each authorization, the department does make an analysis with respect to the legal authority of the president of the United States to move forward.  And so there are administration lawyers that are involved looking to see whether or not does the president still have the authority to authorize the terrorist surveillance program that I've described here today.

SEN. GRASSLEY:  I think my time's up.  I was going to have some follow up questions on that point, but if it's necessary I'll submit it for answer in writing.

SEN. HATCH:  Thank you, Senator.

Senator Feingold?

SEN. RUSSELL FEINGOLD (D-WI):  Thank you, Mr. Chairman.

General **Gonzales,** when my time ended last time we were beginning to talk about the president's statements in the state of the union that his predecessors used the same legal authority that he is asserting.

Let me first ask do you know of any other president who has authorized warrant-less wiretaps outside of FISA since 1978 when FISA was passed?

ATTY GEN. **GONZALES:**  None come to mind, Senator, but maybe I'd be happy to look to see whether or not that's the case.

SEN. FEINGOLD:  Think it is a no unless you submit something.

ATTY GEN. **GONZALES:**  I can't answer that I -- I can't give you an answer.

SEN. FEINGOLD:  Okay.  Isn't it true that the only federal courts to decide the president's authority to authorize warrant-less national security wiretaps were considering wiretaps carried out before the enactment of FISA?

ATTY GEN. **GONZALES:**  I'm sorry, Senator.  I was thinking about your question and I --

SEN. FEINGOLD:  Would you like to answer the previous question?

ATTY GEN. **GONZALES:**  No, but I was thinking about -- I was trying to think of an answer and I didn't catch the first part of your second question.

SEN. FEINGOLD:  Isn't it true that the only federal courts to decide the president's authority to authorize warrant-less national security wiretaps were considering wiretaps that were carried out before the enactment of FISA?

ATTY GEN. **GONZALES:**  In which there were actual decisions? Actually, there was a Fourth Circuit decision, the Truong decision, which was decided after FISA.

To be fair, I don't think they really got into an analysis.

AFTERNOON SESSION OF A HEARING OF THE SENATE JUDICIARY COMMITTEE SUBJECT: "WARTIME EXECUTIVE POWER AND THE NATIONAL SECURITY AGENCY'S SURVEILLANCE AUTHORITY" CHAIRED BY: SENATOR ARLEN S

SEN. FEINGOLD:  That case was about a Vietnam era wiretap before FISA was enacted, right?

ATTY GEN. **GONZALES:**  I believe -- the collection occurred before FISA was enacted.  The decision was made after FISA and consequently, my recollection is is that case doesn't really get into a discussion about how the passage of FISA impacts or affects the president's --

SEN. FEINGOLD:  If it was based on facts prior to FISA, then the only law that controls if the prior to FISA, right?

ATTY GEN. **GONZALES:**  That's right.  And then, of course, In re: Sealed Case, that did not --

SEN. FEINGOLD:  You covered that with Senator Feinstein.  That was dicta, correct?

ATTY GEN. **GONZALES:**  Yes.

SEN. FEINGOLD:  Thank you.  So when the president said that federal courts have, quote, "approved the use of that authority," unquote, that he was trying to make people think that the courts had approved the authority he is invoking and the legal theory that you've put forward here.

That isn't really accurate, is it?

ATTY GEN. **GONZALES:**  The president was totally accurate in saying that in considering the question as to whether or not the president has inherent constitutional authority to authorize warrant-less searches consistent with the Fourth Amendment to obtain foreign intelligence, the statement I think is perfectly accurate.

But he said that federal courts had said it was all right.

ATTY GEN. **GONZALES:**  That's right.

SEN. FEINGOLD:  And you aren't able to give me anything here since FISA that indicates that.

ATTY GEN. **GONZALES:**  But Senator, I don't believe that he was making a statement since or before FISA.  He was making the statement the courts who have considered the president's inherent constitutional authority had -- the court of appeals had said and I think there is -- in fact, there are five court of appeals decisions cited in the In re: Sealed Case.

All of them have said, I believe, that the president does have the constitutional authority to engage in this kind of surveillance.

SEN. FEINGOLD:  Attorney General, that's why we just went over all this, because all of that is based on pre-FISA law.  And here's my concern -- the president has somehow suggested that he couldn't wiretap terrorists before he authorized this program.  He said, quote, "If there are people inside our country who are talking with al Qaeda we want to know about it."  Unquote.  And of course, I agree with that 100 percent and we have a law that permits it.

Isn't it true that FISA permits the NSA to wiretap people overseas without a court order, even if they call into the United States?

ATTY GEN. **GONZALES:**  Well, of course, it depends.

SEN. FEINGOLD:  Well, it does do that in some circumstances, does it not?

ATTY GEN. **GONZALES:**  It could do it in some circumstances, depending on whether or not it is an electronic surveillance as defined under FISA.  As you know, it is a very -- I don't want to say convoluted -- it's a very complicated definition of what kind of radio or wire communications would in fact be covered by FISA.

AFTERNOON SESSION OF A HEARING OF THE SENATE JUDICIARY COMMITTEE SUBJECT: "WARTIME EXECUTIVE POWER AND THE NATIONAL SECURITY AGENCY'S SURVEILLANCE AUTHORITY" CHAIRED BY: SENATOR ARLEN S

SEN. FEINGOLD:  Attorney General, I understand that.  But clearly, FISA, in part, does permit that kind of activity in certain cases.

ATTY GEN. **GONZALES:**  Depending on the circumstances.

SEN. FEINGOLD:  To leave the impression that there is no law permitting that would be incorrect.

ATTY GEN. **GONZALES:**  Oh, of course not.  We use FISA whenever we can.

SEN. FEINGOLD:   -- trying to get at is the impression that the president left, I think, in the State of the Union was not completely accurate.  Isn't it true that FISA permits the FBI to wiretap individuals inside the United States who are suspected of being terrorists or spies so long as the FBI gets secret approval from a judge?

ATTY GEN. **GONZALES:**  Senator, I think I've already said that with respect to even domestic communication involving members of al Qaeda  we use all the tools available to us including FISA.  If we can get a FISA --

SEN. FEINGOLD:  So the fact is, when the president suggests that he doesn't have that -- that power doesn't exist -- that power does exist, at least in part, under FISA -- under current law.

ATTY GEN. **GONZALES:**  Well, Senator, I don't know whether or not that's what the president suggested, but clearly, the authority does exist for the FBI, assuming we can meet the requirements of FISA, assuming it is electronic surveillance covered by FISA to engage in electronic surveillance of al Qaeda here in this country.

SEN. FEINGOLD:  Here's what the president said, he said, again quote, "If there are people inside our country who are talking with al Qaeda, we want to know about it."  Unquote.  I was sitting in the room.  He sure left me the impression that he was suggesting that without this NSA program, somehow he didn't have the power to do that. That's misleading.  So when the president said that he authorized a program to, quote, "Aggressively pursue the international communications of suspected al Qaeda operatives and affiliates to and from America -- trying to suggest that without this program he could not do that under the law -- that's not really right, is it?

ATTY GEN. **GONZALES:**  Senator, I believe that what the president has said is accurate, is not misleading. We've -- the day following the New York Times story, he came out to the American people and explained what he had authorized.  We had given numerous briefing to Congress since that day.  I'm here today to talk about the legal authority for this program.

SEN. FEINGOLD:  Well, I think the president's comments in the State of the Union were highly misleading.  The American people need to know that you already have legal authority to wiretap anyone you suspect of helping al Qaeda and every person on this committee in this Senate supports your use of FISA to do just that.

Let me switch to another subject.  Senator Feinstein sort of got at this, but I want to try a different angle.  If you could answer this with a yes or no, I would obviously appreciate it.  Has the president taken or authorized any other actions -- and other actions that would be illegal if not permitted by his constitutional powers or the authorization to use military force?

ATTY GEN. **GONZALES:**  Repeat your question, please, Senator.

SEN. FEINGOLD:  Has the president taken or authorized any other actions that would be illegal if not permitted by his constitutional powers or the authorization to use military force?

ATTY GEN. **GONZALES:**  You mean in direct contradiction of the statute and relying upon his commander in chief authority?

SEN. FEINGOLD:  Has he taken any other actions -- yes, that would be illegal --

AFTERNOON SESSION OF A HEARING OF THE SENATE JUDICIARY COMMITTEE SUBJECT: "WARTIME EXECUTIVE POWER AND THE NATIONAL SECURITY AGENCY'S SURVEILLANCE AUTHORITY" CHAIRED BY: SENATOR ARLEN S

ATTY GEN. **GONZALES:**  Not to my knowledge, Senator.

SEN. FEINGOLD:  In other words, are there other actions under the use of military force for Afghanistan resolution that, without the inherent power, would not be permitted because of the FISA statute? Are there any other programs like that?

ATTY GEN. **GONZALES:**  Well, I guess what I'd like to do, Senator, is I want to be careful about answering your question.  I obviously cannot talk about operational matters that are not before this committee today and I don't want to leave you with the wrong impression.  And so I would like to get back to you with an answer to your question.

SEN. FEINGOLD:  I definitely prefer that to then being told that something's a hypothetical.

On September 10, 2002, Associate Attorney General David Criss (sp) testified before the Senate **Judiciary** Committee.  His prepared testimony includes the following statement, quote, "Thus both before and after the Patriot Act, FISA can be used only against foreign powers and their agents and only where there is at least a significant foreign intelligence purpose for the surveillance."  Let me repeat for emphasis:  "We cannot monitor anyone today whom we could not have monitored at this time last year."  Unquote.  And this last sentence was actually underlined for emphasis in the testimony, so let me repeat it too -- "We cannot monitor anyone today whom we could not have monitored at this time last year."

Now I understand that Mr. Criss (sp) did not know about the NSA program and has been highly critical of the legal justifications offered by the Department.  I also realize that you were not the attorney general in 2002.  So I know you won't know the direct answer to my question, but can you find out -- and I'd like if you can get me a response in writing -- who in the White House and the Department of Justice reviewed and approved Mr. Criss's (sp) testimony?  And of those people, which of them were aware of the NSA program and thus let what was obviously a highly misleading statement be made to the Congress of the United States?  Will you provide me with that information?

ATTY GEN. **GONZALES:**  We'll see what we can provide to you, Senator. Sir, my understanding is that Mr. Criss (sp) -- I don't think it's fair to characterize his position as highly critical.  I think he may disagree, but saying it's highly critical, I think, is unfair.

SEN. FEINGOLD:  Well, we can debate that, but the point here is to get to the underlying information.  I appreciate your willingness to get that for me if you can.

General **Gonzales,** I'd like to explore a bit further the role of the telecommunications companies and Internet service providers in this program.  As I understand it, surveillance often requires the assistance of these service providers and the providers are protected from criminal and civil liability if they've been provided a court order from the FISA court or criminal court or if a high ranking Justice Department official has certified in writing that, quote, "No warrant or court order is required by law, that all statutory requirements have been met and that the specified assistance is required."  Am I accurately stating the law?

ATTY GEN. **GONZALES:**  I believe that's right, Senator.

SEN. FEINGOLD:  Have you or anyone at the Justice Department provided any telephone companies or ISP's with these certifications in the course of implementing the NSA's program?

ATTY GEN. **GONZALES:**  Sir, that is an operational detail that I just can't go into in this hearing.

SEN. FEINGOLD:  I look forward to an opportunity to pursue it in other venues and thank you very much.

ATTY GEN. **GONZALES:**  Thank you, Senator.

SEN. HATCH:  Thank you, Senator.

AFTERNOON SESSION OF A HEARING OF THE SENATE JUDICIARY COMMITTEE SUBJECT: "WARTIME EXECUTIVE POWER AND THE NATIONAL SECURITY AGENCY'S SURVEILLANCE AUTHORITY" CHAIRED BY: SENATOR ARLEN S

Senator Kyl.

SEN. JON KYL (R-AZ):  Thank you, Mr. Chairman.  I hadn't intended to ask any questions, but I think there are two areas that need to be cleared up.

First, with regard to two points that Senator Feingold said the president -- in which the president made highly misleading statements -- one in the State of the Union, allegedly leaving the impression that the president had authority he didn't have.  When he discussed the president, the authority that he had that other presidents had or had exercised, what was he referring to there?  Was he referring to FISA or was he referring to something else?

ATTY GEN. **GONZALES:**  Senator, he was referring to the president's inherent constitutional authority to engage in electronic surveillance of the enemy.

SEN. KYL:  Exactly.  And secondly, Senator Feingold asked you if there was authority under FISA to conduct wiretaps, including of suspected al Qaeda terrorists and it was misleading for the president to infer otherwise.  Is it possible to acknowledge that FISA authority exists, while also making the point that it's not the optimal or maybe even workable method of collection of the kind that's done under the surveillance program at issue here?

ATTY GEN. **GONZALES:**  No question about it.  It is one of the reasons for the terrorist surveillance program is that while FISA ultimately may be used, it would be used in a way that's ineffective because of the procedures that are in FISA.

SEN. KYL:  Thank you.

Now, let me clear up a concern expressed by Senator Feinstein that the reason that Congress hadn't been asked to statutorily authorize this surveillance program may be because it's much bigger than we have been led to believe.  Is that the reason?

ATTY GEN. **GONZALES:**  Senator, the reason is because, quite frankly, we didn't think we needed it under the Constitution.  And also because we thought we had it with respect to the action by the Congress.  We have believed from the outset that FISA has to be read in a way which is not inconsistent with the president's constitutional authority as commander in chief.

SEN. KYL:  Right.  Now, there was also discussion about briefings by the intelligence community -- General Hayden and perhaps others -- to what's been the called the Big Eight, which are the four elected leaders, bipartisan, of the House and Senate and the four chairman and ranking member of the two committees -- of the two intelligence committees of the Congress.

Was that the group that you referred to when you said that there had been discussion about whether to seek an amendment of FISA in the Congress?

ATTY GEN. **GONZALES:**  Senator, it included the leadership of the Congress and the leadership of the intel committees.

SEN. KYL:  Okay.  And in terms of evaluating -- there was also, Senator Leahy asked the question about why you didn't come to members  of this committee.  Who would be in a better position to judge or to assess the impact on our intelligence with respect to compromise of the program?  Would it be the leadership and chairman and ranking members of the intelligence committees or members of this committee that haven't been read into the program?

ATTY GEN. **GONZALES:**  Sir, the judgement was made that the conversation should occur with members of the intel committee and the leadership of the Congress bipartisan.

SEN. KYL:  And in fact, if you came to this committee to seek amendments to cover the program at issue, the

AFTERNOON SESSION OF A HEARING OF THE SENATE JUDICIARY COMMITTEE SUBJECT: "WARTIME EXECUTIVE POWER AND THE NATIONAL SECURITY AGENCY'S SURVEILLANCE AUTHORITY" CHAIRED BY: SENATOR ARLEN S

members of this committee would have to be read into the program, would they not?

ATTY GEN. **GONZALES:**  Yes, sir.

SEN. KYL:  Senator Leahy also said, thank goodness -- I'm paraphrasing now -- thank goodness that we have the press to tell us what the administration's doing with this program because we wouldn't know otherwise.

And of course, the press did disclose the existence of this highly classified program, which you have indicated has compromised the program to some extent or has done damage to it -- I forgot your exact phrase.

ATTY GEN. **GONZALES:**  Those, I believe, were the comments from the CIA director.

SEN. KYL:  All right.  And it seems to me, Mr. Chairman, that the attitude that it's a good thing that this program was compromised validates the view of the bipartisan leadership that briefing members of Congress further -- or at least briefing members of this committee -- would further jeopardize the program.

It seems to me that those entrusted with knowledge of this program must be committed to its protection.

Thank you, Mr. Chairman.

SEN. HATCH:  Thank you, Senator.

Senator Schumer.

SEN. CHARLES SCHUMER (D-NY):  Thank you, Mr. Chairman.

I just want to go back to where we left off and then I'll move forward.  And thank you, General **Gonzales.**  I know it's been a long day for you -- especially with all that bobbing and weaving, it's not so easy.

We talked before about the legal theory that you have under AUMF. And I had asked you that under your legal theory can the government without ever going to a judge or getting a warrants, search an American's home or office? I'm not saying -- well, can you give me an answer to that?  Why wouldn't the same exact legal theory apply -- that the Congress in the resolution gave the president power he needed to protect America.  Why is one different than the other -- both are fourth amendment?

ATTY GEN. **GONZALES:**  I'm not suggesting that it is different. Quite frankly, I would like the opportunity simply to --

SEN. SCHUMER:  I'm sorry, if you could pull the mike --

ATTY GEN. **GONZALES:**  I'm not saying that it would be different. I would simply like the opportunity to contemplate over it and give you an answer.

SEN. SCHUMER:  And you will be back here, though, so we can ask that, right?

ATTY GEN. **GONZALES:**  According to the chairman.

SEN. SCHUMER:  Okay, good.  If not, I would ask unanimous consent that Mr. **Gonzales** -- General **Gonzales** -- be given time to answer that one in writing.

SEN. HATCH: He said he will.

SEN. SCHUMER:  Okay, good.  Now, here's the next question I have -- has the government done this?  Has the government searched someone's home -- and American citizen or office -- without a warrant since 9/11, let's say?

AFTERNOON SESSION OF A HEARING OF THE SENATE JUDICIARY COMMITTEE SUBJECT: "WARTIME EXECUTIVE POWER AND THE NATIONAL SECURITY AGENCY'S SURVEILLANCE AUTHORITY" CHAIRED BY: SENATOR ARLEN S

ATTY GEN. **GONZALES:** Sir, to my knowledge, that has not happened under the terrorist surveillance program and I'm not going to go beyond that.

SEN. SCHUMER: Wait, I don't know what that -- what does it mean, under the terrorist surveillance program? The terrorist surveillance program is about wiretaps. This is about searching someone's home. It's different. So it wouldn't be done under the surveillance program. I'm asking you, has it been done? ATTY GEN. **GONZALES:** But now you're asking me questions about operations or possible operations and I'm not going to get into that, Senator.

SEN. SCHUMER: I'm not asking you about any operation. I'm not asking you how many times, I'm not asking you where.

ATTY GEN. **GONZALES:** You asked me, has that been done.

SEN. SCHUMER: Yes.

ATTY GEN. **GONZALES:** Have we done something?

SEN. SCHUMER: Yeah.

ATTY GEN. **GONZALES:** That is an operational question in terms of how we're using our capabilities.

SEN. SCHUMER: Okay, so you won't answer whether it is allowed and you won't answer whether it's been done. I mean, isn't part of your -- in all due respect, as somebody who genuinely likes you -- but isn't this part of your job to answer a question like this?

ATTY GEN. **GONZALES:** Of course it is, Senator, and --

SEN. SCHUMER: But you're not answering it.

ATTY GEN. **GONZALES:** Well, in fact, I'm not saying that I will not answer the question.

SEN. SCHUMER: Oh.

ATTY GEN. **GONZALES:** I'm just not prepared to give you an answer at this time.

SEN. SCHUMER: Okay, well, all right. I'll accept.

And I have another one and we can go through the same thing. How about wiretap under the illegal theory, can the government without ever going to a judge wiretap purely domestic phone calls?

ATTY GEN. **GONZALES:** Again, Senator, give me an opportunity to think about that, but of course, that is not what this program is.

SEN. SCHUMER: It's not -- I understand. I'm asking because under the AUMF theory you are allowed to do it for these wiretaps, I just want to know what's going on now. Let me just -- has the government done this? You can get back to me in writing.

ATTY GEN. **GONZALES:** Thank you, Senator.

SEN. SCHUMER: Okay, and one other, same issue -- placed a listening device -- has the government without ever going to a judge placed a listening device inside an American home to listen to the conversations that go on there? Same answer?

ATTY GEN. **GONZALES:** Same answer, Senator.

AFTERNOON SESSION OF A HEARING OF THE SENATE JUDICIARY COMMITTEE SUBJECT: "WARTIME EXECUTIVE POWER AND THE NATIONAL SECURITY AGENCY'S SURVEILLANCE AUTHORITY" CHAIRED BY: SENATOR ARLEN S

SEN. SCHUMER:  Okay, but now I have another one and let's see if you give the same answer here.  And that is, under your legal theory, can the government without going to a judge -- this is legal theory, I'm not asking you whether they do this -- monitor private calls of its political enemies?  People not associated with terrorists, but people who they don't like politically?

ATTY GEN. **GONZALES:**  We're not going to do that.  That's not going to happen.

SEN. SCHUMER:  Okay.  Next, different issue.  Last week in the hearing before the Intelligence Committee, General Hayden refused to state publicly how many wiretaps have been authorized under this NSA program since 2001.  Are you willing to answer that question -- how many have been authorized?

ATTY GEN. **GONZALES:**  I cannot -- no, sir, I'm not at liberty to do that.  I believe -- and of course, I have not been at all the briefings for the congressional leaders and the leaders of the intel committee.  I believe that that number has been shared, however, with members of Congress.

SEN. SCHUMER:  You mean the chair of the Intelligence Committee or something?

ATTY GEN. **GONZALES:**  I --

SEN. SCHUMER:  It's not a classified number, is it?

ATTY GEN. **GONZALES:**  It is a classified -- I believe it is a classified number, yes, sir.

SEN. SCHUMER:  But here's the issue -- FISA is also important to our national security and you praise the program, right?

ATTY GEN. **GONZALES:**  I couldn't agree with you more, Senator.

SEN. SCHUMER:  Okay.

ATTY GEN. **GONZALES:**  It's very important.

SEN. SCHUMER:  Now, FISA makes public every year the number of applications.  In 2004, there were 1,758 applications.  Why can't we know how many under this program?  Why should one be any more classified than the other?

ATTY GEN. **GONZALES:**  I don't know whether or not I have a good answer for you, Senator.

SEN. SCHUMER:  I don't think you do.

ATTY GEN. **GONZALES:**  The information is classified, and I would not be at liberty to talk about it here in this public --

SEN. SCHUMER:  And I understand this isn't exactly your domain, but can you -- I can't even think of a rationale why one should be classified and one should be made routinely public.  Both involve wiretaps, both involve terrorism, both involve protecting American security, and we've been doing the FISA one all along.  I'm sure -- well, let me ask you this, if the administration thought that revealing the FISA number would damage security, wouldn't they move to classify it?

ATTY GEN. **GONZALES:**  Maybe -- of course now I'm just -- I'm going to give you an answer.  Perhaps it has to do with the fact that with FISA, of course, it's much, much broader.  We're talking about enemies beyond al Qaeda.  We're talking about domestic surveillance.  We're talking about surveillance that may exist in peacetime, not just in war time.  And so, perhaps, the equities are different in making that information available to Congress.

AFTERNOON SESSION OF A HEARING OF THE SENATE JUDICIARY COMMITTEE SUBJECT: "WARTIME EXECUTIVE POWER AND THE NATIONAL SECURITY AGENCY'S SURVEILLANCE AUTHORITY" CHAIRED BY: SENATOR ARLEN S

SEN. SCHUMER:  Would you support declassifying that number?

ATTY GEN. **GONZALES:**  Senator, I would have to think about that.

SEN. SCHUMER:  We'll wait for the next -- (inaudible) -- another one. We have a lot of questions to follow up on here.

ATTY GEN. **GONZALES:**  I look forward to our conversation.

SEN. SCHUMER:  Me, too.  Abuses -- this is -- when Frank Church was speaking at the hearing that Senator Kennedy, I think, talked about much earlier this morning, he said -- the NSA's quote-- "Capability at any time could be turned around on the American people and no American would have any privacy left, such as the capability to monitor everything -- telephone conversations, telegrams, it doesn't matter; there'd be no place to hide."  Now it's 31 years later and we have even more technology, so there's the potential that Senator Church mentioned for abuse is greater.

So let me ask you these questions.  I'm going to ask a few of them so you can answer them together.

Have there been any abuses of the NSA surveillance program?  Have there been any investigations arising from concerns about abuse of the NSA program?  Has there been any disciplinary action taken against any official for abuses of the program?

ATTY GEN. **GONZALES:**  Senator, I think that --

SEN. SCHUMER:  Because this gets to the nub of things.  This is what we're worried about.

ATTY GEN. **GONZALES:**  Of course.

SEN. SCHUMER:  I think all of us want to give the president the power he needs to protect us.  I certainly do.  But we also want to make sure there are no abuses.  And so if there have been some abuses, we ought to about, and it might make your case to say, yeah, we found an abuse or a potential abuse and we snuffed it out.  Tell me what the story is.

ATTY GEN. **GONZALES:**  Well, I do not have answers to all these questions.  I'd like to remind people that, of course, in the area of criminal law enforcement, when you talk about probable cause, sometimes there are mistakes made, as you know.

SEN. SCHUMER:  No question. No one's perfect.

ATTY GEN. **GONZALES:**  The mistake has to be one that would be made by a reasonable man.  And so when you ask have there been abuses, I can't -- these are all --

SEN. SCHUMER:  Have there been any -- how about this --

ATTY GEN. **GONZALES:**  Disciplinary action --

SEN. SCHUMER:  Yeah, this is something that you ought to know, if there's been any disciplinary action, because I take it that would be taken --

ATTY GEN. **GONZALES:**  Not necessarily.  I think -- the NSA, I think, has a regimen in place where they ensure that people are abiding by agency policy in regulations.

SEN. SCHUMER:  If I asked those two questions about the Justice Department, any questions arising out of concern for abuse of NSA surveillance or any disciplinary action taken against an official, in either case by the Justice department, you would know the answer to that.

AFTERNOON SESSION OF A HEARING OF THE SENATE JUDICIARY COMMITTEE SUBJECT: "WARTIME EXECUTIVE POWER AND THE NATIONAL SECURITY AGENCY'S SURVEILLANCE AUTHORITY" CHAIRED BY: SENATOR ARLEN S

ATTY GEN. **GONZALES:** I probably would know the answer to that. To my knowledge, then, no.

SEN. SCHUMER:  Okay.  Could you commit when we come back to tell us if there have been -- you know, you can then go broader than you know and then more broadly than what you --

ATTY GEN. **GONZALES:**  In terms of what is going on at NSA, or Justice?

SEN. SCHUMER:  NSA.

ATTY GEN. **GONZALES:**  Well --

SEN. SCHUMER:  I mean, as the chief law enforcement officer, it's still your job to sort of know what's going on in other agencies.

ATTY GEN. **GONZALES:**  Sir, but if we're not talking about -- each agency has its own policies and procedures --

SEN. SCHUMER:  Just asking you when you come back next time to try and find the answer --

ATTY GEN. **GONZALES:**  I'll see what I can do about providing additional information to your questions.

SEN. SCHUMER:  A little soft, but I'll have to take it, I guess.

Thank you, Mr. Chairman.

SEN. GRASSLEY:  Thank you.

Senator DeWine.

SEN. MIKE DEWINE (R-OH):  Thank you, Mr. Chairman.

Long day, Mr. Attorney General.  Let me just you a few questions.

We've had a lot of discussions today, and you've referenced a lot to this group of eight, reporting to this group of eight.  I just want to make a point; it's a small point, I guess.  But the statutory authorization for this group of eight is 50USC413b.  When you look at that section, the only thing this references, as far as what this group of eight does, is receive reports in regard to covert action. So that's really what all it is.  There's no -- does not cover a situation like we're talking about here at all.

So I just wanted to make that point.  We all have a great deal of respect of these eight people.  It's a different group of eight in different periods of time.  We've elected them.  We've selected them.  They are leaders of the Congress.  But there's no statutory authority for this group other than this section that has to do with covert operation, and this is not a covert operation as defined in the specific section.

ATTY GEN. **GONZALES:**  Senator, can I respond to you?

SEN. DEWINE:  Sure.

ATTY GEN. **GONZALES:**  Because I had a similar question from Senator Feinstein.  I don't know whether or not you were here or not.

First of all -- again, repeating for the record that, of course, the chairman of the Senate intel committee and the chairman of the House intel committee --

AFTERNOON SESSION OF A HEARING OF THE SENATE JUDICIARY COMMITTEE SUBJECT: "WARTIME EXECUTIVE POWER AND THE NATIONAL SECURITY AGENCY'S SURVEILLANCE AUTHORITY" CHAIRED BY: SENATOR ARLEN S

SEN. DEWINE:  And I was here when she --

ATTY GEN. **GONZALES:**  Okay.  They both have communicated that we are meeting our statutory obligations.  There is a provision that requires the president of the United States to ensure that agencies are complying with their notice requirements.  The actual notice requirements, as I read it, are 413(A)(a) and 413(B)(b).  And 413(A)(a) deals with non-covert action; 413(B)(b) deals with covert action.  And both of them --

SEN. DEWINE:  Mr. Attorney General, I don't have much time.  I don't mean to be impolite --

ATTY GEN. **GONZALES:**  Okay.  That's alright.

SEN. DEWINE:  I listened to that and I respect your position on it.  My only point was a small point.

ATTY GEN. **GONZALES:**  Yes, sir.

SEN. DEWINE:  And that point simply is that when we reference the group of eight, there's no statutory authorization for the group of eight other than for a covert operation.  I guess I'm just kind of a strict constructionist, kind of a conservative guy, and that's how I read the statute.  And that's my only point.  And I understand your legal interpretation; I respect that.  But you know, that's it.  I don't see any other way on that.

Let me ask you a couple of other questions that I wonder if you could clarify for me.  One is the legal standard that you are using, that's being used by the NSA under this program for deciding when to conduct surveillance of a suspected terrorist.  In your December 19th press conference, you said you must have, and I quote, "reasonable basis to conclude that one party to the communication is affiliated with al Qaeda."

Speaking on Fox TV yesterday, General Hayden referred to the standard as "in the probable cause range."  Could you define it for me?  I know you talked about it today, but we're hearing a lot of different definitions.

ATTY GEN. **GONZALES:**  To the extent there's --

SEN. DEWINE:  You're the attorney general, and just clarify it for me, pinpoint it, give me a definition that the people who are administering this every single day in the field are following.

ATTY GEN. **GONZALES:**  To the extent there's confusion, we must take some of the credit for the confusion, because we have used different words.  The standard is a probable cause standard.  It is reasonable grounds to --

SEN. DEWINE:  A probable cause standard.  Is that different than probable cause as we would normally learn at law school, or is there --

ATTY GEN. **GONZALES:**  Not in my judgment.

SEN. DEWINE:  Okay.  So that means, I think, it's probable cause.

ATTY GEN. **GONZALES:**  It's not probable cause as to guilt --

SEN. DEWINE:  I understand.

ATTY GEN. **GONZALES:**  -- or probable cause as to a crime being committed.   It's probable cause that a party to the communication is a member or agent of al Qaeda.  The precise language that I'd like you to refer to is, is there reasonable grounds to believe -- reasonable grounds to believe that a party to the communication is a member or agent of al Qaeda or of an affiliate terrorist organization?  So it is a probable cause standard, in my judgment.

SEN. DEWINE:  So probable cause.

AFTERNOON SESSION OF A HEARING OF THE SENATE JUDICIARY COMMITTEE SUBJECT: "WARTIME EXECUTIVE POWER AND THE NATIONAL SECURITY AGENCY'S SURVEILLANCE AUTHORITY" CHAIRED BY: SENATOR ARLEN S

ATTY GEN. **GONZALES:** It's probable cause.

SEN. DEWINE: And so all the case law or anything else that we would learn throughout the years about probable cause about that specific question would be what we would look at and what the people are being instructed to follow.

ATTY GEN. **GONZALES:** But again, it has nothing to do with probable cause of guilt, or probable cause that a crime had been committed --

SEN. DEWINE: I understand. We're extrapolating that traditional standard over to another question.

ATTY GEN. **GONZALES:** And the reason that we use these words instead of probable cause is because the people relying upon the standard are not lawyers.

SEN. DEWINE: Let me follow up. I don't have much time.

General Hayden described the standard as a softer trigger than the one that's used under FISA. What does that mean?

ATTY GEN. **GONZALES:** I think what General Hayden meant was that the standard is the same, but the procedures are different in that you have more procedures that have to be complied with under FISA. But the standards are the same in terms of probable cause. But there are clearly more procedures that have to be met under FISA, and that's what I believe General Hayden meant by the softer trigger.

SEN. DEWINE: So it's more -- it's a procedure issue then. In other words, I've got to go through more hoops on one, loops on the other. It's a difference what I have to go through, but my legal standard's the same. Is that what you're saying?

ATTY GEN. **GONZALES:** It's a probable cause standard for both. And yes, sir -- what has to --

SEN. DEWINE: It's the same standard.

ATTY GEN. **GONZALES:** It is the same standard.

SEN. DEWINE: Different question, but different procedures.

Final follow-up question on this. I believe you said that the individual NSA analysts are the ones who are making these decisions. People in the -- who are actually doing this or making this decision obviously -- what kind of training are these individuals given in regard to applying the standard? Well, are you involved in that, or are you not involved in that?

ATTY GEN. **GONZALES:** This is primarily handled by the general counsel's office at NSA, and, as you know, they are very, very aware of the history of abuses. They care very much about ensuring that all the activities that are ongoing at NSA are consistent with the Constitution, and certainly consistent with the authorization by the president for this terrorist surveillance program.

SEN. DEWINE: So this is not something your department is directly involved in?

ATTY GEN. **GONZALES:** No sir, I think it would be unfair to say that we are directly involved. We have provided some guidance, but I think it would be unfair to say that the Department of Justice has been intimately involved in providing training and guidance. I think it's fair to say that that responsibility has fallen primarily to the general counsel's office out at NSA.

SEN. DEWINE: Mr. Attorney General, I will conclude at this point. I just go back to what I said this morning, and

AFTERNOON SESSION OF A HEARING OF THE SENATE JUDICIARY COMMITTEE SUBJECT: "WARTIME EXECUTIVE POWER AND THE NATIONAL SECURITY AGENCY'S SURVEILLANCE AUTHORITY" CHAIRED BY: SENATOR ARLEN S

that is, we've heard a lot of debate -- even more debate than we have this morning about these legal issues and people on different sides of these legal issues. I just really believe it's in the country's best interest, the president's best interest, the war on terrorism's best interest, which is what we're all concerned about. Some four years or so after this program has been initiated, for the president to come to Congress and to get -- for us in the intelligence committee that has jurisdiction to take a look at this program, to get the briefing on the program and then see whatever changes in the law have to be made and to deal with it.

I think you will be, and the president will be in a much stronger position at this point to go forward, and it will be in the best interest of the country.

ATTY GEN. **GONZALES:** Thank you, Senator.

SEN. GRASSLEY: Thank you, Senator.

Senator Kennedy.

SEN. EDWARD KENNEDY (D-MA): Thank you, Mr. Chairman.

And thank you, General **Gonzales.** I join all of those that pay tribute to you for your patience on this, and thank you for responding to the questions.

Just to pick up on what my friend and colleague Senator DeWine has mentioned: I'm in strong agreement with -- that recommendation's bipartisan; I didn't have a chance to talk to Senator DeWine.

I mentioned earlier in the course of our visit this morning that we had, I thought, extraordinary precedents with Attorney General Levi, Ed Levi, and President Ford, where the members of this committee, a number of us went down to the Justice Department, worked with them. They wanted to get it right. The issue was on eavesdropping -- very related to the subject matter -- that they wanted to get it right. And then General Levi had a day and a half where he listened to outside constitutional experts, because he wanted to get it right.

My very great concern is that we're not getting it right. Maybe in terms of the NSA thinks that they're getting the information, but what we're seeing now with the leaks and others -- that there are many people out there that wonder whether they're going to face future prosecution, whether the court system's going to be tied up because of information that's gained as a result of the NSA taps that's not going to be permitted, and that we're going to have these known al Qaeda personnel that are going to be either freed or given a lesser sentence, or whatever, and that they're less inclined to sort of spill the beans, because if they know that they're going away, or worse, they'll be better prepared to make a deal with law enforcement authorities than if they think they can tie up the courts.

So in the FISA Act, as you well know, the 15 days that were included in there were included, as the legislative history shows; that if they needed to have a broader context, it was spelled out in the legislative history. The administration would have seven days, allegedly, to make emergency recommendations, and we'd have seven days to act. Maybe that was too precipitous, but that was certainly the intent -- the invitation of the time, to recognize the time. And I think I believe very strongly that that's, as Senator DeWine has made -- we want to get -- we have uncertainty now. When you have those within your own department who wonder about the legality, the list of constitutional authorities and question the legality. You have Professor Curtis Bradley, who'd been -- someone who'd been part of the administration. The State department questions the legality. I think we're -- this is a matter of concern.

I understand -- I asked you; I didn't think I gave you a chance to answer. But we -- you really didn't have a chance to test this out with outside constitutional authority, as I understand it.

ATTY GEN. **GONZALES:** Sir, of course I wasn't at the department when the program commenced, and so certainly, from within the White House, I'm not aware of any discussions, generally or specifically. I don't think there

AFTERNOON SESSION OF A HEARING OF THE SENATE JUDICIARY COMMITTEE SUBJECT: "WARTIME EXECUTIVE POWER AND THE NATIONAL SECURITY AGENCY'S SURVEILLANCE AUTHORITY" CHAIRED BY: SENATOR ARLEN S

would have been any specific discussions with outside experts. And I suspect -- in fact, I'm fairly sure -- there were not discussions with outside expertise at the department, although I don't know for sure.

SEN. KENNEDY: Well, the -- we'll have our chance and opportunity, hopefully, to find that out. But it -- in further hearings. But it is impressive, but -- what was done previously and the coming together in -- when the legislation was passed, with virtually unanimity and in the House and the Senate. And I think that, as others have expressed, we want to give the president the power to get what's right in terms of protecting us, but we need, as we do on other issues, have the kinds of checks and balance to make sure that it's done right.

Let me just -- I have just a couple of other areas. I'm not sure that -- you might have been asked about this, and if you can't answer it, you can't answer. But since September 11th, has the president authorized any other surveillance program within the United States under his authority as commander in chief or under the authorization for use of military force in Afghanistan --

ATTY GEN. **GONZALES:** Senator, I'm not -- I can't answer that question in terms of other operations.

SEN. KENNEDY: Okay. All right.

On another issue -- and I've heard from staff, apologize for not being here through the whole session -- we were dealing with the asbestos legislation on the floor at the time, and I needed to go over to the floor -- I'm interested in the telephone companies that assist the government engaging in electronic surveillance, face potential criminal and civil penalties if they disclose consumer information unlawfully.

So they are protected from such liability if they receive a written certification from the attorney general or his designee, saying that -- and I quote -- "no warrant or court order is required by law, that all statutory requirements have been met, and that this specific assistance is required."

So you understand that telephone companies can face criminal and civil liability if they provide wiretapping assistance in a way that's not authorized by statute.

ATTY GEN. **GONZALES:** I do understand that, yes, sir.

SEN. KENNEDY: And have you provided a certification to the telephone companies that all statutory requirements have been met?

ATTY GEN. **GONZALES:** Senator, I --

SEN. KENNEDY: You can't answer that?

ATTY GEN. **GONZALES:** -- I can't provide that kind of information.

SEN. KENNEDY: And you couldn't even provide us with redacted copy. So I guess we'd assume that since that's a requirement or otherwise that they can be -- they'll be held under the criminal code, and that is a requirement, one would have to assume that you've given them that kind of authority by that --

ATTY GEN. **GONZALES:** Senator, two points.

There is a lot in the media about potentially what the president has authorized.

SEN. KENNEDY: Okay.

ATTY GEN. **GONZALES:** Much of it is incomplete. Much of it is, quite frankly, wrong. And so you have this muddled picture that the president has authorized something that's much greater than what in fact he has authorized.

AFTERNOON SESSION OF A HEARING OF THE SENATE JUDICIARY COMMITTEE SUBJECT: "WARTIME EXECUTIVE POWER AND THE NATIONAL SECURITY AGENCY'S SURVEILLANCE AUTHORITY" CHAIRED BY: SENATOR ARLEN S

And I can't remember my second point.

SEN. KENNEDY:  But your response to the earlier question about the range of different programs --

ATTY GEN. **GONZALES:**  Oh, I remember my second -- if I can just -- my second point is, is that your question -- again, I haven't -- I think this is true.  I don't want to give -- well, maybe I shouldn't make this statement.

I'm sorry.  Go ahead, Senator.

SEN. KENNEDY:  Well, that's -- we were looking at sort of the range of different programs.  But I think that there's -- I want to just mention, General, as someone that was here when we had the testimony -- just quickly -- on the wiretaps, there was -- prior to the time that J. Edgar Hoover used to appear, they used to lift all the wiretaps.  They'd just have about 450 or 500 wiretaps, and they have 20 the day he testified, then 500 the next day.  No one's suggesting that that's what's happening.  But that's really what many of us who have been on this committee for some time have seen those abuses.  No one is suggesting that.  And we understand your reluctance in mentioning this.  But we've -- this is an issue that's been around over some period of time.

I'd just say in conclusion, Mr. Chairman, I'm very hopeful.  We want to have as much certainty on the program as possible.  I think the -- what we have seen out in the public now is the information that has been out there almost -- certainly weekly, as a result of concerned individuals in these agencies, hard-working Americans that are trying to do a job and are concerned about the legality of this job.  And I think they are entitled to the protections that we ought to be able to provide for them.  And as someone who's been a member of this committee, I think that this committee has in the past, and  certainly would, recognizing the extraordinary sensitivity and the importance of it, do the job and do it right and do it well.  And then done so, I think we would have a different atmosphere and a different climate, and I think we'd be able to get the kind of information that is going to be so important to our national security.  I hope that will be a judgment that you'll consider, as Senator DeWine has mentioned, and others have mentioned.  And I appreciate your testimony.

Thank you, Mr. Chairman.

SEN. SPECTER:  Before proceeding to Senator Sessions, who's next on the Republican side -- and I will defer my turn until after Senator Sessions has had his turn -- I think this is a good time to make an announcement.

Senator Kennedy made this suggestion earlier today about the committee's intentions with respect to renewing the Voting Rights Act; especially propitious time with the death of Coretta Scott King.  We have been talking about hearings.  And we're going to move to renew the Voting Rights Act this year, if we possibly can, in advance of the 2007 date.  We have been laboring under a very, very heavy workload, which everybody knows about.  And we will be scheduling those hearings early on.  They have to be very comprehensive, provide an evidentiary base.  And it is a matter of great concern really to everybody on the committee.

But, Senator Kennedy --

SEN. KENNEDY:  Well, I want to thank the chair.  We've had a chance to talk about this at other times.  But that -- and I particularly appreciate his sensitivity as many of us are going down to the funeral for Coretta Scott King.  I think it's an important statement and comment that her legacy will continue.  So I thank -- I thank the chair.

 I know we have broad support.  My friend Senator Leahy has been a strong supporter, others here -- Senator Biden -- I look around this committee.  It's very, very important legislation.  In the time that we inquired of General **Gonzales,** he had indicated the full support of the administration on this.  We'll look forward to working with you.

I thank the chair for making that announcement.

AFTERNOON SESSION OF A HEARING OF THE SENATE JUDICIARY COMMITTEE SUBJECT: "WARTIME EXECUTIVE POWER AND THE NATIONAL SECURITY AGENCY'S SURVEILLANCE AUTHORITY" CHAIRED BY: SENATOR ARLEN S

SEN. SPECTER:  Thank you, Senator Kennedy.

Senator Sessions.

SEN. SESSIONS:  Thank you, Mr. Chairman.

I would like to offer for the record a letter from Mr. H. Bryan Cunningham, who served for six years with the CIA and the Department of Justice in President Clinton's administration, and for a time in President Bush's administration, in which he defends the actions of the terrorist program -- surveillance program.

I would also join with the chairman in welcoming Ms. Debra Burlingame here.  She's been here all day.  Her brother was a pilot who lost his life in the plane that crashed into the Pentagon, and I think her presence today is a vivid reminder of the human cost that can occur as a result of negligence or failure of will, or failure to utilize the capabilities that are constitutional and are legal in this country.

And we have a responsibility to make sure that we do those things that are appropriate and legal to defend this country.  It's not merely an academic matter.  We've had some good discussions here today.  But it's beyond academics.  It's a matter of life and death, and we've lost a lot of people, over 300 -- nearly 3,000 people have no civil rights today.  They're no longer with us as a result of a terrorist attack.

Thank you, Ms. Burlingame, for coming and being with us today.

We talked about the inherent power of the president.  I think there's been a remarkable unanimity of support for the inherent power of the president to do these kind of things in the interest of national security, and I know post-Aldrich Ames, as you pointed out when I asked you about it, Mr. **Gonzales,** Attorney General **Gonzales,** that laws were changed with regard to that.  But in fact, Jamie  Gorelick, the deputy attorney general in the Clinton administration, testified before Congress in defense of an -- a warrantless search of Aldrich Ames's home and the warrantless search of a Mississippi home of a terrorist in the Aldrich Ames case.

She testified that the president has inherent authority to conduct warrantless physical searches for foreign intelligence purposes.  Now, that sounds to me like that she was saying that that is an inherent constitutional power.  I don't understand it any other way.  Would you?

SEN.    :  Senator, yield for a question.  What year was that? I'm sorry.

SEN. SESSIONS:  This would have been after the Aldrich Ames case, `94-`95.

SEN.    :  Thank you.

SEN. SESSIONS:  It was before the statute was changed by the Congress, but she did not discuss it in that context.  Her context was that it's the inherent power of the president.

And she went on to say, "and the rules and methodologies for criminal searches are inconsistent with the collection of foreign intelligence and would unduly frustrate the president in carrying out his foreign intelligence responsibilities."

And in addition to that, Judge Griffin Bell, who served as a federal judge for a number of years and was attorney general under our Democratic President Jimmy Carter when the FISA act was passed, acknowledged that while the bill did not recognize the president's inherent power to conduct electronic surveillance, he said this, quote:  This does not take away the power of the president under the Constitution.  It simply, in my view, is not necessary to state that power, so there is no reason to reiterate or iterate it, as the case may be; it is in the Constitution, whatever it is.

And then he went on to say a little later -- when asked about the inherent power of the president to order electronic surveillance without first obtaining a warrant, former Attorney General Griffin Bell testified:  We can't change the

AFTERNOON SESSION OF A HEARING OF THE SENATE JUDICIARY COMMITTEE SUBJECT: "WARTIME EXECUTIVE POWER AND THE NATIONAL SECURITY AGENCY'S SURVEILLANCE AUTHORITY" CHAIRED BY: SENATOR ARLEN S

Constitution by agreement -- or by statute, I would add.  A little later he said, when asked if he thought the president has, quote -- he was asked this question:  Does the president have, quote, "the inherent right to engage in electronic surveillance of an American citizen in this country?"  Judge Bell responded:  I do.  I think he has a constitutional right to do that, and he has a concomitant constitutional duty to do it under certain circumstances.

So I don't know all the answers to what the powers are here.  There are a lot of different opinions.  I would say this.  You've almost been criticized some today for not going further, not surveilling purely phone calls within our country.  Some on the other side have criticized you, apparently, are surprised you didn't assert that authority.  But the president, I think, acted narrowly and within what he thought would be appropriate given our constitutional and statutory structure and after having informed eight of the top leaders in the United States Congress.  Would you comment on that?

ATTY GEN. **GONZALES:**  Well, it is a very narrow authorization. And again, I want to repeat what I said earlier in the hearings in terms of I want to assure you that we -- that while domestic-to- domestic is not covered under the terrorist surveillance program, we are using all the tools available, including FISA, to get information regarding those kinds of communications.  I mean, if there are other ways to do it that are permitted under the Constitution, we're going to try to get that information.  It's so very, very important.

SEN. SESSIONS:  Well, thank you.

I would just observe that I think the system was working.  It was a narrow program that the president explained to congressional leaders.  He had his top lawyers in the Department of Justice and the White House review its constitutionality, and he was convinced that it was legal.  He narrowly constrained it to international calls, not domestic calls, and al Qaeda-connected individuals.  And he also did it with the one group that he has concluded was responsible for 9/11, al Qaeda, the group that this Congress has authorized him to have hostilities against, to go to war against -- and they declared war on us even before 9/11.  That's the one group, not other groups that might have hostile interests to the United States like Hezbollah or any other Colombian group or terrorist group around the world.  That's what he authorized to occur.

So I think he showed respect for the Congress, not a disrespect. And General **Gonzales,** other groups that may have violent elements within them are not authorized to be surveiled through this terrorist surveillance program, isn't that correct?

ATTY GEN. **GONZALES:**  Senator, under the -- under the present -- under the present terrorist surveillance program, again as I've indicated, what we're talking about today is people -- members or agents of al Qaeda or related -- of al Qaeda or related terrorist organizations is what we're talking about.

And I think General Hayden I believe testified before the Intel Committee that there are professionals out at NSA, and I presume from other branches of the intel community, that provide input as to what does that mean to be sort of related or working with al Qaeda.SEN **JUDICIARY/GONZALES/**PM      PAGE 96 02/06/2002 .STX

SEN. SESSIONS:  Well, let me just conclude with this point.  I think the system was working in that way.  We were conducting a highly classified, important operation that had the ability to prevent other people from being killed, as Ms. Burlingame's brother was killed and several thousand others on 9/11.

I believe that CIA Director Porter Goss recently in his statement that the revealing of this program resulted in severe damage to our intelligence capabilities is important to note.  And I would just like to follow up on Senator Cornyn's questions, General **Gonzales,** and ask you to assure us that you will investigate this matter, and if people are found to have violated the law, that the Department of Justice will prosecute those cases when they reveal this highly secret, highly important program.

ATTY GEN. **GONZALES:**  Senator, of course we are going to investigate it, and we will make the appropriate decisions regarding a subsequent prosecution.

AFTERNOON SESSION OF A HEARING OF THE SENATE JUDICIARY COMMITTEE SUBJECT: "WARTIME EXECUTIVE POWER AND THE NATIONAL SECURITY AGENCY'S SURVEILLANCE AUTHORITY" CHAIRED BY: SENATOR ARLEN S

SEN. SESSIONS:  Will the appropriate -- will you prosecute if it's appropriate?

ATTY GEN. **GONZALES:**  We will prosecute when it's appropriate. Yes, sir.

SEN. SESSIONS:  Thank you.

SEN. SPECTER:  Thank you, Senator Sessions.

Senator Biden.

SEN. JOSEPH BIDEN (D-DE):  Thank you very much.

General, how has this revelation damaged the program?  I'm always confused about that.  I mean, it seems to presuppose that these very sophisticated al Qaeda folks didn't think we were intercepting their phone calls.  (Chuckles.)  I mean, I'm a little confused.  How did it damage this?

ATTY GEN. **GONZALES:**  Well, Senator, I would first defer to the experts in the intel committee who were making that statement, first of all.  I'm just a lawyer, so when the director of the CIA says this has really damaged our intel capabilities, I would defer to that statement.

I think, based on my experience, it is true you would assume that the enemy is presuming that we are engaged in some kind of surveillance.  But if they're not reminded about it all the time, in the newspapers and in stories, they sometimes forget.

SEN. BIDEN:  (Laughs.)

ATTY GEN. **GONZALES:**  And you're amazed at some of the communications that exist.  And so when you keep sticking it in their face that we've involved in some kind of surveillance, even if it's unclear in these stories, it can't help but make a difference, I think.

SEN. BIDEN:  Well, I hope you and my distinguished friend from Alabama are right that they're that stupid and naive because we are much better off if that's the case.  I got the impression from the work I've done in this area that they are pretty darn sophisticated. They pretty well know -- it's a little like when we talk about -- when I say you all haven't -- not you personally -- the administration has done very little for rail security.  They've done virtually nothing.  And people say, oh, my lord, don't tell them.  Don't tell them there are vulnerabilities in the rail system; they'll know to use terror. Don't tell them that that tunnel was built in 1860 and has no lighting, no ventilation.  I mean, I hope they're that -- I hope they're that stupid.

ATTY GEN. **GONZALES:**  Sir, I think you can be very, very smart and be careless.

SEN. BIDEN:  Well, okay.  But if that's the extent of the damage, then I hope we focus on some other things, too.

Look, I'd like to submit for the record a letter to the -- it's probably already been done -- to Senator Specter and Leahy from former Secretary Jamie Gorelick.  She makes a very basic point.  I don't want to debate it at this time.  She said the Aldrich Ames case is a physical search.  FISA didn't cover physical searches, as my distinguished friend from Alabama knows.  At the time they conducted the search, FISA did not cover physical searches.

And then she went on to say, my testimony did not address whether there would be inherent authority to conduct physical searches if FISA were extended to cover physical searches.  After FISA was extended to cover physical searches, to my knowledge FISA warrants were sought.

So I mean, let's compare apples and apples and oranges and oranges.

AFTERNOON SESSION OF A HEARING OF THE SENATE JUDICIARY COMMITTEE SUBJECT: "WARTIME EXECUTIVE POWER AND THE NATIONAL SECURITY AGENCY'S SURVEILLANCE AUTHORITY" CHAIRED BY: SENATOR ARLEN S

Let me ask a few other basic questions because, for me, you know, I have real doubts about the constitutionality as others have raised here.  But why -- you know, I used to have a friend who used to say, you know, you got to know how to know.  You got to know how to know. And we don't know.

Now you're telling me and the rest of us that the director of CIA said he'd been damaged.  Well, the former director told us that we were going to be greeted with open arms; you know, that they had weapons of mass destruction.  That was honest mistakes.  I mean, for me to accept the assertion made by a single person is something I'd consider, but is not dispositive.

Let me ask you this question.  Do you know -- and you may not -- do you know how many of these wiretaps and/or e-mail intercepts have resulted in anything?

ATTY GEN. **GONZALES:**  Well --

SEN. BIDEN:  Any criminal referral?  Any --

ATTY GEN. **GONZALES:**  Without getting into specifics, Senator, I can say that the director of the FBI said this has been a very valuable program.  And it has helped -- it has helped identify would- be terrorists here in the United Statesm and it has helped identify individuals providing material support for terrorists.

General Hayden has said this has been a very successful program; that but for this program they would not have discovered certain kinds of information.  General Hayden also said that this program has helped protect and prevent -- I think those were his words -- attacks both here and abroad.  These are -- these folks who are paid to make these kinds of assessments.  I'm not.

SEN. BIDEN:  Have we arrested those people?  Have we arrested the people we've identified as terrorists in the United States?

ATTY GEN. **GONZALES:**  Sir, when we can use the law enforcement -- our law enforcement tools to go after the bad guys, we do that.

SEN. BIDEN:  No, that's not my question, General.  You said that -- you cited the assertions made by Defense Department, by General Hayden, by FBI, that this has identified al Qaeda terrorists.  Have we arrested them?

ATTY GEN. **GONZALES:**  Senator, I'm not going to -- I'm not going to go into a specific discussion about --

SEN. BIDEN:  I'm not asking for specifics, with all due respect.

ATTY GEN. **GONZALES:**  -- in terms of how that information has been used and the results of that information.

SEN. BIDEN:  Well, I hope we arrested them if you identified them.  I mean, it kind of worries me because you all talk often about how you identify these people, and I've not heard anything about anybody being arrested.  I hope they're not just hanging out there  like we had these other guys hanging out prior to 9/11.  I don't think you'd make that mistake again.

Can I ask you again, how is this material that proves not to suspected al Qaeda terrorists, calls from Abu Dhabi, American citizen in Selma, Alabama.  It turns out that when you do the intercept, the person on the other end from Abu Dhabi wasn't a terrorist -- understandable mistake -- and it turns out the person in Selma wasn't talking to a terrorist.  What do you do with that conversation that has now been recorded?

ATTY GEN. **GONZALES:**  What I can say, Senator, is that we do have -- there are minimization procedures in place.  You and I had this conversation before about the minimization procedures that may exist with respect to this program.

AFTERNOON SESSION OF A HEARING OF THE SENATE JUDICIARY COMMITTEE SUBJECT: "WARTIME EXECUTIVE POWER AND THE NATIONAL SECURITY AGENCY'S SURVEILLANCE AUTHORITY" CHAIRED BY: SENATOR ARLEN S

SEN. BIDEN:  That may exist?

ATTY GEN. **GONZALES:**  Meaning --

SEN. BIDEN:  Either they do or they don't.  Do they?

ATTY GEN. **GONZALES:**  There are minimization procedures that do exist with this program, and they -- and they would govern what happens to that -- to that information.

SEN. BIDEN:  Does anybody know what they are?

ATTY GEN. **GONZALES:**  Yes, sir, the folks out at NSA who are actually administering this program.

SEN. BIDEN:  Have they told anybody in the Congress?  Have they told any court?

ATTY GEN. **GONZALES:**  Sir, I do not know that, the answer to that question.

SEN. BIDEN:  I guess -- maybe y'all don't have the same problem I have.  If in fact there are minimization procedures and they are being adhered to, no problem.  If in fact the people being intercepted are al Qaeda folks and they are talking to American citizens, no problem.  But how do we know?  I mean, doesn't anybody get to look at this ever? Doesn't a court retrospectively get to look at it?  Doesn't the -- this -- this -- you know, the royalty within the Senate get to look at it -- you know, this two, four or eight people?  I mean, doesn't somebody look at it?

Or you know, the Cold War lasted 40 years.  This war is likely to last 40 years.  Is this for 40 years we got to sit here and assume that every president is just, yeah, well, we know old Charlie, he's a good man, we're sure he wouldn't do anything wrong.  And we know no one in the intelligence community would ever do anything wrong.  We have a history of proving that never occurred.  And we know no one in the FBI will ever do anything wrong; that's clear, that never occurred.

I mean is, there some place along the line that somebody other than an analyst who we don't know, but we know he's asserted to be an expert at al Qaeda -- is there somebody other than that person who's ever going to know what happened and whether or not there is -- the next president may be less scrupulous.  Maybe he or she will be engaged in data mining.

ATTY GEN. **GONZALES:**  Sir, as I indicated in my opening remarks, of course the inspector general at NSA, he has the responsibility to ensure that the activities under this program are done in a way that's consistent with the president's authorization, including the minimization requirements.

 as I indicated in my opening remarks, that of course the inspector general at NSA, he has the responsibility to ensure that the activities under this program are done in a way that's consistent with the president's authorization, including the minimization requirements.

SEN. BIDEN:  Okay.  This reminds me of a Supreme Court hearing. (Chuckles.)

What -- what goes into the president making his decision on reauthorization every 45 days?  Does anybody come and say: Mr. President, look, we have done 2,117 wiretaps, or 219; you've had 60 percent of them had some impact, or only 1 percent has an impact, and we think -- I mean, what -- or is it automatic?  I mean, what kind of things does the president look at --

ATTY GEN. **GONZALES:**  No, sir --

SEN. BIDEN:  -- other than we still have al Qaeda out there?

AFTERNOON SESSION OF A HEARING OF THE SENATE JUDICIARY COMMITTEE SUBJECT: "WARTIME EXECUTIVE POWER AND THE NATIONAL SECURITY AGENCY'S SURVEILLANCE AUTHORITY" CHAIRED BY: SENATOR ARLEN S

ATTY GEN. **GONZALES:** Sir, it's not automatic. As I also indicated in my opening statement, the president receives information from the intelligence community about the threat. The threat is carefully evaluated as to whether or not we believe al Qaeda continues to be a continuing threat to the United States of America.

SEN. BIDEN: So long as it is, the program -- so that's the criteria, is al Qaeda a threat? Not: Is the program working? But: Is al Qaeda a threat? Is that the criteria?

ATTY GEN. **GONZALES:** Well of course not. If we don't have a tool, a lawful tool that's effective, why would we use it? We only use a tool if it's effective.

SEN. BIDEN: (Laughs.) Thank you, General.

ATTY GEN. **GONZALES:** Mr. Chairman? Mr. Chairman, could I ask for a short break?

SEN. SPECTER: Granted.

ATTY GEN. **GONZALES:** Thank you, Mr. Chairman.

(Recess.)

SEN. SPECTER: (Sounds gavel.) The **Judiciary** Committee hearing will resume.

We have four more senators who have not completed their next round who are on the premises. So it may be that we can finish today. Other senators have looked toward another round, so let me negotiate that between today and some date in the future to see if it is necessary to ask you to come back, Mr. Attorney General.

And I had thought about limiting the time to five-minute rounds, but we're going to be here at least until about 5:30, so let's go ahead with the full 10 minutes.

And I'll yield at this time to Senator Graham.

SEN. BIDEN: Mr. Chairman, parliamentary inquiry. I do have other questions. I'm not asking they be asked today or even tomorrow. But if we end today, which I think makes a lot of sense -- the general's been very generous and his physical constitution has been required to be pretty strong here today too. Is it likely, if after you survey us after we close down today, that you may very well ask the general back for more questions from us in open session?

SEN. SPECTER: Senator Biden, I'd like to leave that open. Senator Leahy said that he was looking forward to another round, which is where we were when he left.

SEN. BIDEN: Okay.

SEN. SPECTER: I thought we would have a number of senators who wouldn't have finished a second round, so Attorney General **Gonzales** would have had to have come back for a second round. But it may be that others will have further questions, or it may be that on some of our other hearings we'll have matters we want to take up with the attorney general. And the attorney general has stated to me his flexibility in coming back. So let's -- is that correct, Mr. Attorney General?

ATTY GEN. **GONZALES:** I try to be as helpful as I can to you, Mr. Chairman.

SEN. SPECTER: I take that as a yes.

SEN. BIDEN: Ten more seconds. And the only reason I ask, I, like you, want to go to the floor and speak on the asbestos bill  that's up. And I didn't know whether I should stay here for a third round or --

AFTERNOON SESSION OF A HEARING OF THE SENATE JUDICIARY COMMITTEE SUBJECT: "WARTIME EXECUTIVE POWER AND THE NATIONAL SECURITY AGENCY'S SURVEILLANCE AUTHORITY" CHAIRED BY: SENATOR ARLEN S

SEN. SPECTER:  Oh, I can answer that.  You should stay here! (Laughter.)

SEN. BIDEN:  (Chuckling.)  I oppose -- I oppose the chairman's position on asbestos!  That's a -- I shouldn't have asked that -- I withdraw the question, Mr. Chairman.  Thank you.

SEN. SPECTER:  I expect to go till 9:00, Senator Biden. (Laughter.)

SEN. BIDEN:  (Laughs.)

SEN. SPECTER:  You're going to miss very important materials if you leave.  (Laughter.)

Senator Graham.

SEN. LINDSEY GRAHAM (R-SC):  Oh, thank you, Mr. Chairman.

Mr. Attorney General, we'll see if we can talk a little bit more about that -- this constitutional tension that we -- that is sort of my pet peeve, for lack of a better word.

I would just echo again what Senator DeWine said.  Instead of another around at another time, I would love to engage in a collaborative process with the administration to see if we can resolve this tension.

I want to talk to you exclusively about inherent power and your view of it, and the administration's view of it, and share some thoughts about my view of it.

The signing statement issued by the administration on the McCain language prohibiting cruel, inhumane and degrading treatment, are you familiar with the administration's signing statement?

ATTY GEN. **GONZALES:**  I am familiar with it, Senator.

SEN. GRAHAM:  What does that mean?

ATTY GEN. **GONZALES:**  The entirety of the statement, Senator?

SEN. GRAHAM:  Well, I mean -- I guess to me, I was taken back a bit by saying "notwithstanding."  It was sort of an assertion that the president's inherent authority may allow him to ignore the dictates of the statute.SEN

**JUDICIARY/GONZALES/**PM       PAGE 107 02/06/2002 .STX

 Does it mean that, or did I misunderstand it?

ATTY GEN. **GONZALES:**  I think -- well, of course, it may mean that this president -- first of all, no president can waive constitutional authority of the executive branch.

SEN. GRAHAM:  And my question is very simple, but very important: is it the position of the administration that an enactment by Congress prohibiting the cruel, inhumane and degrading treatment of detainees intrudes on the inherent power of the president to conduct the war?

ATTY GEN. **GONZALES:**  Senator, I think -- I don't know whether or not we have done that specific analysis.

SEN. GRAHAM:  Can I ask you this question, then?

ATTY GEN. **GONZALES:**  Yes.

SEN. GRAHAM:  Is it the opinion of -- your opinion of the administration's position without the force resolution that FISA is unconstitutional in the sense it intrudes on the power of the president to conduct surveillance in a time of

AFTERNOON SESSION OF A HEARING OF THE SENATE JUDICIARY COMMITTEE SUBJECT: "WARTIME EXECUTIVE POWER AND THE NATIONAL SECURITY AGENCY'S SURVEILLANCE AUTHORITY" CHAIRED BY: SENATOR ARLEN S

war?

ATTY GEN. **GONZALES:** I think that question has been raised a couple times today. I've indicated that that then puts us into the third part of the Jackson analysis. I've also indicated that these are difficult questions. Very few --

SEN. GRAHAM: And I'll accept that as an honest, sincere answer because they are difficult.

Let's get back to my scenario about the military member who has a detainee under their charge. They get an order from the commander in chief or some higher authority to do certain techniques. The justification is that we need to know about what's going to happen in terms of battlefield developments. We believe this person possesses information, and those techniques are expressly prohibited by prior statue under the authority of the Congress to regulate the military. That is another classic moment of tension. What do we tell that troop? I mean, if they called you as a lawyer, and they said, "I've got the order from my commander" -- maybe even from the president -- "to engage in five things, but I've been told there's a statute that says I can't do that passed by Congress. What should I do?" What would your answer be to that person?

ATTY GEN. **GONZALES:** I don't know if I could give that person an immediate answer. That's -- I think that's the point that you are making -- to put our military in that kind of position, that's a very difficult question --

SEN. GRAHAM: Thank you for -- that is absolutely the point I've been trying to make for a year and a half. I want to give that troop an answer that we all can live with.

And let me take this just a little bit further. The FISA statute in a time of war is a check and balance. But here's where, I think, I'm your biggest fan -- during a time of war, the administration has the inherent power, in my opinion, to surveil the enemy and to map the battlefield electronically; not just physical, but to electronically map what the enemy's up to by seizing information and putting that puzzle together.

And the administration has not only the right but the duty, in my opinion, to pursue fifth column movements. And let me tell folks who are watching what a fifth column movement is. It is a movement, known to every war, where Americans, citizens, will sympathize with the enemy and collaborate with the enemy. It's happened in every war. And President Roosevelt talked about -- we need to know about fifth column movements.

So to my friends on the other side, I stand by this president's ability, inherent to being commander in chief, to find out about fifth column movements. And I don't think you need a warrant to do that.

But here's my challenge to you, Mr. Attorney General. There will come a point in time where the information leads us to believe that Citizen A may be involved in a fifth column movement. At that point in time, where we will need to know more about Citizen A's activity on the ongoing basis, here's where I part. I think that's where the courts really come in. I would like you and the next attorney general and next president, if you have that serious information that you need to monitor this American citizen's conduct in the future, that they may be part of a fifth column movement to collaborate the enemy -- I want a check and a balance, because -- here's why.

Emotions run high in war, and we've put a lot of people in prison who just looked like the enemy and never did anything wrong, just as loyal American as you or I. But it would be very easy in this war for an American citizen to be called up by the enemy and labeled as something they're not. It would be very easy, in my opinion, if you're a business person dealing in the Mideast who happens to be American citizen, the business deal goes bad, that bad things could happen to you.

And I would just like the administration to entertain the idea of sitting down with Senator DeWine and others to see if we can find a way, at some point in the process of monitoring fifth column movements, to have a check and balance system that not only would strengthen the commander in chief's role; it will give guidance to the people fighting the war; you'll have Congress on board, you'll be stronger in courts; and the winning -- enemy will be weaker.

AFTERNOON SESSION OF A HEARING OF THE SENATE JUDICIARY COMMITTEE SUBJECT: "WARTIME EXECUTIVE POWER AND THE NATIONAL SECURITY AGENCY'S SURVEILLANCE AUTHORITY" CHAIRED BY: SENATOR ARLEN S

How does that proposition sit with you?

ATTY GEN. **GONZALES:** Senator, the president already said that we'd be happy to listen to your ideas.

SEN. GRAHAM: But you do understand my inherent authority argument -- concern with that argument, because taken -- the next president may not be as sensitive to this limited role of the government. Really, Mr. Attorney General, you could use the inherent authority argument of a commander in chief at a time in war -- almost wipe out anything Congress wanted to do.

ATTY GEN. **GONZALES:** See, I disagree with that, Senator. I really meant it when I said earlier that in --

SEN. GRAHAM: Give me a situation where the Congress could regulate or trump the inherent power argument when it comes to war.

ATTY GEN. **GONZALES:** I think Congress has -- a powerful check on the commander in chief is through the purse.

SEN. GRAHAM: If the Congress decided to limit treatment or interrogation techniques of a detainee, would the president have to honor that? Is that part of our authority under the Constitution to regulate the military? Do we have the authority to tell the military you will not do the following things? Would that intrude on the inherent power of the president to run the military?

ATTY GEN. **GONZALES:** (Inaudible) -- the question is whether or not this is an interference of the day-to-day command functions of the commander in chief or does it fall -- does it fall within that clause of Section 8 of Article I, which says that Congress --

SEN. GRAHAM: Do you believe it's lawful for the Congress to tell the military that you cannot physically abuse a prisoner of war?

ATTY GEN. **GONZALES:** I'm not prepared to say that, Senator. I think that that's -- I mean, I think you can make an argument that that's part of the rule -- the government --

SEN. GRAHAM: Mr. Attorney General, if we can't do that, if we can't, during a time of war, regulate the behavior of our troops, then really we have no power in a time of war. And that's the point here. I think we share power.

ATTY GEN. **GONZALES:** I agree. I agree that power is shared in time of war.

SEN. GRAHAM: I think we share a purpose of winning the war.

ATTY GEN. **GONZALES:** No question about that.

SEN. GRAHAM: But we need to get together so the people on the front lines, who are pulled and torn -- if the Bybee memo, Mr. Attorney General, had become the policy, there would have been people subject to court martial. In your good judgment, you repealed that. But I can assure you, Mr. Attorney General, that the Bybee memo's view of how you handle a detainee and what's torture and what's not, if it had been implemented, it would have violated the Uniform Code of Military Justice, and our guys could have gone to jail. And in your good judgment, you repealed that.

I'm asking for you to use that good judgment again and advise our president to come to this Congress and let us sit down and work through these constitutional tensions, because we don't need tension among ourselves, we need unanimity.

Thank you for your service to our country.

AFTERNOON SESSION OF A HEARING OF THE SENATE JUDICIARY COMMITTEE SUBJECT: "WARTIME EXECUTIVE POWER AND THE NATIONAL SECURITY AGENCY'S SURVEILLANCE AUTHORITY" CHAIRED BY: SENATOR ARLEN S

ATTY GEN. **GONZALES:**  Thank you, Senator.

SEN. SPECTER:  Thank you very much, Senator Graham.

Senator Durbin?

SEN. RICHARD DURBIN (D-IL):  Thank you.

Attorney General, you've said that the safeguards for this program, this terrorist surveillance or domestic spying program, include the fact that they are reviewed by career professionals -- I believe you referred to the National Security Agency, perhaps other agencies -- and that there is a 45-day review as to whether you will continue the program. Where did the 45-day review requirement come from?

ATTY GEN. **GONZALES:**  Senator, that really sort of arose by, quite frankly, schedules in terms of having folks be in a position to provide recommendations and advice as to whether the program can continue.  There's nothing magical about the 45 days.

SEN. DURBIN:  I'm not worried about the magic so much as the -- is there a statute that drives this?

 Is there a legal requirement of a 45-day review?

ATTY GEN. **GONZALES:**  We felt that it -- I think it helps us in the Fourth Amendment analysis in terms of, is this a reasonable search -- the fact that it is reviewed periodically -- and I think it's more sort of by happenstance that it really has come out to be approximately every 45 days.

Let me just also mention that when I talked about the review out of NSA, there are monthly meetings, as I understand it, unconnected with this 45-day review in which senior officials involved in this program sit down and evaluate how the program is being operated. That's a process that's totally independent of this 45-day review process.

SEN. DURBIN:  Who chooses the professionals that evaluate this program?

ATTY GEN. **GONZALES:**  Senator, I'm led to believe -- I don't know -- I don't know for sure, but I'm led to believe that they are people -- I'm assuming that senior officials at NSA identify people at NSA who have al Qaeda experience, al Qaeda expertise, knowledge about al Qaeda tactics and aims, and therefore, in the best position to evaluate whether or not a person who's on the call is in fact a member or agent of al Qaeda or an affiliated terrorist organization.

SEN. DURBIN:  Which gets to my point, this so-called safeguard -- and it has been referred to as a check and balance -- is literally the administration talking to itself.  People within the administration meet within their offices and decide about the civil liberties and freedoms of those who are going to be subjected to this surveillance. That is a significant departure from the ordinary checks and balances of our government, is it not, that all of this is being decided within the same executive branch?

ATTY GEN. **GONZALES:**  I don't know if I -- I don't know if I would characterize that way.  I think that there is a lot of -- there is intelligence that is collected by the National Security Agency, where they have control over this information.  They have internal rules and regulations.  They are subject to minimization requirements.  Those are classified.  Those have been shared, as I understand it, with the intel committee, if you're talking about Executive Order 12333, and so I don't know that it's so unique to this program.

SEN. DURBIN:  Well, let me just say, if you want to wiretap as attorney general, you know what you have to do.

ATTY GEN. **GONZALES:**  Yes, sir.

AFTERNOON SESSION OF A HEARING OF THE SENATE JUDICIARY COMMITTEE SUBJECT: "WARTIME EXECUTIVE POWER AND THE NATIONAL SECURITY AGENCY'S SURVEILLANCE AUTHORITY" CHAIRED BY: SENATOR ARLEN S

SEN. DURBIN:  You have to go to another branch of our government. You have to get a warrant; that's case -- criminal cases --

ATTY GEN. **GONZALES:**  In a criminal case, Title III, that's right. I mean --

SEN. DURBIN:  -- terrorist cases, you know that FISA applies. And now, when it comes to these wiretaps or whatever they may be -- this surveillance, whatever it may be -- you don't go to another branch of government.  You meet within your own branch of government, and that I think is a significant difference.

Here's what it comes down to.  You know, there's a general concern here as to whether or not -- the scope of what we're talking about and what it might be, and I know you're limited in what you can tell us.  But I also know that Michael Chertoff, as secretary of Homeland Security, recently said the NSA was -- quote -- "going through literally thousands of phone numbers and trying to sift through an enormous amount of data very quickly."  You've assured us that this is not a dragnet, but I think the thing that it continues to come back to is whether innocent Americans, ordinary Americans, are going to have their e-mails and their phone calls combed through.

And you may shake your head and say, "Oh, we would never do that," but, Attorney General, no one's looking over your shoulder. You're not going to anyone as you would with another wiretap request to determine whether or not it's a reasonable request, or goes to far, or in fact is targeted rather than random.

 I talked to you about Mr. Flesher (sp), who's sitting out here, who asked the very basic question:  Have I been victimized by this program?  Have I been the subject of this program?  He couldn't get an answer.  He's had communications overseas.  The fact that he's sitting here today is a suggestion that he's not worried about what the outcome might be, but he is worried about his freedoms and his liberties.  There is no one for him to speak to.  When he contacts your administration, they say neither confirm nor deny.

So there's no check and balance here.  There's nothing to protect his freedom or liberty, or the freedom and liberty of a lot of innocent people who wonder if you're going too far.  That, I think, is why many of us are absolutely stunned that this administration won't come to Capitol Hill and ask us, on a bipartisan basis, for help with this FISA act, if in fact it does create a problem.  I voted for the Patriot Act.  All but one of the senators in the Senate voted for the Patriot Act.  It isn't as if we're not ready to cooperate with you.  We would feel better about your conduct and the conduct of this administration if there was a law that you followed.  We're not asking you to spell out the operational details, but we're asking you to have at least a FISA Court judge, someone from another branch of government, taking a look at what you're doing.  There is some assurance under that situation, for 28 years, that there's a check and balance.

Do you understand why the blank check that you've asked for causes so much heartburn?

ATTY GEN. **GONZALES:**  Senator, I do understand concern about a blank check.  I don't believe that that is what we have here.

In your comments you've talked about going around the law, going around FISA.  That is not the case here.  We believe we are acting consistent with the requirements of FISA.

I don't know about the comments that Secretary Chertoff made. General Hayden has been out very publicly talking about what this program is about, and it is not about -- it doesn't sound like it's the kind of program that Secretary Chertoff is talking about.  But I would be very interested in studying his remarks.

This is a very narrowly tailored program.

SEN. DURBIN:  How do I know that?  There's no one, other than your good word today, there's no one that can tell me:  I've looked at  this program, trust me, Senator, you can tell Mr. Flesher (sp) and your constituents in Illinois not to worry.  We're not going to comb through the records of innocent Americans.

AFTERNOON SESSION OF A HEARING OF THE SENATE JUDICIARY COMMITTEE SUBJECT: "WARTIME EXECUTIVE POWER AND THE NATIONAL SECURITY AGENCY'S SURVEILLANCE AUTHORITY" CHAIRED BY: SENATOR ARLEN S

There is no one for me to turn to.

ATTY GEN. **GONZALES:**  I don't know if it's proper to ask you a question, Senator, but I'm going to ask you a question.

SEN. DURBIN:  Go ahead.  (Laughter.)

ATTY GEN. **GONZALES:**  If we were to brief you into the program, how would anyone be assured that you would protect the rights of ordinary citizens?  Because we have briefed congressional leaders, and so they know what we're doing and --

SEN. DURBIN:  They are sworn to secrecy, are they not?

ATTY GEN. **GONZALES:**  This is a very classified -- highly classified program.

SEN. DURBIN:  They were sworn to secrecy.

ATTY GEN. **GONZALES:**  But they also --

SEN. DURBIN:  If they found the most egregious violation of civil rights taking place in this program, they are sworn not to say one word about it.

ATTY GEN. **GONZALES:**  Senator, I've got to believe that all of us, we take an oath of office, and if we honestly believe that a crime is being committed, that we would do something about it.

SEN. DURBIN:  How would they?  I've been on the intelligence committee, and I can tell you that when you're briefed with classified material -- I sat in briefings not far from here just a few feet away and listened to what I thought was very meager evidence about weapons of mass destruction before the invasion of Iraq.  Based on that, I voted against it.  But I couldn't walk outside that room until it became public much later and say this administration was at war within when it came to this issue.

ATTY GEN. **GONZALES:**  Senator, I think we're letting members of Congress off the hook easily by saying that as they briefed in the secret program, and they believe it's against the law, that they can't do anything about it.  I think you have an obligation, quite frankly, when you take that oath of office -- if you believe that conduct is, in fact, unlawful, I think you can do something about it.

SEN. DURBIN:  Well, let's talk about one congressman -- congresswoman, in this case, who has spoken out -- Congresswoman Jane Harman.  She's been briefed in the program, and she has said publicly, "You can use FISA.  You don't need to do what you're doing.  You don't need to go through this warrantless process."  So from her point of view, I think she's gone as far as she can go.  That's it.

ATTY GEN. **GONZALES:**  Senator, I don't think we've ever said that we couldn't use FISA with respect -- in particular cases.  But the time it would take to get a FISA application approved would mean that we may lose access to valuable information.

SEN. DURBIN:  You won't come before us and tell us how to change the law to overcome that problem.  That is what I find absolutely inexplicable.

The last thing I'd like to do, Mr. Chairman, if -- or whoever's now presiding -- we've had several references to Mrs. Burlingame, who is here, and I thank her for joining us today and for her statements to the press.  I would also like to acknowledge the presence of Monica Gabrielle and Mindy Kleinberg, who are also in the families of victims of 9/11.  They are here today and they've made a statement for the record.  I'll read the last sentence and ask that this be part of the record.  "Retaining our civil liberties and our cherished democracy in the face of a looming terrorist threat is the

AFTERNOON SESSION OF A HEARING OF THE SENATE JUDICIARY COMMITTEE SUBJECT: "WARTIME EXECUTIVE POWER AND THE NATIONAL SECURITY AGENCY'S SURVEILLANCE AUTHORITY" CHAIRED BY: SENATOR ARLEN S

only way we will this war on terror."  And I ask that this statement be made a part of the record.

SEN. GRAHAM:  Without objection.

SEN. CORNYN:  Thank you very much.  (Laughter.)  Thank you very much, Chairman Graham.  Thank you, General.

ATTY GEN. **GONZALES:**  Thank you, Senator.  (Laughter.)

SEN. CORNYN:  Attorney General **Gonzales,** Chairman Specter had to step out, but he asked me to proceed after Senator Durbin, and I'm happy to do that so we can move on.

If an employee of the National Security Agency has a concern about the legality of what they're being asked to do, is it -- are they authorized to have a press conference or to otherwise leak that information to outside sources?

ATTY GEN. **GONZALES:**  Senator, I think there are laws that prohibit the disclosure of classified information.  I think there might be other ways that may be more -- that would certainly be more appropriate --

SEN. CORNYN:  Let me suggest one to you.  In 1998 Congress passed the Community Whistle-Blower Protection Act -- Intelligence Community Whistle-Blower Protection Act, which provides in part that an employee of the DIA, the National Imagery and Mapping Agency, the National Reconnaissance Office or the National Security Agency, or a contractor of any of those agencies who intends to report to Congress a complaint about the legality of the program -- that they can report that to the inspector general of the Department of Defense or to the leadership of the Intelligence Committees in the United States Congress.  Would you consider that to be a more appropriate place for a so-called whistle- blower to report their concerns?

ATTY GEN. **GONZALES:**  Yes, sir, I would.

SEN. CORNYN:  Well, at the very least, there would be an opportunity for those officials to evaluate the complaint of this individual.  And we wouldn't have -- we wouldn't risk the disclosure of highly classified information or programs that are collecting intelligence.

ATTY GEN. **GONZALES:**  No question about it.  The danger or problem of going to the media as an initial matter is that you have some people, I think, whose motivation, I think, can be questioned in terms of why are they doing that. And when they go out and talk to the public about a highly classified program, they harm the national security of this country.  I think Congress realized that when they passed the statute that you just described, to try to provide an avenue for those people who legitimately are concerned about, perhaps, wrongdoing, that they have an avenue to pursue to express their grievances and to do so in a way that we don't jeopardize the nation's secrets.

SEN. CORNYN:  Let me ask you -- the last area I want to ask you about -- you've endured through a long day, and I know we're trying to wrap up.  I've read a lot about the debate on this program and trying to understand why it is the administration believed that it needed to exercise the authority that it was granted by Congress in the authorization for the use of military force and perhaps the president's power, under the Constitution, over and above what FISA would ordinarily provide.

First of all, if the NSA wants to listen to communications between terrorists abroad that are wholly located in some other country, they can do that without a warrant, can they not?

ATTY GEN. **GONZALES:**  Whether or not FISA applies depends on the answer to basically four key questions. Who is the target?  Namely -- primarily, we're concerned about whether or not the communication involves a U.S. person.  Where is the target?  Primarily we're concerned about whether or not the person is in the United States.

Where is the acquisition taking place?  And then finally, what are you trying to acquire?  Is it wire

AFTERNOON SESSION OF A HEARING OF THE SENATE JUDICIARY COMMITTEE SUBJECT: "WARTIME EXECUTIVE POWER AND THE NATIONAL SECURITY AGENCY'S SURVEILLANCE AUTHORITY" CHAIRED BY: SENATOR ARLEN S

communication? Is it radio communication? And so the answer as to whether or not FISA would apply with respect to a particular communication primarily depends upon answering those kinds of questions.

SEN. CORNYN: Thank you for the precise answer. But as a general matter, if the persons are located in a foreign country and they're not American citizens and the communications are taking place within that foreign country, that FISA does not require the issuance of a warrant.

ATTY GEN. **GONZALES:** As a general matter, if you're talking about non-U.S. persons outside the United States, and certainly if the acquisition is outside the United States, we don't have to worry about FISA.

SEN. CORNYN: Isn't it true that the problem that this program has tried to address -- the gap in FISA that it tries to address -- is that in order to get a warrant under FISA, the government must have grounds to believe the U.S. person it wishes to monitor is a foreign spy or terrorist? And even if a person is here on a student or tourist visa or no visa, the government can't get a warrant to find out whether they are a terrorist; they must already have reason to believe that they are one?

ATTY GEN. **GONZALES:** Well, certainly to obtain an order from the FISA court, the court has to be satisfied that there is probable cause to believe that the target is either a foreign power or an agent of a foreign power, and probable cause to believe that the facility being targeted is actually being used or about to be used by a foreign power or an agent of a foreign power.

SEN. CORNYN: Stated another way --

ATTY GEN. **GONZALES:** (Laughs.) Okay.

SEN. CORNYN: -- the problem with FISA as written is that surveillance -- is, the surveillance it authorizes is unusable to discover who is a terrorist, as distinct from eavesdropping on known terrorists? Would you agree with that?

ATTY GEN. **GONZALES:** That would be a different way of putting it, yes, sir.

SEN. CORNYN: You wouldn't -- you would agree with that statement?

ATTY GEN. **GONZALES:** Yes, sir.

SEN. CORNYN: So the particular program that's been debated here and the authority that the National Security Agency has to conduct it is filling a gap that exists in our intelligence-gathering capabilities. Is that an accurate description?

ATTY GEN. **GONZALES:** I think we quickly realized after the attacks of 9/11 that the tools that we had traditionally been using were insufficient. And this was the opinion of the intelligence community, and that's why the president authorized this program, is because we did have vulnerabilities into our access to information about the enemy.

SEN. CORNYN: Finally, with regard to exclusivity, there have been some on the committee who have asked whether the statement that Congress has made in the FISA statute that it's the exclusive means to gather foreign intelligence, whether that is necessarily a binding obligation when it comes in conflict, if it does, with the Constitution. And I know you've cited the doctrine of, I guess, constitutional avoidance or -- did I get that right?

ATTY GEN. **GONZALES:** The canon of constitutional avoidance, yes, sir.

SEN. CORNYN: Thank you.

For example -- I mean, this has more than just hypothetical applications. For example, is a police -- are the law

AFTERNOON SESSION OF A HEARING OF THE SENATE JUDICIARY COMMITTEE SUBJECT: "WARTIME EXECUTIVE POWER AND THE NATIONAL SECURITY AGENCY'S SURVEILLANCE AUTHORITY" CHAIRED BY: SENATOR ARLEN S

enforcement authorities in this country authorized to shoot down a plane that they believe is carrying illegal drugs or committing some other crime?

ATTY GEN. **GONZALES:**  Senator, I guess I'd have to think about that, if you were asking me whether or not the military have the authorization to shoot down --

SEN. CORNYN:  Well, I'm asking you bout law enforcement authorities other than the military.

ATTY GEN. **GONZALES:**  Well, let me just say that we do not expect our law enforcement officers to be perfect in their judgment when you're talking about the Fourth Amendment and searches.  The standard is probable cause.  It is a reasonable -- it's the totality of the circumstances.  But it's very, very important to remember we're talking about the judgment from the eye of a professional officer.  Feb 06, 2006 18:45 ET .EOF

And this is what the courts have said.  And that's why in the terrorist surveillance program we have the determination made by someone who is experienced regarding al Qaeda tactics and communications.  He's making that decision from the view of like the police officer on the beat in terms of what is reasonable, what satisfies the probable cause standard.

SEN. CORNYN:  Well, making this very personal and real, if a plane is heading toward the (capital/Capitol ?), don't you believe that the use of force resolution in Article II of the Constitution authorized the president to have the United States military forces shoot that plane down, if necessary?

ATTY GEN. **GONZALES:**  I believe so, sir.  And I, quite frankly, believe that the president had the authority prior to the authorization to use military force.  I think even though proponents -- pro-Congress group of scholars who believe very strongly in the power of Congress during a time of war, even they acknowledge that with respect to initiation of hostilities, that only the Congress can declare war, but of course military force can be initiated if the United States has been attacked -- initiated by the president if the United States has already been attacked or if there is an imminent threat to the United States.

And so I think there is strong arguments that would support the notion that the president of the United States, even before the authorization to use military force was passed by Congress, after we had been attacked already, of course, could then use military force to repel an additional attack.  And we have to remember, of course, that in the days and weeks following 9/11, there were combat air patrols. So the president was exercising his authority, even before the authorization of the use of military force, to have the military in place to protect us from another attack.

SEN. CORNYN:  Thank you.

SEN. SPECTER:  Thank you, Senator Cornyn.

Senator Kohl?

SEN. HERB KOHL (D-WI):  Thank you very much.

Just a couple of questions, Mr. Attorney General.  Can you not tell us how many U.S. citizens have had communications intercepted, listened to or recorded by this program since it started?

ATTY GEN. **GONZALES:**  Senator, I wish I could share more information with you, but that information is classified and I can't disclose that.

SEN. KOHL:  How many Americans have had their phone conversations recorded or their e-mails intercepted without a court order?  Any idea?

ATTY GEN. **GONZALES:**  Again, Senator, you're asking me about the operations of this program and I really

AFTERNOON SESSION OF A HEARING OF THE SENATE JUDICIARY COMMITTEE SUBJECT: "WARTIME EXECUTIVE POWER AND THE NATIONAL SECURITY AGENCY'S SURVEILLANCE AUTHORITY" CHAIRED BY: SENATOR ARLEN S

can't get into it.

I've outlined today that this is a very narrowly tailored program that's been authorized by the president of the United States, and we have taken great pains to try to protect the privacy interests of every American. But as the president has said, even if you're an American citizen, if you're talking to a member of al Qaeda, we'd like to know why.

SEN. KOHL: You've talked at length today and over the course of the month -- the past month about how the program has to be authorized every 45 days, and you have lauded that as a strong check and a balance on the potential for abuse. And news reports suggest that one of the authorizations has led to changes in the program. Could you tell us what those changes were?

ATTY GEN. **GONZALES:** Well, again, Senator, you're asking me about operational details of the program, and I really can't get into operational details.

SEN. KOHL: All right. The New York Times reported that in interviews with current and former law enforcement officials that the flood of NSA tips came -- that came from this program led them to expend considerable resources in following the leads, and diverted some agents from work that they had viewed as more productive. Law enforcement officials interviewed said that the program had uncovered no active plots in the United States. One said that, quote, "The information was so thin, the connections were so remote that they never led to anything," unquote. Another said, quote, "It affected the FBI in the sense that they had to devote so many resources to tracking every single one of these leads, and in my experience, they were all dry leads," unquote.

So is there a concern that this program is not collecting enough worthwhile information? And does this suggest that the net was perhaps too large in that you ensnare too many Americans who are not in fact involved in any terrorist activities?

ATTY GEN. **GONZALES:** Thank you for that question, Senator.

It has been -- I'm aware of these stories. First of all, it is true that Director Mueller feels very strongly that we cannot afford to not investigate one way or the other or to check out every particular tip. We have an obligation to do that.

I think General Hayden has already indicated publicly that immediately following the attacks of 9/11, he exercised his own independent authorities, which do exist for the NSA, to gather up information, gather up more information that they would normally do -- again, these are under existing authorities -- lawful authorities -- and to share all that information with the FBI.

And so, you had a situation where the NSA was gathering up more information than it normally does and then sharing more of that  information with the FBI. It -- we quickly discovered that that was not very efficient because of the fact that it required the FBI to utilize their resources. And so that process -- that procedure stopped.

And so I think the stories that you're referred -- referring to do not relate to the terrorist surveillance program about which I'm testifying today.

SEN. KOHL: I thank you very much, and I thank you, Mr. Chairman.

SEN. SPECTER: Thank you, Senator Kohl.

Senator Brownback.

SEN. BROWNBACK: Mr. Chairman, thank you.

General, interesting line of questioning, and I want to pursue going after a FISA warrant with some specificity with

AFTERNOON SESSION OF A HEARING OF THE SENATE JUDICIARY COMMITTEE SUBJECT: "WARTIME EXECUTIVE POWER AND THE NATIONAL SECURITY AGENCY'S SURVEILLANCE AUTHORITY" CHAIRED BY: SENATOR ARLEN S

you because I want to understand this process better.

And I think you've covered it in bits and pieces today, and I've been in and out at times, but I want to go into it in some depth.

Although before I do that, I want to note in the New York Post, online edition, February 6th, just really in response to the last question here, a 2004 NBC report graphically illustrated -- and I'm reading from this -- what not having the program cost us four and a half years ago. "In 1999, the NSA began monitoring a known al Qaeda switchboard in Yemen that relayed calls from Osama bin Laden to operatives all over the world. Surveillance picked up the phone number of a `Khalid' in the United States, but the NSA didn't intercept those calls, fearing it would be accused of, quote, `domestic spying.' After 9/11, investigators learned that Khalid was Khalid al-Midhar, then living in San Diego under his own name, one of the hijackers who flew American Airlines Flight 77 into the Pentagon. He made more than a dozen calls to the Yemen house where his brother- in-law lived." NBC News called this -- quote -- one of the missed clues that could have saved 3,000 lives.

It's a very real thing and -- very real thing for us today, and one that, had we been operating it effectively prior to 9/11, could have possibly saved thousands of lives.

Mr. Attorney General, we continue to hear and I certainly appreciate the need for expediency in carrying out electronic surveillance. And you've mentioned that getting a FISA warrant is often a time-consuming procedure. I wonder -- could you go into some specificity for me so I can hear this -- how long that process generally takes. Just to the degree you can without revealing information that's classified, how long does this process take?

ATTY GEN. **GONZALES:** Well, it varies. What I can say, Senator, is that we have, for a variety of reasons, some applications that have been pending for months, quite frankly. Sometimes that's a result because we can't get -- we can't get sufficient information from the FBI or NSA in order to satisfy the lawyers at the department that in fact we can meet the requirements of the FISA act. Sometimes it's a situation where priorities -- you know, every time -- with each passing day, renewals expire on very important programs, and then we -- so we then have to prepare a renewal package to submit to the FISA court, and that means that other FISA applications that our lawyers have been working on kind of get pushed to the side as they work on more important cases.

So there are a variety of reasons why it takes some time to get a FISA application approved.

If you want me to get into a more down in the weeds discussion, it all began --

SEN. BROWNBACK:  I would.

ATTY GEN. **GONZALES:**  Okay.

SEN. BROWNBACK:  I'd like to get -- you know, what is it that takes so much time in these FISA applications.

ATTY GEN. **GONZALES:**  Well, of course, we can't begin surveillance just based on a whim by someone, say, at the FBI. There has to be a reason to believe that all of the standards of the FISA statute can be satisfied. And we have to know that a FISA Court judge is going to be absolutely convinced that this is an agent of a foreign power; that this facility is going to be a facility that's going to be used or is being used by an agent of a foreign power. The things that I have to approve, I have to -- when I sign an application, I have to -- we have to identify the target, we have to set forth the circumstances and the reasons that I believe that the target is of a foreign power or an agent of a foreign power. I have to set forth the circumstances for why I believe that this facility is being used or about to be used by a foreign power or agent of a foreign power. We have to set forth in the application the minimization requirements that we intend to use. We have to set forth in the application with specificity the type of information we're hoping to get and the type of facilities or communications that we're targeting.

AFTERNOON SESSION OF A HEARING OF THE SENATE JUDICIARY COMMITTEE SUBJECT: "WARTIME EXECUTIVE POWER AND THE NATIONAL SECURITY AGENCY'S SURVEILLANCE AUTHORITY" CHAIRED BY: SENATOR ARLEN S

And so those are just some of the things that I have to include in the application.  The application has to be accompanied by a certification that is signed by a senior official of the administration who has national security responsibility.  It could be -- normally it's the FBI director.  It could be the director of the CIA.  And so that person has to certify that in fact this is foreign intelligence information.  That person has to certify that the primary purpose -- a significant purpose of the surveillance is for foreign intelligence purposes.  That person has to certify that normal investigative techniques or means are not otherwise available.  And I think there -- and there are some other provisions that have to be certified.

And so all those conditions, requirements, have to be met even before I authorize verbally an emergency authorization.  And it takes time.  Even in a perfect world, even in an ideal case, it's going to take a period of time.

And I'm not talking about hours.  We're normally talking about days, weeks.  On the more complicated cases, again, sometimes months.

SEN. BROWNBACK:  And this would include even these sort of operations we've read about data mining operations?  Would that include those sorts of operations, or are those totally a separate type of field?

ATTY GEN. **GONZALES:**  I'm not here to talk about that.  Again, let me just caution everyone that you need to read these stories with caution.  There is a lot of mumbling -- I mean, mixing and mangling of activities that are totally unrelated to what the president has authorized under the terrorist surveillance program, and so I'm uncomfortable talking about other kinds of operations that might -- that are unrelated to the terrorist surveillance program.

SEN. BROWNBACK:  These would be strictly ones where you are going after a targeted set of individuals that have gone through --

ATTY GEN. **GONZALES:**  Under FISA or --

SEN. BROWNBACK:  Yes, that are done do the FISA application.

ATTY GEN. **GONZALES:**  But we have to remember, of course, this is --

SEN. BROWNBACK:  Along the lines of what you've just described in some detail.  This is the sort of information you are seeking before you're going after anything under FISA.

ATTY GEN. **GONZALES:**  In every case.  And of course we always have to remember that we're not just talking about al Qaeda when you're talking about FISA.  You're talking about agents of, you know -- of other countries.  And it's not limited to only international communications under FISA.  It's domestic communications.  So we want to get it right, of course.  And as I said earlier in a response to another question, the fact that we've had such a high approval rate by the FISA Court isn't an indication that the FISA Court is a rubber stamp.  It is more, I think, proof -- proof that we've got a legitimate process.  We take this very seriously.

SEN. BROWNBACK:  Well, I don't want to drag on questions.  You've been here a long period of time.

I just -- I do want to encourage us that as the war on terrorism wears on -- because it's going to wear on for a period of time -- that we do have a check and balance system in place that's workable so that you can get the type of information that you need that we need to protect the country, but at the same time can protect the civil liberties of the nation, and you're doing everything you can in that regard.  I just think as we look on forward, this is going to be a key policy factor of how we move forward and sustain support for the war on terrorism over the periods of various administrations and possible length of time that this could well take.

Thank you for being here.  Thank you, Chairman.

SEN. SPECTER:  Thank you, Senator Brownback.

AFTERNOON SESSION OF A HEARING OF THE SENATE JUDICIARY COMMITTEE SUBJECT: "WARTIME EXECUTIVE POWER AND THE NATIONAL SECURITY AGENCY'S SURVEILLANCE AUTHORITY" CHAIRED BY: SENATOR ARLEN S

Mr. Attorney General, you've held up remarkably well for a long day. I have deferred my second round until everyone else has concluded the second round because as chairman I have to stay, so I thought I'd go last in any event. So it's just you and me.

When we came in today, there was a long line in the hallway waiting to get in, and now only a few people are here, and the senators' bench is pretty well cleared.

I want to come back to the issue as to whether the resolution authorizing the use of force of September 14th gives the president congressional authority to undertake the electronic surveillance. And I said candidly at the outset that I did not think that it did. And let me explore with you the number of questions I have that I'm interested in the administration's response.

Let me start first with the signing statement of President Carter when he signed the Foreign Intelligence Surveillance Act, 1978, on October 25th. He said in part, quote, "The bill requires for the first time a prior judicial warrant for all electronic surveillance for foreign intelligence or counterintelligence purposes in the United States in which communications of U.S. persons might be intercepted."

He clarifies the executive's authority to gather foreign intelligence by electronic surveillance in the United States. It will remove any doubt about the legality of those surveillances which are conducted to protect our country against espionage and international terrorism, so that when you talk about what happened in Washington's time on intercepting messages or unsealing envelopes or what happened in Lincoln's time or what happened in Franklin Delano Roosevelt's time, or when you talk about a number of the circuit court opinions giving broad presidential authority, saying that the gathering of intelligence was his prerogatives without respect to the Fourth Amendment, that's before Congress acted.

Now a signing statement is subjected to -- subject to a number of limitations.

If the president in the signing statement seeks to, well, distinguish his view from what the Congress has passed, I think you're entitled to very little if any weight.

Where the president, as President Carter did, squarely backs what the Congress has done, then you have a concurrence of the Congress and the president. And you really have very forceful, very plain, very strict language in the Foreign Intelligence Surveillance Act.

How do you counter what President Carter has said: that it applies to all U.S. persons and covers all foreign intelligence by electronic surveillance in the United States?

ATTY GEN. **GONZALES:** Well, of course, Senator, I don't believe that it is possible for any president to waive for future presidents any constitutional authority, any authority given to a president under the Constitution. Feb 06, 2006 18:47 ET .EOF

I haven't read that statement in a while, but I don't think in the statement President Carter says, "I have no inherent authority remaining in this area."

Finally, I would just simply remind the chair -- I think this was mentioned earlier by one of the senators -- his attorney general in hearings in connection with the legislation -- I think it was before the House -- I think it was before the committee of the House -- talked about the fact that this is -- and I'm paraphrasing here -- this in no way takes away from the president's inherent constitutional authority -- this legislation.

And so that's how I would respond to your question.

SEN. SPECTER: Well, Mr. Attorney General, the -- that's not the Jackson test which you've subscribed to, but I'm going to come back to that in just a minute.

AFTERNOON SESSION OF A HEARING OF THE SENATE JUDICIARY COMMITTEE SUBJECT: "WARTIME EXECUTIVE POWER AND THE NATIONAL SECURITY AGENCY'S SURVEILLANCE AUTHORITY" CHAIRED BY: SENATOR ARLEN S

In your responses to my question about statutory interpretation -- and we've covered the line that it is disfavored to have a repeal by implication -- and you have the statute of FISA specific -- no interception -- no electronic -- no interception of electronic communication without a warrant, which is very specific. And then, you have the generalized statement of the September 14th resolution, which at best would be repealed by implication, which is disfavored.

But then, we come across -- on another very important provision of statutory construction, and that is, the one which relates to specific language, takes precedence over more generalized pronouncements. And in your answer, you said, quote, "It is not clear which provision is more specific," closed quote. Well, that is false on its face. If you have the statute saying, "No electronic surveillance without a warrant," there's no doubt that that is more specific than the September 14th resolution, isn't it?

ATTY GEN. **GONZALES:** Well --

SEN. SPECTER: How could you disagree with those plain words?

ATTY GEN. **GONZALES:** -- by that answer I only meant to convey, Senator, that the resolution is more specific with respect to al Qaeda, certainly, and of course the FISA statute is not limited only to al Qaeda.

I might also -- as my -- as the answer also indicates, we had sort of the same -- this same discussion or -- occurred with respect -- in the Hamdi decision. We had the same situation, you had a specific statute, 18 USC 4,0001 (a), that said no American citizen could be detained, except as otherwise provided by Congress or maybe -- otherwise provided by an act of -- a statute by Congress.

And the Supreme Court said that nonetheless, you had a broader authorization in the authorization to use military force and that would satisfy the statute, even though you had a specific statute with respect to detention and you had a broad authorization --

SEN. SPECTER: Did the Supreme Court deal with that statute?

ATTY GEN. **GONZALES:** The 4001(a)? That was the statute at issue, yes, sir, in the Hamdi decision. Of course.

SEN. SPECTER: Did the Supreme Court deal with it specifically?

ATTY GEN. **GONZALES:** Sir, in Hamdi, Mr. Hamdi was contesting that that statute prohibited the president of the United States from detaining him because he was an American citizen. And the Supreme Court said, well, okay, you're right, you have this specific statute. But you've also got this broad grant of authority by the Congress and that is sufficient to allow the president of the United States to detain you as an American -- even as an American citizen.

SEN. SPECTER: Well, I think you're dealing with very different circumstances when you talk about a soldier on the field as opposed to a United States person whose conversations are being electronically surveilled.

But let me -- let me move on here. It may well be that you and I won't agree on this point.

The resolution of September 14th did not add the words "in the United States" after the words, quote, "appropriate force." That was rejected to give the president broad authority not just overseas, but in the United States. Isn't that a clear indication of congressional intent not to give the president authority for interceptions in the United States?

ATTY GEN. **GONZALES:** Sir, I don't know where that record is to reflect that that actually happened. I think the CRS, Congressional Research Service, said that in the legislative history -- and I may be wrong -- it's late -- but I believe that they said there's no record to indicate that that ever occurred, quite frankly.

I think -- I think, as I indicated in my opening statement, I think the American public, I think our soldiers, I think

AFTERNOON SESSION OF A HEARING OF THE SENATE JUDICIARY COMMITTEE SUBJECT: "WARTIME
EXECUTIVE POWER AND THE NATIONAL SECURITY AGENCY'S SURVEILLANCE AUTHORITY"
CHAIRED BY: SENATOR ARLEN S

our courts, ought to be able to rely upon the plain language passed by the  Congress.  And there's no question that the
resolution talked about the president of the United States protecting Americans both here and abroad.  And we have to
put it in context.  We were just attacked here in this country from folks within our country communicating within our
country.  It's hard to imagine, as smart as you are, that you wouldn't provide the United States the authority, the grant of
authority to at least deal with a similar kind of threat to the one we just experienced.

SEN. SPECTER:  The law involving wiretapping prior to the enactment of the Foreign Intelligence Surveillance
Act, had the preceding sentence, quote:  "Nothing contained" -- they're referring to the law -- "shall limit the
constitutional power of the president to obtain foreign intelligence information deemed essential to the security of the
United States."

When the Foreign Intelligence Surveillance Act was passed, that language was stricken.  So by all customary
standards of statutory interpretation, FISA -- Foreign Intelligence Surveillance Act -- changed that 180 degrees, didn't
it?

ATTY GEN. **GONZALES:**  There is no question, if you look at the legislative history and the record, that
Congress intended to try to limit whatever president's inherent authority existed.  But there's also, from my review of the
record, a clear indication that some members of Congress were concerned about the constitutionality of this effort.  I
think the House Conference Report talks about the fact this is what we're trying to do, it may be the Supreme Court may
have a different view of this.  And I'm paraphrasing here, but that's a remarkable acknowledgement by a member of
Congress that, geez, is what we're doing here really constitutional?

No question about it that certainly Congress intended to cabin the president's authority, but also Congress, when
they passed FISA, included Section 109, which is the main criminal provision in FISA, that talks about you can't engage
in electronic surveillance under (cover of ?) of law except as otherwise provided by statute.

So I think -- I think we have to apply a fairly possible reading of the statute in that way in order to avoid a very -- in
my judgment a tough constitutional question as to whether or not does the Congress have the constitutional authority to
to pass a statute that infringes upon the president's inherent authority as commander in chief to engage in electronic
surveillance of the enemy during a time of war.

SEN. SPECTER:  I don't think you can use the principle of avoiding a tough constitutional conflict by disagreeing
with the plain words of the statute.

Attorney General **Gonzales,** when members of Congress heard about your contention that the resolution
authorizing the use of force amended the Foreign Intelligence Surveillance Act, there was general shock.

ATTY GEN. **GONZALES:**  Sir, we've never asserted that FISA's been amended.  We've always asserted that our
interpretation of FISA, which contemplates another statute, and we have that here in the authorization to use force, that
those complement each other.  This is not a situation where FISA has been overridden or FISA has been amended.
That's never been our position.

SEN. SPECTER:  Well, that just defies logic on plain English. FISA says squarely that you can't have electronic
surveillance in the -- of any person without a warrant.  And you are saying when you tag onto the -- as other statute,
which is in the penal provision, that those words in FISA are no longer applicable, that there's been a later statutory
resolution by Congress which changes that.

Attorney General **Gonzales,** I think we come back to the Jackson formula.  And my judgment, with some
experience in the field -- and I was starting to tell you how shocked people were when we found out that you thought
what we had done on the resolution of September 14th authorized electronic surveillance -- just nobody had that in the
remotest concept.

AFTERNOON SESSION OF A HEARING OF THE SENATE JUDICIARY COMMITTEE SUBJECT: "WARTIME EXECUTIVE POWER AND THE NATIONAL SECURITY AGENCY'S SURVEILLANCE AUTHORITY" CHAIRED BY: SENATOR ARLEN S

And Senator Graham has articulated in very forceful terms the consequence of the administration making this interpretation; that before you ever get any authority from Congress again, we're going to go through every conceivable exception we can think of, or we just may not give the authority, because you come back to relying on herent (sic) authority.

And you may have the inherent authority.  You may have the Article II authority.  But I do not think that any fair, realistic reading of the September 14th resolution gives you the power to conduct electronic surveillance.

And that brings me to really what Jackson said.  And it's so wise, it's worth reading again.  Quote, "When the president takes measures incompatible with the express or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter."

Now my reading of this situation legally is that there has been an express will of Congress to the contrary and that when the president seeks to rely upon his own inherent power, then he is disregarding congressional constitutional power.

And then Jackson goes on, quote:  "Courts can sustain exclusive presidential control in such a case only by disabling the Congress from acting upon the subject."  And I think that's what you're doing. You're disabling Congress from acting on the subject which Congress did, signed by the president.

And then Justice Jackson goes on for the really -- the critical language:  "Presidential claim to a power at once so conclusive and preclusive must be scrutinized with caution."   That's what we're doing here today.  We're going to do it a lot more.

And then these are the critical words, more so than any of the others.  Quote, "For what is at stake is the equilibrium established by our constitutional system."  And there's a very high value placed on the equilibrium of our constitutional system.  That means everything.

ATTY GEN. **GONZALES:**  I agree, Senator.

SEN. SPECTER:  Okay.  Well, finally we've found something to agree upon.

Now on the issue of the inherent power of the president, I believe the president has very substantial Article II power.  I believe he does.  And we have to be concerned, as a life-or-death matter, about al Qaeda.  We really do.  And I subscribe to the good faith of the president as to what he has done here, and I've said that  publicly.  And I subscribe to your good faith in what you have done here.

And I just hope that there will be oversight somewhere along the line, perhaps in the Intelligence Committee, perhaps in the Intelligence Committee, to get into the details, the interstices, the semicolons, is what you're doing, because I know you can't do that here; but I don't think you can measure the president's inherent authority under Article II without knowing what you're doing, just cannot do it, because that authority is not unlimited.  And you've agreed to that.

ATTY GEN. **GONZALES:**  I agree with that.

SEN. SPECTER:  It's not a blank check.

ATTY GEN. **GONZALES:**  That is correct, sir.

SEN. SPECTER:  So it has to be within the parameters of being reasonable.  And the cases, the circuit opinions, emphasize the reasonable parameters.  And the Supreme Court hasn't ruled on this issue yet.  It's an open question.  And the circuit opinions are mostly, if not all, predating the Foreign Intelligence Surveillance Act.

AFTERNOON SESSION OF A HEARING OF THE SENATE JUDICIARY COMMITTEE SUBJECT: "WARTIME EXECUTIVE POWER AND THE NATIONAL SECURITY AGENCY'S SURVEILLANCE AUTHORITY" CHAIRED BY: SENATOR ARLEN S

So I just hope the Intelligence Committee is going to come down to brass tacks here, and I hope it's the committee and not just the ranking and chairman.  Both Senator Roberts and Senator Rockefeller have expressed forcefully their concern about not being lawyers and not having an opportunity to present these issues to lawyers to get a legal interpretation to square the facts up with what the law is. They just have been very explicit in their own limitations.

So, in conclusion -- the two most popular words of any presentation -- I hope you will give weighty thought to taking this issue to the Foreign Intelligence Surveillance Court lock, stock and barrel; let them see the whole thing, and let them pass judgment. Because if they disagree with you, it's the equilibrium of our constitutional system which is involved.  And the al Qaeda threat is very weighty, but so is the equilibrium of our constitutional system.

ATTY GEN. **GONZALES:**  I agree, Senator.

SEN. SPECTER:  And security is very weighty, but so are civil rights.

Thank you very much, Attorney General **Gonzales.**  You have established very forcefully your fortitude and stamina here today, even if we disagree with portions of your case.

ATTY GEN. **GONZALES:**  Thank you, Mr. Chairman.

SEN. SPECTER:  That concludes the hearing.

(Sounds gavel.)

**LOAD-DATE:** February 7, 2006

# EXHIBIT "F"

# washingtonpost.com

# Ashcroft Tells of Surveillance Disputes

House Panel Hears Of Battle Within Administration

By Paul Kane
washingtonpost.com Staff Writer
Friday, June 22, 2007; A06

Former attorney general John D. Ashcroft told the House intelligence committee yesterday about disputes in the Bush administration over aspects of its domestic surveillance program, which peaked in the March 2004 visit to his hospital bedside by White House officials seeking his change of heart.

House Intelligence Chairman Silvestre Reyes (D-Tex.) said the two-hour closed-door hearing covered Ashcroft's "whole tenure as attorney general." The hearing, Reyes said, examined how the administration viewed the use of Foreign Intelligence Surveillance Act provisions requiring a special court to issue warrants for domestic eavesdropping.

The panel heard last week from former deputy attorney general James B. Comey, whose mid-May testimony before the Senate Judiciary Committee about the 2004 hospital episode sparked an outcry among congressional Democrats. Next month, Reyes said, the committee will hear private testimony from Attorney General Alberto R. Gonzales, FBI Director Robert S. Mueller III and CIA Director Michael V. Hayden, with the goal of holding public hearings in the fall.

Reyes declined to detail the specifics of Ashcroft's testimony but said the former attorney general, now in private practice, gave the panel "very candid advice" as it considers drafting new legislation that could rewrite FISA. There was "robust and enormous debate" within the Bush administration about the post-Sept. 11, 2001, program, he said.

But another member of the panel, Rep. Rush D. Holt (D-N.J.), said that Ashcroft did not give detailed explanations of what he was so concerned about in 2004, more than two years after the program's inception. "He gave long, rambling, nonspecific answers," Holt said.

Advertisement

Vonage

FREE Calls for 30 Days

Then unlimited calling for only $24.99/month

Keep Your Current Phone Number!

Try It FREE »

Plus FREE Router!

The Senate Judiciary Committee, frustrated by what Chairman Patrick J. Leahy (D-Vt.) called "stonewalling" of its requests for information about the dispute by the Bush administration, approved subpoenas yesterday for documents from the Justice Department and the White House related to the authorization and legal justifications for the surveillance program.

Following the committee's practice, it withheld issuing the subpoenas pending further negotiations with the administration. In a demonstration of lawmakers' bipartisan concerns, three Republicans joined Democrats in the 13-3 vote to authorize the subpoenas. "We are asking not for intimate operational details but for the legal justifications and analysis underlying these programs that affect the rights of every American," Leahy said.

# EXHIBIT "G"

JOHN CONYERS, JR., Michigan
CHAIRMAN

HOWARD L. BERMAN, California
RICK BOUCHER, Virginia
JERROLD NADLER, New York
ROBERT C. "BOBBY" SCOTT, Virginia
MELVIN L. WATT, North Carolina
ZOE LOFGREN, California
SHEILA JACKSON LEE, Texas
MAXINE WATERS, California
MARTIN T. MEEHAN, Massachusetts
WILLIAM D. DELAHUNT, Massachusetts
ROBERT WEXLER, Florida
LINDA T. SÁNCHEZ, California
STEVE COHEN, Tennessee
HENRY C. "HANK" JOHNSON, JR, Georgia
LUIS V. GUTIERREZ, Illinois
BRAD SHERMAN, California
TAMMY BALDWIN, Wisconsin
ANTHONY D. WEINER, New York
ADAM B. SCHIFF, California
ARTUR DAVIS, Alabama
DEBBIE WASSERMAN SCHULTZ, Florida
KEITH ELLISON, Minnesota

F. JAMES SENSENBRENNER, JR., Wisconsin
RANKING MINORITY MEMBER

HOWARD COBLE, North Carolina
ELTON GALLEGLY, California
BOB GOODLATTE, Virginia
STEVE CHABOT, Ohio
DANIEL E. LUNGREN, California
CHRIS CANNON, Utah
RIC KELLER, Florida
DARRELL E. ISSA, California
MIKE PENCE, Indiana
J. RANDY FORBES, Virginia
STEVE KING, Iowa
TOM FEENEY, Florida
TRENT FRANKS, Arizona
LOUIE GOHMERT, Texas
JIM JORDAN, Ohio

ONE HUNDRED TENTH CONGRESS

# Congress of the United States
## House of Representatives
### COMMITTEE ON THE JUDICIARY

2138 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515–6216

(202) 225–3951
http://www.house.gov/judiciary

May 17, 2007

The Honorable Alberto R. Gonzales
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 30530

Dear Mr. Attorney General:

We are writing about disturbing new revelations concerning NSA domestic wiretapping activities and about the Department's continuing refusal to provide Judiciary Committee members with access to information about the current version of the NSA's wiretapping program. Congress' oversight responsibilities require that, on a confidential basis if necessary, you provide answers to the troubling questions that have been raised.

Former Deputy Attorney General Comey testified this week about a dramatic series of events in March, 2004 concerning the Justice Department's conclusion that a classified Administration program, widely believed to be the Terrorist Surveillance Program, was not legal as then conducted and that the Department could not certify its legality without alteration. After an unsuccessful effort by you and then-White House Chief of Staff Andrew Card to convince Attorney General Ashcroft to certify the program from his hospital bed, Mr. Comey explained, the program was reauthorized without Department certification, but was subsequently changed pursuant to the President's direction and then certified by the Department. This would appear to contradict your testimony to both the House and the Senate in 2006 that there was not serious disagreement within the Department about the Terrorist Surveillance Program as confirmed by the President in late 2005. The Department has recently stated that you stand by this testimony.

These facts raise extremely disturbing questions about just what wiretapping or other activity was being conducted by the Administration that its own Justice Department lawyers concluded had no proper legal basis. In the exercise of its oversight responsibilities, it is crucial that Congress ascertain the full picture of what happened. In particular, we ask for a prompt response, under classified cover if necessary, to the following questions: 1) Is Mr. Comey's testimony about the events of March, 2004 as provided this week to the Senate Judiciary

The Honorable Alberto R. Gonzales
Page Two
May 17, 2007

Committee (a copy of which is enclosed with this letter) accurate and, if not, please explain your version of what happened; 2) Was the classified program referred to by Mr. Comey the Terrorist Surveillance Program, as it existed prior to the changes made according to the Justice Department's recommendations and, if not, what was the classified program that Mr. Comey was referring to? 3) Who was involved in deciding to seek approval from Attorney General Ashcroft from his hospital bed and who made the telephone call to arrange your visit to his bedside; 4) What was the basis for the Administration's decision on March 10-11 to continue with the program despite the Department's objections, how long did it so continue. Please provide copies of any legal or other memoranda on the subject; 5) What was the basis for the Department's objections to the program. Please provide copies of any Office of Legal Counsel or other documents relating to those objections; and 6) What changes were made to the program to resolve the Department's objections?

We similarly remain extremely concerned about your continuing refusal to provide access for House Judiciary Committee members to information on the Administration's current version of the domestic wiretapping program described in your January 17, 2007, letter to House and Senate members. We believe that your refusal violates applicable legal requirements and precedents, and threatens to effectively eliminate meaningful Judiciary Committee oversight and legislative activity concerning this crucial issue.

Specifically, your January 17 letter informed us that the Foreign Intelligence Surveillance Court (FISC) had recently issued orders authorizing the government to engage in electronic surveillance of certain communications into or out of the United States, and that any electronic surveillance that had been occurring as part of the Administration's Terrorist Surveillance Program (TSP) will now be conducted subject to the approval of the FISC. Your letter also stated, however, that although Intelligence Committee members had been briefed on the orders and the program, you offered to brief only the Chairman and Ranking Member of the Judiciary Committee concerning the wiretapping program. In response to several written requests to you, Assistant Attorney General Hertling reiterated in a February 9, 2007, letter that only the Chairman and the Ranking Member could review and receive a briefing on the new FISC orders and surveillance program, even though all Intelligence Committee members "have been briefed on the new orders, consistent with their oversight authority."

Your position, however, fails to account for the fact that the Judiciary Committee also has crucial oversight authority in this area – the need for which was highlighted by Mr. Comey's testimony – and which simply cannot be exercised without the access that has been requested, and is contrary to law and precedent. Specifically:

The Honorable Alberto R. Gonzales
Page Three
May 17, 2007

1.    <u>The Judiciary Committee has oversight and legislative authority in this area requiring access to the requested information.</u> House Rule X specifically provides that the Judiciary Committee has jurisdiction over the judiciary and judicial proceedings, espionage, civil liberties, criminal law enforcement, and federal courts and judges. The Judiciary Committee's oversight responsibility for the Foreign Intelligence Surveillance Act (FISA) extends as far back as its initial drafting.  The Committee shared in the drafting and amendment of FISA, from the time it was introduced, through the adoption of the PATRIOT Act, and through the hearings and deliberations on PATRIOT Act reauthorization. The Committee's jurisdiction also clearly encompasses the FISC itself, which is an Article III court comprised of Article III judges, as well as the Department of Justice, which made the relevant requests to FISC and will continue to do so. Last year, the House Judiciary Committee and Congress considered specific proposals to change FISA. This year, questions have been raised as to whether, in light of the TSP and the FISC rules now governing such surveillance, changes should be considered to FISA or the FISC.  The Administration is again seeking changes to FISA which will come before this Committee for consideration.  Without access to the information requested, it is impossible for the Judiciary Committee to even consider any of these proposals.

2.    <u>FISA itself recognizes the principle that all legislative committees must be able to obtain access to even confidential information in order to carry out their legislative functions, as do House Rules</u>.  50 U.S.C. § 1808(a)(1) requires the Attorney General to give a detailed report to the Intelligence Committees on electronic surveillance under FISA, and then goes on to state specifically that "[n]othing in this subchapter shall be deemed to limit the authority and responsibility of the appropriate committees of each House of Congress to obtain such information as they may need to carry out their respective functions and duties." House Rule X, clause 11(b)(3) similarly provides that nothing concerning the authority of the House Intelligence Committee "shall be construed as prohibiting or otherwise restricting the authority of any other committee to study and review an intelligence or intelligence-related activity to the extent that such activity directly affects a matter otherwise within the jurisdiction of that committee," as in this case.

3.    <u>The House Judiciary Committee, as well as other committees in addition to the Intelligence Committees, often obtain confidential intelligence-related information in carrying out their duties.</u> Examples range from classified reports provided by you to the Judiciary Committee relating to the use of FISA and PATRIOT Act authority to the recent National Intelligence Estimate, which was provided to the House Armed Services and International Affairs committees and to an Appropriations subcommittee.

The Honorable Alberto R. Gonzales
Page Four
May 17, 2007

4.   <u>Only when the law so provides specifically or when the Committee and the Executive Branch agree can information be provided only to the Committee chairman and ranking member.</u> In a few particular instances, such as the provisions of the National Security Act of 1947 concerning presidential notification to Congress about "covert action," Congress has specifically authorized the President to limit disclosure to specified Congressional leaders, including the chairman and ranking member of selected committees. <u>See</u> 50 U.S.C. 413b(c)(2). Otherwise, such limited disclosure has occurred only where the Executive Branch and the Committee agree. Most recently, for example, the President sought to restrict disclosure of information on the pre-FISA NSA warrantless wiretapping program to the chairman and ranking member of the intelligence committees, but then authorized access for the entire committees when they so requested, as in this case.

5.   <u>Court precedent similarly supports Committee access to the information requested.</u> As the Supreme Court recognized many years ago, a "legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions the legislation is intended to affect or change." <u>McGrain v. Daugherty</u>, 273 U.S. 135, 175 (1927). Indeed, the D.C. Circuit specifically declined to uphold an Executive Branch claim that it could withhold confidential national security information from a subcommittee of the House Committee on Interstate and Foreign Commerce, since that would contradict the "equally legitimate assertion of authority by Congress to conduct investigations relevant to its legislative function." <u>United States v. A.T.& T</u>, 567 F.2d 121, 131-33 (D.C. Cir, 1977). The Executive Branch and the Committee later reached agreement on access to the information concerning the investigation, which concerned allegations of warrantless national security wiretapping.

6.   <u>The description by the President's own representative, White House Press Secretary Tony Snow, of the recent actions by the FISC make clear that much of the information requested should be provided to the Judiciary Committee under FISA itself.</u> In a January 17, 2007 press briefing, Mr. Snow said, *inter alia*, that "[t]he FISA Court has published the rules under which [surveillance] activities may be conducted," that "the Foreign Intelligence Surveillance Court has put together its guidelines and its rules "governing the conduct of such surveillance, and that the Administration's electronic surveillance activities will "continue[] under the rules that have been laid out by the court." Press Briefing by Tony Snow, Jan. 17, 2007 (available at http://www.whitehouse.gov/news/releases/2007/01/20070117-5.html). FISA itself explicitly requires that FISC rules and procedures be reported specifically to the House Judiciary Committee, among others. <u>See</u> 50 U.S.C. 1803(f)(2)(F).  In light of the mandate of FISA itself, and the representations of the White House Press Secretary, the

The Honorable Alberto R. Gonzales
Page Five
May 17, 2007

full Judiciary Committee should have complete access to the new FISC rules discussed by Mr. Snow.

7.   <u>The FISC has no objections to Congressional access to the information, and the standards of access applied to the Intelligence Committee can be applied to the Judiciary Committee as well</u>. In response to a letter from the Senate Judiciary Committee, the Chief Judge of the FISC, U.S. District Judge Colleen Kollar-Kotelly, has indicated that she has no objection to the FISC orders being provided to Congress. We are mindful and respectful of your concerns regarding the sensitive information contained in these documents. However, just as you have created a way for the Intelligence Committees to review them, so too must the same avenue exist for Judiciary Committee review. All members of the House Judiciary Committee have executed an oath, pursuant to House Rule XXIII, clause 13, not to disclose classified information received in the course of their duties. Judiciary Committee members, like those of the Intelligence Committees, could agree to additional strict access limitations with respect to the requested documents and information.

Important questions regarding FISA and the domestic wiretapping program remain unanswered, and access to the requested information is essential in order for the entire Judiciary Committee to carry out its legislative responsibilities. It is up to Congress, not the Executive Branch acting unilaterally, to determine how and by what committees oversight should be undertaken of judicial and executive branch functions, but your position would effectively eliminate meaningful Judiciary Committee oversight and legislative activity in this important area. We ask that you respond personally to this letter and to each of the specific points above and work with us to provide the information requested as soon as possible.

Sincerely,

John Conyers, Jr.
Chairman

Jerrold Nadler
Chairman, Subcommittee on the
Constitution, Civil Rights and Civil
Liberties

Enclosure

cc:   Hon. Richard A. Hertling
      Hon. Lamar S. Smith
      Hon. Trent Franks

# EXHIBIT "H"

5 of 6 DOCUMENTS

Copyright 2006 Gannett Company, Inc.
All Rights Reserved
USA TODAY

May 11, 2006 Thursday
FINAL EDITION

**SECTION:** NEWS; Pg. 1A

**LENGTH:** 2654 words

**HEADLINE:** NSA has massive database of Americans' phone calls;
3 telecoms help government collect billions of domestic records

**BYLINE:** Leslie Cauley

**BODY:**

The National Security Agency has been secretly collecting the phone call records of tens of millions of Americans, using data provided by AT&T, Verizon and BellSouth, people with direct knowledge of the arrangement told USA TODAY.

The NSA program reaches into homes and businesses across the nation by amassing information about the calls of ordinary Americans -- most of whom aren't suspected of any crime. This program does not involve the NSA listening to or recording conversations. But the spy agency is using the data to analyze calling patterns in an effort to detect terrorist activity, sources said in separate interviews.

"It's the largest database ever assembled in the world," said one person, who, like the others who agreed to talk about the NSA's activities, declined to be identified by name or affiliation. The agency's goal is "to create a database of every call ever made" within the nation's borders, this person added.

For the customers of these companies, it means that the government has detailed records of calls they made -- across town or across the country -- to family members, co-workers, business contacts and others.

The three telecommunications companies are working under contract with the NSA, which launched the program in 2001 shortly after the Sept. 11 terrorist attacks, the sources said. The program is aimed at identifying and tracking suspected terrorists, they said.

The sources would talk only under a guarantee of anonymity because the NSA program is secret.

Air Force Gen. Michael Hayden, nominated Monday by President Bush to become the director of the CIA, headed the NSA from March 1999 to April 2005. In that post, Hayden would have overseen the agency's domestic call-tracking program. Hayden declined to comment about the program.

The NSA's domestic program, as described by sources, is far more expansive than what the White House has acknowledged. Last year, Bush said he had authorized the NSA to eavesdrop -- without warrants -- on international calls and international e-mails of people suspected of having links to terrorists when one party to the communication is in the USA. Warrants have also not been used in the NSA's efforts to create a national call database.

NSA has massive database of Americans' phone calls; 3 telecoms help government collect billions of domestic records
USA TODAY May 11, 2006 Thursday

In defending the previously disclosed program, Bush insisted that the NSA was focused exclusively on international calls. "In other words," Bush explained, "one end of the communication must be outside the United States."

As a result, domestic call records -- those of calls that originate and terminate within U.S. borders -- were believed to be private.

Sources, however, say that is not the case. With access to records of billions of domestic calls, the NSA has gained a secret window into the communications habits of millions of Americans. Customers' names, street addresses and other personal information are not being handed over as part of NSA's domestic program, the sources said. But the phone numbers the NSA collects can easily be cross-checked with other databases to obtain that information.

Don Weber, a senior spokesman for the NSA, declined to discuss the agency's operations. "Given the nature of the work we do, it would be irresponsible to comment on actual or alleged operational issues; therefore, we have no information to provide," he said. "However, it is important to note that NSA takes its legal responsibilities seriously and operates within the law."

The White House would not discuss the domestic call-tracking program. "There is no domestic surveillance without court approval," said Dana Perino, deputy press secretary, referring to actual eavesdropping.

She added that all national intelligence activities undertaken by the federal government "are lawful, necessary and required for the pursuit of al-Qaeda and affiliated terrorists." All government-sponsored intelligence activities "are carefully reviewed and monitored," Perino said. She also noted that "all appropriate members of Congress have been briefed on the intelligence efforts of the United States."

The government is collecting "external" data on domestic phone calls but is not intercepting "internals," a term for the actual content of the communication, according to a U.S. intelligence official familiar with the program. This kind of data collection from phone companies is not uncommon; it's been done before, though never on this large a scale, the official said. The data are used for "social network analysis," the official said, meaning to study how terrorist networks contact each other and how they are tied together.

Carriers uniquely positioned

AT&T recently merged with SBC and kept the AT&T name. Verizon, BellSouth and AT&T are the nation's three biggest telecommunications companies; they provide local and wireless phone service to more than 200 million customers.

The three carriers control vast networks with the latest communications technologies. They provide an array of services: local and long-distance calling, wireless and high-speed broadband, including video. Their direct access to millions of homes and businesses has them uniquely positioned to help the government keep tabs on the calling habits of Americans.

Among the big telecommunications companies, only Qwest has refused to help the NSA, the sources said. According to multiple sources, Qwest declined to participate because it was uneasy about the legal implications of handing over customer information to the government without warrants.

Qwest's refusal to participate has left the NSA with a hole in its database. Based in Denver, Qwest provides local phone service to 14 million customers in 14 states in the West and Northwest. But AT&T and Verizon also provide some services -- primarily long-distance and wireless -- to people who live in Qwest's region. Therefore, they can provide the NSA with at least some access in that area.

Created by President Truman in 1952, during the Korean War, the NSA is charged with protecting the United

NSA has massive database of Americans' phone calls; 3 telecoms help government collect billions of domestic records
USA TODAY May 11, 2006 Thursday

States from foreign security threats. The agency was considered so secret that for years the government refused to even confirm its existence. Government insiders used to joke that NSA stood for "No Such Agency."

In 1975, a congressional investigation revealed that the NSA had been intercepting, without warrants, international communications for more than 20 years at the behest of the CIA and other agencies. The spy campaign, code-named "Shamrock," led to the Foreign Intelligence Surveillance Act (FISA), which was designed to protect Americans from illegal eavesdropping.

Enacted in 1978, FISA lays out procedures that the U.S. government must follow to conduct electronic surveillance and physical searches of people believed to be engaged in espionage or international terrorism against the United States. A special court, which has 11 members, is responsible for adjudicating requests under FISA.

Over the years, NSA code-cracking techniques have continued to improve along with technology. The agency today is considered expert in the practice of "data mining" -- sifting through reams of information in search of patterns. Data mining is just one of many tools NSA analysts and mathematicians use to crack codes and track international communications.

Paul Butler, a former U.S. prosecutor who specialized in terrorism crimes, said FISA approval generally isn't necessary for government data-mining operations. "FISA does not prohibit the government from doing data mining," said Butler, now a partner with the law firm Akin Gump Strauss Hauer & Feld in Washington, D.C.

The caveat, he said, is that "personal identifiers" -- such as names, Social Security numbers and street addresses -- can't be included as part of the search. "That requires an additional level of probable cause," he said.

The usefulness of the NSA's domestic phone-call database as a counterterrorism tool is unclear. Also unclear is whether the database has been used for other purposes.

The NSA's domestic program raises legal questions. Historically, AT&T and the regional phone companies have required law enforcement agencies to present a court order before they would even consider turning over a customer's calling data. Part of that owed to the personality of the old Bell Telephone System, out of which those companies grew.

Ma Bell's bedrock principle -- protection of the customer -- guided the company for decades, said Gene Kimmelman, senior public policy director of Consumers Union. "No court order, no customer information -- period. That's how it was for decades," he said.

The concern for the customer was also based on law: Under Section 222 of the Communications Act, first passed in 1934, telephone companies are prohibited from giving out information regarding their customers' calling habits: whom a person calls, how often and what routes those calls take to reach their final destination. Inbound calls, as well as wireless calls, also are covered.

The financial penalties for violating Section 222, one of many privacy reinforcements that have been added to the law over the years, can be stiff. The Federal Communications Commission, the nation's top telecommunications regulatory agency, can levy fines of up to $130,000 per day per violation, with a cap of $1.325million per violation. The FCC has no hard definition of "violation." In practice, that means a single "violation" could cover one customer or 1million.

In the case of the NSA's international call-tracking program, Bush signed an executive order allowing the NSA to engage in eavesdropping without a warrant. The president and his representatives have since argued that an executive order was sufficient for the agency to proceed. Some civil liberties groups, including the American Civil Liberties Union, disagree.

Companies approached

NSA has massive database of Americans' phone calls; 3 telecoms help government collect billions of domestic records
USA TODAY May 11, 2006 Thursday

The NSA's domestic program began soon after the Sept.11 attacks, according to the sources. Right around that time, they said, NSA representatives approached the nation's biggest telecommunications companies. The agency made an urgent pitch: National security is at risk, and we need your help to protect the country from attacks.

The agency told the companies that it wanted them to turn over their "call-detail records," a complete listing of the calling histories of their millions of customers. In addition, the NSA wanted the carriers to provide updates, which would enable the agency to keep tabs on the nation's calling habits.

The sources said the NSA made clear that it was willing to pay for the cooperation. AT&T, which at the time was headed by C. Michael Armstrong, agreed to help the NSA. So did BellSouth, headed by F.Duane Ackerman; SBC, headed by Ed Whitacre; and Verizon, headed by Ivan Seidenberg.

With that, the NSA's domestic program began in earnest.

AT&T, when asked about the program, replied with a comment prepared for USA TODAY: "We do not comment on matters of national security, except to say that we only assist law enforcement and government agencies charged with protecting national security in strict accordance with the law."

In another prepared comment, BellSouth said: "BellSouth does not provide any confidential customer information to the NSA or any governmental agency without proper legal authority."

Verizon, the USA's No.2 telecommunications company behind AT&T, gave this statement: "We do not comment on national security matters, we act in full compliance with the law and we are committed to safeguarding our customers' privacy."

Qwest spokesman Robert Charlton said: "We can't talk about this. It's a classified situation."

In December, The New York Times revealed that Bush had authorized the NSA to wiretap, without warrants, international phone calls and e-mails that travel to or from the USA. The following month, the Electronic Frontier Foundation, a civil liberties group, filed a class-action lawsuit against AT&T. The lawsuit accuses the company of helping the NSA spy on U.S. phone customers.

Last month, U.S. Attorney General Alberto Gonzales alluded to that possibility. Appearing at a House Judiciary Committee hearing, Gonzales was asked whether he thought the White House has the legal authority to monitor domestic traffic without a warrant. Gonzales' reply: "I wouldn't rule it out." His comment marked the first time a Bush appointee publicly asserted that the White House might have that authority.

Similarities in programs

The domestic and international call-tracking programs have things in common, according to the sources. Both are being conducted without warrants and without the approval of the FISA court. The Bush administration has argued that FISA's procedures are too slow in some cases. Officials, including Gonzales, also make the case that the USA Patriot Act gives them broad authority to protect the safety of the nation's citizens.

The chairman of the Senate Intelligence Committee, Sen. Pat Roberts, R-Kan., would not confirm the existence of the program. In a statement, he said, "I can say generally, however, that our subcommittee has been fully briefed on all aspects of the Terrorist Surveillance Program. ... I remain convinced that the program authorized by the president is lawful and absolutely necessary to protect this nation from future attacks."

The chairman of the House Intelligence Committee, Rep. Pete Hoekstra, R-Mich., declined to comment.

One company differs

NSA has massive database of Americans' phone calls; 3 telecoms help government collect billions of domestic records
USA TODAY May 11, 2006 Thursday

One major telecommunications company declined to participate in the program: Qwest.

According to sources familiar with the events, Qwest's CEO at the time, Joe Nacchio, was deeply troubled by the NSA's assertion that Qwest didn't need a court order -- or approval under FISA -- to proceed. Adding to the tension, Qwest was unclear about who, exactly, would have access to its customers' information and how that information might be used.

Financial implications were also a concern, the sources said. Carriers that illegally divulge calling information can be subjected to heavy fines. The NSA was asking Qwest to turn over millions of records. The fines, in the aggregate, could have been substantial.

The NSA told Qwest that other government agencies, including the FBI, CIA and DEA, also might have access to the database, the sources said. As a matter of practice, the NSA regularly shares its information -- known as "product" in intelligence circles -- with other intelligence groups. Even so, Qwest's lawyers were troubled by the expansiveness of the NSA request, the sources said.

The NSA, which needed Qwest's participation to completely cover the country, pushed back hard.

Trying to put pressure on Qwest, NSA representatives pointedly told Qwest that it was the lone holdout among the big telecommunications companies. It also tried appealing to Qwest's patriotic side: In one meeting, an NSA representative suggested that Qwest's refusal to contribute to the database could compromise national security, one person recalled.

In addition, the agency suggested that Qwest's foot-dragging might affect its ability to get future classified work with the government. Like other big telecommunications companies, Qwest already had classified contracts and hoped to get more.

Unable to get comfortable with what NSA was proposing, Qwest's lawyers asked NSA to take its proposal to the FISA court. According to the sources, the agency refused.

The NSA's explanation did little to satisfy Qwest's lawyers. "They told (Qwest) they didn't want to do that because FISA might not agree with them," one person recalled. For similar reasons, this person said, NSA rejected Qwest's suggestion of getting a letter of authorization from the U.S. attorney general's office. A second person confirmed this version of events.

In June 2002, Nacchio resigned amid allegations that he had misled investors about Qwest's financial health. But Qwest's legal questions about the NSA request remained.

Unable to reach agreement, Nacchio's successor, Richard Notebaert, finally pulled the plug on the NSA talks in late 2004, the sources said.

Contributing: John Diamond

**GRAPHIC:** PHOTO, B/W,Ron Edmonds,AP

**LOAD-DATE:** May 11, 2006

# EXHIBIT "I"

4 of 22 DOCUMENTS


Copyright 2005 The New York Times Company
The New York Times

December 24, 2005 Saturday
Late Edition - Final

**SECTION:** Section A; Column 6; National Desk; DOMESTIC SURVEILLANCE: THE PROGRAM; Pg. 1

**LENGTH:** 1357 words

**HEADLINE:** SPY AGENCY MINED VAST DATA TROVE, OFFICIALS REPORT

**BYLINE:** By ERIC LICHTBLAU and JAMES RISEN

**DATELINE:** WASHINGTON, Dec. 23

**BODY:**

The National Security Agency has traced and analyzed large volumes of telephone and Internet communications flowing into and out of the United States as part of the eavesdropping program that President Bush approved after the Sept. 11, 2001, attacks to hunt for evidence of terrorist activity, according to current and former government officials.

The volume of information harvested from telecommunication data and voice networks, without court-approved warrants, is much larger than the White House has acknowledged, the officials said. It was collected by tapping directly into some of the American telecommunication system's main arteries, they said.

As part of the program approved by President Bush for domestic surveillance without warrants, the N.S.A. has gained the cooperation of American telecommunications companies to obtain backdoor access to streams of domestic and international communications, the officials said.

The government's collection and analysis of phone and Internet traffic have raised questions among some law enforcement and judicial officials familiar with the program. One issue of concern to the Foreign Intelligence Surveillance Court, which has reviewed some separate warrant applications growing out of the N.S.A.'s surveillance program, is whether the court has legal authority over calls outside the United States that happen to pass through American-based telephonic "switches," according to officials familiar with the matter.

"There was a lot of discussion about the switches" in conversations with the court, a Justice Department official said, referring to the gateways through which much of the communications traffic flows. "You're talking about access to such a vast amount of communications, and the question was, How do you minimize something that's on a switch that's carrying such large volumes of traffic? The court was very, very concerned about that."

Since the disclosure last week of the N.S.A.'s domestic surveillance program, President Bush and his senior aides have stressed that his executive order allowing eavesdropping without warrants was limited to the monitoring of international phone and e-mail communications involving people with known links to Al Qaeda.

What has not been publicly acknowledged is that N.S.A. technicians, besides actually eavesdropping on specific conversations, have combed through large volumes of phone and Internet traffic in search of patterns that might point to terrorism suspects. Some officials describe the program as a large data-mining operation.

SPY AGENCY MINED VAST DATA TROVE, OFFICIALS REPORT The New York Times December 24, 2005
Saturday

The current and former government officials who discussed the program were granted anonymity because it remains classified.

Bush administration officials declined to comment on Friday on the technical aspects of the operation and the N.S.A.'s use of broad searches to look for clues on terrorists. Because the program is highly classified, many details of how the N.S.A. is conducting it remain unknown, and members of Congress who have pressed for a full Congressional inquiry say they are eager to learn more about the program's operational details, as well as its legality.

Officials in the government and the telecommunications industry who have knowledge of parts of the program say the N.S.A. has sought to analyze communications patterns to glean clues from details like which phone calls are made, how long a phone call lasts and what time of day it is made, and the origins and destinations of phone calls and e-mail messages. Calls to and from Afghanistan, for instance, are known to have been of particular interest to the N.S.A. since the Sept. 11 attacks, the officials said.

This so-called "pattern analysis" on calls within the United States would, in many circumstances, require a court warrant if the government wanted to trace who calls whom.

The use of similar data-mining operations by the Bush administration in other contexts has raised strong objections, most notably in connection with the Total Information Awareness system, developed by the Pentagon for tracking terror suspects, and the Department of Homeland Security's Capps program for screening airline passengers. Both programs were ultimately scrapped after public outcries over possible threats to privacy and civil liberties.

But the Bush administration regards the N.S.A.'s ability to trace and analyze large volumes of data as critical to its expanded mission to detect terrorist plots before they can be carried out, officials familiar with the program say. Administration officials maintain that the system set up by Congress in 1978 under the Foreign Intelligence Surveillance Act does not give them the speed and flexibility to respond fully to terrorist threats at home.

A former technology manager at a major telecommunications company said that since the Sept. 11 attacks, the leading companies in the industry have been storing information on calling patterns and giving it to the federal government to aid in tracking possible terrorists.

"All that data is mined with the cooperation of the government and shared with them, and since 9/11, there's been much more active involvement in that area," said the former manager, a telecommunications expert who did not want his name or that of his former company used because of concern about revealing trade secrets.

Such information often proves just as valuable to the government as eavesdropping on the calls themselves, the former manager said.

"If they get content, that's useful to them too, but the real plum is going to be the transaction data and the traffic analysis," he said. "Massive amounts of traffic analysis information -- who is calling whom, who is in Osama Bin Laden's circle of family and friends -- is used to identify lines of communication that are then given closer scrutiny."

Several officials said that after President Bush's order authorizing the N.S.A. program, senior government officials arranged with officials of some of the nation's largest telecommunications companies to gain access to switches that act as gateways at the borders between the United States' communications networks and international networks. The identities of the corporations involved could not be determined.

The switches are some of the main arteries for moving voice and some Internet traffic into and out of the United States, and, with the globalization of the telecommunications industry in recent years, many international-to-international calls are also routed through such American switches.

One outside expert on communications privacy who previously worked at the N.S.A. said that to exploit its

SPY AGENCY MINED VAST DATA TROVE, OFFICIALS REPORT The New York Times December 24, 2005 Saturday

technological capabilities, the American government had in the last few years been quietly encouraging the telecommunications industry to increase the amount of international traffic that is routed through American-based switches.

The growth of that transit traffic had become a major issue for the intelligence community, officials say, because it had not been fully addressed by 1970's-era laws and regulations governing the N.S.A. Now that foreign calls were being routed through switches on American soil, some judges and law enforcement officials regarded eavesdropping on those calls as a possible violation of those decades-old restrictions, including the Foreign Intelligence Surveillance Act, which requires court-approved warrants for domestic surveillance.

Historically, the American intelligence community has had close relationships with many communications and computer firms and related technical industries. But the N.S.A.'s backdoor access to major telecommunications switches on American soil with the cooperation of major corporations represents a significant expansion of the agency's operational capability, according to current and former government officials.

Phil Karn, a computer engineer and technology expert at a major West Coast telecommunications company, said access to such switches would be significant. "If the government is gaining access to the switches like this, what you're really talking about is the capability of an enormous vacuum operation to sweep up data," he said.

**URL:** http://www.nytimes.com

**LOAD-DATE:** December 24, 2005

# EXHIBIT "J"

1 of 1 DOCUMENT

Copyright 2006 The Conde Nast Publications, Inc.
All Rights Reserved



The New Yorker

May 29, 2006

**SECTION:** THE TALK OF THE TOWN; National Security Dept.; Pg. 24 Vol. 82 No. 15

**LENGTH:** 1395 words

**HEADLINE:** LISTENING IN;
Seymour M. Hersh on the N.S.A.'s domestic surveillance program.

**BYLINE:** Seymour M. Hersh

**BODY:**

A few days before the start of the confirmation hearings for General Michael Hayden, who has been nominated by President Bush to be the head of the C.I.A., I spoke to an official of the National Security Agency who recently retired. The official joined the N.S.A. in the mid-nineteen-seventies, soon after contentious congressional hearings that redefined the relationship between national security and the public's right to privacy. The hearings, which revealed that, among other abuses, the N.S.A. had illegally intercepted telegrams to and from the United States, led to the passage of the 1978 Foreign Intelligence Surveillance Act, or FISA, to protect citizens from unlawful surveillance. "When I first came in, I heard from all my elders that 'we'll never be able to collect intelligence again,'" the former official said. "They'd whine, 'Why do we have to report to oversight committees?' " But, over the next few years, he told me, the agency did find a way to operate within the law. "We built a system that protected national security and left people able to go home at night without worrying whether what they did that day was appropriate or legal."

After the attacks of September 11, 2001, it was clear that the intelligence community needed to get more aggressive and improve its performance. The Administration, deciding on a quick fix, returned to the tactic that got intelligence agencies in trouble thirty years ago: intercepting large numbers of electronic communications made by Americans. The N.S.A.'s carefully constructed rules were set aside.

Last December, the *Times* reported that the N.S.A. was listening in on calls between people in the United States and people in other countries, and a few weeks ago *USA Today* reported that the agency was collecting information on millions of private domestic calls. A security consultant working with a major telecommunications carrier told me that his client set up a top-secret high-speed circuit between its main computer complex and Quantico, Virginia, the site of a government-intelligence computer center. This link provided direct access to the carrier's network core-the critical area of its system, where all its data are stored. "What the companies are doing is worse than turning over records," the consultant said. "They're providing total access to all the data."

LISTENING IN; Seymour M. Hersh on the N.S.A.'s domestic surveillance program. The New Yorker May 29, 2006

"This is not about getting a cardboard box of monthly phone bills in alphabetical order," a former senior intelligence official said. The Administration's goal after September 11th was to find suspected terrorists and target them for capture or, in some cases, air strikes. "The N.S.A. is getting real-time actionable intelligence," the former official said.

The N.S.A. also programmed computers to map the connections between telephone numbers in the United States and suspect numbers abroad, sometimes focussing on a geographic area, rather than on a specific person-for example, a region of Pakistan. Such calls often triggered a process, known as "chaining," in which subsequent calls to and from the American number were monitored and linked. The way it worked, one high-level Bush Administration intelligence official told me, was for the agency "to take the first number out to two, three, or more levels of separation, and see if one of them comes back"-if, say, someone down the chain was also calling the original, suspect number. As the chain grew longer, more and more Americans inevitably were drawn in.

FISA requires the government to get a warrant from a special court if it wants to eavesdrop on calls made or received by Americans. (It is generally legal for the government to wiretap a call if it is purely foreign.) The legal implications of chaining are less clear. Two people who worked on the N.S.A. call-tracking program told me they believed that, in its early stages, it did not violate the law. "We were not listening to an individual's conversation," a defense contractor said. "We were gathering data on the incidence of calls made to and from his phone by people associated with him and others." Similarly, the Administration intelligence official said that no warrant was needed, because "there's no personal identifier involved, other than the metadata from a call being placed."

But the point, obviously, was to identify terrorists. "After you hit something, you have to figure out what to do with it," the Administration intelligence official told me. The next step, theoretically, could have been to get a suspect's name and go to the fisa court for a warrant to listen in. One problem, however, was the volume and the ambiguity of the data that had already been generated. ("There's too many calls and not enough judges in the world," the former senior intelligence official said.) The agency would also have had to reveal how far it had gone, and how many Americans were involved. And there was a risk that the court could shut down the program.

Instead, the N.S.A. began, in some cases, to eavesdrop on callers (often using computers to listen for key words) or to investigate them using traditional police methods. A government consultant told me that tens of thousands of Americans had had their calls monitored in one way or the other. "In the old days, you needed probable cause to listen in," the consultant explained. "But you could not listen in to generate probable cause. What they're doing is a violation of the spirit of the law." One C.I.A. officer told me that the Administration, by not approaching the FISA court early on, had made it much harder to go to the court later.

The Administration intelligence official acknowledged that the implications of the program had not been fully thought out. "There's a lot that needs to be looked at," he said. "We are in a technology age. We need to tweak fisa, and we need to reconsider how we handle privacy issues."

Marc Rotenberg, the executive director of the Electronic Privacy Information Center, believes that if the White House had gone to Congress after September 11th and asked for the necessary changes in FISA "it would have got them." He told me, "The N.S.A. had a lot of latitude under FISA to get the data it needed. I think the White House purposefully ignored the law, because the President did not want to do the monitoring under FISA. There is a strong commitment inside the intelligence community to obey the law, and the community is getting dragged into the mud on this."

General Hayden, who as the head of the N.S.A. supervised the intercept program, is seen by many as a competent professional who was too quick to follow orders without asking enough questions. As one senior congressional staff aide said, "The concern is that the Administration says, 'We're going to do this,' and he does it-even if he knows better." Former Democratic Senator Bob Kerrey, who was a member of the 9/11 Commission, had a harsher assessment. Kerrey criticized Hayden for his suggestion, after the *Times* exposé, that the N.S.A.'s wiretap program could have prevented the

LISTENING IN; Seymour M. Hersh on the N.S.A.'s domestic surveillance program. The New Yorker May 29, 2006

attacks of 9/11. "That's patently false and an indication that he's willing to politicize intelligence and use false information to help the President," Kerrey said.

Hayden's public confirmation hearing last week before the Senate Intelligence Committee was unlike the tough-minded House and Senate investigations of three decades ago, and added little to what is known about the wiretap program. One unexamined issue was the effectiveness of the N.S.A. program. "The vast majority of what we did with the intelligence was ill-focussed and not productive," a Pentagon consultant told me. "It's intelligence in real time, but you have to know where you're looking and what you're after."

On May 11th, President Bush, responding to the *USA Today* story, said, "If Al Qaeda or their associates are making calls into the United States, or out of the United States, we want to know what they are saying." That is valid, and a well-conceived, properly supervised intercept program would be an important asset. "Nobody disputes the value of the tool," the former senior intelligence official told me. "It's the unresolved tension between the operators saying, 'Here's what we can build,' and the legal people saying, 'Just because you can build it doesn't mean you can use it.' " It's a tension that the President and his advisers have not even begun to come to terms with.

**LOAD-DATE:** June 1, 2006

# EXHIBIT "K"

1 of 1 DOCUMENT


Copyright 2006 The New York Times Company
The New York Times

January 17, 2006 Tuesday
Late Edition - Final

**SECTION:** Section A; Column 6; National Desk; DOMESTIC SURVEILLANCE: THE PROGRAM; Pg. 1

**LENGTH:** 2354 words

**HEADLINE:** SPY AGENCY DATA AFTER SEPT. 11 LED F.B.I. TO DEAD ENDS

**BYLINE:** This article is by Lowell Bergman, Eric Lichtblau, Scott Shane and Don Van Natta Jr.; William K. Rashbaum contributed reporting from New York for this article.

**DATELINE:** WASHINGTON, Jan. 16

**BODY:**

In the anxious months after the Sept. 11 attacks, the National Security Agency began sending a steady stream of telephone numbers, e-mail addresses and names to the F.B.I. in search of terrorists. The stream soon became a flood, requiring hundreds of agents to check out thousands of tips a month.

But virtually all of them, current and former officials say, led to dead ends or innocent Americans.

F.B.I. officials repeatedly complained to the spy agency that the unfiltered information was swamping investigators. The spy agency was collecting much of the data by eavesdropping on some Americans' international communications and conducting computer searches of phone and Internet traffic. Some F.B.I. officials and prosecutors also thought the checks, which sometimes involved interviews by agents, were pointless intrusions on Americans' privacy.

As the bureau was running down those leads, its director, Robert S. Mueller III, raised concerns about the legal rationale for a program of eavesdropping without warrants, one government official said. Mr. Mueller asked senior administration officials about "whether the program had a proper legal foundation," but deferred to Justice Department legal opinions, the official said.

President Bush has characterized the eavesdropping program as a "vital tool" against terrorism; Vice President Dick Cheney has said it has saved "thousands of lives."

But the results of the program look very different to some officials charged with tracking terrorism in the United States. More than a dozen current and former law enforcement and counterterrorism officials, including some in the small circle who knew of the secret program and how it played out at the F.B.I., said the torrent of tips led them to few potential terrorists inside the country they did not know of from other sources and diverted agents from counterterrorism work they viewed as more productive.

"We'd chase a number, find it's a schoolteacher with no indication they've ever been involved in international terrorism -- case closed," said one former F.B.I. official, who was aware of the program and the data it generated for the bureau. "After you get a thousand numbers and not one is turning up anything, you get some frustration."

SPY AGENCY DATA AFTER SEPT. 11 LED F.B.I. TO DEAD ENDS The New York Times January 17, 2006 Tuesday

Intelligence officials disagree with any characterization of the program's results as modest, said Judith A. Emmel, a spokeswoman for the office of the director of national intelligence. Ms. Emmel cited a statement at a briefing last month by Gen. Michael V. Hayden, the country's second-ranking intelligence official and the director of the N.S.A. when the program was started.

"I can say unequivocally that we have gotten information through this program that would not otherwise have been available," General Hayden said. The White House and the F.B.I. declined to comment on the program or its results.

The differing views of the value of the N.S.A.'s foray into intelligence-gathering in the United States may reflect both bureaucratic rivalry and a culture clash. The N.S.A., an intelligence agency, routinely collects huge amounts of data from across the globe that may yield only tiny nuggets of useful information; the F.B.I., while charged with fighting terrorism, retains the traditions of a law enforcement agency more focused on solving crimes.

"It isn't at all surprising to me that people not accustomed to doing this would say, 'Boy, this is an awful lot of work to get a tiny bit of information,' " said Adm. Bobby R. Inman, a former N.S.A. director. "But the rejoinder to that is, Have you got anything better?"

Several of the law enforcement officials acknowledged that they might not know of arrests or intelligence activities overseas that grew out of the domestic spying program. And because the program was a closely guarded secret, its role in specific cases may have been disguised or hidden even from key investigators.

Still, the comments on the N.S.A. program from the law enforcement and counterterrorism officials, many of them high level, are the first indication that the program was viewed with skepticism by key figures at the Federal Bureau of Investigation, the agency responsible for disrupting plots and investigating terrorism on American soil.

All the officials spoke on condition of anonymity because the program is classified. It is coming under scrutiny next month in hearings on Capitol Hill, which were planned after members of Congress raised questions about the legality of the eavesdropping. The program was disclosed in December by The New York Times.

The law enforcement and counterterrorism officials said the program had uncovered no active Qaeda networks inside the United States planning attacks. "There were no imminent plots -- not inside the United States," the former F.B.I. official said.

Some of the officials said the eavesdropping program might have helped uncover people with ties to Al Qaeda in Albany; Portland, Ore.; and Minneapolis. Some of the activities involved recruitment, training or fund-raising.

But, along with several British counterterrorism officials, some of the officials questioned assertions by the Bush administration that the program was the key to uncovering a plot to detonate fertilizer bombs in London in 2004. The F.B.I. and other law enforcement officials also expressed doubts about the importance of the program's role in another case named by administration officials as a success in the fight against terrorism, an aborted scheme to topple the Brooklyn Bridge with a blow torch.

Some officials said that in both cases, they had already learned of the plans through interrogation of prisoners or other means.

Immediately after the Sept. 11 attacks, the Bush administration pressed the nation's intelligence agencies and the F.B.I. to move urgently to thwart any more plots. The N.S.A., whose mission is to spy overseas, began monitoring the international e-mail messages and phone calls of people inside the United States who were linked, even indirectly, to suspected Qaeda figures.

Under a presidential order, the agency conducted the domestic eavesdropping without seeking the warrants

SPY AGENCY DATA AFTER SEPT. 11 LED F.B.I. TO DEAD ENDS The New York Times January 17, 2006
Tuesday

ordinarily required from the secret Foreign Intelligence Surveillance Court, which handles national security matters. The administration has defended the legality of the program, pointing to what it says is the president's inherent constitutional power to defend the country and to legislation passed by Congress after the Sept. 11 attacks.

Administration officials told Mr. Mueller, the F.B.I. director, of the eavesdropping program, and his agency was enlisted to run down leads from it, several current and former officials said.

While he and some bureau officials discussed the fact that the program bypassed the intelligence surveillance court, Mr. Mueller expressed no concerns about that to them, those officials said. But another government official said Mr. Mueller had questioned the administration about the legal authority for the program.

Officials who were briefed on the N.S.A. program said the agency collected much of the data passed on to the F.B.I. as tips by tracing phone numbers in the United States called by suspects overseas, and then by following the domestic numbers to other numbers called. In other cases, lists of phone numbers appeared to result from the agency's computerized scanning of communications coming into and going out of the country for names and keywords that might be of interest. The deliberate blurring of the source of the tips caused some frustration among those who had to follow up.

F.B.I. field agents, who were not told of the domestic surveillance programs, complained that they often were given no information about why names or numbers had come under suspicion. A former senior prosecutor who was familiar with the eavesdropping programs said intelligence officials turning over the tips "would always say that we had information whose source we can't share, but it indicates that this person has been communicating with a suspected Qaeda operative." He said, "I would always wonder, what does 'suspected' mean?"

"The information was so thin," he said, "and the connections were so remote, that they never led to anything, and I never heard any follow-up."

In response to the F.B.I. complaints, the N.S.A. eventually began ranking its tips on a three-point scale, with 3 being the highest priority and 1 the lowest, the officials said. Some tips were considered so hot that they were carried by hand to top F.B.I. officials. But in bureau field offices, the N.S.A. material continued to be viewed as unproductive, prompting agents to joke that a new bunch of tips meant more "calls to Pizza Hut," one official, who supervised field agents, said.

The views of some bureau officials about the value of the N.S.A.'s domestic surveillance offers a revealing glimpse of the difficulties law enforcement and intelligence agencies have had cooperating since Sept. 11.

The N.S.A., criticized by the national Sept. 11 commission for its "avoidance of anything domestic" before the attacks, moved aggressively into the domestic realm after them. But the legal debate over its warrantless eavesdropping has embroiled the agency in just the kind of controversy its secretive managers abhor. The F.B.I., meanwhile, has struggled over the last four years to expand its traditional mission of criminal investigation to meet the larger menace of terrorism.

Admiral Inman, the former N.S.A. director and deputy director of C.I.A., said the F.B.I. complaints about thousands of dead-end leads revealed a chasm between very different disciplines. Signals intelligence, the technical term for N.S.A.'s communications intercepts, rarely produces "the complete information you're going to get from a document or a witness" in a traditional F.B.I. investigation, he said.

Some F.B.I. officials said they were uncomfortable with the expanded domestic role played by the N.S.A. and other intelligence agencies, saying most intelligence officers lacked the training needed to safeguard Americans' privacy and civil rights. They said some protections had to be waived temporarily in the months after Sept. 11 to detect a feared second wave of attacks, but they questioned whether emergency procedures like the eavesdropping should become permanent.

SPY AGENCY DATA AFTER SEPT. 11 LED F.B.I. TO DEAD ENDS The New York Times January 17, 2006
Tuesday

That discomfort may explain why some F.B.I. officials may seek to minimize the benefits of the N.S.A. program or distance themselves from the agency. "This wasn't our program," an F.B.I. official said. "It's not our mess, and we're not going to clean it up."

The N.S.A.'s legal authority for collecting the information it passed to the F.B.I. is uncertain. The Foreign Intelligence Surveillance Act requires a warrant for the use of so-called pen register equipment that records American phone numbers, even if the contents of the calls are not intercepted. But officials with knowledge of the program said no warrants were sought to collect the numbers, and it is unclear whether the secret executive order signed by Mr. President Bush in 2002 to authorize eavesdropping without warrants also covered the collection of phone numbers and e-mail addresses.

Aside from the director, F.B.I. officials did not question the legal status of the tips, assuming that N.S.A. lawyers had approved. They were more concerned about the quality and quantity of the material, which produced "mountains of paperwork" often more like raw data than conventional investigative leads.

"It affected the F.B.I. in the sense that they had to devote so many resources to tracking every single one of these leads, and, in my experience, they were all dry leads," the former senior prosecutor said. "A trained investigator never would have devoted the resources to take those leads to the next level, but after 9/11, you had to."

By the administration's account, the N.S.A. eavesdropping helped lead investigators to Iyman Faris, an Ohio truck driver and friend of Khalid Shaikh Mohammed, who is believed to be the mastermind of the Sept. 11 attacks. Mr. Faris spoke of toppling the Brooklyn Bridge by taking a torch to its suspension cables, but concluded that it would not work. He is now serving a 20-year sentence in a federal prison.

But as in the London fertilizer bomb case, some officials with direct knowledge of the Faris case dispute that the N.S.A. information played a significant role.

By contrast, different officials agree that the N.S.A.'s domestic operations played a role in the arrest of an imam and another man in Albany in August 2004 as part of an F.B.I. counterterrorism sting investigation. The men, Yassin Aref, 35, and Mohammed Hossain, 49, are awaiting trial on charges that they attempted to engineer the sale of missile launchers to an F.B.I. undercover informant.

In addition, government officials said the N.S.A. eavesdropping program might have assisted in the investigations of people with suspected Qaeda ties in Portland and Minneapolis. In the Minneapolis case, charges of supporting terrorism were filed in 2004 against Mohammed Abdullah Warsame, a Canadian citizen. Six people in the Portland case were convicted of crimes that included money laundering and conspiracy to wage war against the United States.

Even senior administration officials with access to classified operations suggest that drawing a clear link between a particular source and the unmasking of a potential terrorist is not always possible.

When Michael Chertoff, the homeland security secretary, was asked last week on "The Charlie Rose Show" whether the N.S.A. wiretapping program was important in deterring terrorism, he said, "I don't know that it's ever possible to attribute one strand of intelligence from a particular program."

But Mr. Chertoff added, "I can tell you in general the process of doing whatever you can do technologically to find out what is being said by a known terrorist to other people, and who that person is communicating with, that is without a doubt one of the critical tools we've used time and again."

**URL:** http://www.nytimes.com

**GRAPHIC:** Photos: Robert S. Mueller III (Photo by Spencer Platt/Getty Images)

SPY AGENCY DATA AFTER SEPT. 11 LED F.B.I. TO DEAD ENDS The New York Times January 17, 2006
Tuesday

Michael Chertoff (Photo by Joshua Roberts/Getty Images)
Yassin Aref (Photo by Chip East/Reuters)
 Iyman Faris (Photo by Department of Justice)(pg. A14)

**LOAD-DATE:** January 17, 2006

# EXHIBIT "L"



# NSA spy program hinges on state-of-the-art technology

By Shane Harris *National Journal* January 20, 2006

The furor over the National Security Agency's domestic eavesdropping, authorized by President Bush, has focused largely on legal questions -- whether the NSA has the authority to spy on Americans inside the United States and whether the commander-in-chief can order the agency to do so.

But that debate has largely smothered examination of how the nation's largest intelligence agency is collecting -- and analyzing -- information intercepted from hundreds, possibly thousands, of Americans. Since the 9/11 attacks, the NSA has abandoned the mantra that guided it in earlier decades -- Do not spy on Americans inside the nation's borders. Things have changed, and the NSA may be on the cusp of employing state-of-the-art technologies to uncover more information about potential terrorists, and about Americans here at home.

In the first days after 9/11, amid the palpable fear of another strike and an all-hands investigation of the attacks by the FBI and CIA, the NSA's then-director, Lt. Gen. Michael Hayden, took a broad view of his agency's power to conduct electronic eavesdropping.

Whereas existing laws, regulations, and executive orders restricted domestic monitoring of U.S. persons without a warrant, Hayden told House Intelligence Committee members on October 1, 2001, that he "had been operating since the September 11 attacks with an expansive view of [his] authorities," according to a declassified letter that Rep. Nancy Pelosi, D-Calif., then the committee's ranking Democrat, sent to the general after he briefed lawmakers.

Pelosi was troubled by the legal rationale for the NSA's activities. Although significant portions of her letter -- and most of Hayden's response -- are redacted, Pelosi wrote that she was "concerned whether, and to what extent, the [NSA] has received specific presidential authorization for the operations you are conducting." According to the letter, those operations included the NSA's sharing of intercepted communications with the FBI without first receiving a request for such reports -- the normal procedure, to avoid the co-mingling of intelligence and law enforcement operations.

According to sources who are knowledgeable about the NSA's domestic operations but who would not be identified because those operations are still classified, just after 9/11, the NSA targeted and intercepted the communications of specific foreign persons and groups, an indication that at least some of the targets were previously known to U.S. intelligence. The sources didn't specify whether any persons inside the United States were also monitored. But, Pelosi wrote, Hayden informed lawmakers that the NSA was making the call about what intercepted information was of "foreign-intelligence interest" before passing it to the FBI.

*The New York Times* reported this week that "in the anxious months after the September 11 attacks, the [NSA] began sending a steady stream of telephone numbers, e-mail addresses, and names to the FBI, in search of terrorists." Some of that information led to Americans inside the United States. It appears that the NSA was handing over just about any information it could find that might be useful to investigators. *The Times* reported that the NSA eventually provided thousands of tips a month.

1

The agency conducted these activities without presidential authorization for at least three months following 9/11. In early 2002, Bush authorized the current program, which, he has said, targets only known members of Al Qaeda and affiliated groups, and people linked to them. But even before Bush's order -- which remains classified -- the NSA's work was evolving from targeted interceptions to broader sifting and sorting of huge volumes of communications data.

Officials with some of the nation's leading telecommunications companies have said they gave the NSA access to their switches, the hubs through which enormous volumes of phone and e-mail traffic pass every day, to aid the agency's effort to determine exactly whom suspected Qaeda figures were calling in the United States and abroad and who else was calling those numbers. The NSA used the intercepts to construct webs of potentially interrelated persons. (*The Times*, citing FBI sources, reported that most of these tips led to dead ends or to innocent Americans.)

Analyzing large amounts of telecom traffic would give security officials valuable information about potential adversaries, revealing the times of day that terrorist suspects tended to conduct their communications, and the means they used -- land-line phones, mobile phones, or the Internet -- according to telecommunications experts.

One telecom executive told *National Journal* that NSA officials approached him shortly after the 9/11 attacks and insisted, to the point of questioning his company's patriotism, that executives hand over the company's "call detail records." Those documents, known as CDRs, trace the history of every call placed on a network, including a call's origin and destination, the time it started and ended, how long it lasted, and how it was routed through the network.

Having wholesale access to many companies' records would, in theory, give the NSA a picture of telecom usage across the country. And, since many U.S.-based carriers route international calls through their domestic switches, a picture of the wider world could emerge as well. The telecom executive said he believed that the NSA wanted the information to conduct a "data-mining" analysis of call and e-mail traffic.

Fifty years ago, intelligence officers had to manually scan communications intercepts for keywords, names, or other tantalizing intelligence nuggets. The NSA has long since automated that process with sophisticated supercomputers that can read huge stores of intercepts at speeds human beings can barely contemplate.

But more recently, the NSA has pursued cutting-edge data-mining technologies that don't just find key words but also uncover hidden relationships among data points. These technologies can even detect how a particular analyst thinks, identify what his or her biases are, and then suggest alternative hypotheses.

Data-mining systems, which the NSA has publicly pursued and spent millions of dollars researching, don't just "connect the dots" but also alert analysts about which dots to connect, which to disregard, and how to connect them in ways they may never have considered. It is unclear which, if any, of these data-mining tools the NSA is using to analyze the domestic information gathered in the current eavesdropping program, but the tools themselves offer a telling look into the agency's potential to exploit what it collects, regardless of its legal basis for doing so.

In September 2002, one year after the 9/11 attacks, a technology research-and-development office located at the NSA's Fort Meade, Md., headquarters awarded $64 million in research contracts for a new program called Novel Intelligence from Massive Data. The NIMD project, set to last for three and a half years, is intended to keep intelligence analysts from drowning under the massive flow of

information they encounter and therefore missing key pieces of intelligence. In essence, it is an early-warning system.

"NIMD funds research to ... help analysts deal with information-overload, detect early indicators of strategic surprise, and avoid analytic errors," reads a "Call for 2005 Challenge Workshop Proposals" released by the Advanced Research and Development Activity (ARDA), the group at Fort Meade that was founded in 1998 to field new technologies for intelligence agencies, especially the NSA.

The administration has informed some lawmakers that the eavesdropping program the president authorized in 2002 is also designed to be an early-warning system. In late December, Assistant Attorney General William E. Moschella wrote to the top Democrats and Republicans on the House and Senate Intelligence committees, "The president determined that it was necessary following September 11 to create an early-warning detection system" to prevent more attacks.

Tellingly, Moschella wrote that the Foreign Intelligence Surveillance Act, which allows the government to obtain warrants to conduct domestic eavesdropping or wiretapping, "could not have provided the speed and agility required for the early-warning detection system."

The administration hasn't elaborated on why the system needs to operate independently of FISA, but officials may believe that it cannot meet the law's minimum threshold for surveillance, which requires a probable cause that the target is a terrorist, said Steven Aftergood, an expert on intelligence and government secrecy with the Federation of American Scientists.

"Logistically speaking, the early-warning approach may involve a significant increase in the number of surveillance actions," Aftergood said. "It may be that neither the Justice Department nor the [Foreign Intelligence Surveillance Court, which approves wiretapping warrants] is prepared to prepare and process several thousand additional FISA applications per year, beyond the 1,700 or so approved in 2004."

If the NSA is monitoring large numbers of communications -- *The Times* has reported that the agency has monitored as many as 500 Americans and other residents of the United States at one time -- then it stands to reason that applications for warrants could take time to process.

The NIMD project, as well as some others that ARDA is pursuing, closely resembles those of another controversial data-mining program aimed at discovering terrorist plots -- the Defense Department's Total Information Awareness program. Suspended in 2003, TIA was also designed as an early-warning system that would mine intelligence databases, but also private databases of credit card records and other transactions, for telltale signals of terrorist plots.

Of the companies and research institutions that won NIMD contracts in September 2002, six also held contracts for the earlier TIA project. Their TIA work focused on key areas of interest to NIMD, including challenging analytic assumptions and building prototype data-mining devices.

Like NIMD, TIA aimed to challenge analysts' traditional notions about what a given piece of intelligence might signify. It did this by creating a database of what TIA creator John Poindexter called "plausible futures," or likely terrorism scenarios. Another ARDA project also envisions such a database.

The Advanced Capabilities for Intelligence Analysis program, which is a cousin of NIMD, looks for ways "to construct and use plausible futures in order to provide additional, novel interpretations for today's collection" of intelligence information, according to the 2005 call for proposals.

TIA was distinct from NIMD and other projects in that it specifically focused on counter-terrorism, according to Tom Armour, a former program manager in Poindexter's office at the Defense Advanced Research Projects Agency. However, Armour says, the two research teams had "good coordination" and discussed their projects on a regular basis.

When Congress eliminated funding for most of Poindexter's projects, a number of them (the exact number is classified) were transferred to intelligence agencies. Armour and others associated with TIA would not disclose the names of those agencies, but a former Army intelligence analyst also involved in data mining and counter-terrorism confirms that TIA tools were transferred to other agencies, where work on them continues to this day.

Asked whether data-mining programs, such as NIMD, that the NSA may still be pursuing would be useful for analyzing large amounts of phone and e-mail traffic, Armour said, "Absolutely. That's, in fact, what the interest is." The former No. 2 official in Poindexter's office, Robert Popp, said that he and his colleagues wanted to know whether intercepted phone calls and e-mail would help find terrorists but not ensnare innocent people. "We didn't know," Popp said. "That was the hypothesis. That was the question that Poindexter and I wanted to do research on, to be better able to understand."

The similarities between TIA and the NSA's current data-mining operations were enough to prompt one senior lawmaker to signal his discomfort in a letter to Vice President Cheney. Sen. Jay Rockefeller IV, D-W.Va., the vice chairman of the Senate Intelligence Committee, was briefed by Cheney, Hayden, and then-Director of Central Intelligence George Tenet in July 2003.

"As I reflected on the meeting today," Rockefeller wrote, "John Poindexter's TIA project sprung to mind, exacerbating my concern regarding the direction the administration is moving with regard to security, technology, and surveillance."

Whether the NSA research shares another similarity with Poindexter's work remains, troublingly, unanswered. Poindexter's office spent between $4 million and $5 million researching technology and policy that would protect the privacy of innocent people whose names might turn up in a data search, Popp said. "No one else was, or is, to our knowledge, putting that kind of investment in the privacy R&D area, certainly not in 2002 and 2003, like we were."

The Senate Judiciary Committee plans to hold hearings in the coming weeks on the NSA's domestic operations. In addition to the specifics of how the NSA collects and mines information, senators undoubtedly will want to know what assurances American citizens have that they won't be ensnared in a vast data-search net.

Poindexter addressed the trade-off between privacy and security in 2003, when he was forced to resign as the TIA manager amid criticism that it was an Orwellian assault on civil liberties. In his resignation letter, Poindexter wrote, "It would be no good to solve the security problem and give up the privacy and civil liberties that make our country great."

---

(C) 2007 BY NATIONAL JOURNAL GROUP, INC. ALL RIGHTS RESERVED.

# EXHIBIT "M"

3 of 3 DOCUMENTS

Copyright 2006 The Washington Post



The Washington Post

February 5, 2006 Sunday
Final Edition

**SECTION:** A Section; A01

**LENGTH:** 3091 words

**HEADLINE:** Surveillance Net Yields Few Suspects;
NSA's Hunt for Terrorists Scrutinizes Thousands of Americans, but Most Are Later Cleared

**BYLINE:** Barton Gellman, Dafna Linzer and Carol D. Leonnig, Washington Post Staff Writers

**BODY:**

Intelligence officers who eavesdropped on thousands of Americans in overseas calls under authority from President Bush have dismissed nearly all of them as potential suspects after hearing nothing pertinent to a terrorist threat, according to accounts from current and former government officials and private-sector sources with knowledge of the technologies in use.

Bush has recently described the warrantless operation as "terrorist surveillance" and summed it up by declaring that "if you're talking to a member of al Qaeda, we want to know why." But officials conversant with the program said a far more common question for eavesdroppers is whether, not why, a terrorist plotter is on either end of the call. The answer, they said, is usually no.

Fewer than 10 U.S. citizens or residents a year, according to an authoritative account, have aroused enough suspicion during warrantless eavesdropping to justify interception of their domestic calls, as well. That step still requires a warrant from a federal judge, for which the government must supply evidence of probable cause.

The Bush administration refuses to say  --  in public or in closed session of Congress  --  how many Americans in the past four years have had their conversations recorded or their e-mails read by intelligence analysts without court authority. Two knowledgeable sources placed that number in the thousands; one of them, more specific, said about 5,000.

The program has touched many more Americans than that. Surveillance takes place in several stages, officials said, the earliest by machine. Computer-controlled systems collect and sift basic information about hundreds of thousands of faxes, e-mails and telephone calls into and out of the United States before selecting the ones for scrutiny by human eyes and ears.

Surveillance Net Yields Few Suspects; NSA's Hunt for Terrorists Scrutinizes Thousands of Americans, but Most Are Later Cleared The Washington Post February 5, 2006 Sunday

Successive stages of filtering grow more intrusive as artificial intelligence systems rank voice and data traffic in order of likeliest interest to human analysts. But intelligence officers, who test the computer judgments by listening initially to brief fragments of conversation, "wash out" most of the leads within days or weeks.

The scale of warrantless surveillance, and the high proportion of bystanders swept in, sheds new light on Bush's circumvention of the courts. National security lawyers, in and out of government, said the washout rate raised fresh doubts about the program's lawfulness under the Fourth Amendment, because a search cannot be judged "reasonable" if it is based on evidence that experience shows to be unreliable. Other officials said the disclosures might shift the terms of public debate, altering perceptions about the balance between privacy lost and security gained.

Air Force Gen. Michael V. Hayden, the nation's second-ranking intelligence officer, acknowledged in a news briefing last month that eavesdroppers "have to go down some blind alleys to find the tips that pay off." Other officials, nearly all of whom spoke on the condition of anonymity because they are not permitted to discuss the program, said the prevalence of false leads is especially pronounced when U.S. citizens or residents are surveilled. No intelligence agency, they said, believes that "terrorist . . . operatives inside our country," as Bush described the surveillance targets, number anywhere near the thousands who have been subject to eavesdropping.

The Bush administration declined to address the washout rate or answer any other question for this article about the policies and operations of its warrantless eavesdropping.

Vice President Cheney has made the administration's strongest claim about the program's intelligence value, telling CNN in December that eavesdropping without warrants "has saved thousands of lives." Asked about that Thursday, Hayden told senators he "cannot personally estimate" such a figure but that the program supplied information "that would not otherwise have been available." FBI Director Robert S. Mueller III said at the same hearing that the information helped identify "individuals who were providing material support to terrorists."

Supporters speaking unofficially said the program is designed to warn of unexpected threats, and they argued that success cannot be measured by the number of suspects it confirms. Even unwitting Americans, they said, can take part in communications  --  arranging a car rental, for example, without knowing its purpose  --  that supply "indications and warnings" of an attack. Contributors to the technology said it is a triumph for artificial intelligence if a fraction of 1 percent of the computer-flagged conversations guide human analysts to meaningful leads.

Those arguments point to a conflict between the program's operational aims and the legal and political limits described by the president and his advisers. For purposes of threat detection, officials said, the analysis of a telephone call is indifferent to whether an American is on the line. Since Sept. 11, 2001, a former CIA official said,  "there is a lot of discussion" among analysts "that we shouldn't be dividing Americans and foreigners, but terrorists and non-terrorists." But under the Constitution, and in the Bush administration's portrait of its warrantless eavesdropping, the distinction is fundamental.

Valuable information remains valuable even if it comes from one in a thousand intercepts. But government officials and lawyers said the ratio of success to failure matters greatly when eavesdropping subjects are Americans or U.S. visitors with constitutional protection. The minimum legal definition of probable cause, said a government official who has studied the program closely, is that evidence used to support eavesdropping ought to turn out to be "right for one out of every two guys at least." Those who devised the surveillance plan, the official said, "knew they could never meet that standard  --  that's why they didn't go through" the court that supervises the Foreign Intelligence Surveillance Act, or FISA.

Michael J. Woods, who was chief of the FBI's national security law unit until 2002, said in an e-mail interview that even using the lesser standard of a "reasonable basis" requires evidence "that would lead a prudent, appropriately experienced person" to believe the American is a terrorist agent. If a factor returned "a large number of false positives, I would have to conclude that the factor is not a sufficiently reliable indicator and thus would carry less (or no) weight."

Surveillance Net Yields Few Suspects; NSA's Hunt for Terrorists Scrutinizes Thousands of Americans, but Most Are Later Cleared The Washington Post February 5, 2006 Sunday

Bush has said his program covers only overseas calls to or from the United States and stated categorically that "we will not listen inside this country" without a warrant. Hayden said the government goes to the intelligence court when an eavesdropping subject becomes important enough to "drill down," as he put it, "to the degree that we need all communications."

Yet a special channel set up for just that purpose four years ago has gone largely unused, according to an authoritative account. Since early 2002, when the presiding judge of the federal intelligence court first learned of Bush's program, he agreed to a system in which prosecutors may apply for a domestic warrant after warrantless eavesdropping on the same person's overseas communications. The annual number of such applications, a source said, has been in the single digits.

Many features of the surveillance program remain unknown, including what becomes of the non-threatening U.S. e-mails and conversations that the NSA intercepts. Participants, according to a national security lawyer who represents one of them privately, are growing "uncomfortable with the mountain of data they have now begun to accumulate." Spokesmen for the Bush administration declined to say whether any are discarded.

Recent interviews have described the program's origins after Sept. 11 in what Hayden has called a three-way collision of "operational, technical and legal imperatives."

Intelligence agencies had an urgent mission to find hidden plotters before they could strike again.

About the same time, advances in technology -- involving acoustic engineering, statistical theory and efficient use of computing power to apply them -- offered new hope of plucking valuable messages from the vast flow of global voice and data traffic. And rapidly changing commercial trends, which had worked against the NSA in the 1990s as traffic shifted from satellites to fiber-optic cable, now presented the eavesdroppers with a gift. Market forces were steering as much as a third of global communications traffic on routes that passed through the United States.

The Bush administration had incentive and capabilities for a new kind of espionage, but 23 years of law and White House policy stood in the way.

FISA, passed in 1978, was ambiguous about some of the president's plans, according to current and retired government national security lawyers. But other features of the eavesdropping program fell outside its boundaries.

One thing the NSA wanted was access to the growing fraction of global telecommunications that passed through junctions on U.S. territory. According to former senator Bob Graham (D-Fla.), who chaired the Intelligence Committee at the time, briefers told him in Cheney's office in October 2002 that Bush had authorized the agency to tap into those junctions. That decision, Graham said in an interview first reported in The Washington Post on Dec. 18, allowed the NSA to intercept "conversations that . . . went through a transit facility inside the United States."

According to surveys by TeleGeography Inc., nearly all voice and data traffic to and from the United States now travels by fiber-optic cable. About one-third of that volume is in transit from one foreign country to another, traversing U.S. networks along its route. The traffic passes through cable landing stations, where undersea communications lines meet the East and West coasts; warehouse-size gateways where competing international carriers join their networks; and major Internet hubs known as metropolitan area ethernets.

Until Bush secretly changed the rules, the government could not tap into access points on U.S. soil without a warrant to collect the "contents" of any communication "to or from a person in the United States." But the FISA law was silent on calls and e-mails that began and ended abroad.

Even for U.S. communications, the law was less than clear about whether the NSA could harvest information about that communication that was not part of its "contents."

Surveillance Net Yields Few Suspects; NSA's Hunt for Terrorists Scrutinizes Thousands of Americans, but Most Are Later Cleared The Washington Post February 5, 2006 Sunday

"We debated a lot of issues involving the 'metadata,' " one government lawyer said. Valuable for analyzing calling patterns, the metadata for telephone calls identify their origin, destination, duration and time. E-mail headers carry much the same information, along with the numeric address of each network switch through which a message has passed.

Intelligence lawyers said FISA plainly requires a warrant if the government wants real-time access to that information for any one person at a time. But the FISA court, as some lawyers saw it, had no explicit jurisdiction over wholesale collection of records that do not include the content of communications. One high-ranking intelligence official who argued for a more cautious approach said he found himself pushed aside. Awkward silences began to intrude on meetings that discussed the evolving rules.

"I became aware at some point of things I was not being told about," the intelligence official said.

Hayden has described a "subtly softer trigger" for eavesdropping, based on a powerful "line of logic," but no Bush administration official has acknowledged explicitly that automated filters play a role in selecting American targets. But Sen. Arlen Specter (R-Pa.), who chairs the Judiciary Committee, referred in a recent letter to "mechanical surveillance" that is taking place before U.S. citizens and residents are "subject to human surveillance."

Machine selection would be simple if the typical U.S. eavesdropping subject took part in direct calls to or from the "phone numbers of known al Qaeda" terrorists, the only criterion Bush has mentioned.

That is unusual. The NSA more commonly looks for less-obvious clues in the "terabytes of speech, text, and image data" that its global operations collect each day, according to an unclassified report by the National Science Foundation soliciting research on behalf of U.S. intelligence.

NSA Inspector General Joel F. Brenner said in 2004 that the agency's intelligence officers have no choice but to rely on "electronic filtering, sorting and dissemination systems of amazing sophistication but that are imperfect."

One method in use, the NSF report said, is "link analysis." It takes an established starting point  --  such as a terrorist just captured or killed  --  and looks for associated people, places, things and events. Those links can be far more tenuous than they initially appear.

In an unclassified report for the Pentagon's since-abandoned Total Information Awareness program, consultant Mary DeRosa showed how "degrees of separation" among the Sept. 11 conspirators concealed the significance of clues that linked them.

Khalid Almihdhar, one of the hijackers, was on a government watch list for terrorists and thus a known suspect. Mohamed Atta, another hijacker, was linked to Almihdhar by one degree of separation because he used the same contact address when booking his flight. Wail M. Alshehri, another hijacker, was linked by two degrees of separation because he shared a telephone number with Atta. Satam M.A. Al Suqami, still another hijacker, shared a post office box with Alshehri and, therefore, had three degrees of separation from the original suspect.

Those links were not obvious before the identity of the hijackers became known. A major problem for analysts is that a given suspect may have hundreds of links to others with one degree of separation, including high school classmates and former neighbors in a high-rise building who never knew his name. Most people are linked to thousands or tens of thousands of  people by two degrees of separation, and hundreds of thousands or millions by three degrees.

Published government reports say the NSA and other data miners use mathematical techniques to form hypotheses about which of the countless theoretical ties are likeliest to represent a real-world relationship.

A more fundamental problem, according to a high-ranking former official with firsthand knowledge, is that "the number of identifiable terrorist entities is decreasing." There are fewer starting points, he said, for link analysis.

Surveillance Net Yields Few Suspects; NSA's Hunt for Terrorists Scrutinizes Thousands of Americans, but Most Are Later Cleared The Washington Post February 5, 2006 Sunday

"At that point, your only recourse is to look for patterns," the official said.

Pattern analysis, also described in the NSF and DeRosa reports, does not depend on ties to a known suspect. It begins with places terrorists go, such as the Pakistani province of Waziristan, and things they do, such as using disposable cell phones and changing them frequently, which U.S. officials have publicly cited as a challenge for counterterrorism.

"These people don't want to be on the phone too long," said Russell Tice, a former NSA analyst, offering another example.

Analysts build a model of hypothetical terrorist behavior, and computers look for people who fit the model. Among the drawbacks of this method is that nearly all its selection criteria are innocent on their own. There is little precedent, lawyers said, for using such a model as probable cause to get a court-issued warrant for electronic surveillance.

Jeff Jonas, now chief scientist at IBM Entity Analytics, invented a data-mining technology used widely in the private sector and by the government. He sympathizes, he said, with an analyst facing an unknown threat who gathers enormous volumes of data "and says, 'There must be a secret in there.' "

But pattern matching, he argued, will not find it. Techniques that "look at people's behavior to predict terrorist intent," he said, "are so far from reaching the level of accuracy that's necessary that I see them as nothing but civil liberty infringement engines."

Even with 38,000 employees, the NSA is incapable of translating, transcribing and analyzing more than a fraction of the conversations it intercepts. For years, including in public testimony by Hayden, the agency has acknowledged use of automated equipment to analyze the contents and guide analysts to the most important ones.

According to one knowledgeable source, the warrantless program also uses those methods. That is significant to the public debate because this kind of filtering intrudes into content, and machines "listen" to more Americans than humans do. NSA rules since the late 1970s, when machine filtering was far less capable, have said "acquisition" of content does not take place until a conversation is intercepted and processed "into an intelligible form intended for human inspection."

The agency's filters are capable of comparing spoken language to a "dictionary" of key words, but Roger W. Cressey, a senior White House counterterrorism official until late 2002, said terrorists and other surveillance subjects make frequent changes in their code words. He said, " 'Wedding' was martyrdom day and the 'bride' and 'groom' were the martyrs." But al Qaeda has stopped using those codes.

An alternative approach, in which a knowledgeable source said the NSA's work parallels academic and commercial counterparts, relies on "decomposing an audio signal" to find qualities useful to pattern analysis. Among the fields involved are acoustic engineering, behavioral psychology and computational linguistics.

A published report for the Defense Advanced Research Projects Agency said machines can easily determine the sex, approximate age and social class of a speaker. They are also learning to look for clues to deceptive intent in the words and "paralinguistic" features of a conversation, such as pitch, tone, cadence and latency.

This kind of analysis can predict with results "a hell of a lot better than chance" the likelihood that the speakers are trying to conceal their true meaning, according to James W. Pennebaker, who chairs the psychology department at the University of Texas at Austin.

"Frankly, we'll probably be wrong 99 percent of the time," he said, "but 1 percent is far better than 1 in 100 million times if you were just guessing at random. And this is where the culture has to make some decisions."

Surveillance Net Yields Few Suspects; NSA's Hunt for Terrorists Scrutinizes Thousands of Americans, but Most Are Later Cleared The Washington Post February 5, 2006 Sunday

Researcher Julie Tate and staff writer R. Jeffrey Smith contributed to this report.

**LOAD-DATE:** February 5, 2006

# EXHIBIT "N"





For Immediate Release
Office of the Press Secretary
May 16, 2006

## President Bush and Prime Minister John Howard of Australia Participate in Joint Press Availability

East Room

- Official Visit of the Prime Minister of Australia
- In Focus: Global Diplomacy

11:43 A.M. EDT

VIDEO   Multimedia

President's Remarks
view

PRESIDENT BUSH: Thank you, all. It's my honor to welcome the Prime Minister of Australia here to the East Room for a press briefing. I'm going to feed him tonight -- before I feed him tonight, I'm going to feed him to you. (Laughter.)

We just had a really interesting discussion about a lot of issues. First, I admire John Howard's understanding that the war on terror still goes on and that we've got to be steadfast and firm if we intend to succeed in defeating the terrorists.



Secondly, I appreciate very much his understanding and discussions about the way forward in Iraq. We spent quite a bit of time talking about the new government. I described to him as best as I could my feelings about the Prime Minister-designee, who I believe is a firm and decisive person that is going to make a difference in that country's future.

I thanked him very much for the commitment of Australian troops. We of course talked about the Iraqi security forces' capacity to defend themselves. I reported to him that we're pleased with the progress being made, but that the United States will make decisions about our troop levels based upon conditions on the ground.

We talked about Afghanistan. Again, I want to thank the Prime Minister for his support there for this fledgling democracy. We talked about North Korea. We talked about Iran. We talked about a lot. And that's what you'd expect when you're talking to an ally and a friend and a good strategic thinker.

The Prime Minister is capable of not only seeing the problems for today; he's capable of looking down the road. And I appreciate his advice and his judgment on national security matters, as well as in talking about issues like energy and trade. We've got a good relationship with Australia and we intend to keep it that way.

I always remind my friends who talk to me about countries around the world, I say, I can't think of a country more like -- a place more like Texas than Australia. And that's a compliment. (Laughter.) Except for some of these people over here. (Laughter.) The people of Australia are independent-minded, they're smart, they're capable, their hardworking and I really enjoy my relationship with the Prime Minister.

So Mr. Prime Minister, welcome. Thanks for coming and the floor is yours.

PRIME MINISTER HOWARD: Well, thank you very much, Mr. President. Again, can I thank you very warmly for the great hospitality that you have extended to me. It was a real privilege to sit around the Cabinet table and talk to your Cabinet officers, which followed a very extensive discussion between the two of us about all of those issues of which you spoke.

We remain a steadfast ally of the United States in the war against terror. I've made that clear on every occasion I've spoken here in the United States. The war against terror will go on for a long time; I think we have to accept that. Progress is being made. The challenge remains very, very strong and there needs to be a continued commitment. And we admire and respect the leadership given by you and by the United States in that war. And it's a war that confronts us all. Those who imagine that somehow or other you can escape it by rolling yourself into a little ball and going over in the corner and hoping that you're not going to be noticed are doomed to be very, very uncomfortably disappointed.



We did have an opportunity to talk extensively about some of the challenges in our immediate region. And I spoke about the situation in East Timor and the Solomon Islands, and the importance of the role of Indonesia. The symbolism and also the practical consequence of Indonesia being the largest Islamic country in the world, and, therefore, the success and prosperity of moderate Islamic leadership in that country is itself a very important factor in the long-term success of the fight against terrorism, because the fight against terrorism is not only a military and physical one, it is also an intellectual one. And it's a question of providing within the Islamic world a successful democratic model as an alternative to the fanaticism of those who would have seemly invoked the sanction of Islam to justify what they seek to do.

Can I finally say that the many ties that bind Australia and the United States, as I said on the lawn earlier today, and none are more important, of course, than the shared values and the beliefs that both of our countries have that the spread of democracy around the world is an important goal and an important responsibility. It's been a privilege for our two peoples to enjoy democracy in an uninterrupted fashion for so long, that we tend to take it for granted. And we forget its liberating impact on those who taste and experience it for the first time. And both of our societies have a responsibility in expanding the opportunities for democracy, and that, of course, lies very much at the heart of much of what our two societies do.

Mr. President, thank you very, very much for the honor you've done me and the courtesy and friendship that you've extended to me and all of the traveling party. We appreciate it very, very deeply, indeed. Thank you.

PRESIDENT BUSH: Two questions a side. Terry.

Q Thank you, Mr. President. Mr. President, you've said that the government is not trolling through the lives of innocent Americans, but why shouldn't ordinary people feel that their privacy is invaded by the NSA compiling a list of their telephone calls?

PRESIDENT BUSH: What I have told the American people is, we'll protect them against an al Qaeda attack, and we'll do so within the law. I've been very clear about the principles and guidelines of any program that has been designed to protect the American people.

I've also been clear about the fact that we do not listen to domestic phone calls without court approval, and that this government will continue to guard the privacy of the American people. But if al Qaeda is calling into the United States, we want to know, and we want to know why.

For the Australian press friends here, we got accused of not connecting dots prior to September the 11th, and we're going to connect dots to protect the American people, within the law. The program he's asking about is one that has been fully briefed to members of the United States Congress, in both political parties. They are very aware of what is taking place. The American people expect their government to protect them, within the laws of this country, and I'm going to continue to do just that.

PRIME MINISTER HOWARD: Australian press. Mr. Curry.

Q Mr. President, your relationship with Mr. Howard is obviously very close, personally. And I was wondering, first, could you just expand a little on that chemistry? And, secondly, sir, do you think you would be able to work effectively with a future Australian leader, be it either a successor of Mr. Howard from his own party, or from their

opposition?

PRESIDENT BUSH: Well, I suspect he's going to outlast me, so that is a moot point. (Laughter.) Probably a question you ought to ask him. Somebody said, you and John Howard appear to be so close, don't you have any differences? And I said, yes, he doesn't have any hair. (Laughter.)

Look, ours is a world in which sometimes people tell you something and they don't mean it. In order to work together to make difficult decisions -- decisions of war and peace, decisions of security, decisions of trade -- you've got have somebody you talk to that tells you straight up what's on their mind. You know, politics sometimes produces people that will tell you one thing and don't mean it. It's really hard to be making rational decisions if somebody you're talking to just doesn't level with you.

And that's what I like about John Howard. He may not be the prettiest person on the block -- (laughter) -- but when he tells you something you can take it to the bank. He is a reliable partner. And we don't agree on 100 percent, of course. But the interesting thing, talking to John Howard, is that you can trust the man. And that's what is a necessary ingredient to be working together for the common good.

And I also appreciate a person who is capable of standing by a decision. I remember the campaign -- as a matter of fact, your campaign was right before my campaign -- and John Howard stood strong. And I remember telling somebody -- and the polls didn't look all that good, I guess, at one point in time -- and I remember saying to somebody, this man is going to be rewarded at the ballot box because the people of Australia want somebody who is consistently strong, not somebody who tries to waffle around trying to figure out where to end up for political expediency.

People may not agree with his position on every issue, but people have got to agree with the fact that he's a man of conviction. And that's the essence of leadership -- courage and conviction. And so we've got a relationship that is based upon respect, and I respect him. I've seen him in action. I've seen what it means to have him being pressured -- probably by your newspaper. But I've seen him stand strong, and that's what's needed in this world.

Holland, yes.

Q Thank you, sir. On immigration, some worry that the U.S. military is stretched too thin. How effective can these National Guard troops be if they're shuttling in and out of the border area every two or three weeks? And how are you going to turn around these House members who seem to be unswayed by your argument on the guest worker program?

PRESIDENT BUSH: The program to put Guard on the border is one that will enable the Border Patrol to do its job better. It's very important for the American people to know it's the Border Patrol that's going to be on the front line of apprehending people trying to sneak into our country. And the Guard will be doing a variety of functions, which I outlined last night.

Secondly, the Guard is -- the up to 6,000 Guard in the first year of operation really is not going to put a strain on our capacity to fight and win the war on terror, as well as deal with natural disasters. And, of course, we'll be working in conjunction with governors to make sure that that's not the case, that it doesn't put an unnecessary strain on other functions of the Guard.

Thirdly, the Pentagon is briefing today how the program is going to work. There are Guard troops in Arizona and New Mexico and Texas that can be used by the governors down there to work with the Border Patrol, that they'll be reimbursed for. And there's also training missions that can be used to help complement the Border Patrol. We're going to have double the Border Patrol agents since 2001 by 2008. And what the Guard is doing, the Guard is providing an interim service until those Border Patrol agents get stood up.

I made it clear to the country last night that we're not going to militarize our border. Mexico is a friend. But what we are going to do is use assets necessary to make sure that we can assure the American people that the border is secure.

Now in order to secure the border, it's important for people up here in Washington to understand that there's got

to be a temporary worker program. Border security and a temporary worker program are really important because -- let me say, a temporary worker program is really important to border security because we don't want people trying to sneak into the country. It seems rational to me to say if you're coming to work, come to work in a legal way on a temporary basis so you're not trying to sneak across. So the temporary worker program goes hand in hand with border security. In order for there to be a -- in order for us to solve the problem of an immigration system that's not working, it's really important for Congress to understand that there needs a -- that the elements I described all go hand-in-hand.

And so I'll continue to work with them. Look, this is a hard issue for many people.

Q Would you go along with border protection only and a guest worker program --

PRESIDENT BUSH: I said I want a comprehensive bill because I understand there needs to be a comprehensive bill in order to make -- in order for us to achieve the objective.

And the objective is, on the one hand, protect our borders, and on the other hand, never lose sight of the thing that makes America unique, which is we're a land of immigrants, and that we -- we're not going to discriminate against people, that we don't think there ought to be an automatic path to citizenship. That's called amnesty. Amnesty would be wrong. Amnesty wouldn't say that somebody that stood in line legally is -- is mistreated, as far as I'm concerned. Amnesty would mean that more people would try to come and sneak into our country in the hopes that they would be granted automatic citizenship.

But there ought to be a way for somebody to pay a fine or learn English or prove that they've been here for a long time working and be able to get in line -- not the head of the line, but the back of the line -- in order to become a citizen.

You know, there are some in our country who say, let's just deport everybody. It's unrealistic. It may sound attractive to some. You can't deport people who have been in this country for a long period of time -- millions of people that have been here.

And so we've got to be rational about how we move forward. And part of my appeal last night was to say to people, let's don't get so emotional that we forget who we are. We're a land of immigrants, and when we welcome somebody to our country who is here legally, willing to work and willing to realize a dream, it helps restore our soul.

So this is a difficult debate for members. I'm going to continue working with them. Part of my job is to lead, and I did last night. I said, here's how we get to where we need to be.

Q Mr. President, American wheat growers are angry that hundreds of millions of dollars in bribes were paid to Saddam's Iraq to protect Australia's wheat market. Do you share their anger, and do you sympathize with the push on Capitol Hill to investigate this further in America? And Mr. Prime Minister, I'd be interested in your comments on a possible Capitol Hill inquiry into this.

PRESIDENT BUSH: My own judgment is, is that the Howard administration is pretty capable of investigating what took place, and I look forward to seeing the results of the investigation.

PRIME MINISTER HOWARD: For my part, you are aware of what the Australian government has done. Australia is the only country in the world that has responded to the bulk of findings with a public inquiry with the powers of a royal commission. And you are aware that the commission has probably completed its public hearings, and we're likely to have a report by the 30th of June.

What the United States Congress does in relation to this is a matter for the United States Congress. And, clearly, if it decides to do something, then we will respond in the appropriate fashion. But for our part, in Australia, we have been open, transparent that we do not approve in any way, shape or form of the payment of bribes, and if a finding is to that effect, then the full processes of Australian law should be brought to bear. You can't be more transparent than that and I think that is understood in the United States.

But, obviously, just as we have responsibilities within Australia, the legislators of this country, where I'm a guest, have responsibilities in this country. And if it discharges those in a particular fashion the way it thinks it will, that's its right, and we will respond in what is also the appropriate fashion. I don't think I can add anything more to that, and we have been patently transparent and open. And let me just repeat again, Australia is the only country in the world that has established a public inquiry with the powers of the royal commission.

PRESIDENT BUSH: Thank you, sir.

END 12:02 P.M. EDT

**Return to this article at:**
http://www.whitehouse.gov/news/releases/2006/05/20060516-1.html

 CLICK HERE TO PRINT

# EXHIBIT "O"

Department of Justice Seal

# Transcript of "Operation Global Con" Press Conference
# WASHINGTON, D.C.

## May 23, 2006

ATTORNEY GENERAL GONZALES: Good afternoon. I'm joined by Federal Trade Commission Chairman Debra Majoras, Chief Postal Inspector Lee Heath, Attorney General Francisco Dall 'Anese Ruiz of Costa Rica and Chip Burns, Assistant Director of the Criminal Division of the FBI.

Over the past 15 months, United States and foreign law enforcement agencies have targeted international fraudulent mass marketing schemes in the largest enforcement operation of its kind. The results of Operation Global Con have been dramatic with 565 arrests both here and abroad.

We all know the annoyance of phone calls, junk mail and SPAM and pop-up ads that bombard us with seemingly incredible financial offers. For millions of Americans these intrusions have been more than a nuisance. Operation Global Con targeted international mass marketing schemes. These criminals use telemarketing, the Internet and mass mailings to cheat unsuspecting people through bogus investments, fake lotteries, and sweepstakes schemes, phony credit cards and tax frauds.

In Miami, Florida, for instance, two defendants allegedly duped investors in the United States and Europe for more than $3 million. Investors in Discovery Capital believed it to be legitimate because the defendants would occasionally use funds received from new investors to send out purported interest and dividends. Allegedly the rest of the money went to fancy cars and million dollar homes for the defendants.

In the United States alone, law enforcement conducted 96 investigations into this kind of criminal conduct and arrested nearly 140 people. Along the way, nearly 3 million victims have been defrauded of more than $1 billion. We have succeeded by working together with our international allies including authorities in Canada, Costa Rica, the Netherlands and Spain to take down even more criminals abroad. Among other supportive countries have been the United Kingdom, New Zealand and Nigeria.

This close cooperation enabled us to develop virtual task forces. Cutting-edge technology enables us to reduce the actual exchange of personnel typical of international task forces. Our virtual task forces with Costa Rica and the Netherlands provide a new model for bringing international con artists to justice.

In such a massive effort we have many people to thank. From our foreign partners, I'd like to thank the Royal Canadian Mounted Police, the Costa Rica Attorney General's Office, the Costa Rica Judicial Investigation Organization, the Amsterdam Police, the Dutch Public Prosecutor, the Competition Bureau of Industry Canada, the Phone Buster's National Call Center in Canada and our six joint US-Canadian task forces across Canada.

I would also like to thank our American partners, the US Postal Inspection Service, the Federal

Bureau of Investigation, US Immigration and Customs Enforcement and the Federal Trade Commission plus the Diplomatic Security Service, Department of Commerce Inspector General, Internal Revenue Service Criminal Investigation, and Commodities Futures Trading Commission along with 30 US Attorney Offices and the Criminal and Tax Divisions of the US Department of Justice. As you can see, there's been a lot of people working together to address this issue. I want to thank all of our partners, thank all of the agencies involved in this effort as we fight for consumers everywhere.

And now I'd like to turn the podium over to the Chairman of the FTC.

MS. MAJORAS: Thank you, Attorney General Gonzales.

The Federal Trade Commission enforces competition and consumer protection laws to promote a free and vigorous marketplace. The challenges we are facing include fraudulent telemarketers, SPAMmers, and con artists who defying national boundaries strike from anywhere in the world and prey on our US consumers.

We are meeting these international challenges with a robust program that combines our own law enforcement actions with collaborations with law enforcement partners here and around the world. During Operation Global Con, the FTC filed 21 federal court cases against 143 defendants and halted multi-national mass marketing scams that cost American consumers more than $150 million.

We stopped deceptive advance free credit card offers, bogus medical discount card pitches, fraudulent business opportunities and deceptive SPAM. For example, in a case against Call Center Express, we obtained a $13.9 million judgment against scammers who used telemarketing boiler rooms in Venezuela and Guatemala to trick Spanish-speaking Americans into paying advance fees that range from 149 to $299 for non-existing credit cards. The court permanently banned the defendants from marketing any credit products to consumers. They had advertised the cards on television in our country and promised thousands of people that they would have quick access to credit cards regardless of their credit histories. The court permanently banned them and we put them out of business.

And in FTC v. USA Beverages we stopped a business opportunity fraud whose perpetrators were actually in Costa Rica but who used Voice Over Internet Protocol, VOIP as we know it, to make it appear to American consumers as though they were operating from and calling them from within the United States.

Increasingly the key to successfully prosecuting these cross-border frauds is the coordination among law enforcers and the FTC participates in whatever capacity is needed. As part of this effort, for example, an FTC staff attorney was designated as a Special Assistant United States Attorney to assist the Justice Department in the prosecution of the sweepstakes scam based in Costa Rica which the Attorney General just mentioned.

I join Attorney General Gonzales in thanking the Costa Rican authorities for assisting our law enforcement efforts in bringing these perpetrators to justice.

And just last week in FTC v. DataCom Marketing we stopped a Toronto-based operation that may have taken as much as $1 million a month from American business for business directory listings that they neither wanted nor needed. And we worked closely with the US Postal Inspection Service, Canada's Competition Bureau in Vancouver, the Montreal Police and members of the Toronto Strategic Partnership on this investigation of this scam. The Competition Bureau executed search

2

warrants on the defendants' offices and provided the FTC with the ceased documents that we used to support our case. So these results confirm the tremendous benefits that we can get when we work together.

Much enforcement work remains in the area of multi-national mass marketing fraud and we are committed to continuing to root out and shut down these global scammers. I'd like to thank very much all of our law enforcement partners and, in particular, the Attorney General for the work that we have done together with the Department of Justice. Thank you very much.

CHIEF POSTAL INSPECTOR HEATH: Our global economy creates a wealth of opportunity for both the legitimate businesses to offer a wide variety of goods and services to their customers. Mass marketing has evolved through the use of the Internet, telemarketing and direct mail as a highly effective method to reach customers.

And while the vast majority of these solicitations are legitimate, there exists a criminal element which has copied this business model and turned it into a cash machine for unlawful enterprises.

Today we have trumped the criminals with our own business model. Operation Global Con is a reversal of fortune for international swindlers who exploit those who can least afford to bear the loss including older Americans, the disabled, and others who are disadvantaged in our communities. Our model has built an effective partnership of prosecutors, law enforcement, regulators, and international authorities.

The United States Postal Service is the linchpin of a $900 billion mailing industry. This industry thrives on the trust that the American public has in that commerce transacted through the US mail is secure and free from compromise. Postal inspectors are dedicated to preserving this trust in their relentless pursuit of criminals engaged in mail fraud.

As an example of the many successes attributed to Global Con, Postal Inspectors conducted parallel investigations in February of 2006 with the Amsterdam Police. In our operation dubbed Dutch Treat this partnership shuttered an advance fee scheme in the Netherlands that targeted American consumers and individuals from several other countries.

The Nigerian criminal organization behind this scheme defrauded over 200 Americans of more than $1.3 million. The number of victims and losses continues to climb as we delve deeper into the scheme and review additional evidence.

The defendants SPAMmed e-mail accounts claiming that a terminal cancer patient's desire to bequest $55 million to charity was at risk unless the victim would help fund up front legal expenses, taxes and bank fees. In compensation, victims were offered a percentage of the inheritance which never materialized.

Four suspects were indicted on charges of mail fraud, wire fraud, and bank fraud, three of whom were arrested in the Netherlands by Amsterdam Police. The fourth defendant is currently a fugitive. Remarkably more than 20 perspective victims in the United States were saved from losses totally more than a half-a-million dollars when Postal Inspectors and their partners intervened during the investigation.

In another case, Postal Inspectors worked side-by-side with our Costa Rican law enforcement partners in Operation Jackpot which was designed to dismantle an international sweepstakes scheme that targeted thousands of elderly US citizens. Victims lost in excess of $15 million. The criminals led

their victims to believe that they had won hundreds of thousands of dollars but to get their winnings the victims had to pay up-front insurance fees, usually several thousand dollars. The winnings, of course, never came.

Over 20 individuals have been charged with various federal crimes including mail fraud. Within the last several weeks searches and arrests have been carried out in Costa Rica, Florida, Texas and California.

Invaluable assistance has been provided by the US Immigration and Customs Enforcement, the US Department of Commerce, the Federal Trade Commission, the US State Department Diplomatic Security Service and momentarily the Attorney General for the Republic of Costa Rica will provide you with more insight regarding this large-scale investigation which took place in his country.

I hope the victims find a measure of solace in the justice that has been served. These crimes are particularly tragic in that they are preventable. Armed with the right knowledge, most consumers can recognize a fraudulent scheme and make the right decision before they become a victim.

I'd like to thank the Attorney General for his leadership in protecting the American public and acknowledge the outstanding contributions by our international partners from Costa Rica, the Netherlands and Canada and our domestic partners at ICE, the FBI and the FTC. Thank you.

ATTORNEY GENERAL DALL 'ANESE RUIZ: Good afternoon, Attorney General Alberto Gonzales, all the authorities gathered here today and members of the press.

Operation Global Con has allowed Costa Rican law enforcement officers, prosecutors and judges, this around 160 personnel, to perform in a coordinated effort to work with their counterparts in the United States to combat international mass marketing fraud schemes. This criminal activity was based in San Jose, Costa Rica, but the illegal effects were felt by US citizens.

With this operation we were able to arrest five suspects, confiscate approximate 300,000 US dollars and obtain a great amount of evidence. On the other hand, our police have shown good preparation and performance and I must congratulate our Director General of the OIG, Mr. Jorge Rojas who is also here with us today.

If we have to repeat this joint work to look for more suspects or to combat other types of crimes, we will be more than happy to do it. Let this commitment be clear and a firm message to all international criminals to resign from the idea to establish their criminal networks in Costa Rica because there they will not find their way to evade from other countries the justice from other countries like in this case from the United States.

ATTORNEY GENERAL GONZALES: Okay. Questions?

QUESTION: Judge Gonzales, yesterday you told us that you were going to allay the concerns of Members of Congress about the search that was conducted on Capitol Hill over the weekend. And apparently, if I may say so, sir, it appears that those efforts so far have failed somewhat.

The Speaker of the House says that it was done in the wrong way. And the Majority Leader says, "I wonder whether anybody at the Justice Department has looked at the Constitution lately." Those are members of your own party, sir.

I'm wondering if you have something more that you can tell them today publicly that would alleviate

their concerns about a possible violation of the separation of powers.

ATTORNEY GENERAL GONZALES: We are in discussions privately about what can be done to alleviate the concerns. I obviously, personally, and the Department collectively, we have a great deal of respect for the Congress as a co-equal branch of government, as a separate and independent branch of government and, obviously, are sensitive to their concerns. As I indicated yesterday we are working to try to address those concerns. We have had discussions with the House. Those began last night. We hope to have discussions today to continue working on this.

We respectfully, of course, disagree with the characterization by some. We believe, of course, that we have been very careful, very thorough in our pursuit of criminal wrongdoing and that's what's going on here. We shouldn't lose sight of the fact that the Department of Justice is doing its job in investigating criminal wrongdoing. We have an obligation to the American people to pursue the evidence where it exists.

Obviously, of course, there are additional considerations in this particular case. We want to continue to try to work with the Congress to alleviate the concerns. I talked about yesterday this being a unique step in response to a unique set of circumstances. It is true it has never been done before. The reason it has never been done before is not because there's never been corruption in the Congress unfortunately, as there has been corruption in the Judiciary Branch and corruption in the Executive Branch unfortunately. The reason it has never been done before is because we have before been able to reach an accommodation, to reach an agreement to receive the evidence that we need to prosecute wrongdoing through a subpoena. For a variety of reasons, that could not occur here. We worked very hard over a period of time to get the information, the evidence that we felt was important to a criminal investigation.

At the end of the day, the decision was made that this was absolutely essential to move forward with that investigation. But, again, we understand the sensitivity of this matter and we are going to continue to work with the Congress, to speak with the leaders in the Congress so that we can allay their concerns.

QUESTION: Attorney General Gonzales, as long as we are talking about something different, the VA matter, are you concerned that the Justice Department, the FBI was notified so long after this data went missing and in essence you came to the trail when it was cold?

ATTORNEY GENERAL GONZALES: What I will say about that is that as soon as we were notified of the problem we immediately sprang into action. As soon as I was advised by Secretary Nicholson, I called the FBI Director and directed that we put whatever resources was necessary to address this issue. And so I am focusing on what we can do moving forward to successfully conclude this investigation and specifically questions about what may have happened in the past before all that, I will defer to the VA.

QUESTION: I'd like to just follow up on that. Is there any reason to think that this material is in the hands of someone who would exploit for identity theft? Or, contrariwise, is there any evidence to think it's been thrown away or never will be put to that purpose?

ATTORNEY GENERAL GONZALES: We just do not know. We just do not know. We have no reason to believe that people understand that the thieves understand what kind of information that they have and whether or not they have taken advantage of that. We do not know whether or not they have thrown away, you know, the information. We just do know, but we did feel that out of respect and in deference to our veterans that this was something that we needed at least make them aware of and to

take appropriate steps to prevent themselves from becoming victims of those who would want to steal their identity.

QUESTION: Attorney General Gonzales, can you tell us when you were notified?

ATTORNEY GENERAL GONZALES: As I talked about yesterday -- do you mean in terms of when the theft occurred?

QUESTION: Yes.

ATTORNEY GENERAL GONZALES: I will give out that information at the appropriate time. I talked about the fact that we want to be as forthcoming as we can about the information. I know there has been some information in the media, some confirmed, some not confirmed. I am not comfortable at this time to talk about specific facts without talking to my investigators to ensure that I am not going to say something that inadvertently somehow screws up an investigation or disrupts or harms an investigation would be a better term of saying that.

QUESTION: Attorney General, I would just like to get back to the subject at hand here, but your own numbers on this indicate a rather slim conviction rate to say the least. None in Spain. None in the Netherlands. None in Costa Rica. Twenty percent in Canada. Forty percent in the United States. Dealing with all those other countries, namely, Canada which has been a huge irritant I know for US Attorneys when it comes to cross-border crime of this type where the average sentence in a Canadian court is about two to three months for committing this type of crime. Have you transmitted your concerns to either the Dutch government, the Canadian government, your friend from Costa Rica, about the nature of the fact that justice systems in other countries do not seem to recognize the seriousness of the crimes.

ATTORNEY GENERAL GONZALES: Listen, I do recognize that we are dealing with justice systems that are different from the United States. They have different crimes, different penalties and different sentences. We have to respect that. We also, of course, have to deal with the issue of extradition in some cases, sharing of information. So these are challenges that exist not just with respect to these kinds of crimes but with respect to all kinds of crimes such as terrorism and child pornography and trafficking for example.

To answer your question, yes, we have had discussions -- I have not had direct discussions with my colleague here about this specific issue; but, of course, I often have discussions with my counterparts overseas about the challenges that exist because of the differences in our laws and what can we do to accommodate those differences. In some cases take advantage of differences.

Believe me, we have had numerous conversations about this. We understand the challenges that exist because of our different legal systems and different sentencing regimes.

QUESTION: Just to follow up on that one. Let's take Canada specifically. Have you put in a request of the Canadian authorities to have the perpetrators in Canada extradited to the United States --
ATTORNEY GENERAL GONZALES: I do not know if there has been a specific extradition request but we can certainly give you that information with respect to Canada.

Yes, sir?

QUESTION: Attorney General Gonzales, I was wondering if you could explain why the administration felt that it was necessary to collect the telephone detail records from the phone

companies in your anti-terror -- the President has addressed this in a limited way, but I wondered if you could.

ATTORNEY GENERAL GONZALES: There has been no confirmation about any details relating to the USA Today story. Now, the President has confirmed that with respect to domestic collection, none of that is occurring in the United States without a court order. He has also indicated that we understand we have legal obligations in terms of collection of certain kinds of information. And those legal obligations are being met.

I will say that what was in the USA Today story did relate to business records. As some of you may know the US Supreme Court I believe in 1979 in Smith vs. Maryland held that those kinds of records do not enjoy fourth amendment protection. There is no reasonable expectation of privacy in those kinds of records.

There is a statute that deals with -- there is a statutory right of privacy but that statute recognizes that with respect to business records there are a multiple number of ways that the government can have access to that information, to business records and, of course, the government such as the FBI can issue national security letters and obtain them through those means. There are a number of legal ways, of course, that the government can have access to business records.

Yes, sir?

QUESTION: Attorney General, in terms of the 2.8 million victims, any idea how many of those may be from other -- are the majority of them from the United States? Or are there victims in Canada and the other countries as well?

ATTORNEY GENERAL GONZALES: Well, the 2.8 million victims are here in the United States and obviously there are other victims in other parts of the world. I do not know what those numbers would be nation by nation. I do not know whether or not -Any idea Madam Chairman? We can get that information for you.

QUESTION: I have a question. Can you illuminate the specific criminal cases found in Costa Rica and the name of the criminal organization?

THE INTERPRETER: He is not allowed to go and give out any particular information related to the ongoing investigations in Costa Rica. He did say that they have been able to identify approximate 200 Costa Ricans that were involved in this operation, but they are not allowed to go into particular details.

QUESTION: Judge Gonzales, as long as we are talking about the concerns of veterans and lawmakers today and everybody who owns a telephone, can you tell us about the concerns that were raised after your remarks on Sunday where it appeared that you were burning to jail journalists for receiving and publishing classified information.

ATTORNEY GENERAL GONZALES: I am glad you asked this question.

QUESTION: Did you really foresee approving cases like that going forward of prosecuting journalists?

ATTORNEY GENERAL GONZALES: I was responding to a question about is there a possibility, is there a statute that would seem to allow the prosecution and the publishing of certain kinds of

classified information. And such a statute exists. So the possibility is there. But let me just, let me try to reassure journalists. My primary focus quite frankly is on leakers who share the information with journalists and, of course, I would much prefer to deal directly with responsible journalists and try to persuade them that writing or publishing a story that jeopardizes or compromises national security, secret programs of the United States which been very effective in protecting America against terrorist groups like al Qaeda that it would be better not to publish those kind of stories.

I would prefer, much prefer to work with the press and try to prevent those kinds of stories from running as opposed to doing something else.

STAFF MEMBER: Last question.

QUESTION: If I may ask a question for both you and the FTC CHAIRMAN? Are you surprised that so many people fell for these scams, some of which seemed to be pretty obviously phoney?

CHAIRMAN MAJORAS: No. I am afraid that surprise went away right after I took this job. The fact of the matter is that those who prey on consumers know their vulnerabilities. They know their audience. They know who to go after. So, for example, take the phoney credit card scam on the Spanish-speaking Americans. What the scammers know is that many of these Spanish-speaking Americans are new to our country, do not have an established credit rating here in our country. And so they may fall for, "Hey, it doesn't matter whether you have a good credit record. We'll give you a credit card anyway." They want to establish a financial life here in the United States, so they want that and so you might know that it is too good to be true, but these folks are learning and there is a vulnerability there. And that is what we find time and time again with scammers. They zero in on those who will actually believe them.

Weightloss fraud is a huge one that you know we deal with at the FTC. And you think to yourself, "How on earth can anyone believe that if you rub this cream all over you body and go to sleep that you are going to lose weight by morning?"

And yet diet and exercise is really hard and people want to believe that something else will help them to lose weight. So we take it as it comes and we try to protect consumers. If it is deceptive, we want to go after it.

ATTORNEY GENERAL GONZALES: Thank you everybody.

<div align="center">###</div>

8

# EXHIBIT "P"

1 of 1 DOCUMENT

Copyright 2006 National Public Radio (R)
All Rights Reserved
National Public Radio (NPR)

**SHOW:** All Things Considered 9:00 PM EST

May 17, 2006 Wednesday

**LENGTH:** 1439 words

**HEADLINE:** Senate Intelligence Chair Readies for Hayden Hearings

**ANCHORS:** MICHELE NORRIS, MELISSA BLOCK

**BODY:**

MICHELE NORRIS, host:

From NPR News this is ALL THINGS CONSIDERED. I'm Michele Norris.

MELISSA BLOCK, host:

And I'm Melissa Block.

Tomorrow the Senate Intelligence Committee will take up the nomination of General Michael Hayden to head the CIA. And he's sure to face many questions about domestic monitoring programs put in place when he headed the National Security Agency. Senator Pat Roberts, Republican of Kansas, chairs the Intelligence Committee and he'll be chairing tomorrow's hearing.

Senator Roberts, welcome.

Senator PAT ROBERTS (Republican, Kansas): Thank you very much. My privilege.

BLOCK: You've been in a closed door briefing today about those NSA monitoring activities. I wonder if you've gotten any new information. Anything you didn't know before?

Senator ROBERTS: Well, number one I would call it a surveillance capability. I don't want to get real picky with words, but --

BLOCK: You don't like the word monitoring?

Senator ROBERTS: Well, if you say monitoring that gives the impression that the government is actually listening to the content of the calls and that's not correct. If you do that in terms of a phone call from a U.S. phone number to the U.S. you have to get a court order and all of that, so.

At any rate, I think our briefing went very well. As you may know, originally we started out with only two members of the Intelligence Committee on the House and Senate and the leadership. That was called a gang of eight. And that was done for years and years and years.

Senate Intelligence Chair Readies for Hayden Hearings National Public Ra

We do now have a very different situation with the terrorist war and the terrorist threat that is ongoing. And we have a very capable system that is able to detect and deter and stop these terrorist attacks. And so consequently, we felt it was important we move from two to five to seven. We had a subcommittee that was scrutinizing this program and doing oversight.

It was my feeling that it was very important to expand that to the full committee so that we could tell the American public yes, we're doing our oversight. Yes, we're doing our constitutional responsibility. Yes, we are scrutinizing the program.

BLOCK: Let me clarify, because it seems we're talking about two different programs. One of which does involve monitoring. It involves domestic calls to numbers overseas back and forth. The other has to do with the collection of phone records, which did not involve monitoring.

Regardless, I wanted to ask you about a comment from your colleague Republican Senator Arlen Specter, who made the point over the weekend that there has been no meaningful Congressional oversight of these programs. Do you agree?

Senator ROBERTS: No, I don't. Arlen has not been read into the operational details of the program. I have ever since the inception of the program, along with Senator Rockefeller and along with our two counterparts in the House and along with the leadership. If you attend these briefings, and there have been many of them, and you ask tough questions and you get the answers that you want back, or if you don't, you go back and you ask another question and you make sure of it, I don't know what part of oversight that is not.

Basically, that was expanded so that we had a seven member subcommittee. We've had, what, three or four hearings, numerous briefings. We've actually gone out and seen the program at work. We visited with the people who run it. I don't know of any program that is more scrutinized than this one, so we have had oversight. Senator Specter has not been read into the operational details and so I think that is his concern.

BLOCK: You're saying that you are read into it. I'm curious then if you're saying that you have had oversight directly of the program as has been reported, under which the NSA has collected millions of phone records of domestic calls.

Senator ROBERTS: Well, basically, if you want to get into that, we're talking about business records. We're not, you know, we're not listening to anybody. This isn't a situation where if I call you, you call me, or if I call home or whatever, that that conversation is being listened to.

BLOCK: But those records are being kept and turned over to the government?

Senator ROBERTS: I really can't comment on the details of the program. I can just tell you that basically what we have is a very highly minimized military capability to detect and deter and stop terrorist attacks and that's precisely what it does. My worry is with all of the leaks and all the misinformation about the program, some of which I really can't set the record straight or where I can't set the record straight because it is classified, really worries me.

We could lose this program. The fact that we have not had a major attack since 9/11 and the fact we've been able to stop attacks I think is very significant. And we could lose the program. And I think America would be less safe.

BLOCK: I'd like to ask you a question about the legality here. In your view is basic phone information, in other words, the phone numbers that I've dialed from my telephone at home to somebody else in the United States, is that protected? Or does the government have a right to know about that without a warrant?

Senator ROBERTS: All right. We've got a Smith vs. Maryland Supreme Court case indicating that it should come as no surprise that law enforcement officials and intelligence analysts use what's called business records to prosecute

crime or to try to protect the country from terrorists. We do that with child pornographers, with, you know, drug dealers, with the mafia and with terrorists.

And the Supreme Court held that those records do not come under the protection of the Fourth Amendment, which is the civil liberties provision. What we did today by adding in the eight members of the committee, that means 15 members on the Senate side and I think they have over 20 on the House side, plus the leadership.

We have a much greater number of members who are now fully briefed into the operational details of the program. If they have any questions about the legality of the program, obviously they will be asking those questions. I was satisfied from the first that the president does have that authority under his executive ability to protect the nation during a time of national security, a threat to our national security.

BLOCK: But Senator Roberts, you know it's a very different thing to say it's ok to monitor one guy whom we suspect of child pornography, it's another thing to do a blanket search or data mining of millions and millions of people.

Senator ROBERTS: Oh, we're not data mining and I can't really get into the specifics of what the program is about and that's what you're trying to get me to do and it's classified and I don't, I trust the American people. I would like to make every aspect of this program public to the American people, but when you do that, it is no longer classified and you're making it public to al- Qaida. And that's something we can't do.

If you're going, you have to balance basically national security against civil liberties and what we stand for. Now, I'm an old journalist or an old newspaper man. I strongly believe in the First Amendment and I certainly believe in the Fourth Amendment.

But the way the program works, I can't comment on that. I can't comment on the accuracy in regards to the articles in the New York Times or the USA Today. But I can tell you that I do believe the program is legal. I do believe that the president does have the authority to act in this particular case to protect our national security and I do think there is, there are quite a few legal precedents. I don't want to get into citing all those for the listeners. That would take, you know, much too much time.

BLOCK: Let me ask you briefly, when General Hayden comes before you committee tomorrow for a confirmation hearing, do you feel, going into that hearing, that he's the right man for the job, to head the CIA?

Senator ROBERTS: Well, I think you're really starting to focus on what we ought to be focusing on, the committee, as opposed to the capability we have to stop terrorists. And that is basically, is he qualified? Does he have the experience? When he goes to the CIA, if he is confirmed, will he be able to continue to make the transitional changes that we need to make in the intelligence community, more especially in the CIA, without really becoming an enemy of the institution?

And there are a lot of aspects to that. I don't know of anybody that has more professional experience in intelligence in the Washington area than General Hayden.

BLOCK: Senator Pat Roberts, Republican of Kansas, is Chairman of Senate Intelligence committee.

LOAD-DATE: May 18, 2006

# EXHIBIT "Q"

 

# Congress To Be Briefed On NSA

**NEW YORK, May 16, 2006**

**(CBS/AP)** The Bush administration will brief the full House and Senate Intelligence Committees in Congress on the National Security Agency's controversial surveillance activities, reversing course after five months.

The sessions scheduled for Wednesday afternoon on Capitol Hill were to be led by the NSA's director, Lt. Gen. Keith B. Alexander, and were sure to focus on the ultra-secret agency's efforts to monitor domestic calls when one party is overseas and suspected of terrorism, as well as the agency's efforts to collect records on ordinary Americans' calls.

The briefings were coming less than 24 hours ahead of the opening of confirmation hearings for Gen. Michael Hayden, nominated to head the CIA. He was set to appear Thursday before the Senate Intelligence Committee.

It seems the White House is hoping to alleviate tensions surrounding Hayden's nomination. As **CBS News correspondent Gloria Borger** reports, if you ask questions in a private classified briefing, you cannot ask them again in an open hearing.

Sen. Pat Roberts, R-Kan., the Intelligence Committee chairman, said it became apparent that his entire committee needed to understand the NSA program in advance of having a full hearing on Hayden, who headed the NSA from 1999 until 2005.

"There was no way we could fulfill our collective constitutional responsibilities without that knowledge," Roberts said.

Roberts tells **Borger** that the NSA was looking at the phone calls collected during the surveillance, but he said not at the content, just at the pattern of phone calls.

Previously, only select members of the House and Senate intelligence committees were briefed in detail on the program. Democrats have been pressing the White House to provide the information to the full committees since December, saying that to do otherwise was a violation of the 1947 National Security Act.

"The White House, for the first time, is showing signs that they are serious about oversight of this program," said West Virginia Sen. Jay Rockefeller, the intelligence committee's top Democrat.

Rep. Jane Harman, D-Calif., Rockefeller's House counterpart, said: "It's a shame that it took an endangered nomination to make this happen."

Also on Wednesday, a federal judge ruled that secret documents that allegedly detail the surveillance of AT&T phone lines under the Bush administration's domestic spying program **can be used in a lawsuit against the telephone giant**, but the records will remain sealed.

Meanwhile, Verizon Communications Inc. says it did not give the government records of millions of phone calls, joining fellow phone company BellSouth in disputing key assertions in a USA Today article.

The denials leave open the possibility that the NSA requested customer calling data from long-distance companies like AT&T, Sprint and MCI in 2001, but not from companies that were mainly local phone companies, such as Verizon.



**Read Verizon's Statement**
**Read BellSouth's statement**

President Bush, however, insisted Tuesday that no domestic phone calls were ever listened to without a warrant, **CBS News correspondent Jim Stewart** reports.

"This government will continue to guard the privacy of the American people," Mr. Bush said at the White House. "But if al Qaeda is calling into the United States, we want to know. And we want to know why."

Mr. Bush declined to specifically discuss the compiling of phone records, or whether that would amount to an invasion of privacy.

Verizon has not provided customer call data to the NSA, nor had it been asked to do so, the company said in an e-mailed statement Tuesday.

The statement came a day after BellSouth Corp. issued a similar denial.

"One of the most glaring and repeated falsehoods in the media reporting is the assertion that, in the aftermath of the 9/11 attacks, Verizon was approached by NSA and entered into an arrangement to provide the NSA with data from its customers' domestic calls," the statement read.

Verizon's denial did not apply to MCI, which Verizon acquired in January this year. In an earlier statement, Verizon said it is in the process of ensuring that its policies are put in place in the former MCI business.

A story in USA Today last Thursday said Verizon, AT&T Inc. and BellSouth had complied with an NSA request for tens of millions of customer phone records after the 2001 terror attacks. The report sparked a national debate on federal surveillance tactics.

White House press secretary Tony Snow was asked about the phone record issue on **CBS News' *The Early Show*** Wednesday.

"You're assuming that program exists, and we neither confirm nor deny it," Snow said.

"There seems to be some controversy with the phone companies, all of whom have now said they don't do this sort of thing. ... Now USA Today is having some difficulty with the story itself."

The USA Today story cited anonymous sources "with direct knowledge of the arrangement."

"We're confident in our coverage of the phone database story," USA Today spokesman Steve Anderson said.

Verizon's statement suggested that USA Today may have erred in not drawing a distinction between long-distance and local telephone calls.

"Phone companies do not even make records of local calls in most cases because the vast majority of customers are not billed per call for local calls," Verizon said.

Intelligence analysts suggest that it's the long-distance calls and the international calls that the government has the most interest in,**Stewart** reports. But what's not clear is whether the NSA relies on the phone companies to provide them with that kind of information, or whether it has the ability to just tap into it itself.

The denials by Verizon and BellSouth leave AT&T as the sole company named in the USA Today article that hasn't denied involvement. On Thursday, San Antonio-based AT&T said it had "an obligation to assist law enforcement and other government agencies responsible for protecting the public welfare," but said it would assist only as allowed within the law.

AT&T spokesman Michael Coe said Tuesday the company had no further comment.

The other major long-distance company, Sprint Nextel Corp., has issued a statement similar to AT&T's.

©MMVI, CBS Broadcasting Inc. All Rights Reserved. This material may not be published, broadcast, rewritten, or redistributed. The Associated Press contributed to this report.

> **Feedback**  > **Terms of Service**  > **Privacy Statement**

# EXHIBIT "R"



THE WHITE HOUSE
PRESIDENT
GEORGE W. BUSH

For Immediate Release
Office of the Press Secretary
May 16, 2006

## Press Briefing by Tony Snow

James S. Brady Briefing Room

12:30 P.M. EDT

MR. SNOW: I feel so loved.

Q Welcome to the White House Press Office.



Press Briefing
view

MR. SNOW: Thank you very much. Well, it's good to be here. Thank you one and all.

Very quickly, as you know, President Bush today met with Prime Minister John Howard of Australia. The two of them shared their thoughts about the global war on terror. They have taken your questions. And they had very warm and cordial meetings, as they look forward.

Also, a scheduling note, of which I'm sure many of you are aware: We had placed on the schedule a bipartisan meeting with members of the United States Senate regarding the immigration bill. That has been canceled, for the simple reason that members of the Senate are today working on the immigration bill. And since that was one of the chief action items -- the chief action item in the President's speech last night, he thought it best not to get in the way of the United States Senate as it continues to do that business.



And with no further ado, we'll take questions. Terry.

Q In his news conference with John Howard, was the President giving kind of a back-handed confirmation of the stories that the NSA is compiling telephone --

MR. SNOW: No, he wasn't. If you go back and listen to the answer he gave you, he was talking about foreign-to-domestic calls. The allegations in the USA Today piece, which we'll neither confirm or deny, are of a different nature. So, no, he was not giving a back-handed confirmation.

Q Well, he said they're very aware of what is taking place, and he said the question he's asking about has been fully briefed to members in the United States Congress.

MR. SNOW: Well, what he's talking about is that all intelligence matters conducted by the National Security Agency -- and we've said this many times -- have been fully briefed to a handful of members of the Senate Intelligence and House Intelligence Committees and to the leadership.

Q So he's neither confirming or --

MR. SNOW: He's not -- no, you're not getting any advance on previous news on that question.

Q -- the President talked last night about a rational middle ground dealing with 11 to 12 illegal immigrants who are here --

MR. SNOW: -- 11 million to 12 million.

1

Q -- 11 million to 12 million. What he calls a rational middle ground you know well conservatives, particularly in the House, who have passed a very tough bill on this the President presumably doesn't like -- they call that amnesty. Now, what specifically is the President going to do to breach this divide?

MR. SNOW: I think -- look, one of the things that's interesting is a lot of people have reacted to the President's proposal without having had time to evaluate it. This is an enormous and a complex series of proposals, and anybody who went to the briefing today in 450 I think gets an appreciation of that.

House members have expressed a number of differing concerns, and different House members have expressed those concerns. I think the most important thing to say is that the President is looking for a practical way, consistent with the American spirit, to make sure that we handle border security, we handle interior security, that we go ahead and deal with a number of the chief concerns on immigration that we have always had. And what he's really -- he's going to wait for members of the House of Representatives to have a chance to look over the proposal.

I'll give you an example. A lot of talk about border security. Under the President's proposal, over the span of the President's proposal, he would commit more Border Patrol agents and more assets to the border than even the House of Representatives have proposed, itself. I think that addresses that specific concern.

And I think as the conversations continue, members of the House are going to be able to express themselves, but the President was speaking last night to the American people about an issue that is of enormous importance to him. You see it every time he talks about it. This is an issue for which he has real passion, and he's decided that in this issue, he is going to demonstrate leadership by saying exactly what he wants. That's what he did last night.

Q But what he said today was, "Let's not get emotional about this and forget who we are."

MR. SNOW: Right.

Q Is that what we should look for? Because these aren't new issues, Tony, and the House knows what everybody is talking about, which is a path toward citizenship for those who are here illegally, and they don't like it. It's not just about border security, they're saying that that's amnesty. The definition has not changed in their minds over time, they don't have to read the President's speech to learn about it.

MR. SNOW: Well, what's interesting here is I -- don't leap to conclusions, David, about what the House of Representatives is likely to do. Amnesty, at least to me, means, as it did in 1986, all sins are forgiven, you've got a clean slate, go about your business. In this particular case, what -- the President is taking issue with the description of amnesty for a pretty good reason. He said, you will pay fines, you will have a criminal penalty; you will also have to pay taxes; you will also have to keep your nose clean, you can't break the law; you will also have to stay continuously employed. During that time, you will have to pay your taxes, you will have to have a secure, tamper-proof identification. And when all of that is done, you get to go to the back of the line, and you wait, what, 11 years or more for a chance to become a citizen, at the end of which you have to have a command of English, as well, to be able to become a citizen.

Now, with all those benchmarks, it is hard to square that with the idea of amnesty. You've got a lot of things you have to do, and in addition, the people who would qualify under that would still have to pay all the fees and go through all the steps that those who otherwise have placed themselves in line to become citizens, that they've had to go through.

Jim.

Q The President -- just to follow on this -- that still doesn't address the issue that these people are here illegally, according to people in the House who wanted to --

MR. SNOW: Well, they are here illegally. The President acknowledged that.

Q So what specifics is the President offering? He attempted to reach out to both wings of this debate, and in doing so, he's put himself in a middle course. Now, hasn't he attached all of his political capital to an issue that

may very well be DOA? And what specifically is he giving the House to move the issue?

MR. SNOW: Well, again, what the President is trying to do -- it's a middle course, but it's also -- it's a leadership course. If the President wanted to appeal to certain basic political constituencies, maybe he would have given a different kind of speech. But what he gave is a speech he believes outlines the proper parameters of a reasonable, practical -- and solution that is also consistent with American ideals. The President often talks, for instance, about what immigration has done historically for the United States.

He understands that we have a problem. We've got 11 million or 12 million people here illegally. But as he noted last night, you can't round them all up and deport them. What do you do? You look for a practical -- as he described it, a rational middle ground for dealing with that problem. And that is something the practicalities of which are very complex, and he hopes to work it out both with the House and the Senate.

And interestingly enough, you will find that some of the people that you've already described have said, no, we never intended to deport everybody. That's not what we're talking about at all. I believe what the President did was lay down benchmarks that now invite both parties and both houses of Congress to roll up their sleeves and get working to try to get something done.

Q The President today denied he'd ever broken the law in terms of wiretaps. He also indicated that anything that was looked into, any calls, had some sort of foreign aspect either to or from. And he has said he's always obeyed the law. Are all of these stories untrue that we've been reading for the last several days that millions of Americans have been wiretapped?

MR. SNOW: Well, let's --

Q Are the phone calls turned over to the government?

MR. SNOW: Okay, let's try to segregate the stories here. What he's said about the terror surveillance program is that these are foreign-to-domestic calls and they were all done within the parameters of the law. He has not commented on the --

Q He, himself, has said he didn't obey that law.

MR. SNOW: No, he didn't. What he said is that he has done everything within the confines of the law. The second thing is, you're mentioning a USA Today story about which this administration has no comment. But I would direct you back to the USA Today story itself, and if you analyze what that story said, what did it say? It said there is no wiretapping of individual calls, there is no personal information that is being relayed. There is no name, there is no address, there is no consequence of the calls, there's no description of who the party on the other end is.

Q Privacy was breached by turning over their phone numbers.

MR. SNOW: Well, again, you are jumping to conclusions about a program, the existence of which we will neither confirm, nor deny.

Q Why? Don't you think the American people have a right to know --

MR. SNOW: Because -- what's interesting is, there seems to be a notion that because the President has talked a little bit about one surveillance program and one matter of intelligence gathering, that somehow we have to tell the entire world we have to make intelligence gathering transparent. Let me remind you, it's a war on terror, and there are people -- I guarantee you, al Qaeda does not believe --

Q He doesn't have a right to break the law, does he?

MR. SNOW: No, the President is not talking about breaking the law. But al Qaeda doesn't believe in transparency. What al Qaeda believes in is mayhem, and the President has a constitutional obligation and a heartfelt determination to make sure we fight it.

Q -- to obey the Constitution --

MR. SNOW: Absolutely right.

Q -- the Fourth Amendment --

MR. SNOW: Absolutely right, and he believes in obeying it.

Martha.

Q You might repeat the same thing, but why not declassify this? I mean, the President did talk about the surveillance program a day after The New York Times broke that story. This would seem to affect far more people, and it did sound like the President was confirming that story today. He was answering Terry's question --

MR. SNOW: Well, if you go back -- if you go back and you look through what he said, there was a reference to foreign-to-domestic calls. I am not going to stand up here and presume to declassify any kind of program. That is a decision the President has to make. I can't confirm or deny it. The President was not confirming or denying.

Again, I would take you back to the USA Today story, simply to give you a little context. Look at the poll that appeared the following day. While there was -- part of it said 51 percent of the American people opposed, if you look at when people said, if there is a roster of phone numbers, do you feel comfortable that -- I'm paraphrasing and I apologize -- but something like 64 percent of the polling was not troubled by it. Having said that, I don't want to hug the tar baby of trying to comment on the program -- the alleged program -- the existence of which I can neither confirm nor deny.

Q But there are polls that show Americans are very concerned about it.

MR. SNOW: The President -- you cannot run a security -- you cannot base national security on poll numbers. As the President of the United States you have to make your own judgments about what is in the nation's best interest.

Q You just brought it up, though.

MR. SNOW: Well, I did bring it up because what you were talking about is how people were concerned about privacy issues, and I tried to relate to you what happened. It was interesting, when people were given the specifics in that story, they did not seem to be terribly troubled.

Q We are now.

MR. SNOW: Well, that may have more to do with the way it's being spun than the way it's actually -- go ahead.

Q The news coming out today is as part of the incentives for Iran to cease its enrichment program, that Britain, France and Germany are prepared to offer Iran a light-water reactor. Has the United States signed off on this program? What do you think about that?

MR. SNOW: The United States has been pretty consistent in saying that Iran needs to renounce nuclear ambitions when it comes to a nuclear weapon. We have also said repeatedly that peaceful civil uses of nuclear power for electricity generation, that's perfectly appropriate. The key here is if Iran agrees to the stipulations that the United States and the international community have made -- which is to back away from any potential nuclear -- the creation of nuclear weapons -- that's a development we would welcome.

Q So you support the light-water reactor?

MR. SNOW: I think the United States -- let me just make it very general -- the United States is aware of and supports the continuing efforts of the EU3 to work -- am I getting it wrong? Okay. Thank you very much. In any event, the EU3 to make sure that Iran does, in fact, pursue peaceful, and strictly peaceful, applications of

nuclear power should it do so.

Q Do you have any reaction to Governor Schwarzenegger's comments that the border state governors were not consulted about the President's immigration proposal, about the troops on the border, and that they don't like the idea?

MR. SNOW: Well, governors are going to have different opinions. And I think also, as people again begin to be read into the program, let's see what they have to say. Obviously, we take seriously what Governor Schwarzenegger has to say about the issue. There was consultation on the staff level, and I guarantee you there will be consultation on the principals level, as well.

Give you another example. Governor Richardson of New Mexico has been saying that he would like to see more Border Patrol agents placed on the border. Well, guess what -- that's the heart and soul of the President's proposal.

So I think what's going to happen is that there will be continued dialogue with the governors and with staffs. You've got to keep in mind that as the Commander-in-Chief of California, in effect, Governor Schwarzenegger will have the opportunity to request National Guard support to free up Border Patrol agents to work on the border. In addition, there are provisions within the President's proposal to do things like a high-tech fence along highly-trafficked areas. Duncan Hunter, who has been very conservative on the issue over the years, supports the President's ideas. I think this is one of these things where, again, let's see what happens as they read into the details.

Q The White House has not reached out to him specifically before the President made --

MR. SNOW: The White House -- there was consultation between the White House and gubernatorial offices. I'll just leave it at that.

Q One thing, in talking to House Republicans, that really troubles them about the "path to citizenship" part of the debate over immigration is that -- is the sticking point on whether illegal immigrants who wish to be citizens would be forced to leave the country, then get back in line. It seems to me the President supports at least allowing a certain pool of illegal immigrants to go through the citizenship process without having to physically leave the country. That's accurate, right?

MR. SNOW: Walk me through that again -- what you're talking about -- look, there are a series of proposals that -- what the President did not do is commit himself to specifics about how people would enter the path to citizenship. As you know, that is a topic of debate right now before the United States Senate, and I guarantee you it's going to go to conference. So this is one where the President, I think, is willing to work with willing members of Congress to come up with a solution.

Q Have you heard him talk specifically about this notion of -- he's talked about treating illegal immigrants who have been here longer who have roots differently. Would that include not requiring them to physically leave the country --

MR. SNOW: As I said, at this point that's a level of operational detail I'm not willing to address right now.

Q Tony, the President laid out this plan last night to bring the National Guard in, up to 6,000 troops. But back in December, his own Homeland Security Secretary, I think on a program you, in fact, were guest hosting, said this is not a plan, "the National Guard is really, first of all, not trained for that mission."

MR. SNOW: Right.

Q Why has the White House changed its position in the last few months, first of all? And second of all, does the administration regret not moving quicker to deal with this border security --

MR. SNOW: Keep in mind, the original proposal was for National Guard members to do law enforcement activities. And there is no sense that the National Guard is going to be doing that. Instead, what the President is saying is, we're going to make National Guard units available to do non-law enforcement tasks, such as doing

various kinds of construction, doing surveillance, doing intelligence work, which would permit Border Patrol agents -- who sometimes have to do other things -- to go ahead and work on the border. There's also talk of freeing up people who are at desk jobs within the Border Patrol who have been trained to do law enforcement to do so.

The difference between then and now is, as Secretary Chertoff was saying, National Guard personnel are not trained to do law enforcement. Instead what the President is trying to do is to take the people who specifically trained to do this particular kind of law enforcement and get them out there, get the assets on the border as quickly as possible.

Q Tony, it sounds as though the President did not talk to any of the border state governors, himself, is that correct?

MR. SNOW: I'm not going to engage in on deliberations. I honestly am not sure. I know for a fact that there was staff contact. I don't know if the President called the governors.

Q How about with the Hill? Did the President -- or was it all left to the staff?

MR. SNOW: There, again, I'm not going to get into what the President did or didn't do.

Q Thanks, Tony. You just a second ago said you guarantee it's going to go to conference. So you already know that the Senate is going to pass this?

MR. SNOW: Okay, you know what, I was being presumptuous here. (Laughter.) But I think that there is -- again, I think there's a good chance -- if you talk to people on the Hill, it looks as if the Senate has put together a series of rules. But you're absolutely right. I overstepped and should not be making predictions about what the Senate will do, and we'll leave it to the senators, themselves.

Q The President has talked a great deal in the context of global policy of the concern about an emerging sense of isolationism and protectionism. Can you talk about his concern that some of the criticism from the right on a guest worker program and a path to citizenship foments that isolationism and protectionism with his own party?

MR. SNOW: I think what the President was trying to do last night was, once again, appeal to people's sense of who we are as a country, which is a nation of immigrants. As he said, there's a way to talk about border security and being a nation of immigrants in a way that fits together. He was not trying to point fingers at either party, or at either house of Congress. What he was trying to do was show leadership on the issue and to do it in a practical, principled and idealistic way.

Q One last question if I can. The definition of comprehensive immigration reform that the President demands, does it have to include a path to citizenship?

MR. SNOW: Does it have to? The President laid out exactly what he thinks is necessary, and keep in mind, Carl, what he was saying is you cannot do one thing at a time. You have to do it all at once, or it all falls apart.

Q The initial reaction at the House yesterday was largely solely about the National Guard elements, and either ignored or derided the elements of a path to citizenship or a guest worker program. As you know, the Senate is also taking up amendments today that would largely change very, very fundamentally the Senate bill that the President prefers. Would he veto a bill that emerged either without the guest worker program or without the path to citizenship?

MR. SNOW: I think it's -- two things; first, I'm not sure I would share the characterization. You just gave a global view of how 435 people might regard a highly complex bill, and I think you can agree that there's a pretty wide spread of opinion.

Q -- (inaudible) --

MR. SNOW: No, I think so. The second thing, it's highly presumptuous to talk about veto threats and that sort

of thing when we haven't, as Carl just pointed out, even got a Senate bill.

Q Hold on, Tony. The Speaker did totally ignore the path to citizenship. His statement in response had only to do with border security.

MR. SNOW: And as I said before, David, give members of the House time to digest what goes on. They have talked about one element. As the President pointed out, there are five separate elements.

Q Tony, first of all, welcome and congratulations.

MR. SNOW: Thank you.

Q My question, going back on immigration. I agree with the President that you cannot deport 12 million-plus and also not allow amnesty. But they are taking a lot of -- from people who are legally in this country, paying taxes, they are here for five or 10 years, still waiting for a green card or citizenship, and these people will get automatically from illegal to legal status. What is the future of those people who are still waiting --

MR. SNOW: Those people are -- look, those people are ahead in line. As the President said, nobody is going to be able to jump over those who have been waiting legally in line.

Q You said today and you said yesterday, also, this will free up some Border Patrol agents. Do you have a number of how many would actually be shifted to the border?

MR. SNOW: You know what, rather than have me fake it, I will get a precise number to you -- (laughter) -- because I'll tell you what we have said -- and here in the front row, if anybody wants to provide a precise number -- I know that we said a number of thousand people in desk jobs are being moved. The precise complement on the border, itself, I'll find out.*

Q Tony, I'm curious, why won't you comment at all on the USA Today story, or at least talk in a limited way about how average Americans' phone records are handled by the National Security Agency?

MR. SNOW: Because it's inappropriate.

Q Tony, has there been contact with other governors to see -- in other words, will we start to see some governors coming forward soon to say, I support the President's plan --

MR. SNOW: Well, we've only had Governors Napolitano and Perry expressing support for it, so if you're talking about the border states. And, again, I think based on the comments Governor Richardson made, there is certainly an attempt to address the specific concern about Border Patrol agents. The answer is, this is an issue, obviously, of broad and deep concern and the administration is going to reach out to people all around the political system; we do it, and do it right.

Q Tony, last night Roy Blunt in the House leadership issued a statement saying he still had serious concerns after the President's speech. What's the strategy, what's the White House strategy going forward on how to bring some of these folks around?

MR. SNOW: What I think I've said before is that members of the House -- Roy Blunt said that he was concerned about border security. Now, as I pointed out, the President's own proposal over the length of the proposal actually places more assets on the border than the bill for which Representative Blunt has already voted. So I think there is a serious attempt to address that concern.

As far as outreach, there are going to be different ways to reach out to members of Capitol Hill. I can't tell you exactly how we're going to deal with Roy Blunt or Denny Hastert or anybody else. But I guarantee you, the President knows that this is an issue of sufficient concern that he is going to pay heed to friends and allies on Capitol Hill.

Q Can I look ahead to tomorrow's tax bill signing? The President for many months now has been describing an

economy firing on all cylinders. Does the economy still need that much stimulus, or does it not have more -- avoid the danger posed by the continuing large deficits, not greater at this point?

MR. SNOW: Are you suggesting that we have too much prosperity?

Q I am not suggesting, I'm asking.

MR. SNOW: Well, it seemed -- you're talking about too much stimulus. If you take a look at the revenue numbers that are coming in -- you just talked about deficits -- the revenue numbers are coming in in such a way that the deficits are, in fact, below estimates. I think if you want to have tax revenues coming in and gushing -- the President is committed to a path of growth. He has made it clear that he wants to make permanent all the tax cuts that have been enacted for the simple good reason that it's good to have people employed, it's good to have people making more money, it's good to have productivity up, it's good to have the most vigorous economy on the face of the Earth, and he wants to continue it.

Q Has Karl Rove told the President that he will resign if he is indicated in the Valerie Plame affair?

MR. SNOW: I am not going to comment at all on Karl Rove and his private communications with the President, nor am I going to comment on what may or may not happen.

Q Shouldn't America's immigration problems be solved in context with other countries such as Mexico? What is the President doing to convince such countries as Mexico to curb illegal immigrants from crossing the border into the U.S.?

MR. SNOW: Well, the President is going to do American domestic policy, and he's not going to presume to speak for foreign leaders. He did have a phone call with President Fox, and the two of them talked about cooperating on trying to clamp down on illegal traffic between Mexico and the United States on drug and human trafficking, and try to maintain the sanctity of the borders.

Q Tony, the President used new language today in actually making the case for immigrants to become U.S. citizens. And one thing he said is we're a nation of immigrants, but he went on to say we are not going to discriminate against people. There are some who see this debate, particularly the emotional rhetoric in talking about Mexicans, illegal immigrants as having racial or even racist overtones. Does the President agree with that? And what did he mean when he said today, we are not going to discriminate against people?

MR. SNOW: Well, Suzanne, I think I will not try to improve on the President's words from today.

Q Hi, Tony. Welcome, and nice, nice and zippy. A couple of personal questions. You've made a lot of -- (laughter.) What are your personal goals, what do you hope to achieve here? Will you continue to televise these briefings? And would you put into English the phrase, "hug the tar baby"?

MR. SNOW: Well, when we hug the tar baby -- we could trace that back to American lore. I don't see it as a personal sacrifice to answer a call from the President of the United States to come and serve, I consider it an honor. That still gives me chills. I go out at the end of that lawn, I look back the pillars, and think, man, I'm working here. I don't know if you ever do this, but if you don't, I suggest you do. It's an astounding thing. And whatever the citizens and you may feel about your particular state in life, this is a very special place to work.

What was the second part of the question?

Q Will you continue to televise the briefings?

MR. SNOW: I have made no decisions about whether or not to televise. I am sure that the TV people here would have absolutely no problem with us going dark. (Laughter.)

Q What kind of timetable do you have for a comprehensive bill? I mean, when would you have to have it in your hands, because --

MR. SNOW: You're talking about immigration?

Q Yes.

MR. SNOW: Again, this is one where I've already overstepped my bounds by presuming to predict a Senate vote. I'm not going to go any further. I think the President would like to see action.

Q Does the White House have a notion on the percentage of these Guard troops that are already in the four border states, versus how many might have to come from --

MR. SNOW: I'll refer technical questions like that back to the Department of Homeland Security. I do not have the breakdown. I know that they were briefing on that earlier today.

Let me go back over here --

Q Tony, what's the message to Salvadorans or Mexicans who are headed north as we speak, when they hear the President speaking of tolerance, and might have tuned out for the rest of it? Is it, turn around and go back?

MR. SNOW: What the President wants is an end to illegal immigration, and at the same time, some sort of resolution, some practical way of dealing with the fact that you have 11 million people who have come here illegally, many of which -- many of whom have set down roots, are working and paying taxes. The message is: Obey the law.

Q Tony, just so you can run the full gamut, Rebecca Cooper, with ABC7 News.

MR. SNOW: Yes.

Q Could you update us on where President Bush stands on giving the District voting rights in the House, now that Chairman Tom Davis is pushing a bill that would give the District voting rights?

MR. SNOW: That is an issue -- why don't we wait and see what happens first. If Representative Davis has success, we will be able to formulate a position.

Q Second question, why did you choose to wear the yellow bracelet today? What's the importance to you?

MR. SNOW: I had cancer last year. And having cancer, it's one of these things -- thank Terry Hunt for having provided -- I lost my old one when I was in the hospital having my last cancer surgery. It's going to sound stupid, and I'll be personal here, but -- just having gone through this last year -- and I said this to Chris Wallace -- was the best thing that ever happened to me. It's my Ed Muskie moment. (Laughter.) I lost a mother to cancer when I was 17, same type -- same type, colon cancer. And what has happened in the field of cancer since then is a miracle.

I actually had a chance to talk today with Lance Anderson [sic] about this. You know, it's one of these things where America -- whatever we may say about a health care system, the technologies that were available to me that have me standing behind the podium today, where a doctor who said, you don't have to worry about getting cancer, just heartburn, talking to these people -- (laughter) -- that's a wonderful thing. And I feel every day is a blessing.

April.

Q Tony, going back to Peter and Suzanne talking about race, some are questioning if this guest worker program is divisive. It pits people with color against black Americans. And Congresswomen Sheila Jackson Lee of Texas says that black Americans need to be brought to the table when you're talking about this issue.

MR. SNOW: I don't precisely -- I don't understand -- I don't want to be foolish, but how on earth would it pit willing workers --

Q Okay, then according to the President's proposal those who -- employers are allowed to give jobs to immigrants, those jobs from people -- it keeps giving those jobs to people -- the immigrants because others won't take those jobs. Others -- and some are saying those others are African Americans.

MR. SNOW: No, you know --

Q Vicente Fox said that.

MR. SNOW: Well, again, I'll let President Fox defend his comments. I'm just not going to go into that.

Q Don't you think that African Americans -- and not just African Americans, but black Americans need to be brought to the table? Congresswomen Sheila Jackson Lee is making this request.

MR. SNOW: She's a member of Congress; of course, she's at the table.

Q Tony, three quick things. First of all, welcome aboard.

MR. SNOW: Thank you.

Q Secondly, the beautiful woman in the yellow blouse with the Spanish accent is my wife, Sarah Scott.

Q Oh, God. (Laughter.)

Q Thirdly, like the little old grandfather in the movie Moonstruck, I'm a little confused. Under posse comitatus, if governors call up the National Guard, they are allowed to actually engage in police activities. And there are trained units in the National Guard, trained MP units. Why aren't they being used that way?

MR. SNOW: Well, two things. First I think I called Lance Armstrong, Lance Anderson. So let me first apologize to him for that.

Secondly, the President has made it clear he wants people whose full-time job is law enforcement at the border to handle the full-time job of law enforcement at the border. If you spend time deputizing people who later are going to have to go on to other things, you have failed to achieve your long-term objective, which is to strengthen our ability to patrol the borders and to try to shut down illegal immigration.

Q Tony, a lot of people that have been looking at the immigration issue for a long time say that the President is wasting his time talking about border patrol, that it's an issue that he'll never gain -- this question of temporary workers is something that he'll never convince the hardcore conservatives about, no matter how long he talks about border patrol. What can he do to talk directly to the more moderate doubters in the Senate and the House about this temporary worker --

MR. SNOW: Look, every aspect of this program is something in which the President deeply believes in. I think you've just made the case for leadership here. The President is not sitting around doing calculations about how you get a vote here or there; he's talking about a comprehensive solution. And I think what he will end up doing is talking with members of both parties, of all ideological stripes -- because the idea somehow that there's one group of people and only one group of people -- labor, also, has had problems with the idea of trying to deal with these.

I think the President is looking for a way to reach across both parties, to have bipartisan cooperation on building a solution that is going to be reflective of American ideals and contemporary realities.

Q Tony, as the only other talk radio host in this room, I'd like to ask you as a former colleague a brief, one-part question. (Laughter.) Congresswoman Maloney of New York and 43 others in the House have written the President, and this is the fourth time with no response from him, to ask, is the President opposed to contraception or not?

MR. SNOW: Well, thank you, that's -- (laughter) --

Q Thank you?

MR. SNOW: Yes.

Q How does he stand?

MR. SNOW: The President does not share his private correspondence with members of Congress or others, and so I don't have an answer for you, Lester.

Q The President last night said that there would be help for state and local governments in funding this program. Will the state and local governments be asked to kick in?

MR. SNOW: No.

Q And what are the funds that he's talking about?

MR. SNOW: There are two different types of accounts that were mentioned. One is called 287G; the other is called Stonegarden. Basically, what they do is they provide reimbursements for targeted apprehension and detention. In other words, you've got a certain operation you want to do, you need to call upon local law enforcement, which knows the area, which knows the terrain, which is going to be helpful. You do that and you do the reimbursement. State and local governments are going to be asked to pony up additional funds.

Q So they would be held harmless --

MR. SNOW: Correct.

Q Tony, the President called for a civil tone in the immigration debate. I wonder, is he concerned that by characterizing those who oppose a path to legalization for illegal immigrations as people who want to deport aliens that he's going to further inflame --

MR. SNOW: No, I think what he was trying to do was to talk about the two poles of the debate. You can't deport millions, and on the other hand, you don't grant amnesty and say we just forget about it. What you have to do is to come up with a rational middle ground. I don't think he felt that he was going to offend anybody by doing it. What he was trying to do is explain to the American people what the two poles are in the debate and how he intends to be in the middle.

Q Tony, Fox News, and specifically "The O'Reilly Factor," has aired video of the Mexican military assisting coyotes smuggle people across the border. How could the President call Vicente Fox in Mexico an ally in this immigration issue with corruption that extends all the way to the military?

MR. SNOW: Well, I'm not going to get into -- let me just review what I said before, which is that the two Presidents, in their conversation over the weekend, talked about the importance of border security, about fighting crime, which includes human and drug trafficking, and doing it in a way that's going to be cooperative. The President has already said, Mexico is not our enemy. And he certainly is committed to having secure borders and credible border enforcement.

Q Tony, the Heritage Foundation has done a study on the Senate bill and concluded it would authorize legal -- not illegal, but legal -- immigration of 100 million over the next 20 years. The math seems pretty simple, five times 20 is 100 million. Is that a level of legal immigration that the President would support?

MR. SNOW: Before you do the -- you're talking about a Heritage Foundation study that talks about a Senate bill that may or may not be passed in its present form. And you also have the dangers of trying to do straight-line projections where human beings are cussedly unpredictable. We are talking a look right now at the methodology of the Heritage study, so I don't want to -- I don't want to get too deep into the details. But we are taking a look at it. I mean, those are serious allegations.

But, again, what the President has talked about is figuring out a way to guarantee national security, to

strengthen national security by, A, going ahead and securing the borders; B, doing interior enforcement; C, doing assimilation, and making sure that we have a solution that's going to hold up over time. And finally, the last piece of the guest worker program is designed to make sure that people have a legal path, and a predictable legal path, for getting into the country, and after that, using that as a way to try to prevent the kind of scrambling over the borders that we've seen.

Q But -- does he think there should be a legal --

MR. SNOW: I don't think -- I'm sorry, what?

Q What is the appropriate number of legal immigrants coming into this country?

MR. SNOW: That is something that Congress decides every year.

Q Tony, you've been asked several questions about the NSA. The President was asked about his NSA programs. The President was asked about it this morning. On Thursday, however, isn't General Hayden going to have to be a little more forthcoming in public about these programs if he's going to become the head of the CIA?

MR. SNOW: General Hayden I don't think is under any obligation to spill the beans in terms of national security in a public forum. I think the members who are going to be holding hearings understand where to draw the boundaries. There will be some tough questions, I am sure, that are asked behind closed doors, and those with appropriate classification will be able to see -- receive differing levels of detail. But, again, the idea that somehow you talk about all aspects of National Security Agency activities in an open forum is absolutely inappropriate.

Q He didn't ask that.

MR. SNOW: Well, that is what he asked.

Q Tony, Senator Grassley has introduced legislation that would waive the penalty for Medicare recipients who don't sign up for the drug benefit. Would the President be open to something like that?

MR. SNOW: Well, again, that's a bill that was dropped in the hopper just a couple hours ago, and just as we've said that members of the House and Senate take a good look at the President's proposals, we'll take a good, careful look at that.

Q Thank you.

MR. SNOW: All right.

Q Just thoughts on your first day, Tony, some final thoughts on your first day?

Q Yes, welcome.

Q How hard is it?

MR. SNOW: I love it, this is great. Thank you.

END 1:10 P.M. EDT

* National Guard support will enable us to move more than 500 Border Patrol agents from jobs in the back office to the front lines.

**Return to this article at:**
http://www.whitehouse.gov/news/releases/2006/05/20060516-4.html



# EXHIBIT "S"

Director of National Intelligence
WASHINGTON, DC 20511

MAY 1 7 2006

The Honorable J. Dennis Hastert
Speaker of the
    House of Representatives
Washington, D.C. 20515

Dear Mr. Speaker:

I am responding on behalf of National Security Advisor Stephen Hadley to Ms. Pelosi's May 2, 2006 inquiry regarding the classification of the dates, locations, and names of members of Congress who attended briefings on the Terrorist Surveillance Program. Upon closer review of this request, it has been determined that this information can be made available in an unclassified format. The briefings typically occurred at the White House prior to December 17, 2005. After December 17, briefings occurred at the Capitol, NSA, or the White House. A copy of the list is enclosed.

Sincerely,

John D. Negroponte

Enclosure: As stated.

cc:
The Honorable Nancy Pelosi
The Honorable Jane Harman
The Honorable Peter Hoekstra
The Honorable Pat Roberts
The Honorable John D. Rockefeller IV

| Event Date | Congressional Members Briefed | Name |
|---|---|---|
| 25-Oct-01 | Chair HPSCI | Porter J. Goss |
| | Ranking Minority Member HPSCI | Nancy Pelosi |
| | Chair SSCI | Bob Graham |
| | Vice Chair SSCI | Richard C. Shelby |
| 14-Nov-01 | Chair HPSCI | Porter J. Goss |
| | Ranking Minority Member HPSCI | Nancy Pelosi |
| | Chair SSCI | Bob Graham |
| | Vice Chair SSCI | Richard C. Shelby |
| 4-Dec-01 | Chair Senate Appropriations Committee, Defense Subcommittee | Daniel K. Inouye |
| | Ranking Minority Member Senate Appropriations Committee, Defense Subcommittee | Ted Stevens |
| 5-Mar-02 | Chair HPSCI | Porter J. Goss |
| | Ranking Minority Member HPSCI | Nancy Pelosi |
| | Vice Chair SSCI | Richard C. Shelby |
| 10-Apr-02 | Chair SSCI | Bob Graham |
| 12-Jun-02 | Chair HPSCI | Porter J. Goss |
| | Ranking Minority Member HPSCI | Nancy Pelosi |
| 8-Jul-02 | Chair SSCI | Bob Graham |
| | Ranking Minority Member SSCI | Richard C. Shelby |
| 29-Jan-03 | Chair HPSCI | Porter J. Goss |
| | Ranking Minority Member HPSCI | Jane Harman |
| | Chair SSCI | Pat Roberts |
| | Vice Chair SSCI | John D. "Jay" Rockefeller IV. |
| 17-Jul-03 | Chair HPSCI | Porter J. Goss |
| | Ranking Minority Member HPSCI | Jane Harman |
| | Chair SSCI | Pat Roberts |
| | Vice Chair SSCI | John D. "Jay" Rockefeller IV |
| 10-Mar-04 | Speaker of the House | J. Dennis Hastert |
| | Majority Leader of the Senate | William H. Frist |
| | Minority Leader of the Senate | Tom Daschle |
| | Minority Leader of the House | Nancy Pelosi |
| | Chair HPSCI | Porter J. Goss |
| | Ranking Minority Member HPSCI | Jane Harman |
| | Chair SSCI | Pat Roberts |
| | Vice Chair SSCI | John D. "Jay" Rockefeller IV |
| 11-Mar-04 | Majority Leader of the House | Tom DeLay |
| 23-Sep-04 | Chair HPSCI | Pete Hoekstra |
| 3-Feb-05 | Chair HPSCI | Pete Hoekstra |
| | Ranking Minority Member HPSCI | Jane Harman |
| | Chair SSCI | Pat Roberts |
| | Vice Chair SSCI | John D. "Jay" Rockefeller IV. |
| 2-Mar-05 | Minority Leader of the Senate | Harry Reid |
| 14-Sep-05 | Chair HPSCI | Pete Hoekstra |
| | Ranking Minority Member HPSCI | Jane Harman |
| | Chair SSCI | Pat Roberts |
| | Vice Chair SSCI | John D. "Jay" Rockefeller IV |

| Event Date | Congressional Members Briefed | Name |
|---|---|---|
| 11-Jan-06 | Speaker of the House | J. Dennis Hastert |
| | Majority Leader of the Senate | William H. Frist |
| | Chair HPSCI | Pete Hoekstra |
| | Chair SSCI | Pat Roberts |
| | Vice Chair SSCI | John D. "Jay" Rockefeller IV |
| | | |
| 20-Jan-06 | Minority Leader of the Senate | Harry Reid |
| | Minority Leader of the House | Nancy Pelosi |
| | Chair SSCI | Pat Roberts |
| | Ranking Minority Member HPSCI | Jane Harman |
| | | |
| 11-Feb-06 | Chair SSCI | Pat Roberts |
| | | |
| 16-Feb-06 | Speaker of the House | J. Dennis Hastert |
| | Chair HPSCI | Pete Hoekstra |
| | | |
| 28-Feb-06 | Chairman, House Appropriations Committee, Defense Subcommittee | C.W. Bill Young |
| | Ranking Minority Member, House Appropriations Committee, Defense Subcommittee | John Murtha |
| | | |
| 3-Mar-06 | Vice Chair SSCI | John D. "Jay" Rockefeller IV |
| | | |
| 9-Mar-06 | Chair SSCI TSP subcommittee | Pat Roberts |
| | Vice Chair SSCI TSP subcommittee | John D. "Jay" Rockefeller IV |
| | Member SSCI TSP subcommittee | Orrin G. Hatch |
| | Member SSCI TSP subcommittee | Mike DeWine |
| | Member SSCI TSP subcommittee | Dianne Feinstein |
| | Member SSCI TSP subcommittee | Carl Levin |
| | Member SSCI TSP subcommittee | Christopher S. "Kit" Bond |
| | | |
| 10-Mar-06 | Member SSCI TSP subcommittee | Christopher S. "Kit" Bond |
| | | |
| 13-Mar-06 | Chair SSCI TSP subcommittee | Pat Roberts |
| | Member SSCI TSP subcommittee | Dianne Feinstein |
| | Member SSCI TSP subcommittee | Orrin G. Hatch |
| | | |
| 14-Mar-06 | Member SSCI TSP subcommittee | Mike DeWine |
| | | |
| 27-Mar-06 | Member SSCI TSP subcommittee | Carl Levin |
| | | |
| 29-Mar-06 | Chairman HPSCI TSP group | Pete Hoekstra |
| | Ranking Minority Member HPSCI TSP group | Jane Harman |
| | Member HPSCI TSP group | John McHugh |
| | Member HPSCI TSP group | Mike Rogers (MI) |
| | Member HPSCI TSP group | Mac Thornberry |
| | Member HPSCI TSP group | Heather Wilson |
| | Member HPSCI TSP group | Jo Ann Davis |
| | Member HPSCI TSP group | Rush Holt |
| | Member HPSCI TSP group | Robert E. "Bud" Cramer |
| | Member HPSCI TSP group | Anna G. Eshoo |
| | Member HPSCI TSP group | Leonard Boswell |
| | | |
| 7-Apr-06 | Chairman HPSCI TSP group | Pete Hoekstra |
| | Member HPSCI TSP group | John McHugh |
| | Member HPSCI TSP group | Mike Rogers (MI) |
| | Member HPSCI TSP group | Mac Thornberry |
| | Member HPSCI TSP group | Heather Wilson |
| | Member HPSCI TSP group | Rush Holt |
| | | |
| 28-Apr-06 | Ranking Minority Member HPSCI TSP group | Jane Harman |
| | Member HPSCI TSP group | Heather Wilson |
| | Member HPSCI TSP group | Anna G. Eshoo |
| | | |

| Event Date | Congressional Members Briefed | Name |
|---|---|---|
| 11-May-06 | Chairman, House Appropriations Committee, Defense Subcommittee | C.W. Bill Young |
| | Ranking Minority Member, House Appropriations Committee, Defense Subcommittee | John Murtha |

# EXHIBIT "T"

→ Online NewsHour

REGION: North America
TOPIC: Law

TRANSCRIPT
Debate

Originally Aired: May 11, 2006

# NSA Wire Tapping Program Revealed

An article in Thursday's USA Today reported that three of the largest U.S. phone companies have been providing the National Security Agency with phone records from millions of Americans since 9/11. Two senators discuss the program's legal and security issues now that the public is aware of it.



🔊 RealAudio | Download    📷 Streaming Video

SEN. PATRICK LEAHY, D-Vt.: Look at this headline.

KWAME HOLMAN: Only hours after it appeared in print, the story that the National Security Agency secretly has been gathering a giant database of phone records set off a firestorm on Capitol Hill. Vermont Democrat Patrick Leahy was visibly angry about it and lashed out at the Bush administration at a Senate Judiciary Committee meeting scheduled to discuss judicial nominations.

SEN. PATRICK LEAHY: Only through the press, we begin to learn the truth. The secret collection of phone call records tens of millions of Americans. Now, are you telling me that tens of millions of Americans are involved with al-Qaida? If that's the case, we've really failed in any kind of a war on terror.

KWAME HOLMAN: Arizona Republican Jon Kyl responded.

SEN. JON KYL, R-Ariz.: This is nuts. We are in a war, and we've got to collect intelligence on enemy, and you can't tell the enemy in advance how you're going to do it.

KWAME HOLMAN: Emblazoned across the front page of USA Today, the lengthy report said the code-breaking National Security Agency contracted three of the nation's largest phone companies to provide records of home and business telephone calls made by their customers.

The NSA earlier was revealed to have been monitoring, without warrants, international phone calls and e-mails thought to be linked to terrorists.

USA Today telecommunications reporter Leslie Cauley spent the last several months preparing today's story.

LESLIE CAULEY, USA Today: The NSA is collecting the call detail records of millions of ordinary Americans.

KWAME HOLMAN: The companies reportedly contracted by the spy agency are AT&T, Bell South and Verizon.

LESLIE CAULEY: The pitch to the phone companies was: We feel this information can be very helpful in smoking out, you know, and tracking suspected terrorists. And, again, three out of the four agreed.

KWAME HOLMAN: But Qwest, a telecommunications company that provides local phone service to 14 million customers in 14 western and northwestern states, reportedly refused to participate.

All of the telephone companies that worked with the agency refused to comment on specifics, saying only that they are assisting the government in accordance with the law.

Judiciary Committee Chairman Arlen Specter, who had voiced earlier concerns about the NSA surveillance program, this morning said he wanted to bring the phone company officials before his panel.

SEN. ARLEN SPECTER, R-Pa., Judiciary Committee Chairman: We're going to call on those telephone companies to provide information to try to figure out exactly what is going on.

KWAME HOLMAN: According to the USA Today report, this NSA program does not involve the listening to or recording of calls.

LESLIE CAULEY: This program is referring to in-country calls only, meaning calls that originate and terminate within U.S. borders. There is no eavesdropping as part of this particular program.

KWAME HOLMAN: Alabama Republican Jeff Sessions.

SEN. JEFF SESSIONS, R-Ala.: But it is not a warrantless wiretapping of the American people. And I don't think this action is nearly as troublesome as being made out here.

KWAME HOLMAN: But on the House side, Majority Leader John Boehner said the report was troubling.

REP. JOHN BOEHNER, R-Ohio, House Majority Leader: I am concerned about what I read, with regard to the NSA database of phone calls. I don't know enough about the details, except that I'm going to find out, because I am not sure why it would be necessary for us to keep and have that kind of information.

KWAME HOLMAN: The report came out as former NSA Director General Michael Hayden, who President Bush nominated this week to be the CIA's new director, was scheduled for another round of meetings with congressional members. Hayden spoke after meeting with the Senate's number-two Republican, Mitch McConnell, this afternoon.

GEN. MICHAEL HAYDEN, CIA Director-Designate: All I would want to say is that everything that NSA does is lawful and very carefully done, and that the appropriate members of the Congress -- House and Senate -- are briefed on all NSA activities. And I think I'd just leave it at that.

KWAME HOLMAN: California Democrat Dianne Feinstein said that, as a result of today's revelations, Hayden would have an uphill battle seeking confirmation.

SEN. DIANNE FEINSTEIN, D-Calif.: I happen to believe we're on our way to a major constitutional confrontation on Fourth Amendment guarantees of unreasonable search and seizure. And I think this is also going to be present a growing impediment to the confirmation of General Hayden, and I think that is very regretted.

KWAME HOLMAN: The Senate Intelligence Committee is expected to open Hayden's confirmation hearings a week from today.

## The President Speaks Out

JIM LEHRER: As the story gained momentum this morning, President Bush made a statement at the White House. And here it is in full.

PRESIDENT GEORGE W. BUSH: After September the 11th, I vowed to the American people that our government would do everything within the law to protect them against another terrorist attack.

As part of this effort, I authorized the National Security Agency to intercept the international communications of people with known links to al-Qaida and related terrorist organizations. In other words, if al-Qaida or their associates are making calls into the United States or out of the United States, we want to know what they're saying.



George W. Bush

Today, there are new claims about other ways we are tracking down the al-Qaida to prevent attacks on America. I want to make some important points about what the government is doing and what the government is not doing.

First, our intelligence activities strictly target al-Qaida and their known affiliates. Al-Qaida is our enemy, and we want to know their plans.

Second, the government does not listen to domestic phone calls without court approval.

Third, the intelligence activities I authorized are lawful and have been briefed to appropriate members of Congress, both Republican and Democrat.

Fourth, the privacy of ordinary Americans is fiercely protected in all our activities. We're not mining or trolling through the personal lives of millions of innocent Americans. Our efforts are focused on links to al-Qaida and their known affiliates.

So far, we've been very successful in preventing another attack on our soil. As a general matter, every time sensitive intelligence is leaked, it hurts our ability to defeat this enemy.

Our most important job is to protect the American people from another attack, and we will do so within the laws of our country.

Thank you.

## Crossing the Line?

JIM LEHRER: More on this now from Sen. Kit Bond, a Republican of Missouri, a member of the Senate Intelligence Committee, and Sen. Patrick Leahy of Vermont, the senior Democrat on the Senate Judiciary Committee.

Senator Leahy, did the president's statement resolve your concerns about this?

SEN. PATRICK LEAHY, D-Vt.: No, and I'll tell you why. I think the president was probably



### Senator Kit Bond
(R) Missouri

❝ Regrettably, since December, when word started coming out about the president's program, and terrorists have learned about what is going on, and it makes us less safe. The more we talk about it, the less safe we are. ❞

wise and well-advised to give the statement he did, but we have a major credibility issue.

Every time something new comes out in the press, we hear from the White House: Well, well, we've either just told you about that, or we're going to tell you about it.

And then we find nobody was told fully about it, as Jay Rockefeller, the vice chairman of the Senate Intelligence Committee said today.

I wonder what they're doing, so that you can know whether it's legal or not. All of us want to fight terrorists. The 9/11 happened on this administration's watch; they don't want it to happen again, but I don't want it to happen again. No American does.

We want to make sure that we're not just talking about being safe, but we are being safe. If we're going and running lines on every single phone call in this country, I wonder just what that does. They should come and explain.

First, I want to know if they're breaking the law. If they don't want to follow the law, then come to us and ask us to change the law.

I mean, these are the people that have a list now -- a terrorist watch list of 320,000 people. They say that makes it safe -- makes it safer. Well, on that list is Senator Edward Kennedy of Massachusetts -- he was unable to get on a plane -- a nine-month old baby, a nun, and on, and on, and on. Mistakes happen if things are not done right.

JIM LEHRER: Senator Bond, how do you respond to that, that -- you're a member -- first of all, let me ask you directly. You're a member of the Senate Intelligence Committee. Did you know about this?

SEN. KIT BOND, R-Mo.: Yes. I'm a member of the subcommittee of the Intelligence Committee that's been thoroughly briefed on this program and other programs.

And the first point I would make is every time we have a leak of classified information like this, it makes us significantly less safe. Regrettably, since December, when word started coming out about the president's program, and terrorists have learned about what is going on, and it makes us less safe. The more we talk about it, the less safe we are.

Now, to move on to the points, number one, my colleague, Senator Leahy, is a good lawyer, and I believe that he knows, as any lawyer should know, that business records are not protected by the Fourth Amendment.

The case of Smith v. Maryland in 1979, the U.S. Supreme Court said that the government could continue to use phone records, who called from where to where, at what time, for what length, for intelligence and criminal investigations without a warrant.

This has been going on, and this has been gone on long before the president's program started. And the president's program, as he designed, as he explained, it has been designed, and is carefully monitored by the lawyers from the NSA and the Department of Justice to make sure that they target telephone communications from or to overseas al-Qaida or al-Qaida known affiliates.

And this program has given us significant leads and allowed us to identify terrorists and to break up planned plots in the United States. Telephone calls from domestic to domestic-foreign phone calls are not targeted, are not used -- their content is not used --

unless there is a court order.

SEN. PATRICK LEAHY: If I could just...

JIM LEHRER: Excuse me, Senator Leahy, and let me just ask just one follow-up question to Senator Bond so we understand what this is about.

What these are, are records. And nobody then -- now, these are -- but there are tens of millions of records that are in this database, right? And they say somebody, Billy Bob called Sammy Sue or whatever, and that's all it says, and then they go and try to match them with other people?

SEN. KIT BOND: First, let me say that I'm not commenting on in any way any of the allegations made in the news story today. I can tell you about the president's program.

The president's program uses information collected from phone companies. The phone companies keep their records. They have a record. And it shows what telephone number called what other telephone number.

Now, if it's domestic to domestic, they are not targeting -- they're not going after that. What they are looking at are telephone calls coming into our going out of the United States to known al-Qaida phones or their people.

JIM LEHRER: OK.

SEN. KIT BOND: That's what the program focuses on. The government has, in the past, and could look at all of the records of purely domestic phone calls; that's not the purpose of this program.

## The Price for Safety

JIM LEHRER: All right. Now, Senator Leahy, as described by Senator Bond, does that strike you as being legal?

SEN. PATRICK LEAHY: No, and I'll tell you why: The Maryland case, in 1979 -- Kit Bond was former attorney general and is a very good lawyer. He's absolutely right. That would have allowed it.

Since then, however, we passed several laws. We passed the so-called CALEA, ECPA, FISA, and the Patriot Act. And we make it very specific in those what you can do and can not do.

As this was described today, I'm hard-pressed -- and most lawyers are hard-pressed -- to say what exception this would fall under one of these laws; it doesn't. And there is a strong question of legality.

When Attorney General Gonzales basically stonewalled the Senate Judiciary Committee, but did admit that there may be domestic wiretapping going on. I would say what the vice chairman of the Senate Intelligence Committee said today. He said: Significant questions remain surrounding the legality of the program and whether the White House has misrepresented the program to the public, through the selective declassification.

He's seen everything that's been shown to...



### Sen. Patrick Leahy
(D) Vermont

❝ The president has more times than all presidents put together in history, through signing statements, that said he will follow only parts of the law that he signs. ❞

JIM LEHRER: That's Senator Rockefeller you're talking about?

SEN. PATRICK LEAHY: I'm talking about Senator Rockefeller. But the point is that we haven't done adequate oversight.

Unfortunately, the Congress has acted like a wholly-owned subsidiary of the White House and has rubber-stamped everything that's gone on. And then we usually find out through the press, whoops, they weren't following the law.

Let's go through. Let's find out what parts of the law is being followed, what part's not being followed. The president has more times than all presidents put together in history, through signing statements, that said he will follow only parts of the law that he signs.

Let's get this on the record for the American people. We can make ourselves safe, but it's not enough to say, "Gee, we're doing a great job." That's sort of like telling the head of FEMA, "Brownie, you've done a heck of a job."

JIM LEHRER: Senator Bond, do you...

SEN. KIT BOND: Let me correct a number of things.

JIM LEHRER: OK.

SEN. KIT BOND: First, every time we get something on the record, we are making our country less safe. We have classified information because intelligence is only useful when it is kept out of the knowledge of the terrorists that we're trying to intercept. So every time we talk more about it, then they know more about how to avoid it.

Number two, unfortunately, the vice chairman has been sick and has missed, I think, three in-depth hearings we've had to learn more about the program. He and all of the members of the subcommittee are fully encouraged to ask all of the questions. We have asked those questions.

I've visited NSA. I have seen the steps that they take to make sure the law is followed.

Now, as for the law, the Maryland case, the Smith v. Maryland case, said business records are not protected by the Fourth Amendment. You don't have to get a search warrant.

And the other thing is the FISA court, the court of review in Enray Seal case [ph], said the president has the constitutional authority to conduct foreign intelligence surveillance, what this is, and they said, if the statue limits that ability, it is probably unconstitutional.

JIM LEHRER: Senator Bond, would you have any objection to what Senator Leahy is proposing here, though, that it all be laid out on the table at a -- you're talking about a public hearing, Senator Leahy?

SEN. PATRICK LEAHY: No, I'm asking having the appropriate people of the clearance look at it first, what's going on. Then, we have to make a determination whether it's legal. You know, simply because something is classified doesn't make it legal.

JIM LEHRER: But you're not saying...

6

SEN. PATRICK LEAHY: Our torture program was classified, didn't make it legal.

JIM LEHRER: But you're not satisfied with what Senator Bond and others have said, that the key members of the Senate Intelligence Committee have been briefed on that. You're suggesting there should be something beyond that, Senator Leahy?

SEN. PATRICK LEAHY: Well, you had a cut on here earlier of Senator Feinstein, who is one of those who's been briefed on it, and she obviously is not satisfied with the legality of this. She is a supporter -- has been a supporter of General Hayden, and she's the one that raised the question, because of this, his own confirmation may be in trouble.

SEN. KIT BOND: Let me answer a couple of things. Number one, General Hayden was not the one who ordered the program. General Hayden is not the one who cleared it. It's the lawyers at the Department of Justice. General Hayden carried out the orders pursuant to the directions of the lawyers.

And I'll be happy to discuss with members of the Intelligence Committee the appropriate laws. And, for a non-lawyer, these areas are very confusing, but they have walked me through this.

Number one, the records, phone records are not personal records. They are not entitled to the Fourth Amendment protections.

The president has the foreign intelligence surveillance powers; that's what they're using. I could cite cases...

JIM LEHRER: Sure.

SEN. KIT BOND: ... and I will do it, in the classified hearings. But the more we talk about it in public, the more our country is in danger. And we are much more likely to have a terrorist attack since the discussion of this program has begun.

## Putting the Nation at Risk

JIM LEHRER: That's what I wanted to ask Senator Leahy. I wanted to -- Senator Leahy, what about Senator Bond's point? He's made this two or three times now that just talking about this, the public disclosure in the USA Today, and I guess even the discussion we're having now, is endangering U.S. security?

SEN. PATRICK LEAHY: If anybody thinks that Osama bin Laden, a man who was able to mastermind an attack on us, thinks that we're trying to tap his phone, then they're crazy.

I mean, I was a prosecutor. I got search warrants. I knew how to go after, and I made darn sure that people didn't know exactly what you were doing. We can do that.

But simply saying we're making it safer doesn't mean we're making it...

JIM LEHRER: But he's saying just the opposite. He's saying this is making it un-safer, the public disclosure.

SEN. PATRICK LEAHY: We have so many things that neither Senator Bond or I would

7



**Jim Lehrer**
Executive Editor and
Anchor

talk about here they've done all the time that are perfectly legal, perfectly proper. None of them have been disclosed. They do make us safer.

I just want to make sure that we do not set precedence that removes the privacy of normal, law-abiding Americans. And I think that's why Senator Specter, Republican chairman of the Judiciary Committee, is calling these telephone companies to say: Under what law are you acting?

JIM LEHRER: Senator Bond, do you oppose that? Do you think that's a bad idea, to have phone companies come to the Senate Judiciary Committee?

SEN. KIT BOND: That's a very bad idea, to have a public hearing. And, unfortunately, I've not had the opportunity to discuss the laws with -- and apparently Senator Specter has not been briefed on the program.

What the president said is correct. Number one, that we meticulously -- they meticulously keep the privacy of American citizens protected to the fullest extent of the law.

Number two, Porter Goss, the former director of the Central Intelligence Agency, in response to my question in a public forum in February, said our ability to collect intelligence is very severely damaged, very severely damaged by the leaks. That's what the president said today, and he was correct.

And, by the way, torture has never been tolerated, and the people who engaged in those malicious acts in Abu Ghraib have been punished, and it is incumbent that we punish anybody who violates the law.

SEN. PATRICK LEAHY: And the official policy either was changed once it became...

JIM LEHRER: We're not going -- gentlemen, we're not going there tonight. Thank you both very much.

SEN. PATRICK LEAHY: Thanks, Jim.

SEN. KIT BOND: Thanks.

Funded, in part, by:      

Support the kind of journalism done by the NewsHour...Become a member of your local PBS station.

PBS Online Privacy Policy

Copyright ©1996- 2007 MacNeil/Lehrer Productions. All Rights Reserved.

# EXHIBIT "U"



# TRANSCRIPTS

Transcript Providers

Shows By Category:

**Return to Transcripts main page**

## CNN LATE EDITION WITH WOLF BLITZER

**Interview With Bill Frist; Interview With Stephen Hadley**

Aired May 14, 2006 - 11:00   ET

THIS IS A RUSH TRANSCRIPT. THIS COPY MAY NOT BE IN ITS FINAL FORM AND MAY BE UPDATED.

WOLF BLITZER, HOST: It's 11:00 a.m. in Washington, 8:00 a.m. in Los Angeles, 4:00 p.m. in London and 7:00 p.m. in Baghdad. Wherever you're watching from around the world, thanks very much for joining us for "Late Edition."

We'll get to my interview with President Bush's top national security advisor, Stephen Hadley, in just a moment. First, though, let's go to Brianna Keilar at the CNN headquarters in Atlanta for a quick check of what's in the news right now.

(NEWSBREAK)

BLITZER: President Bush will address the American public from the Oval Office tomorrow night on the hot-button issue of immigration reform.

Just a short while ago I spoke with the president's national security advisor, Stephen Hadley, about that, the renewed furor over the domestic spying program, Vice President Cheney and the outing of the former CIA officer Valerie Plame Wilson, Iran's nuclear program and lots more.

(BEGIN VIDEOTAPE)

BLITZER: Stephen Hadley, thanks very much for joining us. Welcome back to "Late Edition."

STEPHEN HADLEY, NATIONAL SECURITY ADVISER: Nice to be here.

BLITZER: The president, in his speech tomorrow night, will he call for the deployment of thousands of U.S. military forces to the border with Mexico?

HADLEY: The president is very concerned, as are a lot of Americans, about securing the border. He's been in discussions with members of the Congress. A lot of ideas have been suggested.

One of the ideas involves using the National Guard. That's an issue that he's considering. And obviously, it's a decision that he will make.

Let me point out that...

BLITZER: He hasn't made a decision yet on that?

HADLEY: No, sir. This is something that's under consideration. It's a number of ideas that he's talking about.

Let me make...

BLITZER: But let me interrupt for a second. Do you think by tomorrow night, 8 p.m. Eastern, when he delivers the address, he will have made a decision by then? Is there a deadline, in other words, for him to come up with a decision on National Guard forces being deployed to the border by tomorrow night?

HADLEY: What he said he will do tomorrow night is indicate where he stands and what he believes the way forward is on the issue of immigration. And that will include the issues of border security, of internal enforcement, and also the issue of the temporary worker program. So there will be a number of things that he'll be talking about at that time.

Let me just make one point. The notion of using National Guard to support border patrol is not a new one. This is not -- this is something that's actually already being done. It's not about militarization of the border. It's about assisting the civilian border patrol in doing their job, providing intelligence, providing support, logistics support and training and these sorts of things.

BLITZER: Because right now there are only a few hundred National Guard forces on the border. What I think you're talking about are moving thousands, maybe 5,000 or 10,000, maybe even more. So that would be a major leap forward.

HADLEY: No, I think what it would be is simply expanding the kind of thing that has already been done in the past in order to provide a bit of a stop-gap as the Border Patrol build up their capacity to deal with this challenge. That's the kind of idea that's being talked about.

Look, one other thing I need to say is both the United States and our neighbors to the north and the south take the issue of securing the border very seriously. The Mexicans have activities under way; so do the Canadians.

2

So we are all looking in a cooperative spirit to try and deal with the common problem of securing the border, particularly in this hot season, when the humanitarian considerations for people trying to cross the border become so important.

BLITZER: Immigration reform legislation that's already passed in the House calls for the construction of a new wall, a fence, along much of the border between the United States and Mexico.

Does the president support spending hundreds of millions of dollars to build such a fence?

HADLEY: Well, the president certainly supports strengthening the security of the borders. Spending is up; the number of border patrol is up.

This is something that the president has been paying attention to and doing -- and the administration has been doing over the last four years. So this is a priority for the president. It's an important element of dealing with immigration reform.

BLITZER: But what about a wall or a fence, specifically?

HADLEY: There are a number of things that are being looked at. There are a number of programs that Secretary Chertoff has announced. You'll be hearing, probably, more about these programs tomorrow night.

BLITZER: You don't want to comment on the fence? Is that what you're saying?

HADLEY: No. The president's got a number of things. As I say, Secretary Chertoff has announced a number of initiatives. There are things under consideration, and this is the kind of thing the president will address tomorrow.

BLITZER: The president will support a guest-worker program that eventually will lead, over 11 years or so, for citizenship for most of these illegal immigrants who have been in the United States for more than five years.

HADLEY: What the president has said is that he thinks that the proper approach to immigration reform is securing the border, internal enforcement, and a temporary-worker program so that willing employers in the United States can have access to willing workers, particularly from Mexico, and to do it in a way that is lawful.

That will take some of the pressure off on the border and will allow the border patrol to focus on the things we're really worried about, which is crime and narcotics and the like.

So he believes that we need a comprehensive approach and, as he said publicly, a temporary-worker program that is not amnesty...

BLITZER: Why isn't it amnesty? Because a lot of your critics in the House of Representatives, especially, Republicans, conservatives, say this is amnesty, that if you let these illegal immigrants eventually stay in the United States and become citizens, this is amnesty.

HADLEY: Well, the president's concept is not amnesty.

BLITZER: Why?

HADLEY: One of the issues is -- because one of the problems with amnesty, of course, is if you do -- there are now 12

million or so illegal immigrants in the United States. And the concern is that a wholesale amnesty will incentivize more to come.

So the issue is -- and this is one of the things that's going to have to be worked out in the dialogue between the president and the Congress, how to deal with this particular problem, how to deal with the difference between those folks who have recently come to this country and those folks who have been here sometimes for years or even a decade and have families and are part of the community. These are tough problems.

And what the president has said there needs -- we need to do it lawfully. We can both control our borders and be humane. We can do it in a legal way. And we need to do it in a way that provides a lawful way for people to come to work in the United States.

The issue about how they can progress for citizenship is one that's going to be worked out. But one of the things the president has said is that anybody who's part of one of these temporary-worker programs, if they look at the issue of citizenship, there are things they will need to do, requirements that they will have to meet, and they will have to go to the back of the line, not at the front of the line, to reflect those who have proceeded in the lawful way.

But again, this is the kind of issue that the president will have an opportunity to address tomorrow night.

BLITZER: Let's talk a little bit about this USA Today story that came out this week on collecting billions of phone calls over the past nearly five years since 9/11 to look for patterns, suspicious patterns.

One major U.S. phone company, Qwest, refused to cooperate with the National Security Agency. BellSouth did cooperate; AT&T, Verizon, they did cooperate.

The statement that was released by the attorney for Joseph Nacchio, the former CEO of Qwest, said this: "When we learned that there was a disinclination on the part of authorities to use any legal process, Mr. Nacchio concluded that these requests violated the privacy requirements of the telecommunications act. Accordingly, Mr. Nacchio issued instructions to refuse to comply with these requests."

Apparently, the federal government, the NSA, just dropped the request with Qwest after they refused, citing these legal reasons.

Are you 100 percent convinced that this was legal to go ahead and ask these companies for this private information about tens of millions of Americans' phone calls?

HADLEY: Let me put this in a little context, Wolf. The president takes very seriously his responsibility to protect the privacy rights of the American people.

He also takes seriously the need to use the intelligence resources of this country to protect against those who are trying to attack us. And that's principally Al Qaida and its affiliates.

All the intelligence activities that we have been pursuing are lawful. They have been abriefed to the appropriate members of the House and Senate Intelligence Committees, both Republicans and Democrats, and are necessary to protect the country against Al Qaida and its affiliates -- not innocent Americans, but Al Qaida and its affiliates.

I can't, sitting here, confirm or deny the claims made in that story. But if you look at what the story says, it's very

interesting. The story does not claim that there was listening in on domestic -- to domestic phone calls. It does not claim that. It does not claim that names were provided or addresses were provided or content of calls were provided or other personal information.

It's talking about calling information: date of call, to whom and how long. And this is information...

BLITZER: But if you have...

HADLEY: ... this is information that is business records. It can be lawfully provided to the federal government in a lot of circumstances.

BLITZER: But if you have the phone number of an individual, it's easy to find out who that individual is.

HADLEY: The Supreme Court has held that calling records, information -- phone numbers calls, date, duration of call -- is not protected by privacy. And there are lawful ways under a variety of statutes and procedures by which this information can be shared with the federal government. So this is not a privacy issue.

BLITZER: Can you say that over the past nearly five years, this program of collecting all these phone calls, the records, has resulted in thwarting one terrorist attack against the United States?

HADLEY: Again, I cannot confirm or deny the claims in the USA Today story. But what I can say is that the intelligence activities we have conducted against Al Qaida, lawfully briefed to the Congress, narrowly focused on the war on terror, have prevented attacks and saved lives.

BLITZER: There have been specific attacks that were in the working stages that, as a result of this data mining, or whatever it's called, you managed to stop that attack? Is that what you're saying?

HADLEY: I said as a result of intelligence activities undertaken by the United States.

BLITZER: I know, but I'm talking about the collection of the phone numbers. Has that specific program resulted in thwarting a terrorist act?

HADLEY: And as I said to you, I cannot confirm or deny the claims of that story. What I can tell you is the intelligence activity protected and saved lives and protected America, and the president has cited in some of his speeches incidents when that has occurred.

BLITZER: Let's talk about this number-three official at the CIA, Dusty Foggo, who's under investigation. We saw live pictures the other day of his house in suburban Virginia being searched, his offices being searched.

Explain to the American people what's going on here. How is it that the number-three official, appointed by Porter Goss to be the executive director of the CIA, is now under investigation? And you've heard all of these reports about poker games and prostitutes and limousines. What's going on?

HADLEY: This is obviously a matter which is now under investigation. It's a law enforcement matter, as you well know. That means it's something I cannot talk about.

I think the point is that the president has an opportunity in the appointment of Michael Hayden to give new leadership at

the CIA. Porter Goss has done a terrific job of beginning the transition to a reformed Central Intelligence Agency. And Mike Hayden now has an opportunity to carry that process forward. And that's why the president nominated him to head the CIA.

BLITZER: So you don't want to go into specifics on Dusty Foggo?

HADLEY: Correct.

BLITZER: Have you ever met the guy?

HADLEY: I'm not sure.

BLITZER: OK. Fair enough. Obviously didn't have a big impact on you, if you don't remember.

There's another story out this weekend, suggesting, on the Valerie Plame investigation, that the vice president, Dick Cheney, when he saw that article that her husband, Joe Wilson, the former ambassador, wrote in the New York Times, scribbled some notes on the side, including, had they done this sort of thing before, send an ambassador to answer a question? Do we ordinarily send people out, pro bono, to work for us, or did his wife send him on a junket?

Was there an effort under way in the White House, in the Bush administration, to undermine the credibility of Ambassador Joe Wilson, as a result of what he was saying at the time?

HADLEY: Well, again, as you know, this is a matter that's under investigation. There are ongoing legal proceedings associated with it. It's the kind of thing that I'm not at liberty to talk about.

BLITZER: But you were there in the middle of all of this at the time. You remember the discussions, the internal discussions. And I believe you were called to testify before the grand jury.

HADLEY: You know, there's been a lot of press commentary about that time and about Ambassador Wilson and the claims he made publicly. And it's been interesting, because there have been articles in the press and also some findings by investigations on the Hill that suggest that some of the claims that were made were not true.

But again, this is a matter that is under investigation, and the instructions that we have, of course, is to cooperate fully with these investigations and not talk about them publicly.

BLITZER: Should there be direct talks between the United States and Iran on its nuclear program?

HADLEY: Well, there have been, of course, lots of talks with Iran on its nuclear program, and we have been very much supportive of that diplomacy.

BLITZER: But should the U.S. meet directly with Iranian officials?

HADLEY: At this point, what we think needs to happen is that the process that you saw on display in New York last week needs to go forward. There needs to be a Chapter 7 resolution coming out of the United Nations Security Council that makes clear what Iran needs to do, in terms of reassuring the international community that it has given up its weapons ambitions.

We are looking at the kinds of sanctions that might be applied if it does not make the right choice. We're also looking at the kinds of benefits that might be applied if Iran does make the right choice.

But there's been a lot of opportunity for discussion with Iran on this issue. There was an agreement reached with three members of the E.U. There was a subsequent offer from the E.U. There was a proposal by the Russians, which would have done enrichment in Russia, not in Iran.

There have been a lot of opportunities for Iran to make the right choice, which is respond to the will of the international community and give assurances, by getting out of the enrichment business, that it's not pursuing a nuclear bomb.

BLITZER: We're out of time, but under what circumstances will the U.S. start direct talks with Iran on the nuclear issues -- even as you've already authorized the U.S. ambassador in Afghanistan to have direct talks with his Iranian counterpart on Afghan issues. You've authorized the U.S. ambassador in Baghdad to have direct talks with Iranian officials on Iraqi related issues.

Under what circumstances will you authorize direct U.S.-Iranian talks on the nuclear issue?

HADLEY: We think the framework we have is even better. We have a number of countries that are engaged with Iran on this issue. We are supportive of those discussions, as you know. The Europeans made a proposal to Iran about a year and a half ago, and we indicated clearly we were going to facilitate that proposal.

So the forum has now shifted to a discussion in the U.N. Security Council, where the international community, as a whole, of which the United States is a part, can make clear to Iran what it needs to do. We think that's the right forum at this time for this issue.

BLITZER: Stephen Hadley, the president's national security advisor, thanks for coming in.

HADLEY: Thanks very much.

(END VIDEOTAPE)

BLITZER: And just ahead, we'll get a different perspective. Balancing privacy and protection -- is the U.S. government crossing the line? We'll ask a former national security advisor, Zbigniew Brzezinski.

Then, U.S. troops could soon be on the front lines of the immigration battle. We'll talk about the next steps on illegal immigration reform with the Senate majority leader, Bill Frist, and the Senate Judiciary Committee's ranking Democrat, Patrick Leahy.

And remember to tune in to CNN's special primetime coverage of President Bush's speech on immigration reform tomorrow night. I'll begin our coverage with a special edition of "The Situation Room." That starts at 7:00 p.m. Eastern.

"Late Edition" continues right after this.

(COMMERCIAL BREAK)

(BEGIN VIDEO CLIP)

GEORGE W. BUSH, PRESIDENT OF THE UNITED STATES: We're not mining or trolling through the personal lives of millions of innocent Americans.

(END VIDEO CLIP)

BLITZER: President Bush responding to the bombshell report this week that the government has been monitoring millions of Americans' phone calls.

Welcome back to "Late Edition." Joining us now is former national security adviser, Zbigniew Brzezinski. He served under president Jimmy Carter.

Dr. Brzezinski, always good to have you on "Late Edition."

ZBIGNIEW BRZEZINSKI, FORMER NATIONAL SECURITY ADVISER: Nice to be with you, Wolf.

BLITZER: Is it smart for the U.S. to deploy thousands of National Guard forces to the border with Mexico to stop Mexicans and others from coming into the United States illegally?

BRZEZINSKI: I'm afraid that this have will a dramatizing effect on the problem. It, kind of, militarizes it. And I fear that the countries to the South, in particular, Mexico, would just react very adversely.

There is a problem here. There's no denying there's a serious problem. But I think we ought to view it largely as a legal and socioeconomic problem and not primarily as an enforcement problem which then requires the use of U.S. military forces

That part, to me, is troubling. BLITZER: Well, what do you do to stop illegal immigrants from coming in? Do you build a wall? Do you build a fence?

What do you do if you're not going to send in thousands of troops?

BRZEZINSKI: Well first of all, you enhance, you enlarge the border patrols. You mobilize more people to serve in border patrolling. That's what they're for. They don't have to be in the national guard or in the military.

Secondly, you do something to regularize the status of the illegal immigrants. After all, they're here in part because our economy needs them. We really need them. And they've been here, in some cases, for years. We have to tackle this in a broad and, also, humane fashion.

BLITZER: So you support what the president has proposed, a guest worker program that eventually, over 11 years or so, would allow those illegal immigrants who have been in the United States for at least five years to become citizens?

BRZEZINSKI: Yes, I do. Although, I won't argue about specifics. In fact, I think 11 years may be quite long.

But I do think we need to regularize the status of these people; we have to enforce border control more effectively on the basis of services designed to do that. And we have to have some understanding of the balance between legal requirements and economic needs. And right now, they're out of whack.

BLITZER: Let's talk a little bit about the story that came out this week in USA Today that the NSA, the National Security

Agency, since 9/11, has been collecting information on billions of phone calls, tens of millions of Americans, their phone records, to see if there are patterns that could connect the dots, if you will, and lead toward terrorist suspects in the United States or abroad.

Senator Jon Kyl, who is a member of the Judiciary Committee, Republican of Arizona said this. Listen to what he said.

(BEGIN VIDEO CLIP)

SEN. JON KYL (R) AZ: This is nuts. We are in a war. And we've got to collect intelligence on the enemy. And you can't tell the enemy in advance how you're going to do. And discussing all of this stuff is public leads to that.

(END VIDEO CLIP)

BLITZER: Are you comfortable with this NSA collection of phone records?

BRZEZINSKI: I'm not dodging, but I'm going to give you some distinctions. I was briefed at very high levels immediately after 9/11. And it seemed, at the time, that the administration was really expecting a follow-on attack in a fairly short period of time. I can see how, in that atmosphere, something like this was started immediately to see if we could get some clues.

But almost five years have passed since then. What I would like to know is what congressional leaders who were briefed and how were they briefed on this program during the intervening months and years?

Was a legal brief presented? If so, what did it say? And third, when Qwest refused to cooperate, why was it permitted not to cooperate if this was such a real, serious national security need?

So there are some weaknesses in the position of the administration, largely because of the passage of time.

BLITZER: So you're suggesting, at this point, you want more information before you draw a hard and fast conclusion on the legality or the usefulness of this whole program?

BRZEZINSKI: Absolutely. I think, in all these issues, there is tremendous vagueness. I don't know what case was made; I don't know what congressional leaders actually proved it. I don't know why we didn't press Qwest if we thought this was so necessary.

And I don't buy the proposition we are at war. You know, this is really a distortion of reality. We have a serious security problem with terrorism, although we haven't been attacked for five years. We have to deal with it over the long haul.

But to create an atmosphere of fear, almost of paranoia, claiming that we're a nation at war, opens the doors to a lot of legal shenanigans that can infringe on civil rights.

BLITZER: General Michael Hayden, the four-star Air Force general, has been tapped to become the next CIA director.

I want you to listen to what Chuck Hagel said about the law that you put in place in 1978 when you were the national security adviser under President Jimmy Carter, the FISA law, the Foreign Intelligence Service Act, because he has expanded that, Michael Hayden, when he was the National Security Agency director before moving on.

Listen to what Hagel said.

(BEGIN VIDEO CLIP)

U.S. SEN. CHARLES HAGEL (R-NE): The 1978 FISA law is outdated. I think we need a new framework of laws and regulations that in fact bring all of this up into the 21st century, new threats, new technologies.

And we need a law, a framework of regulations so that our intelligence community, our experts can work within the legality of those new laws.

(END VIDEO CLIP)

BLITZER: I assume you agree with Senator Hagel.

BRZEZINSKI: I agree 100 percent.

BLITZER: You think that the FISA has to be updated?

BRZEZINSKI: Oh, absolutely.

BLITZER: If they want to expand it, they should pass new legislation as opposed to just doing it?

BRZEZINSKI: Absolutely. If they just do it, on the basis of, I don't know, written orders, oral orders, how are this orders justified?

We slide into a pattern of illegality which, over time, can become dangerous?

BLITZER: Should General Michael Hayden be confirmed as the CIA director?

BRZEZINSKI: I have no absolutely no view on that subject at this moment. I really don't. I'm not dodging. I just don't have a view.

BLITZER: Well, what about the notion of having a military man, a man in uniform serve as CIA director?

BRZEZINSKI: Some of the best CIA directors were former military men. They weren't, maybe, necessarily, at that moment in uniform, but they got their jobs having been in uniform.

BLITZER: Stansfield Turner was an admiral...

BRZEZINSKI: Bedell Smith was another one.

BLITZER: And he served when you were the national...

BRZEZINSKI: Yes.

BLITZER: Was he active-duty in the Navy at the time when he served as CIA director?

BRZEZINSKI: He certainly was active-duty when he was appointed. I honestly don't know if he then retired or stayed on active duty.

But the point is these people very often have excellent qualifications. I don't think being a military officer necessarily infringes on their capacity to be good directors of CIA.

BLITZER: All right. We're going to ask you to stand by, Dr. Brzezinski.

We have a lot more to talk about. We're going to raise the issue of U.S.-Russia relations, Iran and Iraq, lots more, with Zbigniew Brzezinski.

Also coming up next, a quick look at what's in the news right now, including details on what's been an extremely violent day again in Iraq.

Stay with "Late Edition."

(COMMERCIAL BREAK)

(NEWSBREAK)

(COMMERCIAL BREAK)

BLITZER: Welcome back to "Late Edition." I'm Wolf Blitzer in Washington.

We're talking about the Bush administration's national security strategy with former national security adviser Zbigniew Brzezinski. He served under former President Jimmy Carter.

There seems to be some tension in the U.S.-Russian relationship right now. Vice President Dick Cheney gave a tough speech the other day to which the president of Russia, Vladimir Putin, responded in part this way: "We also must make our house strong and reliable. We must always be ready to counter any attempts to pressure Russia in order to strengthen positions at our expense. The stronger our military is, the less temptation there will be to exert such pressure on us."

How worried are you, if you are, that U.S.-Russian relations are deteriorating?

BRZEZINSKI: I'm not terribly worried.

There are some negatives in these relations due, in part, to the fact that President Bush overstated -- dramatically overstated -- Russia's move toward democracy. And as a consequence, Putin had a five-year-long free ride. So my only comment on the Cheney speech is that it's a little late in coming.

But on the other hand, we have a lot of common interests. We have a stake in developing energy security, and the summit is going to focus on that. We have a stake in meeting somehow constructively with Iran. We have some differences in tactics, but we share the view that Iran should not have nuclear weapons.

So, you know, we cooperate, we compete, and we also criticize them.

BLITZER: Should there be direct U.S. talks with Iranian officials on Iran's nuclear program?

BRZEZINSKI: That's a key issue. You know, it's really ironic. We're not negotiating with Iran, but we are negotiating. Who are we negotiating with? We're negotiating with the negotiators with Iran. And it's an absurd situation.

BLITZER: To let the French, the Germans, the British, the E.U. in effect, negotiate with the Iranians.

BRZEZINSKI: Yes, and even the Chinese and the Russians.

Now, in the case of North Korea, we are involved directly on a multilateral level in the multilateral talks. We are involved directly in the bilateral talks; we talk directly to the North Koreans.

BLITZER: On the sidelines.

BRZEZINSKI: Yes, but it's a direct formal relationship.

The argument that the administration makes is that we can't negotiate with Iran because it will legitimate them. Well, we're legitimating North Korea, so what's the big deal?

The fact is there are serious differences between the United States and Iran, conflicts over security issues, over financial problems, claims and counterclaims. We need to talk to each other to create a measure of security and to be engaged.

BLITZER: But even if the U.S. were to engage in direct talks with Iran, do you see it at all possible that under any circumstances the president of Iran, Ahmadinejad, would give up a nuclear weapons program?

BRZEZINSKI: First of you, we have built them up. We have built them up by making threats. We have pumped him up. He is not really the top figure. We call him president; that's his title. But the president is not the top dog in Iran.

BLITZER: Is there any incentive for him to give up weapons?

BRZEZINSKI: Not in the present circumstances, when we're not engaged in the negotiating process and when we are pumping up an atmosphere of urgency. The fact is that the earliest, by most intelligence analyses, the Iranians will have nuclear weapons is approximately five years, more likely 10. Some even say 15.

So there is time to set in motion a negotiating process which is multilateral, bilateral; we participate in it and then we address some of the issues that concern us.

But the Iranians have also concerns that we need to address. If we do that, we might be able to contrive an arrangement whereby they're allowed to process but in a fashion that gives all of us security that they're not building weapons.

BLITZER: You wrote a provocative piece recently, saying the U.S. should start withdrawing troops from Iraq. What is the timetable you would like to see for a complete U.S. pull-out from Iraq?

BRZEZINSKI: I put a little differently than you summarize it. I said we ought it talk to the new Iraqi leaders and get them to ask us to leave.

Those who are willing to ask us to leave are those who are prepared to stay and govern. Those who don't want to ask us to leave, probably, will leave when we leave.

Secondly, we publicly discuss with them how long we stay. And I would say roughly a year. Then thirdly, the Iraqi government then convenes a conference of all of the adjoining Muslim states regarding stabilization of Iraq of which they do have a real interest. And they won't do it as long as it's occupied by us.

BLITZER: Do you see light at the end of this tunnel in Iraq?

BRZEZINSKI: And last, we then convene a donor's conference to rehabilitate Iraq. If we get out, the situation will stabilize. The longer we stay, the more we become the problem, the more likely the civil strife will escalate into civil war. It is not yet a civil war, but it is getting close to it.

BLITZER: Zbigniew Brzezinski served as President Carter's national security adviser. Thanks very much, Dr. Brzezinski, for coming in.

BRZEZINSKI: As always, good to be here.

BLITZER: Thank you.

And up next, the battle over illegal immigration. President Bush set to address the issue in a major speech tomorrow night. We'll preview that speech. We'll preview lots of other issues with the U.S. Senate's majority leader, Bill Frist and the Senate Judiciary Committee's top Democrat, Patrick Leahy. All that coming up. Stay with us.

(COMMERCIAL BREAK)

BLITZER: Welcome back to "Late Edition." The president's address comes as the Senate tries to hammer out an immigration reform bill. Just a short while ago, here in Washington, I spoke with Senate majority leader, Bill Frist of Tennessee.

(BEGIN VIDEOTAPE)

BLITZER: Senator Frist, thanks very much for joining us. Welcome back to "Late Edition."

SEN. BILL FRIST (R-TN), MAJORITY LEADER: Good to be back with you, Wolf.

BLITZER: The president, Monday night, delivers a major address on immigration. Do you support deploying thousands of National Guard, U.S. military forces to the border with Mexico to stop illegal immigrants from coming in?

FRIST: Wolf, I do. There are a lot of things we can do, we are doing in the United States Senate and our Congress. A lot of those take time. The only thing that we can do to secure our borders right now is to give our states help, and that is best done through the National Guard.

BLITZER: How many troops do you think are needed to be sent to the border with Mexico?

FRIST: I think it's too early to know at this standpoint. I think each state has to identify what law enforcement they can

put on the front line, what the resources are, and then, at that point in time, determine how much of the National Guard will be necessary.

Who pays for the National Guard? Probably, that will be a federal responsibility, I would think. The National Guard will be under state control. They need to determine how many people will be required along that Texas or Arizona or California borders.

BLITZER: Have you been told by the White House that this is in the president's intention, to deploy or, at least, seek approval for the deployment of U.S. military forces to the border with Mexico?

FRIST: You know, I have not been in direct conversation. I have encouraged use of the National Guard, again, not the Army and not the other military, but the National Guard, which is traditionally under the auspices of the states. I've encouraged -- I've encouraged strongly. I think that's the least we can do.

Securing our borders is a federal responsibility. We need to act. We have failed miserably in the past. That was what we failed with in 1986, when we last gave amnesty but we didn't secure our borders. This time, we've got to get it right.

BLITZER: Here's what Harry Reid, your counterpart, the Democratic leader in the Senate, says about this notion. Listen to this.

(BEGIN VIDEO CLIP)

U.S. SENATOR HARRY REID (D-NV), MINORITY LEADER: As a result of the war in Iraq, so overextended, so depleted in numbers and in equipment, I don't know how in the world we could ask them to have this additional burden, where they'll have to be pulled out of various states around the country to go help with Katrina.

Now we have thousands and thousands Guard and Reserve troops in Iraq. Now we're going to ask them to go to the border? I don't think they are able to do that.

(END VIDEO CLIP)

FRIST: Well, you know, he's wrong. The sort of whining and the moaning -- we've go to secure our borders. We hear from the American people. We've got millions of people coming across that border. First and foremost, secure the border, whatever it takes. Everything else we've done has failed, we've got to face that. And so, we need to bring in, I believe, the National Guard. We need to put money in there. We're doing that. We need to increase the number of border security agents. We've done that, and we're going to continue to do that. But right now, for the short term, for all that to take effect, we have to have support, and it's a federal responsibility, and the National Guard are the people to do it. BLITZER: The Republican governor of California, a border state, also has questions about sending troops to the border. Listen to what Arnold Schwarzenegger said.

(BEGIN VIDEO CLIP)

GOV. ARNOLD SCHWARZENEGGER (R), CALIFORNIA: I think that the key thing is to have secure borders. Going the direction of the National Guard I think is maybe not the right way to go, because I think that the Bush administration and the federal government should put up the money to create the kind of protection that the federal government is responsible to provide.

(END VIDEO CLIP)

BLITZER: What do you say to the governor?

FRIST: Well, I think he too is wrong, in the sense that the National Guard shouldn't be used. The money -- we put $10 billion last year on our border. Just the other day, on the floor of the Senate, another $1.9 billion. Money alone is not going to do it. I think the governor just said it does come back to money, and I do feel it is a federal responsibility to support that National Guard on the border.

BLITZER: Do you support the president's proposal for a guest worker program that would eventually lead toward citizenship for 10 or 12 million illegal immigrants in the United States over a number of years?

FRIST: Wolf, what we're going to do starting tomorrow is take a comprehensive bill to the floor of the Senate. Strong on border security, as you heard me say. We've got to lock down the border first and foremost. It also is going to have a temporary worker program for about six years, where people can come and go, and it's going to have a strong workplace interior enforcement, where employers will be given the tools to enforce the law, but they've got to enforce the law. And then the fourth component is what to do with the 12 million people.

I do believe that we need to treat that program in respect to the diversity that it is, and thus for less than two years, send them back home. Between three and five years, put them into the temporary worker program.

And greater than five years, give them the opportunity to earn citizenship over another 11-year period. That means they'd have to be in this country for up to as long as 16 years. They have to learn English. They have to have a job. They have to pay back-taxes, pay current taxes. They need to earn that opportunity for citizenship.

BLITZER: But if they've been here for more than five years right now, they have to wait 11 years to become citizens.

FRIST: It would be an earned citizenship, a probationary period. The current legislation on the floor is not perfect. That's why we need to have amendments. Like, right now, felons could get citizenship under the bill that's on the floor. We have to have an amendment, hopefully tomorrow or vote on it on Tuesday, to pull that felon standard out of there.

So there are a lot of things on this bill that are imperfect, but it's comprehensive, it addresses each of the four dimensions that I mentioned. And I predict we will be able to get that bill off the floor.

BLITZER: A lot of your conservative friends call this amnesty, letting these illegal immigrants who have been here for five years or longer work their way toward citizenship. Is this amnesty?

FRIST: You know, that's where all -- not all, but most of the focus is going to be, I think, over the next week. What is "amnesty"? How to deal with the 12 million people who came here who broke the law, who broke the law, but also we need to treat them with compassion. Forty percent have been here longer than 10 years.

Now, my definition of "amnesty" -- and I've been very consistent with it -- is that you don't give people a leg up on citizenship. Thus they have to earn it. And if that's the case, much of the debate, in my mind, should center on what they need to do over that 11-year period to earn that citizenship, what those criteria should be. And that will be debated on the floor of the Senate.

BLITZER: The CNN poll that we conducted earlier in the month, we asked, "Do you favor or oppose amnesty for illegal

immigrants in the United States for more than five years?" Seventy-two percent favor it. Twenty-five percent oppose it.

That would seem to be a strong support for the president's position, which effectively is the McCain-Kennedy legislation in the Senate that you now are on board with.

FRIST: Yes, that is correct. But, again, I think we need to put the word "amnesty" aside because it's become such a buzzword for people right now. Nobody knows exactly what "amnesty" means. They have to define it in their own mind.

But the focus will be on what those 12 million people will have to go through. Some will be sent back home. Some will just be through the temporary-worker program. Those greater than five years are going to have to earn it. What are those criteria going to be?

And let me come back. They should not get a leg up on anybody else, in terms of citizenship. They broke the law.

(END VIDEOTAPE)

BLITZER: And just ahead, the second part of my interview with Senate Majority Leader Bill Frist. We'll speak about a proposal he wants to raise in early June banning same-sex marriage in the United States. We'll be right back.

(COMMERCIAL BREAK)

BLITZER: For our North American viewers, CNN reporters will be "On the Story." That comes up right after "Late Edition" an hour from now, 1:00 p.m. Eastern, 10:00 a.m. Pacific.

And there's much more ahead on "Late Edition," including the debate over the U.S. government's tracking phone calls. We'll ask the Senate majority leader, Bill Frist, and the Judiciary Committee's ranking Democrat, Patrick Leahy, about that and more.

And don't forget CNN's primetime coverage of President Bush's speech on immigration reform starts at 7:00 p.m. Eastern in "The Situation Room." Lou Dobbs will be joining me. The president's address begins at 8:00 p.m. Eastern. That will be followed by a special edition of "Lou Dobbs Tonight" at 8:30 p.m. Eastern.

"Late Edition" continues right at the top of the hour.

(COMMERCIAL BREAK)

BLITZER: Welcome back to the second hour of "Late Edition."

We'll return to my interview with the Senate majority leader, Bill Frist, in just a moment. First, though, let's get a quick check of what's in the news right now from Brianna Keilar at the CNN headquarters in Atlanta.

(NEWSBREAK)

BLITZER: Just a short while ago, I spoke with the Senate majority leader, Bill Frist of Tennessee. Here's part two of that conversation.

(BEGIN VIDEOTAPE)

BLITZER: As you know, the House of Representatives has already passed legislation that's going to have to be reconciled in a conference committee with any legislation that's eventually passed by the Senate.

The House-passed legislation makes illegal immigration a felony. If you're here in this country illegally, you become a felon. It requires employers to verify worker status and to punish them if they hire illegal immigrants. There are fines, as I said, for hiring illegal immigrants. And it also calls for a fence or a wall to be built along a big chunk of the border, the United States border with Mexico. And no guest-worker program at all.

First of all, do you support building this wall along the border between the United States and Mexico?

FRIST: I think, as I described with the National Guard, we need, in essence, a wall, a wall, a structure where people can't go under, over, around or through. Does it have to be a 30-foot-high concrete wall? No, it does not. It could be the use of UAV, unmanned aerial vehicles, it could be infrared censors, it could be censors on the ground. The point is, we have to have a barrier there that people cannot cross. Part of it will have to be a structural wall; part of it does not need to be.

BLITZER: Can you finesse a compromise...

FRIST: Yes.

BLITZER: ... between the Senate and the House?

FRIST: Yes. Yes. I am absolutely convinced.

Right now, this discussion has matured over the last four to five months. We started even in the Senate with just strong border security, first and foremost, and that's where my heart is. But now people realize, unless you in some way manage the magnet which attracts people to this country, no matter how tall that wall is, people are going to continue to come. And therefore, you need all four components of the program.

The debate has matured. Over the next two weeks on the floor of the Senate, the debate is going to mature more and more as people learn more about how complex this problem is. It's an economic problem. It addresses who we are as the American people, a nation of the rule of law, but also a nation rich in immigrant history, our basic values, the humanitarian aspect, that people are dying across these borders.

It's a tough issue. It's not a Republican issue. It's not a Democrat issue. It's an American issue. And it's one we're going to take on boldly, on the floor of the Senate, following the leadership of the president of the United States.

BLITZER: And finally, when do you think this would be passed by the U.S. Senate?

FRIST: Within the next two weeks. I am confident. You've seen us working together in a bipartisan way -- this is a bipartisan bill, across the board. And yes, you know, there may be 10 people on either side who don't vote for it, but it's a bipartisan bill.

You're going to see the very best of the United States Senate as we have open amendment, open debate, take it to the floor, improve the bill that's on the floor, and we'll have it off before Memorial Day.

BLITZER: Let's talk about the surveillance programs here in the United States since 9/11. USA Today reported a bombshell this week. Let me read to you from the article on Thursday.

"The National Security Agency has been secretly collecting the phone call records of tens of millions of Americans using data provided by AT&T, Verizon and BellSouth. The NSA program reaches into homes and businesses across the nation by amassing information about the calls of ordinary Americans, most of whom aren't suspected of any crime. With access to records of billions of domestic calls, the NSA has gained a secret window into the communications habits of millions of Americans."

Are you comfortable with this program?

FRIST: Absolutely. Absolutely. I am one of the people who are briefed...

BLITZER: You've known about this for years.

FRIST: I've known about the program. I am absolutely convinced that you, your family, our families are safer because of this particular program.

I absolutely know that it is legal. The program itself is anonymous, in the sense that identifiers, in terms of protecting your privacy, are stripped off. And, as you know, the program is voluntary, the participants in that program.

And it comes to the reality -- it faces the reality that we're in the 21st century. And the only way to connect the dots, whether around the world or in this country, to prevent another 9/11, whether it's in the Pentagon or in New York or back in Nashville, Tennessee, is to connect those dots. And the only way to connect those dots is to use 21st-century technology that protects your privacy, and that's exactly what this does.

BLITZER: Can you tell the American people right now that over these past almost five years since the phone records have been collected -- I'm not talking about the warrantless surveillance, the warrantless wiretaps -- the phone records, that has resulted in thwarting one terrorist attack in the United States?

FRIST: You know, I am not going to comment on the program until the appropriate time. There has not been even a confirmation of the USA Today program itself. I...

BLITZER: But have you been briefed on one success story?

FRIST: I can tell you I've been briefed in a classified way, and I can tell you that I am absolutely, 100 percent sure, confident that this has protected and saved lives in the United States of America.

BLITZER: But has there been one success story that you can point to?

FRIST: I just don't want to be pulled in...

BLITZER: Without specifics, just tell us that there has been a terrorist attack that was plotted and, as a result of collecting these phone calls, was thwarted.

FRIST: You know, in appropriate hearings and settings, this will come out. But this is classified information about a classified program. You know, the more we talk about these programs, the more we're giving our playbook to the

terrorists who are sitting out around this country right now, who did plan 9/11 and what happened at the Pentagon today. And they are in this country now. They are waiting. And the more we talk about these programs, we're giving them the playbook, and that empowers them to be able to have an attack on this country. And it's just not the right thing to do.

BLITZER: When are you going to introduce on the floor of the Senate legislation that would ban same-sex marriage?

FRIST: Sometime in early June, in early June. We're going to finish -- the Senate plans will be that we will go through immigration. I'm going to do my best to bring the Kavanaugh nomination to the floor of the Senate. And then we have a break at Memorial Day. And very soon after that we will take the proposed amendment on having marriage be defined as a union between a man and a woman.

BLITZER: As you know, the daughter of the vice president, Mary Cheney, has got a new book out. She's a lesbian; she talks openly about it.

She was on "Larry King Live" earlier this week, and she spoke about this amendment that you would like to see passed that would ban same-sex marriage. I want you to listen to what she said.

(BEGIN VIDEO CLIP)

MARY CHENEY, AUTHOR: ... his position very clear, that he does not support the federal marriage amendment. When President Bush endorsed the federal marriage amendment, I did give pretty serious consideration to quitting the race, or to quitting the campaign, but I just couldn't. It was such an important election, and I believe so strongly in my dad."

(END VIDEO CLIP)

BLITZER: She says her father opposes what you're about to try to pass. What do you say to the vice president and Lynne Cheney, when you look them in the eye and you say, "I want to ban same-sex marriage," knowing that their daughter clearly supports same-sex marriage?

FRIST: Yeah, I basically say, Mr. Vice President, right now marriage is under attack in this country, and we've seen activist judges overturning state by state law, where state legislatures have passed laws defining marriage between a man and a woman and that's it. And that is being overturned by a handful of activist judges around the country. And that is why we need an amendment to come to the floor of the United States Senate to define marriage as that union between one man and one woman.

BLITZER: Are you running for president?

FRIST: You know, I'm going to wait and see after I leave. Right now, as you well know, we've got a lot to work on here, so my number- one goal is going to be push this Republican agenda forward for the American people and, number two, make sure that we're in the majority next year in the United States Senate.

BLITZER: Senator, thanks very much for joining us.

FRIST: Great to be with you, Wolf. Thank you.

(END VIDEOTAPE)

BLITZER: And coming up, a top Democrat's take on the immigration fight, the domestic spying controversy, lots more. We'll talk live with Senator Patrick Leahy of Vermont.

Then: Did the Iraq war spread turmoil across the Middle East?

My special conversation with Jordan's new foreign minister, Abdel Ilah Khatib, about where things stand in the region.

Plus, in case you missed it, we'll have some of the highlights of the other Sunday morning talk shows here in the United States. "Late Edition" continues right after this.

(COMMERCIAL BREAK)

BLITZER: Welcome back. Joining us now with his take on immigration reform as well as the Bush administration's domestic surveillance program, is the ranking Democrat on the Senate Judiciary Committee, Patrick Leahy of Vermont.

Senator, welcome back to "Late Edition."

SEN. PATRICK LEAHY (D), VERMONT: Thank you. Good to be with you.

BLITZER: I want you to listen to what General Michael Hayden -- he's been nominated by the president to become the next CIA director -- what he said about this USA Today report suggesting that, for almost five years, the National Security Agency has been collecting data on billions of phone calls here in the United States.

Listen to what he said.

(BEGIN VIDEO CLIP)

GEN. MICHAEL HAYDEN, CIA DIRECTOR NOMINEE: All I would want to say is that everything that NSA does is lawful and very carefully done and that the appropriate members of the Congress, House and Senate are briefed on all NSA activities. And I think I'd just leave it at that.

(END VIDEO CLIP)

BLITZER: All right. Are you convinced that everything the NSA has done, monitoring these phone calls, recording the patterns, listening in, not necessarily listening directly in but making sure phone numbers are recorded, has been lawful? LEAHY: No, I don't believe it's lawful. I do believe that General Hayden is a very competent, highly intelligence trained officer. And I appreciate that. But this is a question that goes beyond him. It goes to the White House. Is it legal? Is it proper? Does it follow the law?

And what we've been told in public leads me to believe it's not.

That's why I think it's very important that the...

BLITZER: What's illegal about it, potentially?

LEAHY: Well, there are very specific laws about when you can go and collect that. There's nothing that allows just a blanket going into your phone records, my phone records, everybody else that's listening.

And some might question: what does that give us? I mean, it's like drinking from a fire hose. We should be spying on terrorists, not spying on innocent Americans.

If you have hundreds of millions of phone calls you're trying to track a day, what do you get out of it? Remember, this is the same administration that had the information that could have stopped 9/11 from happening. They didn't translate it until September 12.

BLITZER: This has been going on, though since 9/11. Michael Hayden was the director of the National Security Agency. And he says that members of Congress, key members, Republicans and Democrats, were briefed on this program.

LEAHY: I've yet to hear anybody say they were briefed on the legality of it and agreed to it. And that's why the Judiciary Committee is going to have hearings on whether it is legal.

This is also, probably, why one of the telephone companies, Qwest, refused to go along with this. And nobody -- I mean the administration, when they were, told we're not going to go along with it because we don't feel it's legal, if they really thought it was legal, they would have come right back in and said, no, you've got to give it to us.

Instead, they said, whoops, sorry, we're backing off. Does that mean that...

(CROSSTALK)

... if terrorists are going through one phone company, they're OK, and not through another, anymore than I believe that there are millions and millions of Americans involved in terrorist activity.

BLITZER: So did AT&T, Southern Bell and Verizon -- did they violate the law, violate the privacy of their customers?

LEAHY: I do not find anything in the law that allows them to do this. This is why they're going to be invited to come before the Senate Judiciary Committee and explain under what law they acted.

BLITZER: Your colleague on the Judiciary Committee, Jeff Sessions, a Republican of Alabama -- he responded to these reports this way. Listen to what he said.

(BEGIN VIDEO CLIP)

SEN. JEFF SESSIONS (R) AL: We're in a war with terrorism. There are people out there that want to kill us.

And I don't think this action is nearly as troublesome as being made out here because they're not tapping our phones and getting our conversations; they're merely maintaining these numbers from which they have some system, apparently, to utilize those to match up with international phone calls connected to Al Qaida.

(END VIDEO CLIP)

LEAHY: Well, you know, the junior senator from Alabama has raised, basically, the White House talking points. The

chairman of the committee, however, has said we're going to call them forward to find out what they did.

The fact of the matter is, it's almost as though, well, we can't tell you anything because we're fighting terrorists. Every time this administration screws up, whether it's with homeland security, after Katrina, a massive failure even though they spent billions of dollars to make sure that thing wouldn't happen, when they screw up along the border, when they get caught doing illegal surveillance of Americans, they say, well, but 9/11, 9/11.

Well, I'd remind them 9/11 happened on their watch. I think Americans are getting fed up with simply using an excuse for your mistakes and classify everything else so that you can't talk about it.

I want us to be safe. I don't think that this administration is doing it the right way. They screwed up with homeland security. They screwed up with Katrina. I mean, after all, they were told, go catch a 6'6" Arab running around Afghanistan, probably on dialysis, according to the press reports, Osama bin Laden.

We gave them everything they needed to go after him and they failed to catch him because they said, well, let's go to war in Iraq and then -- I mean, some of the declarations, Wolf -- I get very frustrated about it -- the president goes, several years ago, on an aircraft carrier and says, "mission accomplished," "mission accomplished."

BLITZER: He said major operations, combat operations were over.

LEAHY: Well, even that's wrong.

BLITZER: Yes, I know.

You spoke about General Hayden. You like him. You think he's highly qualified. The Republican chairman of the House Intelligence Committee, Peter Hoekstra -- I interviewed him in "The Situation Room" earlier in the week -- listen to what he said about General Hayden.

(BEGIN VIDEO CLIP)

U.S. REPRESENTATIVE PETER HOEKSTRA (R-MI): Obviously the program has been going on for 4 1/2 years in one fashion or another sends a clear signal. The people walked out of those meetings believing the program was legal, essential, and it was making a difference.

(END VIDEO CLIP)

BLITZER: Well, he was defending the program but he also didn't like the fact that General Hayden wears a uniform, active duty. He thinks a civilian should be running the CIA, not a military man.

What do you say?

LEAHY: I think somebody very competent should be running the CIA. I voted against Porter Goss as head of the CIA. He's a nice enough man but totally unsuited. It was just one more mistake by this administration. When they said, "We're going to protect you," they put a crony in who was then asked to hire other Republican cronies to run the CIA. We all know -- even this administration will admit -- that was a massive mistake.

BLITZER: Porter Goss. But what about Hayden? Your intention is to vote to confirm him based on what you know now?

LEAHY: No, I'm going to have to ask him a lot of questions. I said he's highly competent, certainly far more so than Mr. Goss was. But I want to know under what justification -- how does he justify the illegal spying on millions upon millions upon millions of Americans -- you, me and everybody else?

BLITZER: All right. Senator Leahy, stand by.

We're going to continue this conversation. Lots to talk about, including the president's address tomorrow night on immigration reform. We'll continue our conversation with Senator Patrick Leahy.

And don't forget to watch CNN's special coverage tomorrow night, primetime, the president's speech on immigration. It all starts in "The Situation Room" at 7:00 p.m. Eastern. My colleague Lou Dobbs will be joining me then. He'll follow the president's speech at 8:30 p.m. Eastern with a special edition of "Lou Dobbs Tonight."

Stay with "Late Edition."

(COMMERCIAL BREAK)

BLITZER: Welcome back to "Late Edition." We're talking with the Senate Judiciary Committee's top Democrat, Patrick Leahy of Vermont.

Is it a good idea to send thousands of National Guard troops to the border with Mexico to prevent illegal immigrants from trying to sneak across that border? LEAHY: I think what it is saying is our present immigration policy has failed. We have tried for years to get the administration to beef up our border patrol; they haven't done it.

Now that the governors want to call out the National Guard, that's fine, but let's start asking how thin they were. At one time last year, I think 50 percent of our forces in Iraq were National Guard.

BLITZER: About 40 percent National Guard and Reserve.

LEAHY: National Guard and Reserve. I mean, we're stretching them pretty thin now. We're going to make a border patrol out of them?

What I wish they had done -- and we asked them two years ago, why don't you fund the border patrol positions that the Congress has provided? You know what we got from Homeland Security for an answer? Nothing. Nothing at all. We gave them the money. We gave them the positions. They never filled them.

This comes to a question of competence. Having said that -- or incompetence, in this case.

Having said that, I think the president is right when he says we need a comprehensive immigration bill. I'll work with him and with some of my fellow Republicans in the Senate to do that. We passed a bill on a bipartisan vote out of the Judiciary Committee on immigration.

But, you know, there's a whole lot of parts. You're not going to arrest 12 million people -- I think we all agree on that -- and send them back. You just can't do it.

But what we ought to be doing is find a way to actually enforce our laws in employment situations. We don't. There's kind of a wink and nod to employees that are hiring illegal immigrants, paying them less than minimum wage but saying, "You can't say a word about it because we'll just call immigration."

BLITZER: But it looks like there's a compromise on the Senate side between Harry Reid and Bill Frist of the McCain-Kennedy language. It seems like that's going to go forward.

LEAHY: Yes. I've been...

BLITZER: Senator Frist, here on this program, said he expects by Memorial Day that to be passed in the Senate, and it'll have to be reconciled with a very different version in the House.

LEAHY: I applaud both Bill Frist and Harry Reid for getting together on that. I think they've done a service. I've been involved in these negotiations. We still have a way to go, but I think this is the way -- this is the way the Senate used to work, when you'd get together on these tough issues. And I think the president -- and I commend him. He spent about an hour and a half with a number of us a week or two ago talking about it. So long as we understand you're not going to pass simply an enforcement bill, it's got to be a comprehensive immigration bill.

BLITZER: Senator Frist also said that shortly after the Memorial Day break he wants to bring up an amendment to the Constitution that would ban same-sex marriage. He said that was going to be the next major issue on the agenda. Is that a good idea?

LEAHY: No, it's an election-year stunt. It's sort of like calling us into emergency session on Terri Schiavo to try to overturn very competent courts who looked at this terrible, tragic family issue.

These are the same Republicans who say, "We don't want the federal government trampling on our states." Well, the states have traditionally set the laws on marriage. They say what age you have to be to marry, whether you have to have your parents' permission, and so on. The states have done that. And what we ought to do is allow the states to do that.

Most states are going to say marriage is between a man and a woman. My own state of Vermont, because of our constitution, was given a question, would we support gay marriage? They said no. We'll have civil unions, which would give a gay couple legal rights of inheritance and so on.

But let the states work it out. They've always worked out these issues of marriage. That's the way it should be.

BLITZER: All right. One final question before I let you go.

LEAHY: Says the man who's been married 44 years to a woman I adore.

(LAUGHTER)

BLITZER: Especially on Mother's Day.

LEAHY: Especially on Mother's Day.

BLITZER: Let's talk about what Newt Gingrich said on "Meet the Press" earlier today. You remember, he was the

speaker in '94 when the Republicans took the majority in Congress with its "Contract with America."

A lot of Democrats are hoping the Democrats can do the same thing this time, recapture the majority. Newt Gingrich was skeptical you could do it. Listen to this.

(BEGIN VIDEO CLIP)

NEWT GINGRICH, FORMER SPEAKER OF THE HOUSE (R-GA): They can't possibly put together a "Contract with America" because Howard Dean and Nancy Pelosi and their allies are all so far to the left, they can't be clear what they would do: raise taxes, create more big bureaucracy, have a much weaker system of defending America.

(END VIDEO CLIP)

BLITZER: Is he right?

LEAHY: Well, he's so full of himself with this. You know, we need competence with accountability.

This is the man who was opposed to the Clinton plan to balance the budget. We balanced the budget. We brought about a surplus -- a surplus which has now been turned by Republicans into the largest deficit and largest national debt in history.

This is the man who got so upset that he wasn't treated equally with the president on Air Force One that he was willing to shut down the government at a cost of untold millions.

If that's competence, I don't want it. I'm fed up with that. We can do a far better job, and we will.

BLITZER: All right, Senator Leahy, thanks very much for coming in. Appreciate it.

LEAHY: Thank you.

BLITZER: And coming up, it's been six months since the deadly terror attack against Jordan. We'll speak with that country's foreign minister. That's coming up.

But first, this: Mary Cheney, what's her story? The daughter of Vice President Dick Cheney is speaking out in her new book, "Now It's My Turn."

Cheney writes about being a lesbian and working for President Bush while the Republican ticket opposed same-sex marriage. She reveals she nearly quit the campaign when the president publicly supported a constitutional amendment to ban gay marriage.

While Cheney says her family has always been supportive, she did not join them on the platform at the 2004 GOP convention.

Before joining the first Bush/Cheney campaign in 2000, Mary Cheney worked as a gay community liaison for the Coors Brewing Company. She currently lives in northern Virginia with her longtime partner.

(COMMERCIAL BREAK)

BLITZER: Welcome back to "Late Edition." I'm Wolf Blitzer in Washington. Six months ago terrorists, launched a deadly attack in Jordan's capital city of Amman.

On his visit to Washington this week, I spoke with that country's foreign minister, Abdel Ilah Khatib about Jordan's role in the war on terror and more.

(BEGIN VIDEOTAPE)

BLITZER: Foreign minister, welcome to Washington. Good to have you on "Late Edition."

ABDEL ILAH KHATIB, JORDANIAN FOREIGN MINISTER: Thank you. Good to be with you.

BLITZER: Let's talk a little bit about the aftermath of those terrorist attacks against the hotels in Amman back in November.

In February, the New York Times Magazine wrote this, printed this: "Jordan is home to many jihadis, young men from much the same milieu that produced Abu Musab al-Zarqawi and especially since the United States invaded Iraq nearly three years ago, Jordan has increasingly become a not-so-quiet place, a place where local Islamists cross easily into Iraq and back, a place where a jihadist underground can feel almost a normal part of a nation's life."

How bad is the terror threat facing Jordan right now?

KHATIB: Well, in many Muslim countries, there have been young people recruited by extreme groups. And I don't think Jordan is a unique case but I think that the number of people who are being recruited is getting less and less. And I think that Jordan is doing a very good job protecting its border with Iraq.

I think that the explosions were shocking for the average Jordanian and I can say that the Jordanians at the civilian and security levels are more vigilant and there is a very strong drive against any terrorist activity in Jordan. And I think that the ability of these groups to recruit Jordanians is reduced tremendously.

BLITZER: It seems that Abu Musab al-Zarqawi, who himself is a Jordanian, has a special desire to undermine the regime, the kingdom, the Hashemite Kingdom of Jordan.

Is that a fair assumption?

KHATIB: Well, he has not been successful in doing that.

BLITZER: But he's trying to do that.

KHATIB: He tried but he did not find any Jordanian to be recruited by him and to be sent across the border to conduct any terrorist activity.

BLITZER: Well, what about the terrorist activities ...

KHATIB: They were carried by non-Jordanians, non-Jordanian elements. Yes.

BLITZER: Non-Jordanians?

KHATIB: Yes.

BLITZER: Who was responsible? KHATIB: I think that the reports by the security agencies indicated -- they were public -- that Iraqis were sent across the border in that specific instance.

And there is a lady who is jailed and who will be sent to court -- I think she is already before court already -- and she is, again, Iraqi.

BLITZER: Were they sent by Abu Musab al-Zarqawi?

KHATIB: Yes, that was the case.

BLITZER: Al Qaeda in Iraq? That's the organization.

KHATIB: He was not able to recruit any Jordanians to conduct operations in Jordan for him.

BLITZER: The problem, though, exists...

KHATIB: Yes, of course.

BLITZER: ... because a lot of Americans love to go to Jordan for tourist attractions, beautiful sites. How worried should Americans and other foreigners be about visiting Jordan right now?

KHATIB: I think that the record of Jordan is very excellent, and I think that the security agencies in Jordan have been doing a great job. Of course, there is a threat for all of us. Not only in Jordan, throughout the region, and in Europe and the United States, the security and terror threat exists all the time. But I think that what speaks more importantly than anything else is the security agencies' record and the record of Jordan as a country in combating terrorism.

BLITZER: You obviously are trying to find Abu Musab al-Zarqawi. He is the most wanted terrorist in Jordan. He is someplace in Iraq. Is that fair?

KHATIB: Well, these are the media reports.

BLITZER: What do you think?

KHATIB: I think that he is most likely there and I think that he is being pursued by many, many security agencies throughout the world.

BLITZER: You'd like to get your hands on him, I'm sure.

Another issue that's come up in recent days is allegations that Hamas was involved in arms smuggling, trying to bring weapons into Jordan, maybe from Syria, maybe someplace else, causing a serious strain in Jordan's relationship with the Hamas-led Palestinian Authority. What's the latest information you have on this so-called plot?

KHATIB: There is a delegation from the Palestinian Authority in Jordan today discussing this issue, which we don't want

to highlight, you know, publicly, because we care about the relations with the Palestinian Authority. We want to maintain excellent relations with the Palestinian Authority, and we hope that we will be able to do that. And we care for maintaining our relations with the Palestinian people. It's very important not to allow any infiltration, any attempt to undermine our security, but it's also important for Jordan to maintain excellent relations with the P.A. and with the Palestinian people.

BLITZER: With the Palestinian Authority.

Here's what Sami Abu Zuhri, a Hamas spokesman said on April 19th. "We in Hamas reject and condemn these false accusations. We regret that the Jordanian government has used this to justify the canceling of the visit by the foreign minister, Mahmoud al-Zahar.

KHATIB: We did not need any justification to cancel any visit, and we have invited a delegation from both the government and the security agencies of the P.A. And my understanding is that the government preferred not to participate in that delegation.

BLITZER: Here is what President Bush says about Hamas and the U.S. refusal to deal with the Palestinian Authority led by Hamas. Listen to this.

(BEGIN VIDEO CLIP)

BUSH: Hamas has made it clear that they do not acknowledge the right of Israel to exist. And I have made it clear that so long as that is their policy, we will have no contact with the leaders of Hamas.

Democratically leaders cannot have one foot in the camp of democracy and one foot in the camp of terror.

(END VIDEO CLIP)

BLITZER: Is that a wise policy for the U.S., the European Union, Israel, to reject any talks, any negotiations with Hamas so long as they don't meet the requirements they put forward, recognized Israel's right to exist and terrorism and agree to all the Oslo, post-Oslo agreements that the former Palestinian Authority accepted with Israel?

KHATIB: You know that the new government has been in office practically for about five or six weeks, and it's early to make a final judgment. But it is our hope that they face up to their responsibilities and act as a government. There is a huge difference between acting as a resistance or opposition group and acting as a government. They are responsible for the welfare of the Palestinian people, for advancing the national cause of the Palestinian people, so let's hope that they move in the right direction.

BLITZER: Here's what the Israeli prime minister, Ehud Olmert, said the other day about Hamas. Listen to this.

(BEGIN VIDEO CLIP)

EHUD OLMERT, ISRAELI PRIME MINISTER: If they will accept these principles, then of course we are ready to talk. If we wait two months, three months, half a year, and we don't see any change, then most likely we are going to move forward without an agreement, without negotiations.

(END VIDEO CLIP)

BLITZER: Now, Jordan, like Egypt, has a peace treaty with Israel. Are you encouraging, pressuring, telling the Hamas government to accept these conditions and accept Israel's right to exist?

KHATIB: It is our strategy in Jordan to move in the direction of achieving comprehensive peace, and we look at our peace treaty with Israel as part of the comprehensive peace, and we think that all parties have to go back to the negotiating table.

We believe that President Abbas is both authorized and willing to move in the direction of conducting negotiations with Israel, and we hope that the new Israeli government will move in the same direction, because we think at the end of the day, we will not be able to end the conflict unless there is a peace agreement, negotiated peace agreement between the Israelis and the Palestinians.

BLITZER: But do you believe Hamas will accept those conditions? Is that foreseeable?

KHATIB: We hope that all the Palestinian Authority will be moving in that direction, but we know that President Abbas is willing and authorized -- he has been democratically elected with a margin of 62, 64 percent -- and he has expressed his willingness lately, repeatedly, but lately that he is willing to engage in direct peace negotiations.

BLITZER: That's President Mahmoud Abbas of the Palestinian Authority ...

KHATIB: And he is authorized ...

BLITZER: But his party, the Fatah, lost. It was Hamas that won.

KHATIB: But he is the authorized leader of the P.A. and of the PLO, and we believe that he is capable of conducting negotiations, because he is empowered by the basic law of the P.A. to conduct negotiations with Israel.

BLITZER: And just button up that one loose end that we didn't button up. Did Jordan have evidence that Hamas was plotting to get weapons into Jordan to use against Jordanians?

KHATIB: Well, there was an attempt to smuggle arms into Jordan, and, as I said, we tried to put the facts before a joint Palestinian delegation from the security agencies and from the government, and the Hamas government has decided not to participate in that delegation.

BLITZER: So but you did have evidence ...

KHATIB: Yes. BLITZER: Why would Hamas be trying to undermine the Jordanian government?

KHATIB: This is what we intended to discuss with the joint delegation from the security and the political authorities and the Palestinian government.

BLITZER: Ehud Olmert, the prime minister of Israel, says that if the Hamas government doesn't accept these conditions, then Israel will take unilateral action on the West Bank. Let me read to you what he said on March 29th.

"In the coming period, we will move to set the final borders of the state of Israel, a Jewish state with a Jewish majority. We will try to achieve this in an agreement with the Palestinians. If not, Israel will take control of its own fate, and in

consensus among our people and with the agreement of our friends in the world, especially U.S. President George Bush, we will act."

Is that wise for Israel to take unilateral action, withdrawing from parts of the West Bank?

KHATIB: As I said earlier, peace has to be negotiated between the two parties, and an agreement has to be negotiated between the two parties. And the aim of the peace process should be ending the conflict. And I don't think that we will be able to end the conflict unless there is an acceptable agreement negotiated between the Palestinians and the Israelis.

BLITZER: So you would oppose unilateral Israeli withdrawal.

KHATIB: We will definitely push in the direction of conducting peace negotiations leading to a peace treaty between the Israelis and the Palestinians that will allow for the establishment of a Palestinian state, because this is the basic prerequisite for achieving lasting peace in the Middle East.

BLITZER: But what if Hamas continues to refuse the conditions?

KHATIB: We think that the vast majority of the Palestinians are still in favor of a negotiated peace that will lead to establishing a Palestinian state.

BLITZER: The prime minister of the Palestinian Authority, Ismail Haniyeh, said this in the "Washington Post" the other day.

"If the siege continues, the whole authority will be facing collapse, and if there is a collapse, there will be chaos in the region."

Clearly, Jordan's interests are at stake right now as well.

KHATIB: Well, everybody's interests are at stake, and Jordan is very, very close to the conflict, and we are affected by whatever happens between the Israelis and the Palestinians. And this is why it is the responsibility of all to preserve and protect and maintain the P.A. And let's not forget that the P.A. was created by the peace process, by the whole international community, and we should not allow for its collapse.

BLITZER: You have a long border with Iraq.

KHATIB: Yes.

BLITZER: Clearly, you have a lot of interests there as well. Do you believe there will be a stable Iraqi government that emerges in the coming days or weeks that unifies the Shia, the Sunni and the Kurdish communities of Iraq?

KHATIB: It will take a huge effort, but definitely it is our hope that there will be a national unity government which will be able to put Iraq on the right track, to be gaining its stability and to be reintegrated again in the region, to play its vital role.

BLITZER: How ...

KHATIB: Iraq is a very important country in balancing the situation in the region.

BLITZER: How worried are you that Iraq in the end will emerge as a Shiite-led, pro-Iranian regime with enormous influence from Iran in Iraq?

KHATIB: It's very important for everybody in the region, including Iran, to have a sovereign, independent and stable Iraq.

BLITZER: Are you worried, though, about Iran's emerging influence in Iraq?

KHATIB: We hope that all surrounding countries will cease any interference in the internal situation of Iraq.

BLITZER: The president of Iran, Mahmoud Ahmadinejad, sent a letter this week to President Bush, in which he said this, "Liberalism and Western style democracy have not been able to help realize the ideals of humanity. Today, these two concepts have failed."

What do you say to President Ahmadinejad?

KHATIB: Well, I say that the region is suffering from very heavy pressure emanating from the question of Palestine, the Palestinian- Israeli conflict and the situation in Iraq. We don't need another crisis, so we are pushing towards a diplomatic solution for the crisis regarding the weapons of mass destruction and the nuclear file (ph) regarding Iran.

BLITZER: Does Jordan have a good relationship with Iran?

KHATIB: We have a normal relation, but Iran is a part of the region, an important part of the region. And as I say, we prefer to see a diplomatic solution negotiated between the parties.

BLITZER: One final question, Mr. Foreign Minister, before I let you go: Is the region better off or worse off following the U.S.-led invasion, three years ago, of Iraq?

KHATIB: Well, if we succeed to balance the situation in Iraq and if we succeed in maintaining the integrity, the territorial integrity of Iraq then we need to be moving forward to reform the situation in the whole region and to improve the economic and the political situation in the region.

BLITZER: So -- but you're basically saying is it's still an open question?

KHATIB: It's an open question and the challenge is to stabilize Iraq and to maintain the territorial integrity of Iraq.

BLITZER: Foreign Minister, as I said, welcome to Washington. Good to have you on "Late Edition."

KHATIB: Thank you. Thank you, Wolf.

(END VIDEOTAPE)

BLITZER: Up next, the results of our web question of the week, "Does it bother you if the U.S. government collects data on your phone calls?"

Plus, in case you missed it, Sunday morning talk show roundup.

And for our North American viewers coming up right at the top of the hour, CNN reporters are "On the Story," including national security correspondent, David Ensor, on the domestic spying fall-out. You'll want to stick around for that, "On the Story with Ali Velshi," right at the top of the hour.

(COMMERCIAL BREAK)

BLITZER: And now, in case you missed it, let's check some of the highlights from the other Sunday talk shows here in the United States. On all of them, the controversy over the federal government's monitoring of Americans' phone calls was a key topic.

(BEGIN VIDEO CLIP)

LAURA BUSH, FIRST LADY OF THE UNITED STATES: It's a very interesting conversation that we're having across the United States about this right now because, if the intelligence activities had not been authorized by the president within the law as they are and we had a terrorist attack, people would -- the question would be the opposite -- why haven't you been trying to track Al Qaida or links to Al Qaida in the United States?

(END VIDEO CLIP)

(BEGIN VIDEO CLIP)

SEN. JOSEPH BIDEN (D-DE) JUDICIARY COMMITTEE: Technology has probably gone beyond the status of our existing laws. And this administration has a pattern of excess. Rather than come to us and tell us how to amend the law to provide for them being able to do what they want to do, is they go ahead and just go ahead without any congressional oversight.

(END VIDEO CLIP)

(BEGIN VIDEO CLIP)

NEWT GINGRICH, FMR. SPEAKER OF THE HOUSE: Just look at the specifics of what have they're doing. It is totally legal. The real problem is, the Bush administration refuses to come up front and explain it in advance.

If you go to the American people and say, we're in a long war with a irreconcilable wing of Islam. There are people who want to kill millions of us. Your government has to have an ability to track these people down.

(END VIDEO CLIP)

(BEGIN VIDEO CLIP)

REP. JANE HARMAN (D-CA) INTELLIGENCE COMMITTEE: I think the administration is breaking the law. Its legal rationale that it offers, I think, is extremely shaky.

To this White House, the Constitution starts with Article Two, which is the power of the executive. They skip over Article One totally. That's the legislature. And Article Three is the courts.

(END VIDEO CLIP)

BLITZER: Highlights from some of the other Sunday morning talk shows here in the United States. Highlights on "Late Edition," the last word in Sunday talk.

Our "Late Edition" Web question asked, "Does it bother you if the U.S. government collects data on your phone calls?"

Check out your answers: 78 percent of you said yes; 22 percent said no. Remember, this is not a scientific poll.

And that's your "Late Edition for this Sunday, May 14." Please be sure to join me next Sunday and every Sunday at 11:00 a.m. Eastern for the last word in Sunday talk.

I'm in "The Situation Room" tomorrow night, 7:00 p.m. Eastern for our special coverage of President Bush's Oval Office speech on immigration reform.

My colleague Lou Dobbs will be joining us right after the president's speech, a special edition of "Lou Dobbs Tonight" at 8:30 p.m. Eastern. Thanks very much for joining us. "On the Story" is next. Happy Mother's Day to all the mothers out there, including my mom and my wife Lynn.

TO ORDER A VIDEO OF THIS TRANSCRIPT, PLEASE CALL 800-CNN-NEWS OR USE OUR SECURE ONLINE ORDER FORM LOCATED AT www.fdch.com



| International Edition | Languages | CNN TV | CNN International | Headline News | Transcripts | Advertise with Us | About Us |

SEARCH    ○ THE WEB    ○ CNN.COM    [          ]    Search    powered by YAHOO! SEARCH

© 2007 Cable News Network.
A Time Warner Company. All Rights Reserved.
Terms under which this service is provided to you.
Read our privacy guidelines. Contact us. Site Map.

External sites open in new window; not endorsed by CNN.com
CNN [Pipeline] Pay service with live and archived video. Learn more
POD Download audio news | XML Add RSS headlines

# EXHIBIT "V"



THE WHITE HOUSE
PRESIDENT
GEORGE W. BUSH



For Immediate Release
Office of the Press Secretary
May 17, 2006

## Press Briefing by Tony Snow

James S. Brady Briefing Room

12:32 P.M. EDT



MR. SNOW: Okay, let's begin. Welcome, one and all. Good afternoon. For those of you who weren't here, we have coined the term "bupkes list" for items that the Press Secretary may not have had complete and full answers for during the gaggle. So, in response to this morning's bupkes list, who is --

Q How do you spell "bupkes"?

MR. SNOW: Bupkus -- b-u-p-k-u-s.

Q Yiddish.

Q E-s.

MR. SNOW: Thank you, corrected, e-s.

First: Who is doing the briefings in the National Security Agency? That is already out and about now, but it's General Keith Alexander; the NSA Director is doing the briefings on the Hill.

As far as the RNC Gala speech tonight, what points is the President going to make. He is going to -- because the question was, is this a rah-rah speech. And the answer is, no. The President is going to make the argument that elections are about ideas, and he is going to remind people of some of the big ideas. Number one, winning the war on terror -- big idea. Second, maintaining the strength and integrity of the economy. Certainly, he is looking forward in the next couple of hours to signing the Tax Relief Extension Reconciliation Act of 2005, extending the tax cuts. That is an important part. Keeping the economy competitive -- that is an important part. Having an aggressive agenda to keep the growth path continuing is important. He will talk about education. He will talk about energy independence and innovation. He will talk about health care, and, of course, he will talk about values.

In response to the question of whether Governor Napolitano will be with us tomorrow in Yuma, Arizona, the answer is, yes.

And finally, on the background question, has the President, in relationship to the immigration bill, called anybody other than Senator Frist and Speaker Hastert, the answer is, no.

And with no further ado, let us go to questions. Terry.

Q Senator Sessions has offered an amendment to the immigration bill today for more fencing along the U.S.-Mexican border. Is that an amendment that the administration supports?

MR. SNOW: We're not going to comment at this point on any particular amendments. What we're happy about is the fact that the Senate seems to be moving with considerable dispatch toward putting together a comprehensive approach to this. And as you know, Terry, there are a bunch of amendments that are going to make their way. So rather than commenting piecemeal, I think when the whole package is put together,

obviously, we'll have a strategy for talking with the House and Senate about our longer-term objectives.

Again, what the President was talking about is border security. And I think an important thing to remember is that the border security initiatives that the President assembled are designed to put on the ground what is needed at particular places. Some places are going to need fences; some places where you've got rough terrain, maybe you simply use technical means for observing the border; some places you're going to have border guard. In other words, you try to target the appropriate resources at the places where they're needed. And fences, clearly, as the President stated Monday night, are part of the picture.

Q Is General Hayden briefing the Senate Intel and House today?

MR. SNOW: No, it's -- again, my sense, at least the readout I have is that General Alexander, the current Director of NSA, is doing the briefing.

Q Okay, but the briefing is the full Senate --

MR. SNOW: The full Senate Intelligence Committee and the full House Intelligence Committee -- the full Senate today.

Q This seems to be a bit of a departure from what we were previously led to believe. What's behind "the more, the merrier"?

MR. SNOW: What's behind -- how about "the more, the better informed"? As Senator Roberts said earlier today, he thought it was an uncomfortable situation in which you would have seven members fully briefed on the program as they're getting ready to do confirmation hearings, and eight members not briefed. There was a strong sense that everybody needed to be read into the program to do what they needed, in his opinion, to do to have a full and appropriate confirmation hearing for General Hayden. And we agreed with him.

Q This wouldn't be happening without the linkage of General Hayden's hearings starting tomorrow?

MR. SNOW: I'm not sure, but this is a response to a direct request both from the House and Senate Intelligence Committee chairmen.

Q I want to ask you the same question about conservatives that I posed yesterday, because the President said that his approach to this is to lead; that's how you bring conservatives around. Well, he said the same thing about Social Security, and they didn't come around. He lost that issue among conservatives. There's been, frankly, and even more --

MR. SNOW: Well, first let me say --

Q Well, I'll just finish my point, which is, there's been a more vociferous outcry on issues that are well-known to the President in terms of what conservatives oppose about this immigration idea. So what specifically is he prepared to do to bring them around, other than to lead on the issue?

MR. SNOW: Well, the general -- the use of the catch-all term, "conservatives" about particular issues, I don't think allows me to give a specific answer, because, as you know, David, on any given issue, you're going to have shifting groups of people who are for and against. Also, on Social Security, it seems to me that there was wide-spread apprehension on the parts of all members of Congress to take it up in a comprehensive way at this time.

Q But the Republicans control Congress, so they could --

MR. SNOW: Well, there are a few Democrats aboard, too, as you are aware, and they also have the ability to shape debate on particular issues.

But let me address what you were just talking about. Karl Rove was on the Hill today. Karl came out and he said that his meeting with the Republican Caucus in the House of Representatives was "hopeful, optimistic,

2

and positive." The meeting there -- and I'd seen some talk that maybe this was going to be a highly contentious meeting -- the readout I get is that it was not at all. It was respectful; people were obviously having exchanges of views on things. But I also think, what members of the House appreciate is that the President said, okay, this is where I stand. It gives people a basis from which to proceed, because the House and Senate -- provided the Senate does pass a bill -- are going to have to sit down and reconcile their differences. The President can play a very important role on that.

As I said to you yesterday, do not assume that all positions are absolutely chiseled in stone. For instance, on the issue of border security, as I've pointed out a number of times, the President is actually taking a more aggressive approach on border security than the House of Representatives, itself, took -- this is the Republican-led House of Representatives -- getting border agents and more border agents to the site, getting more technological apparatus, getting more resources to the border more quickly. So I think that is the sort of thing that is going to answer a lot of the complaints we have heard from some of the Republican Caucus on Capitol Hill. I think we all need to step back and wait and see how this debate proceeds.

Q But what you're describing and the notion that this was a hopeful and positive meeting --

MR. SNOW: Well, it's not my notion, it's what Karl said.

Q Okay. But, I mean, maybe it was a terrific meeting. As far as I can tell, that has not stopped Republicans, particularly in the House, from going gangbusters against this President before they've had a chance to read everything, as you say they should do.

MR. SNOW: Well, as I pointed out -- I mentioned this yesterday, and for -- let me see if I can find my quote, because I pulled it out. Chuck Hagel, as you may recall, made a fair amount of news over the weekend when he first said that -- let's see -- "Well, I want to listen to the details and I want to listen to the President," said Senator Hagel -- he said this on "This Week" on a competing network. But I would say this: I think we have to be very careful here. That's not the role of our military, that's not the role of our National Guard." That's what Senator Hagel said on Sunday.

After the President's address, here's what Senator Hagel said, after having a chance to read and review it: "I support everything the President said tonight." It's a change. I think a lot of times when people have an opportunity to look at these things -- there are going to be some people, David, who are just going to disagree with the President completely and totally on this. That's how democracy works. We don't have a problem with that. But I think also, a number of people who have expressed skepticism, I think, once they took a fuller look at all this are going to say, okay, this addresses our concerns.

Helen.

Q Is there any change in the status of Karl Rove contemplated in the near future -- status in the White House?

MR. SNOW: Not that I know of, Helen, no.

Q Going back to the intel briefings that are happening today. Previously, Alberto Gonzales said that this is one of the most classified programs, perhaps the most classified program in the United States government, and that is why no more than the gang of eight can be briefed. What's changed?

MR. SNOW: Well, again, what's changed is, as I tried to explain, the dynamics of having hearings -- and I suppose you could say, to a certain extent, General Hayden's appearance has been a driver here, because the committee chairs have said that what they want to make sure is that people are fully briefed on this, and they want to make sure that the committee members are fully briefed. So we're responding to the requests from Chairmen Roberts and Hoekstra on this issue.

Q So had they asked sooner, the President would have considered it?

MR. SNOW: Don't know. That's a big "if," and I'm not going to get into that.

Go ahead, Steve.

Q You described Karl's meeting, but what did he tell the House members?

MR. SNOW: Well, what he was doing was running through -- and I was not there, Steve, so I'm not going to try to pretend that I have a seance on this -- but the readout, basically, is he was listening to their concerns and he was also expressing his views. Karl, of course, is somebody who is deeply conversant not only with the general overview of the President's approach to immigration, but also has a pretty good sense of a lot of the fine details. So there's a lot of give and take. I'll let House members and others who were involved in the meeting give you a better take.

Q Was he invited up, or did the President send him up, or how did that -- how was that arranged?*

MR. SNOW: Don't know. We'll attach that as a footnote. I don't have an answer for you.

Q Tony, two quick questions. One, this is Asian Heritage Month, which the President already celebrated in East Room last week. In talking about the people -- who came from India, and the Prime Minister of India is also one of them -- and they are about 100 in them in the U.S. military fighting for America and, of course, for us all. And one of them died in Iraq, laid down in Arlington Cemetery. My question is, what they are saying -- they gathered about 1,000 of them last week in this area -- that they are being discriminated by the U.S. army, that they cannot wear turbins and they must --

MR. SNOW: Okay, I'm going to have to refer matters -- I'm going to have to refer matters like that over to the Pentagon. I don't have an answer.

Q One on immigration -- I'm sorry. One on immigration. My question -- what I'm suggesting -- that if President can look back, he said that we have stopped terrorism by keeping terrorists beyond our borders where they came from who are training them, they are now there. Why can't we do the same thing with illegal immigrants, if we bring all those factories from China and put them back to Mexico, and then they will have jobs and they won't come across the U.S. border illegally here.

MR. SNOW: You're suggesting that we take factories from China and place them in Mexico?

Q Yes, because in China, we are losing --

MR. SNOW: I think that's beyond the powers of being Press Secretary and even the President.

Q Tony, yesterday, the President was asked by Terry about the surveillance program. He said, "The program he's asking about is one that's been fully briefed to members of the United States Congress and both political parties. They are very aware what is taking place." It's something he said over and over.

MR. SNOW: Right.

Q Why -- if that was true yesterday, why would you need to brief more people -- if they were fully briefed already, if Congress really has been --

MR. SNOW: No, no, no. He's talked about -- and we've already been through this -- it was a gang of seven or a gang of eight depending -- so not everybody on the Intelligence Committee was fully briefed in on this. And so what's happening now is that the full memberships of the Intelligence Committees -- this is not the case that every member of Congress is going to get a full briefing on this. Instead, it's being limited to the appropriate jurisdictions.

Q -- has really been fully briefed, because some Democrats have complained that they have not been fully -- even the gang of eight -- that they were only given limited details, they really were not fully briefed, and that the President has not been telling the truth on that.

MR. SNOW: Neither you, nor I have sat in on the classified briefings. Here's the key. Every -- why don't we find out what happens at the brief; if somebody comes out and says they weren't fully briefed, then I'll go back and find an answer for you. But this all seems to be characterizations and people's characterizations of

conversations and it's very confusing.

What precisely is it that I can help you with on this?

Q If the President keeps saying that the key members of Congress have been fully briefed -- he said that yesterday, right?

MR. SNOW: Yes.

Q What has changed today that he has to fully brief more people?

MR. SNOW: What has changed -- okay, in other words, why is it that we're briefing all of the Intelligence Committees rather than part? Again, I'll refer you back -- because the committee -- it was in the judgment of the committee chairs that all of their members needed to be briefed so that you didn't have to get into the position of compartmentalizing the hearings with General Hayden, and so on. What we're doing is we're taking up the advice of the committee chairs and following their recommendation.

Q Some of these leaders have been asking for the briefing for months now. And there's -- and Pelosi has been asking for it, Jane Harman has said that she hasn't been given as much detail as she'd like.

MR. SNOW: Right.

Q And now, suddenly, what's changed that the President is now responding to the committee chairs?

MR. SNOW: Jessica, how many times do I have to answer the same question? I've answered the same question the same way eight times now. It's not going to change.

Q But until now, no one behind that podium has ever said, well, we'll deal with the committee chairs. They said it was at the discretion of the President who he's going to brief.

MR. SNOW: The President has used his discretion to respond to the concerns of the committee chairs. (Laughter.)

Q I'm trying to figure out why Yuma. The border is, what, 2,000 miles, and Yuma is about as far as you can go short of San Diego. What is there that's special about that?

MR. SNOW: I don't -- look, no matter where we would have chosen on a 2,000-mile swath of border, you would have said why there. (Laughter.) Because it's a really good spot. (Laughter.)

Q Does the fact that Governor Napolitano --

MR. SNOW: No, it really doesn't have anything necessarily to do with Governor Napolitano, although we are very happy to have her joining us. But in any event --

Q The President had a reason to pick it.

MR. SNOW: Say what?

Q He must have had a reason to pick Yuma.

MR. SNOW: Go talk to the advance people.

Q No, no, no, it isn't made by the advance, they just advance.

Q A couple of follow-ups. On the NSA stuff, General Hayden last week, according to Senator Durbin, suggested that there may come a day when FISA might be altered so as to accommodate the terrorist

surveillance program. What's the status of the administration's consideration of that?

MR. SNOW: I think it's really premature at this point. That was a conversation between the two of them. It was the opinion of General Hayden, at least as conveyed to us through Senator Durbin. If and when such a thing should be ready for consideration by the Congress, we'll be able to talk about it in some detail, but that's what it is. You're just reciting a conversation.

Q On the immigration front, last night Senator Bingaman's amendment passed that substantially shrinks the size of the proposed guest worker program.

MR. SNOW: Right.

Q What does the administration, having put forth a statement of administration policy that suggests that it supported the McCain-Kennedy approach to guest worker, think about its reduction?

MR. SNOW: Well, I think, as we've said all along, what we're going to do is we're going to keep an eye on what's happening. The President wants comprehensive immigration reform. And obviously, Carl, between now and anytime that the Senate passes a bill and then it goes to conference, there are going to be lots of conversations about what we deem appropriate. And I think we'll express our views there. But right now the most important and I think heartening thing is that the Senate has moved with considerable dispatch to go ahead and try to provide what the President has been talking about, which is a comprehensive approach to immigration reform.

Q Tony, has there been further discussions with the border state governors? And does the White House have any indication about how much they will go along with the National Guard plan?

MR. SNOW: Well, let me reverse the question, Jim. What we're talking about is using National Guard to free up Border Patrol agents. Now, the governors all have the option of saying yes or no. They have the ability. If the governors choose not to have National Guard forces to come in and relieve Border Patrol, who otherwise would patrol the border, that's their option, and it's entirely at their discretion. Nobody is going to twist their arm and say, you must take National Guard troops, you must deploy more Border Patrol agents to the border.

My sense is hearing -- Governor Richardson has said he wants more Border Patrol agents. We're granting his wish. Governor Schwarzenegger has expressed a little bit of concern about National Guard units who otherwise would do combat being moved to other roles. Well, we're not proposing that. What we're talking about is people doing things for which they've been trained, and that would be engineering, surveillance, transportation and the like.

So I think in many ways, at least based on the public comments, a lot of these concerns have been addressed. But, obviously, there are a lot of very practical questions, hard, practical questions the governors are going to want to ask and considerations they're going to want to have answered, and we will work with them continually.

Q Is that process going on now? And has the President, himself, called any of them yet?

MR. SNOW: I do not know if the President has called any of them yet. I know that there has been considerable work at the staff level.

Q What would the President say to some of these House Republicans who are saying, look, I think it's going to be a very tough election year for midterms, gas is at $3, Iraq is Iraq, and now you're asking me to do something that to a lot of my folks who voted for me last time and the time before that sounds like amnesty -- why should I go along with you on this?

MR. SNOW: Well, this is one of the glories of democracy -- we now get to make the argument. Because a lot of people have been saying "amnesty." Now, as I pointed out yesterday and I think it's worth going back through -- it's not amnesty. I mean, if you say to -- no, you roll your eyes, but let's think about it. Amnesty means, sorry, no harm, no foul, no crime, go about your business. In this particular case it is: You're going to pay fines, stiff fines; you're going to pay taxes; you're going to have to stay continuously employed; you can't break the law; you have to learn English. Now, you have all those.

Then after you've achieved all those things, you get the right to go to the back of the line. You've got 11 years of probation, maybe more. In that probationary period, you have to keep a job, you have to keep your nose clean, you have to learn English, you have to go through the bureaucracy, you have to pay the fees that attend going through. So you put all that together, it's not amnesty. The people who will go through that process are going to have to go through some of the most expensive and the longest tracks towards citizenship anybody has ever faced. But linguistic precision is important here, because when people say it's amnesty, it's not. Period.

Q But you know the argument --

MR. SNOW: I know the argument, and I've just given a rebuttal. One of the things -- this rebuttal has not been offered until the last few days. Now we have our chance to respond to the amnesty argument, and that's the answer.

Q Another crack at why we're going to Arizona tomorrow. Immigration is a big part of the political scene out there. You've got a Republican Senator who's considered vulnerable, a couple of House seats with Republicans. Is the political climate one of the reasons that the President is going to go down there tomorrow?

MR. SNOW: I hate to profess ignorance. I honestly don't know. It's -- I don't know. I'll get you an answer, but my sense is that what we're doing is we're going down to a state where you've got more border crossings than I believe any other state, where it is a hot issue. Why not go to a place where it's important? You've got a governor who's been engaged in this. It's a good place to do it. Again, anyplace we would have done this event, people would asked political questions, they would ask the "why here" questions; those are always going to attend. What the President really wants to do is to find an appropriate place to lay out what he wants to do with immigration, and he's going to have an opportunity to meet with Border Patrol agents. He'll have the Chief of the Border Patrol with him. And I think that also gives him a chance to talk in practical terms of the people who are going to be on the front lines to trying to make the borders even more secure in the future.

Les.

Q Tony, would the President be willing to guard the White House with the same level of security he wants to use to guard the U.S.-Mexican border, without walls, without complete fences, and with insufficient armed services -- armed personnel?

MR. SNOW: With all due respect, the White House is a little different than a 2,000-mile border.

Q I understand that, but --

MR. SNOW: So the answer would be, no.

Q Okay. And can we -- well, thank you. (Laughter.)

Q He's flabbergasted. (Laughter.)

Q Tony, I had a question about the economy. We had a new inflation number out this morning --

MR. SNOW: Yes.

Q -- and you have said that inflation is not a concern, and yet the stock market today and the bond market are saying, yes, it is a concern. Who do we trust?

MR. SNOW: Well, I'm not -- did I say inflation wasn't a concern? I think what we said --

Q John Snow said earlier today that it was well contained, and yet the stock market and bond market are both down sharply today because of inflation concerns --

MR. SNOW: Okay, well you're play off Secretary Snow against the markets. I have to refer that back to

Secretary Snow. You can get his response to it.

Q Well, I mean, in this case, if the administration is saying that inflation is not a concern, and the market is saying it is, who are we to believe?

MR. SNOW: Let me make the broader point, because we're going to have a tax extension ceremony signing -- tax extension bill signing a little later today. What this administration is committed to is continuing on the growth path. We had 5.7 percent increase in real wages in the last quarter. We had 4.8 percent economic growth. We had 3 percent productivity growth. You've got an economy that is moving briskly forward, more rapidly than the rest of the world.

So if you're trying to get me to respond to a snapshot of the market in one day, I'm not going to get myself involved in trying to talk about confidence, whether inflation is a concern or not, because as I'm sure you're aware, comments like that from this podium have a tendency to move markets and do that sort of thing. I'm just not going to be drawn into it.

Q I understand that you're -- the figures on the economy, but are you concerned that it's over -- that this economy could overheat?

MR. SNOW: We went through this yesterday, and the baseline argument is, am I concerned that there's going to be too much prosperity? I am not going to get into a discussion about proper inflation rates and that sort of thing, because, frankly, to do so is not something that's appropriate for me to do from this podium.

Q Can I go back to the NSA briefings that are going on May 17, 2006? Is the briefing going to be limited to the program that the President has publicly acknowledged? Or is it going to be the entire scope of NSA surveillance? Will the people who are briefed get the full picture of what is going on?

MR. SNOW: Permit me to turn to my trustworthy assistants.

MS. PERINO: Full terrorist surveillance program.

MR. SNOW: Full terrorist surveillance program.

Q When these briefings are done, they won't be able to say they've been blind-sided by --

MR. SNOW: That is your characterization. Well, look, you never -- I don't want to predict what a member of Congress will or will not say after coming out of a hearing.

Q Has Karl Rove spoken to you about the CIA leak case?

MR. SNOW: No, he hasn't.

Q Has any member of the administration spoken to you about the CIA leak case?

MR. SNOW: Yes.

Q Who?

MR. SNOW: I'm not going to tell you. (Laughter.)

Q Has any White House lawyer spoken to you about the case?

MR. SNOW: Again, I just -- didn't I just tell you that I'm not going to tell you who I've spoken with?

Q I'm just asking.

MR. SNOW: I know. Good questions. (Laughter.)

Q Tony, a couple of questions on immigration. It can be argued that comprehensive immigration reform, no matter what form it takes, the final form is really going to be an exercise in futility until Mexico does something to actually seal its borders and take care of its economy. What is our government doing to get Mexico to do that?

MR. SNOW: Well, I told you -- we have worked with Mexico through the North American Free Trade Agreement to try to enhance prosperity in Mexico. The President also spoke over the weekend with President Fox about the importance of working together on measures to secure the border, and also to make sure that we try to deal not only with border crossing, but also with crime in and around the border area.

I don't know how much further I can go than that, but that's -- these are ongoing efforts. I mean, if your idea is sort of, snap, suddenly Mexico solves the problem, it doesn't work that way.

Q It doesn't work that way, but I'm also wondering about some of their actions that seem to encourage people to cross the border and treat us almost like a dumping ground for their social problems, i.e. giving them maps on how to cross the border, which they did a few months ago, and now the latest threat is to sue us in U.S. courts if the National Guards happens to apprehend any of their nationals --

MR. SNOW: You're leaping to conclusions. The dumping ground remark, I think, is one with which -- I'll let you stick with your characterization, but I think you've got to be careful about how you characterize these things. I'm also not going to try to get into presumptive arguments with members of the Mexican government about lawsuits that may or may not be filed at some point in the future. As you know, people in politics say many things -- we'll have to see what happens. If that issue arises, we'll address it in due course.

Q Tony, thank you. I'll try to not to chirp. The Post said I chirped yesterday. On Somalia, is the United States working with warlords? Does the United States -- does the Bush administration consider the Somalia government to be responsible for specific genocide against African Christians in Darfur?

MR. SNOW: I'm going to be very precise about this, and I will give you -- because this is one of these things where I want to be careful how I parse it. First, the President has said that his primary responsibility as Commander-in-Chief is to keep the American people safe. That's a solemn task. The second thing is, you've got instability in Somalia right now, and there is concern about the presence of foreign terrorists, particularly al Qaeda, within Somalia right now. In an environment of instability, as we've seen in the past, al Qaeda may take root. And we want to make sure that al Qaeda does not, in fact, establish a beachhead in Somalia.

Now, the problem we've seen before in ungoverned -- these are problems that we've seen in other ungoverned regions in the past. The terrorists are going to seek to take advantage of the environment and use that kind of chaos in order to put together camps and, therefore, mount operations around the world. The United States -- we will continue to work with regional and international partners wherever we can to crack down on terrorism, and also to try to prevent its rising.

In the long run, the answer to your concerns is an effective, functional government of Somalia, which, obviously, we do not at the moment have. The United States strongly supports the transitional federal institutions in Somalia because they are trying to re-establish a functioning central government within Somalia that can bring the Somali people out of the period of civil conflict. As I said, I am going to be very careful with the way I say it, and I will say no more.

Q I appreciate that. One more thing on the genocide, though. Does the President --

MR. SNOW: As I said, I'm not going to make any further comment on Somalia.

Q What are you really saying?

MR. SNOW: Every word will be in the transcript, every, single one.

Q Does the White House have a position on whether earmarks should be identified by individual lawmakers?

MR. SNOW: At this point, once again, guidance from the bench --

MR. LISAIUS: We've been clear on our position on earmarks, and we'll be happy to follow up on that right after this.

MR. SNOW: Okay, in other words, we'll give you a footnote on that.

Q On Karl's meeting on the Hill this morning, do you know if there were any questions or concerns from the House Republicans there about Karl's potentially precarious situation here?

MR. SNOW: His potentially precarious situation? In other words, whether they were talking about the special counsel?

Q And whether he's going to be around for the elections, and in what capacity?

MS. PERINO: In the meeting today?

Q Yes.

MS. PERINO: No, it was about immigration.

MR. SNOW: No, it was about immigration.

Q No concerns were raised by them?

MS. PERINO: No.

MR. SNOW: Dana was there for every moment of it, so you have a full and complete readout.

Q Yesterday you were asked a question about D.C. voting rights. And in the past when I've asked your predecessors these questions, they've said the President is against voting rights, it's in the Constitution, D.C. doesn't deserve voting rights. I notice -- were you sending a signal?

MR. SNOW: No, I wasn't sending a signal.

Q Has he changed his position on that issue?

MR. SNOW: There are -- the President hasn't changed his position.

Q Tomorrow there will be a mark-up on the Davis bill. There also will be a mark-up promise in Judiciary. Both committees have hearings. If it should pass the House and pass the Senate, would the President sign the bill?

MR. SNOW: Well, if and if --- get back to me when.

Q Would the President veto the bill?

MR. SNOW: If and if -- get back to me when.

Q And final question. Why -- I've asked the question to your predecessors, I'll give you a shot at it -- why is the President for democracy in Baghdad, but not right here in the Nation's Capital?

MR. SNOW: Well, again, it's an argumentative question, and based on what you're -- there are many interpretations of that the Constitution does and does not permit. And rather than argue -- I believe there are elections in the District of Columbia, are there not?

Q Yes.

MR. SNOW: So that would qualify as --

Q But the delegate has no vote in the national election.

MR. SNOW: I know, but you just argued that there was no democracy in D.C., and you just said --

Q Not full democracy.

MR. SNOW: Full democracy, okay. Well, that's -- that, as you know, is a much thornier question, and I'm just going to leave it at that.

Q There have been news reports this week that the FBI is using the Patriot Act to obtain phone records of journalists without their knowledge and without judicial oversight. And as a former journalist, are you at all concerned about this sort of intrusion on press --

MR. SNOW: I would be concerned if there was grounding to it. There have been reports, but once again, it has referred to the NSF program, which is strictly concerned with foreign international counterterrorism. I'm sorry, the pieces just don't add up.

Q I have a question about very high gas prices. As you know, the President plans to meet with the leaders of the big three auto companies on June the 2nd. And my first question is, what's the purpose of that meeting? And my second question is, does the President have any plans to meet with the leaders of big oil here at the White House?

MR. SNOW: Big oil?

Q Leaders of the big oil companies.

MR. SNOW: The President has talked repeatedly about his interest in trying to chart a path toward energy independence, and he's going to talk to all parties involved in that. There are many technological issues in play, but as you also know, we tend not to announce greatly in advance items that may appear later on the agenda. The reason you're asking me about the automakers meeting is that that was postponed precisely because we're going to Yuma tomorrow. So I'm not going to jump the gun and tell you what may or may not happen in future events here at the White House.

Q Last week, Senator Sam Brownback mentioned the United States should pursue the human rights issue based on the model of -- will the United States bring the six-party talks on this issue in the future?

MR. SNOW: Well, first, I appreciate Senator Brownback's long commitment to human rights. And secondly, I'm not going to say in advance what they're going to be bringing before the six-party talks.

Q Can you tell us, any more hints about tomorrow, the event itself, who else might be there, what he'll do --

MR. SNOW: Well, I know we've got some members of Congress traveling with us. The President is going to be on the border in Yuma. I did a readout this morning, and you can go back and look at the gaggle transcript if you want, but he will be there, he'll be meeting with Border Patrol agents. We will also have, as I mentioned, Chief Aguilar of the Border Patrol along, and there will be medial avails and he'll have some comments again about the war on terror.

April.

Q Tony, there was a very cordial meeting recently between President Bush and Julian Bond. Julian Bond extended the olive branch and asked the President to attend the upcoming convention of the NAACP. What is the President's --

MR. SNOW: Well, there's no decision on that. Are you talking about at the Correspondents dinner, when they had a moment?

Q Yes. Yes.

MR. SNOW: Because I saw them in the corner of the room. I mean, it was just nice to see them conversing with one another and have smiles on both of their faces. But at this point, there's no determination, April.

Q So how does he feel about Julian Bond now?

MR. SNOW: I'm not going to get into the President's thoughts, either way, about Julian Bond. But, thanks.

Q Did you mean the war on terror comments?

MR. SNOW: What did I say?

Q You just said war on terror comments at the border.

MR. SNOW: No, no, no, I'm sorry, I'm sorry -- immigration. Thank you very much.

Q Congress will be considering its second tax extension bill after the one signed today. They're considering attaching this to pension reform. Does the administration think it should stand alone?

MR. SNOW: I think what the President wants is to make sure that the tax cut provisions are extended. He's made it very clear. I don't want to get into process right now about how that may be achieved. It is very obvious it is very important to the President to make sure that we get extension of all the cuts that have been enacted into law.

Q I just want to follow on Senator Hagel's before and after comment, because it strikes me that that's a bit more reflective of what we're seeing in the Senate -- it's wrong to suggest that they would play ball on this sort of comprehension idea of immigration, something close to the President's. But that's so much different than what you see in the House, which seems to be saying: enforcement, illegal entry only -- I don't want to hear about guest workers and temporary. So who is the before and after in the House?

MR. SNOW: Well, this is why I think it's going to be interesting, because you had a long meeting today -- or you had a meeting, I don't know how long -- how long was it, Dana?

MS. PERINO: About 30 minutes.

MR. SNOW: About 30 minutes. So he had a 30-minute meeting with members of the House. You know, let's just wait and see. As I mentioned yesterday, you've got a big proposal with a lot of parts in it that members of the House and Senate have to take a look at. I mean, I think what you've seen is a number of members of the House who originally were prepared to say there's no border security. Then they look into it -- well, there is. There's border security here.

Q I read a lot of blogs yesterday. I talked to a lot of people yesterday. I didn't hear one person from the House saying, he got it, he finally got it, and now we can play ball with him.

MR. SNOW: Well, there are 435 members of the House. I did not have a chance to ask each and every one of them, or, for that matter, any. But I think the key here is -- as I mentioned, the President is going to be saying tonight at the RNC Gala, politics is about ideas. And I think members of the House -- I don't want to betray confidences, but I think that you're going to find that members of the House -- yes, just between you and me? (Laughter.) That works at that network, doesn't it? (Laughter.) Just between you and me -- it took him about 20 seconds to figure that one out. (Laughter.)

I think Republicans are happy to see the President stepping up and leading on this one. And I think what you're going to see is that they are going to take a good, respectful look at what he has to say. And whatever come

before I think is now going to be shaped by the fact that the President of the United States and the leader of their party has had some very bold things to say about immigration. I think they've got to take that seriously, and I think they will.

Q Tony, a quick follow on tax reconciliation.

MR. SNOW: Yes.

Q Pelosi and Reid's office has just put out a statement pre-slamming you. It says, "Democrats to slam Republican tax cut on middle class families." And they go on to describe it as "a tax cut in the wrong direction, eliminating tax deductions that help students pay for college in order to give massive handouts to big business and multi-millionaires." Your reaction, sir?

MR. SNOW: My reaction, sir. Well, let's see, as we get ready with a flourish here. Look, it is pretty obvious that the tax cuts -- at least it's obvious -- let me change that. Since the tax cuts were enacted, what have we seen? We have seen the American economy zooming upward. We have seen prosperity extended through all levels of our economy. We've seen $800 billion in the pockets of taxpayers. As I pointed out before, you're familiar with the growth statistics.

Now, I'll put that up against any talking points or prebuttals that anybody else has to offer. I'm not going to pick particular fights with the Democratic leaders of the House or Senate, but I think the economy right now is a pretty strong hand to play. And I think that the tax cuts have played a role in making that economy strong.

Q Tony, quick question. Yesterday when the President met with Australian Prime Minister, did the issue of U.S.-India civilian nuclear came up, or not? If so, what their discussion?

MR. SNOW: Well, again, it is not up to me to talk about the private discussions between the Prime Minister and the President.

Q Thank you.

MR. SNOW: All right, Steve, thank you.

Q Scott always did. It's okay. (Laughter.)

END 1:12 P.M. EDT

*Karl Rove was invited to speak by the House Republican Conference.

---

**Return to this article at:**
http://www.whitehouse.gov/news/releases/2006/05/20060517-4.html

 CLICK HERE TO PRINT

# EXHIBIT "W"

1 of 6 DOCUMENTS

Copyright 2006 Gannett Company, Inc.
All Rights Reserved
USA TODAY

June 30, 2006 Friday
FINAL EDITION

**SECTION:** NEWS; Pg. 2A

**LENGTH:** 1654 words

**HEADLINE:** Lawmakers: NSA database incomplete;
Some who were briefed about the database identify who participated and who didn't

**BYLINE:** Susan Page

**BODY:**

WASHINGTON -- Members of the House and Senate intelligence committees confirm that the National Security Agency has compiled a massive database of domestic phone call records. But some lawmakers also say that cooperation by the nation's telecommunication companies was not as extensive as first reported by USA TODAY on May 11.

Several lawmakers, briefed in secret by intelligence officials about the program after the story was published, described a call records database that is enormous but incomplete. Most asked that they not be identified by name, and many offered only limited responses to questions, citing national security concerns.

In the May 11 article that revealed the database, USA TODAY reported that its sources said AT&T, BellSouth and Verizon had agreed to provide the NSA with call records.

AT&T, which is the nation's largest telecommunications company, providing service to tens of millions of Americans, hasn't confirmed or denied its participation with the database. BellSouth and Verizon have denied that they contracted with the NSA to turn over phone records. On May 12, an attorney for former Qwest CEO Joseph Nacchio confirmed the USA TODAY report that Qwest had declined to participate in the NSA program.

Most members of the intelligence committees wouldn't discuss which companies cooperated with the NSA. However, several did offer more information about the program's breadth and scope, confirming some elements of USA TODAY's report and contradicting others:

*Nineteen lawmakers who had been briefed on the program verified that the NSA has built a database that includes records of Americans' domestic phone calls. The program collected records of the numbers dialed and the length of calls, sources have said, but did not involve listening to the calls or recording their content.

*Five members of the intelligence committees said they were told by senior intelligence officials that AT&T participated in the NSA domestic calls program.

AT&T, asked to comment, issued a written statement Thursday. "The U.S. Department of Justice has stated that AT&T may neither confirm nor deny AT&T's participation in the alleged NSA program because doing so would cause 'exceptionally grave harm to national security' and would violate both civil and criminal statutes," it said. "Under these

Lawmakers: NSA database incomplete; Some who were briefed about the database identify who participated and who didn't USA TODAY June 30, 2006 Friday

circumstances, AT&T is not able to respond to such allegations."

*Five members of the intelligence committees said they were told that BellSouth did not turn over domestic call records to the NSA.

Asked about BellSouth's denial, Sen. Saxby Chambliss, R-Ga., a member of the Senate Intelligence Committee, said, "What they said appears to be accurate."

Still, BellSouth customers' call records could end up in the NSA database, he said. "Obviously, a BellSouth customer can contract with AT&T (for long-distance phone service). There is a possibility that numbers are available from other phone companies."

*Three lawmakers said that they had been told that Verizon did not turn over call records to the NSA. However, those three and another lawmaker said MCI, the long-distance carrier that Verizon acquired in January, did provide call records to the government.

While Verizon has denied providing call records to the NSA, it has declined to comment on whether MCI participated in the calls database program.

"The President has referred to an NSA program, which he authorized, directed against al-Qaeda," Verizon said in a written statement May 12. "Because that program is highly classified, Verizon cannot comment on that program, nor can we confirm or deny whether we have had any relationship to it." The statement also said the company was now "ensuring that Verizon's policies are implemented at that entity (MCI) and that all its activities fully comply with law."

Scope and effectiveness

In the weeks since the database was revealed, congressional and intelligence sources have offered other new details about its scope and effectiveness.

"It was not cross-city calls. It was not mom-and-pop calls," said Sen. Ted Stevens, R-Alaska, who receives briefings as chairman of the Senate Appropriations Defense subcommittee. "It was long-distance. It was targeted on (geographic) areas of interest, places to which calls were believed to have come from al-Qaeda affiliates and from which calls were made to al-Qaeda affiliates."

Other lawmakers who were briefed about the program expressed concerns that gaps in the database could undercut its usefulness in identifying terrorist cells.

"It's difficult to say you're covering all terrorist activity in the United States if you don't have all the (phone) numbers," Chambliss said. "It probably would be better to have records of every telephone company."

"The database is not complete," said another lawmaker who was briefed on the program, speaking on condition of anonymity because the information is classified. "We don't know if this works yet."

Other publications have characterized the breadth of the database and how it is used.

The New York Times reported on May 12, for instance, that a senior government official had confirmed that the NSA had access to records of most telephone calls in the USA but said the records are used in a limited way to track "known bad guys."

The Washington Post reported on May 12 that "sources with knowledge of the program" said that the Bush administration had been collecting the domestic telephone records in "gargantuan databases" and that the "companies cooperating with the NSA dominate the U.S. telecommunications market and connect hundreds of billions of telephone calls each year."

Lawmakers: NSA database incomplete; Some who were briefed about the database identify who participated and who didn't USA TODAY June 30, 2006 Friday

Where things stand

President Bush and his top aides have defended the legality of the program, although they haven't directly confirmed its existence.

Three days after the USA TODAY story was published, national security adviser Stephen Hadley said on CBS' Face the Nation that he couldn't "confirm or deny the claims that are in the USA TODAY story."

He went on: "But it's very interesting what that story does not claim. It does not claim that the government was listening on domestic phone calls. It does not claim that names were passed, that addresses were passed, that content was passed. It's really about calling records, if you read the story. ... There are a variety of ways in which those records lawfully can be provided to the government."

At a news conference two weeks later, Attorney General Alberto Gonzales made a similar point. "There has been no confirmation about any details relating to the USA TODAY story," he said. "I will say that what was in the USA TODAY story did relate to business records."  Citing a 1979 Supreme Court decision, he said, "There is no reasonable expectation of privacy in those kinds of records."

Lawmakers who were briefed about the program disagree about whether it's legal.

"It was within the president's inherent powers," said Sen. Orrin Hatch, R-Utah, a member of the Senate Intelligence Committee.

Rep. Anna Eshoo, D-Calif., a member of the House Intelligence Committee, said there was a "schizophrenia in the presentation" by the administration. Officials say, "'It's legal,'" she said. "But in the same breath they say, 'Perhaps we should take another look at FISA.'" FISA refers to the 1978 Foreign Intelligence Surveillance Act, which established a secret court that can grant warrants for eavesdropping.

Rep. Rush Holt, D-N.J., another member of the House Intelligence Committee, said, "I find it interesting that it seems the government is asking telephone companies to do things that their customers and shareholders would find totally unpalatable."

Battles ahead

Debate over the database continues in several areas:

*In federal courts, at least 20 class-action lawsuits have been filed alleging that the government and phone companies have violated the rights of people whose calls have been reviewed by the NSA. The Justice Department signaled its intention in a court filing in Chicago this month to assert the "military and state secrets privilege" in all of them. That privilege allows the government to seek the dismissal of lawsuits if pursuing them would imperil national security.

*In New Jersey, the state attorney general is investigating whether telephone companies released confidential information without the consent of their customers. The federal government  asked a court this month to quash subpoenas the state had issued to phone companies seeking information.

*At the Federal Communications Commission, the American Civil Liberties Union requested this month that approval of AT&T's acquisition of BellSouth be withheld until the commission reviews the companies' dealings with the NSA. However, FCC Chairman Kevin Martin said last month that the commission couldn't investigate complaints about the phone companies and the NSA because the reported activities were classified.

*On Capitol Hill, Vice President Cheney held private talks this month with Republicans on the Senate Judiciary Committee. Cheney discouraged them from supporting Judiciary Chairman Arlen Specter's vow to call

Lawmakers: NSA database incomplete; Some who were briefed about the database identify who participated and who didn't USA TODAY June 30, 2006 Friday

telecommunications executives before the panel to answer questions about the database. Specter, R-Pa., protested to Cheney in an angry public letter.

The White House then agreed to talks with Specter on legislation he has drafted that would give the administration the option of putting the NSA's warrantless-surveillance program -- which includes domestic wiretapping without a court warrant when one participant in a conversation is overseas -- under the scrutiny of the FISA court.

"I'm prepared to defer, on a temporary basis, calling in the telephone companies," Specter said. If the discussions on his legislation fall through, however, he said, he will move again to demand testimony from the telephone executives about the database.

---

This story was reported by Leslie Cauley, John Diamond, Jim Drinkard, Peter Eisler, Thomas Frank, Kevin Johnson and Susan Page. It was written by Page.

**GRAPHIC:** GRAPHIC,B/W, Julie Snider and Marcy E. Mullins, USA TODAY, Source: Yankee Group, Telegeography, Bell Labs (Map, diagram)
PHOTO, B/W, Gerald Herbert, AP
PHOTO, B/W, Mel Evans, AP
PHOTO, B/W, Joshua Roberts, Getty Images
PHOTO, B/W, Al Grillo, AP

**LOAD-DATE:** August 18, 2006

# EXHIBIT "X"

1 of 3 DOCUMENTS

Copyright 2007 Federal News Service, Inc.
All Rights Reserved
Federal News Service

March 14, 2007 Wednesday

**SECTION:** CAPITOL HILL HEARING

**LENGTH:** 10256 words

**HEADLINE:** HEARING OF THE INTELLIGENCE, INFORMATION SHARING, AND TERRORISM RISK
ASSESSMENT SUBCOMMITTEE OF THE HOUSE HOMELAND SECURITY COMMITTEE;
SUBJECT: THE DEPARTMENT OF HOMELAND SECURITY STATE AND LOCAL FUSION CENTER
PROGRAM: ADVANCING INFORMATION SHARING WHILE SAFEGUARDING CIVIL LIBERTIES;
CHAIRED BY: REPRESENTATIVE JANE HARMAN (D-CA);
WITNESSES: CHARLIE ALLEN, ASSISTANT SECRETARY FOR INFORMATION ANALYSIS, DEPARTMENT
OF HOMELAND SECURITY; DANIEL SUTHERLAND, OFFICER FOR CIVIL RIGHTS AND CIVIL LIBERTIES,
DEPARTMENT OF HOMELAND SECURITY; HUGO TEUFEL III, CHIEF PRIVACY OFFICER, DEPARTMENT
OF HOMELAND SECURITY;
LOCATION: 311 CANNON HOUSE OFFICE BUILDING, WASHINGTON, D.C.

**BODY:**

    HEARING OF THE INTELLIGENCE, INFORMATION SHARING, AND TERRORISM RISK ASSESSMENT
SUBCOMMITTEE OF THE HOUSE HOMELAND SECURITY COMMITTEE SUBJECT: THE DEPARTMENT OF
HOMELAND SECURITY STATE AND LOCAL FUSION CENTER PROGRAM: ADVANCING INFORMATION
SHARING WHILE SAFEGUARDING CIVIL LIBERTIES CHAIRED BY: REPRESENTATIVE JANE HARMAN
(D-CA) WITNESSES: CHARLIE ALLEN, ASSISTANT SECRETARY FOR INFORMATION ANALYSIS,
DEPARTMENT OF HOMELAND SECURITY; DANIEL SUTHERLAND, OFFICER FOR CIVIL RIGHTS AND
CIVIL LIBERTIES, DEPARTMENT OF HOMELAND SECURITY; HUGO TEUFEL III, CHIEF PRIVACY
OFFICER, DEPARTMENT OF HOMELAND SECURITY LOCATION: 311 CANNON HOUSE OFFICE
BUILDING, WASHINGTON, D.C. TIME: 3:30 P.M. EDT DATE: WEDNESDAY, MARCH 14, 2007

    REP. JANE HARMAN (D-CA):  Good afternoon.  The subcommittee will come to order.  The subcommittee is
meeting today to receive testimony on state and local fusion centers and on advancing information sharing while
safeguarding civil liberties.

    Earlier this week, I led a member tour to two facilities in the D.C. area with critical homeland security missions, the
National Counterterrorism Center and the Maryland Coordination and Analysis Center, or MCAC, in suburban
Baltimore.  I promptly saw some things that were inspirational and a few things that worried me. Representatives
Perlmutter, Shays, Wolf and I were particularly impressed by the NCTC, the nation's fusion center for all terrorism-
related information.  It's clear that the NCTC has played a key role in improving information sharing across the federal
government, and Admiral Scott Redd and his team are to be commended for their work there.

    I was disturbed, however, by what I learned about the emerging plans for the Interagency Threat Assessment and
Coordination Group, or the ITACG, that our witness Mr. Allen described in his testimony here last month.  How this
group, which is supposed to be creating unclassified products for state, local and tribal law enforcement officers across

HEARING OF THE INTELLIGENCE, INFORMATION SHARING, AND TERRORISM RISK ASSESSMENT
SUBCOMMITTEE OF THE HOUSE HOMELAND SECURITY COMMITTEE; SUBJECT: THE DEPARTMENT OF
HOMELAND SECURITY STATE AND LOCAL FUSI

the country is going to be effective with only one, local, law enforcement person on staff is beyond me.  And I'm a bit
disappointed that DHS, the agency that is supposed to be advocating for state and locals has not fought harder to expand
the number of nonfederal players at the ITACG table.

The subcommittee may have to take a very close look at the ITACG in the coming months, and I'm certain that the
chairman would agree with me.  It also is a good thing that to my right sits a former sheriff, who I think would have
some insights into the value of local participation at the federal level in creating the products that are being distributed
for local consumption.

Our group also paid a visit to the Maryland Coordination and Analysis Center, the MCAC, in west Baltimore, as I
mentioned.  While the MCAC staffers were enthusiastic about their work and impressive, it's clear that the organization
has no budget and is staffed mainly by detailees on loan from other agencies.  They saw that as a positive, because that
meant that no one agency was in charge, which they felt would discourage other agencies from participating, but I saw
that as a negative, because if any of those agencies face budget squeezes, the easiest place to squeeze is to remove the
detailee from the MCAC, and then there would be that enormous loss of competence.

Although the MCAC is turning out impressive intelligence products on a daily basis, the facilities it occupies are, to
say the least, modest.  I was pleased to meet DHS's staffer - Charlie Allen's person - at the MCAC, but I left the MCAC
with one, main conclusion, and that is that all the DHS staff assistants in the world won't get the job done if fusion
centers do not have adequate and sustained funding. Without money, they're going to disappear, and the DHS state and
local fusion center program won't succeed.

In addition to sustained funding, we need to institutionalize how we are doing intelligence at these facilities.  That
means that we should be encouraging not only intelligence fusion, but also - and I know our witness agrees - vigorous
adoption of privacy and civil liberties protections as part of the process.  I often say that security and liberty are not a
zero-sum exercise.  It's not that you get more of one and less of the other.  It's that you get more of both or less of both,
and so it is absolutely critical that we factor those in at the front end, and then we give confidence to those whose
information we hope will be contributed to these fusion centers and whose information may be the critical piece that
helps us unravel a plot before it is launched against America and American interests.

Of course we're pleased that Charlie Allen is back to address these concerns.  Let me say, Charlie, that I've been
through the president's requested budget numbers, and I frankly don't see how you can meet your goal of having your
staff in up to 40 fusion centers by the end of Fiscal Year '08 without some very creative thinking and reprioritization on
your part - or without some additional help on our part.  While we can't get into any classified figures and staffing levels
here, I hope you'll be able to shed light on where the president's budget request leaves you and on how you will go
about meeting the fusion center targets, given the budget constraints you're facing.  We also hope to hear more about the
privacy and civil liberties education that you've mentioned in recent months before this subcommittee and before the
Senate Select Committee on Intelligence.

In that regard, I'm pleased that we have today both the department's privacy officer Huge Teufel and its civil rights
and civil liberties officer Daniel Sutherland.  I note that this hearing comes on the heels of the National Fusion Center
Conference in Florida last week, where DHS, DOJ and the DNI and many state and local representative and some of our
staff got together to discuss the very issues on our agenda.  I'm happy that we all seem to be on the same page.  Now it's
time to move to the next chapter.

Welcome again to you.  And I would now recognize Sheriff Reichert, the ranking member of the subcommittee, for
an opening statement.

REP. DAVID G. REICHERT (R-WA):  Thank you, Madam Chair.  I want to thank you for holding this important
hearing.  We are, I think, going to make a great team, and I'm glad to see my good friend from Washington state, Norm,
with us today, so the three of us will get to inquire a little bit further after your testimony, Charlie.  It's good to see you

HEARING OF THE INTELLIGENCE, INFORMATION SHARING, AND TERRORISM RISK ASSESSMENT
SUBCOMMITTEE OF THE HOUSE HOMELAND SECURITY COMMITTEE; SUBJECT: THE DEPARTMENT OF
HOMELAND SECURITY STATE AND LOCAL FUSI

again. And I've met you only a few times, but I feel very comfortable with you, and it seems like we've known each other for quite a long time. You're very responsive and always available for questions and guidance, and we all appreciate that on this subcommittee.

You know, the process is a little - it always kind of amuses me that politicians speak for a while, and those are things that, you know, we need to get on the record, but we also want to hear from the witness. So, I'll ask you to indulge me just a little bit here while I take the opportunity to express some of my views for the record, and then we'll get to the questioning.

You know, I am a sheriff and have been a law enforcement officer at heart, and there are certain things that touch all of us now as we look ahead to the future of this country, and the gathering of intelligence and the protection of public rights are really at the top of the list. For 33 years, that's what I did, was protect people, protect communities, protect neighbors and protect their rights.

A substantial part of the intelligence portion of the authorization bill that we're talking about today will focus on the Department of Homeland Security's involvement in state and local fusion centers. DHS, the FBI and other federal agencies are participating with local law enforcement in these fusion centers, and many questions are raised as local and federal agencies partner, including, what role does the federal government have? Should there be more money allocated for the federal role in these centers? Should personnel costs of local law enforcement be funded by the federal government, since they are now participating in a so-called "nontraditional" law enforcement role? As a former sheriff of a major county, I was required to reallocate personnel to participate in the joint analytical centers and the JTTS. Knowing the burden this places on local law enforcement, I believe the federal government has an obligation to partner with local authorities in the operation and funding of local fusion centers. I look forward to hearing from Mr. Allen on these issues today.

Another pressing issue on many of our minds is civil rights and civil liberties, as I said, and the main subject of our second panel. It is essential that we have the tools and resources necessary to protect our nation from future terrorist attacks; however, DHS and other agencies must have a healthy respect for privacy and other civil rights and civil liberties. We all hear complaints about potential violations in the newspapers, and some of these are real and concerning. Some are speculative and lack supporting evidence, but what is important is the establishment of proper training methods and procedures for protecting privacy and civil liberties so that mistakes and abuses can be avoided, detected and corrected. In this respect, we must recognize the hard and often thankless work of the DHS Privacy Office and the DHS Civil Rights and Civil Liberties Office. Their sole mission is to minimize the department's impact on people's privacy and rights.

The DHS fusion center work has progressed over the last year on many fronts, from conceptual development to deploying personnel to the fusion centers. As part of this development the department issued fusion center guidelines and disseminated a fusion center grant planning tool. In the guidelines, DHS specifically focuses on privacy as a minimum consideration for interagency memorandums of understanding. DHS also ads, as a key element of the guidelines, adhering to privacy and civil liberty policies. As part of the fusion planning tool, grant funding is allowed to establish a fusion center's critical, baseline operations standards. One of these critical baseline standards is identification and implementation of privacy and civil liberty protections.

Every fusion center official that I've spoken with has acknowledged the importance of safeguarding civil liberties. I look forward to hearing from the Department of Homeland Security on what additional work is to be done to follow up with the fusion centers on these important priorities and ensuring that employees receive appropriate training in privacy and civil liberty issues.

Most recently, I visited the L.A. fusion center, and I also visited Seattle's once again, as I'm quite familiar with their Joint Analytical Center and as they progress and move toward a fusion center - two very outstanding operations, and DHS's role in both of those fusion centers has been greatly appreciated.

HEARING OF THE INTELLIGENCE, INFORMATION SHARING, AND TERRORISM RISK ASSESSMENT
SUBCOMMITTEE OF THE HOUSE HOMELAND SECURITY COMMITTEE; SUBJECT: THE DEPARTMENT OF
HOMELAND SECURITY STATE AND LOCAL FUSI

Madam Chair, I yield.

REP. HARMAN: All right. Thank you for your comments, and I would note that other members of the
subcommittee, under our committee rules, are encouraged to submit opening statements for the record, but we will now
proceed directly to our first witness, Charlie Allen, who's been introduced numerous times by this committee and
subcommittee. So, I just would point out he's the Department of Homeland Security's chief intelligence officer with a
long, distinguished background and a long and distinguished future.

Please summarize your remarks, Mr. Allen, for the record, and we'll go directly to questions. We will have a
second panel today to discuss some of the issues that have been raised in the opening statements.

MR. CHARLES E. ALLEN: Thank you very much, Chairwoman Harman, Ranking Member Reichert and
Congressman Dicks.

I really do welcome the opportunity to speak about our state and local fusion program and also how we work to
protect civil rights and civil liberties. Also, it's a pleasure to be here to know that we have Mr. Hugo Teufel and Dan
Sutherland. I appeared with Mr. Sutherland this morning over in the Senate Homeland Security Committee to talk
about radicalization. I probably won't - I'll omit comments about radicalization here, but I certainly can answer
questions on that.

I do want to speak to the Interagency Threat Assessment and Coordination Group, which, by the way, is now called
the Federal Coordinating Group. We are beginning to move staff officers, who form a core, advance team, into our
location out at Liberty Crossing, as you indicated; and we are beginning to work with federal and nonfederal partners to
staff fully the group. It will be a real opportunity to have sustained, coordinated information sharing down at state and
local levels, and we are working to include additional people in state and local governments. In fact, in the initial
standup staff, I envisioned two or three officers, certainly. So, I don't know exactly what was said out at the NCTC, but
we're still looking to put together a concept of operations, and I want to assure you that there's going to be growth in
state and local government representation.

Let me touch on how the state and local fusion center program promotes information sharing. It does this both
horizontally among centers across the country and, of course, vertically between the intelligence community and the
centers, while working to safeguard civil liberties and privacy. Protecting privacy and civil liberties remains one of my
top organizational priorities. I hold my office to high standards in these areas, and we reinforce these principles with all
of our employees. In terms of incorporating privacy and civil liberties training into our fusion center program, the
Department of Justice has strong efforts to establish and provide important training and outreach programs to fusion
center personnel. The Global Justice Fusion Center Guidelines, published by Department of Justice and DHS in
participation with state and local governments requires fusion centers to create policies that safeguard civil liberties.

The National Fusion Center Conference last week, which you alluded to, brought subject-matter experts from
across the United States to discuss privacy and civil liberties, and there were two breakout sessions devoted to that, that
were well attended. We were very pleased to see that, and over 600 people came to that conference. In addition, federal
intelligence officers assigned to the fusion centers have to comply with policy obligations regarding annual training
requirements for protecting U.S. persons, abiding by privacy guidelines of the information sharing environment, which
of course you're well aware of, and is managed by Ambassador Ted McNamara.

We're working closely with various DHS and external Civil Liberties and Privacy Office -- (personnel) - to ensure
adequate oversight in these areas, and to identify where additional training is needed.

The last time we appeared before the subcommittee, you shared three priorities: information sharing with first
presenters, potential radicalization, and reducing over classification of intelligence. Let me just talk about information
sharing with first presenters. The new(?) BMI, Mike McConnell, recently has set forth his vision for the intelligence
community. He says we all have a responsibility to provide, not just to share. When I spoke to you last, I pledged that

HEARING OF THE INTELLIGENCE, INFORMATION SHARING, AND TERRORISM RISK ASSESSMENT
SUBCOMMITTEE OF THE HOUSE HOMELAND SECURITY COMMITTEE; SUBJECT: THE DEPARTMENT OF
HOMELAND SECURITY STATE AND LOCAL FUSI

DHS intelligence would set the standard in this area.  Our fusion center program underscores the importance I place in this area.  To this end, the department has created a state and local fusion center program almost nine months ago.  This program, as you know, imbeds DHS officers in the fusion centers to share information, collaborate on analysis and to identify intelligence - (inaudible) - at the state and local level.

And I believe on issues of radicalization, and also on old threats, there's a lot of information at that level, as Ranking Member Reichert pointed out.

My office has continued to work with intelligence officers at DHS operating components and with the intelligence community to move tailored and timely intelligence out to the fusion centers. The result is better reporting and validating of actual information, both to our state and local partners and to the intelligence community. Our efforts to deploy intelligence analysts to the fusion centers around the country are progressing, and we will accelerate deployments, if we can.  We have officers in 12 fusion centers, and we do have an aggressive schedule to deploy up to 35 officers by the end of Fiscal Year 2008, and will be a challenge, as you pointed out in your comments.  And I'll be happy to try to respond to questions.

We also realize there's a critical need to provide the fiscal infrastructure and technology to share that information. At the secret level, my office is deploying the Homeland Security Data Network (HSDN) to the fusion centers.  The department is giving direct access not just to my officers, but to state and local officials just as if they were working at the federal level.  The establishment of a Homeland Security information portal and the deployment of HSDN are major steps to increasing productivity between DHS intelligence and our state and local partners.

We're beginning to realize the benefits of the strengthened relationships that the state and local fusion centers program is creating, especially in creating new information into the centers.  We recently assisted a West Coast fusion center in establishing solid information links to extremists operating outside of the United States by connecting information from local investigators with senior intelligence analysts in my office.

I share many of the concerns expressed by the committee at the last hearing about creating a sustainable fusion center capability at nonfederal levels.  You're absolutely right.  There are going to be challenges, and these centers are in various stages of development. Some are immature, and some, like JRIC in Norwalk, near Los Angeles is very mature.

I will defer my comments on radicalization, but look forward to any questions.

A number of the committee members remarked on the challenges that remain in being able to disseminate intelligence to those who need it, especially state and local partners, including a continuing proclivity towards over classifying intelligence.  I have fought against this tendency throughout my career, while trying to ensure we protect citizens and methods.  As I noted previously, I look forward to working this issue with the committee because my primary customers, whether in the state, the private sector or the department, require intelligence shared with them at unclassified and at secret levels. If it's top secret level, we can sanitize it to secret if there're threat warning, threat assessment necessities.

In conclusion, the United States and its allies are engaged in a continuing global struggle against a broad range of transnational threats.  While Department of Homeland Security intelligence is still maturing, we're undertaking vitally important, new initiatives, such as the state and local fusion center program, to accomplish the department's mission of preventing and mitigating those threats. Fusion center initiatives are advancing, invaluable, seamless partnerships for fusing information intelligence.  This will be done, I can assure, while working hard to safeguard privacy and civil liberties, the success of these initiatives based on DHS intelligence, setting the standards of inclusiveness, access in collaboration with all of our partners.

I look forward to your questions.

HEARING OF THE INTELLIGENCE, INFORMATION SHARING, AND TERRORISM RISK ASSESSMENT
SUBCOMMITTEE OF THE HOUSE HOMELAND SECURITY COMMITTEE; SUBJECT: THE DEPARTMENT OF
HOMELAND SECURITY STATE AND LOCAL FUSI

REP. HARMAN:  Thank you, Mr. Allen.  I yield myself five minutes for questions.

You just mentioned that there will be growth in state and local representation at the ITACG, which is now renamed, or will be renamed, the Federal Coordination Group.  Did you say that?  Am I correct?

MR. ALLEN:  That's correct.  The Federal Coordinating Group what - the information sharing environment program manager has decreed that's the name.  At least when I saw him on Monday, I think that's what we called it.

REP. HARMAN:  Okay.  The name is less important than the function.  We can agree on that.  And my question is, what do you mean by growth in state and local representation?  Why can't the entities start with more than one law enforcement officer, which I think all of us here would believe is important?

MR. ALLEN:  As we finish our concept of operations and as we work out the roles and responsibilities in that concept of operations, I think you will find that there will be more representatives than, say, one.  The whole - and I don't know where the issue of one came from, but we're going to work with the chiefs of international major cities' police.  We're going to work with the Global Justice - I can't remember the name of it - the Global Justice Committee in order to ensure that we get the fullest input, because we want the state and local representatives to represent all the state and local fusion centers and local police departments at large.  We don't want each of the cities and other fusion centers sending in officers at the local level.  We want people there who can help our photo intelligence analysts understand what's important, can advice federal analysts.  You know, this foundation document on terrorism techniques, tactics and procedures - that's going to be very helpful at the local level, and so these people are going to be very crucial to our performance.

REP. HARMAN:  Well, you're talking the talk, but I urge you to walk the walk.  I would strongly recommend that more than one law enforcement officer be part of the initial group of people.  Surely, there's more than one qualified law enforcement officer you could include, and I would hope they would be recommended by the state and local groups themselves - not by you.  I mean that does compromise the idea, but also if you call this the Federal Coordinating Group, I think that may send the wrong message, too.  I think the point is to improve information sharing and help get the perspective from state and locals on what products would be useful and what insights they have.  So, I don't want to name the thing, but - and I'm not sure I recall what ITACG stood for, but the point is to take advantage of the talent pool out there.  I think you agree with me, so I urge you to take advantage of more of the talent pool out there.

Let me turn to a couple other subjects that you raised.  You were talking about these guidelines for civil liberties that the Justice Department has.  My question is, are these guidelines mandatory or voluntary?

MR. ALLEN:  These guidelines are recommended by Justice, by our own department, working those guidelines out with state and local.  We believe that state and local fusion centers will follow these guidelines, because they understand it's very important that they meet high standards for protection of those civil liberties.  And I think, you know, that would affect our opinion and our assessment, because before we put officers in any fusion center, I send at least three or four officers out. They spend several days evaluating that center that's forming, and that's one of the places where they put a lot of emphasis.

REP. HARMAN:  Right.

MR. ALLEN:  They have to meet those standards.

REP. HARMAN:  Well, I just point out that HR 1, which has passed the House and has passed the Senate just this week in a different form - H.R. 1 does include a provision that would make those mandatory.  Obviously, we share the goal of making sure that they're the right standards and that they're followed.

Finally, let me ask you about budget.  I understand that the budget is classified.  I'm not asking you to reveal any details of it.  Nor will we, but you said it will be a challenge to meet your goal of getting personnel to 40 fusion centers.

HEARING OF THE INTELLIGENCE, INFORMATION SHARING, AND TERRORISM RISK ASSESSMENT SUBCOMMITTEE OF THE HOUSE HOMELAND SECURITY COMMITTEE; SUBJECT: THE DEPARTMENT OF HOMELAND SECURITY STATE AND LOCAL FUSI

Could an increase in budget be helpful in that regard?

MR. ALLEN:  My view is when we formed our program for FY '08 through '12, I had just arrived.  We have begun a number of new initiatives.  We have not embedded anybody.  We did not have a state and local program office.

We now have that.  As you know, we've started a number of other new initiatives within the DHS intelligence.  I think we're going to be very challenged.  It may require me to reallocate dollars within my overall budget in order to meet some of these demands, such as the state and local government office.  There are other initiatives that - which our staff has briefed will require additional resources.

REP. HARMAN:  So, I'm not sure whether you said yes or no, but let me just - my time has expired.  Would additional resources be helpful?

MR. ALLEN:  We always welcome additional resources.

REP. HARMAN:  Thank you.

(LAUGHTER.)

REP. HARMAN:  Thank you.  I appreciate that.  I now yield five minutes for questions to the ranking member.

REP. REICHERT:  Thank you, Madam Chair.  That's the same answer the sheriff would've given to the county council - (chuckles) - "Always can use more resources."

As we look at the ITACG and you look at bringing local law enforcement in, are you experiencing any resistance to volunteers or people who might be interested in that position? MR. ALLEN:  I don't think there's going to be any shortage of people wanting to come to Washington to work at Liberty Crossing to help in sanitizing, taking away (?) sources and methods, if need be, and pushing the information out, hopefully, at official use or sensitive, but unclassified, or law enforcement-sensitive levels down to there, or, if need be, at secret levels.  I think we're going to have a surfeit of people wanting to do this.  I know that there're a number of cities that have volunteered to send officers.  (Unintelligible) - in New York has done so.

REP. REICHERT:  Good.  I do agree that the opportunity would be one that a local law enforcement officer would love to participate in, but working with the budget side in consideration of those other cities that might have a little bit smaller police force, the usual positions that are volunteered to the federal government to serve in this capacity are on a temporary basis - is that correct?

MR. ALLEN:  That is correct.

REP. REICHERT:  And is there any federal reimbursement at all to the local agency providing the body?

MR. ALLEN:  We have not worked that out, but I certainly would think that that would be appropriate, to reimburse and pay for their moving expenditures and what have you, because it seems to me if we're going to have a, quote, "Federal Coordinating Group," we ought to reach out and give a helping hand to those coming from state and local governments.

REP. REICHERT:  Would wages be a cost that might be a burden that the federal government carry, or would that still apply - (cross talk)?

MR. ALLEN:  We haven't worked that out.  That's a policy decision yet to be reached.  We have to do that in cooperation with the DNI, or the director of national intelligence, as well as with the FBI.

REP. REICHERT:  I do know there has been some resistance to fund positions at fusion centers and

HEARING OF THE INTELLIGENCE, INFORMATION SHARING, AND TERRORISM RISK ASSESSMENT
SUBCOMMITTEE OF THE HOUSE HOMELAND SECURITY COMMITTEE; SUBJECT: THE DEPARTMENT OF
HOMELAND SECURITY STATE AND LOCAL FUSI

MR. ALLEN:  Yes.

REP. REICHERT:  -- joint analytical centers and JTTFs.  Do you know if there's been any further discussion on whether or not the moneys could be found to maybe put them into grants in training --

MR. ALLEN:  I think we can look at grants in training, because we know that grants in training funds can be used, for example, by the fusion centers to hire analysts.  They can hire -

REP. REICHERT:  Yes.

MR. ALLEN:  -- contractors to come in as analysts, and they actually can use some of the grant moneys to actually train those analysts in analytic tradecrafts.  So, we'll have to look into it, but there's some flexibility there.

REP .REICHERT:  It's been one of the big issues that local law enforcement agencies, cities and counties across the country have expressed over and over again - you know, removing, as I said in my opening statement, resources from a gang unit, for example, to participate in a fusion center experience, where I think that their input and participation is absolutely vital for the success of that fusion center or analytical center.

Just to touch on the privacy issue very quickly, to your knowledge, have there been any demonstrated privacy or civil liberties issues with any of the fusion centers?

MR. ALLEN:  I can't speak for all the fusion centers, because that's - there're areas where we really haven't visited.  Some of the fusion centers - we certainly have visited the state of Washington, as you know.

REP. REICHERT:  Yes.

MR. ALLEN:  But where we have officers embedded, we have asked them to report any concerns they may have, and in the 12 fusion centers we've received no reports of any concerns.  That's certainly going to be part and parcel of sending officers to the fusion centers, that all of the civil liberties and privacy rules and guidelines we expect those centers to follow.

REP. REICHERT:  One, last question in my minute remaining.  You're aware of the policy that will request that the federal government's made for phone records for American citizens?  Are you familiar with that?  It was an issue about five or six months ago or so.

MR. ALLEN:  I'm not familiar with any requests.  The Department of Homeland Security, our Customs and Border Patrol and the Transportation Security Administration and Immigration and Customs Enforcement can collect information.  My own office, we do not collect information.  We get the information that they provide, but all the information is collected lawfully at ports of entry.

REP. REICHERT:  Okay.  Thank you.

REP. HARMAN:  Thank you, Mr. Reichert.  I would just note that there are programs of - there is a program that involves the **collection of some phone records,** but it is not administered by the Department of Homeland Security.

MR. ALLEN:  That's correct.

REP. HARMAN:  It is administered in other ways, and much about that program is classified, and certainly I would hope that all of it complies fully with our laws and that - well, let me just leave it there.

The Chair now recognizes for five minutes the gentleman from Washington State, Mr. Dicks.  And I would just like to state for the record that we do plan to come to Washington State for a field hearing.  Both the ranking member and Mr. Dicks will be part of that hearing, if we can find a mutually convenient date.  We are also going to Los Angeles on

HEARING OF THE INTELLIGENCE, INFORMATION SHARING, AND TERRORISM RISK ASSESSMENT
SUBCOMMITTEE OF THE HOUSE HOMELAND SECURITY COMMITTEE; SUBJECT: THE DEPARTMENT OF
HOMELAND SECURITY STATE AND LOCAL FUSI

April 4th and 5th, to revisit the JRIC, the Joint Regional Intelligence Center, to hold a field hearing on radicalization and information sharing, and we will be meeting, Charlie, with your detailee out in Los Angeles at that time.

MR. ALLEN:  Yes, the secretary has asked me to try to attend that, if I could.

REP. HARMAN:  Wonderful. We'll welcome you.  We had thought you were unavailable, but that would be great.

MR. ALLEN:  Well, I'll look at my schedule.  I'd like to make that.

REP. HARMAN:  Terrific.

And now, Mr. Dicks, you're recognized for five minutes.

REP. NORMAN D. DICKS:  Well, I think this fusion center idea is a good idea.  I mean I'm very supportive of this, and I'm glad that we've gotten started with 12, and we're going to build this national network.

Could you provide some specific examples of how fusion centers have improved homeland security and how your staff's presence at fusion centers has made things better?

MR. ALLEN:  Yes sir.  For example, when we had - when the president talked about some of the disrupted terrorist plots, the library tower in Los Angeles was mentioned as one plot, where Khalid Sheikh Mohammed had planned that. That was not pre-cleared, necessarily, directly with the mayor of Los Angeles.  It was cleared at many levels below that, but our having an office embedded there to talk quickly to all the officials at the senior levels, I think, helped ease some of those pains.

The point is we get every day, as you know, Congressman Dicks, threats - I got one last night, which I was called at home on - and we're able then to - most of them are rumors or non-credible.  There are some that are credible.  We're able to separate the wheat from the chaff, and having that officer there with a secure phone, or a secure building network, makes all the difference in the world.  And we've been able to do it with UNYRIC in Upper New York and other places.

REP. DICKS:  And the way the thing is structured, you have these fusion centers out there in the local communities, and then you have your - what do you call it?  (Inaudible)- --

MR. ALLEN:  We have Homeland Security Data Network, which is a secret level that has all the of robustness of a Department of Defense supernet capability.

REP. DICKS:  And then you have an office here in Washington, D.C. Is that correct?

MR. ALLEN:  Yes, we have a state and local government program office that is now being properly classified and so forth at the various levels, and we're selecting a senior officer to head it.

REP. DICKS:  And so the idea is for information to move in both directions, out to the states and locals from here, and then information from there coming back here.

MR. ALLEN:  Absolutely.  My deputy assistant secretary for intelligence this morning told me that her senior intelligence officers - and we have quite a number of them - are receiving every day calls from state fusion centers, not just where we have embedded officers, but around the country.  They have our number, and they're calling us if they have concerns.

REP. DICKS:  And you said you have a data transmission system linked up, too - right -

MR. ALLEN:  Absolutely, yes -- at all the places, except the Upper New York Regional Intelligence Center, and

HEARING OF THE INTELLIGENCE, INFORMATION SHARING, AND TERRORISM RISK ASSESSMENT
SUBCOMMITTEE OF THE HOUSE HOMELAND SECURITY COMMITTEE; SUBJECT: THE DEPARTMENT OF
HOMELAND SECURITY STATE AND LOCAL FUSI

that will within a month. I discussed that yesterday, to get that up to Colonel Bart Johnson.

REP. DICKS: And you have a plan to go to how many - 36?

MR. ALLEN: We want to put people out in 35-plus, and as the chairwoman said, we're going to be challenged to get that all out there by the end of Fiscal Year '08.

REP. DICKS: That's your goal, is to try to do it by '08.

MR. ALLEN: Yes, sir - and that's where the possibility of additional funding would maybe help to do that. We've undertaken a number of new initiatives that your staff has been briefed on, and we probably are going to have another new initiative coming on, perhaps on counterintelligence, that will require some billets and some money, which I'm doing in conjunction with the director of security. So, yeah. We're taking on some real initiatives, sir, that I think are needed.

REP. DICKS: Give me an example of where civil liberties - where you would be concerned about civil liberties and, you know, how you want to safeguard them.

MR. ALLEN: Hypothetically, I could say, having lived through a bit of Vietnam and knowing some of the abuses that occurred then, where people went out and not only videotaped or filmed anti-war demonstrations, but tried to get additional data on those people, if it's a peaceful protest, where there's no reasonable belief, under Executive Order 12333, that any of these people are planning any nefarious activity against the United States at any level, I would think that that would be an abuse. You don't do that. People have the right to protest.

REP. DICKS: We had some protests out in the state of Washington just last weekend at the port of Tacoma regarding, you know, Striker vehicles being sent to the war in Iraq. I mean these are all going to be judgment calls that people are going to have to make, and that's why you're emphasizing the training aspect of this.

MR. ALLEN: If we don't have training, there will be abuses. If we don't have training at the local and state level, and they don't meet federal standards and guidelines, I think there will abuses.

REP. DICKS: Yeah.

MR. ALLEN: So, I think we have to work vigorously at the training part.

REP. DICKS: Is there a set of required people in a fusion center, or do we kind of make it up as we go in each area, or how - and I heard the idea of one law enforcement person, but I mean who is supposed to be in the fusion center?

MR. ALLEN: Well -

REP. DICKS: I know you're going to have your representative there, but who else would be in one of these existing centers?

MR. ALLEN: -- some of these are collocated with the Joint Terrorism Task Force of the FBI. Some are located at emergency operations centers. Some are located with state police, so we have a variety of people. They bring people - there's no set formula now, because there's no one, cookie-cutter approach to state and local fusion centers. These have grown up as a result of 9-11 and the people at the local level feeling that they had to have a more coordinated way to look at problems within their own communities.

REP. DICKS: Thank you. Thank you.

REP. HARMAN: The Chairman now recognizes for five minutes the gentleman from Pennsylvania, Mr. Dent.

HEARING OF THE INTELLIGENCE, INFORMATION SHARING, AND TERRORISM RISK ASSESSMENT
SUBCOMMITTEE OF THE HOUSE HOMELAND SECURITY COMMITTEE; SUBJECT: THE DEPARTMENT OF
HOMELAND SECURITY STATE AND LOCAL FUSI

REP. CHARLES W. DENT (R-PA):  Thanks, Madam Chairman.

Nice to see you, Mr. Allen.  The first one I have is the House Appropriations Committee is proposing an additional $35 million in the FY '07 supplemental for the expansion of the fusion center initiative. How is this funding level going to help you expand and strengthen the program, including privacy and civil liberties programs?

MR. ALLEN:  Well, Congressman, as you know, that would be an action taken by House Appropriations.

REP. DENT:  Correct.

MR. ALLEN:  It's not part of the president's budget or the secretary's budget that we submitted.  As I said, we'll be very challenged to meet some of our goals.  We actually will be able to meet our goals, but we may not be able to fulfill all our other initiatives, so - you know, it's your wisdom as to how to allocate any additional funds.  I certainly cannot say truthfully to you that I'm going to be very much squeezed and will have to - I believe the state and local fusion center initiative is so important that I'm willing to sacrifice other initiatives, if necessary, to meet the goal of embedding officers at 35 major fusion centers by the end of FY '08.

REP. DENT:  Well, thank you for that answer.

How are you working to increase public awareness through outreach between fusion center personnel and key community leaders to help create that trust between law enforcement and communities on this whole fusion center issue?

MR. ALLEN:  Well, certainly at the state and local fusion centers and at major police departments, where we also do close liaison - both in New York and out in Los Angeles, for example - those centers and those police departments do have outreach programs to the local community.  Part of our challenge, of course, is to get our officers out and serving and explaining the kind of information we can provide to help keep the community safe.  We have officers that are very active in some of the centers and know all the key players within the community, and the information we provide is threat warning, threat assessment, and these more foundational documents.  So, I think we're building a center of trust down there, but the state and local fusion centers have a prime responsibility for outreach to their local communities.

REP. DENT:  Thank you, and thank you again for your extraordinary.  I yield back.

REP. HARMAN:  Thank you, Mr. Dent.

I'm not sure whether members are interested in a second round of questions or not.  Is anyone interested in asking some more questions? (Pause.)  All right.  Well, then we will need a few minutes to move to our second panel, but I'd just like to say to you, Mr. Allen, that - (chuckles) - your careful answers to our budget question are noted, but we believe that it would be helpful to give you some resources to make this fusion center concept a more effective one. Fusion centers are the way not only to share information vertically, which has been drawn out in this conversation, but also to share information horizontally, at the local level.  And was something that the members who went to the MCAC in Baltimore learned on Monday, and I actually saw one of the products that's used, which was fascinating because it had information in this Baltimore document about some activity that could be happening in Los Angeles early next week, and that information was being shared with the Joint Regional Intelligence Center, the JRIC - the fusion center in Los Angeles.

And so if we do this right, information will flow seamlessly, as we say, on a horizontal basis at the federal level, but also seamlessly vertically and seamlessly among the state and local fusion centers.  And that will maximize the chance, I hope, that we will connect the dots the next time, before any attack on U.S. interests or U.S. persons.

So, this is really promising.  We know that you're our partner in this, and all of us here are dedicated to making this

HEARING OF THE INTELLIGENCE, INFORMATION SHARING, AND TERRORISM RISK ASSESSMENT
SUBCOMMITTEE OF THE HOUSE HOMELAND SECURITY COMMITTEE; SUBJECT: THE DEPARTMENT OF
HOMELAND SECURITY STATE AND LOCAL FUSI

succeed.  Thank you for your testimony.

MR. ALLEN:  Thank you, Chairman.

REP. HARMAN:  Mr. Reichert, do you have anything to add?

REP. REICHERT:  What the Chairman said.

(CHUCKLING.)

MR. ALLELN:  Thanks very much.

REP. HARMAN:  This is a lovely exercise in bipartisanship.  Thank you, Mr. Allen.

MR. ALLEN:  I'm very grateful.

(PAUSE IN THE PROCEEDINGS.)

REP. HARMAN:  Are we ready?  Okay.  The subcommittee welcomes the second panel of witnesses.  Our first witness, Daniel Sutherland, is the department officer for civil rights and civil liberties.  Mr. Sutherland provides advice to Secretary Chertoff and the senior officers of the department on a full range of civil rights and civil liberties issues.  He has been a civil rights attorney throughout his legal career, serving 14 years with the Civil Rights Division of the Justice Department and nearly two years with the Office for Civil Rights at the U.S. Department of Education.

Our second witness, Hugo Teufel, is the department's privacy officer.  Mr. Teufel has primary responsibility for privacy policy at the department that includes assuring that the technologies used by the department are privacy-compliant, conducting privacy impact assessment of proposed rules at the department, assuring that the department itself complies with the Privacy Act, and reporting to Congress on the activities of the department that affect privacy.  Before joining the Privacy Office, Mr. Teufel served as the first associate general counsel for general law at the department.  He also previously served as the associate solicitor for general law at the Department of Interior.

Without objection, the witnesses' full statements will be inserted in the record.  I now ask each witness to summarize his statement for five minutes, beginning with Mr. Sutherland.  Welcome.

MR. DANIEL W. SUTHERLAND:  Thank you, Chairman Harman and Ranking Member Reichert.  It's a pleasure to testify alongside Hugo Teufel, who has been a good colleague and friend for a number of years at the department, and our offices work closely together.  We hope that that comes across today as we talk.

I just want to describe at the beginning the purpose or mission of our particular office.  In accordance with 6 U.S.C. 345, the statute that creates our office, our mission is to assist our colleagues in the Department of Homeland Security to secure our country, while also preserving our freedoms and our way of life.  In essence, we're providing guidance to our colleagues at the intersection of homeland security and civil rights and civil liberties.  We, therefore, have the opportunity to work closely with every DHS component.  I recently looked at the organization chart for the department and noted that we have a project with essentially every box in the organization chart, and I'm sure that it's the same with the Privacy Office.  We also work with field offices around the country.  We worked on nearly all aspects of the issues in the homeland security effort from the Hurricane Katrina recovery to the operation of the Watch List, the immigration policy, to training of our workforce.

We believe that our work is supported by our other colleagues in the department, because we try to provide constructive and proactive advice that allows our colleagues to do their work in the most effective way possible.  Our work has also been welcomed by our colleagues outside of government, as demonstrated by our frequent collaborations with civil rights and civil liberties organizations. We play a unique role within the department and, we hope, a valuable one; and we're going to continue to try to assist our colleagues as we sort through the issues, again, that are at the

HEARING OF THE INTELLIGENCE, INFORMATION SHARING, AND TERRORISM RISK ASSESSMENT
SUBCOMMITTEE OF THE HOUSE HOMELAND SECURITY COMMITTEE; SUBJECT: THE DEPARTMENT OF
HOMELAND SECURITY STATE AND LOCAL FUSI

intersection of homeland security and civil rights and civil liberties.

Because our office is relatively small, we realize that, to use a sports analogy, we have to "punch above our weight."  And one of the ways that we've decided to expand our influence is to work on training issues, and we've created a program we call Civil Liberties University, which is basically a program to provide high-quality training on a wide range of topics.  Through Civil Liberties University, we have developed a video that emphasizes the elements of the national detention standards for protecting immigrant detainees.  We have a multi-hour instructional video on how to screen people with disabilities at airports.  We've done training on Constitution Day to try to emphasize the value of the Constitution.  We've also developed written materials on how to screen people who wear religious head coverings - for example, people who are Sikh, or people who are Muslim.  We've also developed materials on people who are Sikh who carry the kirpan, the ceremonial religious dagger, and a number of other issues like that.

We've just released an intensive training DVD on the issue of how to relate to Arab and Muslim travelers - travelers from the Arab and Muslim world, or Arab-Americans and Muslim Americans.  It's a training that involves insights from four experts, one a Muslim woman who's on the National Security Council, one a Muslim federal prosecutor, one a member of a civil rights organization that represents Arab and Muslim community interests, and one a prominent Islamic scholar.

We've also developed training on the issue of racial profiling - racial and ethnic profiling, when can you use race or ethnicity in the course of law enforcement activities - a tutorial that our people take, and they have to pass certain tests as they go through the training.  So, the bottom line, I think, is that we have decided that training is a way that we can help make an impact, and it's something that's really being welcomed by our colleagues at the department.

So, just with a better understanding of the office and our training program, I just want to make a couple of comments about fusion centers.  Just one week ago today, as you mentioned, we had the National Fusion Center Conference, and Secretary Chertoff at that conference said that the protection of civil liberties must be a priority, and he outlined the department's vision in fusion centers, including the need to develop thoughtful tools and measures to safeguard privacy and civil liberties.  So, again, I think we're all on the same page in terms of the priority of these issues.

Our office has worked on a number of issues regarding fusion centers, for example, just last week at the conference, we made available over 600 copies of that Arab and Muslim culture video training to people involved in fusion centers around the country.  We've also worked on different policy documents that have been developed over the past years.

We know that fusion centers will face a number of issues with regard to civil rights and civil liberties.  I've outlined a few of those concerns in my written statement and can certainly go over them during the question-and-answer session, but we just want to make clear that the Office of Civil Rights and Civil Liberties stands ready to assist our colleagues in fusion centers around the country, as we have worked with our colleagues within our own department, to try to help meet the challenges that they face at the intersection of civil rights and civil liberties and homeland security.

I thank you for the opportunity to testify.

REP. HARMAN:  Thank you very much.  And now Mr. Tooful - (phonetic) - or Toeful - (phonetic).

MR. HUGO TEUFEL:  It's Toyful - (phonetic) - ma'am.

REP. HARMAN:  Teufel.  Would you please summarize your statement in five minutes?

MR. TEUFEL:  Absolutely.

Madam Chair, Ranking Member Reichert and members of the subcommittee, it is an honor to testify before you here today.  I'm particularly pleased to be appearing with my good colleague Dan Sutherland.  As the subcommittee

HEARING OF THE INTELLIGENCE, INFORMATION SHARING, AND TERRORISM RISK ASSESSMENT SUBCOMMITTEE OF THE HOUSE HOMELAND SECURITY COMMITTEE; SUBJECT: THE DEPARTMENT OF HOMELAND SECURITY STATE AND LOCAL FUSI

knows, our offices have a statutory responsibility to work together to address privacy and civil liberties issues in an integrated and comprehensive manner, and I want to assure you that we do.

Because this is my first time appearing before the subcommittee - in fact, the first time that I've ever testified before any committee in either house - I wanted to mention a couple of -

REP. HARMAN:  It's a great honor, I should point out.

(LAUGHTER.)

MR. TEUFEL:  -- yes, ma'am, indeed.  I wanted to mention a couple more things.  When I was associate general counsel for general law, I was very lucky to have as two of my clients my predecessor - (inaudible) - Canatelli (?) and Dan Sutherland.  So, in that role, I had the opportunity to have a very good understanding of what both offices do.

Also, I would like to mention to you - I think it's particularly relevant, given the Chair's earlier statements, that previously I served as deputy solicitor general for the State of Colorado.  And, fortunately, I see that Representative Perlmutter is not here, but -- a fellow Coloradoan, sadly, who is not with us right now, but I did want to mention Colorado since I'm here before you all.

The subcommittee has just heard from Assistant Secretary Allen, who expressed how important fusion centers are to critical department missions.  He also pointed to the department's aggressive plan to increase the number of fusion centers across the nation.  As chief privacy officer, I was gratified to hear the assistant secretary's commitment to establishing sound and effective privacy practices and policies from the very beginning.  In the Privacy Office, we understand that this is more than a compliance issue.  Sound and effective privacy policies enhance program performance, while minimizing the cost to agencies and the public.  Like the assistant, secretary, I believe the fusion center guidelines issued by the Global Information Sharing Initiative and published in cooperation between the Department of Justice and the Department of Homeland Security provide an invaluable resource for the principals to utilize when founding and operating a fusion center, and will also be helpful to me, as a member of the Information Sharing Environment Privacy Guidelines Committee, in monitoring how privacy is safeguarded in this crucial aspect of the information sharing environment.

The fusion center guidelines encourage consideration of privacy interests from the very moment of formation, a critical step, and these guidelines recommend creating a privacy committee within the governing structure of the fusion center.  The participants are encouraged to enter MOUs where privacy-related security protections and responsibilities are specifically called out.  The guidelines promote meaningful and lawful privacy policies at the fusion centers and provide mechanisms ensuring that the centers adhere to these policies.  Security is also addressed, because it is well understood in the privacy community that security concerns become privacy problems.  These sections contain a number of useful links to templates and model policies, and I want to note that, importantly, they secure the homeland while protecting privacy.

As with you, Madam Chair, I don't believe that it's a zero-sum game.  We can do both, and we can succeed at both, or we fail at both.

I thank the subcommittee for this opportunity to testify.  My office looks forward to working with Assistant Secretary Allen, Dan Sutherland and our fusion center partners to ensure that they maximize their effectiveness by establishing sound privacy practices.  Thank you very much.

REP. HARMAN:  Thank you for your testimony within the time limit.

A vote has been called.  I'm not sure if it's the last one, but we have about ten, good minutes.  It's not the last vote, so I think we'll try to conclude this hearing before we go to vote.  I think that's fair to you and would work better, so I'm going to just make a comment and ask one question and take less than five minutes, and then yield to the other two who

HEARING OF THE INTELLIGENCE, INFORMATION SHARING, AND TERRORISM RISK ASSESSMENT SUBCOMMITTEE OF THE HOUSE HOMELAND SECURITY COMMITTEE; SUBJECT: THE DEPARTMENT OF HOMELAND SECURITY STATE AND LOCAL FUSI

are here.

My comment is that you have revealed a closely guarded secret. Folks out in the countryside don't realize that you're there and what you're doing, and I would urge you to tell your story. In fact, I would urge committee staff to figure out the way we're going to tell this story in Los Angeles on April 5, because it's very important that the neighborhoods which these fusion centers serve understand that this training is available and conducted, and that the policies that these fusion centers are following - hopefully - comply with these federal policies. So, my one question is - and maybe, Mr. Sutherland, this is for you, if you could answer it just in 30 seconds and then yield to Mr. Reichert. Can you assure me that, you know, people who are coming now into the JRIC, the Joint Regional Intelligence Center, in Los Angeles receive this training - watch your video, read your materials - and practice these guidelines that you have developed?

MR. SUTHERLAND: Chairman, I could not assure you that any particular employees or any particular fusion center has seen this video, or seen these materials that I referenced. We need to do a better job in that regard.

REP. HARMAN: Well, then, let me just conclude by urging you to do a better job in that - your job in this regard and find the ways to make these programs known by those who work in these fusion centers. We will, by legislation, consider making some of this mandatory if, as Charlie Allen says, everyone wants to follow these practices, and that can be done even before they're mandatory. Let's do that. Would you commit to working on that problem?

MR. SUTHERLAND: Absolutely.

We'll do it, and we'll follow up with you.

REP.(?): (Off mike.)

REP. HARMAN: Yes, I'll yield to you.

REP. (?): Do you have a plan to do this?

MR. SUTHERLAND: Not specifically with regard to fusion centers. We have, for example, the training that I mentioned on Arab/Muslim values and cultures. We've just had that out for a month, and 4,000 copies are gone. We have a tremendous amount of enthusiasm, so we're confident that when we make this available to individuals in fusion centers, that they will take it. We have distributed over 600 at the training last week, but I think we can definitely follow up to contact them directly and say, "Here's what we have available."

REP. HARMAN: Well, I think Mr. Dicks raises exactly the right point. We're all late in this. Our understanding of Muslim and Sikh and other cultures is lagging in America, and to make policies to protect our homeland work, we obviously have to have better understanding and, hopefully, gain the trust of law-abiding citizens from all these communities who are the first to know whether something is wrong in their neighborhoods. And we want them to tell us if something is wrong, so let us urge you to think through quickly how this information can go out to fusion center personnel, what steps we might have to take to help you get there. Obviously, we're talking about additional budget resources, but let me put that out and follow up with you within a week or so to see where we are, and maybe you can report back on April 5 - or someone can - in Los Angeles. Is that reasonable?

MR. SUTHERLAND: Yes, ma'am.

REP. HARMAN: Thank you.

Let me yield a few minutes to Mr. Reichert and then to Mr. Dicks.

REP. REICHERT: Thank you, Madam Chair. I think you make an excellent point and followed up by Mr. Dicks. And as you were both speaking, I jotted down some quick notes, and it just so happens that my questions for both of

HEARING OF THE INTELLIGENCE, INFORMATION SHARING, AND TERRORISM RISK ASSESSMENT
SUBCOMMITTEE OF THE HOUSE HOMELAND SECURITY COMMITTEE; SUBJECT: THE DEPARTMENT OF
HOMELAND SECURITY STATE AND LOCAL FUSI

you are along the same lines as we've just experienced.  Mr. Sutherland mentioned that the secretary made a comment at
Fusion Center Conference that they wanted to make sure there are tools and measures in place to safeguard our privacy
and civil liberties, and certainly education has got to be at the top of the list.  And then Mr. Teufel, you mentioned the
assistant secretary, whose comment was sound and effective policies.  What tools and measures, or policies are you
talking about?  Just kind of bullet- point them real quick for me, please.

MR. TEUFEL:  Well, I would call your attention to the guidelines, and it's - I'm going to get this wrong - the fusion
center guidelines, but Section 8, Title 8 deals with the privacy guidelines.  Now, it is true that under the guidelines,
these privacy requirements are not mandatory, but they are recommended.  It is my understanding in talking with the
folks over at INA that INA looks to make sure that the privacy guidelines are implemented before they send folks out.
And I want to stress that these privacy guidelines contained in the fusion center guidelines are outstanding, and key to
them, at the heart of them, are the fair information practice principles that undergird the Privacy Act of 1974, the eight
fair information practice principles.  And if you adhere to those principles, you can't go wrong when it comes to -

REP. HARMAN:  Mr. Reichert, would you yield to me just for a request?

REP. REICHERT:  Certainly.

REP. HARMAN:  Would you provide that material to us, please?  I'm assuming it's unclassified, but whatever form
it's in, we'd like to receive it.

MR. TEUFEL:  -- absolutely, ma'am.  We pulled it down off the Internet yesterday.  It's publicly available, and we
can certainly get that -

REP. HARMAN:  Thank you.  I yield back --

MR. TEUFEL:  -- I can get you the URL.

REP. HARMAN:  -- to Mr. Reichert and would point out that we're at about eight minutes.  So, hopefully, we can
get to Mr. Dicks.

REP. REICHERT:  (Cross talk) - rules and measures are the same as the policies that - we're talking about the same
thing for -

MR. SUTHERLAND:  Yes, Congressman.  I think one thing that's important when you look at the guidelines is
that the guidelines - most of the discussion in this context deals with the protection of data, which falls within Mr.
Teufel's area.  So, the training that I was talking about would fall more in the area of the protection of civil rights, or a
better understanding of what to do with data, and that's, I think, where we can really add value here.

REP. REICHERT:  Great.  Thank you.  I yield.

REP. HARMAN:  Mr. Dicks, you have two minutes for questions.

REP. DICKS:  (Off mike) - all about.  You've got ways of protecting the databases and protecting that information.
Is that correct, or is that something you have to work on and develop at each one of these fusion centers?

MR. SUTHERLAND:  Well, every fusion center is different.  They are established by state and local governmental
entities.  The Department of Homeland Security and the Department of Justice participate alongside as partners.  If  I
understand -

REP. DICKS:  Well, let's just say that they're sending top-secret information back and forth.  I mean they've got to
have some way to protect that information, say, in the Los Angeles center, or in the Seattle center.

HEARING OF THE INTELLIGENCE, INFORMATION SHARING, AND TERRORISM RISK ASSESSMENT SUBCOMMITTEE OF THE HOUSE HOMELAND SECURITY COMMITTEE; SUBJECT: THE DEPARTMENT OF HOMELAND SECURITY STATE AND LOCAL FUSI

MR. SUTHERLAND:  Absolutely, sir, and when it comes to the transmission of classified information, there are protocols in place -

REP. DICKS:  Right.

MR SUTHERLAND:  -- and standards that have to be met.  I think it's important to note that you can have all the great gear in the world, all the best technology in the world, and you can still fail, because as long as there're human beings involved, human beings will make mistakes. And so the answer is always training, training, training - so that people do the right thing.

REP. DICKS:  And good judgment.

MR. SUTHERLAND:  Yes, absolutely.

REP. DICKS:  And knowing rules.  That's what you're saying.

MR. SUTHERLAND:  Absolutely.

REP DICKS:  Thank you.

MR. SUTHERLAND:  Hopefully, we don't hire people who don't have good judgment or don't know the rules.

REP. HARMAN:  Thank you.

REP. DICKS:  But just one point as we walk out the door.  I mean it sounds like a lot of people are coming to the fusion centers, and each situation is different.  So, you know, are these people cleared? Do they look into their records? Is there a clearance process of sorts before these people become part of the fusion center?

MR. SUTHERLAND:  That's my understanding, sir, and as I also understand, INA looks at the people and looks at the centers -

REP. DICKS:  Well, all right.

REP. SUTHERLAND:  -- before they get involved, sir.

REP. DICKS:  Thank you.

REP. HARMAN:  Let me thank both of our witnesses.  As Mr. Allen said about fusion centers, one size does not fit all, but what has to fit all is that civil liberties and privacy principles are observed all the time - no exceptions.  And it's going to be hard to get this right.  Training, training, training is clearly a big part of the answer, and I just want to commend both of you for what appears to me to be excellent work at the Department of Homeland Security.

The hearing stands adjourned.

**LOAD-DATE:** March 17, 2007

# EXHIBIT "Y"



FORMAT FOR
PRINTING
sponsored by    **TOSHIBA**  Don't copy. Lead.

**May 12, 2006 11:08 a.m. EDT**

# Full Statement From Attorney
# Of Former Qwest CEO Nacchio
*May 12, 2006 11:08 a.m.*

*Full text of the statement of Herbert J. Stern, attorney for former Qwest
Communications International Inc. Chief Executive Joseph N. Nacchio*

In light of pending litigation, I have been reluctant to issue any public statements.
However, because of apparent confusion concerning Joe Nacchio and his role in
refusing to make private telephone records of Qwest customers available to the
NSA immediately following the Patriot Act, and in order to negate misguided
attempts to relate Mr. Nacchio's conduct to present litigation, the following are the facts.

In the Fall of 2001, at a time when there was no investigation of Qwest or Mr. Nacchio by the Department of
Justice or the Securities Exchange Commission, and while Mr. Nacchio was Chairman and CEO of Qwest and
was serving pursuant to the President's appointment as the Chairman of the National Security
Telecommunications Advisory Committee, Qwest was approached to permit the Government access to the
private telephone records of Qwest customers.

Mr. Nacchio made inquiry as to whether a warrant or other legal process had been secured in support of that
request. When he learned that no such authority had been granted and that there was a disinclination on the part
of the authorities to use any legal process, including the Special Court which had been established to handle such
matters, Mr. Nacchio concluded that these requests violated the privacy requirements of the Telecommications
Act. Accordingly, Mr. Nacchio issued instructions to refuse to comply with these requests. These requests
continued throughout Mr. Nacchio's tenure and until his departure in June of 2002.

URL for this article:
http://online.wsj.com/article/SB114744615734351338.html

**DOW JONES REPRINTS**
This copy is for your
personal, non-commercial use
only. To order presentation-ready
copies for distribution to your
colleagues, clients or customers,
use the Order Reprints tool at the
bottom of any article or visit:
www.djreprints.com.

• See a sample reprint in PDF
format.
• Order a reprint of this article now.

**Copyright 2007 Dow Jones & Company, Inc. All Rights Reserved**

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our
**Subscriber Agreement** and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones
Reprints at 1-800-843-0008 or visit **www.djreprints.com.**

# EXHIBIT "Z"



→ Online NewsHour        → REGION: North America
                         → TOPIC: Science & Technology

TRANSCRIPT                                                    Originally Aired: April 11, 2007

Report

## New Cell Phone Technology Can Track Users

With Global Positioning System chips now installed in some cell phones, parents can use phones to keep tabs on their children and businesses can track the whereabouts of delivery truck drivers. But the new tracking systems leave some privacy advocates dismayed.



🔊 RealAudio | Download    📹 Streaming Video

PARENT: Here you are.

LEE HOCHBERG, NewsHour Correspondent: Tommy Fritz (ph) of suburban Seattle made sure 5-year-old Parker had crayons in his backpack and a cell phone, with its global positioning system, on his backpack.

PARENT: We've got to go. You've got to go.

LEE HOCHBERG: Joel Fritz configured his own cell phone so he could track his son throughout the day. Using Verizon Wireless's chaperone service, he called up a map showing Parker's school, and he set his phone to alert him if Parker strayed too far from school.

JOEL FRITZ, Verizon Customer: So I think today is a writing day.

LEE HOCHBERG: It's the new location-based technology, through which parents like Fritz can keep 24-hour watch on their children.

JOEL FRITZ: We've been with him through his whole life, you know, up until age 4. We've been in preschool with him, and this is the first time where, you know, we haven't been with him. And I know where he is.

Give me a kiss. Love you.

PARKER FRITZ, Son of Joel Fritz: Goodbye, Dad.

JOEL FRITZ: Bye.

LEE HOCHBERG: Global positioning system, or GPS, chips, are in an estimated 100 million cellular phones. They're there so 911 dispatchers can quickly locate cell phone callers. But now the average cell user can do the same thing: lock on to another cell user's GPS chip and pinpoint that phone's location.

GPS DEMONSTRATOR: I can zoom out, zoom in, depending on what I want to see in a map.

LEE HOCHBERG: Verizon spokesmen say the product has become very popular. Customers pay $10 to $20 a month for it. Sprint, with its family locater, and Disney Mobile offer similar services.

The technology has also been embraced by law enforcement. Colorado authorities found an accused serial rapist by tracking the cell phone he stole from a victim.

### Dark side of technology

LEE HOCKBERG: But there are hints that widening access to people's personal location data has a dark side, as well.

SHERRI PEAK, Stalked by Husband: It's like being a prisoner, in a sense.

LEE HOCHBERG: Sherri Peak says she didn't know much about GPS, but after separating from her husband last

summer, the Seattle-area mother of two began noticing him wherever she went.

SHERRI PEAK: I would go to the grocery store, and there would be his car in the parking lot. I would be driving down the road, and he would drive by me. I would be approaching an intersection, and he'd be sitting there. I would be running errands and see him in my rearview mirror.

LEE HOCHBERG: After several months, local police agreed to examine her car.

SHERRI PEAK: So the police ended up removing this last and final portion of the dash. And when they opened this, the phone was tucked in over here. With the GPS, he was tapping into finding out where I was all the time.

LEE HOCHBERG: Her ex-husband was convicted for stalking. Peak got a chilling lesson about GPS technology.

SHERRI PEAK: This guy can barely hook up a computer. That's why I was so surprised. In the wrong hands, technology can be used against you in horribly threatening, dangerous ways.

## Privacy issues

EVAN HENDRICKS, Privacy Times: The bottom line is, if information is collected, it will be compromised in one form or another.

LEE HOCHBERG: Evan Hendricks examines privacy issues in his Internet newsletter Privacy Times. He believes hackers will steal people's location data or cell companies will share it with government or businesses.

EVAN HENDRICKS: As soon as you create a record, that record can be obtained by other people for purposes that you've never imagined. A bad apple in Verizon can be selling it out the back door. And it can be used by just commercial interest or it could be sold to a stalker if someone's particularly interested in a certain Verizon customer.

LEE HOCHBERG: Verizon Wireless says that worry is unwarranted.

KELLY KURTZMAN, Verizon Wireless: You cannot track it. We don't store that information anywhere.

LEE HOCHBERG: Regional president Kelly Kurtzman says the chaperone system's location data goes only to password-protected Verizon subscribers.

KELLY KURTZMAN: So there's no way for a hacker to be able to go in and get it, to get the information. As we developed this system for the chaperone, we were thinking about those bad guys, because we know they're out there, so we don't capture those records anywhere. We don't catch the information; we don't store the information. So once the request has been completed, that information is deleted, so it's no longer available.

LEE HOCHBERG: But Verizon's other location services may be more vulnerable. Its fleet administrator service allows Verizon business customers to track the locations of their delivery personnel. That information is stored in Verizon databanks.

Fleet administrator tracks the routes a company's drivers take, their driving speed, even how many times their ignition has been turned on.

GPS TRACKER VOICE: Map display also verifies that all vehicles are doing what they're supposed to be doing. Let's check in with Vehicle Number Two. There he is.

LEE HOCHBERG: Verizon says it's not an infringement on privacy.

KELLY KURTZMAN: The company can say, as an employee of this company, our expectations that we can track your truck, track you on the job, and the employee has to agree to that, and check the box, "Yes, we agree to that."

## Sharing location with public

LEE HOCHBERG: In fact, some cell phone users intentionally beam their locations over the Internet using software that can be installed on Sprint's Nextel phones. Computer programmer Chuck Fletcher has sold 30,000 copies of his program, Mologogo, to Nextel subscribers.

CHUCK FLETCHER, Co-Creator, Mologogo: An example here is CandyBabe17 is using our service and has shared her location basically with the public.

LEE HOCHBERG: Fletcher says he and his partner wrote Mologogo so customers could let their friends know where they were. To his surprise, 900 of them, like CandyBabe, allow themselves to be tracked by anybody.

CHUCK FLETCHER: We can see a couple places that she's been around town and the most recent place.

LEE HOCHBERG: So CandyBabe, her most recent spot is right along Route 75 there.

CHUCK FLETCHER: In Florida, might even be where she lives.

LEE HOCHBERG: Fletcher showed us real-time locations of subscribers all around the country. There was this man off Bernwood Drive in Florida.

CHUCK FLETCHER: We can kind of zoom in and see this guy, so this is -- his user name there is Founder1. He looks like a middle-aged gentleman, you know, with a suit and tie there.

LEE HOCHBERG: And SimpleGrin in downtown Seattle.

CHUCK FLETCHER: So, right now, SimpleGrin is right here at 5 and whatever this road is, Fourth Avenue or something like that. Yes, so he's right there.

LEE HOCHBERG: He was philosophical about the risks of people's locations being widely available.

CHUCK FLETCHER: I think there's a huge amount of benefit to be able to take advantage of sharing more information. We still have to see -- if there's going to be -- the negatives are going to outweigh that.

Are we going to have a cyber-mafia, you know, a few years from now? Maybe. Maybe criminals will get smart and take advantage of things like this. It's never really designed as a stalking tool, but it's possible that someone could, you know, look at this and say, "Oh, I want to -- this person is online right now, and they were just there. I want to go find them."

If you need to do a people hunt, right, and whether that's for good or bad purposes, hard to say, but that's this person's choice, to make their information available.

## Protecting customers' records

EVAN HENDRICKS: Ultimately it goes to, how creepy does all this make you feel?

LEE HOCHBERG: Privacy advocate Hendricks fear, in the end, access to location data won't be driven by personal choice but by political and economic pressures. He notes, after 9/11, the Bush administration asked phone companies for billions of private phone records.

Federal law forbids turning them over without a court order, but most phone companies did so anyway. Verizon's landline division was hit with a $50 billion consumer lawsuit for doing so. Verizon Wireless emphasizes it withheld its phone records.

KELLY KURTZMAN: Absolutely, absolutely. We were asked, but we said, no, we would not give that information, again, you know, trying to protect the privacy of our customers. We take that very seriously.

LEE HOCHBERG: Still, the company says it doesn't believe its location information is actually covered under federal privacy law. Hendricks says the industry really wants to sell that location data to stores, which will use it to target-market cell users.

EVAN HENDRICKS: Data about us and where we go and our choices is so valuable that there's always going to be sides of the company that are saying, "You know, if we can just use this information, we can increase our revenue growth by this percent." Usually the marketing people within the company win those fights.

LEE HOCHBERG: Verizon acknowledges it's looking at that market.

KELLY KURTZMAN: I think the opportunity is huge out there. And certainly if the customers are saying, "Gosh, I'd like to be notified when I'm near a Starbucks or where the next gas station might be or whatever," those are services that we're certainly looking at potentially offering in the future, but we're not looking to sell carte blanche our customers information, to say, "Gosh, we can make some money on this."

LEE HOCHBERG: Whoever makes money off it, it's clear a most-important feature for cell phone users and sellers will become like in real estate: location, location, location.

Funded, in part, by:

    

Support the kind of journalism done by the NewsHour...Become a member of your local PBS station.

PBS Online Privacy Policy

Copyright ©1996- 2007 MacNeil/Lehrer Productions. All Rights Reserved.