1  Elizabeth J. Cabraser (State Bar No. 083151)
   Barry R. Himmelstein (State Bar No. 157736)
2  Michael W. Sobol (State Bar No. 194857)
   Eric B. Fastiff (State Bar No. 182260)
3  Allison S. Elgart (State Bar No. 241901)
   LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
4  275 Battery Street, 30th Floor
   San Francisco, CA  94111-3339
5  Telephone:  (415) 956-1000
   Facsimile:  (415) 956-1008
6
   Interim Class Counsel for MCI Class
7
   Ronald L. Motley
8  Jodi W. Flowers
   Donald A. Migliori
9  Justin B. Kaplan
   Vincent I. Parrett (State Bar No. 237563)
10 MOTLEY RICE, LLC
   28 Bridgeside Boulevard
11 P.O. Box 1792
   Mount Pleasant, SC 29465
12 Telephone:  (843) 216-9000
   Facsimile:  (843) 216-9440
13
   Interim Class Counsel For Verizon Class
14

15              UNITED STATES DISTRICT COURT

16            NORTHERN DISTRICT OF CALIFORNIA

17              SAN FRANCISCO DIVISION

18

19 IN RE:                                    MDL No. 06-1791 VRW

20 NATIONAL SECURITY AGENCY                  **APPENDIX OF AUTHORITIES IN**
   TELECOMMUNICATIONS RECORDS                **SUPPORT OF PLAINTIFFS' JOINT**
21 LITIGATION,                               **OPPOSITION TO VERIZON'S MOTION**
                                             **TO DISMISS PLAINTIFFS' MASTER**
22 This Document Relates To:                 **CONSOLIDATED COMPLAINT**

23 All Class Actions Against MCI and         Date:   August 30, 2007
   Verizon Defendants in the Master MCI and  Time:   2:00 p.m.
24 Verizon Consolidated Complaint, Dkt. 125  Courtroom:  6, 17th Floor
                                             Judge:  Hon. Vaughn R. Walker
25

26

27

28

636082.2                                           APPENDIX OF AUTHORITIES

1

**ACTS OF CONGRESS**

2

Authorization for Use of Military Force, Pub. L. No. 107- 401                    Tab 1

3

USA PATRIOT Improvement and Reauthorization Act ("PATRIOT                        Tab 2
        Reauthorization Act"), Pub. L. No. 109-177, Title I, § 107(b)(1)(B), 120
4       Stat. 192, 202 (Mar. 9, 2006)

5

**SENATE REPORTS**

6

7       1968 U.S.C.C.A.N. 2112                                                   Tab 3

8       S. Rep. No. 99-541, 1986 U.S.C.C.A.N. 3555                               Tab 4

9       S. Rep. No. 95-604, 1978 U.S.C.C.A.N. 3904                               Tab 5

10      147 Cong. Rec. S10365-02 (2001)                                         Tab 6

11

**HOUSE OF REPRESENTATIVES REPORTS**

12

        H.R. Rep. No. 95-1283 (1978)                                            Tab 7

13      H.R. Rep. No. 99-647 (1986)                                             Tab 8

14      *S. Select Comm. to Study Governmental Operations with Respect to*      Tab 9
            *Intelligence Activities*, 94th Cong., S. Rep. No. 94-755 (1976) (Church
15          Committee Books I-VI)

16

**EXECUTIVE BRANCH REPORTS**

17

        Office of Technology Assessment, *Electronic Surveillance and Civil*    Tab 10
18          *Liberties* (1985)

19      President's Commission on Law Enforcement and Administration of Justice, Tab 11
            The Challenge of Crime in a Free Society 202 (1967)
20

21

**COMMITTEE TESTIMONY**

22

        Testimony of Kris Anne Montieth, Chief, Enforcement Bureau, FCC          Tab 12
            Hearing on "Internet Data Brokers and Pretexting: Who Has Access to
23          Your Private Records?", Sub-Committee on Oversight and
            Investigations, Committee on Energy and Commerce,  U.S. House of
24          Representatives, September 29, 2006

25      *Wartime Executive Power and the NSA's Surveillance Authority (Part I):*  Tab 13
            *Hearing Before the Senate Judiciary Committee*, 109 Congress (2006)
26

**LAW REVIEW ARTICLES**

27

28      Daniel J. Solove, *Digital Dossiers and the Dissipation of Fourth Amendment*  Tab 14

1  *Privacy*, 75 S. Cal. L. Rev.1083 (2002)

2  Daniel J. Solove, *The First Amendment as Criminal Procedure*,          Tab 15
3       82 N.Y.U. L. Rev. 112, 1123 (2007)

4  Neil M. Richards, *Reconciling Data Privacy and The First Amendment*, 52   Tab 16
        UCLA L. Rev. 1149 (2005)

5  Rodney Smolla, *Information as Contraband*: *The First Amendment and*      Tab 17
6       *Liability for Trafficking in Speech*,  96 NW. U. L. Rev. 1099 (2002)

7  **TREATISES**

8  Res. (2d) Torts § 139(2)                                                  Tab 18

9  Res. (2d) Torts § 652B                                                    Tab 19

10 **OTHER AUTHORITIES**

11 Tom Daschle, *Power We Didn't Grant*, WASH. POST, Dec. 23, 2005           Tab 20

12

13 Dated: June 22, 2007              Respectfully submitted,

14                                   LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP

15

16                                   By:   /s/ Barry R. Himmelstein
17                                         Barry R. Himmelstein

18                                   Elizabeth J. Cabraser (State Bar No. 083151)
                                     Barry R. Himmelstein (State Bar No. 157736)
19                                   Michael W. Sobol (State Bar No. 194857)
                                     Eric B. Fastiff (State Bar No. 182260)
20                                   Allison S. Elgart (State Bar No. 241901)
                                     LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
21                                   275 Battery Street, 30th Floor
                                     San Francisco, CA  94111-3339
22                                   Telephone:  (415) 956-1000
                                     Facsimile:  (415) 956-1008

23                                   **Interim Class Counsel for MCI Class**

24

25

26

27

28

# TAB 1

<DOC>
[DOCID: f:publ040.107]


[[Page 115 STAT. 224]]

Public Law 107-40
107th Congress

                        Joint Resolution


    To authorize the use of United States Armed Forces against those
     responsible for the recent attacks launched against the United
          States. <<NOTE: Sept. 18, 2001 -  [S.J. Res. 23]>>

Whereas, on September 11, 2001, acts of treacherous violence were
    committed against the United States and its citizens; and
Whereas, such acts render it both necessary and appropriate that the
    United States exercise its rights to self-defense and to protect
    United States citizens both at home and abroad; and
Whereas, in light of the threat to the national security and foreign
    policy of the United States posed by these grave acts of violence;
    and
Whereas, such acts continue to pose an unusual and extraordinary threat
    to the national security and foreign policy of the United States;
    and
Whereas, the President has authority under the Constitution to take
    action to deter and prevent acts of international terrorism against
    the United States: Now, therefore, be it

    Resolved by the Senate and House of Representatives of the United
States of America in Congress assembled, <<NOTE: Authorization for Use
of Military Force. 50 USC 1541 note.>>

SECTION 1. SHORT TITLE.

    This joint resolution may be cited as the ``Authorization for Use
of
Military Force''.

SEC. 2. AUTHORIZATION FOR USE OF UNITED STATES ARMED FORCES.

    (a)  <<NOTE: President.>> In General.--That the President is
authorized to use all necessary and appropriate force against those
nations, organizations, or persons he determines planned, authorized,
committed, or aided the terrorist attacks that occurred on September
11,
2001, or harbored such organizations or persons, in order to prevent
any
future acts of international terrorism against the United States by
such
nations, organizations or persons.

    (b) War Powers Resolution Requirements.--
            (1) Specific statutory authorization.--Consistent with

section 8(a)(1) of the War Powers Resolution, the Congress
declares that this section is intended to constitute specific
statutory authorization within the meaning of section 5(b) of
the War Powers Resolution.

[[Page 115 STAT. 225]]

(2) Applicability of other requirements.--Nothing in this
resolution supercedes any requirement of the War Powers
Resolution.

Approved September 18, 2001.

LEGISLATIVE HISTORY--S.J. Res. 23 (H.J. Res. 64):
---------------------------------------------------------------------
----

CONGRESSIONAL RECORD, Vol. 147 (2001):
            Sept. 14, considered and passed Senate and House.
WEEKLY COMPILATION OF PRESIDENTIAL DOCUMENTS, Vol. 37 (2001):
            Sept. 18, Presidential statement.

TAB 2

Westlaw.

H.R. CONF. REP. 109-333                                              Page 1
H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 109-333, 2006 U.S.C.C.A.N. 184)**
          P.L. 109-177, **\*1 \*\*184** USA PATRIOT IMPROVEMENT AND REAUTHORIZATION
                                ACT OF 2005

                     DATES OF CONSIDERATION AND PASSAGE

                      House: July 21, November 9, 2005
              Senate: July 29, December 14-16, 2005, March 1, 2006
                          Cong. Record Vol. 152 (2006)

                            House Conference Report
                          No. 109-333, December 8, 2005
                            [To accompany H.R. 3199]

                     HOUSE CONFERENCE REPORT NO. 109-333
                             December 8, 2005

     Mr. Sensenbrenner, from the committee of conference, submitted the following

                              CONFERENCE REPORT

                          [To accompany H.R. 3199]

     The committee of conference on the disagreeing votes of the two Houses on the
amendment of the Senate to the bill (H.R. 3199), to extend and modify authorities
needed to combat terrorism, and for other purposes, having met, after full and free
conference, have agreed to recommend and do recommend to their respective Houses as
follows:
     That the House recede from its disagreement to the amendment of the Senate and
agree to the same with an amendment as follows:
     In lieu of the matter proposed to be inserted by the Senate amendment, insert the
following:

SECTION 1. SHORT TITLE; TABLE OF CONTENTS.

     (a) Short Title.-This Act may be cited as the "USA PATRIOT Improvement and Reau-
thorization Act of 2005".
     (b) Table of Contents.-The table of contents for this Act is as follows:
     Sec. 1. Short title; table of contents.

                 TITLE I-USA PATRIOT IMPROVEMENT AND REAUTHORIZATION ACT

     Sec. 101. References to, and modification of short title for, USA PATRIOT Act.
     Sec. 102. USA PATRIOT Act sunset provisions.
     Sec. 103. Extension of sunset relating to individual terrorists as agents of for-
eign powers.
     Sec. 104. Section 2332b and the material support sections of title 18, United
States Code.

                © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
(Cite as: H.R. CONF. REP. 109-333,  2006 U.S.C.C.A.N. 184)

Sec. 105. Duration of FISA surveillance of non-United States persons under section 207 of the USA PATRIOT Act.

Sec. 106. Access to certain business records under section 215 of the USA PATRIOT Act.

Sec. 106A. Audit on access to certain business records for foreign intelligence purposes.

*2 Sec. 107. Enhanced oversight of good-faith emergency disclosures under section 212 of the USA PATRIOT Act.

Sec. 108. Multipoint electronic surveillance under section 206 of the USA PATRIOT Act.

Sec. 109. Enhanced congressional oversight.

Sec. 110. Attacks against railroad carriers and mass transportation systems.

Sec. 111. Forfeiture.

Sec. 112. Section 2332b(g)(5)(B) amendments relating to the definition of Federal crime of terrorism.

Sec. 113. Amendments to section 2516(1) of title 18, United States Code.

Sec. 114. Delayed notice search warrants.

Sec. 115. Judicial review of national security letters.

Sec. 116. Confidentiality of national security letters.

Sec. 117. Violations of nondisclosure provisions of national security letters.

Sec. 118. Reports on national security letters.

Sec. 119. Audit of use of national security letters.

Sec. 120. Definition for forfeiture provisions under section 806 of the USA PATRIOT Act.

Sec. 121. Penal provisions regarding trafficking in contraband cigarettes or smokeless tobacco.

Sec. 122. Prohibition of narco-terrorism.

Sec. 123. Interfering with the operation of an aircraft.

Sec. 124. Sense of Congress relating to lawful political activity.

Sec. 125. Removal of civil liability barriers that discourage the donation of fire equipment to volunteer fire companies.

Sec. 126. Report on data-mining activities.

Sec. 127. Sense of Congress.

Sec. 128. USA PATRIOT Act section 214; authority for disclosure of additional information in connection with orders for pen register and trap and trace authority under FISA.

TITLE II-TERRORIST DEATH PENALTY ENHANCEMENT

Sec. 201. Short title.

Subtitle A-Terrorist penalties enhancement Act

Sec. 211. Death penalty procedures for certain air piracy cases occurring before enactment of the Federal Death Penalty Act of 1994.

Sec. 212. Postrelease supervision of terrorists.

Subtitle B-Federal Death Penalty Procedures

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:07-cv-02538-VRW    Document 5    Filed 06/23/2007    Page 10 of 303

H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 109-333, 2006 U.S.C.C.A.N. 184)**

Sec. 221. Elimination of procedures applicable only to certain Controlled Sub-
stances Act cases.
Sec. 222. Counsel for financially unable defendants.

TITLE III-REDUCING CRIME AND TERRORISM AT AMERICA'S SEAPORTS

Sec. 301. Short title.
Sec. 302. Entry by false pretenses to any seaport.
Sec. 303. Criminal sanctions for failure to heave to, obstruction of boarding, or
providing false information.
Sec. 304. Criminal sanctions for violence against maritime navigation, placement
of destructive devices.
Sec. 305. Transportation of dangerous materials and terrorists.
Sec. 306. Destruction of, or interference with, vessels or maritime facilities.
Sec. 307. Theft of interstate or foreign shipments or vessels.
Sec. 308. Stowaways on vessels or aircraft.
Sec. 309. Bribery affecting port security.
Sec. 310. Penalties for smuggling goods into the United States.
Sec. 311. Smuggling goods from the United States.

TITLE IV-COMBATING TERRORISM FINANCING

Sec. 401. Short title.
Sec. 402. Increased penalties for terrorism financing.
Sec. 403. Terrorism-related specified activities for money laundering.
Sec. 404. Assets of persons committing terrorist acts against foreign countries or
international organizations.
Sec. 405. Money laundering through hawalas.
Sec. 406. Technical and conforming amendments relating to the USA PATRIOT Act.
Sec. 407. Cross reference correction.
**3 Sec. 408. Amendment to amendatory language.
Sec. 409. Designation of additional money laundering predicate.
Sec. 410. Uniform procedures for criminal forfeiture.

TITLE V-MISCELLANEOUS PROVISIONS

Sec. 501. Residence of United States attorneys and assistant United States attor-
neys.
Sec. 502. Interim appointment of United States Attorneys.
Sec. 503. Secretary of Homeland Security in Presidential line of succession.
Sec. 504. Bureau of Alcohol, Tobacco and Firearms to the Department of Justice.
Sec. 505. Qualifications of United States Marshals.
Sec. 506. Department of Justice intelligence matters.
Sec. 507. Review by Attorney General.

TITLE VI-SECRET SERVICE

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 109-333    Page 3
H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 109-333,  2006 U.S.C.C.A.N. 184)**

Sec. 601. Short title.
Sec. 602. Interference with national special security events.
Sec. 603. False credentials to national special security events.
Sec. 604. Forensic and investigative support of missing and exploited children cases.
Sec. 605. The Uniformed Division, United States Secret Service.
Sec. 606. Savings provisions.
Sec. 607. Maintenance as distinct entity.
Sec. 608. Exemptions from the Federal Advisory Committee Act.

TITLE VII-COMBAT METHAMPHETAMINE EPIDEMIC ACT OF 2005

Sec. 701. Short title.

Subtitle A-Domestic regulation of precursor chemicals

Sec. 711. Scheduled listed chemical products; restrictions on sales quantity, behind-the-counter access, and other safeguards.
Sec. 712. Regulated transactions.
Sec. 713. Authority to establish production quotas.
Sec. 714. Penalties; authority for manufacturing; quota.
Sec. 715. Restrictions on importation; authority to permit imports for medical, scientific, or other legitimate purposes.
Sec. 716. Notice of importation or exportation; approval of sale or transfer by importer or exporter.
Sec. 717. Enforcement of restrictions on importation and of requirement of notice of transfer.
Sec. 718. Coordination with United States Trade Representative.

Subtitle B-International regulation of precursor chemicals

Sec. 721. Information on foreign chain of distribution; import restrictions regarding failure of distributors to cooperate.
Sec. 722. Requirements relating to the largest exporting and importing countries of certain precursor chemicals.
Sec. 723. Prevention of smuggling of methamphetamine into the United States from Mexico.

Subtitle C-Enhanced criminal penalties for methamphetamine production and trafficking

Sec. 731. Smuggling methamphetamine or methamphetamine precursor chemicals into the United States while using facilitated entry programs.
Sec. 732. Manufacturing controlled substances on Federal property.
Sec. 733. Increased punishment for methamphetamine kingpins.
Sec. 734. New child-protection criminal enhancement.
Sec. 735. Amendments to certain sentencing court reporting requirements.
Sec. 736. Semiannual reports to Congress.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 109-333                                    Page 3
H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
(Cite as: H.R. CONF. REP. 109-333,  2006 U.S.C.C.A.N. 184)

Subtitle D-Enhanced environmental regulation of methamphetamine byproducts

Sec. 741. Biennial report to Congress on agency designations of by-products of
methamphetamine laboratories as hazardous materials.
Sec. 742. Methamphetamine production report.
Sec. 743. Cleanup costs.

Subtitle E-Additional programs and activities

Sec. 751. Improvements to Department of Justice drug court grant program.
**4** Sec. 752. Drug courts funding.
Sec. 753. Feasibility study on Federal drug courts.
Sec. 754. Grants to hot spot areas to reduce availability of methamphetamine.
Sec. 755. Grants for programs for drug-endangered children.
Sec. 756. Authority to award competitive grants to address methamphetamine use by
pregnant and parenting women offenders.

TITLE I-USA PATRIOT IMPROVEMENT AND REAUTHORIZATION ACT

SEC. 101. REFERENCES TO, AND MODIFICATION OF SHORT TITLE FOR, USA PATRIOT ACT.

(a) References to USA PATRIOT Act.-A reference in this Act to the USA PATRIOT
Act shall be deemed a reference to the Uniting and Strengthening America by Provid-
ing Appropriate Tools Required to Intercept and Obstruct Terrorism Act (USA PATRIOT
Act) of 2001.
(b) Modification of Short Title of USA PATRIOT Act.-Section 1(a) of the USA PAT-
RIOT Act is amended to read as follows:
"(a) Short Title.-This Act may be cited as the 'Uniting and Strengthening Amer-
ica by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act
of 2001' or the 'USA PATRIOT Act'.".

SEC. 102. USA PATRIOT ACT SUNSET PROVISIONS.

(a) In General.-Section 224 of the USA PATRIOT Act is repealed.
(b) Sections 206 and 215 Sunset.-
(1) In general.-Effective December 31, 2009, the Foreign Intelligence Surveil-
lance Act of 1978 is amended so that sections 501, 502, and 105(c)(2) read as they
read on October 25, 2001.
(2) Exception.-With respect to any particular foreign intelligence investigation
that began before the date on which the provisions referred to in paragraph (1)
cease to have effect, or with respect to any particular offense or potential offense
that began or occurred before the date on which such provisions cease to have ef-
fect, such provisions shall continue in effect.

SEC. 103. EXTENSION OF SUNSET RELATING TO INDIVIDUAL TERRORISTS AS AGENTS OF FOREIGN
POWERS.

Section 6001(b) of the Intelligence Reform and Terrorism Prevention Act of 2004
(Public Law 108-458; 118 Stat. 3742) is amended to read as follows:

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 109-333,  2006 U.S.C.C.A.N. 184)**

   "(b) Sunset.-
   "(1) In general.-Except as provided in paragraph (2), the amendment made by sub-
section (a) shall cease to have effect on December 31, 2009.
   "(2) Exception.-With respect to any particular foreign intelligence investiga-
tion that began before the date on which the provisions referred to in paragraph (1)
cease to have effect, or with respect to any particular offense or potential offense
that began or occurred before the date on which the provisions cease to have effect,
such provisions shall continue in effect.".

**\*5** SEC. 104. SECTION 2332b AND THE MATERIAL SUPPORT SECTIONS OF TITLE 18, UNITED
STATES CODE.

   Section 6603 of the Intelligence Reform and Terrorism Prevention Act of 2004
(Public Law 108-458; 118 Stat. 3762) is amended by striking subsection (g).

SEC. 105. DURATION OF FISA SURVEILLANCE OF NON-UNITED STATES PERSONS UNDER SECTION
207 OF THE USA PATRIOT ACT.

   (a) Electronic Surveillance.-Section 105(e) of the Foreign Intelligence Surveil-
lance Act of 1978 (50 U.S.C. 1805(e)) is amended-
   (1) in paragraph (1)(B), by striking ", as defined in section 101(b)(1)(A)" and
inserting "who is not a United States person"; and
   (2) in subsection (2)(B), by striking "as defined in section 101(b)(1)(A)" and
inserting "who is not a United States person".
   (b) Physical Search.-Section 304(d) of such Act (50 U.S.C. 1824(d)) is amended-
   (1) in paragraph (1)(B), by striking "as defined in section 101(b)(1)(A)" and
inserting "who is not a United States person"; and
   (2) in paragraph (2), by striking "as defined in section 101(b)(1)(A)" and in-
serting "who is not a United States person".
   (c) Pen Registers, Trap and Trace Devices.-Section 402(e) of such Act  (50
U.S.C. 1842(e)) is amended-
   (1) by striking "(e) An" and inserting "(e)(1) Except as provided in paragraph
(2), an"; and
   (2) by adding at the end the following new paragraph:
   "(2) In the case of an application under subsection (c) where the applicant has
certified that the information likely to be obtained is foreign intelligence inform-
ation not concerning a United States person, an order, or an extension of an order,
under this section may be for a period not to exceed one year.".

SEC. 106. ACCESS TO CERTAIN BUSINESS RECORDS UNDER SECTION 215 OF THE USA PATRIOT
ACT.

   (a) Director Approval for Certain Applications.-Subsection (a) of section 501 of
the Foreign Intelligence Surveillance Act of 1978 (50 U.S.C. 1861(a)) is amended-
   (1) in paragraph (1), by striking "The Director" and inserting "Subject to para-
graph (3), the Director"; and
   (2) by adding at the end the following:
   "(3) In the case of an application for an order requiring the production of lib-
rary circulation records, library patron lists, book sales records, book customer

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 109-333    Page 7
H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
(Cite as: H.R. CONF. REP. 109-333, 2006 U.S.C.C.A.N. 184)

lists, firearms sales records, tax return records, educational records, or medical records containing information that would identify a person, the Director of the Federal Bureau of Investigation may delegate the authority to make such application to either the Deputy Director of the Federal Bureau of Investigation or the Executive Assistant Director for National Security (or any successor position). The Deputy Director or the Executive Assistant Director may not further delegate such authority.".

(b) Factual Basis for Requested Order.-Subsection (b)(2) of such section is amended to read as follows:

"(2) shall include-

**\*6** "(A) a statement of facts showing that there are reasonable grounds to believe that the tangible things sought are relevant to an authorized investigation (other than a threat assessment) conducted in accordance with subsection (a)(2) to obtain foreign intelligence information not concerning a United States person or to protect against international terrorism or clandestine intelligence activities, such things being presumptively relevant to an authorized investigation if the applicant shows in the statement of the facts that they pertain to-

"(i) a foreign power or an agent of a foreign power;

"(ii) the activities of a suspected agent of a foreign power who is the subject of such authorized investigation; or

"(iii) an individual in contact with, or known to, a suspected agent of a foreign power who is the subject of such authorized investigation; and

"(B) an enumeration of the minimization procedures adopted by the Attorney General under subsection (g) that are applicable to the retention and dissemination by the Federal Bureau of Investigation of any tangible things to be made available to the Federal Bureau of Investigation based on the order requested in such application.".

(c) Clarification of Judicial Discretion.-Subsection (c)(1) of such section is amended to read as follows:

"(c)(1) Upon an application made pursuant to this section, if the judge finds that the application meets the requirements of subsections (a) and (b), the judge shall enter an ex parte order as requested, or as modified, approving the release of tangible things. Such order shall direct that minimization procedures adopted pursuant to subsection (g) be followed.".

(d) Additional Protections.-Subsection (c)(2) of such section is amended to read as follows:

"(2) An order under this subsection-

"(A) shall describe the tangible things that are ordered to be produced with sufficient particularity to permit them to be fairly identified;

"(B) shall include the date on which the tangible things must be provided, which shall allow a reasonable period of time within which the tangible things can be assembled and made available;

"(C) shall provide clear and conspicuous notice of the principles and procedures described in subsection (d);

"(D) may only require the production of a tangible thing if such thing can be obtained with a subpoena duces tecum issued by a court of the United States in aid of a grand jury investigation or with any other order issued by a court of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 109-333    Page 8
H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
(Cite as: H.R. CONF. REP. 109-333, 2006 U.S.C.C.A.N. 184)

United States directing the production of records or tangible things; and
    "(E) shall not disclose that such order is issued for purposes of an investiga-
tion described in subsection (a).".
    (e) Prohibition on Disclosure.-Subsection (d) of such section is amended to read
as follows:
    *7 "(d)(1) No person shall disclose to any other person that the Federal Bureau
of Investigation has sought or obtained tangible things pursuant to an order under
this section, other than to-
    "(A) those persons to whom disclosure is necessary to comply with such order;
    "(B) an attorney to obtain legal advice or assistance with respect to the pro-
duction of things in response to the order; or
    "(C) other persons as permitted by the Director of the Federal Bureau of Invest-
igation or the designee of the Director.
    "(2)(A) A person to whom disclosure is made pursuant to paragraph (1) shall be
subject to the nondisclosure requirements applicable to a person to whom an order is
directed under this section in the same manner as such person.
    "(B) Any person who discloses to a person described in subparagraphs (A), (B),
or (C) of paragraph (1) that the Federal Bureau of Investigation has sought or ob-
tained tangible things pursuant to an order under this section shall notify such
person of the nondisclosure requirements of this subsection.
    "(C) At the request of the Director of the Federal Bureau of Investigation or
the designee of the Director, any person making or intending to make a disclosure
under this section shall identify to the Director or such designee the person to
whom such disclosure will be made or to whom such disclosure was made prior to the
request, but in no circumstance shall a person be required to inform the Director or
such designee that the person intends to consult an attorney to obtain legal advice
or legal assistance.".
    (f) Judicial Review.-
    (1) Petition review pool.-Section 103 of the Foreign Intelligence Surveillance
Act of 1978 (50 U.S.C. 1803) is amended by adding at the end the following new sub-
section:
    "(e)(1) Three judges designated under subsection (a) who reside within 20 miles
of the District of Columbia, or, if all of such judges are unavailable, other judges
of the court established under subsection (a) as may be designated by the presiding
judge of such court, shall comprise a petition review pool which shall have juris-
diction to review petitions filed pursuant to section 501(f)(1).
    "(2) Not later than 60 days after the date of the enactment of the USA PATRIOT
Improvement and Reauthorization Act of 2005, the court established under subsection
(a) shall adopt and, consistent with the protection of national security, publish
procedures for the review of petitions filed pursuant to section 501(f)(1) by the
panel established under paragraph (1). Such procedures shall provide that review of
a petition shall be conducted in camera and shall also provide for the designation
of an acting presiding judge.".
    (2) Proceedings.-Section 501 of the Foreign Intelligence Surveillance Act of
1978 (50 U.S.C. 1861) is further amended by adding at the end the following new sub-
section:
    "(f)(1) A person receiving an order to produce any tangible thing under this

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H. R. CONF. REP. 109-333     Page 13
H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
(Cite as: H.R. CONF. REP. 109-333,  2006 U.S.C.C.A.N. 184)

section may challenge the legality of that order by filing a petition with the pool
established by section 103(e)(1). The presiding judge shall immediately assign the
petition to one of the judges serving in such pool. Not later than 72 hours after
the assignment of such petition, the assigned judge shall conduct an initial review
of the petition. If the assigned judge determines that the **8** petition is frivolous,
the assigned judge shall immediately deny the petition and affirm the order. If the
assigned judge determines the petition is not frivolous, the assigned judge shall
promptly consider the petition in accordance with the procedures established pursu-
ant to section 103(e)(2). The judge considering the petition may modify or set aside
the order only if the judge finds that the order does not meet the requirements of
this section or is otherwise unlawful. If the judge does not modify or set aside the
order, the judge shall immediately affirm the order and order the recipient to com-
ply therewith. The assigned judge shall promptly provide a written statement for the
record of the reasons for any determination under this paragraph.

"(2) A petition for review of a decision to affirm, modify, or set aside an or-
der by the United States or any person receiving such order shall be to the court of
review established under section 103(b), which shall have jurisdiction to consider
such petitions. The court of review shall provide for the record a written statement
of the reasons for its decision and, on petition of the United States or any person
receiving such order for writ of certiorari, the record shall be transmitted under
seal to the Supreme Court, which shall have jurisdiction to review such decision.

"(3) Judicial proceedings under this subsection shall be concluded as expedi-
tiously as possible. The record of proceedings, including petitions filed, orders
granted, and statements of reasons for decision, shall be maintained under security
measures established by the Chief Justice of the United States in consultation with
the Attorney General and the Director of National Intelligence.

"(4) All petitions under this subsection shall be filed under seal. In any pro-
ceedings under this subsection, the court shall, upon request of the government, re-
view ex parte and in camera any government submission, or portions thereof, which
may include classified information.".

(g) Minimization Procedures and Use of Information.-Section 501 of the Foreign
Intelligence Surveillance Act of 1978 (50 U.S.C. 1861) is further amended by adding
at the end the following new subsections:

"(g) Minimization Procedures.-

"(1) In general.-Not later than 180 days after the date of the enactment of the
USA PATRIOT Improvement and Reauthorization Act of 2005, the Attorney General shall
adopt specific minimization procedures governing the retention and dissemination by
the Federal Bureau of Investigation of any tangible things, or information therein,
received by the Federal Bureau of Investigation in response to an order under this
title.

"(2) Defined.-In this section, the term 'minimization procedures' means-

"(A) specific procedures that are reasonably designed in light of the purpose
and technique of an order for the production of tangible things, to minimize the re-
tention, and prohibit the dissemination, of nonpublicly available information con-
cerning unconsenting United States persons consistent with the need of the United
States to obtain, produce, and disseminate foreign intelligence information;

"(B) procedures that require that nonpublicly available information, which is

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:07-cv-02538-VRW    Document 5    Filed 06/23/2007    Page 17 of 303

H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 109-333,  2006 U.S.C.C.A.N. 184)**

not foreign intelligence information, **\*9** as defined in section 101(e)(1), shall not
be disseminated in a manner that identifies any United States person, without such
person's consent, unless such person's identity is necessary to understand foreign
intelligence information or assess its importance; and

   "(C) notwithstanding subparagraphs (A) and (B), procedures that allow for the
retention and dissemination of information that is evidence of a crime which has
been, is being, or is about to be committed and that is to be retained or dissemin-
ated for law enforcement purposes.

   "(h) Use of Information.-Information acquired from tangible things received by
the Federal Bureau of Investigation in response to an order under this title con-
cerning any United States person may be used and disclosed by Federal officers and
employees without the consent of the United States person only in accordance with
the minimization procedures adopted pursuant to subsection (g). No otherwise priv-
ileged information acquired from tangible things received by the Federal Bureau of
Investigation in accordance with the provisions of this title shall lose its priv-
ileged character. No information acquired from tangible things received by the Fed-
eral Bureau of Investigation in response to an order under this title may be used or
disclosed by Federal officers or employees except for lawful purposes.".

   (h) Enhanced Oversight.-Section 502 of the Foreign Intelligence Surveillance Act
of 1978 (50 U.S.C. 1862) is amended-

   (1) in subsection (a)-

   (A) by striking "semiannual basis" and inserting "annual basis"; and

   (B) by inserting "and the Committee on the Judiciary" after "and the Select Com-
mittee on Intelligence";

   (2) in subsection (b)-

   (A) by striking "On a semiannual basis" and all that follows through "the pre-
ceding 6-month period" and inserting "In April of each year, the Attorney General
shall submit to the House and Senate Committees on the Judiciary and the House Per-
manent Select Committee on Intelligence and the Senate Select Committee on Intelli-
gence a report setting forth with respect to the preceding calendar year";

   (B) in paragraph (1), by striking "and" at the end;

   (C) in paragraph (2), by striking the period at the end and inserting  "; and";
and

   (D) by adding at the end the following new paragraph:

   "(3) the number of such orders either granted, modified, or denied for the pro-
duction of each of the following:

   "(A) Library circulation records, library patron lists, book sales records, or
book customer lists.

   "(B) Firearms sales records.

   "(C) Tax return records.

   "(D) Educational records.

   "(E) Medical records containing information that would identify a person."; and

   (3) by adding at the end the following new subsection:

   "(c)(1) In April of each year, the Attorney General shall submit to Congress a
report setting forth with respect to the preceding year-

   **\*10** "(A) the total number of applications made for orders approving requests for
the production of tangible things under section 501; and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 109-333
H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
(Cite as: H.R. CONF. REP. 109-333,  2006 U.S.C.C.A.N. 184)

"(B) the total number of such orders either granted, modified, or denied.
"(2) Each report under this subsection shall be submitted in unclassified form.".

SECTION 106A. AUDIT ON ACCESS TO CERTAIN BUSINESS RECORDS FOR FOREIGN INTELLIGENCE PURPOSES.

(a) Audit.-The Inspector General of the Department of Justice shall perform a comprehensive audit of the effectiveness and use, including any improper or illegal use, of the investigative authority provided to the Federal Bureau of Investigation under title V of the Foreign Intelligence Surveillance Act of 1978 (50 U.S.C. 1861 et seq.).

(b) Requirements.-The audit required under subsection (a) shall include-

(1) an examination of each instance in which the Attorney General, any other officer, employee, or agent of the Department of Justice, the Director of the Federal Bureau of Investigation, or a designee of the Director, submitted an application to the Foreign Intelligence Surveillance Court (as such term is defined in section 301(3) of the Foreign Intelligence Surveillance Act of 1978 (50 U.S.C. 1821(3))) for an order under section 501 of such Act during the calendar years of 2002 through 2006, including-

(A) whether the Federal Bureau of Investigation requested that the Department of Justice submit an application and the request was not submitted to the court (including an examination of the basis for not submitting the application);

(B) whether the court granted, modified, or denied the application  (including an examination of the basis for any modification or denial);

(2) the justification for the failure of the Attorney General to issue implementing procedures governing requests for the production of tangible things under such section in a timely fashion, including whether such delay harmed national security;

(3) whether bureaucratic or procedural impediments to the use of such requests for production prevent the Federal Bureau of Investigation from taking full advantage of the authorities provided under section 501 of such Act;

(4) any noteworthy facts or circumstances relating to orders under such section, including any improper or illegal use of the authority provided under such section; and

(5) an examination of the effectiveness of such section as an investigative tool, including-

(A) the categories of records obtained and the importance of the information acquired to the intelligence activities of the Federal Bureau of Investigation or any other Department or agency of the Federal Government;

(B) the manner in which such information is collected, retained, analyzed, and disseminated by the Federal Bureau of Investigation, including any direct access to such *11 information (such as access to "raw data") provided to any other Department, agency, or instrumentality of Federal, State, local, or tribal governments or any private sector entity;

(C) with respect to calendar year 2006, an examination of the minimization procedures adopted by the Attorney General under section 501(g) of such Act and whether such minimization procedures protect the constitutional rights of United States per-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 109-333, 2006 U.S.C.C.A.N. 184)**

sons;

(D) whether, and how often, the Federal Bureau of Investigation utilized inform-
ation acquired pursuant to an order under section 501 of such Act to produce an ana-
lytical intelligence product for distribution within the Federal Bureau of Investig-
ation, to the intelligence community (as such term is defined in section 3(4) of the
National Security Act of 1947 (50 U.S.C. 401a(4))), or to other Federal, State, loc-
al, or tribal government Departments, agencies, or instrumentalities; and

(E) whether, and how often, the Federal Bureau of Investigation provided such
information to law enforcement authorities for use in criminal proceedings.

(c) Submission Dates.-

(1) Prior years.-Not later than one year after the date of the enactment of this
Act, or upon completion of the audit under this section for calendar years 2002,
2003, and 2004, whichever is earlier, the Inspector General of the Department of
Justice shall submit to the Committee on the Judiciary and the Permanent Select Com-
mittee on Intelligence of the House of Representatives and the Committee on the Ju-
diciary and the Select Committee on Intelligence of the Senate a report containing
the results of the audit conducted under this section for calendar years 2002, 2003,
and 2004.

(2) Calendar years 2005 and 2006.-Not later than December 31, 2007, or upon com-
pletion of the audit under this section for calendar years 2005 and 2006, whichever
is earlier, the Inspector General of the Department of Justice shall submit to the
Committee on the Judiciary and the Permanent Select Committee on Intelligence of the
House of Representatives and the Committee on the Judiciary and the Select Committee
on Intelligence of the Senate a report containing the results of the audit conducted
under this section for calendar years 2005 and 2006.

(d) Prior Notice to Attorney General and Director of National Intelligence; Com-
ments.-

(1) Notice.-Not less than 30 days before the submission of a report under sub-
sections (c)(1) or (c)(2), the Inspector General of the Department of Justice shall
provide such report to the Attorney General and the Director of National Intelli-
gence.

(2) Comments.-The Attorney General or the Director of National Intelligence may
provide comments to be included in the reports submitted under subsections (c)(1)
and (c)(2) as the Attorney General or the Director of National Intelligence may con-
sider necessary.

(e) Unclassified Form.-The reports submitted under subsection (c)(1) and  (c)(2)
and any comments included under subsection (**12 d)(2) shall be in unclassified form,
but may include a classified annex.

SEC. 107. ENHANCED OVERSIGHT OF GOOD-FAITH EMERGENCY DISCLOSURES UNDER SECTION 212
OF THE USA PATRIOT ACT.

(a) Enhanced Oversight.-Section 2702 of title 18, United States Code, is amended
by adding at the end the following:

"(d) Reporting of Emergency Disclosures.-On an annual basis, the Attorney Gener-
al shall submit to the Committee on the Judiciary of the House of Representatives
and the Committee on the Judiciary of the Senate a report containing-

"(1) the number of accounts from which the Department of Justice has received

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 109-333    Page 19

H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 109-333, 2006 U.S.C.C.A.N. 184)**


voluntary disclosures under subsection (b)(8); and

    "(2) a summary of the basis for disclosure in those instances where-

    "(A) voluntary disclosures under subsection (b)(8) were made to the Department
of Justice; and

    "(B) the investigation pertaining to those disclosures was closed without the
filing of criminal charges.".

    (b) Technical Amendments To Conform Communications and Customer Records Excep-
tions.-

    (1) Voluntary disclosures.-Section 2702 of title 18, United States Code, is
amended-

    (A) in subsection (b)(8), by striking "Federal, State, or local"; and

    (B) by striking paragraph (4) of subsection (c) and inserting the following:

    "(4) to a governmental entity, if the provider, in good faith, believes that an
emergency involving danger of death or serious physical injury to any person re-
quires disclosure without delay of information relating to the emergency;".

    (2) Definitions.-Section 2711 of title 18, United States Code, is amended-

    (A) in paragraph (2), by striking "and" at the end;

    (B) in paragraph (3), by striking the period at the end and inserting  "; and";
and

    (C) by adding at the end the following:

    "(4) the term 'governmental entity' means a department or agency of the United
States or any State or political subdivision thereof.".

    (c) Additional Exception.-Section 2702(a) of title 18, United States Code, is
amended by inserting "or (c)" after "Except as provided in subsection (b)".

SEC. 108. MULTIPOINT ELECTRONIC SURVEILLANCE UNDER SECTION 206 OF THE USA PATRIOT
ACT.

    (a) Inclusion of Specific Facts in Application.-

    (1) Application.-Section 104(a)(3) of the Foreign Intelligence Surveillance Act
of 1978 (50 U.S.C. 1804(a)(3)) is amended by inserting "specific" after "description
of the".

    (2) Order.-Subsection (c) of section 105 of the Foreign Intelligence Surveil-
lance Act of 1978 (50 U.S.C. 1805(c)) is amended-

    (A) in paragraph (1)(A) by striking "target of the electronic surveillance" and
inserting "specific target of the **13 electronic surveillance identified or de-
scribed in the application pursuant to section 104(a)(3)"; and

    (B) in paragraph (2)(B), by striking "where the Court finds" and insert-
ing  "where the Court finds, based upon specific facts provided in the applica-
tion,".

    (b) Additional Directions.-Such subsection is further amended-

    (1) by striking "An order approving" and all that follows through "specify" and
inserting "(1) specifications.-An order approving an electronic surveillance under
this section shall specify";

    (2) in paragraph (1)(F), by striking "; and" and inserting a period;

    (3) in paragraph (2), by striking "direct" and inserting "Directions.-An order
approving an electronic surveillance under this section shall direct"; and

    (4) by adding at the end the following new paragraph:

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

"(3) Special directions for certain orders.-An order approving an electronic
surveillance under this section in circumstances where the nature and location of
each of the facilities or places at which the surveillance will be directed is un-
known shall direct the applicant to provide notice to the court within ten days
after the date on which surveillance begins to be directed at any new facility or
place, unless the court finds good cause to justify a longer period of up to 60
days, of-

"(A) the nature and location of each new facility or place at which the elec-
tronic surveillance is directed;

"(B) the facts and circumstances relied upon by the applicant to justify the ap-
plicant's belief that each new facility or place at which the electronic surveil-
lance is directed is or was being used, or is about to be used, by the target of the
surveillance;

"(C) a statement of any proposed minimization procedures that differ from those
contained in the original application or order, that may be necessitated by a change
in the facility or place at which the electronic surveillance is directed; and

"(D) the total number of electronic surveillances that have been or are being
conducted under the authority of the order.".

(c) Enhanced Oversight.-

(1) Report to congress.-Section 108(a)(1) of the Foreign Intelligence Surveil-
lance Act of 1978 (50 U.S.C. 1808(a)(1)) is amended by inserting ", and the Commit-
tee on the Judiciary of the Senate," after "Senate Select Committee on Intelli-
gence".

(2) Modification of semiannual report requirement on activities under foreign
intelligence surveillance act of 1978.-Paragraph (2) of section 108(a) of the For-
eign Intelligence Surveillance Act of 1978 (50 U.S.C. 1808(a)) is amended to read as
follows:

"(2) Each report under the first sentence of paragraph (1) shall include a de-
scription of-

"(A) the total number of applications made for orders and extensions of orders
approving electronic surveillance under this title where the nature and location of
each facility *14 or place at which the electronic surveillance will be directed is
unknown;

"(B) each criminal case in which information acquired under this Act has been
authorized for use at trial during the period covered by such report; and

"(C) the total number of emergency employments of electronic surveillance under
section 105(f) and the total number of subsequent orders approving or denying such
electronic surveillance.".

SEC. 109. ENHANCED CONGRESSIONAL OVERSIGHT.

(a) Emergency Physical Searches.-Section 306 of the Foreign Intelligence Sur-
veillance Act of 1978 (50 U.S.C. 1826) is amended-

(1) in the first sentence, by inserting," and the Committee on the Judiciary of
the Senate," after "the Senate";

(2) in the second sentence, by striking "and the Committees on the Judiciary of
the House of Representatives and the Senate" and inserting "and the Committee on the
Judiciary of the House of Representatives";

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 109-333     Page 15
H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
(Cite as: H.R. CONF. REP. 109-333,  2006 U.S.C.C.A.N. 184)

(3) in paragraph (2), by striking "and" at the end;

(4) in paragraph (3), by striking the period at the end and inserting  "; and";
and

(5) by adding at the end the following:

"(4) the total number of emergency physical searches authorized by the Attorney
General under section 304(e) and the total number of subsequent orders approving or
denying such physical searches.".

(b) Emergency Pen Registers and Trap and Trace Devices.-Section 406(b) of the
Foreign Intelligence Surveillance Act of 1978 (50 U.S.C. 1846(b)) is amended-

(1) in paragraph (1), by striking "and" at the end;

(2) in paragraph (2), by striking the period at the end and inserting  "; and";
and

(3) by adding at the end the following:

"(3) the total number of pen registers and trap and trace devices whose install-
ation and use was authorized by the Attorney General on an emergency basis under
section 403, and the total number of subsequent orders approving or denying the in-
stallation and use of such pen registers and trap and trace devices.".

(c) Additional Report.-At the beginning and midpoint of each fiscal year, the
Secretary of Homeland Security shall submit to the Committees on the Judiciary of
the House of Representatives and the Senate, a written report providing a descrip-
tion of internal affairs operations at U.S. Citizenship and Immigration Services,
including the general state of such operations and a detailed description of invest-
igations that are being conducted (or that were conducted during the previous six
months) and the resources devoted to such investigations. The first such report
shall be submitted not later than April 1, 2006.

(d) Rules and Procedures for FISA Courts.-Section 103 of the Foreign Intelli-
gence Surveillance Act of 1978 (50 U.S.C. 1803) is amended by adding at the end the
following:

"(f)(1) The courts established pursuant to subsections (a) and (b) may establish
such rules and procedures, and take such actions, as **15 are reasonably necessary to
administer their responsibilities under this Act.

"(2) The rules and procedures established under paragraph (1), and any modifica-
tions of such rules and procedures, shall be recorded, and shall be transmitted to
the following:

"(A) All of the judges on the court established pursuant to subsection (a).

"(B) All of the judges on the court of review established pursuant to subsection
(b).

"(C) The Chief Justice of the United States.

"(D) The Committee on the Judiciary of the Senate.

"(E) The Select Committee on Intelligence of the Senate.

"(F) The Committee on the Judiciary of the House of Representatives.

"(G) The Permanent Select Committee on Intelligence of the House of Representat-
ives.

"(3) The transmissions required by paragraph (2) shall be submitted in unclassi-
fied form, but may include a classified annex.".

SEC. 110. ATTACKS AGAINST RAILROAD CARRIERS AND MASS TRANSPORTATION SYSTEMS.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 109-333     Page 13
H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 109-333,  2006 U.S.C.C.A.N. 184)**

(a) In General.-Chapter 97 of title 18, United States Code, is amended by strik-
ing sections 1992 through 1993 and inserting the following:

"S 1992. Terrorist attacks and other violence against railroad carriers and against
mass transportation systems on land, on water, or through the air

"(a) General Prohibitions.-Whoever, in a circumstance described in subsection
(c), knowingly and without lawful authority or permission-
"(1) wrecks, derails, sets fire to, or disables railroad on-track equipment or a
mass transportation vehicle;
"(2) places any biological agent or toxin, destructive substance, or destructive
device in, upon, or near railroad on-track equipment or a mass transportation
vehicle with intent to endanger the safety of any person, or with a reckless disre-
gard for the safety of human life;
"(3) places or releases a hazardous material or a biological agent or toxin on
or near any property described in subparagraph (A) or (B) of paragraph (4), with in-
tent to endanger the safety of any person, or with reckless disregard for the safety
of human life;
"(4) sets fire to, undermines, makes unworkable, unusable, or hazardous to work
on or use, or places any biological agent or toxin, destructive substance, or de-
structive device in, upon, or near any-
"(A) tunnel, bridge, viaduct, trestle, track, electromagnetic guideway, signal,
station, depot, warehouse, terminal, or any other way, structure, property, or ap-
purtenance used in the operation of, or in support of the operation of, a railroad
carrier, and with intent to, or knowing or having reason to know, such activity
would likely, derail, disable, or wreck railroad on-track equipment; or
"(B) garage, terminal, structure, track, electromagnetic guideway, supply, or
facility used in the operation of, or in **16** support of the operation of, a mass
transportation vehicle, and with intent to, or knowing or having reason to know,
such activity would likely, derail, disable, or wreck a mass transportation vehicle
used, operated, or employed by a mass transportation provider;
"(5) removes an appurtenance from, damages, or otherwise impairs the operation
of a railroad signal system or mass transportation signal or dispatching system, in-
cluding a train control system, centralized dispatching system, or highway-railroad
grade crossing warning signal;
"(6) with intent to endanger the safety of any person, or with a reckless dis-
regard for the safety of human life, interferes with, disables, or incapacitates any
dispatcher, driver, captain, locomotive engineer, railroad conductor, or other per-
son while the person is employed in dispatching, operating, controlling, or main-
taining railroad on-track equipment or a mass transportation vehicle;
"(7) commits an act, including the use of a dangerous weapon, with the intent to
cause death or serious bodily injury to any person who is on property described in
subparagraph (A) or (B) of paragraph (4);
"(8) surveils, photographs, videotapes, diagrams, or otherwise collects informa-
tion with the intent to plan or assist in planning any of the acts described in the
paragraphs (1) through (6);
"(9) conveys false information, knowing the information to be false, concerning
an attempt or alleged attempt to engage in a violation of this subsection; or

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 109-333,  2006 U.S.C.C.A.N. 184)**

"(10) attempts, threatens, or conspires to engage in any violation of any of paragraphs (1) through (9),

shall be fined under this title or imprisoned not more than 20 years, or both, and if the offense results in the death of any person, shall be imprisoned for any term of years or for life, or subject to death, except in the case of a violation of paragraphs (8), (9), or (10).

"(b) Aggravated Offense.-Whoever commits an offense under subsection (a) of this section in a circumstance in which-

"(1) the railroad on-track equipment or mass transportation vehicle was carrying a passenger or employee at the time of the offense,

"(2) the railroad on-track equipment or mass transportation vehicle was carrying high-level radioactive waste or spent nuclear fuel at the time of the offense, or

"(3) the offense was committed with the intent to endanger the safety of any person, or with a reckless disregard for the safety of any person, and the railroad on-track equipment or mass transportation vehicle was carrying a hazardous material at the time of the offense that-

"(A) was required to be placarded under subpart F of part 172 of title 49, Code of Federal Regulations, and

"(B) is identified as class number 3, 4, 5, 6.1, or 8 and packing group I or packing group II, or class number 1, 2, or 7 under the hazardous materials table of section 172.101 of title 49, Code of Federal Regulations,

**\*17** shall be fined under this title or imprisoned for any term of years or life, or both, and if the offense resulted in the death of any person, the person may be sentenced to death.

"(c) Circumstances Required for Offense.-A circumstance referred to in subsection (a) is any of the following:

"(1) Any of the conduct required for the offense is, or, in the case of an attempt, threat, or conspiracy to engage in conduct, the conduct required for the completed offense would be, engaged in, on, against, or affecting a mass transportation provider, or a railroad carrier engaged in interstate or foreign commerce.

"(2) Any person travels or communicates across a State line in order to commit the offense, or transports materials across a State line in aid of the commission of the offense.

"(d) Definitions.-In this section-

"(1) the term 'biological agent' has the meaning given to that term in section 178(1);

"(2) the term 'dangerous weapon' means a weapon, device, instrument, material, or substance, animate or inanimate, that is used for, or is readily capable of, causing death or serious bodily injury, including a pocket knife with a blade of less than 2 1/2 inches in length and a box cutter;

"(3) the term 'destructive device' has the meaning given to that term in section 921(a)(4);

"(4) the term 'destructive substance' means an explosive substance, flammable material, infernal machine, or other chemical, mechanical, or radioactive device or material, or matter of a combustible, contaminative, corrosive, or explosive nature, except that the term 'radioactive device' does not include any radioactive device or material used solely for medical, industrial, research, or other peaceful purposes;

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:07-cv-02538-VRW     Document 5     Filed 06/23/2007     Page 25 of 303

H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 109-333,  2006 U.S.C.C.A.N. 184)**


    "(5) the term 'hazardous material' has the meaning given to that term in chapter
51 of title 49;

    "(6) the term 'high-level radioactive waste' has the meaning given to that term
in section 2(12) of the Nuclear Waste Policy Act of 1982 (42 U.S.C. 10101(12));

    "(7) the term 'mass transportation' has the meaning given to that term
in  section 5302(a)(7) of title 49, except that the term includes school bus,
charter, and sightseeing transportation and passenger vessel as that term is defined
in section 2101(22) of title 46, United States Code;

    "(8) the term 'on-track equipment' means a carriage or other contrivance that
runs on rails or electromagnetic guideways;

    "(9) the term 'railroad on-track equipment' means a train, locomotive, tender,
motor unit, freight or passenger car, or other on-track equipment used, operated, or
employed by a railroad carrier;

    "(10) the term 'railroad' has the meaning given to that term in chapter 201 of
title 49;

    "(11) the term 'railroad carrier' has the meaning given to that term in  chapter
201 of title 49;

    "(12) the term 'serious bodily injury' has the meaning given to that term in
section 1365;

    **18** "(13) the term 'spent nuclear fuel' has the meaning given to that term in
section 2(23) of the Nuclear Waste Policy Act of 1982 (42 U.S.C. 10101(23));

    "(14) the term 'State' has the meaning given to that term in section 2266;

    "(15) the term 'toxin' has the meaning given to that term in section 178(2); and

    "(16) the term 'vehicle' means any carriage or other contrivance used, or cap-
able of being used, as a means of transportation on land, on water, or through the
air.".

    (b) Conforming Amendments.-

    (1) The table of sections at the beginning of chapter 97 of title 18, United
States Code, is amended-

    (A) by striking "RAILROADS" in the chapter heading and inserting "RAILROAD CAR-
RIERS AND MASS TRANSPORTATION SYSTEMS ON LAND, ON WATER, OR THROUGH THE AIR";

    (B) by striking the items relating to sections 1992 and 1993; and

    (C) by inserting after the item relating to section 1991 the following:

  "1992. Terrorist attacks and other violence against railroad carriers and against
mass transportation systems on land, on water, or through the air.".

    (2) The table of chapters at the beginning of part I of title 18, United States
Code, is amended by striking the item relating to chapter 97 and inserting the fol-
lowing:


"97. Railroad carriers and mass transportation systems on land, on

  water, or through the air ............................................ 1991".


    (3) Title 18, United States Code, is amended-

    (A) in section 2332b(g)(5)(B)(i), by striking "1992 (relating to wrecking
trains), 1993 (relating to terrorist attacks and other acts of violence against mass
transportation systems)," and inserting "1992 (relating to terrorist attacks and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 109-333, 2006 U.S.C.C.A.N. 184)**

other acts of violence against railroad carriers and against mass transportation
systems on land, on water, or through the air),";
    (B) in section 2339A, by striking "1993,"; and
    (C) in section 2516(1)(c) by striking "1992 (relating to wrecking trains),".

SEC. 111. FORFEITURE.

    Section 981(a)(1)(B)(i) of title 18, United States Code, is amended by inserting
"trafficking in nuclear, chemical, biological, or radiological weapons technology or
material, or" after "involves".

SEC. 112. SECTION 2332b(g)(5)(B) AMENDMENTS RELATING TO THE DEFINITION OF FEDERAL
CRIME OF TERRORISM.

    (a) Additional Offenses.-Section 2332b(g)(5)(B) of title 18, United States Code,
is amended-
    (1) in clause (i), by inserting ", 2339D (relating to military-type training
from a foreign terrorist organization)" before ", or 2340A";
    (2) in clause (ii), by striking "or" after the semicolon;
    (3) in clause (iii), by striking the period and inserting "; or"; and
    (4) by inserting after clause (iii) the following:
    **\*19** "(iv) section 1010A of the Controlled Substances Import and Export Act
(relating to narco-terrorism).".
    (b) Clerical Correction.-Section 2332b(g)(5)(B) of title 18, United States Code,
is amended by inserting ")" after "2339C (relating to financing of terrorism".

SEC. 113. AMENDMENTS TO SECTION 2516(1) OF TITLE 18, UNITED STATES CODE.

    (a) Paragraph (a) Amendment.-Section 2516(1)(a) of title 18, United States Code,
is amended by inserting "chapter 10 (relating to biological weapons)" after "under
the following chapters of this title:".
    (b) Paragraph (c) Amendment.-Section 2516(1)(c) of title 18, United States Code,
is amended-
    (1) by inserting "section 37 (relating to violence at international airports),
section 43 (relating to animal enterprise terrorism)," after "the following sections
of this title:";
    (2) by inserting "section 832 (relating to nuclear and weapons of mass destruc-
tion threats), section 842 (relating to explosive materials), section 930 (relating
to possession of weapons in Federal facilities)," after "section 751 (relating to
escape),";
    (3) by inserting "section 1114 (relating to officers and employees of the United
States), section 1116 (relating to protection of foreign officials)," after "section
1014 (relating to loans and credit applications generally; renewals and dis-
counts),";
    (4) by inserting "section 1992 (relating to terrorist attacks against mass
transportation)," after "section 1344 (relating to bank fraud),";
    (5) by inserting "section 2340A (relating to torture)," after "section 2321
(relating to trafficking in certain motor vehicles or motor vehicle parts),";
    (6) by inserting "section 81 (arson within special maritime and territorial jur-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 109-333    Page 26

H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 109-333,  2006 U.S.C.C.A.N. 184)**

isdiction)," before "section 201 (bribery of public officials and witnesses)"; and

    (7) by inserting "section 956 (conspiracy to harm persons or property over-
seas)," after "section 175c (relating to variola virus)".

    (c) Paragraph (g) Amendment.-Section 2516(1)(g) of title 18, United States Code,
is amended by inserting before the semicolon ", or section 5324 of title 31, United
States Code (relating to structuring transactions to evade reporting requirement
prohibited)".

    (d) Paragraph (j) Amendment.-Section 2516(1)(j) of title 18, United States Code,
is amended-

    (1) by striking "or" before "section 46502 (relating to aircraft piracy)" and
inserting a comma after "section 60123(b) (relating to the destruction of a natural
gas pipeline"; and

    (2) by inserting ", the second sentence of section 46504 (relating to assault on
a flight crew with dangerous weapon), or section 46505(b)(3) or (c) (relating to ex-
plosive or incendiary devices, or endangerment of human life, by means of weapons on
aircraft)" before of "title 49".

    (e) Paragraph (p) Amendment.-Section 2516(1)(p) of title 18, United States Code,
is amended by inserting ", section 1028A (relating to aggravated identity theft)"
after "other documents".

    (f) Paragraph (q) Amendment.-Section 2516(1)(q) of title 18, United States Code,
is amended-

    **\*20** (1) by inserting "2339" after "2232h";

    (2) by striking "or" before "2339C"; and

    (3) by inserting ", or 2339D" after "2339C".

    (g) Amendment of Predicate Crimes for Authorization for Interception of Wire,
Oral, and Electronic Communications.-Section 2516(1) of title 18, United State Code,
is amended-

    (1) in subparagraph (q), by striking "or" after the semicolon;

    (2) by redesignating subparagraph (r) as subparagraph (s); and

    (3) by adding after subparagraph (q) the following:

    "(r) any criminal violation of section 1 (relating to illegal restraints of
trade or commerce), 2 (relating to illegal monopolizing of trade or commerce), or 3
(relating to illegal restraints of trade or commerce in territories or the District
of Columbia) of the Sherman Act (15 U.S.C. 1, 2, 3); or".

SEC. 114. DELAYED NOTICE SEARCH WARRANTS.

    (a) Limitation on Reasonable Period for Delay.-Section 3103a of title 18, United
States Code, is amended-

    (1) by striking subsection (b)(3) and inserting the following:

    "(3) the warrant provides for the giving of such notice within a reasonable
period not to exceed 30 days after the date of its execution, or on a later date
certain if the facts of the case justify a longer period of delay. "

    (2) by adding at the end the following:

    "(c) Extensions of Delay.-Any period of delay authorized by this section may be
extended by the court for good cause shown, subject to the condition that extensions
should only be granted upon an updated showing of the need for further delay and
that each additional delay should be limited to periods of 90 days or less, unless

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 109-333    Page 23
H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
(Cite as: H.R. CONF. REP. 109-333,  2006 U.S.C.C.A.N. 184)

the facts of the case justify a longer period of delay.".

(b) Limitation on Authority To Delay Notice.-Section 3103a(b)(1) of title 18,
United States Code, is amended by inserting ", except if the adverse results consist
only of unduly delaying a trial" after "2705".

(c) Enhanced Oversight.-Section 3103a of title 18, United States Code, is fur-
ther amended by adding at the end the following:

"(d) Reports.-

"(1) Report by judge.-Not later than 30 days after the expiration of a warrant
authorizing delayed notice (including any extension thereof) entered under this sec-
tion, or the denial of such warrant (or request for extension), the issuing or deny-
ing judge shall report to the Administrative Office of the United States Courts-

"(A) the fact that a warrant was applied for;

"(B) the fact that the warrant or any extension thereof was granted as applied
for, was modified, or was denied;

"(C) the period of delay in the giving of notice authorized by the warrant, and
the number and duration of any extensions; and

"(D) the offense specified in the warrant or application.

"(2) Report by administrative office of the united states courts.-Beginning with
the fiscal year ending September 30, 2007, the Director of the Administrative Office
of the **21 United States Courts shall transmit to Congress annually a full and com-
plete report summarizing the data required to be filed with the Administrative Of-
fice by paragraph (1), including the number of applications for warrants and exten-
sions of warrants authorizing delayed notice, and the number of such warrants and
extensions granted or denied during the preceding fiscal year.

"(3) Regulations.-The Director of the Administrative Office of the United States
Courts, in consultation with the Attorney General, is authorized to issue binding
regulations dealing with the content and form of the reports required to be filed
under paragraph (1).".

SEC. 115. JUDICIAL REVIEW OF NATIONAL SECURITY LETTERS.

Chapter 223 of title 18, United States Code, is amended-

(1) by inserting at the end of the table of sections the following new item:

"3511. Judicial review of requests for information.";

and

(3) by inserting after section 3510 the following:

"S 3511. Judicial review of requests for information

"(a) The recipient of a request for records, a report, or other information un-
der section 2709(b) of this title, section 626(a) or (b) or 627(a) of the Fair Cred-
it Reporting Act, section 1114(a)(5)(A) of the Right to Financial Privacy Act, or
section 802(a) of the National Security Act of 1947 may, in the United States dis-
trict court for the district in which that person or entity does business or
resides, petition for an order modifying or setting aside the request. The court may
modify or set aside the request if compliance would be unreasonable, oppressive, or
otherwise unlawful.

"(b)(1) The recipient of a request for records, a report, or other information

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 109-333                                    Page 23

H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 109-333, 2006 U.S.C.C.A.N. 184)**

under section 2709(b) of this title, section 626(a) or (b) or 627(a) of the Fair
Credit Reporting Act, section 1114(a)(5)(A) of the Right to Financial Privacy Act,
or section 802(a) of the National Security Act of 1947, may petition any court de-
scribed in subsection (a) for an order modifying or setting aside a nondisclosure
requirement imposed in connection with such a request.

"(2) If the petition is filed within one year of the request for records, a re-
port, or other information under section 2709(b) of this title, section 626(a) or
(b) or 627(a) of the Fair Credit Reporting Act, section 1114(a)(5)(A) of the Right
to Financial Privacy Act, or section 802(a) of the National Security Act of 1947,
the court may modify or set aside such a nondisclosure requirement if it finds that
there is no reason to believe that disclosure may endanger the national security of
the United States, interfere with a criminal, counterterrorism, or counterintelli-
gence investigation, interfere with diplomatic relations, or endanger the life or
physical safety of any person. If, at the time of the petition, the Attorney Gener-
al, Deputy Attorney General, an Assistant Attorney General, or the Director of the
Federal Bureau of Investigation, or in the case of a request by a department,
agency, or instrumentality of the Federal Government other than the Department of
Justice, the head or deputy head of such department, agency, or instrumentality,
certifies that disclosure may endanger the national security of the United States or
**\*22** interfere with diplomatic relations, such certification shall be treated as con-
clusive unless the court finds that the certification was made in bad faith.

"(3) If the petition is filed one year or more after the request for records, a
report, or other information under section 2709(b) of this title, section 626(a) or
(b) or 627(a) of the Fair Credit Reporting Act, section 1114 (a)(5)(A) of the Right
to Financial Privacy Act, or section 802(a) of the National Security Act of 1947,
the Attorney General, Deputy Attorney General, an Assistant Attorney General, or the
Director of the Federal Bureau of Investigation, or his designee in a position not
lower than Deputy Assistant Director at Bureau headquarters or a Special Agent in
Charge in a Bureau field office designated by the Director, or in the case of a re-
quest by a department, agency, or instrumentality of the Federal Government other
than the Federal Bureau of Investigation, the head or deputy head of such depart-
ment, agency, or instrumentality, within ninety days of the filing of the petition,
shall either terminate the nondisclosure requirement or re-certify that disclosure
may result in a danger to the national security of the United States, interference
with a criminal, counterterrorism, or counterintelligence investigation, interfer-
ence with diplomatic relations, or danger to the life or physical safety of any per-
son. In the event of re-certification, the court may modify or set aside such a
nondisclosure requirement if it finds that there is no reason to believe that dis-
closure may endanger the national security of the United States, interfere with a
criminal, counterterrorism, or counterintelligence investigation, interfere with
diplomatic relations, or endanger the life or physical safety of any person. If the
recertification that disclosure may endanger the national security of the United
States or interfere with diplomatic relations is made by the Attorney General,
Deputy Attorney General, an Assistant Attorney General, or the Director of the Fed-
eral Bureau of Investigation, such certification shall be treated as conclusive un-
less the court finds that the recertification was made in bad faith. If the court
denies a petition for an order modifying or setting aside a nondisclosure require-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ment under this paragraph, the recipient shall be precluded for a period of one year
from filing another petition to modify or set aside such nondisclosure requirement.

"(c) In the case of a failure to comply with a request for records, a report, or
other information made to any person or entity under section 2709(b) of this title,
section 626(a) or (b) or 627(a) of the Fair Credit Reporting Act, section
1114(a)(5)(A) of the Right to Financial Privacy Act, or section 802(a) of the Na-
tional Security Act of 1947, the Attorney General may invoke the aid of any district
court of the United States within the jurisdiction in which the investigation is
carried on or the person or entity resides, carries on business, or may be found, to
compel compliance with the request. The court may issue an order requiring the per-
son or entity to comply with the request. Any failure to obey the order of the court
may be punished by the court as contempt thereof. Any process under this section may
be served in any judicial district in which the person or entity may be found.

"(d) In all proceedings under this section, subject to any right to an open
hearing in a contempt proceeding, the court must close any hearing to the extent ne-
cessary to prevent an unauthorized disclosure of a request for records, a report, or
other information made **\*23** to any person or entity under section 2709(b) of this
title, section 626(a) or (b) or 627(a) of the Fair Credit Reporting Act, section
1114(a)(5)(A) of the Right to Financial Privacy Act, or section 802(a) of the Na-
tional Security Act of 1947. Petitions, filings, records, orders, and subpoenas must
also be kept under seal to the extent and as long as necessary to prevent the unau-
thorized disclosure of a request for records, a report, or other information made to
any person or entity under section 2709(b) of this title, section 626(a) or (b) or
627(a) of the Fair Credit Reporting Act, section 1114(a)(5)(A) of the Right to Fin-
ancial Privacy Act, or section 802(a) of the National Security Act of 1947.

"(e) In all proceedings under this section, the court shall, upon request of the
government, review ex parte and in camera any government submission or portions
thereof, which may include classified information.".

SEC. 116. CONFIDENTIALITY OF NATIONAL SECURITY LETTERS.

(a) Section 2709(c) of title 18, United States Code, is amended to read:

"(c) Prohibition of Certain Disclosure.-

"(1) If the Director of the Federal Bureau of Investigation, or his designee in
a position not lower than Deputy Assistant Director at Bureau headquarters or a Spe-
cial Agent in Charge in a Bureau field office designated by the Director, certifies
that otherwise there may result a danger to the national security of the United
States, interference with a criminal, counterterrorism, or counterintelligence in-
vestigation, interference with diplomatic relations, or danger to the life or phys-
ical safety of any person, no wire or electronic communications service provider, or
officer, employee, or agent thereof, shall disclose to any person (other than those
to whom such disclosure is necessary to comply with the request or an attorney to
obtain legal advice or legal assistance with respect to the request) that the Feder-
al Bureau of Investigation has sought or obtained access to information or records
under this section.

"(2) The request shall notify the person or entity to whom the request is direc-
ted of the nondisclosure requirement under paragraph (1).

"(3) Any recipient disclosing to those persons necessary to comply with the re-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 109-333    Page 24
H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 109-333, 2006 U.S.C.C.A.N. 184)**

quest or to an attorney to obtain legal advice or legal assistance with respect to
the request shall inform such person of any applicable nondisclosure requirement.
Any person who receives a disclosure under this subsection shall be subject to the
same prohibitions on disclosure under paragraph (1).

"(4) At the request of the Director of the Federal Bureau of Investigation or
the designee of the Director, any person making or intending to make a disclosure
under this section shall identify to the Director or such designee the person to
whom such disclosure will be made or to whom such disclosure was made prior to the
request, but in no circumstance shall a person be required to inform the Director or
such designee that the person intends to consult an attorney to obtain legal advice
or legal assistance.".

(b) Section 626(d) of the Fair Credit Reporting Act (15 U.S.C. 1681u(d)) is
amended to read:

"(d) Confidentiality.-

**\*24** "(1) If the Director of the Federal Bureau of Investigation, or his designee
in a position not lower than Deputy Assistant Director at Bureau headquarters or a
Special Agent in Charge in a Bureau field office designated by the Director, certi-
fies that otherwise there may result a danger to the national security of the United
States, interference with a criminal, counterterrorism, or counterintelligence in-
vestigation, interference with diplomatic relations, or danger to the life or phys-
ical safety of any person, no consumer reporting agency or officer, employee, or
agent of a consumer reporting agency shall disclose to any person (other than those
to whom such disclosure is necessary to comply with the request or an attorney to
obtain legal advice or legal assistance with respect to the request) that the Feder-
al Bureau of Investigation has sought or obtained the identity of financial institu-
tions or a consumer report respecting any consumer under subsection (a), (b), or
(c), and no consumer reporting agency or officer, employee, or agent of a consumer
reporting agency shall include in any consumer report any information that would in-
dicate that the Federal Bureau of Investigation has sought or obtained such informa-
tion on a consumer report.

"(2) The request shall notify the person or entity to whom the request is direc-
ted of the nondisclosure requirement under paragraph (1).

"(3) Any recipient disclosing to those persons necessary to comply with the re-
quest or to an attorney to obtain legal advice or legal assistance with respect to
the request shall inform such persons of any applicable nondisclosure requirement.
Any person who receives a disclosure under this subsection shall be subject to the
same prohibitions on disclosure under paragraph (1).

"(4) At the request of the Director of the Federal Bureau of Investigation or
the designee of the Director, any person making or intending to make a disclosure
under this section shall identify to the Director or such designee the person to
whom such disclosure will be made or to whom such disclosure was made prior to the
request, but in no circumstance shall a person be required to inform the Director or
such designee that the person intends to consult an attorney to obtain legal advice
or legal assistance.".

(c) Section 626(c) of the Fair Credit Reporting Act (15 U.S.C. 1681v(c)) is
amended to read:

"(c) Confidentiality.-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 109-333                                          Page 23
H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
(Cite as: H.R. CONF. REP. 109-333, 2006 U.S.C.C.A.N. 184)

"(1) If the head of a government agency authorized to conduct investigations of
intelligence or counterintelligence activities or analysis related to international
terrorism, or his designee, certifies that otherwise there may result a danger to
the national security of the United States, interference with a criminal, coun-
terterrorism, or counterintelligence investigation, interference with diplomatic re-
lations, or danger to the life or physical safety of any person, no consumer report-
ing agency or officer, employee, or agent of such consumer reporting agency, shall
disclose to any person (other than those to whom such disclosure is necessary to
comply with the request or an attorney to obtain legal advice or legal assistance
with respect to the request), **25** or specify in any consumer report, that a govern-
ment agency has sought or obtained access to information under subsection (a).

"(2) The request shall notify the person or entity to whom the request is direc-
ted of the nondisclosure requirement under paragraph (1).

"(3) Any recipient disclosing to those persons necessary to comply with the re-
quest or to any attorney to obtain legal advice or legal assistance with respect to
the request shall inform such persons of any applicable nondisclosure requirement.
Any person who receives a disclosure under this subsection shall be subject to the
same prohibitions on disclosure under paragraph (1).

"(4) At the request of the authorized Government agency, any person making or
intending to make a disclosure under this section shall identify to the requesting
official of the authorized Government agency the person to whom such disclosure will
be made or to whom such disclosure was made prior to the request, but in no circum-
stance shall a person be required to inform such requesting official that the person
intends to consult an attorney to obtain legal advice or legal assistance.".

(d) Section 1114(a)(3) of the Right to Financial Privacy Act (12 U.S.C.
3414(a)(3)) is amended to read as follows:

"(3)(A) If the Government authority described in paragraph (1) or the Secret
Service, as the case may be, certifies that otherwise there may result a danger to
the national security of the United States, interference with a criminal, coun-
terterrorism, or counterintelligence investigation, interference with diplomatic re-
lations, or danger to the life or physical safety of any person, no financial insti-
tution, or officer, employee, or agent of such institution, shall disclose to any
person (other than those to whom such disclosure is necessary to comply with the re-
quest or an attorney to obtain legal advice or legal assistance with respect to the
request) that the Government authority or the Secret Service has sought or obtained
access to a customer's financial records.

"(B) The request shall notify the person or entity to whom the request is direc-
ted of the nondisclosure requirement under subparagraph (A).

"(C) Any recipient disclosing to those persons necessary to comply with the re-
quest or to an attorney to obtain legal advice or legal assistance with respect to
the request shall inform such persons of any applicable nondisclosure requirement.
Any person who receives a disclosure under this subsection shall be subject to the
same prohibitions on disclosure under subparagraph (A).

"(D) At the request of the authorized Government agency or the Secret Service,
any person making or intending to make a disclosure under this section shall identi-
fy to the requesting official of the authorized Government agency or the Secret Ser-
vice the person to whom such disclosure will be made or to whom such disclosure was

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 109-333                                          Page 26
H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
(Cite as: H.R. CONF. REP. 109-333,  2006 U.S.C.C.A.N. 184)

made prior to the request, but in no circumstance shall a person be required to in-
form such requesting **26** official that the person intends to consult an attorney to
obtain legal advice or legal assistance.".

(e) Section 1114(a)(5)(D) of the Right to Financial Privacy Act (12 U.S.C.
3414(a)(5)(D)) is amended to read:

"(D) Prohibition of certain disclosure.-

"(i) If the Director of the Federal Bureau of Investigation, or his designee in
a position not lower than Deputy Assistant Director at Bureau headquarters or a Spe-
cial Agent in Charge in a Bureau field office designated by the Director, certifies
that otherwise there may result a danger to the national security of the United
States, interference with a criminal, counterterrorism, or counterintelligence in-
vestigation, interference with diplomatic relations, or danger to the life or phys-
ical safety of any person, no financial institution, or officer, employee, or agent
of such institution, shall disclose to any person (other than those to whom such
disclosure is necessary to comply with the request or an attorney to obtain legal
advice or legal assistance with respect to the request) that the Federal Bureau of
Investigation has sought or obtained access to a customer's or entity's financial
records under subparagraph (A).

"(ii) The request shall notify the person or entity to whom the request is dir-
ected of the nondisclosure requirement under clause (i).

"(iii) Any recipient disclosing to those persons necessary to comply with the
request or to an attorney to obtain legal advice or legal assistance with respect to
the request shall inform such persons of any applicable nondisclosure requirement.
Any person who receives a disclosure under this subsection shall be subject to the
same prohibitions on disclosure under clause (i).

"(iv) At the request of the Director of the Federal Bureau of Investigation or
the designee of the Director, any person making or intending to make a disclosure
under this section shall identify to the Director or such designee the person to
whom such disclosure will be made or to whom such disclosure was made prior to the
request, but in no circumstance shall a person be required to inform the Director or
such designee that the person intends to consult an attorney to obtain legal advice
or legal assistance.".

(f) Section 802(b) of the National Security Act of 1947 (50 U.S.C. 436(b)) is
amended to read as follows:

"(b) Prohibition of Certain Disclosure.-

"(1) If an authorized investigative agency described in subsection (a) certifies
that otherwise there may result a danger to the national security of the United
States, interference with a criminal, counterterrorism, or counterintelligence in-
vestigation, interference with diplomatic relations, or danger to the life or phys-
ical safety of any person, no governmental or private entity, or officer, employee,
or agent of such entity, may disclose to any person (other than those to whom such
disclosure is necessary to comply with the request or an attorney to obtain legal
advice **27** or legal assistance with respect to the request) that such entity has re-
ceived or satisfied a request made by an authorized investigative agency under this
section.

"(2) The request shall notify the person or entity to whom the request is direc-
ted of the nondisclosure requirement under paragraph (1).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:07-cv-02538-VRW    Document 5    Filed 06/23/2007    Page 34 of 303

H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 109-333,  2006 U.S.C.C.A.N. 184)**

"(3) Any recipient disclosing to those persons necessary to comply with the re-
quest or to an attorney to obtain legal advice or legal assistance with respect to
the request shall inform such persons of any applicable nondisclosure requirement.
Any person who receives a disclosure under this subsection shall be subject to the
same prohibitions on disclosure under paragraph (1).

"(4) At the request of the authorized investigative agency, any person making or
intending to make a disclosure under this section shall identify to the requesting
official of the authorized investigative agency the person to whom such disclosure
will be made or to whom such disclosure was made prior to the request, but in no
circumstance shall a person be required to inform such official that the person in-
tends to consult an attorney to obtain legal advice or legal assistance.".

SEC. 117. VIOLATIONS OF NONDISCLOSURE PROVISIONS OF NATIONAL SECURITY LETTERS.

Section 1510 of title 18, United States Code, is amended by adding at the end
the following:

"(e) Whoever, having been notified of the applicable disclosure prohibitions or
confidentiality requirements of section 2709(c)(1) of this title, section 626(d)(1)
or 627(c)(1) of the Fair Credit Reporting Act (15 U.S.C. 1681u(d)(1) or
1681v(c)(1)), section 1114(a)(3)(A) or 1114(a)(5)(D)(i) of the Right to Financial
Privacy Act (12 U.S.C. 3414(a)(3)(A) or 3414(a)(5)(D)(i)), or section 802(b)(1) of
the National Security Act of 1947 (50 U.S.C. 436(b)(1)), knowingly and with the in-
tent to obstruct an investigation or judicial proceeding violates such prohibitions
or requirements applicable by law to such person shall be imprisoned for not more
than five years, fined under this title, or both.".

SEC. 118. REPORTS ON NATIONAL SECURITY LETTERS.

(a) Existing Reports.-Any report made to a committee of Congress regarding na-
tional security letters under section 2709(c)(1) of title 18, United States Code,
sections 626(d) or 627(c) of the Fair Credit Reporting Act (15 U.S.C. 1681u(d) or
1681v(c)), section 1114(a)(3) or 1114(a)(5)(D) of the Right to Financial Privacy Act
(12 U.S.C. 3414(a)(3) or 3414(a)(5)(D)), or section 802(b) of the National Security
Act of 1947 (50 U.S.C. 436(b)) shall also be made to the Committees on the Judiciary
of the House of Representatives and the Senate.

(b) Enhanced Oversight of Fair Credit Reporting Act Counterterrorism National
Security Letter.-Section 627 of the Fair Credit Reporting Act (15 U.S.C. 1681(v)) is
amended by inserting at the end the following new subsection:

"(f) Reports to Congress.-(1) On a semi-annual basis, the Attorney General shall
fully inform the Committee on the Judiciary, the Committee on Financial Services,
and the Permanent Select Committee on Intelligence of the House of Representatives
and the **\*28** Committee on the Judiciary, the Committee on Banking, Housing, and Urban
Affairs, and the Select Committee on Intelligence of the Senate concerning all re-
quests made pursuant to subsection (a).

"(2) In the case of the semiannual reports required to be submitted under para-
graph (1) to the Permanent Select Committee on Intelligence of the House of Repres-
entatives and the Select Committee on Intelligence of the Senate, the submittal
dates for such reports shall be as provided in section 507 of the National Security

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 109-333    Page 28
H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 109-333, 2006 U.S.C.C.A.N. 184)**

Act of 1947 (50 U.S.C. 415b).".

(c) Report on Requests for National Security Letters.-

(1) In general.-In April of each year, the Attorney General shall submit to Congress an aggregate report setting forth with respect to the preceding year the total number of requests made by the Department of Justice for information concerning different United States persons under-

(A) section 2709 of title 18, United States Code (to access certain communication service provider records), excluding the number of requests for subscriber information;

(B) section 1114 of the Right to Financial Privacy Act (12 U.S.C. 3414) (to obtain financial institution customer records);

(C) section 802 of the National Security Act of 1947 (50 U.S.C. 436) (to obtain financial information, records, and consumer reports);

(D) section 626 of the Fair Credit Reporting Act (15 U.S.C. 1681u) (to obtain certain financial information and consumer reports); and

(E) section 627 of the Fair Credit Reporting Act (15 U.S.C. 1681v) (to obtain credit agency consumer records for counterterrorism investigations).

(2) Unclassified form.-The report under this section shall be submitted in unclassified form.

(d) National Security Letter Defined.-In this section, the term "national security letter" means a request for information under one of the following provisions of law:

(1) Section 2709(a) of title 18, United States Code (to access certain communication service provider records).

(2) Section 1114(a)(5)(A) of the Right to Financial Privacy Act (12 U.S.C. 3414(a)(5)(A)) (to obtain financial institution customer records).

(3) Section 802 of the National Security Act of 1947 (50 U.S.C. 436) (to obtain financial information, records, and consumer reports).

(4) Section 626 of the Fair Credit Reporting Act (15 U.S.C. 1681u) (to obtain certain financial information and consumer reports).

(5) Section 627 of the Fair Credit Reporting Act (15 U.S.C. 1681v) (to obtain credit agency consumer records for counterterrorism investigations).

SEC. 119. AUDIT OF USE OF NATIONAL SECURITY LETTERS.

(a) Audit.-The Inspector General of the Department of Justice shall perform an audit of the effectiveness and use, including any improper or illegal use, of national security letters issued by the Department of Justice.

**\*29** (b) Requirements.-The audit required under subsection (a) shall include-

(1) an examination of the use of national security letters by the Department of Justice during calendar years 2003 through 2006;

(2) a description of any noteworthy facts or circumstances relating to such use, including any improper or illegal use of such authority; and

(3) an examination of the effectiveness of national security letters as an investigative tool, including-

(A) the importance of the information acquired by the Department of Justice to the intelligence activities of the Department of Justice or to any other department or agency of the Federal Government;

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 109-333    Page 35
H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 109-333,  2006 U.S.C.C.A.N. 184)**

(B) the manner in which such information is collected, retained, analyzed, and disseminated by the Department of Justice, including any direct access to such information (such as access to "raw data") provided to any other department, agency, or instrumentality of Federal, State, local, or tribal governments or any private sector entity;

(C) whether, and how often, the Department of Justice utilized such information to produce an analytical intelligence product for distribution within the Department of Justice, to the intelligence community (as such term is defined in section 3(4) of the National Security Act of 1947 (50 U.S.C. 401a(4))), or to other Federal, State, local, or tribal government departments, agencies, or instrumentalities;

(D) whether, and how often, the Department of Justice provided such information to law enforcement authorities for use in criminal proceedings;

(E) with respect to national security letters issued following the date of the enactment of this Act, an examination of the number of occasions in which the Department of Justice, or an officer or employee of the Department of Justice, issued a national security letter without the certification necessary to require the recipient of such letter to comply with the nondisclosure and confidentiality requirements potentially applicable under law; and

(F) the types of electronic communications and transactional information obtained through requests for information under section 2709 of title 18, United States Code, including the types of dialing, routing, addressing, or signaling information obtained, and the procedures the Department of Justice uses if content information is obtained through the use of such authority.

(c) Submission Dates.-

(1) Prior years.-Not later than one year after the date of the enactment of this Act, or upon completion of the audit under this section for calendar years 2003 and 2004, whichever is earlier, the Inspector General of the Department of Justice shall submit to the Committee on the Judiciary and the Permanent Select Committee on Intelligence of the House of Representatives and the Committee on the Judiciary and the Select Committee on Intelligence of the Senate a report containing the results of **30** the audit conducted under this subsection for calendar years 2003 and 2004.

(2) Calendar years 2005 and 2006.-Not later than December 31, 2007, or upon completion of the audit under this subsection for calendar years 2005 and 2006, whichever is earlier, the Inspector General of the Department of Justice shall submit to the Committee on the Judiciary and the Permanent Select Committee on Intelligence of the House of Representatives and the Committee on the Judiciary and the Select Committee on Intelligence of the Senate a report containing the results of the audit conducted under this subsection for calendar years 2005 and 2006.

(d) Prior Notice to Attorney General and Director of National Intelligence; Comments.-

(1) Notice.-Not less than 30 days before the submission of a report under subsections (c)(1) or (c)(2), the Inspector General of the Department of Justice shall provide such report to the Attorney General and the Director of National Intelligence.

(2) Comments.-The Attorney General or the Director of National Intelligence may provide comments to be included in the reports submitted under subsections (c)(1) or (c)(2) as the Attorney General or the Director of National Intelligence may consider

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 109-333                                                    Page 38
H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 109-333, 2006 U.S.C.C.A.N. 184)**

necessary.

(e) Unclassified Form.-The reports submitted under subsections (c)(1) or (c)(2)
and any comments included under subsection (d)(2) shall be in unclassified form, but
may include a classified annex.

(f) Minimization Procedures Feasibility.-Not later than February 1, 2007, or
upon completion of review of the report submitted under subsection (c)(1), whichever
is earlier, the Attorney General and the Director of National Intelligence shall
jointly submit to the Committee on the Judiciary and the Permanent Select Committee
on Intelligence of the House of Representatives and the Committee on the Judiciary
and the Select Committee on Intelligence of the Senate a report on the feasibility
of applying minimization procedures in the context of national security letters to
ensure the protection of the constitutional rights of United States persons.

(g) National Security Letter Defined.-In this section, the term "national secur-
ity letter" means a request for information under one of the following provisions of
law:

(1) Section 2709(a) of title 18, United States Code (to access certain communic-
ation service provider records).

(2) Section 1114(a)(5)(A) of the Right to Financial Privacy Act (12 U.S.C.
3414(a)(5)(A)) (to obtain financial institution customer records).

(3) Section 802 of the National Security Act of 1947 (50 U.S.C. 436) (to obtain
financial information, records, and consumer reports).

(4) Section 626 of the Fair Credit Reporting Act (15 U.S.C. 1681u) (to obtain
certain financial information and consumer reports).

(5) Section 627 of the Fair Credit Reporting Act (15 U.S.C. 1681v) (to obtain
credit agency consumer records for counterterrorism investigations).

**\*31** SEC. 120. DEFINITION FOR FORFEITURE PROVISIONS UNDER SECTION 806 OF THE USA PAT-
RIOT ACT.

Section 981(a)(1)(G) of title 18, United States Code, is amended-

(1) in clause (i), by striking "act of international or domestic terrorism (as
defined in section 2331)" and inserting "any Federal crime of terrorism (as defined
in section 2332b(g)(5))";

(2) in clause (ii), by striking "an act of international or domestic terrorism
(as defined in section 2331)" with "any Federal crime of terrorism (as defined in
section 2332b(g)(5)"; and

(3) in clause (iii), by striking "act of international or domestic terrorism (as
defined in section 2331)" and inserting "Federal crime of terrorism (as defined in
section 2332b(g)(5))".

SEC. 121. PENAL PROVISIONS REGARDING TRAFFICKING IN CONTRABAND CIGARETTES OR SMOKE-
LESS TOBACCO.

(a) Threshold Quantity for Treatment as Contraband Cigarettes.-(1) Section
2341(2) of title 18, United States Code, is amended by striking "60,000 cigarettes"
and inserting "10,000 cigarettes".

(2) Section 2342(b) of that title is amended by striking "60,000" and inserting
"10,000".

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
**(Cite as: H. R. CONF. REP. 109-333,  2006 U.S.C.C.A.N. 184)**

(3) Section 2343 of that title is amended-

(A) in subsection (a), by striking "60,000" and inserting "10,000"; and

(B) in subsection (b), by striking "60,000" and inserting "10,000".

(b) Contraband Smokeless Tobacco.-(1) Section 2341 of that title is amended-

(A) in paragraph (4), by striking "and" at the end;

(B) in paragraph (5), by striking the period at the end and inserting a semi-colon; and

(C) by adding at the end the following new paragraphs:

"(6) the term 'smokeless tobacco' means any finely cut, ground, powdered, or leaf tobacco that is intended to be placed in the oral or nasal cavity or otherwise consumed without being combusted;

"(7) the term 'contraband smokeless tobacco' means a quantity in excess of 500 single-unit consumer-sized cans or packages of smokeless tobacco, or their equivalent, that are in the possession of any person other than-

"(A) a person holding a permit issued pursuant to chapter 52 of the Internal Revenue Code of 1986 as manufacturer of tobacco products or as an export warehouse proprietor, a person operating a customs bonded warehouse pursuant to section 311 or 555 of the Tariff Act of 1930 (19 U.S.C. 1311, 1555), or an agent of such person;

"(B) a common carrier transporting such smokeless tobacco under a proper bill of lading or freight bill which states the quantity, source, and designation of such smokeless tobacco;

"(C) a person who-

"(i) is licensed or otherwise authorized by the State where such smokeless tobacco is found to engage in the business of selling or distributing tobacco products; and

**\*32** "(ii) has complied with the accounting, tax, and payment requirements relating to such license or authorization with respect to such smokeless tobacco; or

"(D) an officer, employee, or agent of the United States or a State, or any department, agency, or instrumentality of the United States or a State (including any political subdivision of a State), having possession of such smokeless tobacco in connection with the performance of official duties;".

(2) Section 2342(a) of that title is amended by inserting "or contraband smokeless tobacco" after "contraband cigarettes".

(3) Section 2343(a) of that title is amended by inserting ", or any quantity of smokeless tobacco in excess of 500 single-unit consumer-sized cans or packages," before "in a single transaction".

(4) Section 2344(c) of that title is amended by inserting "or contraband smokeless tobacco" after "contraband cigarettes".

(5) Section 2345 of that title is amended by inserting "or smokeless tobacco" after "cigarettes" each place it appears.

(6) Section 2341 of that title is further amended in paragraph (2), as amended by subsection (a)(1) of this section, in the matter preceding subparagraph (A), by striking "State cigarette taxes in the State where such cigarettes are found, if the State" and inserting "State or local cigarette taxes in the State or locality where such cigarettes are found, if the State or local government".

(c) Recordkeeping, Reporting, and Inspection.-Section 2343 of that title, as amended by this section, is further amended-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 109-333,  2006 U.S.C.C.A.N. 184)**

(1) in subsection (a)-

(A) in the matter preceding paragraph (1), by striking "only-" and inserting "such information as the Attorney General considers appropriate for purposes of enforcement of this chapter, including-"; and

(B) in the flush matter following paragraph (3), by striking the second sentence;

(2) by redesignating subsection (b) as subsection (c);

(3) by inserting after subsection (a) the following new subsection (b):

"(b) Any person, except for a tribal government, who engages in a delivery sale, and who ships, sells, or distributes any quantity in excess of 10,000 cigarettes, or any quantity in excess of 500 single-unit consumer-sized cans or packages of smokeless tobacco, or their equivalent, within a single month, shall submit to the Attorney General, pursuant to rules or regulations prescribed by the Attorney General, a report that sets forth the following:

"(1) The person's beginning and ending inventory of cigarettes and cans or packages of smokeless tobacco (in total) for such month.

"(2) The total quantity of cigarettes and cans or packages of smokeless tobacco that the person received within such month from each other person (itemized by name and address).

"(3) The total quantity of cigarettes and cans or packages of smokeless tobacco that the person distributed within such month to each person (itemized by name and address) other than a retail purchaser."; and

(4) by adding at the end the following new subsections:

**\*33** "(d) Any report required to be submitted under this chapter to the Attorney General shall also be submitted to the Secretary of the Treasury and to the attorneys general and the tax administrators of the States from where the shipments, deliveries, or distributions both originated and concluded.

"(e) In this section, the term 'delivery sale' means any sale of cigarettes or smokeless tobacco in interstate commerce to a consumer if-

"(1) the consumer submits the order for such sale by means of a telephone or other method of voice transmission, the mails, or the Internet or other online service, or by any other means where the consumer is not in the same physical location as the seller when the purchase or offer of sale is made; or

"(2) the cigarettes or smokeless tobacco are delivered by use of the mails, common carrier, private delivery service, or any other means where the consumer is not in the same physical location as the seller when the consumer obtains physical possession of the cigarettes or smokeless tobacco.

"(f) In this section, the term 'interstate commerce' means commerce between a State and any place outside the State, or commerce between points in the same State but through any place outside the State.".

(d) Disposal or Use of Forfeited Cigarettes and Smokeless Tobacco.-Section 2344(c) of that title, as amended by this section, is further amended by striking "seizure and forfeiture," and all that follows and inserting "seizure and forfeiture. The provisions of chapter 46 of title 18 relating to civil forfeitures shall extend to any seizure or civil forfeiture under this section. Any cigarettes or smokeless tobacco so seized and forfeited shall be either-

"(1) destroyed and not resold; or

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 109-333

H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 109-333,  2006 U.S.C.C.A.N. 184)**

"(2) used for undercover investigative operations for the detection and prosecu-
tion of crimes, and then destroyed and not resold.".

(e) Effect on State and Local Law.-Section 2345 of that title is amended-

(1) in subsection (a), by striking "a State to enact and enforce" and inserting
"a State or local government to enact and enforce its own"; and

(2) in subsection (b), by striking "of States, through interstate compact or
otherwise, to provide for the administration of State" and inserting "of State or
local governments, through interstate compact or otherwise, to provide for the ad-
ministration of State or local".

(f) Enforcement.-Section 2346 of that title is amended-

(1) by inserting "(a)" before "The Attorney General"; and

(2) by adding at the end the following new subsection:

"(b)(1) A State, through its attorney general, a local government, through its
chief law enforcement officer (or a designee thereof), or any person who holds a
permit under chapter 52 of the Internal Revenue Code of 1986, may bring an action in
the United States district courts to prevent and restrain violations of this chapter
by any person (or by any person controlling such person), except that any person who
holds a permit under chapter 52 of the Internal Revenue Code of 1986 may not bring
such an action against a State or local government. No civil action may be commenced
under this **\*34** paragraph against an Indian tribe or an Indian in Indian country (as
defined in section 1151).

"(2) A State, through its attorney general, or a local government, through its
chief law enforcement officer (or a designee thereof), may in a civil action under
paragraph (1) also obtain any other appropriate relief for violations of this
chapter from any person (or by any person controlling such person), including civil
penalties, money damages, and injunctive or other equitable relief. Nothing in this
chapter shall be deemed to abrogate or constitute a waiver of any sovereign immunity
of a State or local government, or an Indian tribe against any unconsented lawsuit
under this chapter, or otherwise to restrict, expand, or modify any sovereign im-
munity of a State or local government, or an Indian tribe.

"(3) The remedies under paragraphs (1) and (2) are in addition to any other rem-
edies under Federal, State, local, or other law.

"(4) Nothing in this chapter shall be construed to expand, restrict, or other-
wise modify any right of an authorized State official to proceed in State court, or
take other enforcement actions, on the basis of an alleged violation of State or
other law.

"(5) Nothing in this chapter shall be construed to expand, restrict, or other-
wise modify any right of an authorized local government official to proceed in State
court, or take other enforcement actions, on the basis of an alleged violation of
local or other law.".

(g) Conforming and Clerical Amendments.-(1) The section heading for section 2343
of that title is amended to read as follows:

"S 2343. Recordkeeping, reporting, and inspection".

(2) The section heading for section 2345 of such title is amended to read as
follows:

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:07-cv-02538-VRW     Document 5     Filed 06/23/2007     Page 41 of 303

H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005, 2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 109-333,  2006 U.S.C.C.A.N. 184)**


"S 2345. Effect on State and local law".

   (3) The table of sections at the beginning of chapter 114 of that title is amended-
   (A) by striking the item relating to section 2343 and inserting the following new item:
  "2343. Recordkeeping, reporting, and inspection.";
   and
   (B) by striking the item relating to section 2345 and insert the following new item:
  "2345. Effect on State and local law.".
   (4)(A) The heading for chapter 114 of that title is amended to read as follows:

   "CHAPTER 114-TRAFFICKING IN CONTRABAND CIGARETTES AND SMOKELESS TOBACCO".

   (B) The table of chapters at the beginning of part I of that title is amended by striking the item relating to section 114 and inserting the following new item:


"114. Trafficking in contraband cigarettes and smokeless tobacco .. 2341.".


SEC. 122. PROHIBITION OF NARCO-TERRORISM.

   Part A of the Controlled Substance Import and Export Act (21 U.S.C. 951 et seq.) is amended by inserting after section 1010 the following:

   **\*35** "FOREIGN TERRORIST ORGANIZATIONS, TERRORIST PERSONS AND GROUPS

                    "Prohibited Acts

   "Sec. 1010A. (a) Whoever engages in conduct that would be punishable under section 841(a) of this title if committed within the jurisdiction of the United States, or attempts or conspires to do so, knowing or intending to provide, directly or indirectly, anything of pecuniary value to any person or organization that has engaged or engages in terrorist activity (as defined in section 212(a)(3)(B) of the Immigration and Nationality Act) or terrorism (as defined in section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989), shall be sentenced to a term of imprisonment of not less than twice the minimum punishment under section 841(b)(1), and not more than life, a fine in accordance with the provisions of title 18, United States Code, or both. Notwithstanding section 3583 of title 18, United States Code, any sentence imposed under this subsection shall include a term of supervised release of at least 5 years in addition to such term of imprisonment.

                    "Jurisdiction

   "(b) There is jurisdiction over an offense under this section if-
   "(1) the prohibited drug activity or the terrorist offense is in violation of the criminal laws of the United States;

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 109-333     Page 35
H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
(Cite as: H.R. CONF. REP. 109-333,  2006 U.S.C.C.A.N. 184)

"(2) the offense, the prohibited drug activity, or the terrorist offense occurs
in or affects interstate or foreign commerce;

"(3) an offender provides anything of pecuniary value for a terrorist offense
that causes or is designed to cause death or serious bodily injury to a national of
the United States while that national is outside the United States, or substantial
damage to the property of a legal entity organized under the laws of the United
States (including any of its States, districts, commonwealths, territories, or pos-
sessions) while that property is outside of the United States;

"(4) the offense or the prohibited drug activity occurs in whole or in part out-
side of the United States (including on the high seas), and a perpetrator of the of-
fense or the prohibited drug activity is a national of the United States or a legal
entity organized under the laws of the United States (including any of its States,
districts, commonwealths, territories, or possessions); or

"(5) after the conduct required for the offense occurs an offender is brought
into or found in the United States, even if the conduct required for the offense oc-
curs outside the United States.

### "Proof Requirements

"(c) To violate subsection (a), a person must have knowledge that the person or
organization has engaged or engages in terrorist activity (as defined in section
212(a)(3)(B) of the Immigration and Nationality Act) or terrorism (as defined in
section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and
1989).

### *36 "Definition

"(d) As used in this section, the term 'anything of pecuniary value' has the
meaning given the term in section 1958(b)(1) of title 18, United States Code.".

SEC. 123. INTERFERING WITH THE OPERATION OF AN AIRCRAFT.

Section 32 of title 18, United States Code, is amended-
(1) in subsection (a), by redesignating paragraphs (5), (6), and (7) as para-
graphs (6), (7), and (8) respectively;
(2) by inserting after paragraph (4) of subsection (a), the following:
"(5) interferes with or disables, with intent to endanger the safety of any per-
son or with a reckless disregard for the safety of human life, anyone engaged in the
authorized operation of such aircraft or any air navigation facility aiding in the
navigation of any such aircraft;";
(3) in subsection (a)(8), by striking "paragraphs (1) through (6)" and inserting
"paragraphs (1) through (7)"; and
(4) in subsection (c), by striking "paragraphs (1) through (5)" and inserting
"paragraphs (1) through (6)".

SEC. 124. SENSE OF CONGRESS RELATING TO LAWFUL POLITICAL ACTIVITY.

It is the sense of Congress that government should not investigate an American
citizen solely on the basis of the citizen's membership in a non-violent political

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 109-333, 2006 U.S.C.C.A.N. 184)**

organization or the fact that the citizen was engaging in other lawful political
activity.

SEC. 125. REMOVAL OF CIVIL LIABILITY BARRIERS THAT DISCOURAGE THE DONATION OF FIRE
EQUIPMENT TO VOLUNTEER FIRE COMPANIES.

(a) Liability Protection.-A person who donates qualified fire control or rescue
equipment to a volunteer fire company shall not be liable for civil damages under
any State or Federal law for personal injuries, property damage or loss, or death
caused by the equipment after the donation.

(b) Exceptions.-Subsection (a) does not apply to a person if-

(1) the person's act or omission causing the injury, damage, loss, or death con-
stitutes gross negligence or intentional misconduct; or

(2) the person is the manufacturer of the qualified fire control or rescue
equipment.

(3) the person or agency modified or altered the equipment after it had been re-
certified by an authorized technician as meeting the manufacturer's specifications.

(c) Preemption.-This section preempts the laws of any State to the extent that
such laws are inconsistent with this section, except that notwithstanding subsection
(b) this section shall not preempt any State law that provides additional protection
from liability for a person who donates fire control or fire rescue equipment to a
volunteer fire company.

(d) Definitions.-In this section:

(1) Person.-The term "person" includes any governmental or other entity.

(2) Fire control or rescue equipment.-The term "fire control or fire rescue
equipment" includes any fire vehicle, fire **37** fighting tool, communications equip-
ment, protective gear, fire hose, or breathing apparatus.

(3) Qualified fire control or rescue equipment.-The term "qualified fire control
or rescue equipment" means fire control or fire rescue equipment that has been re-
certified by an authorized technician as meeting the manufacturer's specifications.

(4) State.-The term "State" includes the several States, the District of
Columbia, the Commonwealth of Puerto Rico, the Commonwealth of the Northern Mariana
Islands, American Samoa, Guam, the Virgin Islands, any other territory or possession
of the United States, and any political subdivision of any such State, territory, or
possession.

(5) Volunteer fire company.-The term "volunteer fire company" means an associ-
ation of individuals who provide fire protection and other emergency services, where
at least 30 percent of the individuals receive little or no compensation compared
with an entry level full-time paid individual in that association or in the nearest
such association with an entry level full-time paid individual.

(6) Authorized technician.-The term "authorized technician" means a technician
who has been certified by the manufacturer of fire control or fire rescue equipment
to inspect such equipment. The technician need not be employed by the State or local
agency administering the distribution of the fire control or fire rescue equipment.

(e) Effective Date.-This section applies only to liability for injury, damage,
loss, or death caused by equipment that, for purposes of subsection (a), is donated
on or after the date that is 30 days after the date of the enactment of this sec-
tion.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 109-333, 2006 U.S.C.C.A.N. 184)**

SEC. 126. REPORT ON DATA-MINING ACTIVITIES.

(a) Report.-Not later than one year after the date of the enactment of this Act,
the Attorney General shall submit to Congress a report on any initiative of the De-
partment of Justice that uses or is intended to develop pattern-based data-mining
technology, including, for each such initiative, the following information:

(1) A thorough description of the pattern-based data-mining technology consist-
ent with the protection of existing patents, proprietary business processes, trade
secrets, and intelligence sources and methods.

(2) A thorough discussion of the plans for the use of such technology and the
target dates for the deployment of the pattern-based data-mining technology.

(3) An assessment of the likely efficacy of the pattern-based data-mining tech-
nology quality assurance controls to be used in providing accurate and valuable in-
formation consistent with the stated plans for the use of the technology.

(4) An assessment of the likely impact of the implementation of the pattern-
based data-mining technology on privacy and civil liberties.

(5) A list and analysis of the laws and regulations applicable to the Department
of Justice that govern the application of the pattern-based data-mining technology
to the information to be collected, reviewed, gathered, and analyzed with the pat-
tern-based data-mining technology.

**\*38** (6) A thorough discussion of the policies, procedures, and guidelines of the
Department of Justice that are to be developed and applied in the use of such tech-
nology for pattern-based data-mining in order to-

(A) protect the privacy and due process rights of individuals; and

(B) ensure that only accurate information is collected and used or account for
the possibility of inaccuracy in that information and guard against harmful con-
sequences of potential inaccuracies.

(7) Any necessary classified information in an annex that shall be available
consistent with national security to the Committee on the Judiciary of both the Sen-
ate and the House of Representatives.

(b) Definitions.-In this section:

(1) Data-mining.-The term "data-mining" means a query or search or other analys-
is of one or more electronic databases, where-

(A) at least one of the databases was obtained from or remains under the control
of a non-Federal entity, or the information was acquired initially by another de-
partment or agency of the Federal Government for purposes other than intelligence or
law enforcement;

(B) the search does not use personal identifiers of a specific individual or
does not utilize inputs that appear on their face to identify or be associated with
a specified individual to acquire information; and

(C) a department or agency of the Federal Government is conducting the query or
search or other analysis to find a pattern indicating terrorist or other criminal
activity.

(2) Database.-The term "database" does not include telephone directories, in-
formation publicly available via the Internet or available by any other means to any
member of the public, any databases maintained, operated, or controlled by a State,
local, or tribal government (such as a State motor vehicle database), or databases

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 109-333,  2006 U.S.C.C.A.N. 184)**

of judicial and administrative opinions.

SEC. 127. SENSE OF CONGRESS.

    It is the sense of Congress that under section 981 of title 18, United States
Code, victims of terrorists attacks should have access to the assets forfeited.

SEC. 128. USA PATRIOT ACT SECTION 214; AUTHORITY FOR DISCLOSURE OF ADDITIONAL IN-
FORMATION IN CONNECTION WITH ORDERS FOR PEN REGISTER AND TRAP AND TRACE AUTHORITY
UNDER FISA.

    (a) Records.-Section 402(d)(2) of the Foreign Intelligence Surveillance Act of
1978 (50 U.S.C. 1842(d)(2)) is amended-
    (1) in subparagraph (A)-
    (A) in clause (ii), by adding "and" at the end; and
    (B) in clause (iii), by striking the period at the end and inserting a semi-
colon; and
    (2) in subparagraph (B)(iii), by striking the period at the end and inserting ";
and"; and
    (3) by adding at the end the following:
    "(C) shall direct that, upon the request of the applicant, the provider of a
wire or electronic communication service **\*39** shall disclose to the Federal officer
using the pen register or trap and trace device covered by the order-
    "(i) in the case of the customer or subscriber using the service covered by the
order (for the period specified by the order)-
    "(I) the name of the customer or subscriber;
    "(II) the address of the customer or subscriber;
    "(III) the telephone or instrument number, or other subscriber number or iden-
tifier, of the customer or subscriber, including any temporarily assigned network
address or associated routing or transmission information;
    "(IV) the length of the provision of service by such provider to the customer
or subscriber and the types of services utilized by the customer or subscriber;
    "(V) in the case of a provider of local or long distance telephone service, any
local or long distance telephone records of the customer or subscriber;
    "(VI) if applicable, any records reflecting period of usage (or sessions) by
the customer or subscriber; and
    "(VII) any mechanisms and sources of payment for such service, including the
number of any credit card or bank account utilized for payment for such service; and
    "(ii) if available, with respect to any customer or subscriber of incoming or
outgoing communications to or from the service covered by the order-
    "(I) the name of such customer or subscriber;
    "(II) the address of such customer or subscriber;
    "(III) the telephone or instrument number, or other subscriber number or iden-
tifier, of such customer or subscriber, including any temporarily assigned network
address or associated routing or transmission information; and
    "(IV) the length of the provision of service by such provider to such customer
or subscriber and the types of services utilized by such customer or subscriber.".
    (b) Enhanced Oversight.-Section 406(a) of the Foreign Intelligence Surveillance

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005, 2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 109-333,  2006 U.S.C.C.A.N. 184)**

Act of 1978 (50 U.S.C. 1846(a)) is amended by inserting ", and the Committee on the Judiciary of the House of Representatives and the Committee on the Judiciary of the Senate," after "of the Senate".

TITLE II-TERRORIST DEATH PENALTY ENHANCEMENT

SEC. 201. SHORT TITLE.

This title may be cited as the "Terrorist Death Penalty Enhancement Act of 2005".

**\*40** Subtitle A-Terrorist Penalties Enhancement Act

SEC. 211. DEATH PENALTY PROCEDURES FOR CERTAIN AIR PIRACY CASES OCCURRING BEFORE ENACTMENT OF THE FEDERAL DEATH PENALTY ACT OF 1994.

(a) In General.-Section 60003 of the Violent Crime Control and Law Enforcement Act of 1994, (Public Law 103-322), is amended, as of the time of its enactment, by adding at the end the following:

"(c) Death Penalty Procedures for Certain Previous Aircraft Piracy Violations.-An individual convicted of violating section 46502 of title 49, United States Code, or its predecessor, may be sentenced to death in accordance with the procedures established in chapter 228 of title 18, United States Code, if for any offense committed before the enactment of the Violent Crime Control and Law Enforcement Act of 1994 (Public Law 103- 322), but after the enactment of the Antihijacking Act of 1974 (Public Law 93-366), it is determined by the finder of fact, before consideration of the factors set forth in sections 3591(a)(2) and 3592(a) and (c) of title 18, United States Code, that one or more of the factors set forth in former section 46503(c)(2) of title 49, United States Code, or its predecessor, has been proven by the Government to exist, beyond a reasonable doubt, and that none of the factors set forth in former section 46503(c)(1) of title 49, United States Code, or its predecessor, has been proven by the defendant to exist, by a preponderance of the information. The meaning of the term 'especially heinous, cruel, or depraved', as used in the factor set forth in former section 46503(c)(2)(B)(iv) of title 49, United States Code, or its predecessor, shall be narrowed by adding the limiting language 'in that it involved torture or serious physical abuse to the victim', and shall be construed as when that term is used in section 3592(c)(6) of title 18, United States Code.".

(b) Severability Clause.-If any provision of section 60003(b)(2) of the Violent Crime and Law Enforcement Act of 1994 (Public Law 103-322), or the application thereof to any person or any circumstance is held invalid, the remainder of such section and the application of such section to other persons or circumstances shall not be affected thereby.

SEC. 212. POSTRELEASE SUPERVISION OF TERRORISTS.

Section 3583(j) of title 18, United States Code, is amended in subsection (j), by striking ", the commission" and all that follows through "person,".

Subtitle B-Federal Death Penalty Procedures

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:07-cv-02538-VRW    Document 5    Filed 06/23/2007    Page 47 of 303

H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 109-333,  2006 U.S.C.C.A.N. 184)**


SEC. 221. ELIMINATION OF PROCEDURES APPLICABLE ONLY TO CERTAIN CONTROLLED SUBSTANCES
ACT CASES.

    Section 408 of the Controlled Substances Act (21 U.S.C. 848) is amended-
    (1) in subsection (e)(2), by striking "(1)(b)" and inserting (1)(B);
    **\*41** (2) by striking subsection (g) and all that follows through subsection (p);
    (3) by striking subsection (r); and
    (4) in subsection (q), by striking paragraphs (1) through (3).

SEC. 222. COUNSEL FOR FINANCIALLY UNABLE DEFENDANTS.

    (a) In General.-Chapter 228 of title 18, United States Code, is amended by
adding at the end the following new section:

"S 3599. Counsel for financially unable defendants

    "(a)(1) Notwithstanding any other provision of law to the contrary, in every
criminal action in which a defendant is charged with a crime which may be punishable
by death, a defendant who is or becomes financially unable to obtain adequate rep-
resentation or investigative, expert, or other reasonably necessary services at any
time either-
    "(A) before judgment; or
    "(B) after the entry of a judgment imposing a sentence of death but before the
execution of that judgment;
    shall be entitled to the appointment of one or more attorneys and the furnishing
of such other services in accordance with subsections (b) through (f).
    "(2) In any post conviction proceeding under section 2254 or 2255 of title 28,
United States Code, seeking to vacate or set aside a death sentence, any defendant
who is or becomes financially unable to obtain adequate representation or investig-
ative, expert, or other reasonably necessary services shall be entitled to the ap-
pointment of one or more attorneys and the furnishing of such other services in ac-
cordance with subsections (b) through (f).
    "(b) If the appointment is made before judgment, at least one attorney so ap-
pointed must have been admitted to practice in the court in which the prosecution is
to be tried for not less than five years, and must have had not less than three
years experience in the actual trial of felony prosecutions in that court.
    "(c) If the appointment is made after judgment, at least one attorney so appoin-
ted must have been admitted to practice in the court of appeals for not less than
five years, and must have had not less than three years experience in the handling
of appeals in that court in felony cases.
    "(d) With respect to subsections (b) and (c), the court, for good cause, may ap-
point another attorney whose background, knowledge, or experience would otherwise
enable him or her to properly represent the defendant, with due consideration to the
seriousness of the possible penalty and to the unique and complex nature of the lit-
igation.
    "(e) Unless replaced by similarly qualified counsel upon the attorney's own mo-
tion or upon motion of the defendant, each attorney so appointed shall represent the

H.R. CONF. REP. 109-333    Page 45
H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 109-333, 2006 U.S.C.C.A.N. 184)**

defendant throughout every subsequent stage of available judicial proceedings, including pretrial proceedings, trial, sentencing, motions for new trial, appeals, applications for writ of certiorari to the Supreme Court of the United States, and all available post-conviction process, together with applications for stays of execution and other appropriate motions and procedures, and shall also represent the defendant in such competency proceedings and proceedings for executive or other clemency as may be available to the defendant.

**\*42** "(f) Upon a finding that investigative, expert, or other services are reasonably necessary for the representation of the defendant, whether in connection with issues relating to guilt or the sentence, the court may authorize the defendant's attorneys to obtain such services on behalf of the defendant and, if so authorized, shall order the payment of fees and expenses therefor under subsection (g). No ex parte proceeding, communication, or request may be considered pursuant to this section unless a proper showing is made concerning the need for confidentiality. Any such proceeding, communication, or request shall be transcribed and made a part of the record available for appellate review.

"(g)(1) Compensation shall be paid to attorneys appointed under this subsection at a rate of not more than $125 per hour for in-court and out-of-court time. The Judicial Conference is authorized to raise the maximum for hourly payment specified in the paragraph up to the aggregate of the overall average percentages of the adjustments in the rates of pay for the General Schedule made pursuant to section 5305 of title 5 on or after such date. After the rates are raised under the preceding sentence, such hourly range may be raised at intervals of not less than one year, up to the aggregate of the overall average percentages of such adjustments made since the last raise under this paragraph.

"(2) Fees and expenses paid for investigative, expert, and other reasonably necessary services authorized under subsection (f) shall not exceed $7,500 in any case, unless payment in excess of that limit is certified by the court, or by the United States magistrate judge, if the services were rendered in connection with the case disposed of entirely before such magistrate judge, as necessary to provide fair compensation for services of an unusual character or duration, and the amount of the excess payment is approved by the chief judge of the circuit. The chief judge of the circuit may delegate such approval authority to an active circuit judge.

"(3) The amounts paid under this paragraph for services in any case shall be disclosed to the public, after the disposition of the petition.".

(b) Conforming Amendment.-The table of sections of the bill is amended by inserting after the item relating to section 3598 the following new item:

"3599. Counsel for financially unable defendants.".

(c) Repeal.-Subsection (q) of section 408 of the Controlled Substances Act is amended by striking paragraphs (4) through (10).

TITLE III-REDUCING CRIME AND TERRORISM AT AMERICA'S SEAPORTS

SEC. 301. SHORT TITLE.

This title may be cited as the "Reducing Crime and Terrorism at America's Seaports Act of 2005".

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 109-333                                              Page 42
H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 109-333,  2006 U.S.C.C.A.N. 184)**


SEC. 302. ENTRY BY FALSE PRETENSES TO ANY SEAPORT.

    (a) In General.-Section 1036 of title 18, United States Code, is amended-
    (1) in subsection (a)-
    (A) in paragraph (2), by striking "or" at the end;
    **\*43** (B) by redesignating paragraph (3) as paragraph (4); and
    (C) by inserting after paragraph (2) the following:
    "(3) any secure or restricted area of any seaport, designated as secure in an
approved security plan, as required under section 70103 of title 46, United States
Code, and the rules and regulations promulgated under that section; or";
    (2) in subsection (b)(1), by striking "5 years" and inserting "10 years";
    (3) in subsection (c)(1), by inserting ", captain of the seaport,"
after  "airport authority"; and
    (4) by striking the section heading and inserting the following:

"S 1036. Entry by false pretenses to any real property, vessel, or aircraft of the
United States or secure area of any airport or seaport".

    (b) Technical and Conforming Amendment.-The table of sections for  chapter 47 of
title 18 is amended by striking the matter relating to section 1036 and inserting
the following:
    "1036. Entry by false pretenses to any real property, vessel, or aircraft of the
United States or secure area of any airport or seaport.".
    (c) Definition of Seaport.-Chapter 1 of title 18, United States Code, is amended
by adding at the end the following:

"S 26. Definition of seaport

    "As used in this title, the term 'seaport' means all piers, wharves, docks, and
similar structures, adjacent to any waters subject to the jurisdiction of the United
States, to which a vessel may be secured, including areas of land, water, or land
and water under and in immediate proximity to such structures, buildings on or con-
tiguous to such structures, and the equipment and materials on such structures or in
such buildings.".
    (d) Technical and Conforming Amendment.-The table of sections for  chapter 1 of
title 18 is amended by inserting after the matter relating to section 25 the follow-
ing:
    "26. Definition of seaport.".

SEC. 303. CRIMINAL SANCTIONS FOR FAILURE TO HEAVE TO, OBSTRUCTION OF BOARDING, OR
PROVIDING FALSE INFORMATION.

    (a) Offense.-Chapter 109 of title 18, United States Code, is amended by adding
at the end the following:

"S 2237. Criminal sanctions for failure to heave to, obstruction of boarding, or
providing false information

    "(a)(1) It shall be unlawful for the master, operator, or person in charge of a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 109-333                                    Page 43
H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 109-333, 2006 U.S.C.C.A.N. 184)**

vessel of the United States, or a vessel subject to the jurisdiction of the United
States, to knowingly fail to obey an order by an authorized Federal law enforcement
officer to heave to that vessel.

"(2) It shall be unlawful for any person on board a vessel of the United States,
or a vessel subject to the jurisdiction of the United States, to-

**\*44** "(A) forcibly resist, oppose, prevent, impede, intimidate, or interfere with
a boarding or other law enforcement action authorized by any Federal law or to res-
ist a lawful arrest; or

"(B) provide materially false information to a Federal law enforcement officer
during a boarding of a vessel regarding the vessel's destination, origin, ownership,
registration, nationality, cargo, or crew.

"(b) Any person who intentionally violates this section shall be fined under
this title or imprisoned for not more than 5 years, or both.

"(c) This section does not limit the authority of a customs officer under sec-
tion 581 of the Tariff Act of 1930 (19 U.S.C. 1581), or any other provision of law
enforced or administered by the Secretary of the Treasury or the Secretary of Home-
land Security, or the authority of any Federal law enforcement officer under any law
of the United States, to order a vessel to stop or heave to.

"(d) A foreign nation may consent or waive objection to the enforcement of
United States law by the United States under this section by radio, telephone, or
similar oral or electronic means. Consent or waiver may be proven by certification
of the Secretary of State or the designee of the Secretary of State.

"(e) In this section-

"(1) the term 'Federal law enforcement officer' has the meaning given the term
in section 115(c);

"(2) the term 'heave to' means to cause a vessel to slow, come to a stop, or ad-
just its course or speed to account for the weather conditions and sea state to fa-
cilitate a law enforcement boarding;

"(3) the term 'vessel subject to the jurisdiction of the United States' has the
meaning given the term in section 2 of the Maritime Drug Law Enforcement Act (46
U.S.C. App. 1903); and

"(4) the term 'vessel of the United States' has the meaning given the term in
section 2 of the Maritime Drug Law Enforcement Act (46 U.S.C. App. 1903).".

(b) Conforming Amendment.-The table of sections for chapter 109, title 18,
United States Code, is amended by inserting after the item for section 2236 the fol-
lowing:

"2237. Criminal sanctions for failure to heave to, obstruction of boarding, or
providing false information.".

SEC. 304. CRIMINAL SANCTIONS FOR VIOLENCE AGAINST MARITIME NAVIGATION, PLACEMENT OF
DESTRUCTIVE DEVICES.

(a) Placement of Destructive Devices.-Chapter 111 of title 18, United States
Code, as amended by subsection (a), is further amended by adding at the end the fol-
lowing:

"S 2282A. Devices or dangerous substances in waters of the United States likely to
destroy or damage ships or to interfere with maritime commerce

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:07-cv-02538-VRW    Document 5    Filed 06/23/2007    Page 51 of 303

H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005, 2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 109-333, 2006 U.S.C.C.A.N. 184)**

"(a) A person who knowingly places, or causes to be placed, in navigable waters of the United States, by any means, a device or dangerous substance which is likely to destroy or cause damage to a vessel or its cargo, cause interference with the safe navigation of vessels, or interference with maritime commerce (such as by damaging or destroying marine terminals, facilities, or any other marine structure or entity used in maritime commerce) with the intent of **\*45** causing such destruction or damage, interference with the safe navigation of vessels, or interference with maritime commerce shall be fined under this title or imprisoned for any term of years, or for life; or both.

"(b) A person who causes the death of any person by engaging in conduct prohibited under subsection (a) may be punished by death.

"(c) Nothing in this section shall be construed to apply to otherwise lawfully authorized and conducted activities of the United States Government.

"(d) In this section:

"(1) The term 'dangerous substance' means any solid, liquid, or gaseous material that has the capacity to cause damage to a vessel or its cargo, or cause interference with the safe navigation of a vessel.

"(2) The term 'device' means any object that, because of its physical, mechanical, structural, or chemical properties, has the capacity to cause damage to a vessel or its cargo, or cause interference with the safe navigation of a vessel.".

(2) Conforming amendment.-The table of sections for chapter 111 of title 18, United States Code, as amended by subsection (b), is further amended by adding after the item related to section 2282 the following:

"2282A. Devices or dangerous substances in waters of the United States likely to destroy or damage ships or to interfere with maritime commerce.".

(b) Violence Against Maritime Navigation.-

(1) In general.-Chapter 111 of title 18, United States Code as amended by subsections (a) and (c), is further amended by adding at the end the following:

"S 2282B. Violence against aids to maritime navigation

"Whoever intentionally destroys, seriously damages, alters, moves, or tampers with any aid to maritime navigation maintained by the Saint Lawrence Seaway Development Corporation under the authority of section 4 of the Act of May 13, 1954 (33 U.S.C. 984), by the Coast Guard pursuant to section 81 of title 14, United States Code, or lawfully maintained under authority granted by the Coast Guard pursuant to section 83 of title 14, United States Code, if such act endangers or is likely to endanger the safe navigation of a ship, shall be fined under this title or imprisoned for not more than 20 years, or both.".

(2) Conforming amendment.-The table of sections for chapter 111 of title 18, United States Code, as amended by subsections (b) and (d) is further amended by adding after the item related to section 2282A the following:

"2282B. Violence against aids to maritime navigation.".

SEC. 305. TRANSPORTATION OF DANGEROUS MATERIALS AND TERRORISTS.

(a) Transportation of Dangerous Materials and Terrorists.-Chapter 111 of title 18, as amended by section 305, is further amended by adding at the end the follow-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 109-333   Page 45
H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 109-333,  2006 U.S.C.C.A.N. 184)**

ing:

**\*46** "S 2283. Transportation of explosive, biological, chemical, or radioactive or
nuclear materials

   "(a) In General.-Whoever knowingly transports aboard any vessel within the
United States and on waters subject to the jurisdiction of the United States or any
vessel outside the United States and on the high seas or having United States na-
tionality an explosive or incendiary device, biological agent, chemical weapon, or
radioactive or nuclear material, knowing that any such item is intended to be used
to commit an offense listed under section 2332b(g)(5)(B), shall be fined under this
title or imprisoned for any term of years or for life, or both.
   "(b) Causing Death.-Any person who causes the death of a person by engaging in
conduct prohibited by subsection (a) may be punished by death.
   "(c) Definitions.-In this section:
   "(1) Biological agent.-The term 'biological agent' means any biological agent,
toxin, or vector (as those terms are defined in section 178).
   "(2) By-product material.-The term 'by-product material' has the meaning given
that term in section 11(e) of the Atomic Energy Act of 1954 (42 U.S.C. 2014(e)).
   "(3) Chemical weapon.-The term 'chemical weapon' has the meaning given that term
in section 229F(1).
   "(4) Explosive or incendiary device.-The term 'explosive or incendiary device'
has the meaning given the term in section 232(5) and includes explosive materials,
as that term is defined in section 841(c) and explosive as defined in section
844(j).
   "(5) Nuclear material.-The term 'nuclear material' has the meaning given that
term in section 831(f)(1).
   "(6) Radioactive material.-The term 'radioactive material' means-
   "(A) source material and special nuclear material, but does not include natural
or depleted uranium;
   "(B) nuclear by-product material;
   "(C) material made radioactive by bombardment in an accelerator; or
   "(D) all refined isotopes of radium.
   "(8) Source material.-The term 'source material' has the meaning given that term
in section 11(z) of the Atomic Energy Act of 1954 (42 U.S.C. 2014(z)).
   "(9) Special nuclear material.-The term 'special nuclear material' has the mean-
ing given that term in section 11(aa) of the Atomic Energy Act of 1954 (42 U.S.C.
2014(aa)).

"S 2284. Transportation of terrorists

   "(a) In General.-Whoever knowingly and intentionally transports any terrorist
aboard any vessel within the United States and on waters subject to the jurisdiction
of the United States or any vessel outside the United States and on the high seas or
having United States nationality, knowing that the transported person is a terror-
ist, shall be fined under this title or imprisoned for any term of years or for
life, or both.
   "(b) Defined Term.-In this section, the term 'terrorist' means any person who

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005, 2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 109-333,  2006 U.S.C.C.A.N. 184)**

intends to commit, or is avoiding apprehension **\*47** after having committed, an offense listed under section 2332b(g)(5)(B).".

   (b) Conforming Amendment.-The table of sections for chapter 111 of title 18, United States Code, as amended by section 305, is further amended by adding at the end the following:
   "2283. Transportation of explosive, chemical, biological, or radioactive or nuclear materials.
   "2284. Transportation of terrorists.".

SEC. 306. DESTRUCTION OF, OR INTERFERENCE WITH, VESSELS OR MARITIME FACILITIES.

   (a) In General.-Title 18, United States Code, is amended by inserting after chapter 111 the following:

      "CHAPTER 111A-DESTRUCTION OF, OR INTERFERENCE WITH, VESSELS OR MARITIME
                                FACILITIES

   "Sec.
   "2290. Jurisdiction and scope.
   "2291. Destruction of vessel or maritime facility.
   "2292. Imparting or conveying false information.

"S 2290. Jurisdiction and scope

   "(a) Jurisdiction.-There is jurisdiction, including extraterritorial jurisdiction, over an offense under this chapter if the prohibited activity takes place-
   "(1) within the United States and within waters subject to the jurisdiction of the United States; or
   "(2) outside United States and-
   "(A) an offender or a victim is a national of the United States (as that term is defined under section 101(a)(22) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(22));
   "(B) the activity involves a vessel in which a national of the United States was on board; or
   "(C) the activity involves a vessel of the United States (as that term is defined under section 2 of the Maritime Drug Law Enforcement Act (46 U.S.C. App. 1903).
   "(b) Scope.-Nothing in this chapter shall apply to otherwise lawful activities carried out by or at the direction of the United States Government.

"S 2291. Destruction of vessel or maritime facility

   "(a) Offense.-Whoever knowingly-
   "(1) sets fire to, damages, destroys, disables, or wrecks any vessel;
   "(2) places or causes to be placed a destructive device, as defined in section 921(a)(4), destructive substance, as defined in section 31(a)(3), or an explosive, as defined in section 844(j) in, upon, or near, or otherwise makes or causes to be made unworkable or unusable or hazardous to work or use, any vessel, or any part or other materials used or intended to be used in connection with the operation of a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

vessel;

    "(3) sets fire to, damages, destroys, or disables or places a destructive device
or substance in, upon, or near, any maritime facility, including any aid to naviga-
tion, lock, canal, or vessel traffic service facility or equipment;

    **\*48** "(4) interferes by force or violence with the operation of any maritime fa-
cility, including any aid to navigation, lock, canal, or vessel traffic service fa-
cility or equipment, if such action is likely to endanger the safety of any vessel
in navigation;

    "(5) sets fire to, damages, destroys, or disables or places a destructive device
or substance in, upon, or near, any appliance, structure, property, machine, or ap-
paratus, or any facility or other material used, or intended to be used, in connec-
tion with the operation, maintenance, loading, unloading, or storage of any vessel
or any passenger or cargo carried or intended to be carried on any vessel;

    "(6) performs an act of violence against or incapacitates any individual on any
vessel, if such act of violence or incapacitation is likely to endanger the safety
of the vessel or those on board;

    "(7) performs an act of violence against a person that causes or is likely to
cause serious bodily injury, as defined in section 1365(h)(3), in, upon, or near,
any appliance, structure, property, machine, or apparatus, or any facility or other
material used, or intended to be used, in connection with the operation, mainten-
ance, loading, unloading, or storage of any vessel or any passenger or cargo carried
or intended to be carried on any vessel;

    "(8) communicates information, knowing the information to be false and under
circumstances in which such information may reasonably be believed, thereby endan-
gering the safety of any vessel in navigation; or

    "(9) attempts or conspires to do anything prohibited under paragraphs (1)
through (8),
    shall be fined under this title or imprisoned not more than 20 years, or both.

    "(b) Limitation.-Subsection (a) shall not apply to any person that is engaging
in otherwise lawful activity, such as normal repair and salvage activities, and the
transportation of hazardous materials regulated and allowed to be transported under
chapter 51 of title 49.

    "(c) Penalty.-Whoever is fined or imprisoned under subsection (a) as a result of
an act involving a vessel that, at the time of the violation, carried high-level ra-
dioactive waste (as that term is defined in section 2(12) of the Nuclear Waste
Policy Act of 1982 (42 U.S.C. 10101(12)) or spent nuclear fuel (as that term is
defined in section 2(23) of the Nuclear Waste Policy Act of 1982 (42 U.S.C.
10101(23)), shall be fined under this title, imprisoned for a term up to life, or
both.

    "(d) Penalty When Death Results.-Whoever is convicted of any crime prohibited by
subsection (a) and intended to cause death by the prohibited conduct, if the conduct
resulted in the death of any person, shall be subject also to the death penalty or
to a term of imprisonment for a period up to life.

    "(e) Threats.-Whoever knowingly and intentionally imparts or conveys any threat
to do an act which would violate this chapter, with an apparent determination and
will to carry the threat into execution, shall be fined under this title or im-
prisoned not more than 5 years, or both, and is liable for all costs incurred as a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 109-333                                    Page 48
H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 109-333, 2006 U.S.C.C.A.N. 184)**

result of such threat.

**\*49** "S 2292. Imparting or conveying false information

     "(a) In General.-Whoever imparts or conveys or causes to be imparted or conveyed
false information, knowing the information to be false, concerning an attempt or al-
leged attempt being made or to be made, to do any act that would be a crime prohib-
ited by this chapter or by chapter 111 of this title, shall be subject to a civil
penalty of not more than $5,000, which shall be recoverable in a civil action
brought in the name of the United States.
     "(b) Malicious Conduct.-Whoever knowingly, intentionally, maliciously, or with
reckless disregard for the safety of human life, imparts or conveys or causes to be
imparted or conveyed false information, knowing the information to be false, con-
cerning an attempt or alleged attempt to do any act which would be a crime prohib-
ited by this chapter or by chapter 111 of this title, shall be fined under this
title or imprisoned not more than 5 years.
     "(c) Jurisdiction.-
     "(1) In general.-Except as provided under paragraph (2), section 2290(a) shall
not apply to any offense under this section.
     "(2) Jurisdiction.-Jurisdiction over an offense under this section shall be de-
termined in accordance with the provisions applicable to the crime prohibited by
this chapter, or by chapter 111 of this title, to which the imparted or conveyed
false information relates, as applicable.

"S 2293. Bar to prosecution

     "(a) In General.-It is a bar to prosecution under this chapter if-
     "(1) the conduct in question occurred within the United States in relation to a
labor dispute, and such conduct is prohibited as a felony under the law of the State
in which it was committed; or
     "(2) such conduct is prohibited as a misdemeanor, and not as a felony, under the
law of the State in which it was committed.
     "(b) Definitions.-In this section:
     "(1) Labor dispute.-The term 'labor dispute' has the same meaning given that
term in section 13(c) of the Act to amend the Judicial Code and to define and limit
the jurisdiction of courts sitting in equity, and for other purposes (29 U.S.C.
113(c), commonly known as the Norris-LaGuardia Act).
     "(2) State.-The term 'State' means a State of the United States, the District of
Columbia, and any commonwealth, territory, or possession of the United States.".
     (b) Conforming Amendment.-The table of chapters at the beginning of  title 18,
United States Code, is amended by inserting after the item for chapter 111 the fol-
lowing:

"111A. Destruction of, or interference with, vessels or maritime
   facilities ...................................................... 2290".

SEC. 307. THEFT OF INTERSTATE OR FOREIGN SHIPMENTS OR VESSELS.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(a) Theft of Interstate or Foreign Shipments.-Section 659 of title 18, United
States Code, is amended-

(1) in the first undesignated paragraph-

(A) by inserting "trailer," after "motortruck,";

**\*50** (B) by inserting "air cargo container," after "aircraft,"; and

(C) by inserting ", or from any intermodal container, trailer, container freight
station, warehouse, or freight consolidation facility," after "air navigation facil-
ity";

(2) in the fifth undesignated paragraph, by striking "in each case" and all that
follows through "or both" the second place it appears and inserting "be fined under
this title or imprisoned not more than 10 years, or both, but if the amount or value
of such money, baggage, goods, or chattels is less than $1,000, shall be fined under
this title or imprisoned for not more than 3 years, or both"; and

(3) by inserting after the first sentence in the eighth undesignated paragraph
the following: "For purposes of this section, goods and chattel shall be construed
to be moving as an interstate or foreign shipment at all points between the point of
origin and the final destination (as evidenced by the waybill or other shipping doc-
ument of the shipment), regardless of any temporary stop while awaiting transship-
ment or otherwise.".

(b) Stolen Vessels.-

(1) In general.-Section 2311 of title 18, United States Code, is amended by
adding at the end the following, as a new undesignated paragraph: "'Vessel' means
any watercraft or other contrivance used or designed for transportation or naviga-
tion on, under, or immediately above, water.".

(2) Transportation and sale of stolen vessels.-

(A) Transportation.-Section 2312 of title 18, United States Code, is amended by
striking "motor vehicle or aircraft" and inserting "motor vehicle, vessel, or air-
craft".

(B) Sale.-Section 2313(a) of title 18, United States Code, is amended by strik-
ing "motor vehicle or aircraft" and inserting "motor vehicle, vessel, or aircraft".

(c) Review of Sentencing Guidelines.-Pursuant to section 994 of title 28, United
States Code, the United States Sentencing Commission shall review the Federal Sen-
tencing Guidelines to determine whether sentencing enhancement is appropriate for
any offense under section 659 or 2311 of title 18, United States Code, as amended by
this title.

(d) Annual Report of Law Enforcement Activities.-The Attorney General shall an-
nually submit to Congress a report, which shall include an evaluation of law en-
forcement activities relating to the investigation and prosecution of offenses under
section 659 of title 18, United States Code, as amended by this title.

(e) Reporting of Cargo Theft.-The Attorney General shall take the steps neces-
sary to ensure that reports of cargo theft collected by Federal, State, and local
officials are reflected as a separate category in the Uniform Crime Reporting Sys-
tem, or any successor system, by no later than December 31, 2006.

SEC. 308. STOWAWAYS ON VESSELS OR AIRCRAFT.

Section 2199 of title 18, United States Code, is amended by striking "Shall be
fined under this title or imprisoned not more than one year, or both." and inserting

H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 109-333, 2006 U.S.C.C.A.N. 184)**

the following:

"(1) shall be fined under this title, imprisoned not more than 5 years, or both;

**\*51** "(2) if the person commits an act proscribed by this section, with the intent to commit serious bodily injury, and serious bodily injury occurs (as defined under section 1365, including any conduct that, if the conduct occurred in the special maritime and territorial jurisdiction of the United States, would violate section 2241 or 2242) to any person other than a participant as a result of a violation of this section, shall be fined under this title or imprisoned not more than 20 years, or both; and

"(3) if an individual commits an act proscribed by this section, with the intent to cause death, and if the death of any person other than a participant occurs as a result of a violation of this section, shall be fined under this title, imprisoned for any number of years or for life, or both.".

SEC. 309. BRIBERY AFFECTING PORT SECURITY.

(a) In General.-Chapter 11 of title 18, United States Code, is amended by adding at the end the following:

"S 226. Bribery affecting port security

"(a) In General.-Whoever knowingly-

"(1) directly or indirectly, corruptly gives, offers, or promises anything of value to any public or private person, with intent to commit international terrorism or domestic terrorism (as those terms are defined under section 2331), to-

"(A) influence any action or any person to commit or aid in committing, or collude in, or allow, any fraud, or make opportunity for the commission of any fraud affecting any secure or restricted area or seaport; or

"(B) induce any official or person to do or omit to do any act in violation of the lawful duty of such official or person that affects any secure or restricted area or seaport; or

"(2) directly or indirectly, corruptly demands, seeks, receives, accepts, or agrees to receive or accept anything of value personally or for any other person or entity in return for-

"(A) being influenced in the performance of any official act affecting any secure or restricted area or seaport; and

"(B) knowing that such influence will be used to commit, or plan to commit, international or domestic terrorism,

shall be fined under this title or imprisoned not more than 15 years, or both.

"(b) Definition.-In this section, the term 'secure or restricted area' means an area of a vessel or facility designated as secure in an approved security plan, as required under section 70103 of title 46, United States Code, and the rules and regulations promulgated under that section.".

(b) Conforming Amendment.-The table of sections for chapter 11 of title 18, United States Code, is amended by adding at the end the following:

"226. Bribery affecting port security.".

**\*52** SEC. 310. PENALTIES FOR SMUGGLING GOODS INTO THE UNITED STATES.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 109-333   Page 63

H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 109-333,  2006 U.S.C.C.A.N. 184)**

    The third undesignated paragraph of section 545 of title 18, United States Code,
is amended by striking "5 years" and inserting "20 years".

SEC. 311. SMUGGLING GOODS FROM THE UNITED STATES.

    (a) In General.-Chapter 27 of title 18, United States Code, is amended by adding
at the end the following:

"S 554. Smuggling goods from the United States

    "(a) In General.-Whoever fraudulently or knowingly exports or sends from the
United States, or attempts to export or send from the United States, any merchand-
ise, article, or object contrary to any law or regulation of the United States, or
receives, conceals, buys, sells, or in any manner facilitates the transportation,
concealment, or sale of such merchandise, article or object, prior to exportation,
knowing the same to be intended for exportation contrary to any law or regulation of
the United States, shall be fined under this title, imprisoned not more than 10
years, or both.
    "(b) Definition.-In this section, the term 'United States' has the meaning given
that term in section 545.".
    (b) Conforming Amendment.-The chapter analysis for chapter 27 of title 18,
United States Code, is amended by adding at the end the following:
  "554. Smuggling goods from the United States.".
    (c) Specified Unlawful Activity.-Section 1956(c)(7)(D) of title 18, United
States Code, is amended by inserting "section 554 (relating to smuggling goods from
the United States)," before "section 641 (relating to public money, property, or re-
cords),".
    (d) Tariff Act of 1990.-Section 596 of the Tariff Act of 1930 (19 U.S.C. 1595a)
is amended by adding at the end the following:
    "(d) Merchandise exported or sent from the United States or attempted to be ex-
ported or sent from the United States contrary to law, or the proceeds or value
thereof, and property used to facilitate the exporting or sending of such merchand-
ise, the attempted exporting or sending of such merchandise, or the receipt, pur-
chase, transportation, concealment, or sale of such merchandise prior to exportation
shall be seized and forfeited to the United States.".
    (e) Removing Goods From Customs Custody.-Section 549 of title 18, United States
Code, is amended in the 5th paragraph by striking "two years" and inserting "10
years".

                    TITLE IV-COMBATING TERRORISM FINANCING

SEC. 401. SHORT TITLE.

    This title may be cited as the "Combating Terrorism Financing Act of 2005".

SEC. 402. INCREASED PENALTIES FOR TERRORISM FINANCING.

    Section 206 of the International Emergency Economic Powers Act (50 U.S.C. 1705)
is amended-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 109-333, 2006 U.S.C.C.A.N. 184)**

(1) in subsection (a), by deleting "$10,000" and inserting "$50,000".

**\*53** (2) in subsection (b), by deleting "ten years" and inserting "twenty years".

SEC. 403. TERRORISM-RELATED SPECIFIED ACTIVITIES FOR MONEY LAUNDERING.

(a) Amendments to RICO.-Section 1961(1) of title 18, United States Code, is amended in subparagraph (B), by inserting "section 1960 (relating to illegal money transmitters)," before "sections 2251".

(b) Amendment to Section 1956(c)(7).-Section 1956(c)(7)(D) of title 18, United States Code, is amended by striking "or any felony violation of the Foreign Corrupt Practices Act" and inserting "any felony violation of the Foreign Corrupt Practices Act".

(c) Conforming Amendments to Sections 1956(e) and 1957(e).-

(1) Section 1956(e) of title 18, United States Code, is amended to read as follows:

"(e) Violations of this section may be investigated by such components of the Department of Justice as the Attorney General may direct, and by such components of the Department of the Treasury as the Secretary of the Treasury may direct, as appropriate, and, with respect to offenses over which the Department of Homeland Security has jurisdiction, by such components of the Department of Homeland Security as the Secretary of Homeland Security may direct, and, with respect to offenses over which the United States Postal Service has jurisdiction, by the Postal Service. Such authority of the Secretary of the Treasury, the Secretary of Homeland Security, and the Postal Service shall be exercised in accordance with an agreement which shall be entered into by the Secretary of the Treasury, the Secretary of Homeland Security, the Postal Service, and the Attorney General. Violations of this section involving offenses described in paragraph (c)(7)(E) may be investigated by such components of the Department of Justice as the Attorney General may direct, and the National Enforcement Investigations Center of the Environmental Protection Agency.".

(2) Section 1957(e) of title 18, United States Code, is amended to read as follows:

"(e) Violations of this section may be investigated by such components of the Department of Justice as the Attorney General may direct, and by such components of the Department of the Treasury as the Secretary of the Treasury may direct, as appropriate, and, with respect to offenses over which the Department of Homeland Security has jurisdiction, by such components of the Department of Homeland Security as the Secretary of Homeland Security may direct, and, with respect to offenses over which the United States Postal Service has jurisdiction, by the Postal Service. Such authority of the Secretary of the Treasury, the Secretary of Homeland Security, and the Postal Service shall be exercised in accordance with an agreement which shall be entered into by the Secretary of the Treasury, the Secretary of Homeland Security, the Postal Service, and the Attorney General.".

SEC. 404. ASSETS OF PERSONS COMMITTING TERRORIST ACTS AGAINST FOREIGN COUNTRIES OR INTERNATIONAL ORGANIZATIONS.

Section 981(a)(1)(G) of title 18, United States Code, is amended-

**\*54** (1) by striking "or" at the end of clause (ii);

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 109-333,  2006 U.S.C.C.A.N. 184)**

(2) by striking the period at the end of clause (iii) and inserting "; or"; and
(3) by inserting the following after clause (iii):
"(iv) of any individual, entity, or organization engaged in planning or perpet-
rating any act of international terrorism (as defined in section 2331) against any
international organization (as defined in section 209 of the State Department Basic
Authorities Act of 1956 (22 U.S.C. 4309(b)) or against any foreign Government. Where
the property sought for forfeiture is located beyond the territorial boundaries of
the United States, an act in furtherance of such planning or perpetration must have
occurred within the jurisdiction of the United States.".

SEC. 405. MONEY LAUNDERING THROUGH HAWALAS.

Section 1956(a)(1) of title 18, United States Code, is amended by adding at the
end the following: "For purposes of this paragraph, a financial transaction shall be
considered to be one involving the proceeds of specified unlawful activity if it is
part of a set of parallel or dependent transactions, any one of which involves the
proceeds of specified unlawful activity, and all of which are part of a single plan
or arrangement.".

SEC. 406. TECHNICAL AND CONFORMING AMENDMENTS RELATING TO THE USA PATRIOT ACT.

(a) Technical Corrections.-
(1) Section 322 of Public Law 107-56 is amended by striking "title 18" and in-
serting "title 28".
(2) Section 1956(b)(3) and (4) of title 18, United States Code, are amended by
striking "described in paragraph (2)" each time it appears; and
(3) Section 981(k) of title 18, United States Code, is amended by striking "for-
eign bank" each time it appears and inserting "foreign financial institution (as
defined in section 984(c)(2)(A) of this title)".
(b) Codification of Section 316 of the USA PATRIOT Act.-
(1) Chapter 46 of title 18, United States Code, is amended-
(A) in the chapter analysis, by inserting at the end the following:
"987. Anti-terrorist forfeiture protection."
; and
(B) by inserting at the end the following:

"S 987. Anti-terrorist forfeiture protection

"(a) Right To Contest.-An owner of property that is confiscated under any provi-
sion of law relating to the confiscation of assets of suspected international ter-
rorists, may contest that confiscation by filing a claim in the manner set forth in
the Federal Rules of Civil Procedure (Supplemental Rules for Certain Admiralty and
Maritime Claims), and asserting as an affirmative defense that-
"(1) the property is not subject to confiscation under such provision of law; or
**\*55** "(2) the innocent owner provisions of section 983(d) of title 18, United
States Code, apply to the case.
"(b) Evidence.-In considering a claim filed under this section, a court may ad-
mit evidence that is otherwise inadmissible under the Federal Rules of Evidence, if
the court determines that the evidence is reliable, and that compliance with the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 109-333, 2006 U.S.C.C.A.N. 184)**


Federal Rules of Evidence may jeopardize the national security interests of the
United States.
    "(c) Clarifications.-
    "(1) Protection of rights.-The exclusion of certain provisions of Federal law
from the definition of the term 'civil forfeiture statute' in section 983(i) of
title 18, United States Code, shall not be construed to deny an owner of property
the right to contest the confiscation of assets of suspected international terror-
ists under-
    "(A) subsection (a) of this section;
    "(B) the Constitution; or
    "(C) subchapter II of chapter 5 of title 5, United States Code (commonly known
as the 'Administrative Procedure Act').
    "(2) Savings clause.-Nothing in this section shall limit or otherwise affect any
other remedies that may be available to an owner of property under section 983 of
title 18, United States Code, or any other provision of law.".
    (2) Subsections (a), (b), and (c) of section 316 of Public Law 107-56 are re-
pealed.
    (c) Conforming Amendments Concerning Conspiracies.-
    (1) Section 33(a) of title 18, United States Code is amended by inserting "or
conspires" before "to do any of the aforesaid acts".
    (2) Section 1366(a) of title 18, United States Code, is amended-
    (A) by striking "attempts" each time it appears and inserting  "attempts or con-
spires"; and
    (B) by inserting ", or if the object of the conspiracy had been achieved," after
"the attempted offense had been completed".

SEC. 407. CROSS REFERENCE CORRECTION.

    Section 5318(n)(4)(A) of title 31, United States Code, is amended by striking
"National Intelligence Reform Act of 2004" and inserting "Intelligence Reform and
Terrorism Prevention Act of 2004".

SEC. 408. AMENDMENT TO AMENDATORY LANGUAGE.

    Section 6604 of the Intelligence Reform and Terrorism Prevention Act of 2004 is
amended (effective on the date of the enactment of that Act)-
    (1) by striking "Section 2339c(c)(2)" and inserting "Section 2339C(c)(2)"; and
    (2) by striking "Section 2339c(e)" and inserting "Section 2339C(e)".

SEC. 409. DESIGNATION OF ADDITIONAL MONEY LAUNDERING PREDICATE.

    Section 1956(c)(7)(D) of title 18, United States Code, is amended-
    **\*56** (1) by inserting ", section 2339C (relating to financing of terrorism), or
section 2339D (relating to receiving military-type training from a foreign terrorist
organization)" after "section 2339A or 2339B (relating to providing material support
to terrorists)"; and
    (2) by striking "or" before "section 2339A or 2339B".

SEC. 410. UNIFORM PROCEDURES FOR CRIMINAL FORFEITURE.


© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 109-333, 2006 U.S.C.C.A.N. 184)**

Section 2461(c) of title 28, United States Code, is amended to read as follows:
"(c) If a person is charged in a criminal case with a violation of an Act of
Congress for which the civil or criminal forfeiture of property is authorized, the
Government may include notice of the forfeiture in the indictment or information
pursuant to the Federal Rules of Criminal Procedure. If the defendant is convicted
of the offense giving rise to the forfeiture, the court shall order the forfeiture
of the property as part of the sentence in the criminal case pursuant to the Federal
Rules of Criminal Procedure and section 3554 of title 18, United States Code. The
procedures in section 413 of the Controlled Substances Act (21 U.S.C. 853) apply to
all stages of a criminal forfeiture proceeding, except that subsection (d) of such
section applies only in cases in which the defendant is convicted of a violation of
such Act.".

### TITLE V-MISCELLANEOUS PROVISIONS

SEC. 501. RESIDENCE OF UNITED STATES ATTORNEYS AND ASSISTANT UNITED STATES ATTOR-
NEYS.

(a) In General.-Subsection (a) of section 545 of title 28, United States Code,
is amended by adding at the end the following new sentence: "Pursuant to an order
from the Attorney General or his designee, a United States attorney or an assistant
United States attorney may be assigned dual or additional responsibilities that ex-
empt such officer from the residency requirement in this subsection for a specific
period as established by the order and subject to renewal.".
(b) Effective Date.-The amendment made by subsection (a) shall take effect as of
February 1, 2005.

SEC. 502. INTERIM APPOINTMENT OF UNITED STATES ATTORNEYS.

Section 546 of title 28, United States Code, is amended by striking subsections
(c) and (d) and inserting the following new subsection:
"(c) A person appointed as United States attorney under this section may serve
until the qualification of a United States Attorney for such district appointed by
the President under section 541 of this title. ".

SEC. 503. SECRETARY OF HOMELAND SECURITY IN PRESIDENTIAL LINE OF SUCCESSION.

Section 19(d)(1) of title 3, United States Code, is amended by inserting ", Sec-
retary of Homeland Security" after "Secretary of Veterans Affairs".

**\*57** SEC. 504. BUREAU OF ALCOHOL, TOBACCO AND FIREARMS TO THE DEPARTMENT OF JUSTICE.

The second sentence of section 1111(a)(2) of the Homeland Security Act of 2002
(6 U.S.C. 531(a)(2)) is amended by striking "Attorney General" the first place it
appears and inserting "President, by and with the advice and consent of the Senate".

SEC. 505. QUALIFICATIONS OF UNITED STATES MARSHALS.

Section 561 of title 28, United States Code, is amended by adding at the end the
following new subsection:

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

"(i) Each marshal appointed under this section should have-

"(1) a minimum of 4 years of command-level law enforcement management duties, including personnel, budget, and accountable property issues, in a police department, sheriff's office or Federal law enforcement agency;

"(2) experience in coordinating with other law enforcement agencies, particularly at the State and local level;

"(3) college-level academic experience; and

"(4) experience in or with county, State, and Federal court systems or experience with protection of court personnel, jurors, and witnesses.".

SECTION 506. DEPARTMENT OF JUSTICE INTELLIGENCE MATTERS.

(a) Assistant Attorney General for National Security.-

(1) In general.-Chapter 31 of title 28, United States Code, is amended by inserting after section 507 the following new section:

"S 507A. Assistant Attorney General for National Security

"(a) Of the Assistant Attorneys General appointed under section 506, one shall serve, upon the designation of the President, as the Assistant Attorney General for National Security.

"(b) The Assistant Attorney General for National Security shall-

"(1) serve as the head of the National Security Division of the Department of Justice under section 509A of this title;

"(2) serve as primary liaison to the Director of National Intelligence for the Department of Justice; and

"(3) perform such other duties as the Attorney General may prescribe.".

(2) Additional assistant attorney general.-Section 506 of title 28, United States Code, is amended by striking "ten" and inserting "11".

(3) Executive schedule matters.-Section 5315 of title 5, United States Code, is amended by striking the matter relating to Assistant Attorneys General and inserting the following:

" Assistant Attorneys General (11).".

(4) Consultation of director of national intelligence in appointment.- Section 106(c)(2) of the National Security Act of 1947 (50 U.S.C. 403- 6(c)(2)) is amended by adding at the end the following new subparagraph:

"(C) The Assistant Attorney General designated as the Assistant Attorney General for National Security under section 507A of title 28, United States Code.".

(5) Authority to act for attorney general under foreign intelligence surveillance act of 1978.-Section 101(g) of the Foreign Intelligence Surveillance Act of 1978 (50 U.S.C. **58** 1801(g)) is amended by striking "or the Deputy Attorney General" and inserting ", the Deputy Attorney General, or, upon the designation of the Attorney General, the Assistant Attorney General designated as the Assistant Attorney General for National Security under section 507A of title 28, United States Code.

(6) Authorization for interception of communications.-Section 2516(1) of title 18, United States Code, is amended by inserting "or National Security Division" after "the Criminal Division".

(7) Authority to act for attorney general in matters involving witness reloca-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 109-333, 2006 U.S.C.C.A.N. 184)**

tion or protection.-Section 3521(d)(3) of title 18, United States Code, is amended
by striking "to the Assistant Attorney General in charge of the Criminal Division of
the Department of Justice" and inserting "to any Assistant Attorney General in
charge of the Criminal Division or National Security Division of the Department of
Justice".

(8) Prosecution of cases involving classified information.-Section 9A(a) of the
Classified Information Procedures Act (18 U.S.C. App.) is amended by inserting "or
the Assistant Attorney General for National Security, as appropriate," after "Assist-
ant Attorney General for the Criminal Division".

(9) Intelligence and national security aspects of espionage prosecution.- Sec-
tion 341(b) of the Intelligence Authorization Act for Fiscal Year 2004 (28 U.S.C.
519 note) is amended by striking "acting through the Office of Intelligence Policy
and Review of the Department of Justice" and inserting "acting through the Assistant
Attorney General for National Security".

(10) Certifications for certain undercover foreign intelligence and counterin-
telligence investigative operations.-Section 102(b)(1) of Public Law 102-395 (28
U.S.C. 533 note) is amended by striking "Counsel for Intelligence Policy" and in-
serting "Assistant Attorney General for National Security".

(11) Inclusion in federal law enforcement community for emergency federal law
enforcements assistance purposes.-Section 609N(2) of the Justice Assistance Act of
1984 (42 U.S.C. 10502(2)) is amended-

(A) by redesignating subparagraphs (L) and (M) as subparagraphs (M) and  (N),
respectively; and

(B) by inserting after subparagraph (K) the following new subparagraph (L):

"(L) the National Security Division of the Department of Justice,".

(b) National Security Division of Department of Justice.-

(1) In general.-Chapter 31 of title 28, United States Code, is further amended
by inserting after section 509 the following new section:

"S 509A. National Security Division

"(a) There is a National Security Division of the Department of Justice.

"(b) The National Security Division shall consist of the elements of the Depart-
ment of Justice (other than the Federal Bureau of Investigation)**59** engaged primar-
ily in support of the intelligence and intelligence-related activities of the United
States Government, including the following:

"(1) The Assistant Attorney General designated as the Assistant Attorney General
for National Security under section 507A of this title.

"(2) The Office of Intelligence Policy and Review (or any successor organiza-
tion).

"(3) The counterterrorism section (or any successor organization).

"(4) The counterespionage section (or any successor organization).

"(5) Any other element, component, or office designated by the Attorney Gener-
al.".

(2) Prohibition on political activity.-Section 7323(b)(3) of title 5, United
States Code, is amended by inserting "or National Security Division" after "Criminal
Division".

(c) Clerical Amendments.-The table of sections at the beginning of  chapter 31

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 109-333,  2006 U.S.C.C.A.N. 184)**

of title 28, United States Code, is amended-

(1) by inserting after the item relating to section 507 the following new item:
"507A. Assistant Attorney General for National Security.";
and

(2) by inserting after the item relating to section 509 the following new item:
"509A. National Security Division.".

(d) Procedures for Confirmation of the Assistant Attorney General for National
Security.-(1) Section 17 of Senate Resolution 400 (94th Congress) is amended-

(A) in subsection (a), by striking "(a) The" and inserting "(a)(1) Except as
otherwise provided in subsection (b), the";

(B) in subsection (b), by striking "(b)" and inserting "(2)"; and

(C) by inserting after subsection (a) the following new subsection:

"(b)(1) With respect to the confirmation of the Assistant Attorney General for
National Security, or any successor position, the nomination of any individual by
the President to serve in such position shall be referred to the Committee on the
Judiciary and, if and when reported, to the select Committee for not to exceed 20
calendar days, except that in cases when the 20-day period expires while the Senate
is in recess, the select Committee shall have 5 additional calendar days after the
Senate reconvenes to report the nomination.

"(2) If, upon the expiration of the period described in paragraph  (1), the se-
lect Committee has not reported the nomination, such nomination shall be automatic-
ally discharged from the select Committee and placed on the Executive Calendar.".

(2) Paragraph (1) is enacted-

(A) as an exercise of the rulemaking power of the Senate; and

(B) with full recognition of the constitutional right of the Senate to change
the rules of the Senate at any time and to the same extent as in the case of any
other rule of the Senate.

**\*60** SEC. 507. REVIEW BY ATTORNEY GENERAL.

(a) Applicability.-Section 2261 of title 28, United States Code, is amended by
striking subsection (b) and inserting the following:

"(b) Counsel.-This chapter is applicable if-

"(1) the Attorney General of the United States certifies that a State has estab-
lished a mechanism for providing counsel in postconviction proceedings as provided
in section 2265; and

"(2) counsel was appointed pursuant to that mechanism, petitioner validly waived
counsel, petitioner retained counsel, or petitioner was found not to be indigent.".

(b) Scope of Prior Representation.-Section 2261(d) of title 28, United States
Code is amended by striking "or on direct appeal".

(c) Certification and Judicial Review.-

(1) In general.-Chapter 154 of title 28, United States Code, is amended by
striking section 2265 and inserting the following:

"S 2265. Certification and judicial review

"(a) Certification.-

"(1) In general.-If requested by an appropriate State official, the Attorney

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:07-cv-02538-VRW    Document 5    Filed 06/23/2007    Page 66 of 303

H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005, 2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 109-333,  2006 U.S.C.C.A.N. 184)**


General of the United States shall determine-

    "(A) whether the State has established a mechanism for the appointment, compensation, and payment of reasonable litigation expenses of competent counsel in State postconviction proceedings brought by indigent prisoners who have been sentenced to death;

    "(B) the date on which the mechanism described in subparagraph (A) was established; and

    "(C) whether the State provides standards of competency for the appointment of counsel in proceedings described in subparagraph (A).

    "(2) Effective date.-The date the mechanism described in paragraph (1)(A) was established shall be the effective date of the certification under this subsection.

    "(3) Only express requirements.-There are no requirements for certification or for application of this chapter other than those expressly stated in this chapter.

    "(b) Regulations.-The Attorney General shall promulgate regulations to implement the certification procedure under subsection (a).

    "(c) Review of Certification.-

    "(1) In general.-The determination by the Attorney General regarding whether to certify a State under this section is subject to review exclusively as provided under chapter 158 of this title.

    "(2) Venue.-The Court of Appeals for the District of Columbia Circuit shall have exclusive jurisdiction over matters under paragraph (1), subject to review by the Supreme Court under section 2350 of this title.

    "(3) Standard of review.-The determination by the Attorney General regarding whether to certify a State under this section shall be subject to de novo review.".

    **\*61** (2) Clerical amendment.-The table of sections for chapter 154 of title 28, United States Code, is amended by striking the item related to section 2265 and inserting the following:

  "2265. Certification and judicial review.".

    (d) Application to Pending Cases.-

    (1) In general.-This section and the amendments made by this section shall apply to cases pending on or after the date of enactment of this Act.

    (2) Time limits.-In a case pending on the date of enactment of this Act, if the amendments made by this section establish a time limit for taking certain action, the period of which began on the date of an event that occurred prior to the date of enactment of this Act, the period of such time limit shall instead begin on the date of enactment of this Act.

    (e) Time Limits.-Section 2266(b)(1)(A) of title 28, United States Code, is amended by striking "180 days after the date on which the application is filed" and inserting "450 days after the date on which the application is filed, or 60 days after the date on which the case is submitted for decision, whichever is earlier".

    (f) Stay of State Court Proceedings.-Section 2251 of title 28, United States Code, is amended-

    (1) in the first undesignated paragraph, by striking "A justice" and inserting the following:

    "(a) In General.-

    "(1) Pending matters.-A justice";

    (2) in the second undesignated paragraph, by striking "After the" and inserting

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 109-333    Page 60
H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
(Cite as: H.R. CONF. REP. 109-333, 2006 U.S.C.C.A.N. 184)

the following:
    "(b) No Further Proceedings.-After the"; and
    (3) in subsection (a), as so designated by paragraph (1), by adding at the end
the following:
    "(2) Matter not pending.-For purposes of this section, a habeas corpus proceed-
ing is not pending until the application is filed.
    "(3) Application for appointment of counsel.-If a State prisoner sentenced to
death applies for appointment of counsel pursuant to section 3599(a)(2) of title 18
in a court that would have jurisdiction to entertain a habeas corpus application re-
garding that sentence, that court may stay execution of the sentence of death, but
such stay shall terminate not later than 90 days after counsel is appointed or the
application for appointment of counsel is withdrawn or denied.".

                        TITLE VI-SECRET SERVICE

SEC. 601. SHORT TITLE.

    This title may be cited as the "Secret Service Authorization and Technical Modi-
fication Act of 2005".

SEC. 602. INTERFERENCE WITH NATIONAL SPECIAL SECURITY EVENTS.

    (a) In General.-Section 1752 of title 18, United States Code, is amended-
    (1) in subsection (a)-
    (A) by amending paragraph (1) to read as follows:
    *62 "(1) willfully and knowingly to enter or remain in any posted, cordoned off,
or otherwise restricted area of a building or grounds where the President or other
person protected by the Secret Service is or will be temporarily visiting;";
    (B) by redesignating paragraphs (2), (3), and (4) as paragraphs (3), (4), and
(5), respectively;
    (C) by inserting after paragraph (1) the following new paragraph:
    "(2) willfully and knowingly to enter or remain in any posted, cordoned off, or
otherwise restricted area of a building or grounds so restricted in conjunction with
an event designated as a special event of national significance;";
    (D) in paragraph (3), as redesignated by subparagraph (B)-
    (i) by inserting "willfully, knowingly, and" before "with intent to impede or
disrupt";
    (ii) by striking "designated" and inserting "described"; and
    (iii) by inserting "or (2)" after "paragraph (1)";
    (E) in paragraph (4), as redesignated by subparagraph (B)-
    (i) by striking "designated or enumerated" and inserting "described"; and
    (ii) by inserting "or (2)" after "paragraph (1)"; and
    (F) in paragraph (5), as redesignated by subparagraph (B)-
    (i) by striking "designated or enumerated" and inserting "described"; and
    (ii) by inserting "or (2)" after "paragraph (1)";
    (2) by amending subsection (b) to read as follows:
    "(b) Violation of this section, and attempts or conspiracies to commit such vi-
olations, shall be punishable by-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 109-333, 2006 U.S.C.C.A.N. 184)**

"(1) a fine under this title or imprisonment for not more than 10 years, or
both, if-
"(A) the person, during and in relation to the offense, uses or carries a deadly
or dangerous weapon or firearm; or
"(B) the offense results in significant bodily injury as defined by section
2118(e)(3); and
"(2) a fine under this title or imprisonment for not more than one year, or
both, in any other case."; and
(3) by striking subsection (d) and redesignating subsections (e) and (f) as sub-
sections (d) and (e), respectively.
(b) Clerical Amendment.-(1) The heading of such section is amended to read as
follows:

"S 1752. Restricted building or grounds".

(2) The item relating to such section in the table of sections at the beginning
of chapter 84 of such title is amended to read as follows:
"1752. Restricted building or grounds.".

SEC. 603. FALSE CREDENTIALS TO NATIONAL SPECIAL SECURITY EVENTS.

Section 1028 of title 18, United States Code, is amended-
**\*63** (1) in subsection (a)(6), by inserting "or a sponsoring entity of an event
designated as a special event of national significance" after "States";
(2) in subsection (c)(1), by inserting "or a sponsoring entity of an event des-
ignated as a special event of national significance" after "States";
(3) in subsection (d)(3), by inserting "a sponsoring entity of an event desig-
nated as a special event of national significance," after "political subdivision of
a State,"; and
(4) in each of subsections (d)(4)(B) and (d)(6)(B), by inserting "a sponsoring
entity of an event designated by the President as a special event of national signi-
ficance," after "political subdivision of a State,".

SEC. 604. FORENSIC AND INVESTIGATIVE SUPPORT OF MISSING AND EXPLOITED CHILDREN
CASES.

Section 3056(f) of title 18, United States Code, is amended by strik-
ing "officers and agents of the Secret Service are" and inserting "the Secret Ser-
vice is".

SEC. 605. THE UNIFORMED DIVISION, UNITED STATES SECRET SERVICE.

(a) In General.-Chapter 203 of title 18, United States Code, is amended by in-
serting after section 3056 the following:

"S 3056A. Powers, authorities, and duties of United States Secret Service Uniformed
Division

"(a) There is hereby created and established a permanent police force, to be
known as the 'United States Secret Service Uniformed Division'. Subject to the su-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 109-333
H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
(Cite as: H.R. CONF. REP. 109-333, 2006 U.S.C.C.A.N. 184)

pervision of the Secretary of Homeland Security, the United States Secret Service Uniformed Division shall perform such duties as the Director, United States Secret Service, may prescribe in connection with the protection of the following:

"(1) The White House in the District of Columbia.

"(2) Any building in which Presidential offices are located.

"(3) The Treasury Building and grounds.

"(4) The President, the Vice President (or other officer next in the order of succession to the Office of President), the President-elect, the Vice President-elect, and their immediate families.

"(5) Foreign diplomatic missions located in the metropolitan area of the District of Columbia.

"(6) The temporary official residence of the Vice President and grounds in the District of Columbia.

"(7) Foreign diplomatic missions located in metropolitan areas (other than the District of Columbia) in the United States where there are located twenty or more such missions headed by full-time officers, except that such protection shall be provided only-

"(A) on the basis of extraordinary protective need;

"(B) upon request of an affected metropolitan area; and

"(C) when the extraordinary protective need arises at or in association with a visit to-

"(i) a permanent mission to, or an observer mission invited to participate in the work of, an international organization of which the United States is a member; or

**64** "(ii) an international organization of which the United States is a member; except that such protection may also be provided for motorcades and at other places associated with any such visit and may be extended at places of temporary domicile in connection with any such visit.

"(8) Foreign consular and diplomatic missions located in such areas in the United States, its territories and possessions, as the President, on a case-by-case basis, may direct.

"(9) Visits of foreign government officials to metropolitan areas (other than the District of Columbia) where there are located twenty or more consular or diplomatic missions staffed by accredited personnel, including protection for motorcades and at other places associated with such visits when such officials are in the United States to conduct official business with the United States Government.

"(10) Former Presidents and their spouses, as provided in section 3056(a)(3) of title 18.

"(11) An event designated under section 3056(e) of title 18 as a special event of national significance.

"(12) Major Presidential and Vice Presidential candidates and, within 120 days of the general Presidential election, the spouses of such candidates, as provided in section 3056(a)(7) of title 18.

"(13) Visiting heads of foreign states or foreign governments.

"(b)(1) Under the direction of the Director of the Secret Service, members of the United States Secret Service Uniformed Division are authorized to-

"(A) carry firearms;

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:07-cv-02538-VRW    Document 5    Filed 06/23/2007    Page 70 of 303

H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 109-333,  2006 U.S.C.C.A.N. 184)**

     "(B) make arrests without warrant for any offense against the United States com-
mitted in their presence, or for any felony cognizable under the laws of the United
States if they have reasonable grounds to believe that the person to be arrested has
committed or is committing such felony; and
     "(C) perform such other functions and duties as are authorized by law.
     "(2) Members of the United States Secret Service Uniformed Division shall pos-
sess privileges and powers similar to those of the members of the Metropolitan Po-
lice of the District of Columbia.
     "(c) Members of the United States Secret Service Uniformed Division shall be
furnished with uniforms and other necessary equipment.
     "(d) In carrying out the functions pursuant to paragraphs (7) and (9) of subsec-
tion (a), the Secretary of Homeland Security may utilize, with their consent, on a
reimbursable basis, the services, personnel, equipment, and facilities of State and
local governments, and is authorized to reimburse such State and local governments
for the utilization of such services, personnel, equipment, and facilities. The Sec-
retary of Homeland Security may carry out the functions pursuant to paragraphs (7)
and (9) of subsection (a) by contract. The authority of this subsection may be
transferred by the President to the Secretary of State. In carrying out any duty un-
der paragraphs (7) and (9) of subsection (a), the Secretary of State is **\*65** author-
ized to utilize any authority available to the Secretary under title II of the State
Department Basic Authorities Act of 1956.".
     (b) Amendment to Table of Sections.-The table of sections at the beginning of
chapter 203 of title 18, United States Code, is amended by inserting after the item
relating to section 3056 the following new item:
  3056A. Powers, authorities, and duties of United States Secret Service Uniformed
Division.
     (c) Conforming Repeal to Effectuate Transfer.-Chapter 3 of title 3, United
States Code, is repealed.
     (d) Conforming Amendments to Laws Affecting District of Columbia.-(1)  Section
1537(d) of title 31, United States Code, is amended-
     (A) by striking "and the Executive Protective Service" and inserting "and the
Secret Service Uniformed Division"; and
     (B) by striking "their protective duties" and all that follows and inserting
"their protective duties under sections 3056 and 3056A of title 18."
     (2) Section 204(e) of the State Department Basic Authorities Act (sec.
6-1304(e), D.C. Official Code) is amended by striking "section 202 of title 3,
United States Code, or section 3056" and inserting "sections 3056 or 3056A".
     (3) Section 214(a) of the State Department Basic Authorities Act (sec.
6-1313(a), D.C. Official Code) is amended by striking "sections 202(8) and 208 of
title 3" and inserting "section 3056A(a)(7) and (d) of title 18".
     (e) Additional Conforming Amendments.-
     (1) Title 12, United States Code, section 3414, "Special procedures", is amended
by striking "3 U.S.C. 202" in subsection (a)(1)(B) and inserting "18 U.S.C. 3056A".
     (2) The State Department Basic Authorities Act of 1956 is amended-
     (A) in the first sentence of section 37(c) (22 U.S.C. 2709(c)), by striking "sec-
tion 202 of title 3, United States Code, or section 3056 of title 18, United States
Code" and inserting "section 3056 or 3056A of title 18, United States Code";

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)

**(Cite as: H.R. CONF. REP. 109-333, 2006 U.S.C.C.A.N. 184)**

(B) in section 204(e) (22 U.S.C. 4304(e)), by striking "section 202 of title 3,
United States Code, or section 3056 of title 18, United States Code" and inserting
"section 3056 or 3056A of title 18, United States Code"; and

(C) in section 214(a) (22 U.S.C. 4314(a)), by striking "sections 202(7) and 208
of title 3, United States Code" and inserting "subsections (a)(7) and (d) of section
3056A of title 18, United States Code".

(3) Section 8D(a)(1)(F) of the Inspector General Act of 1978 (5 U.S.C. App.) is
amended by striking "section 202 of title 3" and inserting "section 3056A of title
18".

(4) Section 8I(a)(1)(E) of the Inspector General Act of 1978 (5 U.S.C. App.) is
amended by striking "section 202 of title 3" and inserting "section 3056A of title
18".

**\*66 SEC. 606. SAVINGS PROVISIONS.**

(a) This title does not affect the retirement benefits of current employees or
annuitants that existed on the day before the effective date of this Act.

(b) This title does not affect any Executive Order transferring to the Secretary
of State the authority of section 208 of title 3 (now section 3056A(d) of title 18)
in effect on the day before the effective date of this Act.

SEC. 607. MAINTENANCE AS DISTINCT ENTITY.

Section 3056 of title 18 is amended by adding the following at the end of the
section:

"(g) The United States Secret Service shall be maintained as a distinct entity
within the Department of Homeland Security and shall not be merged with any other
Department function. No personnel and operational elements of the United States
Secret Service shall report to an individual other than the Director of the United
States Secret Service, who shall report directly to the Secretary of Homeland Secur-
ity without being required to report through any other official of the Department.".

SEC. 608. EXEMPTIONS FROM THE FEDERAL ADVISORY COMMITTEE ACT.

(a) Advisory Committee Regarding Protection of Major Presidential and Vice Pres-
idential Candidates.-Section 3056(a)(7) of title 18, United States Code, is amended
by inserting "The Committee shall not be subject to the Federal Advisory Committee
Act (5 U.S.C. App. 2)." after "other members of the Committee.".

(b) Electronic Crimes Task Forces.-Section 105 of Public Law 107-56 (18 U.S.C.
3056 note) is amended by inserting "The electronic crimes task forces shall not be
subject to the Federal Advisory Committee Act (5 U.S.C. App. 2)." after "financial
payment systems.".

TITLE VII-COMBAT METHAMPHETAMINE EPIDEMIC ACT OF 2005

SEC. 701. SHORT TITLE.

This title may be cited as the "Combat Methamphetamine Epidemic Act of 2005".

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H. R. CONF. REP. 109-333                                                    Page 68
H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 109-333, 2006 U.S.C.C.A.N. 184)**

Subtitle A-Domestic Regulation of Precursor Chemicals

SEC. 711. SCHEDULED LISTED CHEMICAL PRODUCTS; RESTRICTIONS ON SALES QUANTITY, BE-
HIND-THE-COUNTER ACCESS, AND OTHER SAFEGUARDS.

(a) Scheduled Listed Chemical Products.-

(1) In general.-Section 102 of the Controlled Substances Act (21 U.S.C. 802) is
amended-

(A) by redesignating paragraph (46) as paragraph (49); and

(B) by inserting after paragraph (44) the following paragraphs:

**\*67** "(45)(A) The term 'scheduled listed chemical product' means, subject to sub-
paragraph (B), a product that-

"(i) contains ephedrine, pseudoephedrine, or phenylpropanolamine; and

"(ii) may be marketed or distributed lawfully in the United States under the
Federal, Food, Drug, and Cosmetic Act as a nonprescription drug.

Each reference in clause (i) to ephedrine, pseudoephedrine, or phenylpropanolam-
ine includes each of the salts, optical isomers, and salts of optical isomers of
such chemical.

"(B) Such term does not include a product described in subparagraph (A) if the
product contains a chemical specified in such subparagraph that the Attorney General
has under section 201(a) added to any of the schedules under section 202(c). In the
absence of such scheduling by the Attorney General, a chemical specified in such
subparagraph may not be considered to be a controlled substance.

"(46) The term 'regulated seller' means a retail distributor (including a phar-
macy or a mobile retail vendor), except that such term does not include an employee
or agent of such distributor.

"(47) The term 'mobile retail vendor' means a person or entity that makes sales
at retail from a stand that is intended to be temporary, or is capable of being
moved from one location to another, whether the stand is located within or on the
premises of a fixed facility (such as a kiosk at a shopping center or an airport) or
whether the stand is located on unimproved real estate (such as a lot or field
leased for retail purposes).

"(48) The term 'at retail', with respect to the sale or purchase of a scheduled
listed chemical product, means a sale or purchase for personal use, respectively.".

(2) Conforming amendments.-The Controlled Substances Act (21 U.S.C. 801 et seq.)
is amended-

(A) in section 102, in paragraph (49) (as redesignated by paragraph (1)(A) of
this subsection)-

(i) in subparagraph (A), by striking "pseudoephedrine or" and inserting
"ephedrine, pseudoephedrine, or"; and

(ii) by striking subparagraph (B) and redesignating subparagraph (C) as sub-
paragraph (B); and

(B) in section 310(b)(3)(D)(ii), by striking "102(46)" and inserting "102(49)".

(b) Restrictions on Sales Quantity; Behind-the-Counter Access; Logbook Require-
ment; Training of Sales Personnel; Privacy Protections.-

(1) In general.-Section 310 of the Controlled Substances Act (21 U.S.C. 830) is
amended by adding at the end the following subsections:

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 109-333, 2006 U.S.C.C.A.N. 184)**

"(d) Scheduled Listed Chemicals; Restrictions on Sales Quantity; Requirements
Regarding Nonliquid Forms.-With respect to ephedrine base, pseudoephedrine base, or
phenylpropanolamine base in a scheduled listed chemical product-

"(1) the quantity of such base sold at retail in such a product by a regulated
seller, or a distributor required to submit reports by subsection (b)(3) may not,
for any purchaser, exceed a **\*68** daily amount of 3.6 grams, without regard to the
number of transactions; and

"(2) such a seller or distributor may not sell such a product in nonliquid form
(including gel caps) at retail unless the product is packaged in blister packs, each
blister containing not more than 2 dosage units, or where the use of blister packs
is technically infeasible, the product is packaged in unit dose packets or pouches.

"(e) Scheduled Listed Chemicals; Behind-the-Counter Access; Logbook Requirement;
Training of Sales Personnel; Privacy Protections.-

"(1) Requirements regarding retail transactions.-

"(A) In general.-Each regulated seller shall ensure that, subject to subpara-
graph (F), sales by such seller of a scheduled listed chemical product at retail are
made in accordance with the following:

"(i) In offering the product for sale, the seller places the product such that
customers do not have direct access to the product before the sale is made (in this
paragraph referred to as 'behind-the-counter' placement). For purposes of this para-
graph, a behind-the-counter placement of a product includes circumstances in which
the product is stored in a locked cabinet that is located in an area of the facility
involved to which customers do have direct access.

"(ii) The seller delivers the product directly into the custody of the pur-
chaser.

"(iii) The seller maintains, in accordance with criteria issued by the Attorney
General, a written or electronic list of such sales that identifies the products by
name, the quantity sold, the names and addresses of purchasers, and the dates and
times of the sales (which list is referred to in this subsection as the 'logbook'),
except that such requirement does not apply to any purchase by an individual of a
single sales package if that package contains not more than 60 milligrams of
pseudoephedrine.

"(iv) In the case of a sale to which the requirement of clause (iii) applies,
the seller does not sell such a product unless-

"(I) the prospective purchaser-

"(aa) presents an identification card that provides a photograph and is issued
by a State or the Federal Government, or a document that, with respect to identific-
ation, is considered acceptable for purposes of sections 274a.2(b)(1)(v)(A) and
274a.2(b)(1)(v)(B) of title 8, Code of Federal Regulations (as in effect on or after
the date of the enactment of the Combat Methamphetamine Epidemic Act of 2005); and

"(bb) signs the logbook and enters in the logbook his or her name, address, and
the date and time of the sale; and

"(II) the seller-

**\*69** "(aa) determines that the name entered in the logbook corresponds to the
name provided on such identification and that the date and time entered are correct;
and

"(bb) enters in the logbook the name of the product and the quantity sold.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 109-333    Page 69
H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
(Cite as: H.R. CONF. REP. 109-333, 2006 U.S.C.C.A.N. 184)

"(v) The logbook includes, in accordance with criteria of the Attorney General,
a notice to purchasers that entering false statements or misrepresentations in the
logbook may subject the purchasers to criminal penalties under section 1001 of title
18, United States Code, which notice specifies the maximum fine and term of impris-
onment under such section.

"(vi) The seller maintains each entry in the logbook for not fewer than two
years after the date on which the entry is made.

"(vii) In the case of individuals who are responsible for delivering such
products into the custody of purchasers or who deal directly with purchasers by ob-
taining payments for the products, the seller has submitted to the Attorney General
a self-certification that all such individuals have, in accordance with criteria un-
der subparagraph (B)(ii), undergone training provided by the seller to ensure that
the individuals understand the requirements that apply under this subsection and
subsection (d).

"(viii) The seller maintains a copy of such certification and records demon-
strating that individuals referred to in clause (vii) have undergone the training.

"(ix) If the seller is a mobile retail vendor:

"(I) The seller complies with clause (i) by placing the product in a locked
cabinet.

"(II) The seller does not sell more than 7.5 grams of ephedrine base, pseudoep-
hedrine base, or phenylpropanolamine base in such products per customer during a
30-day period.

"(B) Additional provisions regarding certifications and training.-

"(i) In general.-A regulated seller may not sell any scheduled listed chemical
product at retail unless the seller has submitted to the Attorney General the self-
certification referred to in subparagraph (A)(vii). The certification is not effect-
ive for purposes of the preceding sentence unless, in addition to provisions regard-
ing the training of individuals referred to in such subparagraph, the certification
includes a statement that the seller understands each of the requirements that apply
under this paragraph and under subsection (d) and agrees to comply with the require-
ments.

"(ii) Issuance of criteria; self-certification.-The Attorney General shall by
regulation establish criteria for certifications under this paragraph. The criteria
shall-

*70 "(I) provide that the certifications are self-certifications provided
through the program under clause (iii);

"(II) provide that a separate certification is required for each place of busi-
ness at which a regulated seller sells scheduled listed chemical products at retail;
and

"(III) include criteria for training under subparagraph (A)(vii).

"(iii) Program for regulated sellers.-The Attorney General shall establish a
program regarding such certifications and training in accordance with the following:

"(I) The program shall be carried out through an Internet site of the Depart-
ment of Justice and such other means as the Attorney General determines to be appro-
priate.

"(II) The program shall inform regulated sellers that section 1001 of title 18,
United States Code, applies to such certifications.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

"(III) The program shall make available to such sellers an explanation of the criteria under clause (ii).

"(IV) The program shall be designed to permit the submission of the certifications through such Internet site.

"(V) The program shall be designed to automatically provide the explanation referred to in subclause (III), and an acknowledgement that the Department has received a certification, without requiring direct interactions of regulated sellers with staff of the Department (other than the provision of technical assistance, as appropriate).

"(iv) Availability of certification to state and local officials.- Promptly after receiving a certification under subparagraph (A)(vii), the Attorney General shall make available a copy of the certification to the appropriate State and local officials.

"(C) Privacy protections.-In order to protect the privacy of individuals who purchase scheduled listed chemical products, the Attorney General shall by regulation establish restrictions on disclosure of information in logbooks under subparagraph (A)(iii). Such regulations shall-

"(i) provide for the disclosure of the information as appropriate to the Attorney General and to State and local law enforcement agencies; and

"(ii) prohibit accessing, using, or sharing information in the logbooks for any purpose other than to ensure compliance with this title or to facilitate a product recall to protect public health and safety.

"(D) False statements or misrepresentations by purchasers.-For purposes of section 1001 of title 18, United States Code, entering information in the logbook under subparagraph (A)(iii) shall be considered a matter **71 within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States.

"(E) Good faith protection.-A regulated seller who in good faith releases information in a logbook under subparagraph (A)(iii) to Federal, State, or local law enforcement authorities is immune from civil liability for such release unless the release constitutes gross negligence or intentional, wanton, or willful misconduct.

"(F) Inapplicability of requirements to certain sales.-Subparagraph (A) does not apply to the sale at retail of a scheduled listed chemical product if a report on the sales transaction is required to be submitted to the Attorney General under subsection (b)(3).

"(G) Certain measures regarding theft and diversion.-A regulated seller may take reasonable measures to guard against employing individuals who may present a risk with respect to the theft and diversion of scheduled listed chemical products, which may include, notwithstanding State law, asking applicants for employment whether they have been convicted of any crime involving or related to such products or controlled substances.".

(2) Effective dates.-With respect to subsections (d) and (e)(1) of section 310 of the Controlled Substances Act, as added by paragraph (1) of this subsection:

(A) Such subsection (d) applies on and after the expiration of the 30-day period beginning on the date of the enactment of this Act.

(B) Such subsection (e)(1) applies on and after September 30, 2006.

(c) Mail-Order Reporting.-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 109-333, 2006 U.S.C.C.A.N. 184)**

(1) In general.-Section 310(e) of the Controlled Substances Act, as added by
subsection (b)(1) of this section, is amended by adding at the end the following:
"(2) Mail-order reporting; verification of identity of purchaser; 30-day re-
striction on quantities for individual purchasers.-Each regulated person who makes a
sale at retail of a scheduled listed chemical product and is required under subsec-
tion (b)(3) to submit a report of the sales transaction to the Attorney General is
subject to the following:
"(A) The person shall, prior to shipping the product, confirm the identity of
the purchaser in accordance with procedures established by the Attorney General. The
Attorney General shall by regulation establish such procedures.
"(B) The person may not sell more than 7.5 grams of ephedrine base, pseudoep-
hedrine base, or phenylpropanolamine base in such products per customer during a
30-day period.".
(2) Inapplicability of reporting exemption for retail distributors.-Section
310(b)(3)(D)(ii) of the Controlled Substances Act (21 U.S.C. 830(b)(3)(D)(ii)) is
amended by inserting before the period the following: ", except that this clause
does not apply to sales of scheduled listed chemical products at retail".
**\*72** (3) Effective date.-The amendments made by paragraphs (1) and (2) apply on
and after the expiration of the 30-day period beginning on the date of the enactment
of this Act.
(d) Exemptions for Certain Products.-Section 310(e) of the Controlled Substances
Act, as added and amended by subsections (b) and (c) of this section, respectively,
is amended by adding at the end the following paragraph:
"(3) Exemptions for certain products.-Upon the application of a manufacturer of
a scheduled listed chemical product, the Attorney General may by regulation provide
that the product is exempt from the provisions of subsection (d) and paragraphs (1)
and (2) of this subsection if the Attorney General determines that the product can-
not be used in the illicit manufacture of methamphetamine.".
(e) Restrictions on Quantity Purchased During 30-Day Period.-
(1) In general.-Section 404(a) of the Controlled Substances Act (21 U.S.C.
844(a)) is amended by inserting after the second sentence the following: "It shall
be unlawful for any person to knowingly or intentionally purchase at retail during a
30 day period more than 9 grams of ephedrine base, pseudoephedrine base, or phenyl-
propanolamine base in a scheduled listed chemical product, except that, of such 9
grams, not more than 7.5 grams may be imported by means of shipping through any
private or commercial carrier or the Postal Service.".
(2) Effective date.-The amendment made by paragraph (1) applies on and after the
expiration of the 30-day period beginning on the date of the enactment of this Act.
(f) Enforcement of Requirements for Retail Sales.-
(1) Civil and criminal penalties.-
(A) In general.-Section 402(a) of the Controlled Substances Act (21 U.S.C.
842(a)) is amended-
(i) in paragraph (10), by striking "or" after the semicolon;
(ii) in paragraph (11), by striking the period at the end and inserting a semi-
colon; and
(iii) by inserting after paragraph (11) the following paragraphs:
"(12) who is a regulated seller, or a distributor required to submit reports un-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 109-333, 2006 U.S.C.C.A.N. 184)**

der subsection (b)(3) of section 310-

"(A) to sell at retail a scheduled listed chemical product in violation of para-
graph (1) of subsection (d) of such section, knowing at the time of the transaction
involved (independent of consulting the logbook under subsection (e)(1)(A)(iii) of
such section) that the transaction is a violation; or

"(B) to knowingly or recklessly sell at retail such a product in violation of
paragraph (2) of such subsection (d);

"(13) who is a regulated seller to knowingly or recklessly sell at retail a
scheduled listed chemical product in violation of subsection (e) of such section; or

"(14) who is a regulated seller or an employee or agent of such seller to dis-
close, in violation of regulations under subparagraph (C) of section 310(e)(1), in-
formation in logbooks **73** under subparagraph (A)(iii) of such section, or to refuse
to provide such a logbook to Federal, State, or local law enforcement authorities.".

(B) Conforming amendment.-Section 401(f)(1) of the Controlled Substances Act (21
U.S.C. 841(f)(1)) is amended by inserting after "shall" the following: ", except to
the extent that paragraph (12), (13), or (14) of section 402(a) applies,".

(2) Authority to prohibit sales by violators.-Section 402(c) of the Controlled
Substances Act (21 U.S.C. 842(c)) is amended by adding at the end the following
paragraph:

"(4)(A) If a regulated seller, or a distributor required to submit reports under
section 310(b)(3), violates paragraph (12) of subsection (a) of this section, or if
a regulated seller violates paragraph (13) of such subsection, the Attorney General
may by order prohibit such seller or distributor (as the case may be) from selling
any scheduled listed chemical product. Any sale of such a product in violation of
such an order is subject to the same penalties as apply under paragraph (2).

"(B) An order under subparagraph (A) may be imposed only through the same pro-
cedures as apply under section 304(c) for an order to show cause.".

(g) Preservation of State Authority to Regulate Scheduled Listed Chemicals.-This
section and the amendments made by this section may not be construed as having any
legal effect on section 708 of the Controlled Substances Act as applied to the regu-
lation of scheduled listed chemicals (as defined in section 102(45) of such Act).

SEC. 712. REGULATED TRANSACTIONS.

(a) Conforming Amendments Regarding Scheduled Listed Chemicals.-The Controlled
Substances Act (21 U.S.C. 801 et seq.) is amended-

(1) in section 102-

(A) in paragraph (39)(A)-

(i) by amending clause (iv) to read as follows:

"(iv) any transaction in a listed chemical that is contained in a drug that may
be marketed or distributed lawfully in the United States under the Federal Food,
Drug, and Cosmetic Act, subject to clause (v), unless-

"(I) the Attorney General has determined under section 204 that the drug or
group of drugs is being diverted to obtain the listed chemical for use in the illi-
cit production of a controlled substance; and

"(II) the quantity of the listed chemical contained in the drug included in the
transaction or multiple transactions equals or exceeds the threshold established for
that chemical by the Attorney General;";

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(ii) by redesignating clause (v) as clause (vi); and

(iii) by inserting after clause (iv) the following clause:

"(v) any transaction in a scheduled listed chemical product that is a sale at retail by a regulated seller or a distributor required to submit reports under section 310(b)(3); or"; and

**\*74** (B) by striking the paragraph (45) that relates to the term  " ordinary over-the-counter pseudoephedrine or phenylpropanolamine product";

(2) in section 204, by striking subsection (e); and

(3) in section 303(h), in the second sentence, by striking "section 102(39)(A)(iv)" and inserting "clause (iv) or (v) of section 102(39)(A)".

(b) Public Law 104-237.–Section 401 of the Comprehensive Methamphetamine Control Act of 1996 (21 U.S.C. 802 note) (Public Law 104-237) is amended by striking subsections (d), (e), and (f).

SEC. 713. AUTHORITY TO ESTABLISH PRODUCTION QUOTAS.

Section 306 of the Controlled Substances Act (21 U.S.C. 826) is amended-

(1) in subsection (a), by inserting "and for ephedrine, pseudoephedrine, and phenylpropanolamine" after "for each basic class of controlled substance in schedules I and II";

(2) in subsection (b), by inserting "or for ephedrine, pseudoephedrine, or phenylpropanolamine" after "for each basic class of controlled substance in schedule I or II";

(3) in subsection (c), in the first sentence, by inserting "and for ephedrine, pseudoephedrine, and phenylpropanolamine" after "for the basic classes of controlled substances in schedules I and II";

(4) in subsection (d), by inserting "or ephedrine, pseudoephedrine, or phenylpropanolamine" after "that basic class of controlled substance";

(5) in subsection (e), by inserting "or for ephedrine, pseudoephedrine, or phenylpropanolamine" after "for a basic class of controlled substance in schedule I or II";

(6) in subsection (f)-

(A) by inserting "or ephedrine, pseudoephedrine, or phenylpropanolamine" after "controlled substances in schedules I and II";

(B) by inserting "or of ephedrine, pseudoephedrine, or phenylpropanolamine" after "the manufacture of a controlled substance"; and

(C) by inserting "or chemicals" after "such incidentally produced substances"; and

(7) by adding at the end the following subsection:

"(g) Each reference in this section to ephedrine, pseudoephedrine, or phenylpropanolamine includes each of the salts, optical isomers, and salts of optical isomers of such chemical.".

SEC. 714. PENALTIES; AUTHORITY FOR MANUFACTURING; QUOTA.

Section 402(b) of the Controlled Substances Act (21 U.S.C. 842(b)) is amended by inserting after "manufacture a controlled substance in schedule I or II" the following: ", or ephedrine, pseudoephedrine, or phenylpropanolamine or any of the salts,

H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 109-333, 2006 U.S.C.C.A.N. 184)**


optical isomers, or salts of optical isomers of such chemical,"

SEC. 715. RESTRICTIONS ON IMPORTATION; AUTHORITY TO PERMIT IMPORTS FOR MEDICAL, SCI-
ENTIFIC, OR OTHER LEGITIMATE PURPOSES.

    Section 1002 of the Controlled Substances Import and Export Act (21 U.S.C. 952)
is amended-
    **\*75** (1) in subsection (a)-
    (A) in the matter preceding paragraph (1), by inserting "or ephedrine, pseudoep-
hedrine, or phenylpropanolamine," after "schedule III, IV, or V of title II,"; and
    (B) in paragraph (1), by inserting ", and of ephedrine, pseudoephedrine, and
phenylpropanolamine, " after "coca leaves"; and
    (2) by adding at the end the following subsections:
    "(d)(1) With respect to a registrant under section 1008 who is authorized under
subsection (a)(1) to import ephedrine, pseudoephedrine, or phenylpropanolamine, at
any time during the year the registrant may apply for an increase in the amount of
such chemical that the registrant is authorized to import, and the Attorney General
may approve the application if the Attorney General determines that the approval is
necessary to provide for medical, scientific, or other legitimate purposes regarding
the chemical.
    "(2) With respect to the application under paragraph (1):
    "(A) Not later than 60 days after receiving the application, the Attorney Gener-
al shall approve or deny the application.
    "(B) In approving the application, the Attorney General shall specify the period
of time for which the approval is in effect, or shall provide that the approval is
effective until the registrant involved is notified in writing by the Attorney Gen-
eral that the approval is terminated.
    "(C) If the Attorney General does not approve or deny the application before the
expiration of the 60-day period under subparagraph (A), the application is deemed to
be approved, and such approval remains in effect until the Attorney General notifies
the registrant in writing that the approval is terminated.
    "(e) Each reference in this section to ephedrine, pseudoephedrine, or phenylpro-
panolamine includes each of the salts, optical isomers, and salts of optical isomers
of such chemical.".

SEC. 716. NOTICE OF IMPORTATION OR EXPORTATION; APPROVAL OF SALE OR TRANSFER BY IM-
PORTER OR EXPORTER.

    (a) In General.-Section 1018 of the Controlled Substances Import and Export Act
(21 U.S.C. 971) is amended-
    (1) in subsection (b)(1), in the first sentence, by striking "or to an importa-
tion by a regular importer" and inserting "or to a transaction that is an importa-
tion by a regular importer";
    (2) by redesignating subsections (d) and (e) as subsections (e) and (f), re-
spectively;
    (3) by inserting after subsection (c) the following subsection:
    "(d)(1)(A) Information provided in a notice under subsection (a) or (b) shall
include the name of the person to whom the importer or exporter involved intends to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 109-333     Page 73

H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 109-333,  2006 U.S.C.C.A.N. 184)**

transfer the listed chemical involved, and the quantity of such chemical to be
transferred.

   "(B) In the case of a notice under subsection (b) submitted by a regular import-
er, if the transferee identified in the notice is not a regular customer, such im-
porter may not transfer the listed chemical until after the expiration of the 15-day
period beginning on the date on which the notice is submitted to the Attorney Gener-
al.

   "(C) After a notice under subsection (a) or (b) is submitted to the Attorney
General, if circumstances change and the importer or **\*76** exporter will not be trans-
ferring the listed chemical to the transferee identified in the notice, or will be
transferring a greater quantity of the chemical than specified in the notice, the
importer or exporter shall update the notice to identify the most recent prospective
transferee or the most recent quantity or both (as the case may be) and may not
transfer the listed chemical until after the expiration of the 15-day period begin-
ning on the date on which the update is submitted to the Attorney General, except
that such 15-day restriction does not apply if the prospective transferee identified
in the update is a regular customer. The preceding sentence applies with respect to
changing circumstances regarding a transferee or quantity identified in an update to
the same extent and in the same manner as such sentence applies with respect to
changing circumstances regarding a transferee or quantity identified in the original
notice under subsection (a) or (b).

   "(D) In the case of a transfer of a listed chemical that is subject to a 15-day
restriction under subparagraph (B) or (C), the transferee involved shall, upon the
expiration of the 15-day period, be considered to qualify as a regular customer, un-
less the Attorney General otherwise notifies the importer or exporter involved in
writing.

   "(2) With respect to a transfer of a listed chemical with which a notice or up-
date referred to in paragraph (1) is concerned:

   "(A) The Attorney General, in accordance with the same procedures as apply under
subsection (c)(2)-

   "(i) may order the suspension of the transfer of the listed chemical by the im-
porter or exporter involved, except for a transfer to a regular customer, on the
ground that the chemical may be diverted to the clandestine manufacture of a con-
trolled substance (without regard to the form of the chemical that may be diverted,
including the diversion of a finished drug product to be manufactured from bulk
chemicals to be transferred), subject to the Attorney General ordering such suspen-
sion before the expiration of the 15-day period referred to in paragraph (1) with
respect to the importation or exportation (in any case in which such a period ap-
plies); and

   "(ii) may, for purposes of clause (i) and paragraph (1), disqualify a regular
customer on such ground.

   "(B) From and after the time when the Attorney General provides written notice
of the order under subparagraph (A) (including a statement of the legal and factual
basis for the order) to the importer or exporter, the importer or exporter may not
carry out the transfer.

   "(3) For purposes of this subsection:

   "(A) The terms 'importer' and 'exporter' mean a regulated person who imports or

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 109-333, 2006 U.S.C.C.A.N. 184)**

exports a listed chemical, respectively.

"(B) The term 'transfer', with respect to a listed chemical, includes the sale of the chemical.

"(C) The term 'transferee' means a person to whom an importer or exporter transfers a listed chemical."; and

(4) by adding at the end the following subsection:

"(g) Within 30 days after a transaction covered by this section is completed, the importer or exporter shall send the Attorney General a return declaration containing particulars of the transaction, including the date, quantity, chemical, container, name of transferees, **\*77** and such other information as the Attorney General may specify in regulations. For importers, a single return declaration may include the particulars of both the importation and distribution. If the importer has not distributed all chemicals imported by the end of the initial 30-day period, the importer shall file supplemental return declarations no later than 30 days from the date of any further distribution, until the distribution or other disposition of all chemicals imported pursuant to the import notification or any update are accounted for.".

(b) Conforming Amendments.-

(1) Controlled substances import and export act.-The Controlled Substances Import and Export Act (21 U.S.C. 951 et seq.) is amended-

(A) in section 1010(d)(5), by striking "section 1018(e)(2) or (3)" and inserting "paragraph (2) or (3) of section 1018(f)"; and

(B) in section 1018(c)(1), in the first sentence, by inserting before the period the following: "(without regard to the form of the chemical that may be diverted, including the diversion of a finished drug product to be manufactured from bulk chemicals to be transferred)".

(2) Controlled substances act.-Section 310(b)(3)(D)(v) of the Controlled Substances Act (21 U.S.C. 830(b)(3)(D)(v)) is amended by striking "section 1018(e)(2)" and inserting "section 1018(f)(2)".

SEC. 717. ENFORCEMENT OF RESTRICTIONS ON IMPORTATION AND OF REQUIREMENT OF NOTICE OF TRANSFER.

Section 1010(d)(6) of the Controlled Substances Import and Export Act (21 U.S.C. 960(d)(6)) is amended to read as follows:

"(6) imports a listed chemical in violation of section 1002, imports or exports such a chemical in violation of section 1007 or 1018, or transfers such a chemical in violation of section 1018(d); or".

SEC. 718. COORDINATION WITH UNITED STATES TRADE REPRESENTATIVE.

In implementing sections 713 through 717 and section 721 of this title, the Attorney General shall consult with the United States Trade Representative to ensure implementation complies with all applicable international treaties and obligations of the United States.

Subtitle B-International Regulation of Precursor Chemicals

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005, 2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 109-333,  2006 U.S.C.C.A.N. 184)**

SEC. 721. INFORMATION ON FOREIGN CHAIN OF DISTRIBUTION; IMPORT RESTRICTIONS REGARD-ING FAILURE OF DISTRIBUTORS TO COOPERATE.

Section 1018 of the Controlled Substances Import and Export Act (21 U.S.C. 971), as amended by section 716(a)(4) of this title, is further amended by adding at the end the following subsection:

"(h)(1) With respect to a regulated person importing ephedrine, pseudoephedrine, or phenylpropanolamine (referred to in this section as an 'importer'), a notice of importation under subsection (a) or (b) shall include all information known to the importer on the **\*78** chain of distribution of such chemical from the manufacturer to the importer.

"(2) For the purpose of preventing or responding to the diversion of ephedrine, pseudoephedrine, or phenylpropanolamine for use in the illicit production of methamphetamine, the Attorney General may, in the case of any person who is a manu-facturer or distributor of such chemical in the chain of distribution referred to in paragraph (1) (which person is referred to in this subsection as a 'foreign-chain distributor'), request that such distributor provide to the Attorney General inform-ation known to the distributor on the distribution of the chemical, including sales.

"(3) If the Attorney General determines that a foreign-chain distributor is re-fusing to cooperate with the Attorney General in obtaining the information referred to in paragraph (2), the Attorney General may, in accordance with procedures that apply under subsection (c), issue an order prohibiting the importation of ephedrine, pseudoephedrine, or phenylpropanolamine in any case in which such distributor is part of the chain of distribution for such chemical. Not later than 60 days prior to issuing the order, the Attorney General shall publish in the Federal Register a no-tice of intent to issue the order. During such 60-day period, imports of the chemic-al with respect to such distributor may not be restricted under this paragraph.".

SEC. 722. REQUIREMENTS RELATING TO THE LARGEST EXPORTING AND IMPORTING COUNTRIES OF CERTAIN PRECURSOR CHEMICALS.

(a) Reporting Requirements.-Section 489(a) of the Foreign Assistance Act of 1961 (22 U.S.C. 2291h(a)) is amended by adding at the end the following new paragraph:

"(8)(A) A separate section that contains the following:

"(i) An identification of the five countries that exported the largest amount of pseudoephedrine, ephedrine, and phenylpropanolamine (including the salts, optical isomers, or salts of optical isomers of such chemicals, and also including any products or substances containing such chemicals) during the preceding calendar year.

"(ii) An identification of the five countries that imported the largest amount of the chemicals described in clause (i) during the preceding calendar year and have the highest rate of diversion of such chemicals for use in the illicit production of methamphetamine (either in that country or in another country).

"(iii) An economic analysis of the total worldwide production of the chemicals described in clause (i) as compared to the legitimate demand for such chemicals worldwide.

"(B) The identification of countries that imported the largest amount of chemic-als under subparagraph (A)(ii) shall be based on the following:

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:07-cv-02538-VRW    Document 5    Filed 06/23/2007    Page 83 of 303

H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005, 2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)

**(Cite as: H.R. CONF. REP. 109-333,  2006 U.S.C.C.A.N. 184)**

"(i) An economic analysis that estimates the legitimate demand for such chemicals in such countries as compared to the actual or estimated amount of such chemicals that is imported into such countries.

"(ii) The best available data and other information regarding the production of methamphetamine in such countries **\*79** and the diversion of such chemicals for use in the production of methamphetamine."

(b) Annual Certification Procedures.-Section 490(a) of the Foreign Assistance Act of 1961 (22 U.S.C. 2291j(a)) is amended-

(1) in paragraph (1), by striking "major illicit drug producing country or major drug-transit country" and inserting "major illicit drug producing country, major drug-transit country, or country identified pursuant to clause (i) or (ii) of section 489(a)(8)(A) of this Act"; and

(2) in paragraph (2), by inserting after "(as determined under subsection  (h))" the following: "or country identified pursuant to clause (i) or (ii) of section 489(a)(8)(A) of this Act".

(c) Conforming Amendment.-Section 706 of the Foreign Relations Authorization Act, Fiscal Year 2003 (22 U.S.C. 2291j-1) is amended in paragraph (5) by adding at the end the following:

"(C) Nothing in this section shall affect the requirements of section 490 of the Foreign Assistance Act of 1961 (22 U.S.C. 2291j) with respect to countries identified pursuant to section clause (i) or (ii) of 489(a)(8)(A) of the Foreign Assistance Act of 1961.".

(d) Plan To Address Diversion of Precursor Chemicals.-In the case of each country identified pursuant to clause (i) or (ii) of section 489(a)(8)(A) of the Foreign Assistance Act of 1961 (as added by subsection (a)) with respect to which the President has not transmitted to Congress a certification under section 490(b) of such Act (22 U.S.C. 2291j(b)), the Secretary of State, in consultation with the Attorney General, shall, not later than 180 days after the date on which the President transmits the report required by section 489(a) of such Act (22 U.S.C. 2291h(a)), submit to Congress a comprehensive plan to address the diversion of the chemicals described in section 489(a)(8)(A)(i) of such Act to the illicit production of methamphetamine in such country or in another country, including the establishment, expansion, and enhancement of regulatory, law enforcement, and other investigative efforts to prevent such diversion.

(e) Authorization of Appropriations.-There are authorized to be appropriated to the Secretary of State to carry out this section $1,000,000 for each of the fiscal years 2006 and 2007.

SEC. 723. PREVENTION OF SMUGGLING OF METHAMPHETAMINE INTO THE UNITED STATES FROM MEXICO.

(a) In General.-The Secretary of State, acting through the Assistant Secretary of the Bureau for International Narcotics and Law Enforcement Affairs, shall take such actions as are necessary to prevent the smuggling of methamphetamine into the United States from Mexico.

(b) Specific Actions.-In carrying out subsection (a), the Secretary shall-

(1) improve bilateral efforts at the United States-Mexico border to prevent the smuggling of methamphetamine into the United States from Mexico;

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 109-333,  2006 U.S.C.C.A.N. 184)**

(2) seek to work with Mexican law enforcement authorities to improve the ability
of such authorities to combat the production and trafficking of methamphetamine, in-
cluding by providing equipment and technical assistance, as appropriate; and

(3) encourage the Government of Mexico to take immediate action to reduce the
diversion of pseudoephedrine by drug trafficking **\*80** organizations for the produc-
tion and trafficking of methamphetamine.

(c) Report.-Not later than one year after the date of the enactment of this Act,
and annually thereafter, the Secretary shall submit to the appropriate congressional
committees a report on the implementation of this section for the prior year.

(d) Authorization of Appropriations.-There are authorized to be appropriated to
the Secretary to carry out this section $4,000,000 for each of the fiscal years 2006
and 2007.

Subtitle C-Enhanced Criminal Penalties for Methamphetamine Production and
Trafficking

SEC. 731. SMUGGLING METHAMPHETAMINE OR METHAMPHETAMINE PRECURSOR CHEMICALS INTO THE
UNITED STATES WHILE USING FACILITATED ENTRY PROGRAMS.

(a) Enhanced Prison Sentence.-The sentence of imprisonment imposed on a person
convicted of an offense under the Controlled Substances Act (21 U.S.C. 801 et seq.)
or the Controlled Substances Import and Export Act (21 U.S.C. 951 et seq.), in-
volving methamphetamine or any listed chemical that is defined in section 102(33) of
the Controlled Substances Act (21 U.S.C. 802(33), shall, if the offense is committed
under the circumstance described in subsection (b), be increased by a consecutive
term of imprisonment of not more than 15 years.

(b) Circumstances.-For purposes of subsection (a), the circumstance described in
this subsection is that the offense described in subsection (a) was committed by a
person who-

(1) was enrolled in, or who was acting on behalf of any person or entity en-
rolled in, any dedicated commuter lane, alternative or accelerated inspection sys-
tem, or other facilitated entry program administered or approved by the Federal Gov-
ernment for use in entering the United States; and

(2) committed the offense while entering the United States, using such lane,
system, or program.

(c) Permanent Ineligibility.-Any person whose term of imprisonment is increased
under subsection (a) shall be permanently and irrevocably barred from being eligible
for or using any lane, system, or program described in subsection (b)(1).

SEC. 732. MANUFACTURING CONTROLLED SUBSTANCES ON FEDERAL PROPERTY.

Subsection (b) of section 401 of the Controlled Substances Act (21 U.S.C.
841(b)) is amended in paragraph (5) by inserting "or manufacturing" after "cultivat-
ing".

SEC. 733. INCREASED PUNISHMENT FOR METHAMPHETAMINE KINGPINS.

Section 408 of the Controlled Substances Act (21 U.S.C. 848) is amended by
adding at the end the following:

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

"(s) Special Provision for Methamphetamine.-For the purposes of subsection  (b),
in the case of continuing criminal enterprise involving methamphetamine or its
salts, isomers, or salts of isomers, paragraph (2)(A) shall be applied by substitut-
ing '200' for**81  '300', and paragraph (2)(B) shall be applied by substituting
'$5,000,000' for '$10 million dollars'. ".

SEC. 734. NEW CHILD-PROTECTION CRIMINAL ENHANCEMENT.

    (a) In General.-The Controlled Substances Act is amended by inserting after sec-
tion 419 (21 U.S.C. 860) the following:

    "CONSECUTIVE SENTENCE FOR MANUFACTURING OR DISTRIBUTING, OR POSSESSING WITH
    INTENT TO MANUFACTURE OR DISTRIBUTE, METHAMPHETAMINE ON PREMISES WHERE CHILDREN
                            ARE PRESENT OR RESIDE

    "Sec. 419a. Whoever violates section 401(a)(1) by manufacturing or distributing,
or possessing with intent to manufacture or distribute, methamphetamine or its
salts, isomers or salts of isomers on premises in which an individual who is under
the age of 18 years is present or resides, shall, in addition to any other sentence
imposed, be imprisoned for a period of any term of years but not more than 20 years,
subject to a fine, or both. ".
    (b) Clerical Amendment.-The table of contents of the Comprehensive Drug Abuse
Prevention and Control Act of 1970 is amended by inserting after the item relating
to section 419 the following new item:
    "Sec. 419a. Consecutive sentence for manufacturing or distributing, or possessing
with intent to manufacture or distribute, methamphetamine on premises where children
are present or reside.".

SEC. 735. AMENDMENTS TO CERTAIN SENTENCING COURT REPORTING REQUIREMENTS.

    Section 994(w) of title 28, United States Code, is amended-
    (1) in paragraph (1)-
    (A) by inserting ", in a format approved and required by the Commission," after
"submits to the Commission";
    (B) in subparagraph (B)-
    (i) by inserting "written" before "statement of reasons"; and
    (ii) by inserting "and which shall be stated on the written statement of reas-
ons form issued by the Judicial Conference and approved by the United States Senten-
cing Commission" after "applicable guideline range"; and
    (C) by adding at the end the following:
    "The information referred to in subparagraphs (A) through (F) shall be submitted
by the sentencing court in a format approved and required by the Commission."; and
    (2) in paragraph (4), by striking "may assemble or maintain in electronic form
that include any" and inserting "itself may assemble or maintain in electronic form
as a result of the".

SEC. 736. SEMIANNUAL REPORTS TO CONGRESS.

    (a) In General.-The Attorney General shall, on a semiannual basis, submit to the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 109-333    Page 79
H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 109-333,  2006 U.S.C.C.A.N. 184)**

congressional committees and organizations specified in subsection (b) reports that-

(1) describe the allocation of the resources of the Drug Enforcement Administration and the Federal Bureau of Investigation for the investigation and prosecution of alleged violations of the Controlled Substances Act involving methamphetamine; and

**\*82** (2) the measures being taken to give priority in the allocation of such resources to such violations involving-

(A) persons alleged to have imported into the United States substantial quantities of methamphetamine or scheduled listed chemicals (as defined pursuant to the amendment made by section 711(a)(1));

(B) persons alleged to have manufactured methamphetamine; and

(C) circumstances in which the violations have endangered children.

(b) Congressional Committees.-The congressional committees and organizations referred to in subsection (a) are-

(1) in the House of Representatives, the Committee on the Judiciary, the Committee on Energy and Commerce, and the Committee on Government Reform; and

(2) in the Senate, the Committee on the Judiciary, the Committee on Commerce, Science, and Transportation, and the Caucus on International Narcotics Control.

Subtitle D-Enhanced Environmental Regulation of Methamphetamine Byproducts

SEC. 741. BIENNIAL REPORT TO CONGRESS ON AGENCY DESIGNATIONS OF BY-PRODUCTS OF METHAMPHETAMINE LABORATORIES AS HAZARDOUS MATERIALS.

Section 5103 of title 49, Unites States Code, is amended by adding at the end the following:

"(d) Biennial Report.-The Secretary of Transportation shall submit to the Committee on Transportation and Infrastructure of the House of Representatives and the Senate Committee on Commerce, Science, and Transportation a biennial report providing information on whether the Secretary has designated as hazardous materials for purposes of chapter 51 of such title all by-products of the methamphetamine-production process that are known by the Secretary to pose an unreasonable risk to health and safety or property when transported in commerce in a particular amount and form.".

SEC. 742. METHAMPHETAMINE PRODUCTION REPORT.

Section 3001 of the Solid Waste Disposal Act (42 U.S.C. 6921) is amended at the end by adding the following:

"(j) Methamphetamine Production.-Not later than every 24 months, the Administrator shall submit to the Committee on Energy and Commerce of the House of Representatives and the Committee on Environment and Public Works of the Senate a report setting forth information collected by the Administrator from law enforcement agencies, States, and other relevant stakeholders that identifies the byproducts of the methamphetamine production process and whether the Administrator considers each of the byproducts to be a hazardous waste pursuant to this section and relevant regulations.".

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H. R. CONF. REP. 109-333                                                      Page 86
H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
(Cite as: H.R. CONF. REP. 109-333,  2006 U.S.C.C.A.N. 184)


SEC. 743. CLEANUP COSTS.

    (a) In General.-Section 413(q) of the Controlled Substances Act  (21 U.S.C.
853(q)) is amended-
    *83 (1) in the matter preceding paragraph (1), by inserting ", the possession,
or the possession with intent to distribute, " after " manufacture"; and
    (2) in paragraph (2), by inserting ", or on premises or in property that the de-
fendant owns, resides, or does business in" after "by the defendant".
    (b) Savings Clause.-Nothing in this section shall be interpreted or construed to
amend, alter, or otherwise affect the obligations, liabilities and other responsib-
ilities of any person under any Federal or State environmental laws.


                    Subtitle E-Additional Programs and Activities


SEC. 751. IMPROVEMENTS TO DEPARTMENT OF JUSTICE DRUG COURT GRANT PROGRAM.

    Section 2951 of the Omnibus Crime Control and Safe Streets Act of 1968  (42
U.S.C. 3797u) is amended by adding at the end the following new subsection:
    "(c) Mandatory Drug Testing and Mandatory Sanctions.-
    "(1) Mandatory testing.-Grant amounts under this part may be used for a drug
court only if the drug court has mandatory periodic testing as described in subsec-
tion (a)(3)(A). The Attorney General shall, by prescribing guidelines or regula-
tions, specify standards for the timing and manner of complying with such require-
ments. The standards-
    "(A) shall ensure that-
    "(i) each participant is tested for every controlled substance that the parti-
cipant has been known to abuse, and for any other controlled substance the Attorney
General or the court may require; and
    "(ii) the testing is accurate and practicable; and
    "(B) may require approval of the drug testing regime to ensure that adequate
testing occurs.
    "(2) Mandatory sanctions.-The Attorney General shall, by prescribing guidelines
or regulations, specify that grant amounts under this part may be used for a drug
court only if the drug court imposes graduated sanctions that increase punitive
measures, therapeutic measures, or both whenever a participant fails a drug test.
Such sanctions and measures may include, but are not limited to, one or more of the
following:
    "(A) Incarceration.
    "(B) Detoxification treatment.
    "(C) Residential treatment.
    "(D) Increased time in program.
    "(E) Termination from the program.
    "(F) Increased drug screening requirements.
    "(G) Increased court appearances.
    "(H) Increased counseling.
    "(I) Increased supervision.
    "(J) Electronic monitoring.
    "(K) In-home restriction.


                © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:07-cv-02538-VRW    Document 5    Filed 06/23/2007    Page 88 of 303

H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 109-333, 2006 U.S.C.C.A.N. 184)**

 "(L) Community service.
 "(M) Family counseling.
 **\*84** "(N) Anger management classes.".

SEC. 752. DRUG COURTS FUNDING.

 Section 1001(25)(A) of title I of the Omnibus Crime Control and Safe Streets Act
of 1968 (42 U.S.C. 2591(25)(A)) is amended by adding at the end the following:
 "(v) $70,000,000 for fiscal year 2006.".

SEC. 753. FEASIBILITY STUDY ON FEDERAL DRUG COURTS.

 The Attorney General shall conduct a feasibility study on the desirability of a
drug court program for Federal offenders who are addicted to controlled substances.
The Attorney General lower-level, non-violate report the results of that study to
Congress not later than June 30, 2006.

SEC. 754. GRANTS TO HOT SPOT AREAS TO REDUCE AVAILABILITY OF METHAMPHETAMINE.

 Title I of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C.
3711 et seq.) is amended by adding at the end the following:
 "PART II-CONFRONTING USE OF METHAMPHETAMINE

"SEC. 2996. AUTHORITY TO MAKE GRANTS TO ADDRESS PUBLIC SAFETY AND METHAMPHETAMINE
MANUFACTURING, SALE, AND USE IN HOT SPOTS.

 "(a) Purpose and Program Authority.-
 "(1) Purpose.-It is the purpose of this part to assist States-
 "(A) to carry out programs to address the manufacture, sale, and use of
methamphetamine drugs; and
 "(B) to improve the ability of State and local government institutions of to
carry out such programs.
 "(2) Grant authorization.-The Attorney General, through the Bureau of Justice
Assistance in the Office of Justice Programs may make grants to States to address
the manufacture, sale, and use of methamphetamine to enhance public safety.
 "(3) Grant projects to address methamphetamine manufacture sale and use.- Grants
made under subsection (a) may be used for programs, projects, and other activities
to-
 "(A) investigate, arrest and prosecute individuals violating laws related to the
use, manufacture, or sale of methamphetamine;
 "(B) reimburse the Drug Enforcement Administration for expenses related to the
cleanup of methamphetamine clandestine labs;
 "(C) support State and local health department and environmental agency services
deployed to address methamphetamine; and
 "(D) procure equipment, technology, or support systems, or pay for resources, if
the applicant for such a grant demonstrates to the satisfaction of the Attorney Gen-
eral that expenditures for such purposes would result in the reduction in the use,
sale, and manufacture of methamphetamine.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H. R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 109-333,  2006 U.S.C.C.A.N. 184)**

**\*85** "SEC. 2997. FUNDING.

"There are authorized to be appropriated to carry out this part $99,000,000 for
each fiscal year 2006, 2007, 2008, 2009, and 2010.".

SEC. 755. GRANTS FOR PROGRAMS FOR DRUG-ENDANGERED CHILDREN.

(a) In General.-The Attorney General shall make grants to States for the purpose
of carrying out programs to provide comprehensive services to aid children who are
living in a home in which methamphetamine or other controlled substances are unlaw-
fully manufactured, distributed, dispensed, or used.

(b) Certain Requirements.-The Attorney General shall ensure that the services
carried out with grants under subsection (a) include the following:

(1) Coordination among law enforcement agencies, prosecutors, child protective
services, social services, health care services, and any other services determined
to be appropriate by the Attorney General to provide assistance regarding the prob-
lems of children described in subsection (a).

(2) Transition of children from toxic or drug-endangering environments to appro-
priate residential environments.

(c) Authorization of Appropriations.-For the purpose of carrying out this sec-
tion, there are authorized to be appropriated $20,000,000 for each of the fiscal
years 2006 and 2007. Amounts appropriated under the preceding sentence shall remain
available until expended.

SEC. 756. AUTHORITY TO AWARD COMPETITIVE GRANTS TO ADDRESS METHAMPHETAMINE USE BY
PREGNANT AND PARENTING WOMEN OFFENDERS.

(a) Purpose and Program Authority.-

(1) Grant authorization.-The Attorney General may award competitive grants to
address the use of methamphetamine among pregnant and parenting women offenders to
promote public safety, public health, family permanence and well being.

(2) Purposes and program authority.-Grants awarded under this section shall be
used to facilitate or enhance collaboration between the criminal justice, child wel-
fare, and State substance abuse systems in order to carry out programs to address
the use of methamphetamine drugs by pregnant and parenting women offenders.

(b) Definitions.-In this section, the following definitions shall apply:

(1) Child welfare agency.-The term "child welfare agency" means the State agency
responsible for child and/or family services and welfare.

(2) Criminal justice agency.-The term "criminal justice agency" means an agency
of the State or local government or its contracted agency that is responsible for
detection, arrest, enforcement, prosecution, defense, adjudication, incarceration,
probation, or parole relating to the violation of the criminal laws of that State or
local government.

(c) Applications.-

(1) In general.-No grant may be awarded under this section unless an application
has been submitted to, and approved by, the Attorney General.

**\*86** (2) Application.-An application for a grant under this section shall be sub-
mitted in such form, and contain such information, as the Attorney General, may pre-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005, 2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
(Cite as: H.R. CONF. REP. 109-333, 2006 U.S.C.C.A.N. 184)

scribe by regulation or guidelines.

(3) Eligible entities.-The Attorney General shall make grants to States, territories, and Indian Tribes. Applicants must demonstrate extensive collaboration with the State criminal justice agency and child welfare agency in the planning and implementation of the program.

(4) Contents.-In accordance with the regulations or guidelines established by the Attorney General in consultation with the Secretary of Health and Human Services, each application for a grant under this section shall contain a plan to expand the State's services for pregnant and parenting women offenders who are pregnant women and/or women with dependent children for the use of methamphetamine or methamphetamine and other drugs and include the following in the plan:

(A) A description of how the applicant will work jointly with the State criminal justice and child welfare agencies needs associated with the use of methamphetamine or methamphetamine and other drugs by pregnant and parenting women offenders to promote family stability and permanence.

(B) A description of the nature and the extent of the problem of methamphetamine use by pregnant and parenting women offenders.

(C) A certification that the State has involved counties and other units of local government, when appropriate, in the development, expansion, modification, operation or improvement of proposed programs to address the use, manufacture, or sale of methamphetamine.

(D) A certification that funds received under this section will be used to supplement, not supplant, other Federal, State, and local funds.

(E) A description of clinically appropriate practices and procedures to-

(i) screen and assess pregnant and parenting women offenders for addiction to methamphetamine and other drugs;

(ii) when clinically appropriate for both the women and children, provide family treatment for pregnant and parenting women offenders, with clinically appropriate services in the same location to promote family permanence and self sufficiency; and

(iii) provide for a process to enhance or ensure the abilities of the child welfare agency, criminal justice agency and State substance agency to work together to re-unite families when appropriate in the case where family treatment is not provided.

(d) Period of Grant.-The grant shall be a three-year grant. Successful applicants may reapply for only one additional three-year funding cycle and the Attorney General may approve such applications.

(e) Performance Accountability; Reports and Evaluations.-

**\*87** (1) Reports.-Successful applicants shall submit to the Attorney General a report on the activities carried out under the grant at the end of each fiscal year.

(2) Evaluations.-Not later than 12 months at the end of the 3-year funding cycle under this section, the Attorney General shall submit a report to the appropriate committees of jurisdiction that summarizes the results of the evaluations conducted by recipients and recommendations for further legislative action.

(f) Authorization of Appropriations.-There are authorized to be appropriated to carry out this section such sums as may be necessary.

And the Senate agree to the same.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 109-333,  2006 U.S.C.C.A.N. 184)**


From the Committee on the Judiciary, for consideration of the House
bill  (except section 132) and the Senate amendment, and modifications committed to
conference:
  F. James Sensenbrenner, Jr.,
  Howard Coble,
  Lamar Smith,
  Elton Gallegly,
  Steve Chabot,
  William L. Jenkins,
  Daniel Lungren,
  From the Permanent Select Committee on Intelligence, for consideration secs.
102, 103, 106, 107, 109, and 132 of the House bill, and secs. 2, 3, 6, 7, 9, and 10
of the Senate amendment, and modifications committed to conference:
  Pete Hoekstra,
  Heather Wilson,
  From the Committee on Energy and Commerce, for consideration secs. 124 and 231
of the House bill, and modifications committed to conference:
  Charlie Norwood,
  John Shadegg,
  From the Committee on Financial Services, for consideration sec. 117 of the
House bill, and modifications committed to conference:
  Michael G. Oxley,
  Spencer Bachus,
  From the Committee on Homeland Security, for consideration secs. 127-129 of the
House bill, and modifications committed to conference:
  Peter T. King,
  Curt Weldon,

   Managers on the Part of the House.
  Arlen Specter,
  Orrin Hatch,
  Jon Kyl,
  Mike DeWine,
  Jeff Sessions,
  Pat Roberts,

   Managers on the Part of the Senate.

      **\*89 \*\*184** JOINT EXPLANATORY STATEMENT OF THE COMMITTEE OF CONFERENCE


The managers on the part of the House and the Senate at the conference on the dis-
agreeing votes of the two Houses on the amendment of the Senate to the bill (H.R.
3199), to extend and modify authorities needed to combat terrorism, and for other
purposes, submit the following joint statement to the House and the Senate in ex-
planation of the effect of the action agreed upon by the managers and recommended in
the accompanying conference report:
  The Senate amendment struck all of the House bill after the enacting clause and
inserted a substitute text.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005, 2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 109-333, 2006 U.S.C.C.A.N. 184)**

The House recedes from its disagreement to the amendment of the Senate with an amendment that is a substitute for the House bill and the Senate amendment. The differences between the House bill, the Senate amendment, and the substitute agreed to in conference are noted below, except for clerical corrections, conforming changes made necessary by agreements reached by the conferees, and minor drafting and clarifying changes.

**\*\*185** Section 1. Short title. Table of contents

The House receded to the Senate on the short title of the Act. The short title is the "USA PATRIOT Improvement and Reauthorization Act of 2005."

TITLE I-USA PATRIOT IMPROVEMENT AND REAUTHORIZATION ACT

Section 101. References to, and modification of short title for, USA PATRIOT Act

Section 101 of the conference report is identical to section 101 of the House bill and similar to section 9(d) of the Senate amendment. Section 101 states that references contained within the conference report to the USA PATRIOT Act shall be deemed a reference to Public Law No. 107-56, the "Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act (USA PATRIOT Act) of 2001."

Section 102. USA PATRIOT Act sunset provisions

Section 102 of the conference report adopts a 4-year sunset on sections 206 and 215 of the USA PATRIOT Act, and makes permanent the other provisions, all of which were set to expire on December 31, 2005. Sections 206 and 215 relate to Foreign Intelligence Court orders for multipoint, or "roving," wiretaps and for business records requested under the Foreign Intelligence Surveillance Act (FISA).

**\*90** Section 103. Extension of sunset relating to individual terrorists as agents of foreign powers

Section 103 of the conference report extends the sunset of section 6001(b) of the Intelligence Reform and Terrorism Prevention Act (IRTPA) by 4 years so the provision is set to expire on December 31, 2009. Section 6001(b) applied the USA PATRIOT Act sunset to the new definition of "Agent of a Foreign Power" under section 6001 of IRTPA. Section 6001 states that an "Agent of a foreign power" for any person other than a United States person, includes a person who "engages in international terrorism or activities in preparation thereof." This definition reaches "lone wolf" terrorists engaged in international terrorism.

Section 104. Section 2332b and the material support sections of Title 18, United States Code

Section 104 of the conference report is identical to section 104 of the House bill and substantively similar to section 9(c) of the Senate amendment. This section makes section 6603 of the IRTPA permanent by repealing the sunset contained in section 6603(g) of the IRTPA. This sunset would have allowed a criminal offense, and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 109-333    Page 86

H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 109-333,  2006 U.S.C.C.A.N. 184)**

not a law enforcement tool, to expire. Furthermore, this sunset effectively made the
underlying provision unconstitutional. Section 6603 of the IRTPA amended the law to
address court concerns on the constitutionality of the prohibition of providing ma-
terial support to terrorists.

Section 105. Duration of FISA surveillance of non-United States persons under sec-
tion 207 of the USA PATRIOT Act

   Section 105 of the conference report is substantively similar to section 106 of
the House bill and section 3 of the Senate amendment. This section further extends
the maximum duration of orders for electronic surveillance and physical searches
targeted against all agents of foreign powers who are not U.S. persons. Initial or-
ders authorizing **186 searches and electronic surveillance will be for periods of
up to 120 days and renewal orders will extend for periods of up to one year. Section
105 also extends the maximum duration for both the initial and renewal orders for
pen register/trap and trace surveillance to a period of one year in cases where the
government certified that the information likely to be obtained is foreign intelli-
gence information not concerning a U.S. person.

Section 106. Access to certain business records under section 215 of the USA PATRIOT
Act

   Section 106 of the conference report is a compromise between section 107 of the
House bill and section 7 of the Senate amendment. This section of the conference re-
port amends section 215 of the USA PATRIOT Act to clarify that the tangible things
sought by a section 215 FISA order ("215 order") must be "relevant" to an authorized
preliminary or full investigation to obtain foreign intelligence information not
concerning a U.S. person or to protect against international terrorism or clandes-
tine intelligence activities. The provision also requires a statement of facts to be
included in the application that shows there are reasonable grounds to believe the
tangible things sought are relevant, and, if such facts **91 show reasonable grounds
to believe that certain specified connections to a foreign power or an agent of a
foreign power are present, the tangible things sought are presumptively relevant.
Congress does not intend to prevent the FBI from obtaining tangible items that it
currently can obtain under section 215.
   The provision also clarifies that a recipient of a FISA section 215 production or-
der may challenge that order, and may disclose receipt to a lawyer, other persons
necessary to comply with the order, and additional persons approved by the FBI. This
provision allows the FBI to request the recipient to identify the individuals to
whom disclosure has been or will be made. The provision also makes clear that a
judge should approve an application only "if the judge finds that the [applicable]
requirements [of the section] have been met." The provision also expressly provides
for a judicial review process that authorizes a specified pool of FISA court judges
to review a 215 order that has been challenged. The provision requires high-level
approval, and specific congressional reporting, of requests for certain sensitive
categories of records, such as library, bookstore, tax return, firearms sales, edu-
cational, and medical records. The provision requires promulgation and application
of minimization procedures governing the retention and dissemination by the FBI of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 109-333    Page 89
H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 109-333, 2006 U.S.C.C.A.N. 184)**

any tangible thing obtained under this section and requires restrictions on the use
of information obtained with an order under this section.

In addition, section 106 directs the Attorney General to draft minimization pro-
cedures that apply to information obtained under a FISA "business records" order. In
the application for the order, the applicant must enumerate the minimization proced-
ures applicable to the retention and dissemination of the tangible things sought by
the FBI in the application. Such enumerated procedures should meet the requirements
set forth in the definition of minimization procedures found in new subsection (g)
of section 501. If the court finds that the enumerated procedures fail to meet the
requirements of subsection (g), the Conferees expect that the court will direct that
other procedures adopted by the Attorney General be applied to the information
sought, consistent with the authority of the court specified in section 501(c)(1),
as amended.

Under subsection (g)(1), as amended, the Attorney General is required to adopt
minimization procedures within 180 days of the enactment of this Act. Until the At-
torney General complies, the Conferees expect that the requirements of subsections
(b)(2)(B), (c)(1), and (h) that relate to the adoption of minimization procedures
will be viewed as ineffective and, thus, not prevent the use of section 501 to ac-
quire tangible things.

**\*\*187** Sec. 106A. Audit on access to certain business records for foreign intelli-
gence purposes

Section 106A of the conference report is a new provision. This section requires
that the Department of Justice Inspector General conduct an audit on the effective-
ness and use of section 215 and submit an unclassified report of the audit to the
House and Senate Committees on the Judiciary and Intelligence.

**\*92** Section 107. Enhanced oversight of good-faith emergency disclosures under sec-
tion 212 of the USA PATRIOT Act

Section 107 of the conference report is virtually identical to section 4 of the
Senate amendment, but includes some technical corrections to title 18 of the United
States Code. Section 108 of the House bill is substantively similar. Section 107 of
the conference report amends 18 U.S.C. S 2702, as amended by section 212 of the USA
PATRIOT Act. Section 212 allows Internet service providers to disclose voluntarily
the contents of electronic communications, as well as subscriber information, in
emergencies involving immediate danger of death or serious physical injury. To ad-
dress concerns that this authority, in certain circumstances, is not subject to ad-
equate congressional, judicial, or public oversight (particularly in situations
where the authority is used but criminal charges do not result) the conference re-
port requires the Attorney General to report annually to the Judiciary Committees of
the House and Senate and to set forth the number of accounts subject to section 212
disclosures. The report also must summarize the basis for disclosure in certain cir-
cumstances. The Conferees believe this will strengthen oversight on the use of this
authority without undermining important law enforcement prerogatives and without
alerting perpetrators, while simultaneously preserving the vitality of this life-
saving authority.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 109-333,  2006 U.S.C.C.A.N. 184)**

Section 108. Multipoint electronic surveillance under section 206 of the USA PATRIOT
Act

   Section 108 of the conference report is a compromise between section 109 of the
House bill and section 2 of the Senate amendment. Section 206 of the USA PATRIOT Act
enabled the use of multipoint, or "roving," wiretaps in FISA investigations. The
conference report clarifies that the FISA court must find that the possibility of
the target thwarting surveillance is based on specific facts in the application.
This is reflected in language contained in section 109(a) of the House bill and for
which the Senate amendment did not have a comparable provision. In language derived
from section 2(a) of the Senate amendment and for which the House bill had no com-
parable provision, the conference report also requires that the order describe the
specific target in detail when authorizing a roving wiretap for a target whose iden-
tity is not known. The conference report requires that in the event the government
begins directing surveillance at a new facility or place where the nature and loca-
tion of each of the facilities or places was unknown at the time the surveillance
order was issued, the government must notify the issuing FISA court on an ongoing
basis for all multipoint surveillance authority, which addresses concerns of some
that the open-ended authorization to surveil new locations could be abused. The con-
ference report provisions provide further protections by including an extra layer of
judicial review and to ensure that intelligence investigators will not abuse the
multipoint authority. This approach is superior in the FISA context (where surveil-
lance is often long-running and subject to extensive and sophisticated counter-
surveillance measures) to a proximity test or ascertainment requirement, both of
which could potentially endanger an investigation or field agents conducting the in-
vestigation.

**\*93 \*\*188** Section 109. Enhanced congressional oversight

   Section 109 of the conference report is similar to section 10 of the Senate amend-
ment, but with an additional new provision. Section 109 of the conference report is
identical to section 10 of the Senate amendment and requires: (1) the FISA court to
publish its rules; and (2) reporting to the House and Senate Judiciary Committees of
the use of the emergency employments of electronic surveillance, physical searches,
and pen register and trap and trace devices. Section 109(c) of the conference report
also requires that the Secretary of the Department of Homeland Security submit a
written report providing a description of internal affairs operations at U.S. Cit-
izenship & Immigration Services to the Judiciary Committees of the House and the
Senate.

Section 110. Attacks against railroad carriers and mass transportation systems

   The conference report is substantively similar to sections 110, 115, and 304 of
the House bill. There are no equivalent provisions in the Senate amendment, but sec-
tion 110 of the conference report is substantively similar to S. 629, the "Railroad
Carriers and Mass Transportation Act of 2005," which was reported favorably by the
Senate Judiciary Committee. Section 110 of the conference report amends 18 U.S.C. S
1993, which was created by the USA PATRIOT Act to protect against terrorist attacks

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 109-333
H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
(Cite as: H.R. CONF. REP. 109-333,  2006 U.S.C.C.A.N. 184)

and other acts of violence against mass transportation systems. However, current law
does not cover the planning for such attacks. The conference report closes this
loophole to make it a crime to "surveil, photograph, videotape, diagram, or to oth-
erwise collect information with the intent to plan or assist in planning any of the
acts described" in paragraphs (1)-(5) of section 1993(a). It also harmonizes section
1993 with 18 U.S.C. S 1992 (which criminalizes the "wrecking of trains"), in order
to eliminate the inconsistency between the intent standard in the mass transporta-
tion statute and the intent standard in the wrecking trains statute. It also
strengthens the protection of mass transportation and railroad systems by: expanding
the types of railroad property and equipment that are explicitly protected by Feder-
al law; updating the definition of "dangerous weapons" to cover box cutters and oth-
er previously unrecognized weapons; and expanding the types of prohibited attacks to
include causing the release of a hazardous material, a biological agent, or toxin
near the property of a railroad carrier or mass transportation system. The confer-
ence report restricts the death penalty against inchoate offenses, but retains the
death penalty for aggravated offenses. The section also expands coverage of the
criminal offense to include passenger vessels (as defined in 46 U.S.C. S 2101(22)).

Section 111. Forfeiture

  Section 111 of the conference report is identical to section 111 of the House
bill. There is no comparable section in the Senate amendment. The USA PATRIOT Act
amended 18 U.S.C. S 981 to expressly provide that any property used to commit or fa-
cilitate the commission of, derived from, or otherwise involved in a Federal crime
of terrorism (as defined in 18 U.S.C. S 2331) is subject" to civil forfeiture provi-
sions. Prior to the USA PATRIOT Act, only the "proceeds" of a crime of terrorism **94
were subject to civil forfeiture provisions. This section extends forfeiture to in-
clude property used in or derived from "trafficking in nuclear, chemical, biologic-
al, or radiological weapons technology or material."

Section 112. Section 2332b(g)(5)(B) amendments relating to the definition of Federal
crime of terrorism

  Section 112 of the conference report is substantively similar to section 112 of
the House bill but includes an additional offense. There is no comparable provision
in the Senate amendment. This section amends the current definition of "Federal
crime of terrorism," to include new predicate offenses. It also includes a clerical
correction to 18 U.S.C. S 2332b(g)(S)(B).

Section 113. Amendments to section 2516(1) of Title 18, United States Code

  Section 113 of the conference report is substantively similar to  sections 113 and
122 of the House bill, but includes additions. 18 U.S.C. S S 2510-2522 require the
government, unless otherwise permitted, to obtain an order of a court before con-
ducting electronic surveillance. The government is permitted to seek such orders
only in connection with the investigation of the criminal offenses enumerated in 18
U.S.C. S 2516. The USA PATRIOT Act added new wiretap offenses related to terrorism.
Section 113 adds new "wiretap predicates" under 18 U.S.C. S 2516, which relate to
crimes of terrorism. Those predicates include 18 U.S.C. S S 37 (violence at interna-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 109-333,  2006 U.S.C.C.A.N. 184)**

tional airports); 43 (animal enterprise terrorism); 81 (arson within special mari-
time and territorial jurisdiction); 175b (biological agents); 832 (nuclear and
weapons of mass destruction threats); 842 (explosive materials); 930 (possession of
weapons in Federal facilities); 956 (conspiracy to harm persons or property over-
seas); 1028A (aggravated identity theft); 1114 (killing Federal employees); 1116
(killing certain foreign officials); 1993 (attacks of mass transit); 2340A
(torture); 2339 (harboring terrorists); 2339D (terrorist military training); and
5324 (structuring transactions to evade reporting requirements). In addition to
these sections, new predicates are added under 49 U.S.C. S S 46504 (assault on a
flight crew member with a dangerous weapon); and 46505(b)(3) or (c) (certain weapons
offenses aboard an aircraft).

Section 114. Delayed notice search warrants

   Section 114 of the conference report is a compromise between sections 114 and 121
of the House bill and section 5 of the Senate amendment. Contrary to reports; the
USA PATRIOT Act did not create delayed notice search warrants, but rather codified
existing case law governing delayed notices for search warrants. Delayed notice
simply means that a court has expressly authorized investigators to delay temporar-
ily notifying a subject that a search warrant has been executed (i.e., a court-
ordered search has occurred). The search warrant itself is the same regardless of
when the subject receives notice. Thus, before a search warrant is issued, whether
notice is or is not delayed, a Federal judge must find that there is probable cause
to believe that a crime has been or is about to be committed and that evidence of
that crime or the fruits or instrumentalities **\*95** of that crime will be found at the
location to be searched. As the Department of Justice explained in an August 29,
2005 letter (p. A-5), "Delayed notice search warrants have been available for dec-
ades and were in use long before the USA PATRIOT Act was enacted. Section 213 of the
USA PATRIOT Act merely created a nationally uniform process and standard for obtain-
ing them."
   Section 213 codified the established standard of reasonableness for delayed notice
search warrants, which previously had been the cause for some to express concern
about this indefinite term. Both the House bill in section 114, and the Senate
amendment in section 5, placed a maximum specified limit on the length of time in
which a judge could **\*\*189** authorize law enforcement to delay notice to the subject
that a search has been conducted. The House provision provided that the court main-
tains the discretion to delay notice for up to 180 days with extensions of up to 90
days. The Senate amendment limited the delay to "not later than 7 days after the
date of its execution, or on a later date certain if the facts of the case justify a
longer period of delay, with extensions of up to 90 days unless the facts justify
longer." The conference report reflects a compromise between the House and Senate
provisions to define a reasonable delay as up to 30 days for an initial request, or
on a later date certain if the facts justify, and extensions of up to 90 days unless
the facts justify longer.

Section 115. Judicial review of national security letters

   Section 115 of the conference report is substantively similar to section 116 of

H.R. CONF. REP. 109-333, H.R. CONF. REP. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
(Cite as: H.R. CONF. REP. 109-333,  2006 U.S.C.C.A.N. 184)

the House bill and section 8 of the Senate amendment. This section makes explicit
that the recipient of a national security letter (NSL) may consult with an attorney
and challenge the NSL in court. This section of the conference report amends NSL au-
thority under 18 U.S.C. S 2709, 15 U.S.C. S 1681u, 15 U.S.C. S 1861v, 12 U.S.C. S
3414, and 50 U.S.C. S 436, in a similar manner to the House bill. The Senate amend-
ment only modified 18 U.S.C. S 2709. The conference report: provides that the recip-
ient of an NSL may petition for an order modifying or setting aside the request in
the U.S. district court for the district in which that person or entity does busi-
ness or resides; allows the government to move for judicial enforcement of the NSL
in the event of non-compliance by recipients; and allows the court to impose sanc-
tions for contempt of court if a recipient fails to comply with a court order to en-
force an NSL.

Section 116. Confidentiality of national security letters

   Section 116 of the conference report is substantively similar to section 117 of
the House bill and section 8 of the Senate amendment. This section provides that
upon certification by an individual authorized to issue an NSL, should the disclos-
ure endanger any individual or national security, or interfere with diplomatic rela-
tions or a criminal or intelligence investigation, then the disclosure of the NSL is
prohibited. This section allows for the disclosure to those necessary to comply with
an NSL or obtain legal advice or assistance with respect to an NSL. If the recipient
makes this further disclosure as authorized by law, the recipient must then notify
**96** the person or persons of all applicable nondisclosure requirements. At the re-
quest of the Director of National Intelligence, the conference report includes lan-
guage that allows the Director of the Federal Bureau of Investigation, or the de-
signee of the Director, to request from any person making or intending to make a
disclosure to comply with or to receive legal advice or legal assistance, to identi-
fy to whom such disclosure will be made. The language does not allow the FBI Direct-
or or designee of the Director to request the recipient of an NSL disclose the name
of an attorney to whom such disclosure will be made. The provision, however, does
allow the FBI Director or designee of the Director to make such a request for the
name of an attorney to whom disclosure has already been made. The conference report
clarifies that a recipient of an NSL may challenge any nondisclosure requirement in
court. If a petition is filed within 1 year of issuance of an NSL, the court may
modify or set aside such a nondisclosure requirement if it finds that there is no
reason to believe that disclosure may harm national security; interfere with crimin-
al, counterintelligence, or counterterrorism investigations; interfere with diplo-
matic relations; or endanger the life or physical safety of a person. If, upon fil-
ing the petition, a high-ranking official re-certifies that disclosure may endanger
national security **190** or interfere with diplomatic relations, the court must treat
the re-certification as conclusive unless there is a showing of bad faith. If a pe-
tition is filed after a year, a specific official, within 90 days of the filing of
the petition, shall either terminate the nondisclosure requirement or re-certify
that nondisclosure may: result in danger to the national security of the U.S.; in-
terfere with a criminal, counterterrorism, or counterintelligence investigation; in-
terfere with diplomatic relations; or endanger the life or physical safety of any
person. In the event of re-certification, the court again may modify or set aside

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 109-333    Page 42
H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
(Cite as: H.R. CONF. REP. 109-333,  2006 U.S.C.C.A.N. 184)

such a nondisclosure requirement only upon a finding of bad faith. The petitioner is
barred from seeking review of the nondisclosure requirement for one year if the pe-
tition was denied, but can continue to petition every year. This provision recog-
nizes that the Executive branch is both constitutionally and practically better
suited to make national security and diplomatic relations judgments than the judi-
ciary.

Section 117. Violations of nondisclosure provisions of national security letters

   This section of the conference report is similar to section 118 of the House bill.
There is no comparable provision in the Senate amendment. This section provides for
a felony charge against an individual who was notified of an applicable nondisclos-
ure requirement and nonetheless knowingly and with intent to obstruct an investiga-
tion or judicial proceeding, violates that nondisclosure order. The criminal penal-
ties under 18 U.S.C. S 1510 include up to five years imprisonment, a fine, or both.
Current law contains no penalties for such violations.

Section 118. Reports on national security letters

   Section 118 of the conference report is similar to section 119 of the House bill,
with some additional reporting requirements that are similar to provisions contained
in the Senate amendment. This **97** section requires reporting to the House and Senate
Judiciary Committees on all NSLs, similar to reporting that the Intelligence Commit-
tees receive. This section also requires that the Attorney General submit to Con-
gress the annual aggregate number of requests made concerning different U.S. per-
sons. Such reporting will permit the public to see some of the same data Congress
sees in conducting its oversight responsibilities of the DOJ. Due to the manner in
which this data is currently collected, Congress understands that current reporting
may somewhat overstate the number of different U.S. persons about whom requests for
information are made, because NSLs seeking information on a particular person may be
served at different times and from different FBI field offices. In order to report a
number to Congress that is as meaningful as possible, Congress anticipates that the
DOJ will undertake reasonable efforts to modify its data collection. Congress,
however, does not anticipate that the DOJ will undertake costly or bureaucratically
difficult steps to prepare this report.

Section 119. Enhanced oversight of national security letters

   Section 119 is a new section that requires the Inspector General of DOJ to conduct
an audit of the effectiveness and the use of the NSL authority. The report will de-
tail the specific functions and particular characteristics of the NSLs issued and
comment on the necessity of this law enforcement tool. This report will be submitted
to the House and Senate Committees on the Judiciary and Intelligence one year after
the enactment of the conference report.

**191** Section 120. Definition for forfeiture provisions under section 806 of the USA
PATRIOT Act

   Section 120 of the conference report is substantively similar to section 120 of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 109-333
H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 109-333,  2006 U.S.C.C.A.N. 184)**

the House bill. There is no comparable provision in the Senate amendment. This pro-
vision replaces the reference to the broad definition under 18 U.S.C. S 2331 with
the definition of a Federal crime of terrorism for asset forfeiture under 18 U.S.C.
S 981(a)(1)(G).

Section 121. Penal provisions regarding trafficking in contraband cigarettes or
smokeless tobacco

   Section 121 of the conference report is substantively similar to section 123 of
the House bill. There is no comparable provision in the Senate amendment. This sec-
tion of the conference report amends the Contraband Cigarette Trafficking Act
("CCTA," 18 U.S.C. S S 2341 et seq.), which makes it unlawful for any person know-
ingly to ship, possess, sell, distribute or purchase contraband cigarettes. This
section amends the CCTA by: (1) extending its provisions to cover contraband smoke-
less tobacco; (2) reducing the number of cigarettes that trigger application of the
CCTA from 60,000 to 10,000; (3) imposing reporting requirements on persons, except
for tribal governments, who engage in delivery sales of more than 10,000 cigarettes
or 500 single-unit cans or packages of smokeless tobacco in a single month; (4) re-
quiring the destruction of cigarettes and smokeless tobacco seized and forfeited un-
der the CCTA; and (5) authorizing State and local governments, and certain persons
who hold Federal tobacco permits, to bring causes of **\*98** action against violators of
the CCTA. It also amends section 2344(c), the contraband cigarette forfeiture provi-
sions, by adding "contraband smokeless tobacco" to items subject to forfeiture and
by removing the reference to the Internal Revenue Code, which became outdated after
the enactment of the Civil Asset Forfeiture Reform Act of 2000.

Section 122. Prohibition of narco-terrorism

   Section 122 of the conference report is substantively similar to section 124 of
the House bill. There is no comparable provision in the Senate amendment. This sec-
tion adds new section 1010A to Part A of the Controlled Substance Import and Export
Act, (21 U.S.C. S S 951 et seq.), making it a Federal crime to engage in drug traf-
ficking to benefit terrorists. The conference report changes the mandatory minimum
penalty from the 20 years provided in the House bill to simply twice the minimum un-
der 21 U.S.C. S 841(b). Finally, the conference report modifies the proof require-
ments of the House-passed bill to clarify that a person must have knowledge that the
person or organization has engaged or engages in terrorist activity or terrorism.

Section 123. Interfering with the operation of an aircraft

   Section 123 of the conference report is substantively similar to section 125 of
the House bill. There is no comparable provision in the Senate amendment. This sec-
tion amends 18 U.S.C. S 32, which prohibits the destruction of aircraft or aircraft
facilities, to address the increasing number of reports to the Federal Aviation Ad-
ministration of the intentional aiming of lasers into airplane cockpits. The amend-
ment makes it illegal to interfere with or disable a pilot or air navigation facil-
ity operator with the intent to endanger the safety of any person or with reckless
disregard for the safety of human life.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. Conf. Rep. 109-333                                           Page 94
H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 109-333,  2006 U.S.C.C.A.N. 184)**


**193** Section 124. Sense of Congress relating to lawful political activity

   Section 124 of the conference report is substantively similar to section 126 of
the House bill. There is no comparable provision in the Senate amendment. This sense
of the Congress articulates that no American citizen should be the target of a crim-
inal investigation solely as a result of that person's lawful political activity or
membership in a non-violent political organization. During the many congressional
hearings held on the PATRIOT Act, both in open and classified settings, there has
been absolutely no evidence adduced that the Department of Justice or the FBI has
used the powers conferred by law to investigate anyone based on his or her particip-
ation in the political process.

Section 125. Removal of civil liability barriers that discourage the donation of
fire equipment to volunteer fire companies

   Section 125 of the conference report is substantively similar to section 131 of
the House bill. There is no comparable provision in the Senate amendment. This sec-
tion establishes immunity from civil liability (other than for gross negligence or
intentional misconduct) for anyone other than a fire equipment manufacturer who
donates fire equipment to volunteer fire companies.

**99** Section 126. Report on data-mining activities

   Section 126 of the conference report is similar to section 132 of the House bill.
There is no comparable provision in the Senate amendment. This section instructs the
Attorney General to report to Congress on Department of Justice use or development
of pattern-based data-mining technology.

Section 127. Sense of Congress

   Section 127 of the conference report is substantively similar to section 133 of
the House bill. There is no comparable provision in the Senate amendment. This sec-
tion is a sense of the Congress that the victims of terrorist attacks should have
access to the assets of terrorists.

Section 128. PATRIOT section 214; authority for disclosure of additional information
in connection with orders for pen register and trap and trace authority under FISA

   Section 128 of the conference report is substantively identical to section 6 of
the Senate amendment. There is no comparable provision in the House bill. This sec-
tion requires: (1) an ex-parte order for a pen register or trap and trace device for
foreign intelligence purposes to direct the provider, upon the applicant's request,
to disclose specified information to the Federal officer using the device; and (2)
the Attorney General to fully inform the House and Senate Judiciary Committees re-
garding the use of such devices.

                       TITLE II-TERRORIST DEATH PENALTY ENHANCEMENT

Section 201. Short title


© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
(Cite as: H.R. CONF. REP. 109-333, 2006 U.S.C.C.A.N. 184)

The short title is the "Terrorist Death Penalty Enhancement Act of 2005." Section
201 of the conference report is identical to section 201 of the House bill. There is
no comparable provision in the Senate amendment.

**194 SUBTITLE A-TERRORIST PENALTIES ENHANCEMENT ACT

Section 211. Death penalty procedures for certain air piracy cases occurring before
enactment of the Federal Death Penalty Act of 1994

This section is the same as section 213 of the House bill, except for the addition
of a severability clause. There is no comparable provision in the Senate amendment.
Section 211 of the conference report provides procedures for death penalty prosecu-
tions for air piracy crimes occurring before the 1994 Federal Death Penalty Act,
provided that the government establishes the existence of one or more factors under
former 49 U.S.C. S 46503(c)(2), or its predecessor, and that the defendant has not
established by a preponderance of the evidence the existence of any of the factors
set forth in former 49 U.S.C. S 46503(c)(1), or its predecessor. This section makes
the 1994 procedures applicable to post-1974, and pre-1994 air piracy murder cases.
Section 211 of the conference report would permit the imposition of the death pen-
alty upon an individual convicted of air piracy offenses resulting in death where
those offenses occurred after enactment *100 of the Antihijacking Act of 1974 but
before the enactment of the Federal Death Penalty Act of 1994. This provision would
cover a small, but important category of defendants, including those responsible for
the December 1984 hijacking of Kuwait Airways flight 221 and the murder of two Amer-
ican United States Agency for International Development employees, William Stanford
and Charles Hegna; the June 1985 hijacking of TWA flight 847 and the murder of Navy
diver Robert Stethem; the November 1985 hijacking of Egyptair flight 648 and the
murder of American servicewoman Scarlett Rogenkamp as well as 56 other passengers;
and the September 1986 hijacking of Pan Am flight 73 and the murder of American cit-
izens Rajesh Kumar and Surendra Patel, as well as at least 19 other passengers and
crew.
Section 211 is important to reaffirm the intent of Congress to have available the
ultimate penalty to use against aircraft hijackers whose criminal actions result in
death. In 1974, Congress enacted the Antihijacking Act, making the crime of air pir-
acy the one and only crime under Federal law for which Congress passed comprehensive
procedures, in response to Furman v. Georgia, 408 U.S. 238 (1972), to ensure that
the death penalty could be constitutionally enforced. Over the years after the pas-
sage of the Antihijacking Act of 1974, the crime of air piracy was repeatedly cited
by Members of Congress and the Executive Branch as an example of a crime for which
Congress had enacted the necessary constitutional provisions to enforce the death
penalty. In 1994, in an effort to make the death penalty widely available for numer-
ous Federal offenses, and to enact uniform procedures to apply to all Federal capit-
al offenses, Congress passed the Federal Death Penalty Act of 1994 ("FDPA"), expli-
citly including air piracy procedures among the list of crimes to which it applied,
at the same time repealing the former death penalty procedures of the Antihijacking
Act of 1974.
The problem with this legal development is that there is a perceived gap in legis-
lative intent to maintain the option of a death penalty for those who committed air

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 109-333    Page 99

H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005, 2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)

**(Cite as: H.R. CONF. REP. 109-333, 2006 U.S.C.C.A.N. 184)**

piracy resulting in death before enactment of the FDPA. On September 29, 2001, the United States obtained custody of Zaid Hassan Abd Latif Safarini, the operational leader of the deadly attempted hijacking of Pan Am flight 73, a crime which occurred on September 5, 1986, in Karachi, Pakistan, and which resulted in the death of at least 20 people, including two United States citizens, and the injury of more than 100 others. Safarini personally executed the first United States citizen and after a 16-hour stand-off, he and his fellow hijackers opened fire on approximately 380 passengers and crew on board Pan Am 73, attempting to kill all of them with grenades and assault rifles. Safarini and his **195 co-defendants had been indicted by a grand jury in the District of Columbia in 1991, and after his capture in 2001, the prosecutors filed papers stating the government's intention to seek the death penalty against Safarini. The district court, however, ruled that the government could not seek the death penalty in this case or, by implication, in any other air piracy case from the pre-FDPA period, essentially because Congress had not made clear which procedures should apply to such a prosecution. In its ruling, the court noted that, at the time it passed the FDPA in 1994, Congress *101 did not state any intention as to whether the new capital sentencing procedures should be applied to air piracy offenses occurring before enactment of the FDPA. A further complication exists, in that there are two provisions of the Antihijacking Act of 1974 that, if taken away from pre-FDPA air piracy defendants, could pose ex post facto concerns in light of Ring v. Arizona, 536 U.S. 584 (2002). Safarini has since pled guilty to the charged offenses and was sentenced, pursuant to a plea agreement, to three life terms plus twenty-five years imprisonment.

Section 211 addresses the issues identified by the district court in the Safarini case by explicitly stating that Congress intends for the provisions of the FDPA to apply to this category of defendants, while also explicitly preserving for such defendants the two provisions of the Antihijacking Act to which they are arguably constitutionally entitled, concerning the statutory aggravating and mitigating circumstances set forth in the Antihijacking Act.

This provision is particularly important for several other reasons. In the absence of a death penalty that could be implemented for pre-FDPA hijacking offenses resulting in death that also occurred before the effective date of the Sentencing Guidelines on November 1, 1987, the maximum penalty available would be life imprisonment. Under the pre-Sentencing Guidelines structure, even prisoners sentenced to life imprisonment were eligible for a parole hearing after serving only ten years. While there is a split in the Circuit Courts of Appeals as to whether a sentencing judge can impose a sentence that could avert the 10-year parole hearing requirement, the current position of the Bureau of Prisons is that a prisoner is eligible for a parole hearing after serving ten years of a life sentence. Even if parole is denied on that first occasion, such prisoners are entitled to have regularly scheduled parole hearings every two years thereafter. Moreover, in addition to parole eligibility after ten years, the old sentencing and parole laws incorporated a presumption that even persons sentenced to life imprisonment would be released after no more than 30 years.

In the context of the individuals responsible for the hijacking incidents described above, most of the perpetrators were no older than in their twenties when they committed their crimes. The imposition of a pre-Guidelines sentence of life im-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 109-333, 2006 U.S.C.C.A.N. 184)**

prisonment for these defendants means that many, if not all of them, could be expected to be released from prison well within their lifetime. Given the gravity of these offenses, coupled with the longstanding Congressional intent to have a death penalty available for the offense of air piracy resulting in death, such a result would be at odds with the clear directive of Congress.

Section 211 includes a severability clause that would establish that if any provision of the Act or the application thereof to any person or circumstance is held invalid by a court of law, the remainder of Section 211 and the application of such provision to other persons or circumstances shall not be affected by that declaration of invalidity. The inclusion of this severability clause means that the unaffected portions of the law would remain operable.

**\*102 \*\*196 Section 212. Postrelease supervision of terrorists**

This section is substantively similar to section 215 of the House bill. There is no comparable provision in the Senate amendment. Section 212 of the conference report expands the scope of the individuals covered by the post-release supervision provisions for terrorists.

### SUBTITLE B-FEDERAL DEATH PENALTY PROCEDURES

Section 221. Elimination of procedures applicable only to certain Controlled Substances Act cases

This section retains a portion of section 231 of the House bill. There is no comparable provision in the Senate amendment. The conference report eliminates duplicative death procedures under title 21 of the United States Code, and consolidates procedures governing all Federal death penalty prosecutions in existing title 18 of the United States Code, thereby eliminating confusing requirements that trial courts provide two separate sets of jury instructions in certain Federal death penalty prosecutions.

Section 222. Counsel for financially unable defendants

Section 222 of the conference report is a new provision. This section transfers existing statutes from the death penalty procedures contained in title 21 of the United States Code to the death penalty procedures in title 18 of the United States Code. This section requires that any death-penalty eligible defendant who is or becomes financially unable to obtain adequate representation or investigative, expert, or other reasonably necessary services will be entitled to the appointment of one or more attorneys and the furnishing of such other services.

### TITLE III-REDUCING CRIME AND TERRORISM AT AMERICA'S SEAPORTS

Section 301. Short title

This section designates the short title as the "Reducing Crime and Terrorism at America's Seaports Act of 2005." Section 301 of the conference report is identical to section 301 of the House bill. There is no comparable provision in the Senate

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

amendment, but this section is similar to S. 378, the "Reducing Crime and Terrorism
at America's Seaports Act of 2005," which was reported favorably by the Senate Com-
mittee on the Judiciary on April 21, 2005.

Section 302. Entry by false pretenses to any seaport

  Section 302 of the conference report is substantively similar to section 302 of
the House bill and the parallel section in S. 378. There is no comparable provision
in the Senate amendment. According to the Report of the Interagency Commission on
Crime and Security at U.S. Seaports (hereinafter "Interagency Commission Report"),
"[c]ontrol of access to the seaport or sensitive areas within the seaport is often
lacking." Such unauthorized access is especially problematic, because inappropriate
controls may result in the theft of cargo and, more dangerously, undetected admis-
sion of ter3>> roriststerrorists. **\*103** In addition to establishing appropriate phys-
ical, procedural, and personnel security for seaports, it is important that U.S.
criminal law adequately reflect the seriousness of the offense. This section clari-
fies that 18 U.S.C. S 1036 (fraudulent access to transport facilities) includes sea-
ports and waterfronts within its scope, and increases the penalties for violating
these provisions from a maximum of 5 years to 10 years.

Section 303. Criminal sanctions for failure to heave to, obstruction of boarding, or
providing false information

  Section 303 of the conference report is substantively similar to section 303 of
the House bill and the parallel section in S. 378. A core function of the United
States Coast Guard is law enforcement at sea, especially in the aftermath of the
tragic events of September 11, 2001. While the Coast Guard has authority to use
whatever force is reasonably necessary to require a vessel to stop or be boarded,
"refusal to stop," by itself, is not currently a crime. This section amends title 18
of the United States Code to make it a crime: (1) for a vessel operator knowingly to
fail to slow or stop a ship once ordered to do so by a Federal law enforcement of-
ficer; (2) for any person on board a vessel to impede boarding or other law enforce-
ment action authorized by Federal law; or (3) for any person on board a vessel to
provide false information to a Federal law enforcement officer. Any violation of
this section will be punishable by a fine and/or imprisonment for a maximum term of
5 years.

Section 304. Criminal sanctions for violence against maritime navigation, placement
of destructive devices

  Section 304 of the conference report is substantively similar to section 305 of
the House bill, and excludes the malicious dumping provisions contained in S. 378.
The Coast Guard maintains over 50,000 navigational aids on more than 25,000 miles of
waterways. These aids, which are relied upon by all commercial, military, and recre-
ational mariners, are essential for safe navigation and, therefore, are inviting
targets for terrorists. To deter any such intentional interference, this section
amends 18 U.S.C. S 2280(a) (violence against maritime navigation) to make it a crime
to intentionally damage or tamper with any maritime navigational aid maintained by
the Coast Guard or under its authority, if such act endangers the safe navigation of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. Conf. Rep. 109-333
H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
(Cite as: H.R. CONF. REP. 109-333, 2006 U.S.C.C.A.N. 184)

a ship. In addition, this section amends title 18 of the United States Code to make
it a crime to knowingly place in waters any device that is likely to damage a vessel
or its cargo, interfere with a vessel's safe navigation, or interfere with maritime
commerce. Any violation of this provision will be punishable by a fine and/or a max-
imum term of imprisonment for life, and if death results, an offense could be pun-
ishable by a sentence of death.

Section 305. Transportation of dangerous materials and terrorists

   Section 305 of the conference report is substantively similar to section 306 of
the House bill and the parallel provision in S. 378, but adopts the intent require-
ments as specified in S. 378. The section makes it a crime to knowingly and inten-
tionally transport aboard any vessel an explosive, biological agent, chemical
weapon, *104 or radioactive or nuclear materials, knowing that the item is intended
to be used to commit a terrorist act. Any violation of this provision will be pun-
ishable by a fine and a maximum prison term of life and, if death results, the of-
fense could be punished by a sentence of death.

**198 Section 306. Destruction of, or interference with, vessels or maritime facil-
ities

   Section 306 of the conference report is substantively similar to section 307 of
the House bill and the parallel provision in S. 378. This section makes it a crime
to: (1) damage or destroy a vessel or its parts, a maritime facility, or any appar-
atus used to store, load or unload cargo and passengers; (2) perform an act of viol-
ence against or incapacitate any individual on a vessel, or at or near a facility;
or (3) knowingly communicate false information that endangers the safety of a ves-
sel. Any violation of this section (including attempts and conspiracies) will be
punished by a fine and/or imprisonment for a maximum of 20 years; if death results,
the offense could be punished by a sentence of death. If an individual threatens to
carry out the above-described offense, and has the apparent will and determination
to carry out the threat, that threat is punishable by a fine and/or imprisonment for
a maximum of 5 years. The offender also will be liable for all costs incurred as a
result of the threat. This section also subjects any individual who knowingly con-
veys false information about the offenses described above (or other named offenses)
to a civil penalty up to $5,000. In addition, knowingly conveying false information
concerning an attempted violation of this section or of chapter 11 of title 18 will
be punishable by a maximum of 5 years imprisonment. This section harmonizes the
somewhat outdated maritime provisions with the existing criminal sanctions for de-
struction or interference with an aircraft or aircraft facilities in 18 U.S.C. S S
32, 34, and 35.

Section 307. Theft of interstate or foreign shipments or vessels

   This section is similar to section 308 of the House bill and the parallel provi-
sion in S. 378, except the conference report does not maintain the increased crimin-
al penalties that were included in the House bill. The Interagency Commission Report
found that certain existing statutes, regulations, and sentencing guidelines do not
provide sufficient sanctions to deter criminal or civil violations related to a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:07-cv-02538-VRW    Document 5    Filed 06/23/2007    Page 107 of 303

H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 109-333, 2006 U.S.C.C.A.N. 184)**

range of offenses, including theft of interstate or foreign shipments. In an effort
to close statutory gaps and increase the criminal penalty, this section expands the
scope of section 18 U.S.C. S 659 (theft of interstate or foreign shipments) to in-
clude theft of goods from additional transportation facilities or instruments, in-
cluding trailers, cargo containers, and warehouses. In addition, the section in-
creases the penalties for theft of goods from a maximum of 10 years to a maximum of
15 years imprisonment, and for amounts less than $1000, the punishment will be in-
creased from a maximum of 1 year to a maximum of 3 years imprisonment. The section
clarifies that, under 18 U.S.C. S 659, the determination of whether goods are "mov-
ing as an interstate or foreign shipment" is made by considering the entire cargo
route, regardless of any temporary stop between the point of origin and final des-
tination. **\*105** Finally, the section requires an annual report of law enforcement
activities relating to cargo theft and requires collection and reporting by the FBI
of cargo theft crimes.

Section 308. Stowaways on vessels or aircraft

  Section 308 of the conference report is similar to section 310 of the House bill.
It is similar to the parallel provision in S. 378, though the conference report in-
cludes a death penalty that was not part of the Senate amendment. The section in-
creases the maximum penalty for a violation of 18 U.S.C. S 2199 (stowaways on ves-
sels or aircraft) from 1 year to 5 years imprisonment. If the act is committed with
the intent to commit serious bodily injury and serious bodily injury occurs, it will
be punishable by a fine and a maximum of 20 years imprisonment. If death results, it
will be punishable by death or life imprisonment.

**\*\*199** Section 309. Bribery affecting port security

  This section is substantively similar to section 311 of the House bill and the
parallel provision of S. 378. Section 309 of the conference report makes it a crime
to knowingly, and with the intent to commit international or domestic terrorism,
bribe a public official to affect port security; or to receive a bribe in return for
being influenced in public duties affecting port security, knowing that such influ-
ence will be used to commit, or plan to commit, an act of terrorism. A violation of
this section is punishable by a maximum term of 15 years imprisonment.

Section 310. Penalties for smuggling goods into the United States

  Section 310 of the conference report is substantively identical to section 312 of
the House bill. There is no comparable provision in the Senate amendment. This sec-
tion increases the penalty for violations of 18 U.S.C. S 545 (smuggling) from im-
prisonment for not more than 5 years to imprisonment for not more than 20 years.

Section 311. Smuggling goods from the United States

  Section 311 of the conference report is substantively identical to section 313 of
the House bill. There is no comparable provision in the Senate amendment. This sec-
tion creates a new criminal offense for illegally smuggling goods from the United
States and establishes a maximum penalty of 10 years imprisonment.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. Conf. Rep. 109-333                                              Page 101

H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 109-333,  2006 U.S.C.C.A.N. 184)**


                    TITLE IV-COMBATING TERRORISM FINANCING

Section 401. Short title

   The short title is "Combating Terrorism Financing Act of 2005." Section 401 of the
conference report is identical to section 401 of the House bill. There is no compar-
able provision in the Senate amendment.

Section 402. Increased penalties for terrorism financing

   Section 402 of the conference report is substantively similar to section 402 of
the House bill. There is no comparable provision in the Senate amendment. Currently,
penalties for violating the International Emergency Economic Powers Act (IEEPA) are
not commensurate **106** with terrorist financing violations. This section amends sec-
tion 206 of IEEPA (50 U.S.C. S 1705) to increase the civil penalty from $10,000 to
$50,000 per violation and to increase the criminal penalty from 10 years imprison-
ment to 20 years imprisonment with the maximum criminal fine remaining the same.

Section 403. Terrorism-related specified activities for money laundering

   Section 403 of the conference report is substantively similar to section 403 of
the House bill. There is no comparable provision in the Senate amendment. Under cur-
rent law, a number of activities that terrorist financiers undertake are not predic-
ates for purposes of the Federal money laundering statute, 18 U.S.C. S 1956. Key
among those activities is operating an illegal money transmitting business, includ-
ing "hawala" networks, which terrorists and their sympathizers often use to transfer
funds to terrorist organizations abroad. This section adds three terrorism-related
provisions to the list of specified unlawful activities that serve as predicates for
the money laundering statute. **200** Subsection(a) adds as a RICO predicate the of-
fense in 18 U.S.C. S 1960 (relating to illegal money transmitting businesses), which
has the effect of making this offense a money laundering predicate through the
cross-reference in 18 U.S.C. S 1956(c)(7)(A). Subsection(b) directly adds as money
laundering predicates the new terrorist-financing offense in 18 U.S.C. S 2339C.

Sec. 404. Assets of persons committing terrorist acts against foreign countries or
international organizations

   Section 404 of the conference report is substantively similar to section 404 of
the House bill. There is no comparable provision in the Senate amendment. The USA
PATRIOT Act enacted a new forfeiture provision codified at 18 U.S.C. S 981(a)(1)(G)
pertaining to the assets of any person planning or perpetrating an act of terrorism
against the United States. Section 404 of the conference report adds a parallel pro-
vision pertaining to the assets of any person planning or perpetrating an act of
terrorism against a foreign state or international organization. Where the property
sought for forfeiture is located outside the United States, an act in furtherance of
planning or perpetrating the terrorist act must have occurred within the jurisdic-
tion of the United States.

Sec. 405. Money laundering through hawalas


© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:07-cv-02538-VRW    Document 5    Filed 06/23/2007    Page 109 of 303
H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 109-333, 2006 U.S.C.C.A.N. 184)**

  Section 405 of the conference report is substantively similar to section 405 of
the House bill. There is no comparable provision in the Senate amendment. This sec-
tion outlaws any "dependent transactions" relating to a money laundering transac-
tion. Terrorist financing and money laundering can be mutually exclusive, but many
times they go hand-in-hand. As reported in the National Money Laundering Strategy
(NMLS), "both depend on the lack of transparency and vigilance in the financial sys-
tem. Money laundering requires the existence of an underlying crime, while terrorist
financing does not. Methods for raising funds to support terrorist activities may be
legal or illegal. Also, the objective of money laundering investigations is prosecu-
tion and forfeiture. Terrorist financing **\*107** investigations share these objectives;
however, the ultimate goal is to identify, disrupt, and cut off the flow of funds to
terrorists, whether or not the investigation results in prosecutions."

  Many steps have been taken by Congress, law enforcement, and the private sector to
address the issue of terrorist financing. The USA PATRIOT Act codified money laun-
dering statutes and provided authority improving the flow of financial information
regarding terrorist financing. The Bank Secrecy Act has been amended to require fin-
ancial institutions to report suspicious activities. Enforcement and enhanced regu-
lations make it more difficult for terrorist organizations to compromise U.S. finan-
cial institutions. However, these terrorists continue to seek the path of least res-
istance, utilizing alternative financing systems and foreign banking systems that
lack sufficient standards and regulations.

  Alternative remittance systems are utilized by terrorists to move and launder
large amounts of money around the globe quickly and secretly. These remittance sys-
tems, also referred to as "hawala" networks, are used throughout the world, includ-
ing the Middle East, Europe, North America and South Asia. These systems are desir-
able to criminals and non-criminals alike because of the anonymity, low cost, effi-
ciency, and access to underdeveloped regions. The United States has taken steps to
combat the "hawala" networks by requiring all money transmitters, informal or form-
al, to register as money services businesses.

  **\*\*201** Under current Federal law, a financial transaction constitutes a money laun-
dering offense only if the funds involved in the transaction represent the proceeds
of some criminal offense. See 18 U.S.C. S 1956(a) (1) ("represents the proceeds of
some form of unlawful activity"); and 18 U.S.C. S 1957(f)(2) ("property constitut-
ing, or derived from, proceeds obtained from a criminal offense"). There is some un-
certainty, however, as to whether the "proceeds element" is satisfied with regard to
each transaction in a money laundering scheme that involves two or more transactions
conducted in parallel, only one of which directly makes use of the proceeds from un-
lawful activity. For example, consider the following transaction: A sends drug pro-
ceeds to B, who deposits the money in Bank Account 1. Simultaneously or sub-
sequently, B takes an equal amount of money from Bank Account 2 and sends it to A,
or to a person designated by A. The first transaction from A to B clearly satisfies
the proceeds element of the money laundering statute, but there is some question as
to whether the second transaction-the one that involves only funds withdrawn from
Bank Account 2 does so as well. The question has become increasingly important be-
cause such parallel transactions are the technique used to launder money through the
Black Market Peso Exchange and "hawala" network. Section 405 of the conference re-
port is intended to remove all uncertainty on this point by providing that all con-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 109-333,  2006 U.S.C.C.A.N. 184)**

stituent parts of a set of parallel or dependent transactions involve criminal pro-
ceeds if one such transaction does so. The conference report modifies the hawala
provision to require that it be part of plan or arrangement.

**\*108** Sec 406. Technical and conforming amendments relating to the USA PATRIOT Act

   Section 406 of the conference report is substantively similar to section 406 of
the House bill. There is no comparable provision in the Senate amendment. This sec-
tion makes a number of corrections relating to provisions of the USA PATRIOT Act,
mostly affecting money laundering or asset forfeiture. While essentially technical
in nature, these corrections are critical because typographical and other errors in
the USA PATRIOT Act provisions are preventing prosecutors from fully utilizing that
Act's tools. For example, certain new forfeiture authorities enacted by that Act
refer to a nonexistent statute, 31 U.S.C. S 5333, where 31 U.S.C. S 5331 is inten-
ded.
   Subsection (a) makes technical corrections to a number of provisions in the USA
PATRIOT Act. Subsection (b) codifies section 316(a)-(c) of that Act as 18 U.S.C. S
987. Subsection (c) adds explicit language covering conspiracies to carry out two
offenses likely to be committed by terrorists (18 U.S.C. S S 33(a) and 1366),
thereby conforming these provisions to various crimes modified by section 811 of the
USA PATRIOT Act, which added conspiracy language to other terrorism offense.

Section 407. Cross reference correction

   Section 407 of the conference report is substantively identical to section 408 of
the House bill. There is no comparable provision in the Senate amendment. This sec-
tion corrects a cross-reference, replacing the "National Intelligence Reform Act of
2004" with the correct title, the "Intelligence Reform and Terrorism Prevention Act
of 2004."

Section 408. Amendment to amendatory language

   Section 408 of the conference report is substantively identical to section 409 of
the House bill. There is no comparable provision in the Senate amendment. This sec-
tion amends an incorrect citation.

**\*\*202** Section 409. Designation of additional money laundering predicate

   Section 409 of the conference report is substantively identical to section 410 of
the House bill. There is no comparable provision in the Senate amendment. This sec-
tion adds 18 U.S.C. S 2339D (relating to receiving military-type training from a
foreign terrorist organization) as a money laundering predicate.

TITLE V-MISCELLANEOUS

Section 501. Residence of United States Attorneys and Assistant United States Attor-
neys

   Section 501 is a new section and addresses an unintentional effect of the resid-
ency requirement for United States Attorneys and Assistant United States Attorneys.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 109-333,  2006 U.S.C.C.A.N. 184)**

Section 501 of the conference report provides that the Attorney General can order
that residency requirements be waived when a United States Attorney or Assistant
United States Attorney is assigned dual or additional responsibilities. **\*109** This
provision will enable activities such as participation by United States Attorneys in
legal activities in Iraq.

Section 502. Interim appointment of United States Attorneys

   Section 502 is a new section and addresses an inconsistency in the appointment
process of United States Attorneys.

Section 503. Secretary of Homeland Security in Presidential line of succession

   Section 503 of the conference report is a new section and fills a gap in the Pres-
idential line of succession by including the Secretary of Homeland Security.

Section 504. Bureau of Alcohol, Tobacco, and Firearms to the Department of Justice

   Section 504 of the conference report is a new section. This provision modifies the
appointment procedure for the Director of the Bureau of Alcohol, Tobacco, and Fire-
arms by providing that the President, with the advice and consent of the Senate,
shall appoint the Director.

Section 505. Qualifications of United States Marshals

   Section 505 of the conference report is a new section. This section clarifies the
qualifications individuals should have before joining the United States Marshals.

Section 506. Department of Justice intelligence matters

   Section 506 is a new section that establishes a National Security Division (NSD)
within the DOJ, headed by an Assistant Attorney General for National Security
(AAGNS). This section is consistent with a recommendation by the WMD Commission that
the "Department of Justice's primary national security elements-the Office of Intel-
ligence Policy and Review, and the Counterterrorism and Counterespionage sections-
should be placed under a new Assistant Attorney General for National Security." A
version of this section was included in S. 1803, the "Intelligence Reauthorization
bill for fiscal year 2006," which was reported favorably by the Senate Select Com-
mittee on Intelligence on September 29, 2005.

**\*\*203** Section 507. Review by Attorney General

   Section 507 is a new section. It modifies the process by which States can opt in
to the expedited habeas procedures for capital cases under chapter 154 of title 28
of the United States Code by shifting responsibility to the Attorney General for
certifying when a State has qualified. This section also allows for de novo review
in the U.S. Court of Appeals for the District of Columbia Circuit of the Attorney
General's certification. It relaxes the time constraints imposed on judges for de-
ciding habeas cases under chapter 154. This section also clarifies when a habeas
proceeding is 'pending' for purposes of 28 U.S.C. 2251, which controls the circum-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 109-333,  2006 U.S.C.C.A.N. 184)**


stances under which a federal court hearing a habeas petition may stay a State court
action. Overruling McFarland v. Scott, 512 U.S. 849 (1994), this section provides
that a habeas proceeding is not 'pending' until the habeas application itself is
filed. For prisoners **\*110** who have applied for counsel pursuant to 18 U.S.C. 3599
(a)(2), there is a limited exception allowing the court to stay execution of a death
sentence until after the attorney has been appointed or the application withdrawn or
denied.


TITLE VI-SECRET SERVICE

Section 601. Short title

   The short title is "Secret Service Authorization and Technical Modification Act of
2005." Section 601 of the conference report is new.

Section 602. Interference with national special security events

   Section 602 of the conference report is a new section. 18 U.S.C. S 1752 authorizes
the Secret Service to charge individuals who breach established security perimeters
or engage in other disruptive or potentially dangerous conduct at National Special
Security Events (NSSEs) if a Secret Service protectee is attending the designated
event. Section 602 of the conference report expands 18 U.S.C. S 1752 to criminalize
such security breaches at NSSEs that occur when the Secret Service protectee is not
in attendance. Additionally, it doubles the statutory penalties (from 6 months to 1
year) for violations of S 1752, to make the penalty consistent with the prescribed
penalty under 18 U.S.C. S 3056(d) (interference with Secret Service law enforcement
personnel generally). The conference report makes punishable by up to 10 years the
thwarting of security procedures by individuals in possession of dangerous or deadly
weapons.

Section 603. False credentials to national special security events

   Section 603 of the conference report is a new section. This section amends  18
U.S.C. S 1028 to make it a Federal crime to knowingly produce, possess, or transfer
a false identification document that could be used to gain unlawful and unauthorized
access to any restricted area of a building or grounds in conjunction with a NSSE.
Such actions were a problem during the 2002 Winter Olympics, and the conference re-
port will allow for Federal prosecution against such criminal violations at future
NSSEs.

Section 604. Forensic and investigative support of missing and exploited children
cases

   Section 604 of the conference report is a new section. On April 30, 2003, Presid-
ent Bush signed into law the Child Abduction Prevention Act (Pub. Law No. 108-21),
which authorizes the Secret Service to provide, upon request, forensic and investig-
ative **\*\*204** assistance to the National Center for Missing and Exploited Children or
local law enforcement agencies. The current statute states that "officers and
agents" of the Secret Service may provide this assistance. Section 604 of the con-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ference report clarifies that forensic and other civilian personnel, such as finger-
print specialists, polygraph examiners, and handwriting analysts, are authorized to
provide such assistance.

**\*111** Section 605. The uniformed division, United States Secret Service

   Section 605 of the conference report is a new section. This section places all au-
thorities of the Uniformed Division, which are currently authorized under title 3,
in a newly created 18 U.S.C. S 3056A, following the core authorizing statute of the
Secret Service (18 U.S.C. S 3056), thereby organizing the Uniformed Division under
title 18 of the United States Code with other Federal law enforcement agencies.

Section 606. Savings provisions

   Section 606 of the conference report is a new section. This section makes clear
that the transfer of the Uniformed Division from title 3 of the United States Code
to title 18 of the United States Code shall have no impact on the retirement bene-
fits of current employees or annuitants and others necessary to reimburse State and
local government organizations for support provided in connection with a visit of a
foreign government official.

Section 607. Maintenance as distinct entity

   Section 607 of the conference report is a new section. This section provides a
clear operational and organizational framework for the Secret Service that maintains
the Secret Service as a distinct component of the Department of Homeland Security
while providing the Service with necessary operational latitude. It allows for the
Director of the Secret Service to report directly to the Secretary of the Department
of Homeland Security. Finally, the conference report provides that the assets,
agents, officers, and other personnel of the Secret Service shall remain at all
times under the command and control of the Director.

Section 608. Exemptions from the Federal Advisory Committee Act

   Section 608 of the conference report is a new section. This section exempts the
functions of the Secret Service's Electronic Crime Task Forces and the candidate
protection committee from the Federal Advisory Committee Act (5 U.S.C. App. 2),
which imposes a series of requirements on committees established or utilized by Fed-
eral agencies to provide advice or recommendations to any agency or Federal officer.
Committees that wholly consist of full-time officers or employees of the Federal
Government are not covered by the Act. If the advisory committee is subject to the
Act, it must, among other requirements, open its meetings to the public, publish no-
tice of meetings in the Federal Register, and make its minutes available to the pub-
lic. There are current exemptions from these requirements, such as committees estab-
lished by the CIA and the Federal Reserve. This amendment eliminates any doubt and
confirms that the Act does not apply to the Electronic Crime Task Forces or the can-
didate protection committee.

TITLE VII-COMBAT METHAMPHETAMINE EPIDEMIC ACT OF 2005

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 109-333,  2006 U.S.C.C.A.N. 184)**


Section 701. Short title

   The short title is the "Combat Methamphetamine Epidemic Act of 2005." Section 701
of the conference report is a new section.

          **\*112 \*\*205** SUBTITLE A-DOMESTIC REGULATION OF PRECURSOR CHEMICALS

Section 711. Scheduled listed chemical products; restrictions on sale quantity, be-
hind-the counter access, and other safeguards

   This section of the conference report is new. Section 711 reclassifies pseudoep-
hedrine, phenylpropanolamine, and ephedrine as Schedule Listed Chemicals; reduces
the Federal pertransaction sales limit for SLCs from 9 grams to 3.6 grams (the
amount recently proposed by the Administration); requires behind-the-counter storage
or locked cabinet storage of SLCs; requires that regulated sellers (retail distrib-
utors and pharmacies) maintain a written log of purchases; restricts monthly sales
to no more than 9.0 grams per purchaser; imposes similar requirements on Internet
sellers and mobile retail vendors; and requires each regulated seller to submit a
certification that it is in compliance with these requirements, that its employees
have been trained as to these requirements, and that records relating to such train-
ing are maintained at the retailers location. Such certifications are to be made
available by the Attorney General to State and local law enforcement.

Section 712. Regulated transactions

   This section of the conference report is new and repeals the Federal  "blister
pack" exemption, and clarifies the law to include derivatives of each of these chem-
icals. It makes conforming amendments to the current law, to accommodate the new
sales restrictions, and makes another technical correction to make it clear that
these sales limitations apply to drug combinations containing derivatives of
pseudoephedrine, ephedrine, or phenylpropanolamine.

Section 713. Authority to establish production quotas

   This section of the conference report is new and extends the Attorney General's
existing authority to set production quotas for certain controlled substances (see
21 U.S.C. S 826) to pseudoephedrine, ephedrine, and phenylpropanolamine. Currently,
domestic production of these chemicals is not very high, as most of our country's
supply is imported. With the adoption of the import quotas in section 715 of this
Act (see below), however, the Attorney General would require corresponding authority
within the U.S. if domestic production were to increase. Current law (as amended)
would allow manufacturers to apply for increases in their production quotas (see 21
U.S.C. S 826(e)).

Section 714. Penalties; authority for manufacturing; quota

   This section of the conference report is new and expands the existing penalty for
illegal production beyond established quotas (see 21 U.S.C. S 842(b)) to take into

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 109-333, 2006 U.S.C.C.A.N. 184)**

account the Attorney General's new authority to set quotas for methamphetamine pre-
cursors.

Section 715. Restrictions on importation; authority to permit imports for medical,
scientific, or other legitimate purposes

   Section 715 of the conference report is a new provision and extends the Attorney
General's existing authority to set import quotas for controlled substances (see 21
U.S.C. S 952) to **113 **206 pseudoephedrine, ephedrine, and phenylpropanolamine.
This section allows registered importers to apply for temporary or permanent in-
creases in a quota to meet legitimate needs. The. Attorney General is required to
act on all such applications within 60 days.

Section 716. Notice of importation or exportation; approval of sale or transfer by
importer or exporter

   Section 716 of the conference report is new and closes a loophole in the current
regulatory system for imports and exports of precursor chemicals for methamphetamine
and other synthetic drugs. Under current law, a company that wants to import or ex-
port pseudoephedrine or another precursor chemical must either: (1) Notify the De-
partment of Justice 15 days in advance of the import or export; or (2) be a company
that has previously imported or exported a precursor and is proposing to sell the
chemicals to a customer with whom the company has previously dealt. (See 21 U.S.C. S
971(a), (b).)
   A problem can arise, however, when the sale that the importer or exporter origin-
ally planned falls through. When this happens, the importer or exporter must quickly
find a new buyer for the chemicals on what is called the "spot market"-a wholesale
market. Sellers are often under pressure to find a buyer in a short amount of time,
meaning that they may be tempted to entertain bids from companies without a strong
record of preventing diversion. More importantly, the Department of Justice has no
opportunity to review such transactions in advance and suspend them if there is a
danger of diversion to illegal drug production.
   This section extends the current reporting requirements-as well as the current ex-
emption for regular importers and customers-to post-import or export transactions.
If an importer or exporter were required to file an initial advance notice with the
Department of Justice 15 days before the shipment of chemicals, and the originally
planned sale fell through, the importer or exporter would be required to file a
second advance notice with DOJ identifying the new proposed purchaser. DOJ would
then have 15 days to review the new transaction and decide whether it presents
enough of a risk of diversion to warrant suspension. As is the case under existing
law, a suspension can be appealed through an administrative process. (See 21 U.S.C.
S 971(c)(2)
   If, however, the new proposed purchaser qualifies as a "regular" customer under
existing law, the importer or exporter would not be required to file a second ad-
vance notice. (Note that under current law, DOJ does receive a record of these
transactions after the fact, see 21 U.S.C. S 971(b)(1)).

Section 717. Enforcement of restrictions on importation and of requirement of notice

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 109-333,  2006 U.S.C.C.A.N. 184)**

of transfer

This section of the conference report is new and makes a conforming amendment to
current law to extend existing penalties for illegal imports or exports to the new
regulatory requirements added by sections 715 and 716 of the conference report.

**\*114** Section 718. Coordination with United States Trade Representative

This section of the conference report is new and requires coordination by the At-
torney General with the United States Trade Representative.

**\*\*207** SUBTITLE B-INTERNATIONAL REGULATION OF PRECURSOR CHEMICALS

Section 721. Information of foreign chain of distribution; import restrictions re-
garding failure of distributors to cooperate

This section of the conference report is new and further amends the reporting re-
quirements for importers of meth precursor chemicals, by requiring them to file with
Federal regulators the detailed information about the chain of distribution of im-
ported chemicals (from the manufacturer to the shores of the U.S.). This provision
will assist U.S. law enforcement agencies to better track where meth precursors come
from, and how they get to the U.S. At present, very little information exists about
the international "chain of distribution" for these chemicals, hindering effective
controls.

Section 722. Requirements relating to the largest exporting and importing countries
of certain precursor chemicals

This section of the conference report is new, and was originally introduced by
Rep. Mark Kennedy in the House and was adopted by the House as part of the State De-
partment reauthorization legislation for FE 2006-07 (H.R. 2601). It mandates a sep-
arate section of the current State Department report on major drug producing and
transit countries (see 22 U.S.C. 2291h), identifying the five largest exporters of
major methamphetamine precursor chemicals, and the five largest importers that also
have the highest rate of methamphetamine production or diversion of these chemicals
to the production of methamphetamine. If any of those countries was not fully co-
operating with U.S. law enforcement in implementing their responsibilities under in-
ternational drug control treaties, there would be consequences for their eligibility
for U.S. aid, similar to those faced by the major drug trafficking nations under
current law.

The conference report adds a provision clarifying the original intent of this
amendment, to apply the "fully cooperates" standard (and not the lesser standard un-
der another, separate provision of law). The provision also includes an authoriza-
tion of one million dollars for implementation. The House recently passed an amend-
ment to the State Department's appropriations bill for FY '06, adding $5 million for
the State Department to implement anti-methamphetamine measures; this $1 million
could be derived from that amount.

Section 723. Prevention of smuggling of methamphetamine into the United States from

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 109-333    Page 208
H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 109-333, 2006 U.S.C.C.A.N. 184)**

Mexico

   This section of the conference report is new and requires the State Department's
Bureau for International Narcotics and Law Enforcement Affairs (INL) to provide as-
sistance to Mexico to prevent the production of methamphetamine in that country, and
to encourage Mexico to stop the illegal diversion of methamphetamine **\*115** precursor
chemicals. The conference report authorizes the use of $4 million of the $5 million
recently approved by the House for these purposes. (The remaining funds would be
available to help the State Department implement Sec. 722, as described above.)

   **\*\*208** SUBTITLE C-ENHANCED CRIMINAL PENALTIES FOR METHAMPHETAMINE PRODUCTION
                                  AND TRACKING

Section 731. Smuggling methamphetamine or methamphetamine precursor chemicals into
the United States while using facilitated entry programs

   This section of the conference report is new. Even as more methamphetamine is be-
ing smuggled across the border, increased legitimate international traffic has
forced the bureau of Customs and Border Protection (CBP) to rely on facilitated
entry programs-so-called "fastpass" systems like SENTRI (for passenger traffic on
the Southwest border), FAST (for commercial truck traffic), and NEXUS (for passenger
traffic on the Northern border). These systems allow pre-screened individuals to use
dedicated lanes at border crossings, subject only to occasional searches to test
compliance with customs and immigration laws. This section of the conference report
creates an added deterrent for anyone who misuses a facilitated entry program to
smuggle methamphetamine or its precursor chemicals. An additional penalty of up to
15 years. imprisonment is added to the punishment for the base offense. If con-
victed, an individual would also be permanently barred from using a fastpass system.

Section 732. Manufacturing controlled substances on Federal property

   This section of the conference report is new. This section clarifies that current
penalties for cultivating illegal drugs on Federal property also apply to manufac-
turing synthetic drugs such as methamphetamine). Methamphetamine "cooks" frequently
move their operations to parks, national forests, and other public lands, causing
serious environmental damage. This criminal penalty can help deter such destructive
conduct.

Section 733. Increased punishment for methamphetamine kingpins

   This provision of the conference report is new, and allows for easier application
of the enhanced penalties of the "continuing criminal enterprise" section of the
Controlled Substances Act (21 U.S.C. S 848). That section (commonly referred to as
the "kingpin" statute) imposes life imprisonment on a leader of a drug trafficking
organization convicted of trafficking in very large quantities of a drug, and re-
ceiving very large profits from that activity. This new provision reduces the
threshold amount of methamphetamine (from 300 to 200 times the threshold for base
violations) and profits from methamphetamine (from $10 million to $5 million), while
still applying the life imprisonment penalty only to. true "kingpins"-the ringlead-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. Conf. Rep. 109-333    Page 114

H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 109-333, 2006 U.S.C.C.A.N. 184)**


ers of methamphetamine trafficking organizations.

**\*116** Section 734. New child-protection criminal enhancement

   This provision of the conference report, which is new, punishes an offender who
manufactures methamphetamine at a location where a child resides or is present, and
imposes a consecutive. sentence of up to an additional 20 years imprisonment.

Section 735. Amendments to certain sentencing court reporting requirements

   This provision of the conference report is new and authorizes the United States
Sentencing Commission to establish a form to be used by United States District
Judges when imposing criminal sentences in order to facilitate data gathering and
reporting by the Sentencing Commission.

**\*\*209** Section 736. Semiannual reports to Congress

   This provision, which is new to the conference report, requires the Attorney Gen-
eral to report to Congress on investigations and prosecutions relating to
methamphetamine production.

        SUBTITLE D-ENHANCED ENVIRONMENTAL REGULATION OF METHAMPHETAMINE BYPRODUCTS

Section 741. Biennial report to Congress on agency designations of by-products on
methamphetamine laboratories as hazardous materials

   This provision of the conference report is new, and requires the Department of
Transportation to report to Congress every two years whether then-existing statutes
and regulations cover methamphetamine by-products as hazardous materials.

Section 742. Methamphetamine production report

   This provision of the conference report is new, and requires the Environmental
Protection Agency (EPA) to report to Congress every two years on whether then-
existing statutes and regulations cover methamphetamine by-products as hazardous ma-
terials.

Section 743. Cleanup costs

   This provision of the conference report is new, and clarifies existing law impos-
ing the obligation of restitution for environmental cleanup costs on persons in-
volved in meth production and trafficking. The recent decision of the Eighth Circuit
Court of Appeals in United States v. Lachowski (405 F3d 696, 8th Cir. 2005) has un-
dermined the ability of the Federal government to seek cleanup costs. from
methamphetamine traffickers who are convicted only of methamphetamine possession-
even when the methamphetamine lab in question was on the defendant's own property.
This provision would ensure that any person convicted of a methamphetamine-related
offense can be held liable for clean-up costs for methamphetamine production that
took place on the defendant's own property, or in his or her place of business or
residence.

                 © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 109-333                                                    Page 112
H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 109-333,  2006 U.S.C.C.A.N. 184)**

*117 SUBTITLE E-ADDITIONAL PROGRAMS AND ACTIVITIES

Section 751. Improvements to Department of Justice Drug Courts program

   This section of the conference report is new, and revises the Drug Court program
statute to clarify the requirement for periodic testing, graduated sanctions when an
offender tests positive, and a list of potential sanctions when a positive test oc-
curs.

Section 752. Drug Courts funding

   This provision of the conference report is new and authorizes appropriations for
drug courts.

Section 753. Feasibility study on Federal Drug Courts

   This provision of the conference report, which is new, directs the Attorney Gener-
al to conduct a study on the feasibility of Federal drug courts.

**210 Section 754. Grants to hot spot areas to reduce availability of methamphetam-
ine

   This section, which is new to the conference report, authorizes $99 million for
fiscal years 2006 to 2010 for grants to State and local law enforcement agencies to
assist in the investigation of methamphetamine traffickers and to reimburse the DEA
for assistance in cleaning up methamphetamine laboratories.

Section 755. Grants for programs for drug-endangered children

   This section of the conference report, which is new, authorizes grants to States
to assist in treatment of children who have been endangered by living at a residence
where methamphetamine has been manufactured or distributed.

Section 756. Authority to award competitive grants to address methamphetamine use by
pregnant and parenting women offenders

   Section 756 is a new provision and authorizes the Attorney General to award grants
to address the use of methamphetamine among pregnant and parenting women offenders
to promote public safety, public health, family permanence and well being.
   From the Committee on the Judiciary, for consideration of the House bill (except
section 132) and the Senate amendment, and modifications committed to conference:
   F. James Sensenbrenner, Jr.,
   Howard Coble,
   Lamar Smith,
   Elton Gallegly,
   Steve Chabot,
   William L. Jenkins,
   Daniel Lungren,
   From the Permanent Select Committee on Intelligence, for consideration of secs.
102, 103, 106, 107, 109, and 132 of the House bill, and secs. 2, 3, 6, 7, 9, and 10

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005,
2006 U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 109-333,  2006 U.S.C.C.A.N. 184)**


of the Senate amendment, and modifications committed to conference:
  Pete Hoekstra,
  Heather Wilson,
  **\*118** From the Committee on Energy and Commerce, for consideration of secs. 124
and 231 of the House bill, and modifications committed to conference:
  Charlie Norwood,
  John Shadegg,
  From the Committee on Financial Services, for consideration of sec. 117 of the
House bill, and modifications committed to conference:
  Michael G. Oxley,
  Spencer Bachus,
  From the Committee on Homeland Security, for consideration of secs. 127-129 of
the House bill, and modifications committed to conference:
  Peter T. King,
  Curt Weldon,

    Managers on the Part of the House.
  Arlen Specter,
  Orrin Hatch,
  Jon Kyl,
  Mike DeWine,
  Jeff Sessions,
  Pat Roberts,

    Managers on the Part of the Senate.

 H.R. CONF. REP. 109-333, H.R. Conf. Rep. No. 333, 109TH Cong., 1ST Sess. 2005, 2006
U.S.C.C.A.N. 184, 2005 WL 3350148 (Leg.Hist.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 3

Westlaw.

S. REP. 90-1097                                                        Page 1
S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

**\*2112** P.L. 90-351, OMNIBUS CRIME CONTROL AND SAFE STREETS ACT OF
1968
Senate Report (Judiciary Committee) No. 90-1097,
Apr. 29, 1968 (To accompany S. 917)
House Report (Judiciary Committee) No. 90-488,
July 17, 1967 (To accompany H.R. 5037)
Cong. Record Vol. 113 (1967)
Cong. Record Vol. 114 (1968)
DATES OF CONSIDERATION AND PASSAGE
Senate May 24, 1968
House Aug. 8, 1967; June 6, 1968
The House bill was passed in lieu of the Senate bill after substituting for its
language the text of the Senate bill.
The Senate Report is set out.

(CONSULT NOTE FOLLOWING TEXT FOR INFORMATION ABOUT OMITTED MATERIAL.  EACH
COMMITTEE REPORT IS A SEPARATE DOCUMENT ON WESTLAW.)


SENATE REPORT NO. 90-1097
Apr. 29, 1968

THE Committee on the Judiciary, to which was referred the bill (S. 917) to assist
State and local governments in reducing the incidence of crime to increase the ef-
fectiveness, fairness, and coordination of law enforcement and criminal justice sys-
tems at all levels of government, and for other purposes having considered the same,
reports favorably thereon, with an amendment in the nature of a substitute, and re-
commends that the bill, as amended, do pass.


**\*2113** PURPOSE OF AMENDMENT


The bill, as amended, is divided into five title:  Title I, Law Enforcement As-
sistance; Title II, Admissibility of Confessions, Reviewability of Admission in
Evidence of Confessions in State Cases, Admissibility in Evidence of Eyewitness
Testimony, and Procedures in Obtaining Writs of Habeas Corpus; Title III, Wiretap-
ping and Electronic Surveillance; Title IV, State Firearms Control Assistance; and
Title V, General Provisions.

Title I, Law Enforcement Assistance, authorizes the establishment of a three-mem-
ber Law Enforcement Assistance Administration within the Department of Justice under
the general authority of the Attorney General to administer grant programs to States
and units of local government to strengthen and improve law enforcement.  These pro-
grams will consist of planning grants of up to 80 percent and action grants of up to
60 percent, with grants of up to 80 percent and action grants of up to 60 percent,
and control riots and other civil disorders.  In addition, grants of up to 100 per-
cent are authorized for research, education, training, and demonstration projects.
The Federal Bureau of Investigation National Academy at Quantico, Va., and, at the
request of any State or local government, provide training assistance for law en-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**


forcement personnel.  This provision is directed toward the expansion and upgrading
of the law enforcement training program that is already in progress under the aus-
pices of the Federal Bureau of Investigation.

   Title II adds three new sections to chapter 223, title 18, United States Code,
which relate to (a) the admissibility into evidence of voluntary confessions in
criminal prosecutions in Federal courts, (b) reviewability by Federal courts of
State court rulings admitting confessions found to be voluntary, and (c) the admiss-
ibility into evidence of eyewitness testimony. This title also adds a new section to
chapter 153, title 28, United States Code, designed to relieve our overburdened Fed-
eral courts from the growing practice of convicted persons using the habeas corpus
procedures as a substitute for direct appeal.

   Title III prohibits all wiretapping and electronic surveillance by persons other
than duly authorized law enforcement officials engaged in the investigation of spe-
cified types of major crimes after obtaining a court order, with exceptions provided
for interceptions by employees of communications facilities whose normal course of
employment would make necessary such interception, personnel of the Federal Commu-
nications Commission in the normal course of employment, and Government agents to
secure information under the powers of the President to protect the national secur-
ity.  This proposed legislation conforms to the constitutional standards set out in
Berger v. New York (87 S.Ct. 1873, 388 U.S. 41 (1967)), and Katz v. United States
(88 S.Ct. 507, 389 U.S. 347 (1967)).

   The principal purposes of title IV are to aid in making it possible to keep fire-
arms out of the hands of those not legally entitled to possess them because of age,
criminal background, or incompetency, and to assist law **\*2114** enforcement authorit-
ies in the States and their subdivisions in combating the increasing prevalence of
crime in the United States.

   The ready availability; that is, ease with which any person can anonymously ac-
quire firearms (including criminals, juveniles without the knowledge or consent of
their parents or guardians, narcotic addicts, mental defectives, armed groups who
would supplant duly constituted public authorities, and others whose possession of
firearms is similarly contrary to the public interest) is a matter of serious na-
tional concern.

   The existing Federal controls over interstate and foreign commerce in firearms are
not sufficient to enable the States to effectively cope with the firearms traffic
within their own borders through the exercise of their police power.  Only through
adequate Federal control over interstate and foreign commerce in firearms, and over
all persons engaging in the business of importing, manufacturing, or dealing in
firearms, can this problem be dealt with, and effective State and local regulation
of the firearms traffic be made possible.

   It is not the purpose of the title to place any undue or unnecessary restrictions
or burdens on responsible, law-abiding citizens with respect to the acquisition,
possession, transporting, or use of firearms appropriate to the purpose of hunting,
trapshooting, target shooting, personal protection, or any other lawful activity.
The title is not intended to discourage or eliminate the private ownership of such
firearms by law-abiding citizens for lawful purposes, or to provide for the imposi-
tion, by regulations, of any procedures or requirements other than those reasonably
necessary to implement and effectuate the provisions of the title.


© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097
S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

Title V contains the customary legislative separability clause.

The title of the act has been changed to read:  'A bill to assist State and local governments in reducing the incidence of crime, to increase the effectiveness, fairness, and coordination of law enforcement at all levels of government, and for other purposes,' and the citation of the act has been changed from the 'Safe Streets and Crime Control Act of 1967' to the 'Omnibus Crime Control and Safe Streets Act of 1967,' to more nearly reflect the purpose of the bill as amended by the committee.

A total of $100,111,000 is authorized to be appropriated to fund the grant program of title I, Law Enforcement Assistance, for the fiscal years ending June 30, 1968, and June 30, 1969, $300 million for the fiscal year ending June 30, 1970, and for succeeding fiscal years such sums as the Congress might authorize.

### MAJOR CHANGES MADE BY THE AMENDMENT TO THE BILL AS INTRODUCED

The major changes made by the amendment to the bill as introduced include the creation of a three-member, nonpartisan, Law Enforcement Assistance Administration to supervise and administer, under the general authority of the Attorney General, the grant provisions of the bill; provision for grants to prevent and control riots; authorization for the FBI to establish and conduct training programs at the FBI National Academy at Quantico, Va., and, at the request **\*2115** of State and local governments, to assist in training law enforcement personnel; establishment of a National Institute of Law Enforcement and Criminal Justice under the general authority of three-member Administration for the purposes of encouraging research and development to improve and strengthen law enforcement; an academic educational assistance program for police or correctional personnel comprised of loan and tuition assistance to improve and strengthen law enforcement; an increase of $50,111,000 in the authorization over the original bill for a total authorization of $100,111,000 for fiscal 1968 and 1969, to provide for the above-mentioned additions, and $300 million for fiscal 1970; the addition of tile II relating to voluntary confessions, eyewitness testimony and habeas corpus proceedings; the addition of title III relating to the prohibiting, with the exceptions noted, of all wiretapping and electronic surveillance by persons other than duly authorized law enforcement officials engaged in the investigation of specific types of major crimes after obtaining a court order; the addition of title IV relating to State firearms control assistance; and the citation of the bill changed from the 'Safe Streets and Crime Control Act of 1967' to the 'Omnibus Crime Control and Safe Streets Act of 1967'.

The 'Findings and Declarations of Purpose' have been restated so as to emphasize the Congress' concern over the startling increase in the crime rate and the threat which this poses to the peace, security and general welfare of the Nation and its citizens.

### STATEMENT

### TITLE I-LAW ENFORCEMENT ASSISTANCE

In his special message on the Crime Commission report, on February 6, 1967, the President called for enactment of legislation in the area of Federal assistance for the control of crime.  On February 8, 1967, Senator McClellan, by request, and oth-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097                                                              Page 4
S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

ers, introduced S. 917, which represented the administration's proposals.  In a spe-
cial message, the President said:

Substantially greater resources must be devoted to improving the entire criminal
justice system.  The Federal Government must not and will not try to dominate the
system.  It could not if it tried.  Our system of law enforcement is essentially
local; based upon local initiative, generated by local energies, and controlled by
local officials.  But the Federal Government must help to strengthen the system, and
to encourage the kind of innovations needed to respond to the problem of crime in
America.  I recommended that the Congress enact the Safe Streets and Crime Control
Act of 1967.

Title I of S. 917, as amended, declares it to be policy of the Congress to assist
State and local governments in strengthening and improving law enforcement at every
level by national assistance.  It is the purpose of this legislation to (1) encour-
age States and units of general local government to prepare and adopt comprehensive
plans to increase their effectiveness in dealing with local comprehensive plans to
increase their effectiveness in dealing with local problems of law enforcement; (2)
authorize grants to States and units of local government in order to improve and
strengthen **\*2116** law enforcement; (3) encourage research development directed toward
the improvement and strengthening of law enforcement and the development of new
methods for the prevention and reduction of crime and the detection and apprehension
of criminals; (4) the control and eradication of organized crime; and (5) the pre-
vention and control of riots.

Title I was in response to the recommendations resulting from the study made by
the President's Commission on Law Enforcement and the Administration of Justice.
This was the most comprehensive study of crime in the history of our country.  The
President's Crime Commission's report represents a landmark in crime research and
the study of law enforcement needs.  The work of the Commission covered a period of
some 18 months.  The chairman of the 19-member Commission was Undersecretary of
State Nicholas deB. Katzenbach.  The Commission published a comprehensive report en-
titled 'The Challenge of Crime in a Free Society' (1967), and nine task force re-
ports dealing with such subjects as police, organized crime, and corrections.  The
major report emphasized the critical need for the Federal Government to begin imme-
diately a financial and technological assistance program to assist State and local
governments in combating the rising incidence of crime. The Commission's report
states:

* * * although day-by-day criminal administration is primarily a State and local
responsibility, the Federal Government's contribution to the national effort against
crime is crucial.

The President said, in his 1966 message on national strategy against crime:

Crime-- the fact of crime and the fear of crime-- marks the life of every Americ-
an.  We know its unrelenting pace:  A forcible rape every 26 minutes; a robbery
every 5 minutes; an aggravated assault every 3 minutes; a car theft every minute; a
burglary every 28 seconds.  We know the still more widespread cost tt exacts from
millions in fear; fear that can turn us into a nation of captives imprisoned nightly
behind chained doors, double locks, barred windows; fear that can make us afraid to
walk city streets by night or public parks by day.

In 1967, in a special message to the Congress on the National Crime Commission re-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097     Page 5
S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

port, the President stated:

Lawlessness is like a plague.  Its costs, whether economic, physical, or psycholo-
gical, are spread through every alley and every street in every neighborhood.  It
creates a climate in which people make choices, not out of confidence, but out of
fear.

Recently, a survey made in high-crime areas of two of our largest cities found
that--

Forty-three percent of those interviewed stayed off the streets at night.

Thirty-five percent did not speak to strangers.

Twenty-one percent used only cabs and cars at night.

Twenty percent would like to move to another neighborhood.

All because of their crime

**\*2117** \* \* \* for them, and for all of us, crime-- and the fear of crime-- has be-
come a public malady.  Its extent may be subject for debate but its existence is
certain.  So is our duty to seek its cure with every means at our command.

The President's Commission on Law Enforcement and Administration of Justice stated
in its report, 'The Challenge of Crime in a Free Society,' of February 1967:

One-third of a representative sample of all Americans say it is unsafe to walk
alone at night in their neighborhoods.  Slightly more than one-third say they keep
firearms in the house for protection against criminals.  Twenty-eight percent say
they keep watchdogs for the same reason.

According to the FBI'S uniform crime report of June 1967, the country experienced,
during the first 3 months of 1967, an increase in crime of 20 percent over the same
period in 1966.  The Director of the Federal Bureau of Investigation, Mr. J. Edgar
Hoover, cautioned that the 20-percent rise in serious crime in the United States for
this 3-month period was the sharpest recorded since 1958.  Moreover, since 1960,
there has been an increase in crime of 62 percent while the population of the Nation
has increased by only 9 percent.  Each crime category had a substantial rise with
murder up 23 percent, forcible rape up 8 percent, robbery up 32 percent, aggravated
assault up 15 percent, burglary up 21 percent, and auto theft up 20 percent.

Attorney General Ramsey Clark testified before the subcommittee on March 7, 1967,
that--

\* \* \* crime will not wait while we seek to eliminate its underlying causes.  These
are immense and stubborn forces pervading our environment, measuring our character
and determining the quality of our lives.  Through long range effort we can conquer
poverty, ignorance, disease, discrimination, social tensions and despair, family
breakdown, the dehumanization of mass culture, injustice.  To do these things is our
firm commitment.  But while we strive to uproot the causes of crime, we must secure
the public safety (hearings, p. 147). [FN1]

Crime is a national catastrophe.  Its elimination and control must be directed
from the local level as law enforcement in the United States has traditionally been
a local responsibility.  The present threat of lawlessness dictates, however, that
national assistance is needed to strengthen and improve the law enforcement effort
by the States and units of local government.

Under the bill, planning grants and action may be made directly to States and
units of local government, or combinations thereof, having populations of not less
than 50,000 persons.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

Although the 50,000 population cutoff will avoid any possibility that the bill
will stimulate further decentralization of law enforcement, the cutoff is not inten-
ded to be a bar to participation in the new grant program by **\*2118** smaller jurisdic-
tions. The bill encourages a city, town, or county that does not by itself have the
requisite population to formulate a joint plan or implement an action program with
one or more nearby jurisdictions.  The bill specifically authorizes the administra-
tion to make planning grants and action grants to combinations of local jurisdic-
tions, and the bill's definition of combination makes clear that a combination may
exist solely for the purpose of preparing or implementing a law enforcement plan.

In addition, a local jurisdiction with a population of less than 50,000 persons
will be eligible for Federal assistance through grants made to the State in which
the jurisdiction is located by way of a comprehensive statewide plan.  In effect,
therefore, S. 917 as reported reflects a broad grant approach with sufficient flex-
ibility to meet the law enforcement needs of the States and individual units of gen-
eral local government and combinations thereof.

Equally important, S. 917 provides an express opportunity for the chief executive
of the State or the appropriate State law enforcement agency to review and comment
upon any application for a planning grant or an action grant made by a unit of local
government in the State. Thus, no grant can be made by the administration to a local
government until the chief executive has been given the opportunity to comment upon
the grant application plan.

In addition, S. 917 specifically directs the administration to encourage plans
which encompass entire metropolitan areas and which take into account of all other
relevant law enforcement plans and systems.  In this manner, S. 917 should promote
the adoption and implementation of law enforcement plans that cut across artificial
geographic and political boundaries.

The Crime Commission concluded in its studies that an obligation rests upon the
Federal Government to assist local governments in improving their programs of law
enforcement.  Federal assistance directed toward this objective is encompassed in
title I of the amended bill.  In testimony before the subcommittee, the Attorney
General described the objectives of this legislation and noted that this can triple
the rate of objectives of this legislation and and noted that this can triple the
rate of increase in resources devoted to law enforcement purposes.

The authorization for the planning, law enforcement purposes, training, education,
demonstration, and research purposes is $100,111,000 for the fiscal years ending
June 30, 1968, and June 30, 1969, including $15 million each for grants to combat
organized crime and to prevent and control riots and other violent civil disorders--
up to $10 million for police and correctional personnel academic education and
$5,111,000 for expanding the Federal Bureau of Investigation's training assistance
to State and local police officers.  There is authorized to be appropriated for the
fiscal year ending June 30, 1970, $300 million for the strengthening and improving
of law enforcement. The Attorney General testified that the Federal contribution to
law enforcement needs will experience a substantial increase in future years.  He
stated that by the second year this grant program is in operation $300 million will
be needed.  If enacted, this legislation, the Attorney General thought, probably
would require that the Federal Government's annual contribution be increased eventu-
ally to around $1 billion.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097    Page 7

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**


**\*2119** The main objectives of this title have been endorsed by--
The American Civil Liberties Union.
The Americans for Democratic Action.
The International Association of Chiefs of Police.
The National Association of Attorneys General.
The National Association of Counties.
The National Council on Crime.
The National Council on Crime and Delinquency.
The National Governors Conference.
The National League of Cities.
The National Sheriffs Association.
The U.S. Conference of Mayors.
  The grant programs authorized by this title have grown out of a long and arduous
study and analysis of the crime conditions in the Nation. Under the Law Enforcement
Assistance Act of 1965, pilot projects related to crime control were launched for a
3-year period beginning in 1966.  To date, some $19 million in direct financial as-
sistance for the support of some 330 projects involving police, courts, corrections,
and the overall administration of law enforcement has been made.  These projects
have encompassed training, education, research, and demonstration.
  Legislation to strengthen and improve law enforcement throughout the Nation must
come to grips with the problems of organized crime.  Part C, Law Enforcement Assist-
ance, carries provisions which embrace the amendment to S. 917, introduced by Senat-
or Hruska on June 29, 1967, which relates to the prevention and control of organized
crime.
  The President's Crime Commission report succinctly states:
  Organized crime is a society that seeks to operate outside the control of the
American people and their Government.  It involves thousands of criminals working
within structures as complex as those of any large corporation, subject to laws more
rigidly enforced than those of legitimate governments.  Its actions are not impuls-
ive but rather the result of intricate conspiracies, carried on over many years and
aimed at gaining control over whole fields of activity in order to amass huge
profits.
  The core of organized crime activity is the supplying of illegal goods and ser-
vices-- gambling, loan sharking, narcotics, and other forms of vice-- to countless
numbers of citizen customers.  But organized crime is also extensively and deeply
involved in legitimate business and in labor unions. Here it employs illegitimate
methods monopolization, terrorism, extortion, tax evasion-- to drive out or control
lawful ownership and leadership and to exact illegal profits from the public.  And
to carry on its many activities secure from governmental interference, organized
crime corrupts public officials.
  The impact of organized crimes' activities is said, in the Crime Commission re-
port, to be in its--
  * * * accumulation of money not the individual transactions by which the money is
accumulated.  Millions of quarters in thousands of jukeboxes can provide both a
strong motive for **\*2120** murder and the means to commit murder with impunity.  Organ-
ized crime exists by virtue of the power it purchases with its money.  The millions
of dollars it can invest in narcotics or use for payoff money gives it power over

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097
S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

the lives of thousands of people and over the quality of life in whole neighbor-
hoods.  The millions of dollars it can throw into the legitimate economic system
gives it power to manipulate the price of shares on the stock market, to raise or
lower the price of retail merchandise, to determine whether entire industries are
union or nonunion, to make it easier or harder for businessmen to continue in busi-
ness.  The purpose of organized crime is not competition with visible legal govern-
ment but nullification of it.

The Crime Commission recommends, among other things:

(1)  Every attorney general in States where organized crime exists should form in
his office a unit of attorneys and investigators to gather information and assist in
prosecution regarding this criminal activity.

(2)  Police departments in every major city should have a special intelligence
unit solely to ferret out organized criminal activity and to collect information re-
garding the possible entry of criminal cartels into the area's criminal operations.

(3)  The prosecutor's office in every major city should have sufficient manpower
assigned full time to organized crime cases.

(3)  The prosecutor's office in every major city should have sufficient manpower
assigned full time to organize crime cases.

(4)  The Department of Justice should give financial assistance to encourage the
development of efficient systems for regional intelligence gathering, collection,
and dissemination.  By financial assistance and provisions of security clearance the
Department should also sponsor and encourage research by the many relevant discip-
lines regarding the nature, development, activities, and organization of these spe-
cial criminal groups.

It is to these ends that an authorization of up to $15 million for control of or-
ganized crime is directed by providing grants of up to 75 percent of the cost of the
establishment of State organized crime prevention councils, the recruiting and
training of special personnel, and the development and dissemination of information
relating to the control of organized crime. According to the sponsor of this provi-
sion, some 15 States are directly involved with the threat of organized crime.

Law enforcement encompasses the prevention and control of riots. Legislation to
strengthen and improve law enforcement at every level of our national life would be
incomplete without specific provisions to prevent and control riots. Grants to as-
sist in the prevention and control of riots embrace the provisions of an amendment
to S. 917 introduced by Senator Hart on August 27, 1967.

The President's Crime Commission report, in referring to this subject, stated:

The size of the threat to the community that riots offer cannot be reckoned as
merely the sum of the individual acts of murder, assault, arson, theft, and vandal-
ism that occur during them.

**\*2121** * * * Riots are a mass repudiation of the standards of conduct citizens must
adhere to if society is to remain not only safe, but civilized and free.

The ghetto riots of 1964, 1965, 1966, 1967, and 1968 represent crime in its most
aggravated form.  In the 1965 riot in the Watts section of Los Angeles alone, 34
persons were killed, 930 injured, and 3,332 arrested.  An estimated $40 million in
property was destroyed and some 600 buildings were damaged.  In Newark, N.J., riots
last year, two policemen and 23 civilians were killed and 725 persons were injured.
Through 250 cases of arson, coupled with numerous instances of looting and vandal-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097
S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
(Cite as: 1968 U.S.C.C.A.N. 2112)

ism, there was an estimated $20,251,000 loss in property damages; 1,462 persons were
arrested.

Detroit, Mich., also experienced a catastrophic riot last year in which four po-
licemen and 39 civilians were killed and 324 persons were injured.  Some estimated
$144 million loss in property damage was incurred and 7,231 persons were arrested.
In 1967, there were some 80 instances of criminal disorders and riots, of which the
above-cited examples are illustrative of the devastation resulting therefrom.

An early estimate of the damage, destruction, injuries, and deaths resulting from
the April 1968 riots in the District of Columbia shows: In excess of $13.3 million
in property loss.  Deaths, 7 to 10.  Arrests 6,826.  Total injured, 1,120-- 52 po-
licemen, 19 firemen, 10 military personnel, and 1,049 civilians. Approximately
14,000 troops were deployed in the city.  The total number of fires, 919.

Riots, regardless of the underlying causes, are war-- to which the special Army
troops sent into Detroit, can testify.  Local law enforcement officers are not
equipped nor trained to meet this new criminal crisis.

There is authorized $15 million to States and units of local government to meet
this new threat to the peace and internal security of our Nation by providing grants
of up to 75 percent of the cost of projects or programs designed to prevent or con-
trol riots.

Part D of title I makes provisions for training, education, research and develop-
ment for the purpose of strengthening and improving law enforcement.

There is established, within the Department of Justice, a National Institute of
Law Enforcement and Criminal Justice under the general authority of the three-member
Administration for the purpose of encouraging research and development to improve
and strengthen law enforcement.

Since 1965, the Department of Justice has been engaged in a modest grant program,
geared to improve and upgrade our law enforcement system.  Under the Law Enforcement
Assistance Act of 1965, the Department has made grants totaling approximately $19
million to support more than 330 research and pilot projects in law enforcement.
These projects have laid a foundation for the research programs to be sponsored by
the National Institute of Law Enforcement and Criminal Justice.

The Institute, which is authorized to establish a central research facility to
create and develop comprehensive programs to carry out the programs described in
this section, would be modeled along the lines of the National Institutes of Health
and the National Academy of Sciences.

*2122 Grants of up to 100 percent may be authorized for the purposes of research,
demonstration, or special projects.  Part D also authorizes the Director of the Fed-
eral Bureau of Investigation to establish and conduct training programs at the Na-
tional FBI Academy, and, at the request of State or local governmental units, to as-
sist in the training of State or local law enforcement personnel.  For the purposes
of part D the sum of $20,111,000 is authorized, with $5,111,000 authorized to be ap-
propriated to the FBI for the exercises of its functions under this part.  During
the 1967 fiscal year, the FBI, at the request of State, county, and local law en-
forcement authorities assisted in a total of 6,045 police training schools
throughout the Nation. Approximately 178,000 law enforcement officers attended these
schools.

Training instructors and personnel are a crucial factor in strengthening and im-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097
S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

proving law enforcement capability.  Often the local agencies are incapable of meet-
ing this need.  The FBI has traditionally supplied assistance to State and local po-
lice efforts in training.  Through this legislation, the FBI will be able to expand
their instructional facilities and thus be prepared to render broader assistance to
State and local government.

As a first step toward raising the status of the police, and improving the equal-
ity of law enforcement, higher educational standards for police should be estab-
lished.  Today most police do not have a college education.  A 1961 study of 300 po-
lice departments showed that less than 1 percent required any college training; and
a 1964 survey of 6,200 officers across the Nation revealed that only 30 percent had
taken one or more college courses, and just 7 percent had a college degree.

The President's Commission on Law Enforcement recognized that the education and
training needed for effective police work can best be acquired through college work.
For this reason, it recommended that our goal be 2 years of college for officers and
that a bachelor's degree be set as the standard for all major administrative and su-
pervisory personnel.

The amended bill takes a long stride toward that goal. Authorization is made up to
$10 million for educational assistance to police and correctional personnel.  This
will provide an opportunity for policemen and correctional personnel throughout the
Nationl to improve their knowledge and skills, and should lead to greater public
awareness of the policeman's task and increased respect for him and his job.

The bill authorizes the Administration to establish a major program of educational
assistance to institutions of higher education in subjects related to law enforce-
ment.  The National Crime Commission recommended that police departments should take
immediate steps to establish minimum degree requirements for supervisory and execut-
ive positions, and that the ultimate aim of police departments should be a bacca-
laureate degree for personnel with general law enforcement powers.

The Committee bill authorizes two types of financial assistance:

Forgivable loans, not to exceed $1,800 per academic year, to students in areas re-
lated to law enforcement in undergraduate or graduate degree programs; and

**\*2123** Tuition fees, not exceeding $200 per academic quarter of $300 per semester,
for inservice law enforcement officers enrolled in courses in such programs.

Coupled with the President's National Crime Commission studies, the work of the
Law Enforcement Assistance Act program has provided valuable experience in formulat-
ing the provisions of title I.  Speaking for the objectives of this title, the At-
torney General said that they are--

* * * supported by the most comprehensive study of crime ever undertaken in this
country.  The National Crime Commission has amassed an invaluable reservoir of fact,
experience and judgement.  The theory of the act is buttressed by 18 months grant
experience involving the expenditure of $10 million for research, demonstration,
training, and education in law enforcement under the Law Enforcement Assistance Act
of 1965.

Planned, studied, and tested, the Crime Control Act is ready  (hearings, p. 149).

TITLE II.-ADMISSIBILITY OF CONFESSIONS, REVIEWABILITY OF ADMISSION IN EVIDENCE
OF CONFESSIONS IN STATE CASES, ADMISSIBILITY IN EVIDENCE OF EYEWITNESS
TESTIMONY, AND PROCEDURES FOR OBTAINING WRITS OF HABEAS CORPUS

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
(Cite as: 1968 U.S.C.C.A.N. 2112)

Federal aid to the States is not enough to successfully combat the menace of crime.  Much more is necessary.  No matter how much money is spent for upgrading police departments, for modern equipment, for research and other purposes encompassed in title I, crime will not be effectively abated so long as criminals who have voluntarily confessed their crimes are released on mere technicalities.  The traditional right of the people to have their prosecuting attorneys place in evidence before juries the voluntary confessions and incriminating statements made by defendants simply must be restored.  It is the purpose of title II to accomplish this and other related objectives.

Section 701, which includes S. 674, introduced by Senator McClellan and others, provides that a voluntary confession is admissible in evidence in any Federal criminal prosecution.  The section lists the factors and circumstances the trial judge is to consider in deciding whether the confession is voluntary.  The trial judge is required to instruct the jury to give the confessions such weight as it feels it is entitled under all the circumstances.  The section also assures that confessions made while the suspect is under arrest shall not be inadmissible solely because of delay in bringing the defendant before a magistrate or commissioner, and provides that nothing therein will bar from evidence a voluntary, spontaneous, and unsolicited confession. The term 'confession' is defined and includes self-incriminating statements.

The section also includes a portion of S. 1194, introduced by Senator Ervin and others, which denies jurisdiction to Federal courts to reverse State cases involving admissions and confessions admitted as voluntarily given where the highest court of The state has affirmed. It also contains an amendment offered by Senator Ervin which provides that eyewitness **2124** testimony is admissible in evidence in Federal criminal prosecutions and limits the appellate jurisdiction of Federal courts in State and Federal cases admitting this testimony into evidence.

Section 702, an amendment offered by Senator Ervin, provides that State court judgments regarding questions of law or fact shall be conclusive unless reversed by a court with jurisdiction to review by direct appeal or certiorari, and defines the extent to which the Federal courts can review certain State court decisions.

ADMISSIBILITY OF, AND REVIEW ABILITY OF, ADMISSION IN EVIDENCE OF CONFESSIONS

Voluntary confessions have been admissible in evidence since the early days of our Republic.  These inculpatory statements have long been recognized as strong and convincing evidence-- often called the best evidence of guilt.  In Mallory v. United States, 77 S.Ct. 1356, 354 U.S. 449 (1957), the U.S. Supreme Court declared inadmissible voluntary confessions made during a period of unnecessary delay between the time of arrest and the time the suspect is taken before a committing magistrate. The case of Alston v. United States, 348 F.2d 72 (D.C. Cir 1965), is indicative of the illogical and unrealistic court decisions resulting from the application of the Mallory rule. The Honorable Alexander Holtzoff, U.S. district judge for the District of Columbia, testified before the subcommittee as follows:

On the other hand, the District of Columbia circuit takes an extreme position and practically holds that an arrested person must be taken to a magistrate immediately,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097
S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

even in the dead of night, subject to necessary time to make a record of the arrest, fingerprinting the defendant, and similar mechanical processes.  This is illustrated by the case of Alston v. United States, 121 U.S.App.D.C. 66, 348 F.2d 72, in which the conviction of a self-confessed murderer whose guilt was not in dispute, was reversed.  The facts are startling.  The defendant was brought to police headquarters at 5:30 a.m.  He was questioned by the police for about 5 minutes and then immediately confessed on the advice of his wife who had accompanied him with the police.  It was held by the court of appeals that the arresting officers should have taken the defendant before a committing magistrate immediately and that the questioning, even for 5 minutes, was not permissible-- the conviction was reversed.  It is my understanding that the indictment thereafter was dismissed on the motion of the U.S. attorney in view of the fact that he felt that without the confession he did not have sufficient evidence to convict (hearings, pp. 260-261).

The rigid, mechanical exclusion of an otherwise voluntary and competent confession is a very high price to pay for a 'constable's blunder.'

Enactment of subsections 3501 and 3502 of section 701 is needed to offset the harmful effects of the Mallory case, Senator Alan Bible, chairman of the Senate Committee on the District of Columbia, was especially critical and dismayed by the effect of that case on the crime rate in critical and dismayed by the effect of that case on the crime rate in **\*2125** Washington, D.C. Senator Bible explained that the decision in Mallory v. United States, 77 S.Ct. 1356, 354 U.S. 449 (1957), was one of several factors influencing the increased crime rate in Washington, D.C.  Studies and statistics in the District of Columbia indicate that serious crimes in the District have increased 72 percent in 16 years.  Since 1950, police clearance rates for the proportion of cases solved in the serious crime area declined from 48 1/2 to 26.3 percent.  Despite the tremendous increase in crime in the District, the number of felony convictions has decreased markedly.  The 72 percent increase in crime was accompanied by a 39 percent decrease in felony convictions.  The decline in felony convictions has been accompanied by an increase in the number of guilty pleas to lesser offenses.  From 1950 to 1960, these 'compromise' pleas increased from 21 percent of the defendants to 38 percent of the defendants.  It is his view that the Mallory decision contributed to these disturbing statistics.  He continued:

These statistics clearly point out, it seems to me, that something is drastically wrong with our system of criminal justice.  What is causing the drastic decline in felony prosecutions as well as the growing increase in pleas of guilty to lesser offenses may be, again repeating, conjectural, and depending upon the person to whom you are talking, but in my opinion, the Mallory decision and other rights granted to defendants by the courts have contributed to it.

It seems to me we have become obsessed with uncovering new rights and safeguards for the criminal to such a degree that we have unbalanced the scales of justice, and find ourselves in the unenviable position of losing control of the crime and violence that are running rampant in our cities, * * * I think it is significant to note that the President's Commission on Crime in the District of Columbia, in its report dated December 15, 1966, also supported a change in postarrest procedures, in order to afford the police officers the opportunity to question suspects.  I am indeed gratified that the Commission, in its long and conscientious study of crime in the District, concluded that such a change is considered necessary (hearings, pp.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

132-133).

Judge Holtzoff was equally critical of Mallory and its harmful effects.  He testified:

In my humble judgment, * * * (the Mallory rule) was one of the contributing causes to the difficulty in enforcing the criminal law and in the increasing rate of crime. Washington has become a crime-ridden city.  The grapevine of the underworld travels fast, and members of the underworld, while not familiar with the intricacies of the law, know the general tendencies, and the result is that they become bolder, feeling that there will be some technicality or other which will save them from punishment.

We get fewer pleas of guilty than we ever did before, because experienced and sophisticated criminals feel that, well, they will take a chance.  The chances are very great that eventually, if they are found guilty, the conviction may be reversed.

**\*2126** Not only have we had a diminution in the percentage of pleas of guilty, but trials take longer, because instead of concentrating on the real issue of the case-- namely, did the defendant commit the crime, that is what we should be trying-- we have to try a great many tangential issues, such as did the policeman take his prisoner promptly enough to a magistrate?  Should he have questioned him?  Should he have searched him?  And more time is devoted to these tangential issues than to the real issue that has to be tried.

The question of guilt or innocence becomes relegated to the background, because in many of these instances guilt isn't seriously indispute.  The only matters that are tried nowadays are these side issues.  And I must say that sometimes I feel, when I am trying a criminal case, as though I am in a topsy-turvy world-- I am not trying the accused, I am trying the policeman-- did he break any rule?

In view of these considerations and in the interest of public safety and the law enforcement, legislation such as is embodied in S. 674 is highly desirable and I hope that it will be enacted (hearings, p. 261).

Judge Holtzoff sees no constitutional bar to congressional abrogation of the Mallory rule.  He told the subcommittee:

* * * This doctrine was predicated not on any constitutional principle, but merely is a procedural matter as a sanction or a means of enforcing rule 5 of the Federal Rules of Criminal Procedure, which requires an arrested person to be brought before a committing magistrate without unnecessary delay.  Since this rule is not based on any constitutional principle, it can be changed by legislation (hearings p. 260).

Attorney General Lynch of the State of California affirms the above by stating:

One portion of the bill will eliminate the rule of McNabb v. United States, 63 S.Ct. 608, 318 U.S. 332 (1943), and Mallory v. United States, 77 S.Ct. 1356, 354 U.S. 449 (1957).  These cases held that failure of the police to observe the Federal statutes and rules requiring that an arrested person be brought before a committing magistrate without unnecessary delay bars the admission in Federal prosecutions of any confession made after arrest and before arraignment.  Eradication of this rule seems to me long overdue and badly needed.  While perhaps some incentive should be given Federal officers to obey the prompt-arraignment statutes, the exclusion of confessions obtained in violation thereof is too high a price for society to pay for this type of 'constable's blunder.'  Since the McNabb-Mallory rule was formulated in the exercise of the Supreme Court's supervisory powers over lower Federal courts,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097                                                              Page 14
S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

and has never been considered a constitutional requisite, no constitutional obstacle
is imposed in the way of its legislative repeal (hearings, p. 925).

 **\*2127** Enactment of the provisions of subsections 3501 and 3502 would assign proper
weight to the Mallory rule.  Delay in bringing a suspect before a committing magis-
trate would be a factor to consider in determining the issue of voluntariness, but
it would not be the sole criterion to be considered operating to automatically ex-
clude an otherwise competent confession.

 The case of Escobedo v. Illinois, 84 S.Ct. 1758, 378 U.S. 478 (1964), set the
stage for another most disastrous blow to the cause of law enforcement in this coun-
try. [FN2] This case, along with others, formed the basis for the decision in Mir-
anda v. Arizona, 86 S.Ct. 1602, 384 U.S. 436 (1966).  In Miranda, the Supreme Court
held that an otherwise voluntary confession made after the suspect was taken into
police custody could not be used in evidence unless a fourfold warning had been giv-
en prior to any questioning. The majority opinion in this respect reads:

 Prior to any questioning, the person must be warned that he has a right to remain
silent, that any statement he does make may be used as evidence against him, and
that he has a right to the presence of an attorney, either retained or appointed.
The defendant may waive effectuation of these rights, provided the waiver is made
voluntarily, knowingly, and intelligently.  If, however, he indicates in any manner
and at any stage of the process that he wishes to consult with an attorney before
speaking, there can be no questioning. Likewise, if the individual is alone and in-
dicates in any manner that he does not wish to be interrogated, the police may not
question him.  The mere fact that he may have answered some questions or volunteered
some statements on his own does not deprive him of the right to refrain from answer-
ing any further inquiries until he has consulted with an attorney and thereafter
consents to be questioned (384 U.S.at 444).

 After considering the testimony of many witnesses, and statements and letters of
many other interested parties, the committee found that there is a need for legisla-
tion to offset the harmful effects of the Court decisions mentioned above.  These
decisions have resulted in the release of criminals whose guilt is virtually beyond
question.  This has had a demoralizing effect on law-enforcement officials whose ef-
forts to investigate crimes and interrogate suspects have been stymied by the tech-
nical roadblocks thrown up wby the Court.  The general public is becoming frightened
and angered by the many reports of depraved criminals being released to roam the
streets in search of other victims.  For example, the infamous Mallory was convicted
on another rape charge shortly after his first rape conviction was reversed by the
Supreme Court.

 The Honorable John Stennis, a U.S. Senator from the State of Mississippi, stated
in subcommittee hearings that recent Supreme Court **\*2128** decisions dealing with in-
terrogation procedures have demoralized policeman and threatened to lessen their ef-
fectiveness in combating crime.  He feels that a change from the approach of the
Miranda case is essential and significant in the fight against crime.  The Miranda
rule goes to the very heart of the investigative process-- custodial interrogation.
If Miranda is not challenged, its harmful effect will gain momentum when the lower
Federal courts begin expanding its doctrine and result in many extended interpreta-
tions of the case.

 The Honorable Alexander Holtzoff, U.S. district judge for the District of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

Columbia, also discussed the harmful effects of Miranda. He said the case would result in reducing the use of voluntary confessions in a very large percentage of cases. This hinders the quick and efficient enforcement of the criminal law.

Quinn Tamm, executive director of the International Association of Chiefs of Police, agreed that the Miranda case will materially reduce the number of confessions from defendants.

Statistical evidence further indicates the harmful effects of the Miranda decision. During the subcommittee hearings, Arlen Specter, district attorney of the City of Philadelphia, revealed a study on the effects of Miranda conducted by his office. The results indicated that prior to the Escobedo case 90 percent of the suspects would make a statement, often not incriminating on their face, but valuable in investigating the crime. After Escobedo, only 80 percent would give statements. After the second circuit Russo case, only 68 percent of suspects would give statements. Then came the Miranda case in June 1966. For a period after Miranda, out of 5,220 suspects arrested for serious crimes, 3,095 refused to give a statement. This is a percentage of only 41 percent who would give statements, a decrease of 49 percent since Escobedo. These statistics are inclined to become more alarming as more criminals become more familiar with Miranda.

Aaron Koota, district attorney for Kings County, N.Y., conducted a similar survey, indicating that prior to Miranda, approximately 10 percent of the suspects involved in serious crimes refused to make statements or confessions to police. After Miranda, 41 percent refused to make statements or confessions. Specifically, between June and September of 1966, Mr. Koota revealed that 130 of 316 suspects refused to make any statement at all. In only 30 of these 130 cases did Mr. Koota have sufficient evidence to prosecute apart from the confession. Mr. Koota was unequivocal in stating that confessions are helpful in securing convictions.

Charles E. Moylan, Jr., State's attorney for the city of Baltimore, Md., reports more disturbing statistics. Mr. Moylan said:

* * * (W)e used to get * * * (confessions) in 20 to 25 percent of our cases, and now we are getting * * * (them) in 2 percent of our cases. The confession as a law-enforcement instrument has been virtually eliminated (hearings, p. 622).

Mr. Moylan noted that the Miranda case has encouraged criminals, discouraged the police, and disappointed the public that depends on the courts for protection.

**\*2129** Frank S. Hogan, New York County district attorney, reported similar findings. In the 6 months prior to the Miranda case, 49 percent of the nonhomicide felony defendants in New York County made incriminating statements. In the 6 months after the decision, only 15 percent of the defendants gave incriminating statements. Mr. Hogan characterized it as being most harmful to efforts to convict criminals who roam our streets and assault our citizens.

Some who defend the Miranda rule rely on a survey conducted by New York Judge Nathan Sobel [FN3] to buttress their position. Judge Sobel concluded that confessions are not really vital to prosecution, since his survey indicates that confessions constitute part of the evidence in less than 10 percent of all indictments. The following portion from a letter by Miles F. McDonald, Justice of the Supreme Court of the State of New York, lays the Sobel survey to rest. After stating that confessions are by far the most reliable evidence in criminal cases, Justice McDonald writes:

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

But we did do a survey that we completed at the same time as the district attorney
in Los Angeles, and I just think this was premature.  I don't think the results
would have been conclusive, although as I say, there was a great deal of discussion
on cases being lost (hearings, pp. 340-341).

   Mr. Younger himself recognizes certain limitations in his report and qualifies his
findings with these forthright reservations:

   However, I must state, as I did before, that we are not prepared to say that these
decisions have not impaired the efficiency of law enforcement in areas which are at
this moment not subject to accurate measurement (hearings, p. 341).

   These decisions have not made it impossible for law enforcement to successfully
protect lives and property, but, presumably, have made it more difficult for the po-
lice to ascertain the truth by curtailing their use of the important investigative
device of proper and reasonable interrogation of suspects.  These decisions can be
harmful to law enforcement in a way that cannot be measured by preventing a confes-
sion at the first confrontation between suspect and policeman and depriving the of-
ficer of **2131** information necessary to make an arrest. However, arrests in Los
Angeles County continue to increase at a consistent and predictable rate (hearings,
pp. 343-344).

   It should be noted that since neither of these two surveys attempted a correlation
with pre-Escobedo cases wherein confessions or admissions were obtained, it cannot
be determined what effect these decisions are having upon the police department's
efforts in solving crimes. We only obtain those requests for complaints wherein the
police officers are satisfied that they have sufficient evidence to establish the
corpus and sufficient connecting evidence regarding the particular suspect.  We can-
not tell from this present survey how many cases we are not ever seeing from the po-
lice agencies (hearings, p. 345).

   A letter from H. R. Morton, chief of police of the city of Fresno, Calif., is typ-
ical of those letters received by the subcommittee explaining the plight of law en-
forcement officials.  Chief Morton writes:

   It appears to be well established that the Escobedo and Miranda decisions have had
a decidedly adverse effect upon law enforcement. Examining the fact that the law en-
forcement officers are not thoroughly schooled in constitutional law, may shed some
light on the situation. Contributing to the overall problem, however, is the diffi-
culty with which lower courts apply the Escobedo and Miranda principles.  In many
instances they are arriving at decisions which are poles apart under very similar
circumstances.

   The number of convictions and guilty pleas have declined drastically since the
pre-Escobedo days of 1963.  This is in spite of the fact that felony arrests have
increased 75 percent since 1963.  The following table is included for reference:

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

   Figures such as those shown make a travesty of the efforts of dedicated law en-
forcement officers.  In previous years and through 1963, there had been a gradual
increase in the number of felony arrests and the percentage of those arrests which
terminated in a conviction or plea of guilty.   The trend, which I attributed to
better police methods, was drastically reversed after Escobedo and the California
decision in Dorado.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**


   Fresno county court records show that the fiscal year 1965-66 experienced a new
high in the number of felony cases in which criminal informations were filed.  In
spite of this new high, **\*2132** the percentage of guilty pleas as compared to com-
plaints filed, dropped to a new low. The percentage drop in guilty pleas amounts to
24 percent since the pre-Escobedo and pre-Miranda era. One of the most disturbing
facts, however, is that for the first 6 months after the 1966 Miranda decision, dis-
missals before trial are already higher than for the entire preceding year.

   It may appear rather trite to reiterate that the Supreme Court  has contributed
immeasurably to the above facts, but I am compelled to do so. Advancements in train-
ing police personnel and the utilization of more science in crime detection methods
are no doubt partial solutions to the mounting crime toll, but they certainly are
not the complete answer.  There are too many crimes in which no physical evidence of
value may be found and well-trained investigators are definitely thwarted when they
must tell a suspect that he has a right to say nothing to them.

   I hope that the above comments may be of value to you and wish you success in your
attempt to remedy this situation.  Certainly, as the dissenting opinion in Miranda
expressed, no other country in the world has ever had such restrictions nor are such
restrictions founded on a constitutional basis (hearings, pp. 695-696).

   The committee is convinced from the mass of evidence heard by the subcommittee
much of which is printed in the transcript of hearings, that the rigid and inflex-
ible requirements of the majority opinion in the Miranda case are unreasonable, un-
realistic, and extremely harmful to law enforcement. Instance after instance are
documented in the transcript where the most vicious criminals have gone unpunished,
even though they had voluntarily confessed their guilt.  The transcript and subcom-
mittee files contain testimony and statements from district attorneys, police
chiefs, and other law enforcement officers in cities and towns all over the country,
demonstrating beyond doubt the devastating effect upon the rights of society of the
Miranda decision. The unsoundness of the majority opinion was forcefully shown by
the four dissenting justices, who also predicted the dire consequences of overruling
what theretofore had been the law of the land, confirmed in 1896 in Wilson v. U.S.,
16 S.Ct. 895, 162 U.S. 613, and in 1912 in Powers v. U.S., 32 S.Ct. 281, 223 U.S.
303, and in other more recent Supreme Court decisions.

   The Supreme Court itself suggests that Congress is free to enact legislation in
this field.  The Court's invitation for Congress to act could stem from a widespread
notion that Congress is better able to cope with the problem of confessions than is
the Court.  Senator Bible, in testifying before the subcommittee, observed that ex-
perience has taught that Court decisions are to inexact to deal with postarrest
problems.  The Honorable J. Edward Lumbard, Chief Judge of the U.S. Court of Appeals
for the Second Circuit agrees.  He states:

   In my opinion, it is most important that the Congress should take some action in
the important areas I have discussed.  The **\*2133** legislative process permits a wide
variety of views to be screened and testimony can be taken from those who know the
facts and those who bear the responsibility for law enforcement.

   The legislative process is far better calculated to set standards and rules by
statute than is the process of announcing principles through court decision in par-
ticular cases where the facts are limited. The legislative process is better adapted
to seeing the situation in all its aspects and establishing a system and rules which

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

can govern a multitude of different cases.

Judges seldom have before them all those who are the best informed regarding prac-
tical problems and the difficulties in living with any proposed change in the law.
Judges usually are advised only by the parties in the case; the parties want to win
the case and do not always care about general principles of wider application.

As I said before, it is because the Congress and the legislatures of the States
have taken so little action in the field of criminal justice that the courts have
more and more chosen to lay down rules which have the force of law until changed,
and which all too frequently come to us in the form of new constitutional principles
which then can be modified only by constitutional amendment (hearings, p. 184).

Mr. Specter expresses a similar view.  He pointed out that the subcommittee hear-
ings made it possible for Congress to examine all the facets of human experience
that must be taken into account in solving the problems of confessions.  The courts,
in considering only the limited facts and issues of each particular case do not have
the opportunity to evaluate all these factors.  Passage of this bill with all of its
legislative history-- the record of the subcommittee hearings and all of the under-
lying social policies bearing on this issue and taken into account by Congress--
will furnish an excellent record that will hopefully make an impression on some of
the Supreme Court Justices.

In commenting upon the Court's encouragement to the Congress to legislate in this
area, Attorney General Thomas C. Lynch, of the State of California, wrote:

It seems to me that the Court has implicitly acknowledged that Congress, with its
vastly superior fact-gathering powers, is in a much better position than the Court
to formulate standards most likely to result in a correct determination, in a given
case, of the issue of voluntariness of a confessions.  The bill under consideration
sets out factors bearing on the voluntariness of confessions.  If findings of fact
are made by Congress that demonstrate the relevance and importance of these factors,
and their superiority over the rules laid down in Miranda, it would seem that the
Court would have little choice but to defer to the expert judgment of Congress.  Ac-
cordingly, I consider the bill constitutional and am happy to give it my full sup-
port (hearings, p. 925).

More than one of the witnesses expressed the opinion that subsections 3501 and
3502 represent a sensible and workable approach to the problem **\*2134** of confessions.
Senator Stennis commented that the approach taken in the bill is fair and reason-
able, as the admissibility of a confession should depend on its voluntariness.  The
Judge and jury are in a much better position to determine the truthfulness of a
testimony regarding the confession than is an appellate court from a cold record.
Senator Frank J. Lausche points out that subsections 3501 and 3502 reflect the his-
torical rule governing admissibility of a confession.

One of the most damaging aspects of the Miranda decision is its apparent holding
that, absent waiver, no suspect can be interrogated at all without the benefit of
counsel.  It is widely known that counsel will advise the suspect to make no state-
ment at all.  The police are virtually hamstrung.  This is much more serious than
the barring from evidence of a confession-- the suspect may refuse to make any
statement whatever.

Hearings before the subcommittee revealed further defects in the Miranda reason-
ing.  Mr. Specter pointed out that the so-called third-degree methods deplored by

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

the Supreme Court and cited as a basis for their opinion in Miranda is not a correct
portrayal of what actually goes on in police stations across the country.  While
there are isolated cases of police using coercive tactics, this is the exception
rather than the rule.  Mr. Tamm agrees, stating that while these coersive practices
might have been approved 30 years ago, they have no place in modern police tech-
niques.  The committee is convinced that the Court overreacted to defense claims
that police brutality is widespread.

   The severest and perhaps the most eloquent critics of the majority opinion in Mir-
anda were the four dissenting Justices, Justices Clark, Harlan, Stewart, and White.

   Justice Clark pointed out that under the majority opinion not only the incrimina-
ting statement but the fruits thereof also would be excluded from the jury trying the
issue of the guilt or innocence of the accused.  For instance, if the statement led
the police officers to the weapon which injured or killed the victim of the crime,
the weapon, too, although demonstrating the truth of the statement, would have to be
excluded.  Justice Clark states:

   The Court further holds that failure to follow the new procedures requires inexor-
ably the exclusion of any statement of the accused, as well as the fruits thereof.
Such a strict constitutional specific inserted at the nerve center of crime detec-
tion may well kill the patient.

   This decision was an abrupt departure from precedent extending back at least to
the earliest days of the Republic.  Up to the time of the rendition of this 5-to-4
opinion, the 'totality of circumstances' had been the test in our State and Federal
courts in determining the admissibility of incriminating statements and evidence de-
rived by leads therefrom.  Custodial interrogation had always been recognized as 'un-
doubtedly an essential tool in effective law enforcement ' (Hayes v. Washington, 83
S.Ct. 1336, 373 U.S. 503, 515 (1963)).

   Mr. Justice Clark said the majority was 'in one full sweep changing the tradition-
al rules of custodial interrogation which this Court has for **2135** so long recog-
nized as a justifiable and proper tool in balancing individual rights against the
rights of society.'

   Justice Harlan, joined by Justices Stewart and White, said:

   I believe the decision of the Court represents poor constitutional law and entails
harmful consequences for the country at large.

   How serious these consequences may prove to be only time can tell.

   * * * To incorporate this notion into the Constitution requires a strained reading
of history and precedent.

   Mr. Justice Harlan pointed out that the limitations imposed by the majority  'were
rejected by necessary implication in case after case, the right to warnings having
been explicitly rebuffed in this Court many years ago (Powers v. United States, 32
S.Ct. 281, 223 U.S. 303; Wilson v. United States, 16 S.Ct. 895, 162 U.S. 613).'

   Moreover, the dire effects upon law enforcement, which were developed by the sub-
committee hearings, as hereinbefore shown, were prophesied by the dissenting
Justices.  Justice Harlan said:

   There can be little doubt that the Court's new code would markedly decrease the
number of convictions.  To warn the suspect that he may remain silent and remind him
that his confession may be used in court are minor obstructions.  To require also an
express waiver by the suspect and an end to questioning whenever he demurs must

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

heavily handicap questioning.  And to suggest or provide counsel for the suspect
simply invites the end of interrogation.  How much harm this decision will inflict
on law enforcement cannot fairly be predicted with accuracy.  * * * We do know that
some crimes cannot be solved without confessions, that ample expert testimony at-
tests to their importance in crime control, and that the Court is taking a real risk
with society's welfare in imposing its new regime on the country.  The social costs
of crime are too great to call the new rules anything but a hazardous experimenta-
tion.

  Citing the oft-quoted language of Mr. Justice Cardozo-- 'Justice, though due to
the accused, is due to the accuser also.  The concept of fairness must not be
strained until it is narrowed to a filament.  We are to keep the balance true'-- Mr.
Justice Harlan severely criticized the majority ruling and pointed out 'it would
probably be shared by few.'  Specifically, he said:

  One is entitled to feel astonished that the Constitution can be read to produce
this result.  * * * The resulting confession, and the responsible course of police
practice they represent, are to be sacrificed to the Court's own fine-spun concep-
tion of fairness which I seriously doubt is shared by many thinking citizens in this
country. In this case new restrictions on police questioning have been opposed by
the United States and in an amicus brief signed by 27 States and Commonwealth, not
including the three other States who are parties.  No State in the country has urged
this Court to impose the newly announced rules, nor has any State chosen to go
nearly so far on its own.  (The reference to 'the three other States' arises out of
the fact that the decision disposed **\*2136** of three State court cases and one Federal
court case.  Justice Thurgood Marshall, who was the Solicitor General of the United
States, urged affirmance of the Federal court conviction.)

  The Committee feels that it should be borne in mind that the Miranda majority
opinion upset what had been the law in practically every State and in all Federal
circuits.  It nullified four trials by jury (one of five cases heard together was
later disposed of by a holding that the newly announced restrictions should not be
applied retroactively).

  Mr. Justice White's dissent, concurred in by Justice's Harland and Stewart, going
back to the earliest cases in the Supreme Court, demonstrates beyond question that
the law prior to the Miranda decision was that warnings as to constitutional rights
were not required by the Constitution, and that the sole test of admissibility
should be 'totality of circumstances' as bearing on voluntariness.

  Mr. Justice White, as had Justice Harlan, in dissenting, predicted the majority
opinion's extremely harmful effects on society's rights which is so convincingly
shown by evidence adduced by the subcommittee hearings.  Justice White said:

  Until today, 'the admissions or confessions of the prisoner, when voluntarily and
freely made, have always ranked high in the scale of incriminating evidence.'  Brown
v. Walker, 16 S.Ct. 644, 161 U.S. 591; see also Hopt v. Utah, 4 S.Ct. 202, 110 U.S.
574, 584-585. Particularly when corroborated as where the police have confirmed the
accused's disclosure of the hiding place of implements or fruits of the crime, such
confessions have the highest reliability and significantly contribute to the certi-
tude with which we may believe the accused is guilty.  * * * There is, in my view,
every reason to believe that a good many criminal defendants, who otherwise would
have been convicted on what this Court has previously thought to be the most satis-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

factory kind of evidence, will not, under this new version of the fifth amendment,
either not be tried at all or acquitted if the State's evidence, minus the confes-
sion, is put to the test of litigation.  I have no desire whatsoever to share the
responsibility for any such impact on the present criminal proceeds. In some unknown
number of cases the Court's rule will return a killer, a rapist or other criminal to
the streets and to the environment which produced him, to repeat his crime whenever
it pleases him.  As a consequence, there will not be a gain, but a loss, in human
dignity.

   The Committee is of the view that it simply makes no sense to exclude from a jury
what has traditionally been considered the very highest type of evidence, and the
most convincing evidence of guilt, that is, a voluntary confession or incriminating
statement by the accused.  This view is borne out by common experience and general
acceptation, and by almost 200 years of precedent in the courts of this country.

   The Committee also feels that the majority opinion not only runs counter to prac-
tically all the precedent in the State and Federal courts, but that it misconstrues
the Constitution.  The Committee alines itself wholeheartedly with the view ex-
pressed by the dissenting Justices and with **\*2137** what it feels are the views of the
vast majority of judges, lawyers, and plain citizens of our country who are so obvi-
ously aroused at the unrealistic opinions such as the Miranda decision which are
having the effect of daily releasing upon the public vicious criminals who have vol-
untarily confessed their guilt.

   Consequently, the committee feels that Congress, through its power to prescribe
rules of evidence in Federal courts, should respond to the majority opinion's invit-
ation to Congress, wherein the Court says:

   It is impossible for us to foresee the potential alternatives for protecting the
privilege which might be devised by Congress or the States in the exercise of their
creative rule-making capacities. Therefore we cannot say that the Constitution ne-
cessarily requires adherence to any particular solution for the inherent compulsions
of the interrogation process as it is presently conducted.  Our decision in no way
creates a constitutional straitjacket which will handicap sound effects at reform,
nor is it intended to have this effect. We encourage Congress and the States to con-
tinue their laudable search for increasingly effective ways of protecting the rights
of the individual while promoting efficient enforcement of our criminal laws
(Miranda v. Arizona, 86 S.Ct. 1602, 384 U.S. at 467).

   The committee is of the view that the legislation proposed in section 701 of title
II would be an effective way of protecting the rights of the individual and would
promote efficient enforcement of our criminal laws.  By the express provisions of
the proposed legislation the trial judge must take into consideration all the sur-
rounding circumstances in determining the issue of voluntariness, including spe-
cifically enumerated factors which historically enter into such a determination.
Whether or not the arrested person was informed of or knew his rights before ques-
tioning is but one of the factors. There is the added safeguard that the jury must
be instructed to give the confession or statement the weight that they feel it war-
rants under all the circumstances.  The committee feels that society is entitled to
the use of confessions and incriminating statements which are admitted only after
passing the tests of both court and jury under the above-described safeguards.  The
committee also feels that a civilized society could not be more fair to persons ac-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

cused of crime, as the constitutional rights of defendants in criminal cases would
be fully protected and respected by the safeguards in this proposed legislation.

The committee is aware that a few have expressed the view that legislation by Con-
gress restoring the voluntariness test to the admissibility of confessions and in-
criminating statements would be declared unconstitutional, on the ground that the
provisions do not measure up to the rigid standards set forth in the majority opin-
ion in Miranda.  The Committee, however, is aware also that the overwhelming weight
of the testimony adduced by the subcommittee supported the passage of these provi-
sions of the bill, and that the vast majority of the witnesses expressed no doubt as
to the constitutionality of the legislation. The committee is also aware that the
opinions of the four dissenting Justices clearly indicate that neither of them would
consider these provisions unconstitutional.  Justice Harlan, **\*2138** it will be re-
called, said the majority opinion 'represents poor constitutional law,' and that 'it
would be shared by few.'

The committee feels that it is obvious from the opinion of Justice Harlan and oth-
er  dissenting Justices (excerpts from which are heretofore quoted in this report)
that the overwhelming weight of judicial opinion in this country is that the volun-
tariness test does not offend the Constitution or deprive a defendant of any consti-
tutional right.  No one can predict with any assurance what the Supreme Court might
at some future date decide if these provisions are enacted.  The committee has con-
cluded that this approach to the balancing of the rights of society and the rights
of the individual served us well over the years, that it is constitutional and that
Congress should adopt it.  After all, the Miranda decision itself was by a bare ma-
jority of one, and with increasing frequency the Supreme Court has reversed itself.
The committee feels that by the time the issue of constitutionality would reach the
Supreme Court, the probability rather is that this legislation would be upheld.

FEDERAL APPELLATE REVIEW OF FINAL STATE COURT DECISIONS ADMITTING VOLUNTARY
CONFESSIONS

The need for a revision of the Miranda decision has been well documented in the
preceding section of this report.  The committee feels that passage of subsection
3502 is necessary to bring about a complete judicial restoration of the sound rule
which allows the admissibility of a confession of an accused into evidence if it is
voluntarily made.

That portion of title II which adds section 3502 to chapter 223 of title 18 of the
United States Code, limits the power of the Federal courts to review a State court's
admission into evidence of a voluntary confession and is designed to foster State
and Federal cooperation in the orderly and efficient enforcement of criminal laws of
the several States.

In recent years, the Federal judiciary, following the leadership of the U.S. Su-
preme Court, his usurped and infringed upon the sovereign powers of the States in the
administration of their criminal laws.  The Federal judiciary has practically re-
written the criminal procedures of the States basing their interference upon the
Bill of Rights, which was intended to be applicable only to the Federal Government.
While recognizing that some issues raised in State cases do present Federal ques-
tions, the committee feels that there are other legal questions heretofore deemed

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

reviewable as a Federal question that should be finally decided on the State level,
free from Federal interference. One of these questions is whether, as a factual mat-
ter, a confession was voluntarily given.  This is a question of fact-- not one of
law-- and should be decided on the trial level.  The decision of the trial judge on
the question of voluntariness is reviewable by the respective State appellate courts
and is generally affirmed if it is supported by substantial evidence.  At this stage
of the proceeding, exercise of jurisdiction by Federal courts is disruptive and
tends to dilute the State's enforcement of its criminal laws.  To counteract this
disruptive practice, title II limits Federal jurisdiction to review a State court's
final decision as to voluntariness of a confession as follows:

Neither the Supreme Court nor any inferior court ordained and established by Con-
gress under article II of the Constitution of **\*2139** the United States shall have
jurisdiction to review or to reverse, vacate, modify, or disturb in any way, a rul-
ing of any trial court of any State in any criminal prosecution admitting in evid-
ence as voluntarily made an admission or confession of an accused if such ruling has
been affirmed or otherwise upheld by the highest court of the State having appellate
jurisdiction of the cause.

Section 2 of article III of the Constitution of the United States provides in
part, as follows:

* * * The judicial power of the United States, shall be in one Supreme Court, and
in such inferior courts as the Congress may from time to time ordain and establish.
* * * (T)he Supreme Court shall have appellate jurisdiction, both as to law and
fact, with such exceptions, and under such regulations as the Congress shall make.
This provision vests in the Congress the authority to deny Federal appellate juris-
diction regarding the question of voluntariness of confessions in criminal cases
brought by the various States.  (Ex parte MCardle, 73 U.S. (6 Wall.) 318 (1868); 74
U.S. (7 Wall.) 508 (1869).)

### ADMISSIBILITY OF EYE-WITNESS TESTIMONY

The use of eyewitness testimony in the trial of criminal cases is an essential
prosecutorial tool.  The recent case of United States v. Wade, 87 S.Ct. 1926, 388
U.S. 218 (1967), struck a harmful blow at the nationwide effort to control crime.
The Court held that an in-court identification of the suspect by an eyewitness is
inadmissible unless the prosecution can show that the identification is independent
of any prior identification by the witness while the suspect was in custody, and
while his court appointed lawyer was neither notified nor present.  It is incredible
that a victim is not permitted to identify his assailant in court.  The same is true
of eyewitnesses who saw the victim assailed or murdered.  The fact that eyewitness
might on some occasion prior to trial have identified the accused, without a lawyer
for the accused being present, cannot in reason, law, or commonsense justify such a
disastrous rule of evidence.  Nothing in the Constitution warrants it.  To counter
this harmful effect, the committee adopted that portion of title II providing that
eyewitness testimony is admissible in criminal prosecutions brought in the Federal
courts and that portion of title II that denies the Federal courts the power to re-
view the final State court and Federal trial court decisions declaring eyewitness
testimony to be admissible.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

#### CONSTITUTIONALITY OF LEGISLATION TO LIMIT THE JURISDICTION OF THE FEDERAL COURTS

At the beginning of the 90th Congress, Senator Ervin introduced S. 1194. to re-
verse the Miranda decision by regulating the appellate jurisdiction of the Federal
courts.  At that time, he requested the American Law Division, Legislative Reference
Service, to prepare a memorandum setting out the possible theories on which the con-
stitutionality of the bill could be sustained.  The memorandum, set out below, con-
siders the **\*2140** matter in the context of S. 1194, but its argument and discussions
apply equally well to provisions contained in title II, incorporating as it does
much of S. 1194.  It is the committee's view that the argument presented and the
principle set out concerning the regulation of the appellate jurisdiction of the
Federal courts apply to section 901 in its entirety, including subsection 3503 deal-
ing with the eyewitness testimony.

The committee was acquainted with this memorandum and its premises informed our
consideration of and final treatment of title II.

#### BRIEF IN SUPPORT OF CONSTITUTIONALITY OF BILL LIMITING JURISDICTION OF FEDERAL COURTS IN CONFESSION CASES

This report will undertake to develop and present a theory under which the consti-
tutionality of a proposed Senate bill which would reinstate the voluntariness test
as the standard for the admissibility of confessions or other incriminating state-
ments in criminal trials in both the State and Federal Courts would be sustained.
It is argued that, under the plain language of the Constitution, Congress has almost
plenary power over the appellate jurisdiction of the Supreme Court and of the juris-
diction of the inferior Federal courts. Further, it is contended that, whatever may
be the limitations existing on congressional power over the jurisdiction of the Fed-
eral courts, the proposed bill does not approach that area of limitation.  And, fi-
nally, it is argued that the purpose and effect of this proposed bill, aside from
the argument about control over jurisdiction, is an appropriate matter to be reached
by statutory processes.

The bill would provide as follows:

'Sec. 1.   That the test of the admissibility of an admission or confession of an
accused in a criminal prosecution in any trial court ordained and established by the
Congress under Article III of the Constitution of the United States shall be its
voluntary character and neither the Supreme Court nor any inferior appellate court
ordained and established by the Congress under Article III of the Constitution of
the United States shall have jurisdiction to reverse, vacate, modify, or disturb in
any way a ruling of such a trial court in any criminal prosecution admitting in
evidence as voluntarily made any admission or confession of an accused if such rul-
ing is supported by any competent evidence admitted at the trial.

'Sec. 2.   Neither the Supreme Court nor any inferior court ordained and estab-
lished by the Congress under Article III of the Constitution of the United States
shall have jurisdiction to review or to reverse, vacate, modify, or disturb in any
way, a ruling of any trial court of any State in any criminal prosecution admitting
in evidence as voluntarily made an admission or confession of an accused if such

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

ruling has been affirmed or otherwise upheld by the highest court of the State hav-
ing appellate jurisdiction of the cause.'

**\*2141** The intent of the bill is to reverse the holding of Miranda v. Arizona, 86
S.Ct. 1602, 384 U.S. 436 (1966), applying in both Federal and State courts an exclu-
sionary rule in regard to confession and inculpatory statements of an accused unless
the prosecution demonstrates that the accused had the benefit of procedural safe-
guards effective to secure to him the privilege against self-incrimination guaran-
teed by the fifth amendment to the Constitution.

The bill would also set aside the holdings of such cases as McNabb v. United
States, 63 S.Ct. 608, 318 U.S. 332 (1943), and Mallory v. United States, 77 S.Ct.
1356, 354 U.S. 449 (1957), which made inadmissible statements given while the ac-
cused were held allegedly in violation of a statute requiring prompt arraignment.
This line of cases is founded on the Supreme Court's asserted supervisory power over
the lower Federal courts, rather than upon any constitutional provision.  These
holdings have not been applied to the States and after Miranda are probably not too
important.

Miranda, however, is the case to which the bill is directly addressed.  What was
its holding?  What range of legislation does it place beyond the constitutional
pale?

I

First, it is important to note that Miranda does not do away with the voluntari-
ness test as a standard of admissibility.  Miranda v. Arizona, supra, 457, 478; and
see, supra 505 (Harlan J., dissenting).  Thus, voluntariness is still a test of ad-
missibility, and, in a sense, it might be said that Miranda simply adds on certain
procedural safeguards that a majority of the Court sees as necessary before a con-
fession may be deemed truly voluntary.

Second, and very important in terms of what the bill seeks to do, the Court did
not purport to lay down its standards because these standards were compelled by the
fifth amendment; the standards were called for because without 'adequate protective
devices (being) employed to dispel the compulsion inherent in custodial surround-
ings, no statement obtained from the defendant can truly be the product of his
choice' (supra, 458).

In other words, the Court made a finding of fact that every custodial interroga-
tion was inherently coercive and intimidating.  And upon what basis is this conclu-
sion drawn?  It is upon impartial surveys, not by  examination of the records of any
police interrogation, not by drawing upon a developing consensus among the authorit-
ies in this area (supra, 532-33 (White, J., dissenting)).

Rather, the Court notes that since '(i)interrogation still takes place in pri-
vacy', there is a secrecy which 'results in a gap in our knowledge as to what in
fact goes on in the interrogation rooms' (supra, 448).

**\*2142** Examples of presumed police practice and data supporting the conclusion of
inherent coercion in custodial interrogation were drawn solely from police manuals
and tests which may or may not have been followed. (supra, 448-55).

This, then, is the case with which the proposed bill would attempt to deal.  Any
analysis of its validity must proceed first upon a consideration of the congression-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097                                                    Page 27
S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
(Cite as: 1968 U.S.C.C.A.N. 2112)

al power over the jurisdiction of the Federal courts and second upon a consideration
of the exercise of that power in this instance.

                                    II

     It is provided in article III, section 2, clause 2 of the Constitution, that the
Supreme Court 'shall have appellate jurisdiction both as to law and fact, with such
exceptions, and under such regulations as the Congress shall make. '  Article I,
section 8, clause 9, provides that Congress has power to establish an inferior sys-
tem of courts.
     The Supreme Court has repeatedly asserted that absent enactments of Congress ex-
pressly sanctioning the exercise of all or specific portions of the measure of jur-
isdiction enumerated in article III, none of the provisions of that constitutional
source may be invoked by Federal district courts established as tribunals vested
with original jurisdiction or by the Supreme Court in its capacity solely as an
agency endowed with powers of appellate review.
     For example, in Chisholm v. Georgia, 2 Dall. (2 U.S.) 419, 423  (1973), Mr.
Justice Iredell wrote:
     'I conceive that all the courts of the United States must receive, not merely
their organization as to the number of judges of which they are to consist; but all
their authority, as to the manner of their proceeding, from the legislature only.'
     And in Derousseau v. United States, 6 Cranch (10 U.S.) 307, 313 (1810), Chief
Justice Marshall stated of the recently enacted Judiciary Act:
     'The appellate powers of this Court are not given by the Judicial Act, they are
given by the Constitution.  But they are limited and regulated by the Judicial Act
and by such other acts as have been passed on the subject.'
     Reiteration of the conclusion respecting the broad extent of congressional author-
ity under article III and article I, section 8, clause 9, is found in many cases;
see e.g., Sheldon v. Sill 8, How. (49 U.S.) 440 (1850); Kentucky v. Powers, 26 S.Ct.
487, 201 U.S. 1, 24, 35 (1908); Kline v. Burke Construction Co., 43 S.Ct. 79, 260
U.S. 226, 233, 234 (1922); Lauf v. E. G. Skinner Co., 58 S.Ct. 578, 303 U.S. 323
(1938); Stephen v. United States, 63 S.Ct. 1135, 319 U.S. 423, 426 (1943).
     The leading case in this area is Ex parte McCardle, 7 Wall. (74 U.S.) 506  (1968),
in which the Court accepted a withdrawal by Congress of its appellate jurisdiction
immediately affecting *2143 case already on its docket.  The Court dismissed the
case, saying that 'without jurisdiction the Court cannot proceed at all in any
cause.  Jurisdiction is power to declare the law and when it ceases to exist, the
only function remaining to the Court is that of announcing the fact and dismissing
the case' (supra, 514).
     There are dicta in some cases which suggest that the congressional power might not
be unlimited, without specificity as to the nature of the limitation.  See, e.g.,
United States v. Bitty, 208 U.S. 393, 399-400 (1908); Lockerty v. Phillips, 63 S.Ct.
1019, 319 U.S. 182, 187 (1943); Yakus v. United States, 64 S.Ct. 660, 321 U.S. 414,
444 (1944). It has been suggested by some authorities that, at the least, a limita-
tion exists in the sense that it would be a violation of due process to deny someone
any means of judicial review, of appellate review, at all.  See, Hart, 'The power of
Congress to limit the jurisdiction of Federal Courts:  An Exercise in Dialectic,' 66

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

Harvard Law Review 1362 (1953).

The only limitation of which we may be sure is found in United States v. Klein, 58
S.Ct. 123, 80 U.S. 128 (1871). During the Civil War, Congress had passed a numberof
acts providing for the confiscation of property belonging to those persons in rebel-
lion or otherwise disloyal. It had also passed an act authorizing the President to
offer pardons on such conditions as he deemed advisable, an unnecessary act because
of the constitutional grant of the power to pardon to the President. One element of
all pardons under presidential proclamation was the restoration of all property, ex-
cept slaves, on condition that the formerly disloyal person take an oath of loyalty
to the United States.

A faction of President Johnson's administration was opposed to his pardoning
policy and fought in the Court of Claims suits to recover confiscated property with
the pardon as the basis for recovery. On the first case appealed, the Supreme Court
held that the effect of the pardon was as if the person had never been in rebellion
and that he was therefore entitled to his property. United States v. Padelford, 9
Wall. (76 U.S. 531 (1869).

Whereupon, Congress repealed its pardoning statute and adopted a rider to an ap-
propriation bill designed to frustrate the effect of the presidential pardons, in-
cluding that in Klein's case which had already been decided by the Court of Claims
and was being appealed to the Supreme Court. The rider declared that no pardon, ac-
ceptance, oath, or other act performed in pursuance or as a condition, of pardon,
should be admissible in evidence in support of any claim against the United States
in the Court of Claims, or to establish the right of any claimant to bring suit in
that court, nor, if already put in evidence, should be used or considered on behalf
of the claimant by the court or by the Supreme Court on appeal. Proof of loyalty
was required to be made according to provisions of certain congressional enactments
irrespective of any executive pardon, and when judgment had **\*2144** already been
rendered on other proof of loyalty, the Supreme Court, on appeal, should have no
further jurisdiction and should dismiss it for want of jurisdiction.

The rider further provided that whenever any pardon, granted to any suitor in the
Court of Claims for the proceeds of seized property should recite in substance that
the person pardoned took part in the late rebellion, or was guilty of any act of re-
bellion or disloyalty, and was accepted in writing without express disclaimer
against the fact so recited, such pardon was to be taken as conclusive evidence in
the Court of Claims and on appeal that the claimant did give aid to the rebellion.
On proof of such pardon, the jurisdiction of the court was to cease and the suit be
dismissed.

Said the court:

'Undoubtedly, the legislature had complete control over the organization and ex-
istence of that court and may confer or withhold the right of appeal from its de-
cisions. And if this act did nothing more, it would be our duty to give it effect.
* * *

'But the language of the proviso shows plainly that it does not intend to withhold
appellate jurisdiction except as a means to an end. Its great and controlling pur-
pose is to deny to pardons granted by the President the effect which this court had
adjudged them to have' (supra, 145).

There were two grounds on which to hold the act unconstitutional, said the court.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

First, it was invalid because it 'infring(ed) the constitutional power of the exec-
utive' (supra, 147).  Second, it was invalid because it 'prescrib(ed) a rule for the
decision of a cause in a particular way' (supra, 146).  In other words, it told the
court what facts to consider and what decision to make upon the narrow range of
facts which could be considered.  As the court asked:

'Can (Congress) prescribe a rule in conformity with which the court must deny to
itself the jurisdiction thus conferred, because and only because its decision, in
accordance with settled law, must be adverse to the government and favorable to the
suitor?  This question seems to us to answer itself ' (supra, 147).

The statute was invalid then, because in both instances, it contravened the separ-
ation of powers, infringing upon both a presidential and a judicial power.

III

The question, then, is how the proposed bill comports with the range and limita-
tions of the congressional power over the jurisdiction of the Federal courts.

First, it will be noted that neither section of the bill proposes a simple denial
of jurisdiction in a class of cases in terms of either original or appellate juris-
diction.  What it does, in terms of jurisdictional limitations, is to deny appellate
jurisdiction to **\*2145** reverse or otherwise modify a finding of a trial court, State
or Federal, admitting a confession on the grounds that it is voluntary if such rul-
ing is supported by any competent evidence.

The effect of this limitation is not to deny to anyone the privilege of judicial
review or appellate review which might be though to be commanded by due process.  A
defendant still has the right to appeal, all the way to the Supreme Court if he can
get there, on all issues involved in his trial but on the question of the determina-
tion of an essential fact issues, whether in fact a confession has been voluntarily
made, the decision of the trial court, at the Federal level, or the trial court and
the highest State appellate court, at the State level, must be left undisturbed if
supported by any competent evidence. This denial of review, limited as it is, is
much less than the absolute denial of review of administrative determination of fact
sanctioned in South Carolina v. Katzenbach, 86 S.Ct. 803, 383 U.S. 301, 332-33
(1966); cf. United States v. California Eastern Line, 75 S.Ct. 419, 348 U.S. 351
(1952); Switchmen's Union v. National Mediation Board 64 S.Ct. 95, 320 U.S. 397
(1943).  The Court Mediation Board, 64 S.Ct. 95, 320 U.S. 297 (1943). The Court has
upheld a statute limiting its review of Court of Claims decisions to questions of
law, making the fact determination below final.  Luckenback S.S. Co. v. United
States, 47 S.Ct. 186, 272 U.S. 533 (1926).

Thus, no issue of law is being disturbed here.  The lower courts must determine a
question of fact, of voluntariness, and the standards, the legal standards for de-
termining what constitutes voluntariness, are left undisturbed.  The standards have
been grouped by the court in the past under the general heading of 'the totality of
circumstances,' an examination of which is necessary to see if the defendant was de-
prived of 'a free choice to admit, to deny, or to refuse to answer,' Lisenba v.
California, 62 S.Ct. 280, 314 U.S. 219, 241 (1941), and whether physical or psycho-
logical coercion was of such a degree that 'the defendant's will was overborne at
the time he confessed. '  Haynes v. Washington, 83 S.Ct. 1336, 373 U.S. 503, 513

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

(1963); Lynumn v. Illinois, 83 S.Ct. 917, 372 U.S. 528, 534 (1963). Under the su-
premacy clause, article 6, clause 2, all judges, Federal and State, are required to
apply these standards.

So, it may not be said that the proposed legislation would deprive anyone of all
judicial review. It merely says that, on a particular issue of fact, under stated
circumstances, there is no further appellate review. Even there, a defendant may
obtain appellate review to the extent of determining whether any competent evidence
supports the finding of fact.

If one has no constitutionally protected right to be able to carry any case to the
Supreme Court, and no one of whom we are aware contends otherwise then the limita-
tion of that privilege to the extent proposed by this bill could in no way be deemed
impermissible.

**\*2146** Our second area of consideration relates to the teaching of Klein. On a su-
perficial level, it could be said that the proposed legislation dictates a result to
the appellate courts. If any competent evidence exists to support the trial court's
finding of voluntariness, the holding of the trial court must be left undisturbed.
But this can hardly be what the Court had in mind in Klein when the act there found
unconstitutional was condemned for prescribing 'a rule for the decision of a cause
in a particular way.' The act there prescribed the result at the trial and appel-
late level, it not only prescribed a result, it set out and limited the standards
for getting to that result. By its standards and prescription, the claimant against
the Government could not win because the pardon which he had could not be used in
evidence for him but was irrebutable evidence against him.

Here, on the other hand, the proposed bill prescribes a test, voluntariness, which
all courts have used heretofore and in respect to which there are established judi-
cial standards. Each case will turn upon its own facts and how they are proved. If
a defendant can prove his confession was coerced, it will be excluded, if he cannot
so prove, it will be admitted.

If one should argue that this prescription of a test is unconstitutional on the
basis of Klein, because it sets out a rule of decision, one would have to draw the
same conclusion about a statute which prescribes negligence as the test whether a
claimant may or may not recover in a court case for damages.

This, then, would seem to dispose of one basis of the Klein holding the violation
of the separation-of-powers concept between legislative and judicial powers. Here,
a result is not imposed on the courts; rather a standard, a test is set out, and
this process is usual in practically all legislation concerning the courts, whether
it deals with, for instance; the monetary amount in issue before one may assert Fed-
eral  jurisdiction, or with what acts one must have done before he may be found
guilty of manslaughter.

And, of course, the other holding in Klein, the infringement on the powers of the
President, is not at all involved.

IV

At this point it may well be conceded that the limitation on jurisdiction consti-
tute proper, appropriate, and valid legislation. There still remains however, the
one question of  whether Congress may establish voluntariness as the test of admiss-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

ibility when the Court held in Miranda that other standards were also constitution-
ally required.

   It will be remembered from the discussion of Miranda earlier in the memorandum
that the court did not hold that the fifth amendment compelled the result; it held
rather than in effectuating and protecting the privilege against self incrimination,
the majority Justices, in the absence of contrary evidence and in **\*2147** reliance on
police manuals and tests, had decided that custodial interrogation was inherently
coercive and therefore violative of the fifth amendment. without the safeguards
there promulgated.

   But if, in fact, custodial interrogation is not inherently coercive, how does the
constitutional basis of the decision fare?  With its underpinning removed, it would
seem that the Court would be compelled to retreat to its past standard-- the stand-
ard of voluntariness.

   How may the Court be acquainted of the error of its factual assumption?  It would
seem that congressional legislation with a finding of fact and a reassertion of the
traditional test would be appropriate means to that end.

   There would be nothing unusual in this approach.  In fact, the Voting Rights Act
of 1965 (79 Stat. 437, 42 U.S.C. 1973 et seq.) and the judicial response afford at
least two examples of the process of work and point importantly to the constitution-
ality of the approach of the proposed bill.

   In section 4(e) of the 1965 act (42 U.S.C. 1973(b)(e)), it was provided that no
person who has successfully completed the sixth primary grade in a public school in,
or a private school accredited by, the Commonwealth of Puerto Rico, or any State or
territory, in which the language of instruction was other than English should be
denied the right to vote in any election because of his inability to read or write
English.  The effect of the section, if it were valid was to enfranchise all those
Puerto Ricans in New York, who met the conditions set forth, who could not meet the
English literacy requirement for voting, in effect, in New York.

   Earlier, an English literacy requirement had been held constitutional by the
Court.  Lassiter v. Northampton Election Board, 79 S.Ct. 985, 360 U.S. 45 (1969).
The franchise is essentially a matter of State concern.  Minor v. Happersett, 21
Wall. (88 U.S.) 162 (1874); Lassiter v. Northampton Election Board, supra.  It is a
matter then of Federal concern only if in administering its laws relating to the
franchise a State engages in administering its laws relating to the franchise a
State engages in unlawful discrimination.  See, e.g., Carrington v. Rash, 85 S.Ct.
775, 380 U.S. 89 (1964).  It would seem, therefore, and the attorney general of New
York so argued, that section 4(e) could not be sustained as appropriate legislation
unless Congress had decided and the judiciary independently, with or without the
guidance literacy requirement was discriminatory in violation of the equal protec-
tion clause.

   The Court disagreed and upheld section 4(e).  Katzenbach v. Morgan, 86 S.Ct. 1717,
384 U.S. 641 (1966).  Congress, said Mr. Justice Brenna, may not have considered the
New York requirement of literacy in English as itself a violation of the 14th amend-
ment.  Rather Congress may have been concerned with evidence of discriminatory
treatment of the Puerto Rican community at the **\*2148** hands of New York public agen-
cies, although no evidence was adduced to support this assumption. Thus, Congress
sought to secure the vote for the Puerto Rican community in the belief that its

                    © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

political power would then enable that community to insure nondiscriminatory treat-
ment for itself.

The nature of the evidence and the considerations of all the factors that went to
make up the conclusion was up to Congress to determine.

'It is not for us to review the congressional resolution of these factors.  It is
enough that we be able to perceive a basis upon which the Congress might resolve the
conflict as it did' (supra, 653).

To the argument that the New York requirement constituted an incentive for non-
English speaking people to learn English and better to assure the intelligent exer-
cise of the franchise, the Court thought that Congress might have concluded other-
wise.

'Congress might well have concluded that as a means of furthering the intelligent
exercise of the franchise, an ability to read or understand Spanish is as effective
as ability to read English for those to whom Spanish-language newspapers and Span-
ish-language radio and television programs are available to inform them of election
issues and governmental affairs.  Since Congress undertook to legislate so as to
preclude the enforcement of the State law, and did so in the context of a general
appraisal of literacy requirements for voting * * * it was Congress' prerogative to
weigh these competing considerations' (supra, 655-56).

Stated simply, the Court previously made a constitutional decision, the validity
of English literacy as a requirement for voting, on the basis both of constitutional
theory and of its appraisal of the facts surrounding the application of that re-
quirement and the results, appraisal which led the Court to conclude that no invidi-
ous discrimination existed.  With section 4(e), Congress did not change the consti-
tutional theory; rather, it made its appraisal of the facts and reached a different
factual conclusion than the Court had.

On the basis of that different factual conclusion, the Court would now hold that,
to the extent of section 4(e), the English literacy requirement was invalid and
would do so without an independent verification of the basis of the congressional
conclusion.  It was enough that the Justices could 'perceive a basis upon which Con-
gress might predicate (its) judgment' (supra 656).

The effect of this ruling, and of the ones discussed below, was perceived by Mr.
Justice Harlan in dissent.  Supra, 667-68.  His formulation of the inevitable con-
clusion to be drawn from the Court's ruling has a direct bearing upon the validity
of the proposed bill.  As he saw it, the question was whether there has 'in fact'
been an infringement of a constitutional guarantee so as to underpin the congres-
sional action.

'That question is one for the judicial branch ultimately to determine.  Were the
rule otherwise, Congress would be able to qualify **\*2149** this Court's constitutional
decision under the 14th and 15th amendments, let alone those under other provisions
of the Constitution, by resorting to congressional power under the necessary and
proper clause.'

The teaching of the majority opinion, however, is that 'the rule (is) otherwise,'
that a congressional determination of fact making the difference in constitutional
adjudication, so long as basis may be perceived for that determination, will be ac-
cepted by the Court.

In much less detail, the other two examples may be considered here.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

    Twice, the Supreme Court upheld the constitutionality of the poll tax as a re-
quirement for voting.  Breedlove v. Suttles, 58 S.Ct. 205, 302 U.S. 277 (1937); But-
ler v. Thompson, 71 S.Ct. 1002, 341 U.S. 937 (1951).  But Congress in section 10 of
the Voting Rights Act, 42 U.S.C. 1973(h), found that the poll tax inhibits voting by
the poor, is not reasonably related to 'any legitimate State interest in the conduct
of elections,' and in some cases has the effect of discriminating by race.
    'Upon the basis of these findings, Congress declares that the constitutional right
of citizens to vote is denied or abridged in some areas by the requirement of the
payment of a poll tax as a precondition to voting.'
    The section then directed the Attorney General to bring suit for declaratory judg-
ment or injunctive relief against enforcement of the poll tax.  On two suits brought
thereunder, two Federal district courts declared the poll tax as a precondition to
voting unconstitutional. United States v. Texas, 252 F.Supp. 234 (D.C.W.D.Tex.,
1966), affirmed, 86 S.Ct. 1383, 384 U.S. 155 (1966); United States v. Alabama, 252
F.Supp. 95 )D.C.M.D.Ala., 1966). Subsequently, the Supreme Court, in a suit not
brought under section 10, invalidated the poll tax on grounds conspicuously in reli-
ance on the section though without mentioning it. Harper v. Virginia Board of Elec-
tions, 86 S.Ct. 1079, 383 U.S. 663 (1966).
    Finally, we might turn to the principal point of the Voting Rights Act, that is,
the automatic triggering device for putting the act into effect.  When the Attorney
General determines that a State or political subdivision maintained as of November
1, 1964, 'any test or device,' and the Director of the Census certifies that fewer
than 50 percent of persons of voting age residing there were registered on November
1, 1964, or voted in the presidential election of that year, the otherwise valid
'test or device' may be suspended because there is created the presumption that it
is discriminatory.  This, too, the Court upheld, South Carolina v. Katzenbach, 86
S.Ct. 803, 383 U.S. 301 (1966). Once more, Congress on the basis of its determina-
tion of a factual issue has been allowed to mold constitutional policy.
    Certainly, the proposed bill does much less than that.

                                    **\*2150** V

    It is submitted, therefore, that, first, because Miranda as a constitutional de-
cision was based upon a factual conclusion by the Justices, and, second, since under
the Voting Rights Act cases it appears that Congress may undertake to mold constitu-
tional policy by itself making factual determination, it is proper and appropriate
for Congress, by simple legislation, not to override Miranda, but to present to the
Court a factual determination and conclusion different from that underpinning Mir-
anda.  The proposed bill does not, at this point at least, contain such a statement
of factual determination.  It was nor required in Katzenbach v. Morgan, supra, al-
though in the case of the poll tax a statement of finding was set out.  Any defi-
ciency in this area could be remedied by the legislative history or by an inclusion
of a statement of findings.
    In conclusion, then, it appears that the power of Congress over the jurisdiction
of the Federal courts is broad enough to provide a basis for the action sought here;
it further appears that it is constitutionally permissible for Congress to formulate
a test of admissibility different from that adopted by the Court, inasmuch as the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

adoption does not follow upon any attempt to change constitutional theory but rather
upon a qualifying of the factual basis of the effectuation of that policy.

        RESTRICTION ON THE USE OF FEDERAL HABEAS CORPUS AS A SUBSTITUTE FOR DIRECT
                                        APPEAL

  In the case of Fay v. Noia, 83 S.Ct. 822, 372 U.S. 391 (1963), Townsend v. Sain,
83 S.Ct. 745, 372 U.S. 293 (1963), and others, the Supreme Court liberalized the use
of the Federal habeas corpus procedure to such an extent that it is now being used
as a substitute for direct appeal.  This has increased the caseload on the various
courts and has disrupted the orderly process of final disposition of State criminal
cases.  The following portion of an address by Hon. W. Walter Braham, submitted to
the committee by the Honorable Homer Kreider, aptly expressed the need for congres-
sional enactment of that portion of title II that adds section 2256 to chapter 153
of title 28 of the United States Code:
  The Noia case discloses the determination of the Supreme Court to assert its au-
thority over all cases of Federal civil rights tried in State courts. The prisoner's
petition for habeas corpus was filed in the Federal courts 14 years after the date
of his sentence.  The Supreme Court voided the sentence and directed the prisoner's
release unless he was granted an immediate new trial.  Townsend v. Sain rules that
the district court had had to accord the prisoner a full trial of his case de novo
although more than five petitions for habeas corpus had been filed in the case, and
it had been three times before the Supreme Court on certiorari.  Sanders v. United
States involved a Federal prisoner; after losing in one hearing he was allowed to
allege other grounds and get another hearing.  * * *
  **\*2151** No sooner were the decisions of the Supreme Court which we have cited re-
leased than word about them flashed through the dim, occult reaches of the peniten-
tiaries, and the courts have been flooded with habeas corpus cases ever since.
  The extent to which this process has increased the business of the Federal courts
is appalling.  The reports of the Standing Committee on the American Bar Association
on Jurisprudence and Law Reform affirm that the applications by State prisoners for
writs of habeas corpus in the Federal courts grew from 127 in 1941 to 981 in 1961,
and 4,664 in 1965.  The proportion of increase was 675 percent from 1941 to 1961,
and 3,750 percent from 1941 to 1965.  The growth in the number of these cases has
continued unabated in 1966.  It is estimated that about 30 percent of the business
of the Federal courts derives from habeas corpus.  From an opinion of the District
Court for the District of Columbia, I cite the following:  'In 5 years the most ex-
treme example is that of a person who, between July 1939 and April 1944, presented
in the district court 50 petitions for writs of habeas corpus; another person has
presented 27 petitions, a third 24, a fourth 22, a fifth 20. One hundred nineteen
persons have presented 597 petitions-- an average of five.'
  The Standing Committee on Jurisprudence and Law Reform of the American Bar Associ-
ation in its report in August 1966, has this to say:
  'The delay in the enforcement of the judgments of conviction in the State courts
is perhaps the worst feature of the habeas corpus proceedings in the Federal courts
by State prisoners.  It is a serious factor in bringing about the unfortunate delay
of criminal justice in the United States that contributes to disrespect for the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

laws.

  ' * * * In the Chessman case in California, the elapsed period was 12 years.'

  'In the Townsend case in Illinois, 11 years have elapsed, and it is not yet clear whether the proceedings have terminated.  Eight of those 11 years have been consumed in habeas corpus proceedings in the Federal court * * * .'

  'In the Labat case in Louisiana, over 12 years have increased, and the case is not over yet.  Eight of the 12 years of delay have been in connection with habeas corpus proceedings in the Federal courts, and the case is now in the Court of Appeals for the Fifth Circuit.'

  In these opinions, little or nothing is said about whether the defendant is guilty.  Up to 12 years have been spent to determine preliminarily the civil rights of these defendants, to determine whether he is guilty of crime, has had to wait. If the defendant is ever to come to trial for his alleged crime, the witnesses will be scattered and the prosecution will probably fail.

  All are agreed that most of the applications for habeas corpus are frivolous and without merit.  Before the change in interpretation **\*2152** of the 14th amendment, about 2 percent of the applications were successful.  After the change, the percentage of successful applications went to 2.25 in 1963, and to 3.84 percent in 1965. The only figure I have for 1966 is about 2 percent (hearings, p. 280).

  The committee recognized the problems created by the disruptive use of the habeas corpus procedure to relitigate questions that should have been raised at trial or on appeal.  To alleviate this problem, the committee recommends that the Congress exercise its powers under Article III of the Constitution by enacting legislation providing that certain State court decisions can be reviewed by the Federal courts only by the process of appeal or by writ of certiorari.

### CONSTITUTIONALITY OF RESTRICTIONS ON FEDERAL HABEAS CORPUS

  No constitutional problems are raised by this section since Noia, Townsend, Brown v. Allen, and others were all cases of statutory interpretation by the Court.  The Court purported to interpret the act of February 5, 1867, 14 Stat. 385, now title 28, United States Code, section 2241, to support its decision that under habeas corpus it could examine whether the constitutional rights of convicted prisoners tried by State courts had been violated somehow. Competent scholarly inquiry has demonstrated irrefutably, the committee believes, that these holdings were a total distortion of the 1867 statute. [FN4]

  The only possible constitutional objection that could arise would have to be premised on article I, section 9, clause, 2 of the Constitution which forbids Congress to suspend the privilege of habeas corpus except in cases of rebellion or invasion.  But two considerations militate against reliance on this clause in regard to the bill's provisions.

  First, the writ of habeas protected in the Constitution is not the writ of habeas corpus that the Supreme Court has fashioned.  It is clear from history that the office of the writ from the time of its development before Magna Carta down through the time of the Founding Fathers and until the present activist Court was to allow a court to examine the reason for the detention of one bringing or for whom was brought a petition for the writ.  If the person holding custody of the detainer

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
(Cite as: 1968 U.S.C.C.A.N. 2112)

presented to the inquiring court a lawful reason for the detention the matter was
closed.  Except in those cases in which a sentencing court had had no jurisdiction,
the fact that a person was being detained upon sentence after conviction of a crime
always foreclosed further inquiry. [FN5] The writ did not authorize a writ to in-
quire behind the fact of conviction.  That was the invention of the Supreme Court in
Brown v. Allen, 73 S.Ct. 397, 344 U.S. 433 (1953). The effect of section 702(a) is
to restore the classic concept of habeas corpus and require State prisoners to seek
to uphold their constitutional rights through the regular appellate process.

Second, the constitutional provisions quoted above related to the power of Federal
courts to issue writs of habeas corpus to inquire into the detention *2153 of per-
sons by Federal authority.  The first Congress so understood this and included a
provision to this effect in the Judiciary Act of 1789, section 14, 1 Stat. 81. The
power did not extend to Federal court inquiry into detention by State authority.  As
the legislative history, developed in the sources cited in note 1, makes clear, Con-
gress in 1867 did not intend to grant the Federal courts plenary authority to in-
quire into State detention but only detention designed to frustrate the involuntary
servitude prohibition of the 13th amendment.  By this bill, therefore, Congress
would only reassert that intent and restrict the exercise of Federal court power to
the manner in which it was suggested to be exercised.

In other words, the Constitution does not compel Congress to allow the Federal
courts power to inquire into State court convictions of criminals. Article I, sec-
tion 9, closure 2, does not provide for this and even if it did require Congress to
allow Federal courts to issue writs to inquire into State Detention of prisons it
most assuredly does not look to inquiry into detention after conviction.

It is therefore submitted that section 702(a) is well within the legislative
powers of Congress.

TITLE III-WIRETAPPING AND ELECTRONIC SURVEILLANCE

Title III, is essentially a combination of S. 675, the Federal Wire Interception
Act, introduced by Senator McClellan on January 25, 1967, and S. 2050, the Electron-
ic Surveillance Control Act of 1967, introduced by Senator Hruska on June 29, 1967.
Subsequent to the introduction of S. 675, the U.S. Supreme Court, on June 12, 1967,
handed down the decision in Berger v. New York, 87 S.Ct. 1873, 388 U.S. 41, which
declared unconstitutional the New York State statute authorizing electronic eaves-
dropping (bugging) by law-enforcement officers in investigating certain types of
crimes.  The Court held that the New York statute, on its face, failed to meet cer-
tain constitutional standards.  In the course of the opinion, the Court delineated
the constitutional criteria that electronic surveillance legislation should contain.
Title III was drafted to meet these standards and to conform with Katz v. United
States, 88 S.Ct. 507, 389 U.S. 347 (1967).

Title III has as its dual purpose (1) protecting the privacy of wire and oral com-
munications, and (2) delineating on a uniform basis the circumstances and conditions
under which the interception of wire and oral communications may be authorized.  To
assure the privacy of oral and wire communications, title III prohibits all wiretap-
ping and electronic surveillance by persons other than duly authorized law enforce-
ment officers engaged in the investigation or prevention of specified types of seri-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

ous crimes, and only after authorization of a court order obtained after a showing
and finding of probable cause. The only exceptions to the above prohibition are:
(1) the power of the President to obtain information by such means as he may deem
necessary to protect the Nation from attack or hostile acts of a foreign power, to
obtain intelligence information essential to the Nation's security, and to protect
the internal security of the United States from those who advocate its overthrow by
force or other unlawful means; (2) employees of the Federal Communications Commis-
sion may, in the **\*2154** normal course of employment, intercept and disclose wire com-
munications in the discharge of the monitoring responsibilities discharged by the
Commission in the enforcement of chapter 5 of title 47 of the United States Code;
and (3) employees of a communication common carrier may intercept and disclose wire
communications in the normal course of their employment while engaged in any activ-
ity necessary to the rendition of service, or protection of the rights, or property
of the carrier of such communication.

### PROBLEM

The tremendous scientific and technological developments that have taken place in
the last century have made possible today the widespread use and abuse of electronic
surveillance techniques. As a result of these developments, privacy of communica-
tion is seriously jeopardized by these techniques of surveillance. Commercial and
employer-labor espionage is becoming widespread. It is becoming increasingly diffi-
cult to conduct business meetings in private. Trade secrets are betrayed. Labor and
management plans are revealed. No longer is it possible, in short, for each man to
retreat into his home and be left alone. Every spoken word relating to each man's
personal, marital, religious, political, or commercial concerns can be intercepted
by an unseen auditor and turned against the speaker to the auditor's advantage.
The Report of the President's Commission on Law Enforcement and Administration of
Justice, 'The Challenge of Crime in a Free Society' (1967), concluded that 'the
present status of the law (relating to wiretapping and electronic surveillance) is
intolerable.' 'It serves,' the Report observed, 'neither the interests of privacy
nor of law enforcement.'
Both proponents and opponents of wiretapping and electronic surveillance agree
that the present state of law in this area is extremely unsatisfactory and that the
Congress should act to clarify the resulting confusion.
The first case in which the Supreme Court considered the status of wire tapping
was Olmstead v. United States, decided in 1928, 48 S.Ct. 564, 277 U.S. 438. It held
that the tapping of telephone wires and the use of the intercepted messages did not
constitute an unreasonable search and seizure under the Fourth Amendment, there be-
ing no trespass into constitutionally protected areas and no seizure of anything
tangible.
At the time the Olmstead case was decided there was no Federal statute governing
wiretapping. Section 605 of the Federal Communications was enacted in 1934 and
provides that 'no person not being authorized by the sender shall intercept any com-
munication and divulge or publish the existence contents, substance, purport, effect
or meaning of such intercepted communication to any person * * *' (47 U.S.C. 605).
Soon after the enactment of the Federal Communications Act, the Supreme Court held

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

in Nardone v. United States, 58 S.Ct. 275, 302 U.S. 379 (193&), that evidence ob-
tained by wiretapping in violation of section 605 was inadmissible in Federal
courts.  The decision was based not on constitutional grounds, but rather on the
Court's supervisory powers over Federal courts and officers.

**\*2155** Later, in the second Nardone case, 60 S.Ct. 266, 308 U.S. 388  (1939), the
Supreme Court went further and held that section 605 bars not only evidence obtained
directly by wiretapping but also evidence obtained by use of leads secured by
wiretapping (the 'fruit of the poisonous tree' doctrine).

Then, in 1939, the Supreme Court held that section 605 prohibited the interception
and divulgence of intrastate as well as interstate calls (Weiss v. United States, 60
S.Ct. 269, 308 U.S. 321).

The Court then held in Goldstein v. United States, 62 S.Ct. 1000, 316 U.S. 114
(1942), that only a party to a tapped conversation has standing to object to the use
of evidence so obtained and in Rathburn v. United States, 78 S.Ct. 161, 355 U.S. 107
(1957), that the statute was not violated when police officers listened in on a
telephone from an extension with the permission of one party to the conversation,
since there was no forbidden 'interception.'

In 1952, in the case of Schwartz v. Texas, 73 S.Ct. 232, 344 U.S. 199, The supreme
Court held that, although it was a Federal crime for State officers to divulge
wiretapping evidence, section 605 did not render such evidence inadmissible in State
Court.  Wiretap evidence, however, obtained by State officers under sanction of
State law, could not be admitted in Federal courts (Benanti v. United States, 78
S.Ct. 155, 355 U.S. 96 (1957)).

In the area of 'bugging,' as distinguished from wiretapping, the Supreme Court has
held that evidence procured by electronic eavesdropping devices becomes inadmissible
only where there has been an unauthorized physical invasion of the defendant's
premises.  Evidence procured by the use of a detectophone attached to the wall of a
room, in order to allow Federal agents in the room to pick up conversations on the
other side of the wall, was admissible (Goldstein v. United States, 62 S.Ct. 1000,
316 U.S. 114 (1942) citing Goldman v. United States, 62 S.Ct. 993, 316 U.S. 129
(1942) at page 120).

Where a 'spike mike' was inserted into a heating duct to pick up conversations in
other parts of the building, however, the evidence was held inadmissible as violat-
ing the Fourth Amendment (Silverman v. United States, 81 S.Ct. 679, 365 U.S. 505
(1961).  In 1953 the Supreme Court held an informer could be 'wired for sound' to
transmit a suspect's statements to officers waiting with a receiver outside the
building (On Lee v. United States, 72 S.Ct. 967, 343 U.S. 747 (1953)). Moreover, the
Supreme Court decided in 1963 that no constitutional rights would be violated if a
Federal agent concealed a small tape recorder on his person and thus recorded the
statements of a suspect who knew the interrogator was an agent but did not know he
was 'bugger' (Lopez v. United States, 83 S.Ct. 1381, 373 U.S. 427 (1963)).

Thus, the Supreme Court has effectively prevented the use in both Federal and
State courts of intercepted communications by wiretapping, as well as the fruits
thereof.  State officers would be subject to Federal prosecution and, therefore,
most State prosecutors do not use such evidence, although it is authorized by their
State statutes.

Supreme Court cases, to some extent, prior to the Berger decision, which is here-

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**


inafter more fully discussed, had clarified a few complexing problems **\*2156** in the
area of 'bugging.'  That case, by a divided Court, held unconstitutional the New
York statute authorizing electronic surveillance, but in doing so has laid out
guidelines for the Congress and State legislatures to follow in enacting wiretapping
and electronic eavesdropping statutes which would meet constitutional requirements.

 On the State level, there is little uniformity.  Most States have 'malicious mis-
chief' statutes passed in the latter part of the last century to protect the prop-
erty of telephone companies.  Not all of them, however, are broad enough to cover
illegal wiretapping that does not involve physical damage to the lines of communica-
tion.  See, e.g., Washington v. Nordskeg, 76 Wash. 472, 136 P. 694 (1913).  Only a
few States have enacted statutes dealing with other forms of electronic surveil-
lance.  Few States, took have set up needed court order systems for law enforcement
officers.  Even those existing statutes, however, must now be reformed in light of
the standards for constitutional electronic surveillance laid down by the Supreme
Court in Berger v. New York, 87 S.Ct. 1873, 388 U.S. 41 (1967), and Katz v. United
States, 88 S.Ct. 507, 389 U.S. 347 (1967).

 It would be, in short, difficult to devise a body of law from the point of view of
privacy or justice more totally unsatisfactory in its consequences. The need for
comprehensive, fair and effective reform setting uniform standards is obvious.  New
protections for privacy must be enacted.  Guidance and supervision must be given to
State and Federal law enforcement officers.  This can only be accomplished through
national legislation.  This the subcommittee proposes.


                          PROHIBITION


 Virtually all concede that the use of wiretapping or electronic surveillance tech-
niques by private unauthorized hands has little justification where communications
are intercepted without the consent of one of the participants.  No one quarrels
with the proposition that the unauthorized  use of these techniques by law enforce-
ment agents should be prohibited.  It is not enough, however, just to prohibit the
unjustifiable interception, disclosure, or use of any wire or oral communications.
An attach must also be made on the possession, distribution, manufacture and advert-
ising of intercepting devices. All too often the invasion of privacy itself will go
unknown.  Only by striking at all aspects of the problem can privacy be adequately
protected.  The prohibition, too, must be enforced will all appropriate sanctions.
Criminal penalties have their part to play.  But other remedies must be afforded the
victim of an unlawful invasion of privacy.  Provision must be made for civil re-
course for dangers.  The perpetrator must be denied the fruits of his unlawful ac-
tions in civil and criminal proceedings.  Each of these objectives is sought by the
proposed legislation.


                       NATIONAL SECURITY


 It is obvious that whatever means are necessary should and must be taken to pro-
tect the national security interest.  Wiretapping and electronic surveillance tech-
niques are proper means for the acquisition of counter intelligence against the hos-
tile action of foreign powers. Nothing in the **\*2157** proposed legislation seeks to
disturb the power of the President to act in this area.  Limitations that may be


© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097                                                    Page 46
S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

deemed proper in the field of domestic affairs of a nation become artificial when
international relations and internal security are at stake.

LAW ENFORCEMENT

   The major purpose of title III is to combat organized crime.  To consider the
question of the need for wiretapping and electronic surveillance techniques in the
administration of justice, it is necessary first to consider the historical develop-
ment of our system of criminal law and procedure and the challenge put to it today
by modern organized crime.  We inherited from England a medieval system, devised
originally for a stable, homogeneous, primarily agrarian community.  In our format-
ive years, we had no professional police force. Today, however, we are a mobile,
modern, heterogeneous, urban industrial community.  Our Nation, moreover, is no
longer small.  Our traditional methods in the administration of justice, too, were
fashioned in response to the problems of our Nation as they were in its formative
years.  In years past it was not possible to investigate crime aided by science.
Today it is not only possible but necessary, in the development of evidence, to sub-
ject it to analysis by the hands of those trained in the scientific disciplines.
Even so, scientific 'crime detection, popular fiction to the contrary notwithstand-
ing, at present is a limited tool' ('The challenge of Crime in a Free Society '
(1967)).  In our formative years, offenses usually occurred between neighbors.  No
specialized law enforcement force was thought necessary to bring such crimes into
the system of justice.  Ignored entirely in the development of our system of
justice, therefore, was the possibility of the growth of a phenomenon such as modern
organized crime with its attendant corruption or our political and law enforcement
processes.
   We have always had forms of organized crime and corruption.  But there has grown
up in our society today highly organized, structured and formalized groups of crim-
inal cartels, whose existence transcends the crime known yesterday, for which our
criminal laws and procedures were primarily designed. The 'American system was not
designed with (organized crime) * * * in mind, ' the President's Crime Commission
noted in its report 'The Challenge of Crime in a Free Society' (1967), and it has
been notably unsuccessful to date in preventing such organizations from preying on
society.'  These hard-core groups have become more than just loose associations of
criminals.  They have developed into corporations of corruption, indeed, quasi-
governments within our society, presenting a unique challenge to the administration
of justice. Organized crime has never limited itself to one illegal endeavor.
Today, it is active in, and largely controls, professional gambling, which can only
be described as exploitative, corruptive and parasitic, draining income away from
food, clothing, shelter, health, and education in our ghettos.  The net take is es-
timated at $7 billion a year.
   Organized crime also has an almost monopolistic control over the illegal importa-
tion, distribution and sale of narcotics, which is estimated to be a $350 million a
year business.  The destruction of human personality, the **2158** violation of human
dignity, even death, associated with addiction need not be belabored here nor ought
it be necessary to point out again who the victims are, the poor, the uneducated,
the unskilled, the young.  The cost of narcotics varies, but it is seldom low enough

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097
S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

to permit the typical addict to obtain money for drugs by lawful means.  Theft and
prostitution are necessary by products of many addicts.

   Loan sharking, finally, is everywhere dominated by organized crime. Its estimated
take is $350 million a year.  Its victims, in contrast, come from all segments of
our society.  Only a pressing need for cash and no access to regular channels of
credit separate the victim from each of us.  Repayment is everywhere compelled by
force.  Since debtors are often pressed into criminal acts to find repayment, loan
sharking also has wide social impact.

   Organized crime has not limited itself to criminal endeavors.  It has large
spheres of legitimate business and union activity undermining our basic economic
mores and institutions.  In many cities, it dominates the fields of jukebox and
vending machine distribution. Laundry services, liquor and beer distribution, night
clubs, food wholesaling, record manufacturing, the garment industry, and a host of
other lines have been invaded.  Our fee control of businesses has been acquired by
the sub rosa investment of profits acquired from illegal ventures, accepting busi-
ness interests in payment of gambling or loan sharks debts, or using various forms
of extortion.  After takeover, the defaulted loan has sometimes been liquidated by
professional arsonists burning the business and collecting the insurance or by vari-
ous bankruptcy fraud techniques.  All of us consequently pay higher insurance premi-
ums and higher prices to cover the losses.  Many times the group, using force and
fear, will attempt to secure a monopoly in the service or product of the business.
When the campaign is successful, the organization begins to extract a premium price
from customers.  Either way, each of us suffers individually and our traditional
economic way of life is damaged.

### CORRUPTION OF DEMOCRATIC PROCESSES

   Organized crime flourishes best only in a climate of corruption. Today's corrup-
tion is less visible, more subtle, and therefore difficult to detect and assess than
the corruption of earlier times. With the expansion of governmental regulation of
private and business activity, the power to corrupt has given organized crime great-
er control over matters affecting the everyday life of each of us.  At various
times, it has been the dominant political force in such metropolitan centers as New
York, Chicago, Miami, and New Orleans. Political leaders, legislators, police of-
ficers, prosecutors, and judges have been tained by organized crime, and the public
is the victim because there can be no true liberty or justice under a corrupt gov-
ernment.

   The President's Crime Commission, in their report 'The Challenge of Crime in a
Free Society' (1967), put it this way:  Organized crime's success preaches 'a sermon
that all too many Americans heed:  The Government is for sale; lawlessness is the
road to wealth; honesty is a pitfall and morality a trap for suckers.

   **\*2159** In discussing the use of electronic surveillance as a weapon against organ-
ized crime, the President's Crime Commission states:

   * * * communication is essential to the operation of any business enterprise.  In
legitimate business this is accomplished with written and oral exchanges.  In organ-
ized crime enterprises, however, the possibility of loss or seizure of an incrimin-
ating document demands a minimum of written communication.  Because of the varied

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
(Cite as: 1968 U.S.C.C.A.N. 2112)

character of organized crime enterprises, the large numbers of persons employed in
them, and frequently the distances separating elements of the organization, the
telephone remains an essential vehicle for communication.

Victims, complainants, or witnesses are unwilling to testify because of apathy,
fear, or self-interest, and the top figures in the rackets are protected by layers
ofinsulation and direct participation in criminal acts. Information received from
paid informants is often unreliable, and a stern code of discipline inhibits the de-
velopment of informants against organized criminals.  In short, intercepting the
communications of organized criminals is the only effective method of learning about
their activities.

District Attorney Frank Hogan, a recognized national authority, who has served in
the New York District Attorney's office for 32 years, states that wiretapping is an
indispensable weapon in the fight against organized crime. The President's Commis-
sion on Law Enforcement and Administration of Justice had this to say about the or-
ganized crime problem in New York:

Over the years New York New York has faced one of the Nation's most aggravated or-
ganized crime problems.  Only in the New York have law enforcement officials
achieved some level of continuous success in bringing prosecutions against organized
crime.  For over 20 years, New York has authorized wiretapping on court order.
Since 1957 'bugging' has been similarly authorized.  Wiretapping was the mainstay of
the New York attack against organized crime until Federal court decisions inter-
vened.

The principal argument of those who oppose wiretapping and electronic surveillance
by law enforcement officers on court order is that it will destroy our right of pri-
vacy.  Wiretapping and electronic surveillance as practiced by law enforcement of-
ficers has been subject to much confusion and misunderstanding.  As District Attor-
ney Frank Hogan so aptly put it when testifying before the subcommittee:

This is a field that produces the most extravagant accusations of abusive prac-
tices, as ill-founded and unsupported as they are shocking, and as irresponsible as
they are inaccurate (hearings, p. 1100).

When the facts are brought to light, statistics show that extremely few telephones
are tapped law enforcement officers-- and that even fewer electronic surveillance
devices are installed.  Testimony at the subcommittee hearings revealed the follow-
ing statistics:  In Kings County, N.Y., with over 3,000,000 people, 47 wiretap or-
ders were obtained the first 11 months of 1966.  In Nassau County, N.Y., which has a
population of approximately 1,500,000 persons, 78 wiretap orders were obtained in
1966.  *2160 In New York County, N.Y., with a population of nearly 3,200,000 per-
sons, 73 wiretaps orders were obtained in 1966. In 1966 in New York County, 23 or-
ders granting installations of electronic surveillance devices were entered.  Since
1958, when the law permitting this type of eavesdropping by law enforcement author-
ities under court order was enacted, the average in New York County has been less
than 19 orders a year.

In his testimony before the subcommittee, District Attorney Frank Hogan referred
to a study conducted by the New York Legislature which reinforces the above figures
and shows that the danger that law enforcement officials may listen in on conversa-
tions that do not concern some criminal enterprise is exceedingly remote.  Accord-
ing, to Mr. Hogan, starting in 1955 a joint legislative committee conducted a 5-year

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

study in the State of New York inquiring particularly into possible abuses by law
enforcement officers.  In its report the committee explicitly declared that no ab-
uses whatever by any district attorney had been found in the use of the wiretapping
privilege. Quite the contrary is true.  The committee concluded that the system of
legalized telephonic interception had worked well in New York for over 20 years,
that it had popular approval, and that it enjoyed the overwhelming support of New
York's highest State officers, executive, legislative, and judicial.  There was un-
animous agreement that law enforcement in New York had used this investigative
weapon fairly, sparingly, and with the most selective discrimination.  Law enforce-
ment officers simply have too much to do to be listening in on conversations of
law-abiding citizens.  Available manpower just does not permit such abuse.  It is
idle to contend otherwise.

'From a legal standpoint, organized crime,' the President's Crime Commission noted
in its report 'The Challenge of Crime in a Free Society' (1967), 'continues to grow
because of defects in the evidence gathering process.'  The prohibitions of the
criminal law are, in short, not self-executing.  To bring criminal sanction into
play, it is necessary to develop legally admissible evidence.  Due process requires
no less (Thompson v. City of Louisville, 80 S.Ct. 624, 362 U.S. 199 (1960)).  Absent
that evidence, criminal sanctions can have no role to play in dealing with this so-
cial problem.  That means witnesses, since organized crime groups do not keep books
and records available for law enforcement inspection.  Yet, the President's Crime
Commission found in their report 'The Challenge of Crime in a Free Society' (1967),
that under 'present procedures too few witnesses have been produced to prove the
link between criminal group members and the illicit activities that they sponsor. '
Victims do not normally testify for they are already in bodily fear or they are com-
pliant, that is, the narcotic addict in desparate need of a 'fix' does not usually
turn in his 'pusher.'  What victim of extortion will unsolicitedly risk his body by
cooperation with law enforcement?  Insiders are kept quiet by an ideology of silence
underwritten by a fear, quite realistic, that death comes to him who talks.

All of this is not to say that significant cases have not been developed by law
enforcement agents using conventional techniques and based upon the testimony of
brave martyr-witnesses.  The most successful drive ever launched against organized
crime begun by the U.S. Department of Justice **2161** in 1961 had by 1966 raised the
number of federally secured convictions in the area of organized crime from 73 to
477. Yet against the hard-core little real progress was made.  The estimated number
of members of the leading groups today is put at 5,000.  During the 1961-66 period,
only 185 of these individuals were indicted and 102 convicted.  Six gained acquit-
tals and dismissals and four secured reversals.  A conviction rate of 5 percent per
5-year period hardly constitutes more than a harassing action.  The effect is negli-
gible.

Organized criminals must hold meetings to lay plans.  Where the geographical area
over which they operate is large, they must use telephones.  Wiretapping and elec-
tronic surveillance techniques can intercept these wire and oral communications.
This is not, however, the whole situation.  More than the securing of an evidentiary
substitute for live testimony, which is not subject to being eliminated or tampered
with by fear or favor, is necessary.  To realize the potential possible from the use
of criminal sanctions, it will be necessary to commit to the system more than legal

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

tools. Time, talent, and personnel are required. Nevertheless, no amount of time, talent, or personnel without the necessary legal tools-- will work, and authorized wiretapping and electronic surveillance techniques by law enforcement officials are indispensable legal tools.

Debate over the constitutionality of wiretapping and electronic surveillance techniques has raged insistently since the Court decided in 1928 in Olmstead v. United States, 48 S.Ct. 564, 277 U.S. 438 (1928), that wiretapping accomplished without a physical trespass into a constitutionally protected area did not violate any provision of the Constitution. That debate has taken many forms. It has posited many hypotheses. All of them need not now be considered, for the Court itself now has authoritatively set down the constitutional standards in this area on the use of these techniques in Berger v. New York, 87 S.Ct. 1873, 388 U.S. 41 (1967), and Katz v. United States, 88 S.Ct. 507, 389 U.S. 347 (1967).

The Berger decision reversed by a vote of 6 to 3 the conviction, secured through a court-ordered eavesdrop, of a New York public relations man for conspiracy to bribe the chairman of the New York State Liquor Authority. In declaring the New York State eavesdropping statute unconstitutional, the Court held that (1) a conversation is within the fourth amendment's right to privacy protections, and the use of electronic devices to seize conversations is a search within the meaning of that amendment; (2) the language of the New York statute was so broad that it resulted in a trespassory intrusion into a constitutionally protected area and is violative of the fourth and 14th amendments; and (3) evidence obtained by an eavesdrop which violates the fourth amendment must be excluded in State courts.

During the course of the majority opinion the Court delineated the following constitutional standards the New York statute failed to meet:

(1) Particularly in describing the place to be searched and the person or thing to be seized.

(2) Particularity in describing the crime that has been, is being, or is about to be committed.

(3) Particularity in describing the type of conversation sought.

**\*2162** (4) Limitations on the officer executing the eavesdrop order which would (a) prevent his searching unauthorized areas, and (b) prevent further searching once the property sought is found.

(5) Probable cause in seeking to renew the eavesdrop order.

(6) Dispatch in executing the eavesdrop order.

(7) Requirement that the executing officer make a return on the eavesdrop order showing what was seized.

(8) A showing of exigent circumstances in order to overcome the defect of not giving prior notice.

The Katz decision, handed down 6 months after Berger, reaffirmed the principles and constitutional guidelines set out in Berger. In Katz petitioner was convicted of interstate transmission of wagering information via telephone in violation of a Federal statute (18 U.S.C. 1084). At trial the Government introduced, over petitoner's objection, evidence of his end of telephone conversations, overheard by FBI agents, who had attached an electronic listening and recording device to the outside of the public telephone booth from which he had placed his calls.

On certiorari the Supreme Court held that the Government's activities in electron-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097
S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
(Cite as: 1968 U.S.C.C.A.N. 2112)

ically listening to and recording petitioner's words constituted an unlawful search
and seizure within the fourth amendment and reversed the conviction.

The Court noted that the Government handled the surveillance in the following man-
ner:  (1) The agents did not begin their electronic surveillance until investigation
of the petitioner's activities had established a strong probability that he was us-
ing the telephone in question to transmit gambling information interstate, in viola-
tion of Federal law; (2) the surveillance was limited, both in scope and duration,
to the specific purpose of establishing the contents of petitioner's unlawful tele-
phonic communications; (3) the agents confined their surveillance to the brief peri-
ods during which petitioner used the telephone booth and took great care to overhear
only the conversations of the petitioner himself.

Commenting on the manner in which the surveillance was carried out, the Court
stated, 'It is clear that this surveillance was so narrowly circumscribed that a
duly authorized magistrate, properly notified of the need for such investigation,
specifically informed of the basis on which it was to proceed, and clearly apprised
of the precise intrusion it would entail, could constitutionally have authorized,
with appropriate safeguards, the very limited search the Government asserts took
place.'

The Court noted that the agents had acted with restraint, but that the restraint
was imposed by the agents themselves, not by a judicial officer.  The agents were
not required, before starting the search, to do the following things:  (1) present
their estimate of probable cause for detached scrutiny by a neutral magistrate; (2)
conduct the search within precise limits established by a specific court order; (3)
to notify the authorizing magistrate, after the search, of all that had been seized.

In concluding, the Court held that the Government agents ignored the procedure of
antecedent justification that is central to the fourth amendment, and a procedure
the Court held to be a constitutional pre-condition of the kind of electronic sur-
veillance involved in this case.

**2163** Working from the hypothesis that any wiretapping and electronic surveillance
legislation should include the above constitutional standards, the subcommittee has
used the Berger and Katz decisions as a guide in drafting title III.  Each section
of title III is discussed in detail in the analysis section of this title, including
those provisions which are intended to conform to the Berger and Katz decisions.

Legislation meeting the constitutional standards set out in the decisions, and
granting law enforcement officers the authority to tap telephone wires and install
electronic surveillance devices in the investigation of major crimes and upon ob-
taining a court order, which is the purpose of title III of S. 917, has been en-
dorsed by the following groups and organizations:

(1)  The President's Commission on Law Enforcement and Administration of Justice.
(2)  The Judicial Conference of the United States.
(3)  National Association of Attorney General.
(4)  National District Attorneys Association.
(5)  Association of Federal Investigators.
(6)  All living former U.S. attorneys for the souther district of New York.
(7)  The National Council on Crime and Delinquency.

In addition to the above endorsements, the subcommittee received comments on
wiretapping and electronic surveillance legislation from many State and Federal

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

judges and law enforcement officials, officials of State and local crime commis-
sions, the attorneys general of the States, local prosecuting attorneys, and other
interested and qualified persons.  These statements favored almost without exception
legislation granting carefully circumscribed authority to law enforcement officials
to engage in wiretapping and electronic surveillance in the investigation of certain
serious crimes after obtaining a court order. These statements are available for
reference in the subcommittee's offices.

  It also should be pointed out that every U.S. Attorney General since 1931, except-
ing the present Attorney General, has endorsed some sort of legislation granting law
enforcement officers the right to utilize wiretapping and/or electronic surveillance
devices in the investigation of major crimes upon the securing of a court order.

              TITLE IV-STATE FIREARMS CONTROL ASSISTANCE

  According to FBI figures, in 1966 firearms were used in 60 percent of the murders
committed in the United States.  Thus, 6,500 persons were killed in 1966 by persons
armed with guns, a 16-percent increase over 1965.

  In the category of aggravated assault by gun and robbery by gun, the percentages
of increase were 25 and 14, respectively, with 43,500 citizens assaulted with fire-
arms and 59,000 Americans robbed at gunpoint in 1966.

  In 1967, there were further increases in these two categories of violent crime;
armed robbery increased 30 percent and aggravated assault by gun increased 22 per-
cent.

  **\*2164** President Johnson, the American Bar Association, the International Associ-
ation of Chiefs of Police, the National Association of Citizens Crime Commissions,
and civic, religious, and fraternal affiliations have urged the enactment of mean-
ingful and effective Federal legislation to regulate the interstate traffic in, and
access to, firearms.

  Passage of this legislation would not interfere with the lawful use of firearms by
the vast majority of responsible gun owners in the United States.

  We also believe that enactment of this measure would aid in curbing the problem of
gun abuse that exists in the United States.  The preponderance of evidence substan-
tiates that firearms controls are effective in curtailing gun abuse and there is
every reason to believe that the enactment of this title would effect similar res-
ults.

  A careful study of this issue for the last 6 years has led us to conclude that the
enactment of this title is necessary and prudent.

                     EXTENT OF THE PROBLEM

  The problem of firearms misuse in crimes of violence in the United States has been
adequately documented by the Judiciary Subcommittee to Investigate Juvenile Delin-
quency, commencing with the subcommittee's hearings record of 1963 and including the
hearing records of 1964, 1965, and 1967.

  There is no further need to detail the committee's findings in this report, in
view of the fact that they are included in the above-referenced hearing records and
in Judiciary Committee Report 1866, 89th Congress, Second session.

  However, a summary of the major problem areas documented by the committee is ap-

          © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

propriate to outline the extent and the scope of the firearms abuse problem.

   Two prime sources of firearms to criminals, juveniles, mental defectives, and
crime-bent individuals which involve access to guns through interstate routes are
the mail-order common carrier source and the out-of-state, nonresident source.  In
both cases, the committee's record is replete with evidence substantiating that
these sources of firearms for illicit purposes are major problem areas with which
only the Federal Government can deal effectively.

   Because of interstate, nonresident purchases of firearms for criminal purposes,
the laws of our States and their political subdivisions are circumvented, contra-
vened, and rendered ineffective.

   As an example of this, the Massachusetts authorities have testified that 87 per-
cent of 4,506 crime guns misused in that State were purchased outside of Massachu-
setts in neighboring States.  The result is that their stringent controls which are
applicable to the sale of firearms and primarily handguns, are considered reduced in
effectiveness.

   The prosecuting attorney of Wayne County, Mich., which includes the city of De-
troit, testified that 90 out of every 100 crime guns confiscated in Detroit are not
purchased and registered in Michigan, and that the prime source of these crime guns
is by purchases in neighboring Ohio, **\*2165** where controls on firearms are minimal.
This was also true of the firearms used in the Detroit riot of July 23-29, 1967.

   A second major source of crime guns, the mail-order, common carrier route, has
been substantiated by the committee's investigations and by the testimony of a host
of witnesses who have appeared before it.

   One-quarter of the mail-order gun recipients investigated had criminal records be-
fore ordering and receiving their firearms.  In addition, juveniles and minors have
utilized the anonymity of the mails to order and then receive firearms by common
carrier in circumvention and contravention of State and local laws.  In contributing
to our ever-increasing crime rates, juveniles account for some 49 percent of the ar-
rests for serious crimes in the United States and minors account for 64 percent of
the total arrests in this category.

   Additional major problem areas concern (1) the question of imported firearms; (2)
the ease with which anyone can become licensed as a federally licensed dealer in
firearms; and (3) the ease with which anyone may acquire a destructive device, such
as an antitank gun, a bazooka, or a mortar for unlawful purposes.

   Substantial numbers of firearms that are sold via the mail-order route in the
United States are foreign imported firearms, either of the military surplus category
or the category of inexpensive, small-caliber firearms, which have been termed as
'unsafe' and as 'Saturday night specials.'

   Our law enforcement officials have testified that from 50 to 80 percent of our
crime guns that are confiscated each year are foreign imports of either of the above
categories of weapons.  Many of these imports are shipped into the United States as
parts or disassembled. Many are rebored and rechambered upon reentry into the United
States and the barrels are cut down for concealment purposes.

   The majority of the countries whose surplus arms are dumped in the United States
stringently control access to firearms within their own borders and preclude such
dumping in those countries.  Furthermore, the United States no longer sells domestic
military surplus to the public. Only through affiliation with the National Rifle As-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097                                                          Page 48
S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

sociation may an individual secure a domestic military surplus firearm from the Federal Government.

The importation of military surplus arms is a contributing factor to the misuse of the destructive devices, such as the Finnish Lahti antitank gun that was used in the robbery of a Brinks Co. installation in Syracuse, N.Y.

The majority of the destructive devices that have been used unlawfully in recent years in the United States have been imported military surplus.  Such implements of war have no sporting use and their continued importation and domestic availability to virtually anyone cannot be justified.

The last major area covered by the committee in its investigations and hearings concerns the licensing standards and the issuing of licenses to persons as federally licensed dealers, manufacturers, and importers in firearms.

A recent Treasury Department survey of licensed firearms dealers reflects that fully one-quarter of them are not bona fide dealers in firearms,**\*2166** but rather are individuals who have purchased a Federal license for $1 in order to trade in firearms at substantial discounts or for whatever other purpose they desire.

The $1 license fee is not realistic and the licensing standards are not adequate to insure that only bona fide persons are to be licensed as Federal firearms dealers.  In addition, the licensing fee for manufacturers and importers is not realistic nor are the standards in order to obtain such licenses adequate under existing law.

The problem of gun abuse as documented by the committee is real, it is urgent and it is increasing each year and there should be no further delay in meeting it squarely with remedial Federal legislation.

### PRESIDENT'S STATEMENT ON FIREARMS CONTROL

In President Johnson's message on crime to the Congress of February 6, 1967, he indicated that 'Any effective crime control program requires the enactment of firearms legislation.'  He went on to underscore the need for firearms legislation and said 'I urge the 90th Congress to place it high on its agenda in this session.'

He went on to indicate that the legislation that he was proposing to the Congress was 'closely comparable in substance to that which was under consideration in the last Congress.'

In concluding his remarks on this issue, the President said:  'To pass strict firearms control laws at every level of government is an act of simple prudence and a measure of civilized society.  Further delay is unconscionable.'

### SCOPE OF COVERAGE

The interstate traffic in mail-order firearms, other than rifles and shotguns

The title would have the effect of channeling interstate and foreign commerce in firearms other than rifles and shotguns through federally licensed importers, manufacturers, and dealers, thereby prohibiting the commercial mail-order traffic in firearms other than rifles and shotguns to unlicensed persons.  This will enable the States to more effectively control this traffic within their own jurisdictions under the police power granted to them by the Constitution.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097                                                          Page 49

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**


   The record reflects the concern of law enforcement officials throughout the coun-
try over the vast proliferation of mail-order firearms in interstate commerce.
   This traffic is a means which affords circumvention and contravention of State and
local laws governing the acquisition of forearms.  It is characterized by ready
availability, minimal cost and anonymity of purchase. The result has been an ever-
increasing abuse of this source of firearms by juveniles, minors, and adult crimin-
als.  We believe that the controls on the mail-order traffic as contained in this
title are justified.


                  Acquisition of firearms by juveniles and minors


   The title would bar federally licensed importers, manufacturers, and dealers from
selling or otherwise disposing of any firearms to any person **\*2167** who (in the case
of an individual) he knows, or has reasonable cause to believe, is under 21 years of
age (except for a shotgun or rifle).  The title would place similar restrictions on
interstate carriers regarding delivery of firearms to such persons. Thus, the title
would provide a uniform and effective means through the United States for preventing
the acquisition of the specified firearms by persons under such ages.  However, un-
der the title, a minor or juvenile would not be restricted from owning or learning
the proper usage of the firearm which his parent or guardian desired him to have
could be obtained for the minor or juvenile by the parent or guardian.
   The clandestine acquisition of firearms by juveniles and minors is a most serious
problem facing law enforcement and the citizens of this country. The controls pro-
posed in the title are designed to meet this problem and to substantially curtail
it.


                  Out-of-State purchase of concealable firearms


   The title would prohibit a federally licensed importer, manufacturer, or dealer
from selling or otherwise disposing of a firearm (other than a shotgun or rifle) to
any person whom he knows, or has reasonable cause to believe, does not reside in (or
in the case of a corporation or other business entity, who does not have a place of
business in) the State in which the importer's manufacturer's, or dealer's place of
business is located.
   The title would also make unlawful for any person to bring into or receive in the
State where he resides a firearm purchased outside that State in those cases where
it would be unlawful for him to purchase or possess such firearm in the State (or
political subdivision thereof) where he resides.
   The provisions of the title which prohibit a licensee from disposing of firearms
(other than rifles and shotguns) to persons who are not residents of the State in
which he conducts his business is justified by the record, which is replete with
testimony documenting the fact that the purchase of such firearms by persons in oth-
er than their residence.  State is a serious contributing factor to crime.  Testi-
mony further indicates that large numbers of criminals and juveniles have availed
themselves of this source of firearms in order to circumvent the laws of their re-
spective jurisdictions.


                 Importation of nonsporting and military surplus firearms


© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097                                                                   Page 56
S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
(Cite as: 1968 U.S.C.C.A.N. 2112)

The title would curb the flow of surplus military weapons and other firearms being brought into the United States which are not particularly suitable for target shooting or hunting.

The provisions concerning the importation of firearms would not interfere with the bringing in of currently produced firearms, such as rifles, shotguns, pistols, or revolvers of recognized quality which are used for hunting and for recreational purposes, or for personal protection.

The importation of certain foreign-made and military surplus non-sporting firearms has an important bearing on the problem which this title is designed to alleviate. Thus the import provisions of this title seem entirely justified.

### Highly destructive weapons

The title would extend the coverage of Federal law specifically to include highly destructive devices, such as explosive or incendiary bombs, grenades, **\*2168** mines, and so forth, and would establish strict controls for interstate and foreign commerce in such devices, and large-caliber military-type weapons, such as bazookas, mortars, and antitank guns.

The record reflects a consensus that these highly destructive devices should be subjected to strict Federal regulations.

### Licensing of importers, manufacturers, and dealers

The title would prescribe meaningful licensing standards and denial hearing procedures designed to assure that licenses would be issued only to responsible, law-abiding persons actually engaged in or intending to engage in business as importers, manufacturers, or dealers in firearms.  License fees, to be increased by the title would provide sufficient funds to partially defray investigation of applicants and would tend to discourage license applications by persons who do not intend to engage in the business for which the license is sought.

The record is abundantly clear on the need for the provisions of this title which set forth specific standards and increased license fees in order to obtain Federal licenses to engage in business as a manufacturer, dealer, or importer in firearms.

The absence of specific standards from the present Federal law and the minimal fees in the law have resulted in abuse which violates the intent of present Federal firearms controls.

### Recordkeeping provisions

The title would place more emphasis on the recordkeeping responsibilities of licensees by requiring that the licensee record identifying information submitted to him by the purchaser, and by specifically providing for the inspection of records by the Treasury Department.

The title would also authorize the release of pertinent information obtained from the licensee's records, to State and local authorities, to assist them in law-enforcement activities.  In addition, the title would make it possible to require, by regulations, the submission of reports concerning the operations of licensees.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097
S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

Transfer of Federal Firearms Act

   This Title transfers the provisions of the Federal Firearms Act, as modified by
this Title, from Title 15 of the United States Code to Title 18 of the United States
Code, which Title contains the Federal criminal laws.

## CONSTITUTIONALITY OF FEDERAL FIREARMS LEGISLATION

   A number of witnesses at the hearings have raised the question of the constitu-
tionality of Federal firearms legislation, because it would interfere with individu-
al rights guaranteed by the second amendment to the Constitution. The amendment
provides:
   A well regulated Militia, being necessary to the security of a free State, the
right of the people to keep and bear Arms, shall not be infringed.
   It is noteworthy that enactment of the National Firearms Act of 1934, as well as
of the Federal Firearms Act, was opposed on the same grounds **\*2169** and that these
statutes were attacked in the courts as being violative of the second amendment.
The courts have uniformly ruled to the contrary, and their decisions make it plain
that the amendment presents no obstacle to the enactment and enforcement of this
title.
   The decisions hold that the second amendment, unlike the first, was not adopted
with the individual rights in mind, but is a prohibition upon Federal action which
would interfere with the organization of militia by the states of the Union.
   Obviously, Federal firearms legislation does not hamper the present-day militia,
that is, the National Guard, and the courts have held accordingly (see United States
v. Miller, 59 S.Ct. 816, 307 U.S. 174 (1939); Cases v. United States, 131 F.2d 916
(1st Cir., 1942), certiorari denied, sub nom Velasquez v. United States, 63 S.Ct.
1431, 319 U.S. 770 (1943); United States v. Tot, 131 F.2d 261 (3d Cir., 1942), re-
versed on other grounds, 63 S.Ct. 1241.319 U.S. 462 (1943); United States v. Adams,
11 F.Supp. 216 (S.D. Fla., 1935)).
   It is sometimes contended that, aside from the second amendment, there is a natur-
al right to bear arms, or a right stemming from a State constitution. However, it is
well settled that there is nothing inherent in any such right that renders it abso-
lute.  The overwhelming majority of State cases hold that the legislature may pre-
scribe regulations and limitations with regard to the carrying of weapons.  It is
clear, for example, that a State law prohibiting the carrying of revolvers without a
license, or forbidding possession of concealed weapons, does not violate either the
Federal or that State's constitution.  And it is clear that no body of citizens oth-
er than the organized State militia, or other military organization provided for by
law, may be said to have a constitutional right to bear arms.
   In summary, the decided cases, both at the Federal and State levels, reveal no
constitutional barrier to the passage of this title.  To the contrary, they afford
ample precedent for its validity.

SECTION-BY-SECTION ANALYSIS

TITLE I

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**


   Section 101.-- Section 101 of part A establishes within the Department of Justice,
under the general authority of the Attorney General, a three member Law Enforcement
Administration (referred to in this title as 'Administration ') appointed by the
President, by and with the consent of the Senate.  No more than two members of the
Administration shall be of the same political part. The members of the Administra-
tion shall have the special qualifications and expertise in the field of law en-
forcement.


                         PART B-PLANNING GRANTS


   Sections 201 and 202 establish and authorize a grant program to be carried out by
the Administration for the purpose of encouraging and assisting States and local
governments to prepare and adopt comprehensive law-enforcement plans, with the pro-
viso that no unit or combination of **2170** units of local government shall be eli-
gible for a planning grant unless it has a population of 50,000 or more persons.
   Section 203.-- Section 203 provides that a grant authorized under section 202
shall not exceed 80 percent of the total cost of the preparation, development, or
revision of a plan.
   Section 204.-- Section 204 states that the Administration may advance grants au-
thorized under section 202 upon application.  Such application shall (1) set forth
programs and activities designed to carry out the purposes of section 302, (2) con-
tain information as may be prescribed in accordance with section 501, and (3) con-
tain a certification that a copy of the application has been submitted to the chief
executive of the State and, where appropriate, the State law-enforcement agency, of
the State or States in which the applicant is located, in accordance with section
521.


               PART C-GRANTS FOR LAW ENFORCEMENT PURPOSES


   Section 301-- States the purpose of this part to be to encourage States and units
of general local government to carry out programs and projects to improve and
strengthen law enforcement.
   Section 302(a).-- Authorize the Administration to make grants to States and units
of general local government, and combinations of such States or units, to improve
and strengthen the law enforcement.  To be eligible for a grant, such State, unit or
combination of units of local government must have a population of not less than
50,000 persons.
   Subsection (b) of section 302 sets forth the purposes for which grants may be made
under this part to be:  (1) Public protection, including the development, demonstra-
tion, evaluation, implementation, and purchase of methods, devices, facilities, and
equipment designed to improve and strengthen law enforcement and reduce crime in
public and private places.  (2) The recruitment and training  of law enforcement
personnel.  (3) Public education relating to crime prevention and encouraging re-
spect for law and order.  (4) Construction of buildings or other facilities which
would fulfill or implement the purpose of this section.  (5) Organization,  educa-
tion, and training of special law enforcement units to combat organized crime.  (6)
Organization, education, and training of regular law enforcement reserve units for
the prevention, detection, and control of riots.


            © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**


   Subsection (c) of section 302 limits the amount of any grant under this part to
nor more than 60 percent of the cost of the program or project, except that up to 75
percent of the cost may be allowed for grants for organized crime and riot control
purposes, and not more than 50 percent of the cost may be allowed for construction
of buildings or other facilities, with no part of the funds to be used for land ac-
quisition.
   Subsection (d) provides that not more than one-third of any grant may be expended
for the compensation of personnel except that this limitation shall not apply to
personnel engaged in training programs.
   **\*2171** Section 303(a).-- Requires an application be made to the Administration con-
taining:  (1) information which may be prescribed in accordance with section 501;
and (2) a program which carries out the purposes set forth in section 302 which is
consistent with a law enforcement plan developed by the applicant and approved for
the purpose of this part.
   Subsection (b) of section 303 authorizes the Administration to make grants under
this part only if the applicant has on file with the Administration an approved law
enforcement plan which conforms to the purposes and requirements of this title.
Each plan shall (1) encompass a State, unit or general local government, or combina-
tion, unless it is not practicable to do so, and (2) contain adequate assurances
that Federal funds to be made available under the application will be used to sup-
plement, or, to the extent practicable, increase the amount of funds that the ap-
plicant would otherwise make available for law enforcement purposes.
   Subsection (c) of section 303 states that the Administration may approve applica-
tions for grants under this part only if the requirements of subsections (a) and (b)
are met.  The Administration is directed to encourage plans which encompass entire
metropolitan areas, encourage plans which are coordinated with other State or local
plans and systems, and encourage plans which provide for the improvement of all law
enforcement agencies in the area encompassed by the plans.
   Section 304(a).-- In making grants under this part, the Administration is to give
special emphasis, where appropriate or feasible, to programs and projects dealing
with the prevention, detection, and control of organized crime and riots.
   Subsection (b) of section 304 suspends the requirements of section 303 until Au-
gust 31, 1968, and authorizes the Administration to make grants for programs and
projects dealing with the prevention, detection and control of riots and other civil
disorders on the basis of detailed applications, including the relationship of the
programs and projects to the general program for the improvement of law enforcement.

     PART D-TRAINING, EDUCATION, RESEARCH, DEMONSTRATION, AND SPECIAL GRANTS

   Section 401.-- States the purpose of this part.
   Section 402(a).-- Establishes within the Department of Justice, under the general
authority of the Administration, a National Institute of Law Enforcement and Crimin-
al Justice to encourage research and development to improve and strengthen law en-
forcement.
   Subsection 402(b) authorizes the Institute to (1) make grants or enter into con-
tracts with public agencies, institutions of higher education, or private organiza-
tions to conduct research, demonstrations, or special projects pertaining to the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097
Page 94
S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

purposes described in this title; (2) make continuing studies to develop new or im-
proved approaches, techniques, systems, etc., to improve and strengthen law enforce-
ment-- not limited to projects or **\*2172** programs carried out under this title; (3)
carry out behavioral research projects on the causes and preventions of crime and
the evaluation of correctional procedures; (4) make recommendations for the improve-
ment and strengthening of law enforcement by Federal, State, and local governments;
(5) carry out programs of instructional assistance, such as research fellowships;
(6) collect and disseminate information to improve and strengthen law enforcement;
and (7) establish a research center to carry out the programs described in this sec-
tion.

Section 403.-- Provides that grants for this part may be up to 100 percent of the
total cost of each project for which a grant is made.

Section 404(a).-- The Director of the Federal Bureau of Investigation is author-
ized to (1) establish and conduct training programs for State or local law enforce-
ment personnel at the Federal Bureau of Investigation National Academy at Quantico,
Va., when such training is requested by the State or local unit of government; (2)
develop new or improved approaches, techniques, systems, equipment, and devices to
improve and strengthen law enforcement; and (3) at the request of a State or local
unit of government, assist in conducting regional training programs for the training
of State and local law enforcement personnel.

Subsection (b) of section 404 provides that in carrying out the duties of this
section the Director of the Federal Bureau of Investigation shall be under the gen-
eral authority of the Attorney General.

Section 405.-- Repeals the Law Enforcement Assistance Act of 1965, with the provi-
sion that the Administration is to study, review, and evaluate projects and programs
funded under that act.  The Administration (or the Attorney General until the mem-
bers of the Administration are appointed) is authorized to obligate funds for the
continuation of LEEA projects approved prior to the date of enactment of this act,
to the extent that such approval provided for continuation.

Section 406(a).-- Authorizes the Administration, after consultation with the Com-
missioner of Education, to carry out programs of academic educational assistance
provided for in subsections (b) and (c) of this section.

Subsection (b) of section 406 authorizes the Administration to make payments to
institutions of higher education for loans to students enrolled on a full-time basis
in college-level programs approved by the Administration and leading to degrees or
certificates in areas directly related to law enforcement. Special consideration
will be given to police or correctional personnel of States or local government on
academic leave to earn such degrees or certificates.  The maximum loan authorized
for any person is $1,800 per academic year.  The total amount of such loan shall be
canceled at the rate of 25 percent of the total amount of the loan plus interest for
each year of service as a full-time law enforcement officer.  The Administration is
to issue regulations stating terms and conditions under which loans are to be made.

Subsection (c) of section 406 authorizes the Administration to make payments of
institutions of higher education for tuition and fees of law **\*2173** enforcement of-
ficers enrolled in college-level courses. The maximum payment is $200 per academic
quarter or $300 per semester. The academic program must be approved by the Adminis-
tration and lead to a degree or certificate in an area related to law enforcement or

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097                                                          Page 95
S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

an area suitable for persons employed in law enforcement.  An officer receiving as-
sistance under this subsection must agree to repay the full amount of the assistance
if he does not remain in the employment of his law enforcement agency for 2 years
following completion of the courses for which assistance was granted.

### PART E-ADMINISTRATIVE PROVISIONS

  Section 501.-- Authorizes the Administration, after consultation with representat-
ives of States and units of general local government, to establish rules and regula-
tions necessary to the exercise of its functions under, and are consistent with the
stated purpose of this title.
  Section 502.-- Section 502 permits the Administration to delegate to any officer
or official of the Administration, or, with the approval of the Attorney General,
any officer of the Department of Justice, such functions as it deems appropriate.
  Section 503.-- Section 503 provides that the powers, functions, and duties spe-
cified in this title to be carried out by the Administration shall not be trans-
ferred elsewhere in the Department unless specifically hereafter authorized by the
Congress.
  Section 504.-- Section 504 gives the Administration the power to hold hearings,
sign and issue subpoenas, administer oaths, examine witnesses, and receive evidence
at any place in the United States it may designate.
  Sections 505 and 506.-- Sections 505 and 506 amend sections 5315 and 5316 of title
5, United States Code, to provide for the schedule of compensation of the Adminis-
trator at a level IV position ($27,000) and the Associate Administrators at level V
positions ($26,000).
  Section 507.-- Section 507 authorizes the Administration, subject to the civil
service and classification laws, to select, appoint, employ, and fix the compensa-
tion of officers and employees necessary to carry out the functions of this -title.
  Section 508.-- Section 508 authorizes the Administration, on a reimbursable basis,
to use the available services, equipment, personnel, and facilities of the Depart-
ment of Justice and of other agencies of the Government.
  Section 509.-- Section 509 provides that the Administration shall have the power
and authority to discontinue payments under this title, after reasonable notice and
opportunity for hearing, whenever it finds that the applicant or grantee substan-
tially fails to comply with the provisions of this title, regulations promulgated by
the Administration, or a plan or application submitted in accordance with the provi-
sions of this title.
  **\*2174** Section 510.-- Subsection (a) of section 510 states that the findings and
conclusions of the Administration shall be final, except as hereinafter provided.
  Subsection (b) of section 510 provides that whenever the Administration takes ac-
tion to reject an application deny a grant, make a grant in a lesser amount than ap-
plied for, or discontinues a grant or a portion thereof, it shall so notify the ap-
plicant or grantee of its action setting forth the reasons for the action taken, and
further provides that an applicant or grantee, under this title, upon request, may
obtain a hearing before the Administration upon the action taken, and the Adminis-
tration is authorized and directed to hold such hearings.  The findings of the Ad-
ministration shall be conclusive except as otherwise provided in this part.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

Subsection (c) of section 510 provides for a rehearing if an applicant is dissatisfied with the findings of the Administration under subsection (b) of section 510.

Section 511.-- Subsection (a) of section 511 provides for an appeal by an applicant or grantee dissatisfied with the final action under section 509 or section 510. It grants such applicant or grantee 60 days after notice of action to file with the appropriate U.S. circuit court of appeals a petition for review of the final action of the Administration.  The Administration is directed to file in the court the record of the proceedings on which the action was based.

Subsection (b) of section 511 provides that the court, for good cause shown may remand the case to the Administration to take further evidence and the Administration may make new modified findings of fact and modify its previous action.

Subsection (c) of section 511 gives the court jurisdiction to affirm the action of the Administration or to set it aside, in whole or in part.  The judgement of the court shall be subject to review by the Supreme Court of the United States.

Section 512.-- Section 512 provides a 5-year period for the programs provided for by this title.

Section 513.-- Section 513 authorizes the Administration to request from other Federal agencies statistics, data, program reports, and other material in order that the programs under this title can be carried out in a coordinated manner.

Section 514.-- Section 514 provides for the reimbursement of the heads of other Federal departments for the performance of any functions under this title.

Section 515.-- Subsections (a) and (b) of section 515 provide that the Administration shall collect and disseminate information on the condition and progress of law enforcement in the several States, and to cooperate and lend technical assistance to States or local governmental units.

Section 516.-- Subsection (a) of section 516 permits the Administration to determine the method of payments under this title.

Subsection (b) of section 516 provides that not more than 12 percent of the funds appropriated for any 1 fiscal year shall be used in any one State.  This limitation does not apply to grants made under part D.

**\*2175** Section 517.-- Section 517 authorizes the Administration to appoint advisory committees and makes provisions for compensation and travel allowances.

Section 518.-- Subsection (a) of section 518 provides that nothing contained in this title or any other act shall be construed to authorize any Federal control over any law enforcement agency of any State or political subdivision thereof.

Subsection (b) of section 518 states that notwithstanding any other provision of law the Administration shall not construe anything in this title as authorization to require an applicant or grantee to adopt a percentage ratio or other program to achieve racial balance or to eliminate racial balance in any law enforcement agency, or to deny or discontinue a grant because of the refusal of an applicant or a grantee to adopt such a ratio, system, or program.

Section 519.-- Section 519 directs the Administration to report to the President and to the Congress by August 31, of each year on the activities under this title.

Section 520.-- Section 520 authorizes $100,111,000 to be appropriated for the fiscal years ending June 30, 1968, and June 30, 1969, and $300 million for the fiscal year ending June 30, 1970. Authorization of sums for succeeding fiscal years is left to the discretion of the Congress.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

Of the amount appropriated for the fiscal years ending June 30, 1968, and June 30,
1969, $35 million shall be for part B, planning grants; $50 million shall be for
part C, law enforcement grants (action grants), with not more than $2,500,000 of ac-
tion grant funds for programs or projects in the area of public education relating
to crime prevention and improving public understanding in relation to law enforce-
ment, not more than $15 million for projects and programs relating to the prevention
and control of organized crime, with not more than $1 million to be used in any one
State; not more than $15 million for projects and programs relating to the preven-
tion and control of riots, not more than $10 million shall be for purposes relating
to correction, probation, and parole; and $25,111,000 shall be for the purposes of
part D, training, education, research, demonstration, and special grants, of which
amount $5,111,000 shall be for the Federal Bureau of Investigation to carry out its
functions under section 404, and not more than $10 million shall be for programs of
academic educational assistance authorized by section 406.

Section 521.-- Section 521 sets as a prerequisite for a grant under this title a
certification that the applicant has submitted a copy of the application to the
chief executive of the State or States, and, where appropriate, to the State law en-
forcement agency or agencies, in which the unit is located.  It provides a period of
60 days in which the chief executive and, where appropriate, law enforcement agency
can evaluate the application in relationship to other applications and submit such
evaluation in writing to the Administration.

Section 522.-- Subsection (a) of section 522 provides for the keeping of such re-
cords by each recipient as the Administration shall prescribe.

**\*2176** Subsection (b) of section 522 provides that the Administration and the Comp-
troller General shall have access to pertinent material relating to grants received
under this title.

Section 601.-- Section 601 defines, as used in this title, the following terms:
'law enforcement,' 'organized crime,' 'State,' 'unit of general local government,'
'combination' as applied to States or units of general government, 'construction,'
State law enforcement agency,' 'State organized crime prevention council,' 'metropol-
itan area,' 'public agency,' and 'institution of higher education.'

TITLE II

Section 701 of title II adds new sections 3501-3503 to chapter 223, title 18,
United States Code.  The section analysis by Code citation follows:

Section 3501, United States Code.-- Subsection (a) of section 3501 provides that a
voluntary confession is admissible in evidence in any criminal prosecution brought
by the United States or the District of Columbia.

Subsection (b) lists the factors and circumstances that the trial judge is to con-
sider in deciding whether the confession is voluntary.

Subsection (c) provides that a confession made while under detention shall not be
inadmissible solely because of delay in bringing the defendant before a magistrate
or commissioner.

Subsection (d) provides that nothing in that section will bar from evidence a vol-
untary spontaneous confession, given to anyone without interrogation or when the de-
fendant was not under arrest or other detention.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

   Subsection (e) defines the term 'confession' to include incriminating statements.
   Section 3502, United States Code.-- Section 3502 denies jurisdiction to Federal
courts to reverse State cases involving admissions and confessions admitted as vol-
untarily given where the highest court of the State has affirmed.
   Section 3503, United States Code.-- Section 3503 provides that eye-witness testi-
mony is admissible in evidence and limits the appellate jurisdiction of Federal and
State cases admitting this testimony into evidence.
   Section 702 of title II adds a new section 2256 to chapter 153, title 28, United
States Code.  The Analysis of the new section to the Code is as follows:
   Section 2256, United States Code.-- Section 2256 provides that State courts' judg-
ments in criminal cases regarding questions of law or fact shall be conclusive un-
less reversed by a court with jurisdiction to review by direct appeal or certiorari,
and denies Federal court jurisdiction to review State court criminal judgments, ex-
cept upon appeal or certiorari after review of such judgments by the highest court
of the State.

                          **\*2177** TITLE III

   Because of the complexity in the area of wiretapping and electronic surveillance,
the committee believes that a comprehensive and in-depth analysis of title III would
be appropriate in order to make explicit congressional intent in this area.
   Section 801.-- Section 801 contains the findings relating to the conditions with
which the proposed legislation is designed to deal, and of the actions necessary to
cope with those conditions.
   Paragraph (a) notes that intrastate and interstate wire communications in our Na-
tion are inextricably interwoven.  Because the same facilities are alternatively
used by each class of communication, it is not practicable to draw a distinction
between them.  (Weiss v. United States, 60 S.Ct. 269, 308 U.S. 321 (1939).)  It then
finds that there has been extensive wiretapping carried on without legal sanction or
the consent of any of the participants to the communications.  Next it recognizes
that intercepting devices are being used by certain segments of our society to over-
hear private oral conversations.  It then notes that the contents of these communic-
ations are used in court and administrative proceedings and by persons whose activ-
ities affect interstate commerce and that the possession, manufacture, distribution,
advertising, and use of these devices are facilitated by interstate commerce. Com-
pare Wickard v. Filburn, 63 S.Ct. 82, 317 U.S. 111 (1942).  The findings also recog-
nize again that it is not practicable to draw distinctions between different classes
of
   oral communications.
   Paragraph (b) recognizes that to protect the privacy of wire and oral communica-
tions, to protect the integrity of court and administrative proceeding and to pre-
vent the obstruction of interstate commerce, it is necessary for Congress to define
on a uniform basis the circumstances and conditions under which the interception of
wire or oral communications may be authorized.  It also finds that all unauthorized
interception of such communications should be prohibited, as well as the use of the
contents of unauthorized interceptions as evidence in courts and administrative
hearings.

                © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

Paragraph (c) recognizes the extensive use made by organized crime of wire and or-
al communications.  It then finds that the ability to intercept such communications
is indispensable in the evidence gathering process in the administration of justice
in the area of organized crime.

Paragraph (d) recognizes the responsible part that the judiciary must play in su-
pervising the interception of wire or oral communications in order that the privacy
of innocent persons may be protected:  Except in emergency situations (2518(7)) and
where the national security is involved, the interception or use of wire or oral
communications should only be on court order.  Because of the importance of privacy,
such interceptions should further be limited to major offenses and care must be
taken to insure that no misuse is made of any information obtained.

Section 802.-- This section amends title 18, United States Code, by adding a new
chapter, entitled 'Chapter 119-- Wire Interception and Interception of Oral Commu-
nications.'

**\*2178** Section 2510 of the new chapter contains the definitions of certain words
employed in the proposed new chapter.

Paragraph (1) defines 'wire communication' to include all communications carried
by a common carrier, in whole or in part, through our Nation's communications net-
work.  The coverage is intended to be comprehensive.

Paragraph (2) defines 'oral communication' to include any oral communication
uttered by a person exhibiting an expectation that such communication is not subject
to interception under circumstances justifying such expectation.  The definition is
intended to reflect existing law.  See Katz v. United States, 88 S.Ct. 507, 389 U.S.
347 (1967).  Compare United States v. South Eastern Underwriters Assn., 64 S.Ct.
1162, 322 U.S. 533 (1944) with Lee v. Florida, 191 So.2d 84 (1966), certiorari gran-
ted, Jan. 15, 1968, No. 174, 1967 Term. The persons's subjective intent or the place
where the communication is uttered is not necessarily the controlling factor.  Com-
pare Linnell v. Linnell, 143 N.E. 813 (Mass. 1924), with Freeman v. Freeman, 130
N.E. 220 (Mass. 1921). Nevertheless, such an expectation would clearly be unjusti-
fied in certain areas; for example, a jail cell (Lanza v. New York, 82 S.Ct. 1218,
370 U.S. 139 (1962) or an open field (Hester v. United States, 44 S.Ct. 445, 265
U.S. 57 (1924)).  Ordinarily, however,a person would be justified in relying on such
expectation when he was in his home (Silverman v. United States, 81 S.Ct. 679, 365
U.S. 505 (1961)) or office (Berger v. New York, 87 S.Ct. 1873, 388 U.S. 41 (1967)),
but even there, his expectation under certain circumstances could be unwarranted,
for example, when he speaks too loudly.  See State v. Cartwright, 418 P.2d 822 (Ore.
1966), certiorari denied 87 S.Ct. 961, 386 U.S. 937 (1967).  The person's expecta-
tion that his communication is or is not subject to 'interception,' defined in para-
graph (4), discussed below, is thus to be gathered and evaluated from and in terms
of all the facts and circumstances.

Paragraph (3) defines 'State' to include the District of Columbia, the Common-
wealth of Puerto Rico, and any territory or possession of the United States.

Paragraph (4) defines 'intercept' to include the aural acquisition of the content
of any wire or oral communication by any electronic, mechanical, or other device.
Other forms of surveillance are not within the proposed legislation.  See Lee v.
United States, 47 S.Ct. 746, 274 U.S. 559 (1927); Corngold v. United States, 367
F.2d (9th 1966).  An examination of telephone company records by law enforcement

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

agents in the regular course of their duties would be lawful because it would not be
an 'interception.' (United States v. Russo, 250 F.Supp. 55 (E.D.Pa. 1966)). The
proposed legislation is intended to protect the privacy of the communication itself
and not the means of communication.

Paragraph (5) defines 'electronic, mechanical, or other device' to include any
device which can be used to intercept wire or oral communications. Only equipment
furnished to a subscriber by a communications common carrier in the ordinary course
of its business, and being used by the subscriber in the ordinary course of its
business, equipment being used by a communications common carrier **\*2179** in the or-
dinary course of its business, or by an investigative or law enforcement officer in
the ordinary course of his duties, or hearing aids would be excluded. Otherwise the
phrase intends to be comprehensive.

Paragraph (6) defines 'person' to include any individual, partnership, associ-
ation, corporation, agent, or other natural or legal entity. Through the various
provisions of the proposed legislation, including the section imposing civil and
criminal liability, this definition defines the scope of the proposed chapter. The
definition explicitly includes any officer or employee of the United States or any
State or political subdivision of a State. But see Pierson v. Ray, 87 S.Ct. 1213,
386 U.S. 547 (1967)). Only the governmental units themselves are excluded. Compare
Monroe v. Pope, 81 S.Ct. 473, 365 U.S. (1961); Wilford v. California, 352 F.2d 474
(9th 1965). Otherwise the definition is intended to be comprehensive.

Paragraph (7) defines 'investigative or law enforcement officer' to include any
Federal, State, or local law enforcement officer empowered to make investigations of
or to make arrests for any of the offenses enumerated in the proposed legislation.
It would include law enforcement personnel carrying out law enforcement purposes.
It includes within the phrase any attorney authorized by law to prosecute or parti-
cipate in the prosecution of such offenses. The definition gives recognition to the
affirmative responsibility which the prosecuting officer has for the investigation
of offenses and envisions close cooperation between law enforcement and prosecuting
officers.

Paragraph (8) defines 'contents' in reference to wire and oral communication to
include all aspects of the communication itself. No aspect, including the identity
of the parties, the substance of the communication between them, or the fact of the
communication itself, is excluded. The privacy of the communication to be protected
is intended to be comprehensive.

Paragraph (9) defines 'judge of competent jurisdiction.' This definition desig-
nates the judicial officers whose responsibility it will be to supervise authorized
interceptions. Existing Federal search warrant practice permits U.S. Commissioners
and city mayors to issue warrants (18 U.S.C. 3041 (1964)). This practice is too
permissive for the interception of wire or oral communications. Only judges of Fed-
eral district courts or courts of appeal should issue Federal warrants. On the
State level only the judges designated under legislation meeting the standards under
section 2516(2) discussed below, would be permitted to issue warrants. This is in-
tended to guarantee responsible judicial participation in the decision to use these
techniques.

Paragraph (10) defines 'communication common carrier' to have the same meaning the
'common carrier' has in 47 U.S.C. 153(1) (1958). It is intended to reflect existing

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**


law.

  Paragraph (11) defines 'aggrieved person' to mean any person who was a party to
any intercepted wire or oral communication or a persons against whom the intercep-
tion was directed.  This definition defines the class of those who are entitled to
invoke the suppression sanction of section 2515 discussed below, through the motion
to suppress provided for by section 2518**\*2180** (10)(1) also discussed below. It is
intended to reflect existing law (Jones v. United States, 80 S.Ct. 725, 362 U.S. 257
(1960); Goldstein v. United States, 62 S.Ct. 1000, 316 U.S. 114 (1942); Wong Sun v.
United States, 83 S.Ct. 407, 371 U.S. 471 (1963); see United States ex rel. De forte
v. Mancusi, 379 F. 897 (2d 1967), certiorari granted, Jan. 22, 1968, No. 844, 1967
Term).

  Section 2511 of the new chapter prohibits, except as otherwise specifically
provided in the chapter itself, the interception and disclosure of all wire or oral
communications.  Paragraph (1) sets out several prohibitions. Subparagraph (a) pro-
hibits the interception itself.  This eliminates the requirement under existing law
that an 'interception' and a 'divulgence' must take place.  See Massicot v. United
States, 254 F.2d 58 (5th), certiorari denied, 79 S.Ct. 23, 358 U.S. 816 (1958); Ben-
anti v. United States, 78 S.Ct. 155, 355 U.S. 96, 102 n. 10 (1957).

  Subparagraph (a) establishes a blanket prohibition against the interception of any
wire communication. Since the facilities used to transmit wire communications form
part of the interstate or foreign communications network, Congress has plenary power
under the commerce clause to prohibit all interception of such communications,
whether by wiretapping or otherwise. (Weiss v. United States, 60 S.Ct. 269, 308 U.S.
321 (1939)).

  The broad prohibition of subparagraph (a) is also applicable to the interception
of oral communications.  The interception of such communications, however, does not
necessarily interfere with the interstate or foreign communications network, and the
extent of the constitutional power of Congress to prohibit such interception is less
clear than in the case of interception of wire communications.  The Supreme Court
has indicated that Congress has broad power to protect certain rights under the
Equal Protection Clause of the 14th amendment against private interference.  (United
States v. Guest, 86 S.Ct. 1170, 383 U.S. 745 (1966) (concurring and dissenting opin-
ions).)  The right here at stake-- the right of privacy-- is a right arising under
certain provisions of the Bill of Rights and the due process clause of the 14th
amendment.  Although the broad prohibitions of subparagraph (a) could, for example,
be constitutionally applied to the unlawful interception of oral communications by
persons acting under color of State or Federal law, see Katzenbach v. Morgan, 86
S.Ct. 1717, 384 U.S. 641 (1966), the application of the paragraph to other circum-
stances could in some cases lead to a constitutional challenge that can be avoided
by a clear statutory specification of an alternative constitutional basis for the
prohibition.

  Therefore, in addition to the broad prohibitions of subparagraph (a), the commit-
tee has included subparagraph (b), which relies on accepted jurisdictional bases un-
der the commerce clause and other provisions of the Constitution to prohibit the in-
terception of oral communications.

  Subparagraph (i) prohibits any interception through the use of a device linked in
any way to the interstate or foreign network of wire communications. Under this pro-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**


vision, for example, the use of leased or other telephone lines to transmit signals
intercepted by eavesdropping devices is prohibited.  The use of such lines in the
past has greatly extended the range of eavesdropping devices, since the devices can
be made useful in circumstances **\*2181** where intercepted conversations cannot be con-
veniently monitored from adjacent premises, but must be transmitted to a more dis-
tant location.

   Subparagraph (ii) prohibits any interception through the use of a device which
transmits communications by radio or which interferes with the transmission of radio
communications.  As in the case of wire communications, by radio or which interferes
with the transmission of radio communications.  As in the case of wire communica-
tions, Congress has plenary power under the commerce clause to regulate not only the
use of radio devices, but also the use of devices that interfere with radio commu-
nications.  Subparagraph (ii) is intended to be a complete prohibition against the
use of such devices for the interception of oral communications.  The provisions
will be applicable even though only one component in a series of devices used in
combination by an eavesdropper is a radio device.

   Subparagraph (iii) prohibits any interception through the use of a device, if the
device itself or any of its components has been sent through the mail or transmitted
in interstate or foreign commerce.

   Subparagraph (iv) prohibits any interception that takes place on the premises of a
business whose operations affect interstate or foreign commerce.  The subparagraph
also prohibits any interception, wherever it takes place, which obtains or is for
the purpose of obtaining information about such a business. The broad provisions of
the subparagraph are intended to eliminate one of the most insidious contemporary
practices of industrial espionage.

   Subparagraph (v) prohibits any interception that takes place in the District of
Columbia, Puerto Rico, or the territories or possessions of the United States.
Since Congress has plenary power over these geographic areas, the prohibitions are
complete.

   Taken together, subparagraphs (i) to (v) of subparagraph (b) create an essentially
comprehensive ban on the interception of oral communications.  The provisions will
be applicable to the overwhelming majority of cases involving the unlawful intercep-
tion of such communications, and it will be unnecessary to rely on the broader pro-
hibition of subparagraph (a).  In many cases, use of a particular device will viol-
ate more than one, or even all, of the provisions of subparagraph (b).  The commit-
tee intends in such cases that a person may be convicted of only one offense under
the section.

   Subparagraphs (c) and (d) prohibit, in turn, the disclosure or the use of the con-
tents of any intercepted communication by any person knowing or having reason to
know the information was obtained through an interception in violation of this sub-
section.  The disclosure of the contents of an intercepted communication that had
already become public information' or 'common knowledge ' would not be prohibited.
The scope of this knowledge required to violate either subparagraph reflects exist-
ing law (Pereira v. United States, 74 S.Ct. 358, 347 U.S. 1 (1954)).  A violation of
each must be willful to be criminal (United States v. Murdock, 54 S.Ct. 223, 290
U.S. 389 (1933)). Each prohibition strikes not only at the prohibited action but
also at endeavors (Osborn v. United States, 87 S.Ct. 429, 385 U.S. 323 (1966)) and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

procurements (Nye & Nissen v. United States, 69 S.Ct. 766, 336 U.S. 613 (1949)).
There is no intent to preempt State law. **\*2182** Each violation is punishable by a
fine of $10,000 or imprisonment of not more than 5 years, or both.

  Paragraph (2)(a) provides that it shall not be unlawful for an operator of a
switchboard or employees of a common carrier to intercept, disclose, or use wire
communications in the normal course of their employment while engaged in any activ-
ity which is a necessary incident to the rendition of his service or the protection
of the rights or property of the carrier.  It is intended to reflect existing law
(United States v. Beckley, 259 F.Supp. 567 (D.C. Ga. 1965)). Paragraph (2)(a) fur-
ther provides that communication common carriers shall not utilize service observing
or random monitoring except for mechanical or service quality control checks.  Ser-
vice observing is the principal quality control procedure used by these carriers for
maintaining and improving the quality of telephone service.  Such observing is done
by employees known as service observers, and this provision was inserted to insure
that service observing will not be used for any purpose other than mechanical and
service quality control.

  Paragraph (2)(b) provides a similar exception for an employee of the Federal Com-
munications Commission in the normal course of his employment in the discharge of
the monitoring responsibility of the Commission.

  Paragraph (2)(c) provides that it shall not be unlawful for a party to any wire or
oral communication or a persons given prior authority by a party to a communication
to intercept such communication.  It largely reflects existing law.  Where one of
the parties consents, it is not unlawful.  (Lopez v. United States, 83 S.Ct. 1381,
373 U.S. 427 (1963); Rathbun v. United States, 78 S.Ct. 161, 355 U.S. 107 (1957); On
Lee v. United States, 72 S.Ct. 967, 343 U.S. 747 (1952)).  Consent may be expressed
or implied.  Surveillance devices in banks or apartment houses for institutional or
personal protection would be impliedly consented to.  Retroactive authorization,
however, would not be possible.  (Weiss v. United States, 60 S.Ct. 269, 308 U.S. 321
(1939)) and 'party' would mean the person actually participating in the communica-
tion.  (United States v. Pasha, 332 F. 193 (7th), certiorari denied, 85 S.Ct. 75,
379 U.S. 839 (1964)).

  Paragraph (3) is intended to reflect a distinction between the administration of
domestic criminal legislation not constituting a danger to the structure or exist-
ence of the Government and the conduct of foreign affairs.  It makes it clear that
nothing in the proposed chapter or other act amended by the proposed legislation is
intended to limit the power of the President from the acts of a foreign power in-
cluding actual or potential attack or foreign intelligence activities, or any other
danger to the structure or existence of the Government.  Where foreign affairs and
internal security are involved, the proposed system of court ordered electronic sur-
veillance envisioned for the administration of domestic criminal legislation is not
intended necessarily to be applicable.  The two areas may, however, overlap. Even
though their activities take place within the United States, the domestic Communist
party and its front groups remain instruments of the foreign policy of a foreign
power (Communist Party, U.S.A. v. Subversive Activities Control Board, 81 S.Ct.
1357, 367 U.S. 1 (1961)). **\*2183** Consequently, they fall within the field of foreign
affairs and outside the scope of the proposed chapter. Yet, their activities may in-
volve violations of domestic criminal legislation.  See Abel v. United States, 80

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**


S.Ct. 683, 362 U.S. 217 (1960). These provisions of the proposed chapter regarding
national and internal security thus provide that the contents of any wire or oral
communication intercepted by the authority of the President may be received into
evidence in any judicial trial or administrative hearing. Otherwise, individuals
seeking the overthrow of the Government, including agents of foreign powers and
those who cooperate with them, could not be held legally accountable when evidence
of their unlawful activity was uncovered incident to the exercise of this power by
the President.  The only limitations recognized on this use is that the intercep-
tions be deemed reasonable based on an ad hoc judgment taking into consideration all
of the facts and circumstances of the individual case, which is but the test of the
Constitution itself (Carroll v. United States, 45 S.Ct. 280, 267 U.S. 132 (1925)).
The possibility that a judicial authorization for the interception could or could
not have been obtained under the proposed chapter would be only one factor in such a
judgement.  No preference should be given to either alternative, since this would
tend to limit the very power that this provision recognizes is not to be deemed dis-
turbed.
  The provisions of section 2512 banning the manufacture, distribution, sale, pos-
session, and advertising of wiretapping and eavesdropping devices will significantly
curtail the supply of a variety of devices.  There is no intent to preempt State
law.  The prohibitions are applicable to devices whose design renders them primarily
useful for the surreptitious interception of private wire or oral communications.
The statutory phrase is intended to establish a relatively narrow category of
devices whose principal use is likely to be for wiretapping or eavesdropping.  A
device will not escape the prohibition merely because it may have innocent uses.
The crucial test is whether the design of the device renders it primarily useful for
surreptitious listening.  Obviously, the sort of judgment called for here in close
cases would warrant the use of expert testimony.
  See United States v. One Device, 160 F. 194 (10th 1947).  The prohibition will
thus be applicable to, among others, such objectionable devices as the martini olive
transmitter, the spike mike, the infinity transmitter, and the microphone disguised
as a wristwatch, picture frame, cuff link, tie clip, fountain pen, stapler, or ci-
garette pack.  Such devices are widely advertised and distributed at the present
time and are readily available on the market.  By banning these devices, a signific-
ant source of equipment highly useful for illegal electronic surveillance will be
eliminated.
  At the same time, the prohibitions of section 2512 will cause no substantial in-
terference with the production, distribution, or use of legitimate electronics
equipment, whether by the electronics industry or others.  Size alone is not the
criterion under the section.  A device does not fall under the prohibitions merely
because it is small, or because it may be adapted to wiretapping or eavesdropping.
Nor will the prohibition be applicable, for example, to devices such as the parabol-
ic microphone or other directional microphones ordinarily used by broadcasters at
sports events.  Such devices cannot be said to be primarily useful for surreptitious
listening.  To be prohibited **2184** the device would also have to possess attributes
that give predominance to the surreptitious character of its use, such as the spike
in the case of the spike mike or the disguised shape in the case of the martini
olive transmitter and the other devices mentioned in the preceding paragraph.


© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

Excepted from the above prohibitions are (1) the actions of a communications common carrier and its employees or persons under contract with a communications common carrier in the normal course of its business; (2) any officer, agent, or employee of, or person under contract with, the United States, a State or a political subdivision of a State in the normal course of its activities.

Section 2513 of the new chapter provides that any electronic, mechanical or other intercepting device possessed, used, sent, carried, manufactured or assembled in violation of section 2511 or 2512, discussed above, may be seized and forfeited to the United States. This provision adds a significant sanction to the prohibitions of sections 2511 and 2512. The equipment employed in electronic surveillance is usually expensive. The equipment itself often makes the interception possible. Its confiscation will impose an additional penalty on the individual who violates the provisions of sections 2511 and 2512 and prevent further violations using the same equipment. The provision should be particularly effective in stripping a professional eavesdropper of the tools of his trade and in taking off the market the inventory of those who manufacture or assemble prohibited devices. The provision is keyed to the postal, interstate, and foreign commerce powers. It will not be coextensive with section 2511. Even so, its scope should be sufficient to be effective. The provision makes applicable to the process of confiscation under the direction of the Attorney General all of the existing provisions relating to violations of the customs law. With suitable modifications, the provision is intended to reflect existing law.

Section 2514 of the new chapter provides for the granting of immunity from prosecution in the investigation of violations of the chapter and the offenses enumerated in section 2516. Since unlawful electronic surveillance is typically a clandestine crime, often committed by an individual at the instigation of another person, the usual techniques of criminal investigation will not, as in organized crime investigations, be adequate to enforce the prohibitions of the statute. The privilege against self-incrimination would work in most cases to prevent the principals behind the overt acts of others from being held legally accountable. Consequently, an immunity grant will be necessary to enforce effectively the prohibitions of the statute and safeguard privacy. Under the proposed section, the grant of immunity would have to be approved by the Attorney General and would be effective only upon an order of the court. The provision is patterned after provisions in other laws which have been upheld and found effective. It is intended to reflect existing law (Pullman v. United States, 76 S.Ct. 497, 350 U.S. 422 (1956), upholding 18 U.S.C. 3486 (1964), as amended, 18 U.S.C. 3486(c) (Supp. 1, 1965); Reina v. United States, 81 S.Ct. 260, 364 U.S. 507 (1960), upholding 18 U.S.C. 1406 (1964)).

Section 2515 of the new chapter imposes an evidentiary sanction to compel compliance with the other prohibitions of the chapter. It provides that intercepted wire or oral communications or evidence derived therefrom may **2185** not be received in evidence in any proceeding before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision of a State, where the disclosure of that information would be in violation of this chapter. The provision must, of course, be read in light of section 2518(10)(1) discussed below, which defines the class entitled to make a motion to suppress. It largely reflects existing law. It applies

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097
S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

to suppress evidence directly (Nardone v. United States, 58 S.Ct. 275, 302 U.S. 379 (1937)) or indirectly obtained in violation of the chapter.  (Nardone v. United States, 60 S.Ct. 266, 308 U.S. 338 (1939)).  There is, however, no intention to change the attenuation rule.  See Nardone v. United States, 127 F.2d 521(2d), certi-orari denied, 62 S.Ct. 1296, 316 U.S. 698 (1942); Wong Sun v. United States, 83 S.Ct. 307, 371 U.S. 471 (1963).  Nor generally to press the scope of the suppression role beyond present search and seizure law.  See Walter v. United States, 74 S.Ct. 354, 347 U.S. 62 (1954).  But it does apply across the board in both Federal and State proceeding.  Compare Schwartz v. Texas, 73 S.Ct. 232, 344 U.S. 199 (1952). And it is not limited to criminal proceedings.  Such a suppression rule is necessary and proper to protect privacy.  Compare Adams v. Maryland 74 S.Ct. 442, 247 U.S. 179 (1954); Mapp v. Ohio, 81 S.Ct. 1684, 367 U.S. 643 (1961).  The provision thus forms an integral part of the system of limitations designed to protect privacy. Along with the criminal and civil remedies, it should serve to guarantee that the stand-ards of the new chapter will sharply curtail the unlawful interception of wire and oral communications.

  Section 2516 of the new chapter authorizes the interception of particular wire or oral communication under court order pursuant to the authorization of the appropri-ate Federal, State, or local prosecuting officer.

  Paragraph (1) provides that the Attorney General, or any Assistant Attorney Gener-al of the Department of Justice specifically designated by him, may authorize an ap-plication for an order authorizing the interception of wire or oral communications. This provision centralizes in a publicly responsible official subject to the polit-ical process the formulation of law enforcement policy on the use of electronic sur-veillance techniques.  Centralization will avoid the possibility that divergent practices might develop.  Should abuses occur, the lines of responsibility lead to an identifiable person. This provision in itself should go a long way toward guaran-teeing that no abuses will happen.

  The application must be made to a Federal judge of competent jurisdiction, as defined in section 2510(9), discussed above.  The application must conform to sec-tion 2518, discussed below.  The judicial officer's decision is also circumscribed by section 2518. This provision is in accord with the practical and constitutional demand that a neutral and detached authority be interposed between the law enforce-ment officers and the citizen (Berger v. New York, 87 S.Ct. 1873, 388 U.S. 41, 54 (1967); Katz v. United States, 88 S.Ct. 507, 389 U.S. 347 (1967)).  Judicial review of the decision to intercept wire or oral communications will not only tend to in-sure that the decision is proper, but it will also tend to assure the community that the decision is fair.

  **\*2186** The order of authorization may permit the Federal Bureau of Investigation or the Federal agency having responsibility for the investigation of the offense in-volved to intercept the wire or oral communication.  The Department of Justice under the leadership of the Attorney General must be the central focal point of any drive against organized crime, particularly in the collection, analysis, and dissemination of information.  It is appropriate that no limitation be placed on the investiga-tions in which the investigative arm of the Department may participate.  Organized crime has not limited itself to the commission of any particular offense.  No limit-ation should be placed on the Department of Justice.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

Applications for orders authorizing the interception of wire or oral communica-
tions may be made only in the investigation of certain major offenses, which are
designated in subparagraphs (a) through (f).  Each offense has been chosen either
because it is intrinsically serious or because it is characteristic of the opera-
tions of organized crime.  Subparagraph (a) includes those offenses that fall within
the national security category.  It includes offenses involving espionage, sabotage,
treason, and the enforcement of the Atomic Energy Act of 1954 (68 Stat. 921, 42
U.S.C. secs. 224-227 (1958)).  Subparagraph (b) includes any offense under title 18,
United States Code, which involves murder, kidnapping, robbery or extortion.  It is
aimed, among other things, primarily at organized crime, bank robbery and hijacking
activity.  It would include, for example, 18 U.S.C. 1951 (1964), which prohibits af-
fecting interstate commerce by extortion.  (Cf. Carbo v. United States, 314 F.2d 718
(9th), certiorari denied, 84 S.Ct. 1626, 377 U.S. 953 (1964)).  Under appropriate
circumstances, loan sharking would also be included.  It also strikes at labor rack-
eteering by the inclusion of 29 U.S.C. and 501(c).  Subparagraph (c) specifically
enumerates the following sections of title 18, United States Code: Section 1084
(transmission of wagering information); section 1503 (influencing or injuring an of-
ficer, juror, or witness generally); (Cf. United States v. Buffalino, 285 F.2d 408
(2d 1960); Ferina v. United States, 340 F.2d 837 (8th), certiorari denied, 381
U.S.C. 902 (1965); section 1510 (obstruction of criminal investigations); section
1751 (Presidential assassinations, kidnapping, and assault); section 1951
(interference with commerce by threats of violence); section 1952 (interstate and
foreign travel or transportation in aid of racketeering enterprises); section 1954
(offer, acceptance, or solicitation to influence operations of an employee benefit
plan); or sections 2313 and 2314 (interstate transportation of stolen property).
This last provision is included to make it possible to strike at organized crime
fencing. Subparagraph (d) includes any offense involving bankruptcy fraud or the
manufacture, importation, receiving, concealment, buying, selling, or otherwise
dealing in narcotic drugs, marijuana, or other dangerous drugs, punishable by any
law of the United States. (Cf. United States v. Castellana, 349 F.2d (2d 1965), cer-
tiorari denied, 86 S.Ct. 934, 383 U.S. 928 (1966); United States v. Ariles, 274 F.2d
179 (2d 1960); certiorari denied sub nom., Evola v. United States, 80 S.Ct 1057,
362 U.S. 974 (1960)).  Finally, subparagraph (f) includes any conspiracy to commit
any of the foregoing offenses.

**\*2187** Paragraph (2) provides that the principal prosecuting attorney of any State
or the principal prosecuting attorney of any political subdivision of a State may
authorize an application to a State judge of competent jurisdiction, as defined in
section 2510(9), for an order authorizing the interception of wire or oral communic-
ations.  The issue of delegation by that officer would be a question of State law.
In most States, the principal prosecuting attorney of the State would be the attor-
ney general.  The important question, however, is not name but function.  The intent
of the proposed provision is to provide for the centralization of policy relating to
statewide law enforcement in the area of the use of electronic surveillance in the
chief prosecuting officer of the State.  Who that officer would be would be a ques-
tion of State law.  Where no such officer exists, policymaking would not be possible
on a statewide basis; it would have to move down to the next level of government.
In most States, the principal prosecuting attorney at the next political level of a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**


State, usually the county, would be the district attorney, State's attorney, or
county solicitor. The intent of the proposed provision is to centralize areawide law
enforcement policy in him.  Who he is would also be a question of State law.  Where
there are both an attorney general and a district attorney, either could authorize
applications, the attorney general anywhere in the State and the district attorney
anywhere in his county.  The proposed provision does not envision a further break-
down.  Although city attorneys may have in some places limited criminal prosecuting
jurisdiction, the proposed provision is not intended to include them.

 No applications may be authorized unless a specific State statute permits it.  The
State statute must meet the minimum standards reflected as a whole in the proposed
chapter.  The proposed provision envisions that States would be free to adopt more
restrictive legislation, or no legislation at all, but not less restrictive legisla-
tion.  State legislation enacted in conformity with this chapter should specifically
designate the principal prosecuting attorneys empowered to authorize interceptions.
The State judge of competent jurisdiction, as defined in section 2510(9), empowered
by the State legislation to grant orders for interceptions would have to make the
findings which would be the substantial equivalent to those required by section
2518(3), discussed below, and the authorization itself would have to be made in sub-
stantial conformity with the standards set out in section 2518, discussed below.
The interception of wire or oral communications by State law-enforcement officers
could only be authorized when it might provide, or has provided evidence of desig-
nated offenses.  (See McNally v. Hill, 55 S.Ct. 24, 293 U.S. 131 136 (1934)).  Spe-
cifically designated offenses include murder, kidnaping, gambling, robbery, bribery,
extortion, or dealing in narcotic drugs, marihuana, or other dangerous drugs.  All
other crimes designated in the State statute would have to be 'dangerous to life,
limb, or property, and punishable by imprisonment for more than 1 year.'  This lim-
itation is intended to exclude such offenses are fornication and adultery, which do
not involve danger to life, limb, or property.  The term 'property,' however, is not
to be read restrictively.  For example, the activities of organized crime in 'cigar-
ette bootlegging,' which pose a substantial threat to the revenue of **\*2188** some cit-
ies and States, could be made a designated offense if the penalty were made high
enough. Finally, any conspiracy to commit any of the designated offenses would war-
rant the issuance of an order.

 Section 2517 of the new chapter authorizes the use and disclosure of intercepted
wire or oral communications in specified circumstances. Section 2517 must, of
course, be read in light of section 2518.

 Paragraph (1) authorizes any investigative or law-enforcement officer as defined
in section 2510(7), who, by any means authorized in this chapter, has obtained know-
ledge of the contents of any wire or oral communication or evidence derived there-
from to disclose the contents to other investigative or law enforcement officers.
The proposed provision envisions close Federal, State, and local cooperation in the
administration of justice.  The utilization of an information-sharing system within
the law-enforcement community circumscribed by suitable safeguards for privacy is
within the intent of the proposed legislation.  Examples of existing systems include
the law-enforcement intelligence unit established in California in 1956, the New
England State Police compact (see R. I. Gen Laws Ann Sec. 42 37-1 to 3 (Supp.
1965)), the New York State identification and intelligence system, and the National

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**


Crime Information Center.  Only disclosure that is appropriate to the proper per-
formance of the official duties of the officers making and receiving the disclosure
may be made.

  Paragraph (2) authorizes any investigative or law-enforcement officer who, by any
means authorized in this chapter, has obtained knowledge of the contents of any wire
or oral communication or evidence derived therefrom to use it.  Only use that is ap-
propriate to the proper performance of official duties may be made.  The proposed
provision envisions use of the contents of the intercepted communications, for ex-
ample, to establish probable cause for arrest (Ginsberg v. United States, 96 F.2d
433 (5th 1938)), to establish probable cause to search (Foley v. United States, 64
F.2d 1 (5th), certiorari denied, 289 U.S. 762 (1933), or to develop witness.  (In re
Saperstein, 30 N.J.Super. 373, 104 A.2d 842 (1954), certiorari denied 348 U.S. 874
(1954); New York v. Saperstein, 2 N.Y.2D 210, 140 N.E.2D 252 (1957)).  Neither para-
graphs (1) or (2) are limited to evidence intercepted in accordance with the provi-
sions of the proposed chapter, since in certain limited situations disclosure and
use of illegally intercepted communications would be appropriate to the proper per-
formance of the officers' duties.  For example, such use and disclosure would be ne-
cessary in the investigation and prosecution of an illegal wiretapper himself.  (See
United States v. Gris, 146 F.Supp. 293 (S.D.N.Y. 1956), affirmed 247 Fed. 860 (2d
1957)).

  Paragraph (3) authorizes any persons who has received, by any means authorized by
this chapter, any information concerning a wire or oral communication or evidence
derived therefrom intercepted in accordance with the provisions of the proposed
chapter to disclose the contents of that communication or evidence derived therefrom
while giving testimony.  It envisions, of course, the use and disclosure of such
evidence at trial to establish guilt directly (New York v. Saperstein, 2 N.Y.2d 210,
140 N.E.2d 252 (1957)), or to corroborate (United States v. Walker, 320 **\*2189** F.2d
472 (6th 1963)), or to impeach (People v. Hughes, 203 Cal.App.2d 598, 21 Cal.Rptr.
668 (1962)), a witness' testimony or to refresh his recollection (Monroe v. United
States, 234 F.2d 49 (D.C. 1956), certiorari denied, 78 S.Ct. 114, 355 U.S. 875
(1957)).

  Paragraph (4) provides that no otherwise privileged wire or oral communication in-
tercepted in accordance with or in violation of the new chapter shall lose its priv-
ileged character.  Traditionally, the interest of truth in the administration of
justice has been subordinated in the law to the interest of preserving privileged
communications where four relationships have been involved; physician-patient, law-
yer-client; clergyman-confidant, and husband-wife.  The scope and existence of these
privileges varies from jurisdiction to jurisdiction.  The proposed provision is in-
tended to vary the existing law only to the extent it provides that an otherwise
privileged communication does not lose its privileged character because it is inter-
cepted by a stranger.  But see State v. Wallace, 162 N.C. 622, 78 S.E. 1 (1913) Com-
monwealth v. Wakelin, 230 Mass. 567, 120 N.E. 209 (1918).  Otherwise, it is intended
to reflect existing law. See Fed.R.Crim.Proc. 26; Wolfe v. United States, 54 S.Ct.
279, 291 U.S. 7 (1934).

  Paragraph (5) provides that if an investigative or law enforcement officer, while
engaged in intercepting wire or oral communications in the manner authorized in the
chapter, intercepts wire or oral communications relating to offenses other than

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

those specified in the order of authorization or approval, the contents thereof, and
evidence derived therefrom, may be disclosed or used as provided in subsections (1)
and (2) of this section, discussed above.  Such contents and any evidence derived
therefrom may be introduced in evidence under subsection (3) of this section only
when authorized or approved by a judge of competent jurisdiction as defined in sec-
tion 2510(9) where such judge finds on subsequent application that the contents were
otherwise intercepted in accordance with the provisions of this chapter.  They need
not be designated 'offenses.'  Such subsequent application would include a showing
that the original order was lawfully obtained, that it was sought in good faith and
not as subterfuge search, and that the communication was in fact incidentally inter-
cepted during the course of a lawfully executed order.  Compare, Marron v. United
States, 48 S.Ct. 74, 275 U.S. 192, 196 (1927), with United States v. Eisner, 297
Fed. 595 (6th 1962), and State v. Hunter, 235 Wis. 188, 292 N.W. 609 (1940).

   Section 2518 of the new chapter sets out in detail the procedure to be followed in
the interception of wire or oral communications.

   Paragraph (1) requires a written application for an authorization to intercept
wire or oral communications.  This reflects existing law. See Fed.R.Crim.Proc. 41.
The information each application should contain is specified in subparagraphs (a)
through (c).

   Subparagraph (a) requires the identity of the person who makes, and the person who
authorized the application to be set out.  This fixes responsibility.

   Subparagraph (b) requires that a full and complete statement of the facts and cir-
cumstances relied upon by the applicant be set out, including (i) the details as to
what type of offense has been, is being, or is about **2190** to be committed, (ii) the
place where, or the facilities or phone from which the communication is to be inter-
cepted, (iii) a particular description of the type of the communication which it is
expected will be intercepted, and (iv) the identity of the person, if known, who is
committing the offense and whose communications are to be intercepted.  Each of
these requirements reflects the constitutional command of particularization (Berger
v. New York, 87 S.Ct. 1873, 388 U.S. 41, 58-60 (1967); Katz v. United States, 88
S.Ct. 507, 389 U.S. 347, 354-56 (1967)).

   Subparagraph (c) requires a full and complete statement as to whether or not nor-
mal investigative procedures have been tried and have failed or why these are un-
likely to succeed if tried, or to be too dangerous.  This requirement is patterned
after traditional search warrant practice abd present English procedure in the issu-
ance of warrants to wiretap by the Home Secretary.  Compare Report of the Committee
of Councillors Appointed to Inquire into the Interception of Communication, par. 64
(1957); Read v. Case, 4 Conn. 166 (1822).  The judgment would involve a considera-
tion of all the facts and circumstances.  Normal investigative procedure would in-
clude, for example, standard visual or aural surveillance techniques by law enforce-
ment officers, general questioning or interrogation under an immunity grant, use of
regular search warrants, and the infiltration of conspiratorial groups by undercover
agents or informants.  Merely because a normal investigative technique is theoretic-
ally possible, it does not follow that it is likely.  See Giancana v. United
States, 352 F.2d 921 (7th) certiorari denied, 86 S.Ct. 437, 382 U.S. 959 (1965); New
York v. Saperstein, 2 N.Y.2d 210, 140 N.E.2d 252 (1957).  What the provision envi-
sions is that the showing be tested in a practical and commonsense fashion. Compare

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

United States v. Ventresca, 85 S.Ct. 741, 380 U.S. 102 (1965).

Subparagraph (d) requires a statement of the period of time during which the interceptions are to be made. This provision must be read in light of paragraphs (4)(e), (5), and (6), discussed below. Together they require that the duration of an interception not be longer than is necessary under the facts of the particular case. This is a command of the Constitution according to Berger v. New York, 87 S.Ct. 1873, 388 U.S. 41, 59 (1967) and Katz v. United States, 88 S.Ct. 507, 389 U.S. 347, 355-56 (1967). Where it is necessary to obtain coverage to only one meeting, the order should not authorize additional surveillance. Compare Osborn v. United States, 87 S.Ct. 429, 385 U.S. 323 (1966). Where a course of conduct embracing multiple parties and extending over a period of time is involved, the order may properly authorize proportionately longer surveillance, but in no event for longer than 30 days, unless extensions are granted. Compare People v. Sica, 112 Cal.App.2d 574, 247 P.2d 72 (1952); People v. Tarinto, 45 Cal.2d 590, p. 505 (1955). What is important is that the facts in the application on a case-by-case basis justify the period of time of the surveillance.

Subparagraph (e) requires a full and competent statement of the facts concerning all previous applications known to the individual authorizing and making the application, made to any judge for authorization to intercept, or for approval of interceptions of, wire or oral communications **2191** involving any of the same persons, facilities, or places specified in the application, and the action taken by the judge on each such applications.

Paragraph (2) provides that the judge may require the applicant to furnish additional testimony or documentary evidence in support of the application. The additional testimony need not be in writing, but it should be under oath or affirmation and a suitable record should be made of it. The use of a court reporter would be the best practice.

Paragraph (3) authorizes the judge to enter an ex parte order authorizing or approving the interception of wire or oral communications within the territorial jurisdiction of the court. Authorization would be based on an application made pursuant to paragraph (1). Approval would be based on an application made in conformity with paragraph (1) but made pursuant to paragraph (7), discussed below, or section 2517(5), discussed below. The proposed provision recognizes that the judge may properly deny the application altogether, or grant it as suitably modified.

What the judge must determine before he can issue an order based on the facts submitted to him is specified in subparagraphs (a) through (d). Subparagraph (a) requires that the judge determine that there is probable cause for belief that a particular type of offense enumerated in section 2516, discussed above, is being, has been, or is about to be committed by a particular person. This is intended to reflect the test of the Constitution (Berger v. New York, 87 S.Ct. 1873, 388 U.S. 41, 58-60 (1967)). Subparagraph (b) requires him to determine that there is probable cause for belief that facts concerning that offense may be obtained through such interception. Compare Warden v. Hayden, 87 S.Ct. 1642, 387 U.S. 294 (1967). Subparagraph (c) requires a finding that normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous. This finding is discussed above in the analysis of paragraph (1)(c). Subparagraph (d) requires a finding of probable cause for belief that the facilities

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

from which, or the place where, the wire or oral communications are to be intercep-
ted are being used, or are about to be used, in connection with the commission of
such offense, or are leased to, listed in the name of, or are commonly used by, the
person who has committed, is committing, or is about to commit such offense.  With
the findings required by subparagraphs (a) and (b), the order will link up specific
person, specific offense, and specific place. Together they are intended to meet the
test of the Constitution that electronic surveillance techniques be used only under
the most precise and discriminate circumstances, which fully comply with the re-
quirement of particularity (Berger v. New York, 87 S.Ct. 1873, 388 U.S. 41, 58-60
(1967), Katz v. United States, 88 S.Ct. 507, 389 U.S. 347, 355-56 (1967)).

  Subparagraph (4) sets out in subparagraphs (a) through (e) the requirements that
each order authorizing or approving the interception of wire or oral communications
must meet.  Subparagraphs (a) requires the order to specify the identity, if known,
of the individual whose communications are to be intercepted.  See West v. Cabell,
14 S.Ct. 752, 153 U.S. 78 (1894). Subparagraph (b) requires the order to specify the
phone or other communication facilities from which or the place where the authority
to **2192** intercept is granted. See Steele v. United States, 45 S.Ct. 414, 267 U.S.
498 (1925). Subparagraph (c) requires a particular description of the type of commu-
nication sought to be intercepted, and a statement of the particular offense to
which it relates.  (Berger v. New York, 87 S.Ct. 1873, 388 U.S. 41 (1967). Subpara-
graph (d) requires that the order note the agency authorized to make the intercep-
tion and the person who authorized the application so that responsibility will be
fixed.  Finally, subparagraph (e) requires that the order specify the period of time
during which the interception is authorized including a statement as to whether or
not the interception shall automatically terminate when the described communication
has been first obtained.

  Paragraph (5) provides that no order may authorize or approve the interception of
wire or oral communications for a period of time longer than necessary to achieve
the approved objective of the law enforcement officers and in no event longer than
30 days.  The provision must be read in light of section 2518(a)(d), discussed
above.  It is intended to prevent the issuance of blank warrants, condemned in Ber-
ger v. New York, 87 S.Ct. 1873, 388 U.S. 41 (1967).  It requires the time of the
warrant to be carefully tailored to the showing of probable cause.  The period of
authorized interception if intended to the showing of probable cause.  The period of
authorized interception is intended to begin when the interception-- in fact-- be-
gins and terminates when the interception-- in fact-- terminates.  This will be a
question of fact in each case.  When it is necessary to conduct surveillance for a
period of time longer than that specified, the provision provides for extensions.
No arbitrary limit is placed on the number of extensions which can be obtained. The
application for an extension must be made in accordance with paragraph (1) discussed
above, and the judge must make the findings required by paragraph (3), discussed
above.  This meets the test of the Constitution (Berger v. New York, 87 S.Ct. 1873,
388 U.S. 41 (1967)).  As with initial orders, extensions must be related in time to
the showing of probable cause and in no event shall be granted for longer than 30
days.  All orders and extensions must be executed as soon as practicable and shall
be conducted in such a way as to minimize the interception of communications not
otherwise subject to interception under this chapter.  A wiretap can take up to sev-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

eral days or longer to install.  Other forms or devices may take even longer.  The
provision is intended to recognize that each case must rest on its own facts.  But
the execution must be prompt (Berger v. New York, 87 S.Ct. 1873, 388 U.S. 41
(1967)).  Otherwise, there is a danger that the showing of probable cause and the
additional information in the application will become stale.  Compare Sgro v. United
States, 53 S.Ct. 138, 287 U.S. 206 (1932).  This will be a question of fact in each
case.  The provision finally requires each order or extension to specify that inter-
ception must terminate when the objective for which the order was issued is achieved
even though the period of authorized interception has not been exhausted or in any
event within 30 days. Again, this meets the test of the Constitution (Berger v. New
York, 87 S.Ct. 1973, 388 U.S. 41 (1967)).

Paragraph (b) sets out a procedure for periodic judicial supervision during a
period of surveillance.  It must read in light of paragraph (1)(d) and paragraph
(5), both of which are discussed above.  It provides that **\*2193** when an order to in-
tercept is entered the order may require reports to be made to the judge who issued
the order showing what progress has been made toward achievement of the authorized
objective and the need for continued inception.  The reports are intended as a check
on the continuing need to conduct the surveillance. At any time the judge is con-
vinced the need is no longer established, he may order the surveillance discontin-
ued.  Section 2518 (1)(e), discussed above, will serve to insure that extended sur-
veillance is not undertaken lightly.  This provision will serve to insure that it is
not unthinkingly or automatically continued without due consideration.

Paragraph (7) provides for an emergency procedure for the interception of wire or
oral communications.  Where any investigative or law enforcement officer determines:
(a) that an emergency situation exists that requires a wire or oral communication to
be intercepted before an order authorizing an interception can with due diligence be
obtained, and (b) that there are grounds upon which an order could be entered under
this chapter to authorize such an interception, this provision authorizes the inter-
ception of the communication. Often in criminal investigations a meeting will be set
up and the place finally chosen almost simultaneously.  Requiring a court order in
these situations would be tantamount to failing to authorize the surveillance.  The
provision reflects existing search warrant law in which the principle of emergency
search is well established (Carroll v. United States, 45 S.Ct. 280, 267 U.S. 132
(1925); Schmerber v. California, 86 S.Ct. 1826, 384 U.S. 757 (1966)).  Where an in-
terception is made, an application for an order of approval must be made under para-
graph (1) of this section within 48 hours after the interception has occurred or be-
gun to occur.  In the absence of an order, such interception shall immediately ter-
minate when the communication sought is obtained, or when the application for the
order is denied, whichever is earlier.  If the application is denied or terminated
without an order having been issued, the intercepted communication must be treated
as provided for in section 2515, discussed above.  An inventory under paragraph
(8)(d), discussed below, must be filed.  A denial of an application for an order of
approval would be appealable under paragraph (10)(b).  See Gottone v. United States,
345 F.2d 165(10th), certiorari denied, 86 S.Ct. 234, 382 U.S. 901 (1965).

Paragraph (8) sets out safeguards designed to insure that accurate records will be
kept of intercepted communications.

Subparagraph (a) requires, if practicable, that the communication be recorded on

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

tape, wire, or other comparable device.  The recording must be made in such a way as
will protect it insofar as possible from editing or alteration. Appropriate proced-
ures should be developed to safeguard the identity, physical integrity, and contents
of the recordings to assure their admissibility in evidence.  Immediately upon the
termination of the interception, the records must be made available to the judge who
issued the order and sealed.  Custody of the records shall be wherever the judge or-
ders.  Most law enforcement agency's facilities for safekeeping will be superior to
the court's and the agency normally should be ordered to retain custody, but the in-
tent of the provision is that the records should be considered confidential court
records. They must not be destroyed except upon **\*2194** court order and must be kept
for at least 10 years.  Duplicate recordings may be made for authorized disclosure
or use under section 2517(a) and (2), discussed above.  Finally, the presence of the
seal, noted above, is intended to be a prerequisite for use or disclosure under sec-
tion 2817(3) or (5) unless a satisfactory explanation can be made to the judge be-
fore whom the evidence is to be disclosed or before whom permission is sought for
other use or disclosure.

   Subparagraph (b) provides that applications and orders for authorization shall be
treated confidentially.  Particularly in renewal situations, they may be expected to
contain sensitive information.  The provision requires them to be sealed and kept
wherever the judge directs, which would normally be with the records themselves. Ap-
plications and orders may not be disclosed except incidental to the disclosure or
use of the records themselves after a showing of good cause, for example, under
(10)(a), discussed below.  Applications and orders may not be destroyed except on a
court order and must be kept for at least 10 years.

   Subparagraph (c) makes explicit the power of the judge to enforce the provisions
of subparagraphs (a) and (b) through the contempt power of the court.

   Subparagraph (d) places on the judge the duty of causing an inventory to be served
by the law enforcement agency on the person named in an order authorizing or approv-
ing an interception.  This reflects existing search warrant practice.  See Federal
Rules of Criminal Procedures, 41(c); Berger v. New York, 87 S.Ct. 1873, 388 U.S. 41
(1967); Katz v. United States, 88 S.Ct. 507, 389 U.S. 347 (1967).  The inventory
must be filed within a reasonable period of time, but not later than 90 days after
the interception is terminated. It must include notice of the entry of the order,
the date of its entry, the period of authorized or approved interception, and wheth-
er or not wire or oral communications were intercepted.  On an ex parte showing of
good cause, the serving of the inventory may be, not dispensed with, but postponed.
For example, where interception is discontinued at one location, when the subject
moves, but is reestablished at the subjects new location, or the investigation it-
self is still in progress, even though interception is terminated at any one place,
the inventory due at the first location could be postponed until the investigation
is complete.  In other situations, where the interception relates, for example, to a
matter involving or touching on the national security interest, it might be expected
that the period of postponement could be extended almost indefinitely.  Yet the in-
tent of the provision is that the principle of postuse notice will be retained. This
provision alone should insure the community that the techniques are reasonably em-
ployed.  Through its operation all authorized interceptions must eventually become
known at least to the subject.  He can then seek appropriate civil redress for ex-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

ample, under section 2520, discussed below, if he feels that his privacy has been
unlawfully invaded.

  Paragraph (9) provides that the contents of any intercepted wire or oral communic-
ation or evidence derived therefrom shall not be received in evidence or otherwise
disclosed in any Federal or State trial, hearing, or other proceeding unless each
party not less than 10 days before the trial **\*2195** has been furnished with a copy of
the court order under which the interception was authorized or approved. 'Proceed-
ing' is intended to include all adversary type hearings.  It would include a trial
itself, a probation revocation proceeding, or a hearing on a motion for reduction of
sentence.  It would not include a grand jury hearing.  Compare Blue v. United
States, 86 S.Ct. 1416, 384 U.S. 251 (1966). The 10-day period is designed to give
the party an opportunity to make a pretrial motion to suppress under paragraph
(10)(a), discussed below. Compare Segurola v. United States, 48 S.Ct. 77, 275 U.S.
106 (1927). Where it is not possible to furnish the party the information 10 days
before trial, and he would not be prejudiced, the judge may waive the requirement.
Such a situation might arise, for example, when an intercepted communication became
relevant only as a result of the character of a defense presented by the defendant.
Ordinarily, prejudice would be shown only where it was established that the trial
could not be reasonably recessed in order that the motion to suppress could be fully
heard or that the granting of a mistrial rather than excluding the evidence would be
grossly unfair.

  Paragraph (10)(a) provides that any aggrieved persons, as defined in section
2510(11, discussed above, in any trial hearing or other proceeding in or before any
court department, officer, agency, regulating body or other authority of the United
States, a State, or a political subdivision of a State may make a motion to suppress
the contents of any intercepted wire or oral communication or evidence derived
therefrom.  This provision must be read in connection with sections 2515 and 2517,
discussed above, which it limits.  It provides the remedy for the right created by
section 2515.  Because no person is a party as such to a grand jury proceeding, the
provision does not envision the making of a motion to suppress in the context of
such a proceeding itself. Normally, there is no limitation on the character of evid-
ence that my be presented to a grand jury, which is enforcible by an individual.
(Blue v. United States, 86 S.Ct. 1416, 384 U.S. 251 (1965).  There is no intent to
change this general rule.  It is the intent of the provision only that when a motion
to suppress is granted in another context, its scope may include use in a future
grand jury proceeding.  Nor is there any intent to grant jurisdiction to Federal
courts over the Congress itself.  See Hearst v. Black, 66 App.D.C. 313, 87 F.2d 68
(1936)).  Otherwise, the scope of the provision is intended to be comprehensive.
The motion may be made on the ground that:  (i) the communication was unlawfully in-
tercepted, (ii) the order of authorization or approval is insufficient on its face,
or (iii) the interception was not made in conformity with the order.  The motion
must be made before the trial, hearing, or proceeding unless there was no opportun-
ity to make the motion or the person was not aware of the grounds of the motion, for
example, when no notice was given under paragraph (9), discussed above.  Care must
be exercised to avoid having a defendant defeat the right of appeal under paragraph
(b), discussed below, by waiting until trial.  (Giacona v. United States, 257 F. 450
(5th), certiorari denied, 79 S.Ct. 113, 358 U.S. 873 (1958).)  Upon the filing of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

such a motion to suppress, the court may make available to the person or his counsel
such portions of the intercepted communications or evidence derived therefrom as the
court determines to be in the interest of justice. This provision explicitly **\*2196**
recognizes the propriety of limiting access to intercepted communications or evid-
ence derived therefrom according to the exigencies of the situation.  The motion to
suppress envisioned by this paragraph should not be turned into a bill of discovery
by the defendant in order that he may learn everything in the confidential files of
the law enforcement agency.  Nor should the privacy of other people be unduly in-
vaded in the process of litigating the propriety of the interception of an aggrieved
person's communications.

Subparagraph (b) provides that the United States shall have a right of appeal from
an order granting a motion to suppress under paragraph (a), above, or the denial of
an application for an order of approval. This right is necessary in order that the
proposed chapter will receive a uniform interpretation.  This provision is intended
to reflect existing law in the area of narcotics. Compare 18 U.S.C. 1404 (1966). The
United States Attorney must certify to the judge or other official granting the mo-
tion that the appeal is not taken for purposes of delay. The appeal must be taken
within 30 days after the date the order was entered and prosecuted diligently.

Section 2519 of the new chapter provides for a series of reports on the adminis-
tration of the court order system.  They are intended to form the basis for a public
evaluation of its operation.  The reports are not intended to include confidential
material.  They should be statistical in character.  It is intended that the con-
tents of the reports should be governed by 18 U.S.C. 1001 (1958).  It will assure
the community that the system of court-order electronic surveillance envisioned by
the proposed chapter is properly administered and will provide a basis for evaluat-
ing its operation.

Section 2520 of the new chapter authorizes the recovery of civil damages.  It
provides that any person whose wire or oral communication is intercepted, disclosed,
or used in violation of this chapter shall have a civil cause of action against any
person, as defined in section 2510(6), discussed above, who intercepts, discloses or
uses or procures any other person to intercept disclose or use such communication.
The scope of the remedy is intended to be both comprehensive and exclusive, but
there is no intent to preempt parallel State law.

Recovery shall include: (a) actual damages, but not less than liquidated damages
at the rate of $100 a day for each day of violation or $1,000, whichever is higher,
(b) punitive damages, where malice is shown, and (c) a reasonable attorney's fee and
other litigation costs reasonably incurred. Injunctive relief, with its attendant
discovery proceedings, is not intended to be available (Pugach v. Dollinger, 81
S.Ct. 650, 365 U.S. 458 (1961)).  It is expected that civil suits, if any, will in-
stead grow out of the filing of inventories under section 2518(8)(d).  A good faith
reliance on a court order would constitute a complete defense to an action for dam-
ages.  (Compare Pierson v. Ray, 87 S.Ct. 1213, 386 U.S. 547 (1967)).

Section 803.-- This section amends section 605 of the Communications Act of 1934
(48 Stat. 1103, 47 U.S.C.sec. 605 (1958)).  This section is not intended merely to
be a reenactment of section 605.  The new provision is intended as a substitute.
The regulation of the interception of wire or oral communications in the future is
to be governed by proposed new chapter 119 of title 18, United States Code.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**


   **\*2197** As redrafted, the new section 605 would provide that, except as authorized
or permitted by chapter 119, title 18, United States Code, no person receiving, as-
sisting in receiving, transmitting, assisting in transmitting, any interstate or
foreign communication by wire or radio shall divulge or publish the existence, con-
tents, substance, purport, effect, or meaning thereof, except through authorized
channels of transmission or transmission or reception, (1) to any person other than
the addressee, his agents, or attorney, (2) to a person employed or authorized to
forward such communication to its destination, (3) to proper accounting or distrib-
uting officer of the various communication centers over which the communications may
be passed, (4) to the master of a ship under whom he is serving, (5) in response to
a subpena issued by a court of competent jurisdiction or (6) on demand of other law-
ful authority.  The new section is designed to regulate the conduct of communica-
tions personnel.  It also provides that no person not authorized by the sender shall
intercept any radio communication and divulge or publish the existence, contents,
substance, purport, effect, or meaning of such intercepted communication to any per-
son.  'Person' does not include a law enforcement officer acting in the normal
course of his duties.  But see United States v. Sugden (226 F.2d 281 (9th 1955), af-
firmed per curiam, 76 S.Ct. 709, 351 U.S. 916 (1956)).  Under the new section, no
person not so entitled will be permitted to receive or assist in receiving any in-
terstate or foreign radio communication for his own benefit or for the benefit of
another not entitled to it. Finally, no person who has received any intercepted ra-
dio communication or become acquainted with its contents, substance, purport, ef-
fect, or meaning, knowing that the communication was intercepted, shall divulge or
publish the existence contents, substance, purport, effect, or meaning, of it for
his own benefit or for the benefit of another not entitled to it.  The section is
not intended to apply to radio broadcasts or transmission by amateurs or others for
the use of the general public or which relates to ships in distress.


                                TITLE IV


   Section 901.-- This section of the title contains a statement of findings and de-
claration.  The purpose of setting forth such a statement is to clarify misconcep-
tions which have arisen concerning the nature and purpose of the provisions of the
title and to include a definite declaration of the purpose of the title and of the
findings which justified its enactment.
   Subsection (a) of section 501 contains findings and declarations as to the exist-
ence of the conditions with which the title is designed to deal and of the action
necessary to cope with those conditions.  Each of these findings is fully supported
by the evidence of record before the committee.
   Paragraph (1) is the basic finding and declaration that the existing Federal con-
trols over the traffic in firearms moving in (or otherwise affecting) interstate or
foreign commerce do not adequately enable the States to control the firearms traffic
within their own borders through the exercise of their police power.
   Paragraph (2) is the basic finding and declaration that the ease with which any
person can acquire firearms other than a rifle and shotgun (including **\*2198** crimin-
als, juveniles without the knowledge or consent of their parents or guardians, nar-
cotics addicts, mental defectives, armed groups who would supplant the functions of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

duly constituted public authorities, and others whose possession of such firearms is
similarly contrary to the public interest) is a significant factor in the prevalence
of lawlessness and violent crime in the United States.

The committee, through its own investigations and by the evidence presented to the
committee by the Nation's leading law enforcement officers, has established this
fact beyond reasonable doubt.

Paragraph (3) is the basic finding and declaration that only through adequate Fed-
eral control over interstate and foreign commerce in firearms, other than rifles and
shotguns, and over all persons engaging in the business of importing, manufacturing,
or dealing in firearms, can the grave problem of firearms getting into the wrong
hands be properly dealt with, and effective State and local regulation of the fire-
arms traffic be made possible.

Paragraph (4) is a specific finding that the acquisition on a mail order basis of
firearms, other than rifles and shotguns, by nonlicensed individuals, from a place
other than their State of residence, has materially tended to thwart the effective-
ness of State laws and regulations, and local ordinances.

This specific finding is documented by the evidence summarized in the August 7,
1964, Interim Report on Interstate Traffic in Mail Order Firearms (S.Rept. 1340,
88th Cong., 2d sess.), and in S.Rept. 1866, 89th Congress, 2d session.

Paragraph (5) is a specific finding and declaration that the sale or other disposi-
tion of concealable weapons by importers, manufacturers, and dealers holding Feder-
al licenses, to nonresidents of the State in which the licensee's place of business
is located, has tended to make ineffective the laws, regulations and ordinances in
the several States and local jurisdictions regarding such firearms.

The evidence of record before the committee fully supports this finding and de-
claration. (See summary in the general discussion of the scope of coverage of the
bill under the subheading 'Out of State Purchase of Concealable Firearms,' p. 12,
S.Rept. 1866, 89th Cong., 2d sess.)

Paragraph (6) is a specific finding and declaration that there is a causal rela-
tionship between the easy availability of firearms other than rifles and shotguns,
and juvenile and youthful criminal behavior, and that such firearms have been widely
sold by federally licensed importers and dealers to emotionally immature, or
thrill-bent juveniles and minors prone to criminal behavior.

The committee in the course of its investigation and hearings has fully estab-
lished the basis for this finding and declaration. The committee expressed its con-
cern with regard to the casual relationship between the availability of firearms and
juvenile and youthful criminal behavior in the interim report on August 7, 1964
(S.Rept. 1340, 88th Cong., 2d sess.), relating to the 'Interstate Traffic in Mail
Order Firearms.'

This finding and declaration has been fully supported by the evidence presented at
the several hearings before the Senate on firearms legislation.

**\*2199** Paragraph (7) is a specific finding and declaration that the United States
has become the dumping ground of the castoff surplus military weapons of other na-
tions, and that such weapons, and the large volume of relatively inexpensive pistols
and revolvers (largely worthless for sporting purposes), imported into the United
States in recent years have contributed greatly to lawlessness and to the Nation's
law enforcement problems.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**


   This finding and declaration is fully supported by the evidence developed by the
investigations of the committee and by testimony before it by the Attorney General
of the United States, the attorneys general of California, New Jersey, and South
Carolina, and by the police officials of Atlanta, Chicago, Los Angeles, New York
City, Philadelphia, St. Louis, and the District of Columbia.
   Paragraph (8) is a specific declaration and finding that the lack of adequate Fed-
eral control over interstate and foreign commerce in highly destructive weapons
(such as bazookas, mortars, antitank guns, and so forth, and destructive devices
such as explosive or incendiary grenades, bombs, missiles, and so forth) has allowed
such weapons and devices to fall into the hands of lawless persons, including armed
groups who would supplant lawful authority and those participating in civil dis-
orders, thus creating a problem of national concern.
   This finding and declaration is fully supported by the investigations of the com-
mittee and by the evidence presented at the hearings before the committee.
   The concern of Federal, State, and city law enforcement officers over this problem
was made clear at the hearings before the committee.
   Paragraph (9) is a specific finding and declaration that the existing licensing
system under the Federal Firearms Act does not provide adequate license fees or
proper standards for the denial of licenses, and that this has led to licenses being
issued to persons not reasonably entitled thereto, thus distorting the purposes of
the licensing system.
   This finding and declaration is fully supported by investigations of the committee
and by the evidence presented by Federal, State, and city law enforcement officials
at the hearings before the committee.
   Subsection (b) of section 501 is designed and intended to remove certain public
misconceptions as to the nature of the title and is a general declaration that the
purpose of the title is to cope with the conditions referred to in the findings in
subsection (a), and that it is not the purpose of the title to place any undue or
unnecessary restrictions or burdens on law-abiding citizens with respect to the ac-
quisition, possession, or use of firearms appropriate to the purpose of hunting,
trapshooting, target shooting, personal protection, or any other lawful activity,
and that the title is not intended to discourage or eliminate the private ownership
or use of firearms by law-abiding citizens for lawful purposes, or provide for the
imposition by regulations of any procedures or requirements other than those reason-
ably necessary to implement, and effectuate the provisions of the title.
   Section 902.-- This section would incorporate in title 18, United States Code, a
new chapter (ch. 44) consisting of sections 921 through 928. For **\*2200** clarity, ref-
erences in this section of the title will be to sections as they would appear in
chapter 44 of title 18.


                       Section 921 provides definitions


   Section 921(a)(1).-- The definition of the term 'person' in this paragraph is sub-
stantially the same as existing law (15 U.S.C. 901(1)). However, the term 'whoever'
is added and 'any company, firm, society, or joint-stock company' is included in the
definition.
   Section 921(a)(2).-- The definition of the term 'interstate or foreign commerce'


© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

is a restatement of existing law (15 U.S.C. 901(2)). 'Territory' is omitted since
there is no territory at this time.  The last sentence of this definition is added
to clarify the status of the title in Puerto Rico, the Virgin Islands, and the Dis-
trict of Columbia through providing that these areas shall be included within the
term 'State.'

  Section 921(a)(3).-- This definition of the term 'firearm' is a revision of the
definition in the present law (15 U.S.C. 901(3))).  The definition has been extended
to include any weapon (including a starter gun) which will, or may be readily con-
verted to, expel a projectile or projectiles by the action of an explosive.  This
provision makes it clear that so-called unserviceable firearms come within the
definition. Under the present definition of 'firearm', any part or parts of such a
weapon are included.  It has been found that it is impractical to have controls over
each small part of a firearm.  Thus, the revised definition substitutes only the ma-
jor parts of the firearm; that is, frame or receiver for the words 'any part or
parts.'  The revised definition continues to cover mufflers silencers and is exten-
ded to include destructive devices which term is subsequently defined. Section
921(b)(1) of the title excludes an antique firearms from this definition.  It should
be noted that powder actuated industrial tools used for their intended purposes are
not considered weapons and, therefore, are not included in this definition.

  Section 921(a)(4).-- The term 'destructive device' is a new provision defined to
mean dangerous bomb and incendiary-type weapons and weapons having a large bore such
as antitank guns.  Section 921(b)(2) of the title excludes certain devices from the
definition.

  Section 921(a)(5).-- The term 'shotgun' is defined in the same manner as in sec-
tion 5848(4) of title 26 which is a part of the National Firearms Act that is, a
weapon intended to be fired from the shoulder designed to fire a number of ball shot
through a smooth bore. The present Federal Firearms Act does not contain such a
definition.

  Section 921(a)(6).-- The term 'short and barreled shotgun' is defined as a shotgun
which comes within the purview of the National Firearms Act (26 U.S.C. 5801 et
seq.)-- that is, a shotgun having a barrel less than 18 inches in length or a modi-
fied shotgun having an overall length less than 26 inches. The term is not defined
in the present Federal Firearms Act.

  Section 921(a)(7).-- The term 'rifle' is defined in the same manner as the term is
defined in section 5848(3) of title 26 which is a part of the **\*2201** National Fire-
arms Act-- that is a weapon intended to be fired from the shoulder and designed to
fire a single projectile through a rifled bore.  This term is not defined in the
present Federal Firearms Act.

  Section 921(a)(8).-- The term 'short barreled rifle' is defined as being a rifle
coming within the purview of the National Firearms Act (26 U.S.C. 5801 et seq.)--
i.e., a rifle having a barrel less than 16 inches in length or a modified rifle hav-
ing an overall length of less than 26 inches.  This definition is not included in
the present Federal Firearms Act.

  Section 921(a)(9).-- The term 'importer' is defined as one engaged in the business
of importing or bringing firearms and ammunition into the United States for sale or
distribution.  Under the present Federal Firearms Act, the term 'manufacturer' is
defined in such a way that an importer is included within the meaning of the term

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097    Page 91
S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
(Cite as: 1968 U.S.C.C.A.N. 2112)

(15 U.S.C. 901(4)).

  Section 921(a)(10).-- The definition of the term 'manufacturer' is a restatement
of existing law (15 U.S.C. 904(4)), except that reference to importation has been
deleted.  Importation activities would come within the definition of the term 'im-
porter' in paragraph (9) of this subsection.

  Subsection 921(a)(11).-- The term 'dealer' is defined in somewhat the same manner
as that definition appears in present law (15 U.S.C. 901(5)).  The definition would
make one engaged in the business of selling ammunition for destructive devices a
dealer and specifically provides that a pawnbroker dealing in firearms shall be con-
sidered a dealer.

  Section 921(a)(12).-- The term 'pawnbroker' is a new definition and is designed to
make it clear what category of person is required to obtain a dealer license as a
pawnbroker under section 923(a) as contained in the title.

  Section 921(a)(13).-- The definition of the term 'indictment' is a new provision.
Inasmuch as a person under indictment for certain crimes is proscribed from shipping
or receiving firearms in interstate or foreign commerce and a license will not be
issued to such a person, the definition makes it clear that either an indictment or
an information in any court for a felony comes within the meaning of the term.

  Section 921(a)(14).-- The definition of the term 'fugitive from justice' is a re-
statement of the present definition (15 U.S.C. 901(6)) with 'Territory' and the 'Dis-
trict of Columbia' being omitted.  These omissions were made in that there are no
more territories and under the provision of section 921(a)(2) as contained in the
title, the District of Columbia is treated as a State.

  Section 921(a)(15).-- The definition of the term 'antique firearm' is a new provi-
sion.  Section 921(b)(1) as contained in the title excludes an antique firearm from
the definition of a firearm in section 921(a)(3) as contained in the title.  Thus,
the definition makes it clear that the term includes only firearms of a design used
before the year 1870, or a replica thereof, which were not designed to use smokeless
powder.

  *2202 Section 921(a)(16).-- The term 'ammunition' is defined in the present law
(15 U.S.C. 901(7)), as pistol and revolver ammunition. This title does not include
controls over pistol or revolver ammunition but it does incorporate controls over
ammunition for destructive devices.  Thus, this term is defined as meaning ammuni-
tion for destructive devices and ammunition for use in any other type of firearm is
excluded from its meaning.

  Section 921(a)(17).-- This definition of the term 'Secretary' or 'Secretary of the
Treasury' is a new provision.  The term is defined to eliminate the necessity of re-
peating 'Secretary of the Treasury or his delegate' in several provisions of the
title.

  Section 921(b)(1).-- As noted in section 921(a)(3) as contained in the title, this
paragraph excludes an 'antique firearm,' which is defined in section 921(a)(15) as
contained in the title, from the definition of 'firearm'.  Thus, an antique firearm
is not controlled under the title.

  Section 921(b)(2).-- As noted under section 921(a)(4) as contained in the title,
this paragraph excludes certain devices from the definition of 'destructive device.'
The devices excluded are those not designed or redesigned or used or intended for us
as a weapon-- e.g., construction tools using explosives when used for such purposes;

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

those used solely for such purposes as signaling; shotguns other than those coming
within the purview of the National Firearms Act; nonautomatic rifles suitable for
big game hunting; surplus military weapons distributed under 10 U.S.C. 4684(2),
4685, and 4686, e.g., a piece of obsolete field artillery given to an American Le-
gion post; or those devices which the Secretary finds will not likely be used as a
weapon, e.g., a rocket used in a research project.

Section 921(b)(3).-- This paragraph provides that certain commercial-type crimes
shall not be included in the term 'crime punishable by imprisonment for a term ex-
ceeding one year.' Thus, one convicted, for example, of unfair trade practices,
would not be restricted under those provisions of the title related to purchase or
transportation of firearms by convicted felons. While the paragraph enumerates cer-
tain types of crimes which are excluded from the felony criteria, it also gives the
Secretary authority to add similar types of crimes to the list. The present Federal
Firearms Act contains no comparable provision.

Section 922(a) contains prohibitions applicable to all persons as well as prohibi-
tions applicable only to licensees

Section 922(a)(1).-- This paragraph proscribes any person from engaging in the
business of importing, manufacturing, or dealing in firearms or ammunition
(destructive device) without a license. The prohibition goes to both an unlicensed
person engaging in a firearms business and such a person who, in the course of that
business, ships, transports, or receives, a firearm or ammunition in interstate or
foreign commerce. Thus, the paragraph makes it clear that a license is required for
an intrastate business as well as an interstate business. The present Federal Fire-
arms Act (15 U.S.C. 902(a)) merely prohibits the interstate or foreign shipment or
receipt of firearms by a manufacturer or dealer unless he has a license.

**\*2203** Section 922(a)(2).-- This paragraph contains one of the major measures of
the title-- the interstate shipment of any firearm (other than a rifle or shotgun)
or ammunition by a licensee to anyone other than another licensee is prohibited un-
less such shipment comes within one of the three exceptions states. In effect, the
interstate mail-order shipments of firearms (other than rifles and shotguns) and am-
munition would be banned so that State and local authorities may better exercise the
controls they deem desirable over the acquisition and possession of such firearms.
There is no similar provision in the present Federal Firearms Act. Exceptions to
the overall prohibition are: (1) licensees returning a repaired firearm or replace-
ment firearm of the same kind to the person from whom received; (2) shipment of a
firearm by mail to one entitled to receive it under 18 U.S.C. 1715; and (3) delivery
by a licensee in the District of Columbia to a resident of the District of Columbia
(this exception also goes to transactions in Puerto Rico and the possessions).

Section 922(a)(3).-- This paragraph implements the prohibition in section
922(a)(2) of the title, as well as State and local controls over firearms. Any per-
son other than a licensee, would be prohibited from transporting or receiving in his
State of residence any firearm, except as a rifle or shotgun, purchased or otherwise
obtained by him outside that State and the prohibition is extended to a rifle and
shotgun if the purchase or possession of such weapon would be unlawful in the State,
or political subdivision thereof, where he resides. There is no comparable require-
ment in the present Federal Firearms Act.

Section 922(a)(4).-- This paragraph prohibits transportation of destructive

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097
S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

devices and National Firearms Act weapons (gangster-type) in interstate or foreign
commerce, except as authorized by the Secretary.  There is no comparable provision
in the present Federal Firearms Act.

  Section 922(a)(5).-- This paragraph is also designed to implement section
922(a)(2) of the title, as well as State and local firearms control provisions by
prohibiting any unlicensed person from transferring in any way a firearm, other than
a rifle or shotgun, to another unlicensed person who resides in another state.  The
prohibition is extended to a rifle or shotgun if the State or local law of the place
of residence of the transferee would be violated by the purchase or possession of
the weapon.  The present Federal Firearms Act contains no comparable provision.

  Section 922(a)(6).-- This paragraph prohibits the making of false statements or
the use of any deceitful practice (both knowingly) by a person in connection with
the acquisition or attempted acquisition of a firearm from a licensee.  To invoke
the prohibition, the false statement or deceitful practice must be material to the
lawfulness of the sale of the firearm under the provisions of the title.  The re-
quirement that one who obtains a firearm from a licensee must properly identify him-
self is inherent in this prohibition.  This is strengthened by the recordkeeping
provisions of sections 922(b)(5) and 923(d) as contained in the title.  There is no
specific prohibition in the present Federal Firearms Act covering the type of falsi-
fication involved in this paragraph.

     **\*2204** Section 922(b) contains prohibitions applicable only to licensees--
     These prohibitions go to intrastate, as well as interstate, transactions by
                                    licensees

  Section 922(b)(1).-- The sale by a license of any firearm, other than a shotgun or
rifle, to anyone less than 21 years old is prohibited.  The prohibition would usu-
ally be concerned with over-the-counter sales but would also be involved in in-
trastate mail-order sales.  There is no comparable restriction in the present Feder-
al Firearms Act.

  Section 922(b)(2)-- This paragraph was designed to implement State and local fire-
arms controls by making it unlawful for a licensee to deliver any firearm to an un-
licensed person with reasonable cause to believe the receipt or possession of the
weapon would be in violation of State or local law.  Again, this control measure is
directed primarily toward over-the-counter sales but would also be applicable to all
sales.  There is no comparable provision in the present Federal Firearms Act.

  Section 922(b)(3).-- Under this paragraph, it would be unlawful for a licensee to
sell a firearm, other than a rifle or shotgun, to an out-of-State unlicensed resid-
ent.  Shotguns, or rifles could be sold over-the-counter or mail-order to out-
of-state residents.  This prohibition implements the strict controls over the inter-
state movements of pistols and revolvers in section 922(a)(2) as contained in the
title.  It also is designed to prevent the avoidance of State and local laws con-
trolling firearms other than rifles and shotguns by the simple expediency of cross-
ing a State line to purchase one. There is no comparable provision in the present
Federal Firearms Act.

  Section 922(b)(4).-- A licensee is prohibited from disposing of a destructive
device or a national act weapon (gangster type) to any unlicensed person unless that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

person has a statement executed by the principal law enforcement officer of the loc-
ality where the unlicensed person resides.  The statement is required to be main-
tained as part of the records of the licensee.  This prohibition is directed to
over-the-counter sales and may be applied to intrastate mail-order sales.  The
present Federal Firearms Act has no similar provision.

  Section 922(b)(5).-- This paragraph makes it unlawful for a licensee to dispose of
a firearm without making a record showing the name, age, and residence of the pur-
chaser.  Of course, this prohibition implements each of the controls imposed by the
title.  There is a somewhat similar provision in the present Federal Firearms Act
(15 U.S.C. 903(d)).

  Section 922(c).-- This subsection prohibits a licensee from disposing of a firearm
or ammunition to a fugitive, a felon, or one under indictment.  A person who has
been granted relief under section 925(c) is excluded from the class of persons
covered by this restriction.  The prohibition here goes to all types of sales or
dispositions-- over the counter as well as mail order.  The provisions of this sub-
section are similar to 15 U.S.C. 902(d) of the present Federal Firearms Act but go
further than that subsection in that over the counter sales are covered.  Also am-
munition for destructive devices is included in the prohibition.

  **\*2205** Section 922(d).-- This subsection makes it unlawful for a common or contract
carrier to transport or deliver any firearm in interstate or foreign commerce with
knowledge that its transportation or receipt would be in violation of any provision
of the title.  Present law has no specific restrictions on common or contract carri-
ers.  However, 15 U.S.C. 902(d) through (i) of the present Federal Firearms Act
could be applied to carriers in proper factual situations.

  Section 922(e).-- This subsection prohibits a felon, fugitive, or one under in-
dictment from shipping a firearm or ammunition in interstate or foreign commerce.
The same prohibition is contained in 15 U.S.C. 902(e) of the present Federal Fire-
arms Act except that ammunition for a destructive device is not covered.

  Section 922(f).-- This subsection makes it unlawful for a felon, fugitive, or one
under indictment to receive a firearm or ammunition which has been shipped or trans-
ported in interstate or foreign commerce.  The present Federal Firearms Act (15
U.S.C. 902(f)), contains a similar prohibition.  However, a person under indictment
is added by this subsection to the class of persons restricted from receiving fire-
arms, the presumption in 15 U.S.C. 902(f) is not carried over into this subsection,
and the restriction in the present Federal Firearms Act does not go to ammunition
for destructive devices.

  Section 922(g).-- This subsection makes it a crime to transport a stolen firearm
or ammunition in interstate of foreign commerce knowing either was stolen.  This
subsection follows 15 U.S.C. 902(g) of the present Federal Firearms Act except that
it covers ammunition for destructive devices rather than pistol and revolver ammuni-
tion.

  Section 922(h).-- This subsection prohibits any person from receiving, etc., any
stolen firearm or ammunition 'moving as', etc., in interstate or foreign commerce.
This prohibition is a modified form of the restriction in 15 U.S.C. 902(h) of the
present Federal Firearms Act but the restriction would go to ammunition for de-
structive devices rather than pistol and revolver ammunition.

  Section 922(i).-- This subsection makes it unlawful for any person knowingly to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097
S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

ship or receive in interstate or foreign commerce any firearm having the serial num-
ber removed or altered.  This prohibition is found in 15 U.S.C. 902(i) of the
present Federal Firearms Act except that the presumption would not be carried over.

   Section 922(j).-- This subsection is related to section 925(d) as contained in the
title which authorizes the importation of firearms upon meeting state conditions
precedent.  The subsection makes it unlawful to import a firearm in violation of
section 925(d) as contained in the title or knowingly receive any firearm unlawfully
imported under that section.  The present Federal Firearms Act contains no compar-
able prohibition.

   Section 922(k).-- This subsection makes it unlawful for a licensee to falsify re-
cords, to fail to make record entries or to fail to maintain records **\*2206** required.
The present Federal Firearms Act requires records in 15 U.S.C. 903(d).  However,
this prohibition, coupled with the more detailed record requirements in section
923(d) as contained in the title, goes further than requirements in the present Fed-
eral Firearms Act.

                    Section 923 contains licensing provisions

   Section 923(a).-- This subsection requires all persons engaging in business as a
firearms manufacturer, importer, or dealer to have a license for each place of busi-
ness.  The Secretary if given authority to prescribe the form of the application and
the information it will contain.  The fees are prescribed and range from $1,000 per
year, in the case of a manufacturer or importer of destructive devices, to $10 per
year (after the first renewal, which would be $25), in the case of a dealer in fire-
arms other than destructive devices.  The licensing requirements of the present Fed-
eral Firearms Act, 15 U.S.C. 903(a), are based upon dealers and manufacturers
(includes importers) shipping or receiving firearms in interstate or foreign com-
merce.  Here, the requirement is on engaging in business and would include one enga-
ging in such a business in intrastate commerce.  Also, the fees for licenses are
substantially increased by this subsection and types of licenses are increased--
manufacturers and importers of destructive devices are added and a new type of deal-
er-- pawnbroker is included.

   Section 923(b).-- This subsection authorizes the Secretary to issue a license to
one who has filed a proper application and paid the prescribed fee and provides that
such license shall, subject to the provisions of the title and other applicable law,
entitle the licensee to transport or receive the firearms and ammunition covered by
the license in interstate or foreign commerce for the period stated.  The subsection
is comparable to 15 U.S.C. 903(b) of the present Federal Firearms Act except that no
specific provision is made for revocation. However, it should be noted that the pro-
visions of the proposed subsection specifically restrict the licensee to interstate
shipments and receipts in accordance with the provisions of the title.  Thus, for
example, a licensee finally convicted of a felony could not continue to engage in
business under the title.

   Section 923(c).-- The standards for issuing a license would be greatly
strengthened by the provision of this subsection.  This subsection provides for
denial of a license applied for under subsections (a) and (b) of this section if the
Secretary finds the applicant (1) is under 21 years of age; (2) is prohibited by the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
(Cite as: 1968 U.S.C.C.A.N. 2112)

title from transporting or receiving firearms in interstate or foreign commerce or
is not likely to maintain operations in compliance with title; (3) has violated any
provision of the chapter; (4) has failed to disclose material information, or made a
false statement in his application; or (5) does not have or intend to have, business
premises. Notice and opportunity for a hearing on the disapproval of an application
are specifically provided. Under the present Federal Firearms Act, there is no spe-
cific authorization to deny an application for a license. However, licenses are not
issued to persons who may not lawfully ship or receive firearms or ammunition in in-
terstate commerce. Of course, 5 U.S.C., 556-558, and related sections of Title 5 of
the United States Code are applicable in actions with respect to licensing under
this title.

**\*2207** Section 923(d).-- Requires all licensees to maintain records of importation,
production, shipment, receipt, and sale or other disposition' of firearms and am-
munition as the Secretary may by regulations prescribe and that such records be made
available for inspection at reasonable times. The subsection also provides that the
Secretary may enter the business premises of a licensee for inspection and author-
izes the Secretary to disclose information acquired through provisions of the title
to State and local authorities. The requirements for records under the present Fed-
eral Firearms Act is vague. (15 U.S.C. 903(d)).)

Section 923(e).-- This subsection requires the license be kept posted and avail-
able for inspection. There is no similar provision in the present Federal Firearms
Act.

Section 923(f).-- Licensed importers and licensed manufacturers are required to
identify firearms imported or manufactured. The present Federal Firearms Act does
not contain a specific requirement for identification of firearms. However, there is
an implied requirement in the recordkeeping provisions (15 U.S.C. 903(d) and in 15
U.S.C. 902(i).

Section 924 contains the penalty and forfeiture provisions

Section 924(a).-- Provides penalties for violation, including false statements. of
any provision of the title, or regulations issued thereunder-- a fine of not more
than $5,000 or imprisonment for not more than 5 years or both. Under 15 U.S.C.
905(a) of the present Federal Firearms Act, the penalty for a violation is a $2,000
fine or imprisonment for 5 years or both.

Section 924(b).-- This subsection provides that a person who ships, transports, or
receives a firearm in interstate or foreign commerce with intent to commit a felony,
or with knowledge or reason to believe that such crime will be committed, with the
weapon shall be fined not more than $10,000 or imprisoned not more than 10 years, or
both. There is no comparable provision in the present Federal Firearms Act.

Section 924(c).-- This subsection provides that any firearm involved in a viola-
tion of the title, or regulations thereunder, and any firearms involved in any viol-
ation of any criminal law of the United States shall be subject to forfeiture. The
forfeiture provisions of the National Firearms Act (26 U.S.C. 5801, et seq.) are,
insofar as applicable, extended to forfeiture under this subsection. Under 15
U.S.C. 905(b) of the present Federal Firearms Act, a firearm involved in a violation
of that act is subject to forfeiture. However, there is no comparable provision in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**


the present Federal Firearms Act as to forfeiting firearms used in a violation of
other Federal laws.

Section 925 concerns exceptions to the title and relief from disabilities under
the title

   Section 925(a).-- This subsection excepts from the title transactions in which a
firearm or ammunition is imported for, sold or shipped to, or issued for the use of
the United States (including any department or agency thereof), or any State or pos-
session (including any department, agency or political subdivision thereof).  Those
examinations are carried over from the present Federal Firearms Act (15 U.S.C. 904)
but this subsection does **\*2208** not carry over other exemptions in that act, e.g.,
shipments of firearms to a 'research laboratory designated by the Secretary.'
   Section 925(b).-- This subsection authorizes a licenses indicted for a felony to
continue operations under his existing license until a conviction under the indict-
ment becomes final.  The present Federal Firearm Act contains no specific provision
to this effect but has been interpreted to authorize this procedure.  (See 26 CFR
177.31(b)).
   Section 925(c).-- This subsection is 15 U.S.C. 910 in the present Federal Firearms
Act.  It would grant relief to certain individuals from the restrictions that would
be imposed on them under the title by reason of having been convicted of certain
felonies.
   Section 925(d).-- This subsection gives the Secretary authority to permit the im-
portation of certain types of firearms-- (1) those imported for scientific 401 of
title 10 of the United States Code; (2) an unserviceable firearm other than a ma-
chine gun; (3) those firearms not coming within the purview of the National Firearms
Act (26 U.S.C. 5801, et seq.) and suitable for sporting purposes (in the case of
surplus military weapons, this type is limited to shotguns and rifles), and those
previously taken out of the United States.  The subsection contains a proviso per-
mitting the Secretary to authorize the importation of a firearm for classification
purposes.  There is no comparable provision in the present Federal Firearms Act.

Section 926.  Rules and regulations

   This section provides the rulemaking authority now granted to the Secretary by 15
U.S.C. 907.  It also specifically provides that interested parties will be given op-
portunity for a public hearing on proposed rules and regulations after notice.  The
present Federal Firearms Act does not contain a comparable provision.  However, oth-
er Federal statutes require notice of the issuance of regulations.

Section 926.  Rules and regulations

   This section provides the rulemaking authority now granted to the Secretary by 15
U.S.C. 907.  It also specifically provides that interested parties will be given op-
portunity for a public hearing on proposed rules and regulations after notice.  The
present Federal Firearms Act odes not contain a comparable provision.  However, oth-
er Federal statutes require notice of the issuance of regulations.


© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097                                                    Page 98

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

Section 927.  Effect on State law

   This section sets out the intent of Congress with respect to the title as it would
relate to the law of any State on the subject matter.

Section 928.   Separability

   This section provides that if any provision of the title is held invalid, the re-
mainder of the title shall not be affected thereby.

Section 903

   Here, the Secretary of the Treasury is given specific authority to administer and
enforce the provisions of the title.

Section 903

   This section provides that nothing in the title would modify or affect any provi-
sion of the National Firearms Act (26 U.S.C. 5801, et seq.), section 414 of the Mu-
tual Security Act of 1954 (22 U.S.C. 9134), or section 1715 of title 18, United
States Code.

**\*2209** Section 905

   This section would conform the table of contents in 'Part I-- Crimes' of  title
18, United States Code, to reflect a new chapter 44 of that title.

Section 906

   The Federal Firearms Act (15 U.S.C. 901, et seq.) would be repealed by this sec-
tion.

Section 907

   This section contains the effective date provisions of the title. The provisions
of the title would become effective 180 days after enactment, except as to a license
issued under the present Federal Firearms Act which would be deemed valid until it
expired according to its terms, i.e., usually 1 year after date of issuance.

TITLE V

   This title provides that if any provision of the act is held invalid, the re-
mainder of the act shall not be affected thereby.

MINORITY VIEWS OF MESSRS. TYDINGS, DODD, HART, LONG OF MISSOURI, KENNEDY OF
MASSACHUSETTS, BURDICK, AND FONG ON TITLE II OF S. 917

   As we make clear in the following paragraphs, each of the five major provisions of
title II of S. 917 is subject to extremely serious objections on both constitutional

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097
S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

and policy grounds.  Title II, which was originally added to S. 917 in the subcom-
mittee, was retained in the bill by the narrowest possible margin in the committee--
an evenly divided vote of the full committee.  We strongly opposed the committee ac-
tion, and we urge our colleagues in the Senate to delete title II from the bill when
it is offered on the floor of the Senate.

  The constitutional objections to title II are manifold.  The provisions on police
interrogation and eyewitness testimony are so squarely in conflict with the recent
decisions of the Supreme Court in the Miranda and Wade cases that they will almost
certainly be declared unconstitutional as soon as they are tested in the courts.

  The provisions limiting the appellate jurisdiction of the Supreme Court and abol-
ishing the habeas corpus jurisdiction of the Federal courts will fare better.  Since
no Congress in the history of this country has ever before enacted this sort of ex-
treme curtailment of the authority of the Federal judiciary, no occasion has yet
arisen for the courts to pass upon such issues.  But, it is highly likely that these
provisions too will be held unconstitutional as soon as they are tested in the
courts.

  The Constitution itself sets out clear procedures for amending its provisions.  If
Congress determines that the Constitution itself or the decisions of the Supreme
Court interpreting the Constitution are in need of change, Congress cannot act by
statute, but must act through the only method established by our system of law, the
method of constitutional amendment.

  **\*2210** Equally serious, title II promise nothing but frustration, confusion and un-
certainty as the product of any effort by law enforcement officers and agencies to
implement its provisions.  Grave doubts will inevitably surround the validity of
confessions obtained by law enforcement officers in reliance on title II instead of
the clear command of Miranda.  The use of such confessions in evidence will inevit-
ably be challenged at every stage of the judicial process. Convictions obtained on
the basis of such confessions will inevitably be reversed, sometimes years after
trial, when witnesses and other sources of evidence have long since disappeared.
For all of these reasons, title II offers only the dismal prospect of yet another
self-defeating round of police frustration and public dissatisfaction with the
courts.

  But the constitutional arguments against title II, however strong they are, tell
only part of the story.  As we indicate below, all of the provisions of title II are
highly objectionable on grounds of policy alone, even without consideration of ques-
tions of constitutionality.  Title II nourishes the wholly inaccurate attitude that
Congress has done its part in the war against crime by deciding whether it is for or
against police interrogation, or for or against the Supreme Court.  Simplistic an-
swers do us no service in the struggle to find solutions for the complicated prob-
lems we face in the war against crime.

  We submit that the cost paid by law enforcement for enactment of title II far ex-
ceeds any possible benefit that may be obtained.  As the comprehensive studies car-
ried out by the National Crime Commission demonstrate, there are literally scores of
noncontroversial improvements in law enforcement that can be initiated by State and
local governments across the Nation as soon as the necessary resources are made
available.  Title I is a wise and useful method of providing Federal assistance to
these governments.  We urge our colleagues to take the high road of title I as the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097    Page 98

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

appropriate route toward achieving our goal of improving and strengthening law en-
forcement and bringing law and order to the Nation, and to reject the low road of
title II, a road that invites disrespect for our Government of laws and undermines
the Constitution itself, the fundamental law of the land.

DETAILED ANALYSIS

Title II of the committee print would add three new sections of title 18, United
States Code (3501-3503), and one new section (2256) to title 28, United States Code.
These sections would modify present law in five principal respects.  As described in
the following paragraphs, they are vulnerable to serious constitutional and policy
objection.

A.  CONFESSIONS-THE REPEAL OF MIRANDA

Section 3501(a) of the committee print makes voluntariness the sole criterion of
the admissibility of a confession in a Federal court.
According to the provisions of subsections (a) and (b) of section 3501, the pro-
cedure in Federal courts will be as follows:
A preliminary determination of the voluntariness of a confession will be made by
the trial judge, outside the presence of the jury (sec. 3501(a)).
**\*2211** In making his preliminary determination, the trial judge will be required to
consider all the circumstances surrounding the confession, including the following
specified factors, none of which is to be conclusive on the issue of voluntariness
(sec. 3501(b)):
 Delay between arrest and arraignment of the defendant.
 Whether the defendant knew the nature of his offense.
 Whether the defendant was aware or advised of his right to silence or that any-
thing he said might be used against him.
 Whether the defendant was advised of his right to counsel.
 Whether the defendant had the assistance of counsel during his interrogation and
confession.
If the trial judge makes a preliminary determination that a confession was volun-
tary, he must admit the confession in evidence (sec. 3501(a)).  The jury must then
hear the relevant evidence on the issue of voluntariness and determine the weight to
be accorded the confession (sec. 3501(a)).
Section 3501(a) and (b) are squarely in conflict with the Supreme Court's decision
in Miranda v. Arizona, 86 S.Ct. 1602, 384 U.S. 436 (1966), and will almost certainly
be held unconstitutional.  In Miranda, the Supreme Court held unequivocally that a
confession obtained from a defendant during custodial police interrogation could not
constitutionally be used in evidence against the defendant unless the following spe-
cific procedural safeguards were followed, based on the defendant's privilege
against self-incrimination under the fifth amendment:
 The defendant must be advised that he has a right to remain silent and that any-
thing he says may be used against him.
 The defendant must be advised that he has the right to consult with a lawyer and
to have the lawyer with him during the interrogation.
 The defendant must be advised that if he cannot afford a lawyer, a lawyer will be

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**


appointed for him.

   Although the case also held that a suspect could waive these rights, the Court
stated that a heavy burden of proof rests on the prosecution to demonstrate that the
waiver was knowing and intelligent.

   The Court emphasized in Miranda that the procedural safeguards established in the
case are in addition to the traditional voluntariness test.  Since section 3501 spe-
cifically dispenses with these safeguards and in lieu thereof establishes voluntari-
ness as the sole test of the admissibility of a confession, the section is obviously
contrary to the Constitution.

   The Supreme Court made clear in the Miranda opinion that its holding was firmly
grounded on a constitutional basis that no legislature could overrule. In both the
briefs and oral arguments in the case, the court was specifically requested to with-
hold decision until legislative bodies had a chance to act upon the issue.  The
Court replied:

   Congress and the States are free to develop their own safeguards for the priv-
ilege, so long as they are fully as effective as those described (in the Court's
holding) in informing accused persons of their right of silence and in affording a
continuous opportunity to exercise it.  In any event, however, the issues presented
are of constitutional dimensions and must be determined by the courts.  The admiss-
ibility of a statement in the face of a claim that it was **2212** obtained in viola-
tion of the defendant's constitutional rights is an issue the resolution of which
has long since been undertaken by this Court.  * * * Judicial solutions to problems
of constitutional dimension have evolved decade by decade.  As courts have been
presented with the need to enforce constitutional rights, they have found means of
doing so.  That was our responsibility when Escobedo was before us and it is our re-
sponsibility today. Where rights secured by the Constitution are involved, there can
be no rule making or legislation which would abrogate them (384 U.S.at 490-491).

   The Court's invitation in Miranda for legislatures to adopt 'other fully effective
means' to protect suspects in the free exercise of their constitutional rights of-
fers no solace to the proponents of section 3501. The provisions of that section can
hardly be characterized as 'other fully effective means,' since the means chosen by
the section are manifestly less effective than the safeguards announced in Miranda.

   Moreover, even though Congress has broad general power under the cOnstitution to
enact procedural rules governing the admissibility of evidence in Federal courts,
nothing in the Constitution gives Congress the power to adopt procedural rules that
override specific decisions of the Supreme Court interpreting the fundamental re-
quirements of the Constitution.  Simply put, Congress has the power only to expand,
not to contract or abrogate these basic guarantees.

   The fault in the Miranda decision, if any, lies not with the Supreme Court, but
with the fifth amendment itself.  Long ago, our Founding Fathers enshrined in the
Bill of Rights the ancient maxim, nemo tenetur seipsum accusare.  In the words of
the fifth amendment, no person 'shall be compelled in any criminal case to be a wit-
ness against himself.'  At the very heart of the privilege against self-in-
crimination lies one of the fundamental principles of our system of criminal
justice, that the Government must produce evidence against an individual by its own
independent labors, rather than by the cruel simple expedient of compelling it from
his own mouth.  Chambers v. Florida (60 S.Ct. 472, 309 U.S. 227, 235-238 (1940)).


© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**


As Sir James Fitzjames Stephen commented almost a century ago on the use of inter-
rogation by law enforcement officers:

There is a great deal of laziness in it.  It is far pleasanter to sit comfortably
in the shade rubbing red pepper into a poor devil's eyes than to go about in the sun
hunting up evidence (1 Stephen, 'A History of the Criminal Law in England,'  442
(1883)).

In Miranda, the Supreme Court breathed life into the privilege as applied to po-
lice interrogation.  The basic thrust of the Court's decision was to place the poor
and inexperienced suspect on an equal footing with the wealthy and most sophistic-
ated suspect by informing all suspects of their constitutional right to silence and
assuring them of a continuous opportunity to exercise it.

As Justice Walter Schaefer, of the Supreme Court of Illinois, one of our most dis-
tinguished jurists, has eloquently stated, the quality of a nation's civilization
can be largely measured by the methods it uses in the enforcement of its criminal
law.  See Schaefer 'Federalism and State Criminal **\*2213** Procedure' (70 Harv.L.Rev.
1, 26 (1956)).  To allow the Government in the administration of justice to take ad-
vantage of the ignorance or indigence of an accused would violate the most element-
ary principles of our constitutional jurisprudence.

Forty years ago, Justice Brandeis forcefully answered the recurrent argument that
the needs of law enforcement outweigh the rights of the individual.  In Olmstead v.
United States, he said:

Decency, security, and liberty alike demand that Government officials shall be
subjected to the same rules of conduct that are commands to the citizen.  In a gov-
ernment of laws, existence of the Government will be imperiled if it fails to ob-
serve the law scrupulously.  Our Government is the potent, the omnipresent teacher.
For good or for ill, it teaches the whole people by its example. Crime is conta-
gious.  If the Government becomes a lawbreaker, it breeds contempt for law; it in-
vites every man to become a law unto himself; it invites anarchy.  To declare that
in the administration of the criminal law the end justifies the means * * * would
bring terrible retribution. Against that pernicious doctrine this Court should res-
olutely set its face (277 U.S. 438, 485 (1928) (dissenting opinion)).

Contrary to the suggestion of the proponents of title II, it can hardly be said
with authority that the Miranda decision has seriously hampered law enforcement.
Essentially the same warnings required by the Supreme Court in Miranda were being
used by the FBI 14 years before the decision in that case.  As Chief Justice Warren
stated in delivering the opinion of the Court in Miranda:

Over the years the Federal Bureau of Investigation has compiled an exemplary re-
cord of effective law enforcement while advising any suspect or arrested person, at
the outset of an interview, that he is not required to make a statement, that any
statement may be used against him in court, that the individual may obtain the ser-
vices of an attorney of his own choice and, more recently, that he has a right to
free counsel if he is unable to pay * * *. (T)he present pattern of warnings and re-
spect for the rights of the individual followed as a practice by the FBI is consist-
ent with the procedure which we delineate today (384 U.S.at 483-484).

Equally important, each of the two major field studies published to date on the
impact of Miranda on law enforcement has concluded that the impact has been small
and that the decision has had little effect on police practices or the clearance of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

crime.  What is by far the most comprehensive of these studies was conducted by the
student editors of the Yale Law Journal and faculty members of the Yale Law School.
See 'Interrogations in New Haven: The Impact of Miranda' (76 Yale L.J. 1519 (1967)).
Over a period of 3 months, the Yale investigators observed every stationhouse inter-
rogation undertaken by the New Haven police force.  One of the basic conclusions
reached by the study was that interrogation of suspects by police was unnecessary in
the overwhelming majority-- 87 percent-- of the cases observed, since the police had
already obtained enough **\*2214** evidence against a suspect at the time of his arrest
to assure his conviction.  In the typical case, either the police already had enough
evidence to convict a suspect without interrogation, or they did not even have
enough evidence to arrest him in the first place.

   The second major study of the impact of Miranda was a statistical survey by two
law professors at the University of Pittsburgh Law School.  See Seeburger and Wet-
tick, 'Miranda in Pittsburgh-- A Statistical Study' (29 U. Pittsburgh L.R. 1
(1967)).  Using files made available by the Pittsburgh Detective Bureau, the authors
found that the incidence of confessions declined by almost 20 percent in the period
following the Miranda decision.  But and this is the crucial finding of the study--
the decline in the incidence of confessions was accompanied by no substantial de-
cline in the arrest rate, the conviction rate, the rate of crime clearance, or the
court backlog.

   The Yale and Pittsburgh studies point up the crucial defect in many of the studies
relied upon by the proponents of title II to support the provisions of section 3501.
It is not enough to study the impact of Miranda on law enforcement by the crude
measure of the incidence of confessions.  The real impact can be determined only by
measuring the effect on convictions and crime clearance.  By this scale, the only
true scale, the much-ballyhooed deleterious impact of Miranda on law enforcement has
been extremely small, if not illusory.

   Indeed, Miranda itself and its three companion cases [FN6] present graphic ex-
amples of the overstatement of the 'need' for confessions in law enforcement.  In
each case, law-enforcement officers had developed substantial other evidence against
the defendants before conducting the interrogations held invalid by the Supreme
Court.  Thus, Miranda, Vignera, and Westover had been identified by eyewitnesses.
Marked bills from the robbed bank had been found in Westover's car.  Articles stolen
from several robbery victims had been found in Stewart's home.

   The overstatement of the 'need' for confessions becomes even more obvious when the
subsequent history of the four Miranda defendants is considered. Miranda himself was
convicted in Arizona in February 1967 on the same two counts of kidnapping and rape
with which he was originally charged, and received the same sentence of concurrent
prison terms of 20 to 30 years on each count.  Vignera pleaded guilty in New York to
an indictment charging a lesser robbery offense, and was sentenced to a prison term
of 7 1/2 to 10 years. Westover was convicted in February 1967 on the same two counts
of bank robbery, and received the same sentence of consecutive 15-year terms on each
count. Stewart has not yet been retried on the original charges of robbery and
murder, for which he was convicted and sentenced to death.  However, a motion to
suppress evidence in the case was denied in November 1967; after several continu-
ances, the trial has been set for May 1968.

   One specter raised by the proponents of title II that is easily put to rest is the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

suggestion that Miranda and like decisions are daily releasing vicious, and con-
fessed criminals upon the public streets. This suggestion stems **\*2215** from the brief
and unfortunate period immediately following the Miranda decision.  In Johnson v.
New Jersey, 86 S.Ct. 1772, 384 U.S. 719 (1966), decided 1 week after Miranda, the
Supreme Court held that the rules approved in Miranda, would apply to all defendants
tried after June 13, 1966, the date of the Miranda decision.  Thus, in a number of
cases awaiting trial at that time, seemingly voluntary confessions obtained prior to
the date of Miranda were inadmissible in evidence, and some cases involving heinous
crimes were dismissed, amid great publicity.  That situation was temporary, however,
and is no longer a serious problem.  So long as the procedures of Miranda are fol-
lowed, any truly voluntary confession can still be made and will still be admissible
in evidence.  As the studies of the impact of Miranda suggest, most of the confes-
sions lost in the wake of Miranda could today be saved.

   Yet another specter raised by the committee majority must also be laid to rest.
The suggestion is made that the harmful effect of Miranda will be compounded as the
lower Federal courts expand its doctrine and extend its interpretation.  Nearly 2
years of judicial experience under Miranda in the Federal courts of appeal have
proved this suggestion false.  The trend of cases to date shows a strong reluctance
by the Federal courts to apply the requirements of Miranda except in obvious in-
stances of formal custodial interrogation.  If anything, the definition of custodial
interrogation in Miranda as 'Questioning initiated by law enforcement officers after
a person has been taken into custody or otherwise deprived of his freedom in any
significant way' is receiving a highly restrictive interpretation. See, for example,
O'Toole v. Scarfati, 386 F.2d 168 (1st Cir. 1967) (statement to prosecutor by city
official given chance to explain deficiencies held inadmissible); United States v.
Adler, 380 F.2d 917 (2nd Cir. 1967) (volunteered statements to FBI agent examining
books of suspect's corporation held admissible); United States v. Gibson, 4th Cir.
(March 1, 1968) (discussion of stolen car by defendant after State police officer
asked him to step outside held admissible); Yates v. United States, 384 F.2d 586
(5th Cir. 1968) (statements made to hotel manager holding suspect in conversation
pending arrival of FBI held admissible; United States v. Agy, 374 F.2d 94 (6th Cir.
1967) (incriminating reply to question asked by alcohol tax agent held admissible);
United States v. Holmes, 387 F.2d 781 (7th Cir. 1968) (statement to selective ser-
vice clerk held admissible); Frohmann v. United States, 380 F.2d 832 (8th Cir. 1967)
(statement to internal revenue agent making criminal investigation held admissible);
Williams v. United States 381 F.2d 20 (9th Cir 1967) (false statements to border-
crossing guards held admissible); Mares v. United States, 383 F.2d 811 (10th Cir.
1967) (statement to FBI by suspect free to leave held admissible); Allen v. United
States, D.C.Cir. (Jan. 25, 1968); (statement made during detention after failure to
produce auto registration held admissible).

             B.  CONFESSIONS-THE REPEAL OF 'MALLORY'


   Section 3501(c) of the committee print specifies that a confession shall not be
inadmissible in evidence in a Federal court solely because of delay between the ar-
rest and arraignment of the defendant.
   **\*2216** Subsection (c) is obviously intended to repeal the decision of the Supreme

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

Court in Mallory v. United States, 77 S.Ct. 1356, 354 U.S. 449 (1957).  In Mallory,
the Court held that if an arrested person is not taken before a magistrate or other
judicial officer 'without unnecessary delay,' as required by rule 5(a) of the Feder-
al Rules of Criminal Procedure, any confession obtained during the period of delay
is inadmissible in evidence in a Federal court.

   Section 3501(c) will inevitably encourage prolonged and indefinite incarceration
and interrogation of suspects, without opportunity to consult with friends, family,
or counsel.  Unlike the recently enacted District of Columbia Crime Act, section
3501(c) fails to provide any time limit whatsoever on the period during which inter-
rogation may take place.  The District of Columbia Crime Act provides a maximum
3-hour period for interrogation after which a person may be released without charge
and without an arrest record.

   Rules prohibiting unnecessary delay between arrest and arraignment are based on
sound law enforcement policy.  Prompt arraignment of arrested persons is necessary
in a free society which values the fair administration of criminal justice.  Pro-
longed incarceration and interrogation of suspects, without giving them the oppor-
tunity to consult with friends, family, or counsel, must be condemned.  Yet, it is
precisely such incarceration and interrogation that are countenanced by the commit-
tee print.  In effect, section 3501(c) would leave the 'without unnecessary delay'
provision of rule 5(a) of the Federal Rules of Criminal Procedure as a rule without
a remedy.

                C.  EYEWITNESS TESTIMONY-THE REPEAL OF 'WADE'

   Section 3503 of the committee print makes eyewitness testimony that a defendant
participated in a crime admissible in evidence in any Federal court.

   Section 3503 is squarely in conflict with the Supreme Court's decisions in United
States v. Wade, 87 S.Ct. 1926, 388 U.S. 218 (1967), Gilbert v. California, 87 S.Ct.
1951, 388 U.S. 263 (1067) and Stovall v. Denno, 87 S.Ct. 1967, 388 U.S. 293 (1967).
In Wade and Gilbert, the Supreme Court held that a pretrial lineup at which a de-
fendant is exhibited to identifying witnesses is a critical stage of a criminal pro-
secution, and that the defendant is constitutionally entitled to the assistance of
counsel at the lineup.  In Stovall, the Court held that, even though the Wade de-
cision was not to be applied retroactively, [FN7] lineups in pending cases must
still satisfy the requirements of the due process clause.

   For essentially the same reasons stated in part A, supra, section 3503 will almost
certainly be held unconstitutional.  The section dispenses with **\*2217** the procedural
safeguards established in Wade for police lineups and is therefore in clear conflict
with the requirements of the Constitution announced by the Supreme Court.  In addi-
tion, section 3503 does not even attempt to establish effective alternative safe-
guards for lineups in lieu of the requirements of Wade.  Instead, the section is a
blanket provision making eyewitness testimony admissible in all circumstances,
whether or not even the most fundamental and time-honored requirements of due pro-
cess have been met in the identification, let alone the requirements of the right to
counsel under the sixth amendment.

   In the Wade decision itself, the Supreme Court discussed at length the grave po-
tential for prejudice and miscarriage of justice inherent in lineup procedures.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:07-cv-02538-VRW     Document 5     Filed 06/23/2007     Page 217 of 303
S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**


Eyewitnesses to crimes are notoriously subject to mistaken identification.  Fre-
quently, their opportunity for observation at the time of the crime was insubstan-
tial.  At the lineup, they are highly susceptible to suggestion, whether intentional
or not, based on the manner in which the prosecutors or police present the suspect
for identification.  Where the victim himself is the witness, the hazard to object-
ive identification is even further increased, because of the turbulent and possibly
vengeful emotional attitude of the witness.

  One expert authority quoted by the Supreme Court has given graphic examples of
cases in which grossly unfair lineups were conducted.

  In a Canadian case * * * the defendant had been picked out of a lineup of six men,
of which he was the only Oriental.  In other cases, a black haired suspect was
placed in a group of light-haired persons, tall suspects have been made to stand
with short nonsuspects, and in a case where the perpetrator of a crime was known to
be a youth, a suspect under 20 was placed in a lineup with five other persons, all
of whom were over 40 (Wall, 'Eyewitness Identification in Criminal Cases,' 53).

  Once an eyewitness has picked out a suspect from a lineup, the witness easily be-
comes committed to the identification and is unlikely to go back on his word at tri-
al.  The requirement of Wade that a suspect is entitled to the presence of counsel
at a lineup is well-calculated to eliminate the possibility that unfair procedures
will lead to mistaken eyewitness identifications or the conviction of innocent per-
sons.

  At the same time, the requirement of Wade is unlikely to cause an undue burden on
law enforcement.  The Supreme Court suggested that a variety of procedures could
conveniently be used by law enforcement officers to assure fair and impartial
lineups.  It also suggested appropriate alternative procedures that could be used in
circumstances where the presence of a suspect's counsel at a lineup was likely to
cause prejudicial delay or obstruction of the confrontation.

  The Wade opinion thus offers workable guidelines for achieving a reasonable acco-
modation between the needs of law enforcement and the rights of persons accused of
crime.  So far as we are aware, no study has yet been made of the impact of Wade on
law enforcement.  Moreover, as is demonstrated by the recent decision of the Supreme
Court in Simmons v. United States (decided March 18, 1968), the Court has granted
broad leeway for the needs of law enforcement in areas related to lineups.  In **2218**
Simmons, the Court refused to apply the requirements of Wade to circumstances in
which eyewitnesses are shown photographs of suspects by the police.  The Court re-
cognized that photograph identification procedures are widely and effectively used
in law enforcement and held only that such procedures must meet the elementary re-
quirements of due process of law-- that is, that the procedures are invalid only if
they are 'so impermissibly suggestive as to give use to a very substantial likeli-
hood of irreparable misidentification'  (slip opinion, pp. 5-6).

  In these circumstances, therefore, we believe that precipitous legislative action
overruling Wade would be not only unconstitutional, but unwise and highly premature
as well.


                    D.  FEDERAL COURT JURISDICTION


  Section 3502 of the committee print abolishes the jurisdiction of the Supreme

                  © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**


Court and other Federal courts to review a State trial Court's determination that a
confession was voluntary, provided that the State court's determination has been up-
held by the highest State court having appellate jurisdiction over the case.

  Section 3503 of the committee print goes even further.  Not only does it abolish
the jurisdiction of the Supreme Court and other Federal courts to review a State
trial court's determination that eyewitness testimony was admissible in evidence.
It also abolishes the appellate jurisdiction of both the Supreme Court and the Fed-
eral courts of appeals to review a Federal trial court's determination that such
testimony was admissible.

  Under the present law, the Supreme Court has appellate jurisdiction over all cases
in the lower Federal courts.  The Supreme Court also has appellate jurisdiction over
cases in the State courts raising a Federal question (28 U.S.C. 1251 et seq.).

  Sections 3502 and 3503 drastically curtail the appellate jurisdiction of the Fed-
eral courts over determinations involving the voluntariness of a confession or eye-
witness testimony.  Any attempt by Congress to accomplish this result by statute,
rather than by constitutional amendment is open to constitutional challenge.  The
sections raise especially grave questions with respect to State court determinations
in these areas, since no Federal review whatsoever would be available, even though a
Federal claim has obviously been raised.

  The supremacy clause, in article VI of the Constitution, states that the Constitu-
tion and laws of the United States 'shall be the Supreme Law of the Land.'  At least
since the time of Marbury v. Madison, 1 Cranch 137 (1803), and Martin v. Hunter's
Lessee, 1 Wheat. 203 (1816), the Supreme Court has been the sole tribunal under the
Constitution with ultimate authority to resolve inconsistent or conflicting inter-
pretations of Federal constitutional law by State and Federal courts and to maintain
the supremacy of Federal law against conflicting State law.

  Although article III, section 2 of the Constitution provides that the appellate
jurisdiction of the Supreme Court is created 'with such Exceptions, and under such
Regulations as the Congress shall make,' the exercise by Congress of such power must
be consistent with the fundamental role of the Supreme Court in our Federal system.
The exceptions and regulations **\*2219** clause does not give Congress the power to ab-
olish Supreme Court review in all cases involving a particular issue, whether con-
fessions, eyewitness testimony, or any other.  To interpret the clause otherwise
would deny the long accepted power of ultimate resolution of constitutional ques-
tions by the Supreme Court.  It would radically alter our established legal system
by nullifying the supremacy clause and destroying the essential role of the Supreme
Court as the principal instrument for implementing that clause in our constitutional
system.

  The unconstitutionality of sections 3502 and 3503 is forcefully and concisely
urged in Hart and Wechsler, 'The Federal Courts and the Federal System' (312
(1953)), and Ratner, 'Congressional Power Over the Appellate Jurisdiction of the Su-
preme Court.'  (109 U.Pa.L.Rev. 157 (1960)).  Although the Supreme Court itself has
never been specifically called upon to determine the validity of a blanket exclusion
of appellate jurisdiction over particular issues, we have little doubt as to the un-
constitutionality of these provisions.  In every case raising the issue, the Court
has either found no limitation on its jurisdiction or upheld a limitation which did
not seriously impair its jurisdiction. The leading case is Ex parte McArdle, 7 Wall.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**


586 (1868), in which the Court upheld an act of Congress removing Supreme Court jur-
isdiction over appeals from lower court decisions denying habeas corpus relief. The
Court made clear, however, that the statute did not affect its power to review such
decisions by issuing a writ of habeas corpus in its original jurisdiction.  Thus,
for example, in Ex parte Yerger, 8 Wall. 85 (1869), decided a few months after the
McArdle case, the Court reviewed on a petition for an original writ of habeas cor-
pus, a lower court decision denying habeas corpus relief.  In the Yerger case, the
Court specifically indicated that Congress could not constitutionally abolish all
appellate jurisdiction of the Supreme Court.

   Moreover, even though Congress may have some general power under the exceptions
and regulations clause to withdraw Federal appellate jurisdiction to review consti-
tutional questions in certain areas of the law, Congress surely cannot dilute or ab-
rogate existing constitutional guarantees in the guise of exercising such power.
See United States v. Klein, 13 Wall. 128 (1872).  It is obvious that sections 3502
and 3503 dealing with Federal appellate jurisdiction are intended by the committee
majority as part of a single inseparable plan to accomplish the legislative overrul-
ing of the Miranda and Wade decisions.  As such, the sections will almost certainly
be declared unconstitutional along with the substantive provisions of sections 3501
and 3503 discussed in part A and part C, supra.

   Apart from the issue of the constitutional validity of legislation by Congress to
eliminate the appellate jurisdiction of the Supreme Court over particular issues,
enactment of such legislation would be extremely unwise, as a matter of policy, for
several reasons.

   1.  Abolition of Supreme Court jurisdiction by Congress would seriously distort
the delicate balance that is maintained between the three branches of Government in
our federal system.  The exercise by Congress of an ultimate power such as abolition
of Supreme Court jurisdiction would cause the sort of basic confrontation between
court and legislature that should be avoided at all costs if possible. Sections 3502
and 3503 are attacks on **\*2220** the Supreme Court even more drastic and extensive than
the infamous Court-packing plan of the 1930's.

   3.  Experience has shown that the Federal courts, and especially the Supreme
Court, perform an important and useful function in reviewing State criminal convic-
tions in the area of confessions.  A long line of confessions cases in the Supreme
Court, extending back many years before the present controversy over Miranda, points
up the fact that there have been numerous occasions in the past when State courts
have not effectively protected the constitutional rights of accused persons.

   4.  By abolishing the appellate jurisdiction of the Supreme Court, Congress will
reduce the Constitution and laws of the United States to a hodgepodge of inconsist-
ent decisions.  The 50 State courts and 94 Federal district courts will become the
final arbiters of the meaning of the Constitution and laws of the United States.  As
Hamilton eloquently stated in The Federalist, No. 80, 'The mere necessity of uni-
formity in the interpretation of the national laws decides the question.  Thirteen
independent courts of final jurisdiction over the same causes, arising upon the same
laws, is a hydra in government, from which nothing but contradiction and confusion
can proceed.'

                              E.  HABEAS CORPUS


                   © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**


   Section 2256 of the committee print abolishes the habeas corpus jurisdiction of
the Federal courts with respect to State criminal convictions. Under this section,
the sole Federal review of Federal claims by State prisoners will be limited to ap-
peal or certiorari to the Supreme Court from the highest State court having appel-
late jurisdiction over the case.

   As in the case of sections 3502 and 3503 described in part D, supra, section 2256
is open to serious constitutional attack.

   The Constitution specifically provides that 'The Privilege of the Writ of Habeas
Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the
public Safety may require it.'  Since 1867, as we discuss in greater detail below,
Congress has made the Federal writ of habeas corpus available to all persons, in-
cluding State prisoners, restrained of their liberty in violation of the Constitu-
tion or laws of the United States. Although the constitutional provision prohibiting
suspension of the writ of habeas corpus does not of itself confer jurisdiction on
any Court to issue the writ, decisions of the Supreme Court make clear that once
Congress has granted jurisdiction to the Federal courts to issue the writ, the jur-
isdiction cannot be withdrawn except in cases of rebellion or invasion.  Thus, in
United States v. Hayman, 72 S.Ct. 263, 342 U.S. 205 (1952), in which the Court up-
held the validity of the alternative method of collateral attack required under 28
U.S.C. 2255 for Federal prisoners, the Court emphasized that nothing in the legis-
lative history of section 2255 disclosed any purpose to infringe upon a prisoner's
right of collateral attack upon his conviction.  The Court specifically held that
the sole purpose of the section was to minimize difficulties encountered in habeas
corpus hearings by providing the same rights through an alternative and more con-
venient procedure, and that the section did not operate to suspend the writ of
habeas corpus.

   **\*2221** Even apart from consideration of constitutionality, however, the elimination
of Federal habeas corpus jurisdiction is open to grave objection on the grounds of
both history and policy.

   The writ of habeas corpus, the great writ, is one of the ancient pillars of
Anglo-American law.  Blackstone called it 'the most celebrated writ in English law'
(3 Blackstone's Commentaries 129). (See also 9 Holdsworth, 'History of English Law'
(108-125 (1926)), and United States v. Hayman, supra.)  Power to issue the writ was
first granted to the Federal courts, as early as the Judiciary Act of 1789 (1 Sta.
73, 81-82).  At that time, however, the common law rule governing issuance of the
writ held that a judgment of conviction rendered by a court of general criminal jur-
isdiction was conclusive proof that confinement was legal.  In addition, even where
the writ was available the common law rule permitted an inquiry only into the law,
not the facts of a detention.

   In 1867, Congress modified the common law rule by making the Federal writ of
habeas corpus available to all persons, including State prisoners, restrained of
their liberty in violation of the Constitution or laws of the United States, and by
permitting inquiry into both the facts and the law of the detention (14 Stat. 385,
now incorporated in 28 U.S.C. 2241 et seq.).  Thus, in all cases in which a full and
fair disposition of a Federal claim has not been reached in a State court, the Fed-
eral courts are available as an alternative forum through their habeas corpus juris-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097                                                      Page 106
S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

diction to test the legality of the prisoner's confinement.

For a hundred years, the Federal courts have vindicated the basic constitutional
rights of American citizens through habeas corpus proceedings, frequently after
blatant denials of such rights have gone uncorrected in the State courts. Many of
the great principles of American constitutional law have been established in such
proceedings. (See, for example, Moore v. Dempsey, 43 S.Ct. 265, 261 U.S. 86 (1923)
(mob domination of a trial); Mooney v. Holohan, 55 S.Ct. 340, 294 U.S. 103 (1935)
(knowing use of perjured testimony by the prosecution); and Gideon v. Wainwright,
835 S.Ct. 792, 372 U.S. 335 (1961) (right to appoint counsel in criminal trials.))

Equally important, the provisions in section 2256 for Federal review of State
criminal convictions by appeal or certiorari to the Supreme Court are grossly inad-
equate. As is well known, both of these appeal procedures are largely and necessar-
ily discretionary in the Supreme Court. The Supreme Court simply does not have the
time to consider thoroughly all the appeals and petitions for certiorari that are
filed. To make these procedures the sole avenue for Federal review will, at best,
cause the Supreme Court to accept for review many questionable cases on poor factual
records, since this would be the Court's sole opportunity to review the Federal
questions in the case. At worst, section 2256 will deny many State prisoners even
one full and fair review in a Federal court of their constitutional claims. In ad-
dition, section 2256, taken in conjunction with the provisions of sections 3502 and
3503 abolishing the appellate jurisdiction of the Supreme Court with respect to is-
sues involving the voluntariness of confessions or the conduct of lineups, means
that no Federal review whatsoever will be available to State defendants raising such
issues, no matter how meritorious their Federal constitutional claims.

**\*2222** Because of their number and their ability as trial courts to hold hearings
and make findings, the Federal district courts are uniquely suited to review the
disposition of Federal claims in State courts. See, e.g., Wright and Sofaer, 'Feder-
al Habeas Corpus Jurisdiction for State Prisoners: The Allocation of Fact-Finding
Responsibility' (75 Yale L.J. 894-985 (1966).)

It is regrettable that the highly charged emotional atmosphere in which the cur-
rent debate over Federal habeas corpus for State prisoners is taking place obscures
the single most salient fact of the procedure applicable under present law. In
Townsend v. Sain, 83 S.Ct. 745, 372 U.S. 293 (1963), the Supreme Court held unequi-
vocally that State court findings of fact, arrived at after full and fair hearings,
must be accepted by Federal courts. A Federal habeas corpus hearing is not avail-
able merely because a State prisoner has been convicted of a serious offense. It is
not available merely to reevaluate the evidence obtained at a full and fair State
proceeding, or because a Federal district judge may disagree with the State court's
evaluation of such evidence. Under the specific doctrine of Townsend v. Sain, Fed-
eral habeas corpus is available only when the State trier of fact has not afforded
the habeas applicant a full and fair hearing. The Townsend doctrine recognizes the
basic importance in our Federal system of allocating the primary factfinding re-
sponsibility to the State courts in cases involving State criminal proceedings. At
the same time, it preserves the important role of the Federal review of Federal
claims raised in State courts.

A hundred years of experience under the Federal habeas corpus provisions force-
fully demonstrate that absolute reliance on State courts to protect Federal rights

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**


does not adequately protect these rights.  To abolish this jurisdiction would roll
back a century of progress in American constitutional law and restore American crim-
inal procedure to the dark ages of the early 1900's.


     JOSEPH D. TYDINGS.

     THOMAS J. DODD.

     PHILIP A. HART.

     EDWARD V. LONG.

     EDWARD M. KENNEDY.

     QUENTIN N. BURDICK.

     HIRAM L. FONG.

     INDIVIDUAL VIEWS OF MR. LONG OF MISSOURI AND MR. HART IN OPPOSITION TO TITLE
                                 III OF S. 917


   We object most strenuously to title III of S. 917, dealing with wiretapping and
other forms of electronic eavesdropping (popularly known as 'bugging').
   In our view, title III of S. 917, as reported, is unconstitutional, as it provides
for unreasonable searches and seizures.  However, even if the constitutional defects
could and would be corrected, we would oppose it equally as much on purely policy
grounds.
   **\*2223** The Congress had debated similar bills to legalize wiretapping and bugging
for 40 years and, until the present, rejected each and every one as providing for
serious and unwarranted invasions of personal privacy.  Now, through the mistaken
idea that limited wiretapping and bugging will (1) help stamp out organized crime
and (2) help eliminate crime in the streets, Congress is asked to sell its soul for
a mess of porridge.
   The hard truth of the matter is that limited eavesdropping is neither sought nor
particularly helpful in the fight against organized crime.  What would help is un-
limited surveillance.  As proof, look at New York which has had limited wiretap and
eavesdrop for decades, and which has as much organized crime as almost any city in
the country. The vast majority of the fish in the New York wiretap net are petty
gamblers, and relatively few of them go to jail.
   As to crime in the streets, the talk of electronic eavesdropping being helpful to
the police is ludicrous.  Who ever heard of a purse-snatcher or rapist planning his
crime so as to be caught by wiretap or bugging.  The proponents are using crime in
the streets as nothing more than a red herring. If we are to really do something
about crime in the streets, we must get at its roots-- poverty and ignorance-- not
legalize wiretapping.
   George Orwell's 'Big Brother' is well on his way technologically. Do we want to
speed his arrival legally by sanctioning use of his tools, especially when their ap-
plication will have little or no effect in lessening crime?


© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097    Page 302
S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

RIGHT OF PRIVACY ACT OF 1967

(S. 928)

The administration's Right of Privacy Act of 1967 (S. 928), which outlaws elec-
tronic eavesdropping except in national security cases, was introduced on February
8, 1967, sponsored by 21 Senators.  The bill was referred to the Subcommittee on Ad-
ministrative Practice and Procedure and hearings were held on 10 different days
between March 20 and May 19, 1967, during which 41 witnesses were heard.  Thirty-
five days of hearings, involving over 200 witnesses, had previously been held relat-
ing to invasions of privacy by Federal and other agencies, particularly through the
use of wiretapping and eavesdropping.

Our conclusions, as a result of these extensive hearings, are as follows:
wiretapping and bugging, with rare exception, are currently illegal as well as un-
constitutional; both are repugnant to our historical concepts of privacy; both are
repugnant to our concepts of justice and fairplay for all, guilty and innocent
alike.  It is this repugnance that has caused these activities to be cloaked in
secrecy.

The subcommittee has encountered instance after instance where otherwise honest
and decent law enforcement officials have dishonestly denied or withheld the fact
that their investigations involved the use of wiretapping or bugging. In the last 2
years, we have been treated to the spectacle of the Solicitor General of the United
States going before the Supreme Court to disclose that a number of convicted defend-
ants had been the subject of electronic eavesdropping-- a fact not disclosed to the
Department of Justice until after that Department had obtained convictions.

**\*2224** Two hundred and forty-three witnesses have appeared before the subcommittee
and several times that number have been interviewed.  Some were engaged in wiretap-
ping and bugging; others were its victims.  From their testimony, several conclu-
sions are inescapable:

(1)  Whether wiretapping and bugging are legal or illegal, constitutional or un-
constitutional, they are essentially a form of 'peeping tomism' and repugnant to men
of good conscience;

(2)  Notwithstanding the personal reluctance to admit such activity, the activity
itself, in order to be effective, must remain secret and covert just as all spying
activities must be and must remain surreptitious;

(3)  Either by reason of personal embarrassment or for reasons of deception, evid-
ence or leads to evidence are disguised so as to conceal the fact that such were ob-
tained by 'peeping' upon the conversations of the suspect or his associates;

(4)  No matter how circumscribed the 'peeping,' conversations of innocent parties
are invariably listened to and recorded.

The above observations explain why all legislation offered by the proponents of
legalized eavesdropping draft such legislation to provide ex parte proceedings in
obtaining court sanction and thereafter the withholding from the suspect the fact
that he was the victim of such techniques.

The administration's bill (S. 928) would prohibit all forms of electronic eaves-
dropping, private and law enforcement alike, except when authorized by the President
in cases involving the national security and in such cases no evidence thus obtained

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

could be used in any civil or criminal proceeding.  In our view, this is a good bill
and should be passed; it would preserve the modicum of privacy that progress has
left to us, while at the same time permitting the President to use whatever tools he
needs in the interest of national security.

                SAFE STREETS AND CRIME CONTROL ACT OF 1967

                             (S. 917)

   Title III of the Safe Streets and Crime Control Act of 1967 (S. 917), as amended
and adopted by the Committee on the Judiciary, sanctions electronic eavesdropping in
instances where any court has approved their use.   Thus, title III would for the
first time legalize the use of wiretapping and bugging as a legitimate law enforce-
ment technique incorporating, of necessity, the proposition that what the courts
have heretofore abhorred is not so abhorrent if there is legislative sanction.

   Let us examine what appears to be a 'little bit' of an invasion of privacy.  Fed-
eral and State law enforcement agencies are to be provided with a procedure under
which they may obtain court authorized approval to wiretap or eavesdrop where 'a
crime has been, is being, or is about to be committed.'  The subcommittee on Admin-
istrative Practice and Procedure is yet to hear a single witness testify to the ef-
fect that wiretapping or eavesdropping would contribute one iota to the prevention
or prosecution of those crimes of violence against persons or property which consti-
tute the major percentage of 'crime in the streets.'  As to such crimes as are **2225**
about to be committed, we lack the speculative ability to make practical use of the
proposed statute-- except possibly for invading individual privacy in the random
collection of criminal intelligence.

   Section 2518(10)(a) of the proposed statute would permit an  'aggrieved person' in
any trial the right to suppress the contents of any intercepted wire or oral commu-
nication, or evidence derived therefrom, on certain specified grounds, while section
2510(11) defines an 'aggrieved person ' as one who 'was a party to any intercepted
wire or oral communication or a persons against whom the interception was directed.'
There is no pretense of affording by way of suppression or otherwise for the person
'who was the subject of the conversation.' Hence, the proposed legislation legitim-
izes a practice of law enforcement now banned by the courts.

   In order to understand the import of this 'loop hole,' let us consider A and B who
are alleged to be bookmakers.  A's and B's premises are bugged and their telephones
are tapped under the authority of the proposed statute on the grounds that there is
probable cause for belief that A and B are committing a crime.  In the course of the
surveillance, numerous leads are obtained which, in turn, provide independent evid-
ence connecting X and Y with a different crime.  It subsequently develops that
neither A nor B were involved in any criminal activity-- in fact, that there never
was probable cause for such a belief in the first instance.  However, X and Y are
brought to trial.  Neither have any relief under the proposed statute, either by way
of suppression or civil damages.  Assume, further, that X and Y were engaged purely
in political activities, that such political activities had as its objective the re-
moval of the corrupt chief of police who sought and obtained the spurious tap and
bug on A and B. The suspected public official has in his possession evidence relat-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097
S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

ive to X and Y that he may use in such a manner as he chooses, all lawfully acquired
through wiretapping and eavesdropping.

'Law enforcement' includes a number of functions, but principally it includes the
investigation of crimes committed and thereafter the prosecution of the suspect,
when apprehended.  The investigation of crimes normally presupposes that a crime has
been or is being committed.  That is the historical proposition.  In any event, pro-
secution essentially requires the 'crime complete' although it may encompass a con-
spiracy where only a single act in pursuit of the conspiracy may have been committed
while the final objective of the conspiracy is still remote in time.  The modern
concern of many law enforcement agencies has been to concentrate upon crimes which
are in a continuous process of commission or are about to be committed.  The latter
is of gravest concern to those who challenge 'organized crime,' a term which they
apply to that nationwide criminal conspiracy which transcends State boundaries,
which touches every citizen, and which deals chiefly in gambling, narcotics, prosti-
tution, and loan sharking.

Traditional military intelligence has furnished this group of law enforcement of-
ficials with both the vocabulary and the tools by which it wages constant war upon
the sophisticated but sinister barbarians of our times.

**\*2226** Essentially the attack involves the collection of 'criminal intelligence'
through the use of informants, undercover agents, and electronic surveillance.  The
product of this effort is thousands of bits of information all theoretically capable
of being woven into the clearly identifiable fabric of criminal activity.  Yet there
is no ascertainable relationship or ratio between the thousands of man-hours and
dollars involved in this activity and the convictions which it produces.

In the terms of convenience, electronic surveillance has no peer. Hundreds of
,omes and offices, and thousands of telephone conversations can be monitored from
the comfort of the agency's offices miles away. It is small wonder that it is so
tenaciously fought for by its adherents.  One is often reminded of the story about
the poor unfortunate who lost his dime one night on a darkened street but searched
for it at the next corner where the street lamp furnished better light.  We are in-
clined to adopt the Attorney General's public view that there is no substitute for
good old-fashioned police work and that his restrictions on the use of electronic
devices has not hampered the Department of Justice's drive on organized crime.

The subcommittee's investigations of criminal intelligence-gathering activities
disclosed that almost every metropolitan police department and almost every major
State has a bureau engaged exclusively in the collection of criminal and political
intelligence.  It was particularly interesting to find that these bureaus had no
direct responsibility to investigate any specific crimes.  Such responsibilities
were assigned to and ably performed by the detective, homicide, vice, and other bur-
eaus, while crimes in the street were directly handled by the patrolman on the beat
or in the police cruiser.  The number of files and the quantity of information
gathered by these intelligence bureaus is appalling.  A computerized consolidation
of all such information could certainly make available some sort of information on
almost 9 out of every 10 citizens in the country.  Much of this information has been
obtained through illegal, unconstitutional, and unconscionable electronic eavesdrop-
ping.  Since the improper use of the proposed legislation will never be discovered
unless the evidence is produced in a criminal proceeding, there is no reason to be-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

lieve that these agencies will not, in time, achieve the perfection of 10 out of 10.

CONCLUSION

Most of the countries of the world have a 'Big Brother' to watch over them.
So far, America has been fortunate enough to avoid such a form of government.
But, as Sinclair Lewis said, 'It Can Happen Here.'
Technology is Big Brother's right hand, especially electronic technology.  Nowhere
has such technology outrun the United States.  In being and on the drawing board, we
have marvels of electronic eavesdropping.
There is no good reason why Congress should join technology in speeding the ar-
rival of Big Brother.
To the contrary, we should continue our historic course of resisting invasions of
privacy.
**\*2227** Constant surveillance of citizens by the State may be inevitable, but we
need not lend a hand to the process.  Little enough privacy remains today.  There-
fore, we are implacably opposed to passage of title III of S. 917.

EDWARD V. LONG.

PHILIP A. HART.

ADDITIONAL VIEWS OF MR. HART ON TITLE III OF S. 917

As do Senators Burdick, Fong, and Long, I strongly oppose passage of title III,
which authorizes Federal and State law enforcement wiretapping and eavesdropping for
a wide range of crimes.

A.   CONSTITUTIONAL ISSUE

First, I have serious doubts about the constitutionality of title III.  Proponents
of title III cite the recent Supreme Court eavesdropping decisions in Katz v. United
States, 88 S.Ct. 507, 389 U.S. 347 (1967) and Berger v. New York, 87 S.Ct. 1873, 388
U.S. 41 (1967) for the proposition that Congress now has the constitutional green
light to pass a court-ordered eavesdropping statute such as title III.
While mindful of the quote attributed to Chief Justice Hughes that 'the Constitu-
tion is what the judges say it is,' I believe a close reading of the Supreme Court's
recent eavesdropping decisions in these two cases casts considerable doubt on the
constitutionality of title III of S. 917.

1.   BERGER v. NEW YORK, 87 S.Ct. 1873, 388 U.S. 41 (1967)

The Supreme Court by a 6 to 3 decision reversed the conviction of Ralph Berger who
had been convicted of conspiracy to bribe the chairman of the New York Liquor Au-
thority.  Evidence for conviction was obtained by eavesdropping authorized by a New
York statute (N.Y.Code Criminal Procedures 813-a) permitting law enforcement eaves-
dropping for up to a 2-month period.
The Supreme Court held that the language of the New York law was too broad, res-
ulting in a trespassory intrusion into a constitutionality protected area in viola-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097
S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

tion of the fourth and 14th amendments. The Court specifically held that the provision in the New York statute authorizing eavesdropping for a 1-month period was unconstitutional. According to the Court, such eavesdropping is the equivalent of a series of intrusions, searches, and seizures pursuant to a single showing of probable cause. During such a long and continuous (24 hours a day) period, the conversation of any and all persons coming into the area covered by the eavesdropping device are seized indiscriminately and without regard to their connection with the crime under investigation (388 U.S.at 59).

2. KATZ v. U.S., 88 S.Ct. 507, 389 U.S. 347 (1967)

Six months after Berger v. New York, the Supreme Court set aside a conviction based on evidence obtained from a bug placed by FBI agents on two public telephones that Katz habitually used.

**\*2228** In many ways the Katz decision represented a major victory for privacy. First, the Supreme Court finally overruled Olmstead v. U.S., 48 S.Ct. 564, 277 U.S. 438 (1928), which had denied fourth amendment protection to eavesdropping which did not physically penetrate one's premises. Katz thus brought wiretapping clearly within the fourth amendment's prohibition against 'unreasonable searches and seizures'-- thus impliedly requiring the exclusion from State courts of wiretapping evidence obtained in an unconstitutional manner.

Further, in Katz the Supreme Court discarded the 'constitutionally protected areas' doctrine under which unlimited eavesdropping had been permitted in such places as prison visiting rooms because such rooms had been deemed unprotected areas. Instead the Court held that the correct rule is 'what (a person) seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected.'

It is true that the Court in Katz stated that had the eavesdropping been conducted pursuant to a court order, it would have been sustained (389 U.S. 347, 359&. Nothing in Katz, however, supports the broad provisions of title III.

Katz involved that rare situation where electronic eavesdropping could be limited, not only with respect to time and place, but also to a specific person or persons and specific conversations. In Katz, FBI agents had established that Katz was in the habit of using certain public telephones at a certain location at a certain time to transmit wagering information. The FBI agents, therefore, installed a bug on the phone booth which was activated only when Katz entered the booth. The bug caught only KatZ's end of the conversation and was turned off when he left.

In approving this kind of eavesdropping the Court emphasized that no conversations of innocent persons were overheard. It noted that 'on the single occasion where the statements of another person were inadvertently intercepted, the (FBI) agents refrained from listening to them' (389 U.S. 347, 354). The Supreme Court placed particular emphasis on the extremely narrow circumstances under which the surveillance in Katz was conducted:

Accepting this account of the Government's actions as accurate, it is clear that this surveillance was so narrowly circumscribed that a duly authorized magistrate * * * clearly apprised of the precise intrusion could constitutionally have authorized, with appropriate safeguards, the very limited search and seizure that the Gov-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097
S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

ernment asserts in fact took place (at 354).

Katz thus permits eavesdropping in one of the rare situations where it can be carefully circumscribed-- a bug activated only when the suspect uses the 'bugged' premises and recording only particular conversations of the suspect. Supreme Court approval of such a narrowly circumscribed eavesdropping situation as Katz does not imply approval of a 30-day bug on a house or office (as is provided by title III), where many innocent people congregate to talk about many innocent things.

Katz is thus consistent with the language and tone of Berger, which disapproved the indiscriminate seizure of the conversations of innocent people when a bug is in continuous operation in an area during any lengthy **\*2229** period of time (388 U.S.AT 59).   Indeed, in both Berger and Katz the Court cited examples of narrowly circum- scribed electronic eavesdropping which it had approved in prior decisions.   As stated in Berger:

This Court has in the past, under specific conditions and circumstances, sustained the use of eavesdropping devices.  See Goldman v. U.S., supra; On Lee v. U.S., supra; Lopez v. U.S., supra; and Osborn v. U.S., supra (388 U.S.at 63).

These four eavesdropping cases cited approvingly by the Court in  Berger involved, as did Katz, very circumscribed eavesdropping.  In Goldman, an FBI detectaphone was installed to overhear four conversations to which an FBI informer was a party.  In On Lee an informer wore a radio transmitter for his conversation with a specific suspect.  In both Lopez and Osborn the Supreme Court upheld the use of an eavesdrop- ping device wired to an informer and used to record the informer's conversations with a suspect.  In each of these four cases, as in Katz, the eavesdropping the Su- preme Court approved was carefully circumscribed and limited to specific conversa- tions which the eavesdropper knew would take place.

The eavesdropping and wiretapping authorized by title III of S. 917, however, is essentially an indiscriminate dragnet.  Section 2518(5) of title III authorizes wiretapping and eavesdropping orders for 30-day periods.  During such 30-day author- izations, a title III bug or tap will normally be in continuous operation.  Such a bug or tap will inevitably pick up all the conversations on the wire tapped or room bugged.  Nothing can be done to capture only the conversations authorized in the tapping order.  Thus, under title III, not only is the privacy of the telephone user invaded with respect to those calls relating to the offense for which the tap is in- stalled, but all his other calls are overheard, no matter how irrelevant, intimate (husband-wife, doctor-patient, priest-penitent), or constitutionally privileged (attorney-client).  Further, under title III all persons who respond to the tele- phone user's calls also have their conversations overheard.  Likewise, under a title III tap, all other persons who use a tapped telephone are overheard, whether they be family, business associates, or visitors; and all persons who call a tapped phone are also overheard.

To illustrate the indiscriminate nature of title III tap, one need only consider the experience of a New York police agent who in the course of tapping a single telephone recorded conversations involving, at the other end, the Julliard School of Music, Brooklyn Law School, Western Union, Mercantile National Bank, several res- taurants, a drugstore, Prudential Insurance Co., the Medical Bureau To Aid Spanish Democracy, dentists, brokers, engineers, and a New York Police station.

Wiretapping and eavesdropping as authorized by title III thus represent a sweeping

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097                                                    Page 108

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

intrusion into private and often constitutionally protected conversations of many,
and often innocent, persons.  The effect of Berger and Katz is now to measure
wiretapping and eavesdropping authorizations against the fourth amendment's require-
ments for a search warrant.  Title III, as I see it, permits 'general searches' by
electronic devices, the offensive character of which was first condemned in Entick
v. Carrington, 19 How.St.Tr. 1029 (1765) and which were then known as 'general war-
rants.'

  **\*2230** The use of such 'general warrants' was a motivating factor behind the De-
claration of Independence.  'Under these 'general warrants,' customs officials were
given blanket authority to conduct general searches for goods imported to the colon-
ies in violation of the tax laws of the Crown.  The fourth amendment's requirement
that a warrant 'particularly describe the place to be searched, and the persons or
things to be seized' repudiated these general warrants' (Berger at 58).

            3.  CONSTITUTIONAL REQUIREMENT OF PARTICULARITY

  There is yet another fundamental inconsistency between title III and the require-
ments of the Constitution applicable to electronic surveillance, as interpreted by
the Supreme Court in the Berger and Katz decisions.  I believe that title III viol-
ates the requirement of these decisions that a warrant for electronic surveillance
must particularly describe the conversations to be overheard.

  As the Court emphasized time and again in Berger and Katz, the requirements of the
fourth amendment applicable to wiretapping and eavesdropping are the same require-
ments applicable to conventional search warrants.  Thus, it is clear that the over-
all purpose of Berger and Katz is to assimilate electronic surveillance to the
strict requirements applicable to searches and seizures for tangible physical ob-
jects.

  It has long been established that a conventional search warrant must describe with
particularity the object to be seized, and that a judge authorizing the issuance of
a warrant for the object must have probable cause to believe that the described ob-
ject will be found on the premises to be searched.

  Under rule 41(c) of the Federal Rules of Criminal Procedure, of course, the re-
quirements applicable to nighttime searches are more stringent than for searches to
be executed in daytime.  Thus, a warrant for a daytime search may be issued on the
basis merely of a showing of probable cause for belief that the object named in the
warrant will be found on the premises to be searched. A warrant may not be issued
for a nighttime search,  however, unless the issuing judge finds as a fact that the
object will be found on the premises. Title III draws no distinction between daytime
and nighttime searches, but authorizes round-the-clock surveillance for the entire
30-day period of the warrant.

  It is true that section 2518(3)(b) of title III require a finding of probable
cause for belief that particular communications concerning the offense named in the
warrant will be intercepted.  That provision, however, pays only lipservice to the
constitutional mandate.  The lengthy period of surveillance authorized in title
III-- up to 30 days, with unlimited renewals for fresh periods of 30 days each-- be-
lies the apparent adherence of title III to the requirement of particularity.

  No one would suggest that a conventional search warrant may validly be issued to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

authorize a law enforcement officer to enter a private home or office and embark on
a search lasting even a few days, let alone authorize the officer to move into the
premises for a month.

Conventional searches lasting even a few hours have been roundly condemned in the
courts as general, or 'ransacking,' searches.  Yet it is precisely **\*2231** such a ran-
sacking search that title III authorizes.  A search lasting for a period of days or
months can hardly be a search for a particularly described object.  Unless we are to
define 'particularity' in novel terms, completely divorced from the requirements
long held applicable to traditional search warrants, title III cannot stand.

Fortunately, the circumstances of the Katz case offer a clear example of what the
Supreme Court intended as a valid application of the particularity requirement in
existing search-and-seizure law to electronic surveillance.  In Katz, the Federal
investigating agents obviously had probable cause to believe that the particular
communications made by the suspect from the public telephone booth were themselves
part of the suspect's ongoing criminal activities.  An application by the agents for
a warrant authorizing the surveillance could clearly have described the communica-
tions to be intercepted with precisely the sort of particularity that is required in
warrants authorizing searches for tangible physical objects.

The surveillance authorized by title III, however, is vastly different.  It ranges
far beyond the circumstances of Katz.  Instead of requiring a meaningful description
of particular communications to be intercepted, it authorizes all conversations of
the person named in the warrant to be intercepted over the entire period of the sur-
veillance, with law enforcement officers authorized to sift through the many varied
conversations, innocent and otherwise, that take place during the period.

No search warrant could constitutionally authorize all of a person's future writ-
ten statements to be seized for a 30-day period, in the hope that one or another of
the statements would contain certain incriminating information.  The constitutional
protection for oral statements can be no less.  I suggest that no warrant should be
able to authorize all of a person's conversations to be seized for a 30-day period,
in the hope that an incriminating conversation will be intercepted.  Yet, this is
precisely the sort of unlimited search contemplated by title III.  It was not con-
templated, nor is it permitted by the Constitution.

### B.  POLICY CONSIDERATIONS

Usually, one who opposes legislation in the belief it is unconstitutional opposes
it also as unwise and undesirable.  There is a chicken-egg question here, admit-
tedly, and my opposition to legalizing wiretapping and eavesdropping goes beyond the
constitutional doubts I have about title III.

Wiretapping and other forms of eavesdropping are recognized by even their most
zealous advocates as encroachments on a man's right to privacy, characterized by
Justice Brandeis as 'the most comprehensive of rights and the right most value by
civilized men.'

In yesteryear, a man could retire into his home or office free from the prying eye
or ear.  That time is now long past.  Transmitting microphones the size of a sugar
cube can be bought for less than $10. Other gadgets now enable a would-be snooper in
New York to eavesdrop in Los Angeles merely by dialing a telephone number.  This is

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097                                                        Page 116
S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

done by attaching to the telephone in Los Angeles a beeper which converts the tele-
phone into a transmitter without its ever leaving its cradle.

**\*2232** Directional microphones of the 'shotgun' and parabolic mike type make it
possible, by aiming the mike at a subject, to overhear conversations several hundred
feet away.  Laser beams permit an eavesdropping to monitor conversations in rooms up
to half a mile away by aiming the beam at a thin wall or window.  And the experts
now tell us that in the years to come, as the methods of eavesdropping technology
surges forward, the problems of protecting personal privacy will even further in-
tensify.

Against this backdrop of diminishing individual privacy, proponents of title III
now want to legitimate law enforcement wiretapping and eavesdropping.  Clearly, if
such an effort is successful, today's narrowing enclave of individual privacy will
shrink to the vanishing point.

Personal privacy is not the only basic right wiretapping and eavesdropping circum-
scribe.

Private property is a basic institution in our democratic country. Without it, in-
dividualism and freedom wither and die, no matter how democratic a government pur-
ports to be.  One of the major purposes of our Constitution and Bill of Rights was
to safeguard private property.

One of the most important characteristics of private property is the right to pos-
sess it exclusively-- to keep all strangers out.  The householder may shut his door
against the world.

This right of a citizen to shut the door against anyone, even the king himself, is
part of our ancient heritage.  One of the great ends for which men entered into so-
ciety was to protect their property. Under common law, every invasion of private
property, no matter how minute, was a trespass, even if no damage was done.  And the
king's man, entering without sanction of law, was as much a trespasser as the ordin-
ary citizen.

Make no mistake about it:  Eavesdropping and wiretapping are trespasses against
the home.  They are more serious trespasses than an unlawful search of the premises
because they continue over long periods of time unknown to the householder.  Thus to
those who value the institution of private property, eavesdropping and wiretapping
have always been regarded as unacceptable.  That property shall not be immune from
all control and entry, however, long has been accepted. Overriding claims of public
health and safety needs, for example, have justified carefully defined limitations
on freedom and use of private property.

Is there such an overriding claim here?  Is there so great a need for wiretapping
as to allow it as title III proposes, assuming it is constitutionally permitted?

Despite the clear-cut invasion of privacy, there is a great clamor for wiretapping
and bugging from certain of the law enforcement community.  Yet there is in fact
serious doubt and disagreement as to the need for such authority in dealing with
crime.  According to this Nation's highest ranking law enforcement officer, U.S. At-
torney General Ramsey Clark:

Public safety will not be found in wiretapping.  Security is to be found in excel-
lence in law enforcement, in courts and in corrections * * *.  Nothing so mocks pri-
vacy as the wiretap and electronic surveillance.  They are incompatible with a free
society.  Only the most urgent need can justify wiretapping and other electronic

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

surveillance.  Proponents of authorization have failed **\*2233** to make a case-- much
less meet the heavy burden of proof our values require. Where is the evidence that
this is an efficient police technique? Might not more crime be prevented and detec-
ted by other uses of the same manpower without the large scale, unfocused intrusions
on personal privacy that electronic surveillance involves?

Ray Girardin, speaking as police commissioner of Detroit, said:

\* \* \* from the evidence at hand as to wiretapping, I feel that it is an outrageous
tactic and that it is not necessary and has no place in law enforcement.

Nor are the Attorney General and Commissioner Girardin alone in their views.  Back
in the twenties, thirties, and forties, when we also had a serious crime problem,
Attorneys General Harlan F. Stone and Robert H. Jackson condemned wiretapping as in-
efficient and unnecessary.

As Attorney General Robert H. Jackson said before World War II:

The discredit and suspicion of the law-enforcing branch which arises from the oc-
casional use of wiretapping more than offsets the good which is likely to come of
it.

It is far from clear that crime cannot be fought without wiretapping and eaves-
dropping.  Rifling the mails and reading private correspondence, suspension of the
fifth amendment's privilege against self-incrimination and judicious use of the
thumbscrew and rack would probably help the police secure more convictions.  This
country, however, has wisely seen fit to forbid the police from using such tech-
niques; for the past 34 years Congress also wisely classified wiretapping as a for-
bidden police method because the dangers inherent in it to innocent persons far out-
weigh any benefit it may yield to law enforcement.  As Justice Holmes said in the
first eavesdropping case to confront the Supreme Court:

For my part I think it is a less evil that some criminals should escape than that
a government should play an ignoble part (dissent, Olmstead v. U.S. 48 S.Ct. 564,
277 U.S. 438).

When the Government overhears clients talking to their attorneys, husbands to
their wives, ministers to their penitents, patients to their doctors, or just inno-
cent people talking to other innocent people, it is clearly playing an 'ignoble
part.'

C.  THE JOHNSON ADMINISTRATION POSITION ON EAVESDROPPING

President Johnson and Attorney General Clark have recognized the clear threat to
privacy wiretapping and eavesdropping pose.

In his state of the Union address in 1967, the President stated:

We should protect what Justice Brandeis called the 'right most valued by civilized
men'-- the right to privacy.  We should outlaw all wiretapping-- public and
private-- wherever and whenever it occurs, except when the security of the Nation
itself is at stake-- and only then with the strictest safeguards.  We should exer-
cise the full reach of our constitutional powers to outlaw electronic 'bugging' and
'snooping.'

**\*2234** On February 8, 1967, the President sent to Congress his Right of Privacy Act
(S. 928) which outlaws electronic eavesdropping except in national security cases.
Twenty-two Senators cosponsored S. 928. Although I feel S. 928's national security

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097                                                    Page 112

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**


provisions could be tighter, I commend the President, because S. 928 represents a
tremendous step forward for privacy. Under S. 928, neither the Government nor
private citizens could legally use today's frightening panoply of eavesdropping
devices to snoop on our citizens. Under S. 928, individual privacy and the institu-
tion of private property would once again be meaningful there.

On February 7, 1968, in his special message on crime to Congress, the President
again called for passage of the administration's Right to Privacy Act (S. 928).

Title III rejects the approach recommended by the President and supported by the
Attorney General.

### D.  TECHNICAL ASPECTS OF TITLE III

Even for those who favor legalizing wiretapping, title III could present certain
problems.

#### 1.  AGGRIEVED PERSON (SEC. 2510(11))

Section 2510(11) of title III gives standing to challenge a surveillance order
only to a person who was either a party to an intercepted communication or against
whom the interception was directed.

Section 2510(11) is thus likely to encourage illegal surveillance in cases where
the parties to a communication are not the real objects of the surveillance.  For
example, section 2510(11) may encourage illegal surveillance of petty hoodlums to
gain intelligence against their bosses.  As section 2510(11) now stands, it is an
open invitation to law enforcement officers to engage in illegal electronic surveil-
lance. So long as the illegally obtained evidence is not used against the parties to
the intercepted communications, no person will have standing to challenge its intro-
duction in evidence.  Although section 2510(11) gives standing to the person against
whom an interception is directed, whether or not he was a party to the communica-
tion, it will be difficult in many cases to determine that the surveillance was dir-
ected against anyone other than the parties to the communication.

#### 2.  RANGE OF FEDERAL CRIMES FOR WHICH WIRETAPPING AND EAVESDROPPING AUTHORIZED
#### (SEC. 2516a-f)

In their report, proponents of title III state:

Applications for orders authorizing the interception of wire or oral communica-
tions may be made only in the investigation of certain major offenses * * *.  Each
offense has been chosen because it is intrinsically serious or because it is charac-
teristic of the operations of organized crime.

Section 2516 of title III then goes on to authorize Federal wiretapping for such
crimes as bribery of union officials (sec. 186, title 29), embezzlement of union as-
sets (sec. 501(c), title 29), bribery of public officials and witnesses (sec. 201,
title 18), offering or soliciting kickbacks to influence **\*2235** the operation of em-
ployee benefit plans (sec. 1954 of title 18), and 'any offense involving the manu-
facture, importation, receiving, concealment, buying, selling, or otherwise dealing
in narcotic drugs, marihuana, or other dangerous drugs.'

Even the most zealous advocate of wiretapping might be hard-pressed to establish

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097                                                     Page 113
S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

some of the preceding crimes as 'major offenses.'

Under the list of offenses spelled out in section 2516, every high school or col-
lege student who takes a puff of marihuana could be tapped or bugged; every union
activity, too.

One should be able to be against union corruption and illegal drug usage without
inaugurating the big brother state which could result if the present list of Federal
crimes for which tapping and bugging are authorized is allowed to stand.

   3.  RANGE OF STATE CRIMES FOR WHICH EAVESDROPPING WARRANTS MAY BE ISSUED (SEC.
2516(2))

It is hard to conceive how the range of State offenses for which such a serious
invasion of privacy as wiretapping is authorized could be broader than the Federal
offenses, but such is the case.

Section 2516(2) permits wiretapping and eavesdropping for any state crime punish-
able by more than one year in prison and dangerous to 'life, limb or property.'
Nothing in Section 2516(2) thus prohibits the use of bugging or tapping in such
sensitive areas as state income tax violations.

Likewise in many states numerous petty offenses will qualify under Section 2516(2)
as crimes for which wiretapping and bugging orders may be issued.

     4.  NATIONAL SECURITY TAPPING-SECTION 2511(3)

Section 2511(3) of Title III permits the President to authorize, without first
seeking a court order, wiretapping and eavesdropping in 'national security cases'.
In Section 2511(3), however, it states:

Nor should anything contained in this chapter be deemed to limit the constitution-
al power of the President to take such measures as he deems necessary to protect the
United States . . . against any other clear and present danger to the structure of
existence of the Government.

This language leaves too much discretion in the hands of a President.  Under
2511(3) a President on his own motion could declare a militant right wing political
group (i.e., the Minutemen) or left wing group (i.e., Black Nationalists), a nation-
al labor dispute, a concerted tax avoidance campaign, draft protesters, the Mafia,
civil rights demonstrations, a 'clear and present danger to the structure of the
Government.'  Such a declaration would allow unlimited unsupervised bugging to cer-
tain crimes and places such eavesdropping under judicial supervision.  As drafted,
however, Section 2511(3) gives the President a blank check to tap or bug without ju-
dicial supervision, whenever he finds, on his motion, that an activity poses a
'clear and present danger to the Government.'  Further, section 2511(3) permits the
introduction into evidence any bug or tap the President authorizes.

**\*2236** Section 2511(3) vests power in a President to utilize bugging and tapping in
many areas totally unconnected with our traditional concept of 'national security.'

     5.  CONSENSUAL WIRETAPPING AND EAVESDROPPING (SEC. 2511(2)(c))

Section 2511(2)(c) of title III completely exempts all
consensual wiretapping and eavesdropping from the provisions of the title.  So

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

long as at least one of the parties to a conversation has consented to its intercep-
tion, title III is inapplicable.

Thus, although the title contains blanket prohibitions on all 'third-party '
('nonconsensual') interception-- that is, interceptions without the consent of at
least one of the parties to a conversation-- by private persons, and places strict
controls on the use of such interception by law-enforcement officers, it is totally
permissive with respect to surreptitious monitoring of a conversation by a party to
the conversation, even though the monitoring may be for insidious purposes such as
blackmail, stealing business secrets, or other criminal or tortious acts in viola-
tion of Federal or State laws.

The use of such outrageous practices is widespread today, and I believe they con-
stitute a serious invasion of privacy.  See Greenwalt, 'The Consent Problem in
Wiretapping and Eavesdropping:  Surreptitious Monitoring with the Consent of a Par-
ticipant in a Conversation' (68 Col.L.Rev. 189 (1968)).  Consensual wiretapping and
eavesdropping may be accomplished in several different ways:

A party to a conversation may himself record the conversation;

A party to a conversation may use or even wear a concealed electronic device to
transmit the conversation to a nonparty; or

A party to a conversation may consent to the use of an electronic device by a non-
party to overhear the conversation.

Occasionally, it is said that the parties to a conversation rely on their trust of
one another not to reveal confidences that are disclosed in the conversation, and
that the risk that the confidence will later be repeated to other persons is essen-
tially the same, whether the repetition is by memory or by electronic recording.

I believe, however, that the risk created by electronic recording is of an en-
tirely different order from the risk of repetition involved in normal conversations,
and that consensual electronic surveillance presents grave dangers to free and open
expression in our society. None of us is so circumspect in our speech that we can
countenance the later use of our most private utterances, played with the shattering
impact of a broadcast in our own words.  Therefore, if the provisions of title III
prohibiting the use of electronic surveillance by private persons are to become
meaningful protections of the right of privacy, I believe that the abusive practice
of consensual wiretapping and eavesdropping by private persons cannot be completely
exempted from the title.

There are, of course, certain situations in which consensual electronic surveil-
lances may be used for legitimate purposes by public officials and private persons.
Law-enforcement officers use it to record incriminating statements in their con-
frontations with a suspect, in order to obtain convincing **\*2237** evidence that will
not be subject to attack on grounds of credibility when it is later introduced at
the trial of the suspect.  Law-enforcement officers also use it defensively to pro-
tect the integrity of government officials from attempts by private persons to dis-
tort their conversations or to engage them in criminal or compromising activities.
Private persons may use it to preserve accurate records of their conversations in
order to refresh their memory, or to prevent future distortions of their remarks by
other parties, without intending in any way to harm the nonconsenting party.  In ad-
dition, private persons placed in compromising circumstances may desire to record
incriminating conversations by the other party in order to be able to take an accur-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097                                                      Page 115
S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

ate record of such conversations to law-enforcement officers.  Such legitimate uses
of consensual electronic surveillance should not be prohibited.

Title III contains strong prohibitions against wiretapping and eavesdropping by
private persons where none of the parties to the conversation has consented to the
interception.  I believe that these provisions should be broadened to prohibit the
flagrant abuses that now exist in circumstances where some, but not all, of the
parties have consented to the interception.  Such nefarious practices can readily be
curbed without hindering in any way the legitimate needs of law enforcement or
private citizens.  I urge the Senate to amend title III to accomplish this goal.

        6.   DISCLOSURE OF EAVESDROPPING ORDER SEC. 2518(8)(D)

Section 2518(8)(d) places on the judge the duty of causing an inventory to be
served by the law-enforcement agency on the person named in an order authorizing or
approving a bug or wiretap.  Such 'inventory' must be filed not later than 90 days
after the eavesdropping order is terminated, and shall include notice of the entry
of the eavesdropping order, the period of authorized or approved interception, and
whether or not wire or oral communications were intercepted.  According to the ma-
jority report on title III, the preceding 'inventory procedure' reflects existing
search warrant practice under rule 41 of the Federal Rules of Criminal Procedure.

It should be noted, however, that under rule 41 of the Federal Rules of Criminal
Procedure, the police must, after seizing any property, give the defendant a written
inventory of such 'seized property.'  To fully comply with rule 41 under title III
eavesdropping order, the police, therefore, should have to give the person named in
the order either a copy of the conversations intercepted or a copy of the complete
logs of the intercepted conversations or permit the person named in the order to
hear the tapes of the intercepted conversations.

Since proponents of title III attempt to have section 2518(8)d reflect  'existing
search warrant practice,' I urge they fully meet the inventory disclosure require-
ments of rule 41.

                    **\*2238** E.   CONCLUSION

For nearly four decades Congress wisely has rejected numerous bills similar to
title III.

In 1948, Orwell wrote a book, '1984,' in which he painted a bleak prophecy of what
life would be like 16 years from now:

The telescreen received and transmitted simultaneously.  Any sound that Winston
made, above the level of a very low whisper, would be picked up by it; moreover, so
long as he remained within the field of vision which the metal plaque commanded, he
could be seen as well as heard.  There was of course no way of knowing whether your
were being watched at any given moment. . . You had to live-- did live, from habit
that became instinct-- in the assumption that every sound you made was overheard
and, except in darkness, every movement scrutinized.

In terms of technological advances in the field of electronic eavesdropping, 1984
is clearly upon us.  I, for one, however, to not want to see the Government given
the right to use, especially when their use will have little or no effect in lessen-
ing crime, 1984's tools against its citizens.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097    Page 116

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

Therefore, I oppose Senate adoption of title III.

PHILIP A. HART.

### INDIVIDUAL VIEWS OF MR. BURDICK ON S. 917

I believe that title III should be stricken from the bill.  It is fraught with
grave doubts of constitutionality.  In my opinion neither Katz v. United States, 88
S.Ct. 507, 389 U.S. 347 (1967) or Berger v. New York, 87 S.Ct. 1873, 388 U.S. 41
(1967), nor any other Supreme Court decision, sustains the broad intrusion into the
private lives of our citizens which is authorized under title III.  Under this
title, the right of privacy of innocent third parties is ignored and violated.
Therefore I will oppose the inclusion of title III in the bill.

I have read the individual views expressed by my colleagues, Senator Long of Mis-
souri and Senator Hart of Michigan, and I concur generally therewith.

QUENTIN N. BURDICK.

### INDIVIDUAL VIEWS OF MR. FONG

According to the FBI Uniform Crime Report for 1967, the incidence of violent
crimes in the United States showed a sharp increase by more than 16 percent. Murder
increased by 12 percent, armed robbery by more than 33 percent, property crimes by
16 percent, and the use of firearms in aggravated assault by 22 percent; 53,000
Americans were assaulted with guns in 1967, a sharp rise of 22 percent over the 1966
figure.  In not a single category of crime did the FBI'S crime index show a decline
or any change from the previous period surveyed.

**\*2239** During 1966 the police in our country were able to solve only 25 percent of
the serious crimes reported-- a slight decrease from the national police solution
rate in 1965.

America's high crime rates are tremendously costly to the American economy.  In
1965 the crimes against property-- robbery, burglary, larceny (more than $50) and
auto theft-- cost the nation $600 million; crimes against the person-- homicide and
assault, for example-- cost $815 million.  These figures represent a staggering
total of $1,145 million.

All of these statistics underscore the need for action by the Federal Government
to maintain an orderly society through the effective enforcement of our laws.  Fed-
eral assistance is urgently required to achieve these ends.

### TITLE I-LAW ENFORCEMENT ASSISTANCE

I wholeheartedly endorse the objectives of title I of this bill. This title rep-
resents the heart of this legislation.

There are certain national objectives which are vital to every citizen of this
country, and the elimination of crimes is one of the foremost among these object-
ives.  We cannot sit back and expect the existing law enforcement agencies to solve
the problem without aid from Congress and from all the citizens of the United
States.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**


   Title I clearly recognizes, as it must, that law enforcement in the United States
is primarily a task for our State and local governments. The Constitution of the
United States confers no general police power on the Federal Government.  The denial
of such power is soundly predicated on the fear that a too powerful central govern-
ment will become despotic.  Our citizens have always insisted and continue to insist
that police power must be dispersed among the State and local governments of the Na-
tion, as a guarantee that no single government can begin to accumulate enough power
to submerge the democratic foundations of the Republic.

   This basic principle of the responsibility of State and local governments for law
enforcement in the United States is firmly maintained in title I of the bill.  The
law enforcement assistance programs authorized by the title will remain under the
direction and control of State and local law enforcement agencies.  Title I
strengthens the capacity of State, and local governments to solve their problems of
law enforcement, and thereby eliminates any tendency toward Federal domination.

   At the same time, title I recognizes that there are many problems in law enforce-
ment and crime prevention which State and local governments cannot solve on their
own.

   In accord with the recommendations of the President's Commission on Law Enforce-
ment and Administration of Justice, title I provides substantial Federal financial
assistance to these governments to improve and strengthen all aspects of their sys-
tems of law enforcement where the need is greatest and most immediate.  It will en-
courage the planning, coordination, and research in law enforcement that has been so
seriously lacking in the past.

   The additional resources which would be available under title I to both Federal
and local authorities will facilitate better training for law enforcement **\*2240** per-
sonnel, acquisition of modern equipment and facilities, incorporation of innovative
techniques for apprehension of the lawless, and improvements in rehabilitation pro-
cesses and procedures.

   This legislation will not solve all of the problems.  No simple or easy solution
is available.

   It will, however, firmly commit the Federal Government to a role of leadership and
support.  Within the framework of our established and traditional separation of re-
sponsibilities, it will let all levels of Government work together to fight the com-
mon enemy-- crime and lawlessness.

   I believe this proposal to be a sound, imaginative approach which will make a sub-
stantial contribution to the life of our society.

   I am happy to endorse the comments of the majority report pertaining to title I.

         TITLE II-CONFESSIONS, EYEWITNESSES TESTIMONY, AND HABEAS CORPUS

   However bright the promise of title I, I deplore the action of the committee in
accepting title II of the bill.  Title II is a dangerous affront to the Construction
of the United States.  It presents a grave threat to the fundamental principles of
the Nation-- to our basic concept of separation of powers, to Federal supremacy to
Judicial independence-- in short, to our most cherished notions of justice and the
rule of law.

   Title II, if enacted, would:

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

Require Federal Courts to admit confessions and eyewitness identifications into
evidence even if such evidence were obtained in violation of the specific safeguards
required under the Constitution by the Supreme Court in Miranda v. United States
(1966) and United States v. Wade (1967);

Abolish Supreme Court jurisdiction to review State criminal cases in which confes-
sions or eyewitness identifications have been admitted in evidence;

Abolish Federal habeas corpus jurisdiction over State criminal convictions, in
disregard of article I, section 9, of the Constitution, which provides that 'the
privilege of the writ of habeas corpus shall not be suspended, unless when in cases
of rebellion or invasion the public safety may require it';

Overrule the Supreme Court's decision in Mallory v. United States (1957) and per-
mit Federal criminal suspects to be questioned indefinitely before they are presen-
ted to a committing magistrate. Unlike the District of Columbia Crime Act, enacted
in the first session of this Congress, no time limit or other safeguards on inter-
rogations are provided.

Each of the provisions of title II is vulnerable to serious constitutional objec-
tions. Several of the provisions are almost certainly unconstitutional on their
face, because they attempt to overrule by statute clear commands of the Constitu-
tion-- particularly those limiting the appellate jurisdiction of the Federal high
courts and abolishing the habeas corpus jurisdiction of all Federal courts. I had
thought it settled within our federal system **\*2241** that what is mandated by the Con-
stitution may not be dismissed by legislative fiat.

Moreover, the provisions of existing law that title II seeks to overturn can
hardly be declared unreasonable. Under present law, prior to any questioning, a pu-
tative defendant must be warned that--

(a) He has the right to remain silent;

(b) Anything he says could be used against him in a court of law;

(c) He has the right to the presence of an attorney;

(d) If he cannot afford an attorney, one will be appointed for him prior to any
questioning if he so desires;

(e) Opportunity to exercise these rights must be given him throughout the inter-
rogation;

(f) After these warnings have been given and he has been afforded these opportun-
ities, the individual may knowingly and intelligently waive these rights and agree
to answer questions or make a statement.

These points were spelled out in the landmark decision Miranda v. Arizona, 86
S.Ct. 1602, 384 U.S. 436 (1966), where the Supreme Court held that a confession made
after the suspect was taken into police custody could not be used in evidence unless
the above sixfold warning had been given before questioning.

Another landmark case in this area was Mallory v. United States, 77 S.Ct. 1356,
345 U.S. 444 (1957). There, the Supreme Court held that if the arresting officer
fails to comply with rule 5(a) of the Federal Rules of Criminal Procedure-- requir-
ing imprisonment of an arrested person 'without unnecessary delay'-- any confession
obtained during the period of unnecessary delay shall be excluded.

Section 3501 of title II would overrule all of the presently existing standards
and render them merely as guidelines to determine admissibility.

In short, existing law is designed to assure that confessions are voluntary, that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097                                                      Page 119
S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

lineups are fair, that arraignments are prompt, and that defendants receive a full
and fair hearing of their Federal claims in a Federal court. Unless we are to reject
these principles, title II cannot stand.

   I am therefore, in accord with the views expressed in the minority report on title
II.

                TITLE III-WIRETAPPING AND ELECTRONICS SURVEILLANCE

   I must also respectfully interpose serious constitutional and policy objections to
title III of the bill.  Title III, in the form proposed by the administration as S.
928, was properly described as the Right to Privacy Act.  As accepted by the commit-
tee, title III is more appropriately described as the End to Privacy Act.

   To be sure, title III has incorporated substantially verbatim, many of the provi-
sions of S. 928.  I strongly endorse the portions of title III concerned with pro-
tecting the individual from electronic invasions of his privacy by private persons.
I also approve the excellent prohibitions on the manufacture, shipment, or advert-
ising of electronic surveillance devices.  If we are to make substantial progress
toward protecting individual privacy, we must sharply curtail the supply of the ne-
farious devices that are so easily obtained in the marketplace today.

   **\*2242** But these protections are scant compensation for the grave threat to privacy
engendered by the permissive provisions in the remainder of title III. Police con-
ducted invasions of privacy are authorized to investigate a vast range of Federal or
States crimes.  Section 2516(1) offers a shopping list of crimes for which Federal
warrants may be issued that is far too broad to be reconciled with any legitimate
law enforcement purpose.  And the provisions of section 2516(2) give carte blanche
to State and local police to engage in wiretapping and eavesdropping for any felony
whatsoever.

   So long as a willing judge is found to issue a surveillance warrant, there is no
bar to massive electronic surveillance by the police at every level-- Federal,
State, or local.  The statutory requirement of a judicial warrant is simply inad-
equate to protect the precious right of the individual to privacy. The ease with
which some judges now rubberstamp conventional search warrants is notorious.  No
doubt, the vast majority of judges will take care to make proper findings before is-
suing surveillance warrants.  We shall inevitably find, however, that law enforce-
ment officers in search of surveillance warrants will seek out the judges who are
less exacting or less cautious in their dispensation.

   I oppose the enactment of any permissive electronic surveillance legislation at
the present time.  I especially regret the action of the committee in tying such le-
gislation to the crucially important provisions of the law enforcement assistance
program in title I of the bill.

   At the same time, however, I recognize that there may be areas of law enforcement
in which some police eavesdropping and wiretapping may eventually be shown to be ne-
cessary.  In matters of national security, for example, electronic surveillance may
be essential because the stakes involved are so high.

   In matters involving organized crime, electronic surveillance may be essential be-
cause of the shroud of secrecy that organized crime can and does command to the
death.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

I cannot believe, however, that such surveillance is needed in the investigation
of the myriad other Federal and State crimes for which warrants are authorized under
the bill.  If title III is to be enacted in some form, I urge the Congress to limit
the use of surveillance to the narrow areas of national security and hard-core or-
ganized crime, and even then to allow such surveillance to be conducted only by the
Federal Bureau of Investigation.

The truth is, however, that wiretapping and eavesdropping are law enforcement
weapons whose value and impact is as yet dimly perceived. At the present time we can
only speculate on the burdens and benefits involved.  In our present state of know-
ledge, we simply ought not to create a blanket authorization for the wholesale use
of such an ultimate weapon.

I am fearful that if these wiretapping and eavesdropping practices are allowed to
continue on a widespread scale, we will soon become a nation in fear a police state.

Further, if title III is to be enacted, I urge that its permissive provisions be
limited to a life of 5 years.  If wiretapping and eavesdropping prove in actual ex-
perience to be useful, and their cost is not too great, then Congress, **\*2243** I am
sure, will not hesitate to make the legislation permanent.  In light of the tremend-
ously advanced state of technology today, with its vast potential for invasion of
privacy, we owe it to each individual American citizen to require this second look
at title III before it passes with finality into the statute books.

I also respectfully suggest that title III be amended to include a requirement
that a National Commission be appointed to study the results of electronic surveil-
lance carried out under the bill, and to report to Congress on whether the legisla-
tion has been effective.  In this manner, the judgment of Congress on this basis is-
sue will be as fully informed as possible.  The right to privacy is deeply valued by
our society.  It deserves no less.

TITLE IV-HANDGUN CONTROL

All citizens of the United States are aware of the danger presented by the posses-
sion of firearms by irresponsible and criminal members of our society. We have noth-
ing to fear from the possession of firearms by responsible citizens in the pursuit
of the legitimate goals of recreation or self-protection.

However, as I have repeatedly pointed out in the past, we must prevent indiscrim-
inate purchase of weapons and control their use, so that our citizens are protected
from their unlawful and destructive use.

As approved by the committee, title IV contains the following provisions:

(1)  Prohibits the interstate order sale of handguns except between federally li-
censed dealers.

(2)  Prohibits the over-the-counter sale of handguns to persons not residing in
the State in which the dealer's place of business is located.

(3)  Prohibits a Federal dealer from selling a handgun to a person under 21 years
of age.

(4)  Prohibits a Federal dealer from selling a firearm to a person who the li-
censee believes is prohibited by State or local law from receiving or possessing a
firearm.  (Rifles and shotguns are included in the definition of 'firearm.')

(5)  Provides higher standards for obtaining Federal firearms dealer licenses and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097                                                      Page 131
S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

increases the licensing fees for dealers, importers and manufacturers.

  (6)  Regulates the importation of firearms into the United States by excluding
surplus military handguns and rifles and shotguns not suitable for sporting pur-
poses.

  (7)  Prohibits the sale of destructive devices (antitank guns, bombs, grenades),
machineguns and sawed-off rifles and shotguns unless the dealer has a sworn state-
ment from the purchaser's local law enforcement officer stating that no law would be
violated by such person's possession.

  (8)  Prohibits the interstate transportation of destructive devices, machineguns,
and sawed-off rifles and shotguns in interstate commerce except between licensed
dealers or as authorized by the Treasury Secretary.

  (9)  Prohibits the transportation or receipt in interstate commerce of a firearm
(including rifles and shotguns) knowing a felony is to be committed with it.

  **\*2244** Although this title represents the first step to effective Federal gun con-
trol legislation and has my support, I strongly believe that it is entirely inad-
equate.  By limiting its coverage to only handguns and excluding rifles and long
guns, title IV falls far short of the strong and effective firearms control legisla-
tion so urgently required to control crime.

  As one who has, since 1963. urged the adoption of a strong, comprehensive gun con-
trol law, I consider the provisions contained in S. 1, to control the indiscriminate
sale of all firearms-- rifles as well as handguns-- as being the first effective
step in that direction.

  S. 1 would limit the number of firearms in the possession of minors and persons
with serious criminal records.  It would limit the mail order sale of all firearms
in interstate commerce, unless the purchaser is positively identified.

  In short, title IV should be amended so as to cover not only handguns but all
types of firearms.

  The Congress has a clear mandate from the people to pass such a comprehensive law.

  According to the Gallup poll, nearly 75 percent of the American people want some
kind of strong and effective gun control legislation. The Harris poll of April 22,
1968, indicated that Americans favor strict control over the sale of firearms by 71
to 23 percent. Significantly, the Harris poll also showed that people who own guns
favor such a law by a better than 2-to-1 margin, 65 to 31 percent.

  The International Association of Chiefs of Police representing law enforcement of-
ficers from across the Nation, have voted overwhelmingly to endorse S. 1; so have
the American Bar Association, the National Association of Citizens Crime Commis-
sions, and the President's Commission on Law Enforcement and Administration of
Justice.

  Facts and figures overwhelmingly support the urgent need for a comprehensive law.
According to surveys taken in 1966, 59 percent of all murders were committed with
guns-- the highest percentage ever recorded; aggravated assaults with a gun rose by
22 percent; and armed robbery, which comprises 58 percent of all robberies, rose 10
percent.

  Even more compelling is the fact that in States which have strong gun control
laws, homicides committed with guns are less common than in States with no law or
which have ineffective controls.  For example: In four States having strong gun con-
trol laws, the proportion of murders committed with firearms to the total number of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097                                                    Page 222
S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

homicides committed in the last 4 years, according to the FBI report, was well below
the national average of 57 percent.  In Pennsylvania, firearm murders were 43 per-
cent of the total; in New Jersey 39 percent; in Massachusetts, 35 percent, in New
York, 32 percent.  On the other hand, States with minimal controls or no such law
had much higher rates: Colorado, 59 percent; Louisiana, 62 percent; Arizona, 66 per-
cent; Montana, 68 percent; Texas, 69 percent; and Nebraska, 70 percent.
     A good, strong Federal firearms law is long overdue.

          HIRAM L. FONG.

               **\*2245** INDIVIDUAL VIEWS OF MR. BAYH

     An examination of crime incident statistics, from whatever source, leaves little
doubt that all agencies at all levels of government must invest new resources in
crime preventative measures if efforts at deterence are to be meaningful.  Title I
of the 'Safe Streets' bill represents an effort on the part of the Federal Govern-
ment to assist local law enforcement agencies in meeting some of their growing re-
sponsibilities.  Although we need not expect that this measure will eliminate all
criminal activity, it does represent a significant recognition and awareness that a
total marshalling of local state-federal resources is necessary if a successful as-
sault on criminal activity is to result.  Because the thrust of Title I of this
measure does provide assistance to local law enforcement agencies in the areas of
street crime, riot control and prevention, and organized crime, I enthusiastically
support this portion of the bill.
     Title III of the bill provides for the limited use of electronic listening devices
by law enforcement agencies.  The uncontrolled use of electronic listening devices
has long concerned me as a violation of the right to privacy of each individual cit-
izen.  I frankly look with great concern at many efforts to legitimatize this type
of 'snooping'. The need to use electronic devices in the area of national security
has general acceptance, but their extension to other fields should only come after
closest examination demonstrates the most compelling need. The area of organized
crime increasingly appears to meet this criteria.
     'Organized crime,' according to the report of the Task Force on Organized Crime,
'is the society that seeks to operate outside the control of the people of America
and its government, which involves thousands of criminals working within its struc-
tures, as complex as those of any large corporation, subject to laws more rigidly
enforced than those of legitimate governments.  Its actions are not impulsive,
rather the result of intricate conspiracies carried on over many years and aimed at
gaining control over whole fields of activity in order to amass huge profits.'  Be-
cause of its operation in complete and total contravention of the mores and tenets
of society as we know it, little can be achieved without the ability to pierce the
organization veil. Since the essence of organized crime is secrecy and conspiracy,
particular emphasis is placed on the 'internal security' of this organization which
makes the usual and common means of information and intelligence gathering by police
insufficient to thwart their expanding activities.
     It is clear that those who traffic in terrorism, murder, extortion, loan-sharking,
prostitution, narcotics and tax evasion have a twisted sense of society which pre-
vents their acceptance of our traditional notions of justice, humaneness and moral-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

ity.

Acknowledging, as we must, that the trail of organized crime has led into an ever
enlarging circle to high public and private offices, I have come to the avoidable
conclusion that organized crime and its capacities for extortion, blackmail, duress,
and murder threatens not only the very moral fiber of our country, but as import-
antly, our national security.

**\*2246** It is with this though in mind that I reluctantly support Title III as a
means to provide an effective tool to combat the continued conspiracies of organized
crime which are eating at the very foundation of America.  The requirement of con-
tinued judicial supervision and the limited duration during which the electronic
devices may be used must be closely adhered to so that organized crime and not the
individual citizen will become the target of this section.

Title II of the proposed bill is one with which I must take issue. Those views
filed by the minority as they pertain to Sections B, C, D, and E of Title II so ad-
equately express the agreements regarding these particular points that there is no
need for me to list them here.  I do not feel compelled to express different
thoughts than those of the Minority concerning Section A of Title II.

Section A deals with the application of certain legal criteria in the determina-
tion of the admissibility of confessions as evidence in a criminal court.  This pro-
vision of the bill exists as a result of the Supreme Court decision in Miranda v.
Arizona.  In my capacity as Chairman of the Subcommittee on Constitutional Amend-
ments, I have conducted a number of hearings following the Miranda decision regard-
ing the wisdom of suggesting Constitutional changes that might abrogate the effect
of that decision on law enforcement agencies.

This entire area is an extremely difficult and complicated one.  Law enforcement
officials almost unanimously agree that Miranda did in varying degrees cause them
considerable difficulty.  On the other hand, there was strong evidence expressing
reluctance to support an effort to rearrange, restrict or repeal the Fifth Amendment
guarantees.

For over 35 years, since the decision in Brown v. Mississippi, we have accepted
the view that physical beatings that result in a confession of a crime are not con-
ducive to the achievement of perfect truth or justice.  Since that time there has
been a growing awareness that beatings administered mentally were also subject to
question on the same grounds.  This aspect, difficult for us to understand, received
sharp attention as examples of the techniques of brainwashing came to us from the
Korean conflict.  And so the Courts eventually recognized the invalidity of the men-
tally coerced confession when they stated in Blackburn v. Alabama that 'the blood of
the accused is not the only hallmark of an unconstitutional inquisition.'

Although there is little empirical evidence that law enforcement agencies engage
in concerted and deliberate efforts, either physical or mental, which are not in
keeping with our traditional notions of fair play and justice, there are isolated
instances where duress and trickery were employed by the State against the individu-
al.  The question inevitably is this:  were those actions sufficient in number and
degree to warrant what some believe to be the devastating criteria of Mir-
anda'  Notwithstanding the Court has now assured the criminally accused a right to
be clinically processed in the 'cold light of day.'

It is my judgement that from a practical standpoint if this Court rendered criter-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

ia is to be changed, it cannot be done by legislation which the Court would, in all
probability, subsequently render unconstitutional.

**\*2247** I doubt that the provisions of this bill which relate to the admissibility
of confessions meets the requirements expressed by the Court in the following lan-
guage:

'* * * unless we are shown other procedures which are at least as effective in ap-
prising accused persons of their right of silence and in assuring a continuous op-
portunity to exercise it, the following safeguards must be observed';

However, I do believe that it could serve, as Senator McClellan has suggested as
an admonition to the Court, that strong sentiment and cause exists against the fur-
ther extension of the doctrine pronounced in Miranda.  In addition, it is hoped that
the consideration of this matter by the Congress will cause all law enforcement
agencies to reexamine the actual holding of the Court in Miranda.  Much evidence was
presented in the hearings of the Subcommittee on Constitutional Amendments to the
effect that some well-meaning jurisdictions had extended the holding of Miranda to
be more restrictive on the police than was actually the intention of the Court.  It
is this narrow line which the Congress and the country must walk which, on the one
hand, guarantees each individual against oppressive police tactics while, on the
other, guarantees to each individual law-abiding citizen adequate protection of a
police force which is increasingly hard put to maintain vigilance against the up-
surge in criminal activity.

BIRCH BAYH.

ADDITIONAL VIEWS OF MR. TYDINGS ON TITLE IV, THE CONCEALED WEAPONS AMENDMENT

Three years ago President Johnson first asked Congress to enact the 'State Fire-
arms Control Assistance Act.'  That bill provided modest federal controls on the in-
terstate commerce in firearms.  Its purpose was to assist the states in enforcing
whatever gun laws they wish to enact.  Three years and 2040 pages of congressional
hearings later, the Judiciary Committee is now favorably reporting a limited portion
of that legislation as Title IV of the Safe Streets and Crime Control Act.

WHAT TITLE IV PROVIDES

Title IV, the Concealed Weapons Amendment, is a very limited, stripped down, bare
minimum gun traffic control bill, primarily designed to reduce access to handguns
for criminals, juveniles, and fugitives.

This Concealed Weapons Amendment does not provide for registration of any firearm
or require any permit for purchase of firearms.

This Concealed Weapons Amendment does not affect domestic sale of rifles or shot-
guns in any fashion.  Mial order and over-the-counter sales of rifles and shotguns
are totally exempt from the bill.

Regarding handguns, Title IV, provides only that handguns must be bought in the
purchaser's home state.  Mail order sales of handguns, except between licensed deal-
ers, are prohibited.  Likewise, dealers cannot sell handguns to out-of-state pur-
chasers, or minors, fugitives or felons.

**\*2248** Title IV affects long guns in only two ways.  First, it authorizes the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**


Treasury Department to control imports of weapons not suitable for sporting pur-
poses.  Second, Title IV prohibits sale of any handgun or long gun in violation of
the law of the state where the sale is made, or which the seller knows will be used
in a felony.

As an avid hunter, who first learned to shoot at his father's knee in the duck
blinds at the age of nine, I can fairly say that this Concealed Weapons Amendment
does not significantly inconvenience hunters and sportsmen in any way. The people it
does frustrate are the juveniles, felons, and fugitives who today can, with total
anonymity and impunity, obtain guns by mail or by crossing into neighboring states
with lax or no gun laws at all, regardless of the law of their own state.

This Concealed Weapons Amendment does not violate any state's rights to make its
own gun laws.  Quite the contrary, Title IV provides the controls on interstate gun
traffic which only the federal government can apply, and without which no state gun
law is worth the paper it is written on.

The purpose of this Concealed Weapons Amendment is simply to help the states en-
force whatever gun laws each wishes to enact.  Without such federal assistance, any
state gun law can be subverted by any child, fugitive, or felon who orders a gun by
mail or buys one in a neighboring state which has lax gun laws.  As William L. Ca-
halan, Prosecuting Attorney, Wayne County (Detroit) Michigan, told the Senate Juven-
ile Delinquency Committee last summer, in the wake of the Detroit riots:

Effective law enforcement in Michigan, particularly in the County of Wayne, has
been seriously hampered by the unlawful possession and illegal use of firearms
brought into the State of Michigan by residents who are able to purchase these fire-
arms with scarcely any restrictions in the State of Ohio, principally in the City of
Toledo and its environs which is only a one hour drive on the Expressway from De-
troit.

Michigan has enacted adequate legislation for regulating the purchase and posses-
sion of handguns within the state.

However, law enforcement in this area has been largely circumvented by those who
can leave the City of Detroit and drive to Toledo, Ohio, where handguns may be pur-
chased in various kinds of business establishments merely by making the purchase and
giving the seller a name and address.  No other requirement is imposed upon the pur-
chaser. . . .

Handguns confiscated by the City of Detroit police from defendants in connection
with the commission of crimes, and held for use as evidence in those criminal cases,
have increased substantially in recent years.  In the year 1965, there were 2,910
such firearms seized, followed by 3,970 in the year 1966, and 2,435 seized during
the first 6 months (to June 30, 1967) of the current year.

**\*2249** Of the handguns seized each week, 90 of these firearms are found to be unre-
gistered within the State of Michigan and most of these 90 firearms have been used
in the commission of crimes.

Based on information which has been gathered from surveillances, statements ob-
tained from defendants, and data supplied by Federal and local law enforcement agen-
cies, most of these firearms are purchased by Michigan residents outside the State
of Michigan either by direct purchase or by mail order.

I think the situation that occurs in Wayne County in which Detroit is the major
city, demonstrates probably better than any other locality in the country the very

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

need for some sort of Federal regulation, particularly as it has to do with hand-
guns.  (Hearings before Senate Juvenile Delinquency Subcommittee on the Federal
Firearms Act, July 1967, pages 368-401.)

   The Concealed Weapons Amendments provides this desperately needed federal safe-
guard to make state gun laws effective.  Title IV represents the least Congress can
do to meet the urgent public demand for protection against the currently unrestric-
ted gun traffic to criminals and juveniles in this country.

### WHO WANTS FIREARMS CONTROL?

   The President, the Attorney General, the Director of the FBI, the President's Com-
mission on Law Enforcement and the Administration of Justice, the International As-
sociation of Chiefs of Police, the American Bar Association, and state and local law
enforcement officials all across the country have recommended federal firearms con-
trol legislation much more stringent than Title IV, the Concealed Weapons Amendment,
provides.  (See Appendix-- , hereto these views.)

   The overwhelming majority of Americans, including gun owners, wants strong gun
controls.  A nation-wide Harris poll opinion released on April 22, 1968, reports
that three out of every four Americans, and two out of every three gun owners, want
far more stringent gun controls than Title IV provides.

   Gun owners and non-gun owners alike recognize that today's virtually unlimited gun
traffic threatens every law-abiding American.  In September 1966, Gallup reported
that 56% of all gun owners favored registration.  By September 1967, a Harris poll
reported that this support has risen to 66% of all gun owners.  The April 22, 1968
Harris poll shows gun owner support of Federal laws compelling registration remains
at the same high level, with more than 2 out of every 3 gun owners in favor of fed-
erally required registration of all gun sales. These findings have been confirmed
again and again by all entire series of public opinion polls by the Harris and Gal-
lup organizations during the past two years.  (See Appendix I, hereto).

   Yet to judge from the mail manufactured and inspired by the firearms lobby, one
might conclude that some members of the National Rifle Association speak for the
200,000,000 other Americans who are more concerned **\*2250** with personal and public
safety than with the hysteria generated by the NRA'S American Rifleman magazine.
The fact is, however, that the NRA does not speak for the U.S.A.  The American
people want action to deny guns to criminals, juveniles and fugitives. The American
people want protection, not bogus legal arguments and sophistries about punishing
criminals after they have killed, maimed and wounded innocent persons.

   I believe the great majority of NRA members would also favor the Concealed Weapons
Amendment, if only they could get the facts rather than deceitful half-truths from
their national headquarters.  The sad fact is that a handful of professional gun
control fighters, who make a living opposing gun sales control legislations, have so
distorted and misrepresented the provisions and purpose of federal firearms legisla-
tion that hunters and sportsmen all over America have grave misconceptions of what
such legislation provides.  Whether hunting in one of our great Western States last
summer, or shooting duck on Maryland's famous Eastern Shore last fall, I have found
that readers of the American Rifleman hold wildly inaccurate views of proposed fed-
eral firearms proposals. Many sportsmen actually seem to believe the President's

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097
S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

modes firearms bill would require surrender of their weapons.

The reason for these misconceptions is painfully clear.  The NRA propagandists and a few other irresponsible 'journalists' have, either through incredible carelessness or calculated deceit, grossly misled their audience about the purposes, and provisions off recent federal firearms control proposals.  For example, the April 12, 1968 Congressional Quarterly reported on the NRA'S gun control lobbying activities. Citing a letter the NRA had sent to its entire 700,000 membership about the President's gun control bill, CQ stated:

The letter said the bill could lead to elimination of 'the private ownership of all guns' and would give the Secretary of the Treasury 'unlimited power to surround all sales of guns by dealers with arbitrary and burdensome regulations.'  The letter warned NRA members that 'if the battle is lost, it will be your loss, and that of all who follow.'

By any accounting, the letter was replete with distortions of the fact.  NRA members were told that 'anyone engaged in the manufacturer of ammunition would be required to have a $1,000 manufacturer's license.'  In fact, the license fee was set at $500.  Furthermore, the letter stated, 'Apparently, this (license fee) would apply to a club engaged in reloading for its members.'  It was not clear how the NRA determined that reloading constituted manufacturing of ammunition.

Another paragraph stated:  'If you transported your rifle or shotgun to another state, for a lawful purpose, such as hunting, you would have to comply with such burdensome restrictions and red tape as might be required by the regulations.'  In fact, there were no restrictions in the bill against carrying guns in interstate commerce for a lawful purpose (except for a felon or a fugitive from justice), and there would have been no reason for the Secretary of the Treasury to impose regulations which had nothing to do with administering the legislation.

**\*2251** The letter also stated:  'A dealer could not sell a nonresident of his state.'  In fact, the bill only prohibited selling handguns to out-of-state residents.  Shotguns and rifles could be purchased freely anywhere.

During Senate hearings, Dodd went through the NRA letter paragraph by paragraph and pointed out items he called patently untrue.'  Dodd asked NRA officials to correct the record with a new mailing.  NRA President Harlon B. Carter told Dodd he felt 'a keen sense of responsibility' and would consider sending another letter.

No new letter was sent.  In the December 1965 issue of The American Rifleman, Orth, the NRA executive vice president, thanked members for the 'response to My April letter.  Probably no issue before the 1st Session of the 89th Congress drew the volume of mail that poured into the nation's lawmakers in opposition to S. 1592. . . .  That these letters were effective in preventing the passage of S. 1592 is beyond question.' (Congressional Quarterly, April 12, pp. 811-812).

Unfortunately, such fast and loose treatment of the truth by the gun lobby continues to this day to plague rational discussion of firearms legislation.

While congressional action on the gun traffic has been stalled by this vocal, but relatively small, band of gun lobbyist, the American people have become increasingly critical of congressional inaction on effective firearms sales regulation.  A Harris poll in January of this year indicated that the major cause of a 5-year low in public confidence in Congress is congressional failure to pass gun sales regulation legislation.  Almost half of all citizens interviewed put congressional inaction on

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

guns as the major cause for their loss of confidence in Congress.

The American people are fed up with the unlimited gun traffic in this country.
They are grievously disappointed in Congressional failure to take any action to keep
concealed weapons out of the hands of criminals, juveniles, and fugitives.

The American people want action now to control the gun traffic in this country.
Americans want an end to the incredible condition we face in this country when any
fugitive, 10-year-old, or escaped convict can order a gun by mail in any State in
the Union with total anonymity and impunity.

As one distinguished American put it:

Each year, thousands of businessmen look up from their work into the menacing
muzzle of a gun wielded by a trigger-happy robber.  In recent months, murderous
snipers have waged guerilla warfare against law enforcement officers in our city
streets.  In 1963, our President was slain with  a mail order rifle. During the cal-
endar year of 1966 alone, more citizens were killed or assaulted with guns in Amer-
ican streets and homes than were killed in battle during the entire Korean conflict.

The use of firearms in crime is indeed a serious and major problem in our country
today.

**\*2252** A firearm continues to be the instrument of death in virtually every murder
of a law enforcement officer.  Last year, 55 of the 57 law enforcement victims
killed in the line of duty died of gunshot wounds. These figures are in keeping with
the trend since 1960 which reflects that firearms have been the murder weapons in 96
per cent of the 335 police killings.

I think mail-order firearm purchases should be banned, interstate transportation
of firearms controlled, and local registration of weapons required and enforced.

There is no doubt in my mind that the easy accessibility of firearms is respons-
ible for many killings both impulse and premeditated.  The statistics are grim and
realistic.  Strong measures must be taken, and promptly, to protect the public.

Those are not my words.  Nor are they the words of any Senator or Congressman.
They are the words of Mr. J. Edgar Hoover, Director of the Federal Bureau of Invest-
igation, writing in the September 1967 issue of the FBI Law Enforcement Bulletin.

Mr. Hoover's words reflect the views of law enforcement officials and concerned
citizens all across the country.  For example, Mr. Quinn Tamm Executive Director of
the prestigious International Association of Chiefs of Police says:

Law-abiding citizens and the police are tired of living in a country which is be-
coming a veritable armed camp, erupting too frequently into violence, bringing death
and destruction by firearms to innocent citizens.

In October 1965, our members adopted a resolution supporting proposed federal le-
gislation . . . to restrict the widespread traffic in firearms . . . pointed out
that the ease with which any person can acquire firearms (including criminals, ju-
veniles without knowledge or consent of their parents or guardians, narcotics ad-
dicts, mental defectives, (and) armed groups) . . . is a significant factor in the
prevalence of lawlessness and violent crime in the United States. (Quinn Tamm, edit-
orial in Police Chief, magazine of the International Association of Chiefs of Po-
lice, July, 1967.)

Governor Hughes of New Jersey, testifying before the Senate Judiciary Committee
after last year's Newark riots, testified forcefully in favor of federal legislation
to control the gun traffic. He said:

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097                                                      Page 229
S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**


It is tragic . . . and it seems to me to contain the beginning elements of a na-
tional scandal at this important and dangerous posture of our Nation's affairs, that
Congress should even be considering the denial of the protection of an interstate
gun control law to Americans threatened not only by criminals and narcotics addicts
and mentally unstable persons, but by extremists who openly and criminally call for
armed revolt in the cities of America . . .

**\*2253** And I think, Mr. Chairman, it is time that all of us . . . gave more thought
to the safety of the people of America, and the policeman on the street, whose job
is already dangerous enough . . .

These policemen at least in my State, are of the unanimous view, that guns must be
controlled if the safety of American citizens is to be protected. (Hearings Before
Juvenile Delinquency Subcommittee on Federal Firearms Act, July 31, 1967, pp.
997-1030.)

Title IV, the Concealed Firearms Amendment, a limited, moderate measure to protect
the safety of the American people by making state handgun sales law enforceable.  In
fact, it is so limited that if apologies for it need be made to anyone, they should
be made to the American public, since this bill falls short of the comprehensive gun
control legislation their safety requires.

Yet, the provisions of even this limited bill has been vigorously opposed both
within Congress and elsewhere.

Some opponents of Title IV assert the President's bill is a part of a campaign to
disarm law-abiding citizens.  In fact, the bill only places reasonable restraints on
the interstate shipment and sale of handguns, to reduce the chance they will fall
into the hands of criminals, fugitives and juveniles.

The bill does not require or contemplate registration of surrender of any firearms
by their owners, and would not prevent any law-abiding adult from walking into his
local store and buying or ordering a handgun.  Furthermore, rifles and shotguns will
continue to be freely available both over-the-counter and by mail in any state in
the Union.

Opponents of Title IV argue that it imposes unfair restrictions on sportsmen.  The
only restriction this bill imposes on sportsmen is that they must purchase thier
handguns in their own state.  This provision will help states enforce their own ef-
fective gun laws by preventing their residents from evading those laws by purchasing
handguns by mail or in a neighboring state with lax gun laws.

One study by the Massachusetts State Police showed that 87% of concealable fire-
arms used during the commission of crimes there are obtained from sources outside
the state, thus undermining Massachusetts' own strong gun laws. Hearings before Sen-
ate Juvenile Delinquency Subcommittee, Federal Firearms Act, pp. 343-373, June 3,
1965).  Similarly, as I have already noted, after the Detroit riots last summer, the
Michigan's State's Attorney for the Detroit area told the Senate Juvenile Delin-
quency Subcommittee that, despite Michigan's strong gun law, 90 of every 100 hand-
guns seized from criminals in Michigan are illegally possessed and most of them were
purchased by Michigan residents outside the state either by direct purchase in
neighboring Ohio or by mail order.

The third argument that opponents of the gun control bill make is that criminals
will still get guns, despite any gun control measure. Therefore, to reduce gun
crimes, stronger penalties for gun crimes, not reasonable controls on gun sales are

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

the answer.  The record shows, however, **\*2254** that stringent penalties for gun
crimes do not control gun crimes.  The death penalty for murder did not prevent the
5,090 gun-caused murders in 1963, the 5,634 in 1965, or the 6,552 gun murders com-
mitted in 1966.  The prospect for long terms in jail did not prevent the 27,700
gun-committed aggravated assaults in 1964, the 34,700 in 1965 or the 43,500 commit-
ted in 1966.  Nor did the strong penalties in existing law deter the 40% increase in
armed robbery by guns between 1964 and 1966 alone.

  On the other hand, states which have enacted strong control laws have experienced
significantly lower gun crime rates than states which have lax laws or no laws at
all.  Fifty-seven per cent of all murders in the United States between 1962 and 1965
were committed by gun.  In four states which have effective gun laws, however, gun
murders made up only 43% of the total murders in Pennsylvania, 39% in New Jersey,
35% in Massachusetts, and 32% in New York. In stark contrast, states with minimal or
no gun laws experienced sharply higher gun murder rates. The percentage of all
murders committed with guns was 59% in Colorado, 62% in Louisiana, 66% in Arizona,
29% in Texas, 70% in Nebraska, and 72% in Montana.  In Vermont, a state frequently
cited by the NRA as having weak gun laws but low gun crime rates there were only
seven murders between 1962 and 1965, but all seven were by guns, for a 100% gun
murder rate.  (See FBI Law Enforcement Bulletin, Appendix II, hereto.)

  The reason effective state gun laws do not work even better is that existing fed-
eral law undercuts them by allowing guns to be purchased by mail-order or purchased
under looser laws in nearby states and then smuggled in.

                         THE AFFIDAVIT APPROACH

  Many who recognize the dire need for federal legislation to regulate the gun
traffic nonetheless do not wish to go very far in any such law. They suggest not
only that rifles and shotguns be exempt from any regulation, but also that mail or-
der and over-the-counter handgun sales be regulated only by an affidavit approach
fails to provide either effective regulation or adequate coverage of the handgun
traffic.

  Title IV would make state handgun laws enforceable by prohibiting over the counter
sales of handguns except in the buyer's home state. Title IV would also outlaw mail
order sales.  The affidavit approach would permit mail order sales and over the
counter sales to non-residents, regardless of the law of any state, but would re-
quire the purchaser to affirm under oath such things as that he is over 21, not vi-
olating any law in buying the gun, not a drug addict, or convicted drug pusher, and
not insane.  Also, the affidavit would include the name and address of the principal
law enforcement officer of the buyer's residence or the locality to which the hand-
gun would be shipped.  The seller would have to send a copy of the affidavit to the
police official named therein and wait a brief period before delivering the handgun
to the mail order purchaser.

  **\*2255** It is not clear how the affidavit approach would work, if the would-be pur-
chaser lies about his identity or the identity or address of the local police offi-
cial.  In fact, the affidavit procedure appears to be a burden and harassment for
the honest, but no barrier to the juvenile, fugitive, or criminal intent on getting
a gun by mail, regardless of the law of his state.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097    Page 191
S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

Aside from its ineffectiveness, the affidavit approach will impose a new administrative burden on already badly overworked state and local police.  In contrast, Title IV is self-executing and actually keeps weapons out of the hands of criminals, rather than counting on their honesty in executing mail orders.

PROTECTING THE AMERICAN PEOPLE

The almost limitless gun traffic must be brought under control. More than 100,000,000 guns are already in private hands in our country. More than 1,000,000 more a year are being dumped in this country through imports alone. Americans tolerate a rate of gun murder unthinkable in other countries.  In 1962, for example, the 4,954 gun murders in this country compared to 29 in Great Britain, 9 in Belgium, 6 in Denmark; 5 in Sweden and none in Holland. The soaring gun crime rate endangers every American and is killing and maiming many new thousands of citizens every year.

Effective federal legislation to protect the American people from the gun traffic is long overdue. The time for action is now.

ADDITIONAL VIEWS OF MR. KENNEDY OF MASSACHUSETTS, MR. TYDINGS, MR. SMATHERS, AND MR. FONG

Although I am pleased that some legislation regulating the sale of firearms finally has been reported from the Judiciary Committee, I intend to support an amendment on the Senate floor to substitute the Administration's bill, S. 1, Amendment 90, for Title IV.  Title IV is a measure supported by some members as the only way to get any kind of gun control legislation out of the committee.  But it is not an adequate substitute for S. 1, Amendment 90, and in my judgment there is no justification for passing legislation weaker in impact or narrower in scope than Amendment 90.

Indeed, it amazes me that we continue to tolerate a system of laws which makes it so outrageously easy for any criminal, insane person, drug addict or child to obtain lethal firearms which can be used to rain violence and death on innocent people.

In 1967 serious assaults where a gun was used as the weapon rose 22 percent, and one out of every five assaults was committed with a gun. The vicious crime of armed robbery had a sharp upswing of 30 percent, and firearms were used in 58 percent of all robbery offenses.  60 percent of all murders involved the use of a gun.

**\*2256** I recognize that Amendment 90 is not a panacea, that effective gun regulation will require state action and that gun controls by themselves will not eliminate violence.  But I think we have a responsibility to do what we can to minimize bloodshed and death resulting from firearms abuse.  Amendment 90 represents a responsive and responsible effort to build a framework within which state and local regulation of firearms can be made effective.  For without Federal regulation of interstate traffic in deadly weapons, it is impossible for state and local governments to prevent evasion of the gun controls which they choose to pass.

Amendment 90 will increase safety and strengthen local regulation by:

Requiring that interstate mail-order sales of handguns and long guns be ordered through a local dealer;

Restricting over-the-counter purchases of handguns by nonresidents;

Establishing minimum ages of 18 for the purchase of long guns and 21 for the pur-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**


chase of handguns;

   Prohibiting the sale of firearms to criminals;

   Curbing the flow of cheap non-sporting and military surplus firearms which have
poured into this country from abroad in recent years and been dumped on the market
at low prices attractive to juveniles and to those amassing weapons for criminal
purposes.

   Amendment 90 is a constructive attempt to deal with the serious problems uncovered
by testimony taken at the many hearings held by the Senate Juvenile Delinquency Sub-
committee.  It is supported by the American Bar Association, the International Asso-
ciation of Chiefs of Police, the National Sheriffs Association, the National Council
on Crime and Delinquency, the National Council for a Responsible Firearms Policy,
the National Crime Commission, the National Riot Commission, the Federal Bureau of
Investigation, and attorneys general, police chiefs and prosecutors across the coun-
try.

   In contrast to Amendment 90, however, Title IV as it now reads, permits almost
anyone, no matter how young or dangerous, to buy a rifle or shotgun only over-
the-counter but also in total anonymity through the mail.

   This is the major flaw as well of S. 1853, another alternative which has been pro-
posed to Amendment 90 by Senator Roman L. Hruska.  And S. 1853 is even weaker than
Title IV because it would permit the impersonal interstate purchase of handguns by
anyone willing to fill out an affidavit and wait a few days for delivery.  It has no
requirement that the seller obtain or receive any clearance from the authorities in
the purchaser's home state.

   Ironically, the affidavit procedure constitutes a true administrative burden of
the type which gun control opponents constantly complain about.

   In addition, S. 1853 would do nothing to stop the torrent of cheap imports flood-
ing our country with unsafe and untested military surplus weapons.  Under Amendment
90, on the other hand, imported military surplus handguns are banned and imported
military surplus rifles are permitted only if they meet recognized safety standards
and are suitable **\*2257** for lawful sporting purposes.  The aim of this restriction is
to stop the United States from being the dumping ground for weapons of death from
abroad.

   The simple fact is that S. 1853 would not and could not provide effective control
even as to pistols and revolvers.  But even more important, S. 1853 provides no con-
trols whatsoever over rifles and shotguns.

   Considering the evidence of the frequency with which long guns are involved in
crimes, accidents and other gun abuses-- particularly in areas where handguns are
regulated-- I can see no justification for leaving mail-order rifle and shotgun
sales totally unregulated.

   Of all murders by firearm in 1966, in 27 percent of the cases the murder weapon
was a rifle or shotgun.  One quarter of the law enforcement officers killed that
year met their death by long gun. Close to 2,000 people a year five persons a day--
are murdered with a rifle or shotgun.

   In major riots in 1967, nine policemen and 75 civilians were killed-- many of them
victims of snipers, lurking in windows and rooftops where they could shoot rifles
with deadly accuracy.

   Indeed, the riots have had over the last few years-- and which still threaten us

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

in the future-- point up dramatically the danger from long guns as well as handguns.
For not only does the practice of sniping directly lead to death and serious injury,
the threat and fear of sniping increases tensions and the level of violence.

In assessing the factors contributing to riots, the President Commission on Civil
Disorders cited the problem of sniper fire and guns, and recommends the enactment of
strong federal, state and local gun legislation as a step towards preventing their
reoccurrence.  The Commission says in its report:

The fact that firearms can readily be acquired is an obviously dangerous factor in
dealing with civil disorders.  It makes it easier for a serious incident to spark a
riot and may increase the level of violence during disorders.  It increases the
dangers faced by police and others seeking to control riots.

We recommend that all state and local governments should enact gun control legis-
lation of the type recommended by the Crime Commission.

We also believe that Federal legislation is essential in order to make state and
local laws fully effective and to regulate areas beyond the reach of state govern-
ment.  We therefore support the President's call for gun control legislation and
urge its prompt enactment.

The President's Commission on Law Enforcement and Administration of Justice also
stresses the seriousness of gun misuse and recommends legislative change:

Since laws, as they now stand, do not accomplish the purposes of firearms control,
the Commission believes that all States and the Federal Government should act to
strengthen them. In fact the legislation urged by the Crime Commission-- calling for
a comprehensive system for actual registration of all guns by all owners-- is far
stronger than the modest provisions of Amendment 90.

**\*2258** Opponents of Amendment 90 base their opposition on what they claim to be the
unnecessary burdens which it will cause the average gun buyer.  But in fact Amend-
ment 90 will not in any significant way inconvenience the legitimate and honest
sportsman, hunter or hobbyist from obtaining a firearm. He still can purchase a
rifle or shotgun while away from his home state, and he still can carry a gun across
state lines for hunting or other lawful purposes as long as he complies with state
and local regulations.

Indeed, Amendment 90 asks the gun buyer only to cooperate in two simple ways;
first, that he identify himself so that it can be determined that he is not a minor
or criminal; and second, that if he wants a gun from an out-of-state mail-order sup-
plier he places the order through his local gun shop or hardware store, so that any
requirement of local law can be complied with upon delivery.

I do not believe that these very minor and speculative inconveniences of Amendment
90 can in any way justify further delay in enactment of this very limited gun con-
trol legislation.

I believe that most honest gun users would be willing to incur an even greater
burden to help this nation achieve a reduction, however slight, in the 17,000 fire-
arms deaths which occur in the country each year-- a rate of one death every half
hour.

Many times over the last several years I have posed the question of why we have
not succeeded in passing legislation like Amendment 90 which is so obviously vital
to the safety and security of our citizens.

It is increasingly clear that the answer lies in the opposition of a small group

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097                                                        Page 194

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**


of self-interested people who have promoted misunderstanding and misinformation
about the various effective gun control proposals which many of us in the senate
have supported.

   Frankly, I have always doubted that the position of these few leaders accurately
reflects the sentiments of the sportsmen and hunters and hobbyists they purport to
represent.  And this opinion was confirmed just recently by a poll which indicates
not only that 71 per cent of all Americans favor Federal gun control legislation,
but also that 65 per cent of persons who themselves own guns favor Federal control.

   Nevertheless, there are reports that the gun lobbyists are prepared to commit un-
limited efforts and resources to defeat even the mild bill reported by the Judiciary
Committee.  Already floods of mail have started to pour in to Senate Offices, stimu-
lated through a well-coordinated national campaign.

   I am hopeful and confident that the United States Senate will not be swayed by ap-
peals to emotion through exaggeration and misinformation.

   We have an opportunity to exercise our leadership responsibilities in the in-
terests of all citizens, and we should not let the unsupported and unsupportable
outcry of a vociferous few steer us from our course.

                     **\*2259** INDIVIDUAL VIEWS OF MR. SCOTT


   As a member of the original U.S. Crime Commission headed by Governor Franklin D.
Roosevelt, as a former Assistant District Attorney, and presently as a member of the
Senate Judiciary Subcommittee on Criminal Laws and Procedures, I have had the oppor-
tunity both to witness crime and its manifold effects, and to hear and study the en-
lightened views of this Nation's specialists on this most urgent problem.

   But while expertise and sophistication are necessary to mount a successful anti-
crime attack, one need be no specialist to sense the growing and understandable con-
cern of America.  It should be clear to all that this country has failed in the
first order of business-- the maintenance of law and order. And this failure
threatens to rend the very fabric of American life as we know it.

   Recent surveys of high crime areas discussed in the President's Commission on Law
Enforcement and Administration of Justice found that due to the fear of crime:
   Forty-three percent of those interviewed stayed off the streets at night
   Thirty-five percent did not speak to strangers
   Twenty-one percent used only taxicabs and cars at night
   Over 33% kept firearms in their houses
   Twenty-eight percent kept watchdogs.
   Surely we can take no pride when our citizens restrict and alter their daily way
of living because law and order have broken down. Moreover, these are not idle
fears.  They represent a toll of the increased incidence of crime which must be con-
sidered along with the personal tragedy that accompanies every additional murder,
rape, robbery, and other such senseless acts.  Nor can we ignore the growing feeling
that crime is the easy way out, with the rewards high and the chances for conviction
low.  The long-range prospects of such a philosophy, unless its errors are clearly
demonstrated, are truly alarming.

   How extensive is crime?  Read the Uniform Crime Reports of the Federal Bureau of
Investigation and learn that serious crime is increasing at a sharper rate now than

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

at any time during almost the past 10 years.  Read the well documented Reports of
the President's Crime Commission on Law Enforcement and Administration of Justice.
Regretfully, in fact, you need not read further than your local newspaper.

The need is clear as is the urgency.  We cannot wait until the bolted door and
suspicious glance totally replace the warmth of America.  Our resolve to act must be
articulated and transformed into coordinated, planned and reasoned programs which
strike out at every facet and level of the law enforcement and criminal justice sys-
tems. New approaches must be sought, proven methods continued and expanded and inef-
fective approaches discarded.  Greater efforts to bring the benefits of modern tech-
nology to bear on the problem are necessary to provide the latest techniques and
equipment to local law enforcement officials throughout the Nation.  Law enforcement
training and education must be encouraged alone with **\*2260** advanced research into
the causes and prevention of crime.  In short, the best talent and most progressive
thinking must be focused on-- and a part of-- the entire law enforcement and crimin-
al justice systems. The public interests and safety must continually be measured
against the rights of the individual-- new balances being struck within Constitu-
tional limits where old ones prove unworkable or unwise. America must commit herself
to a truly national effort to combat the internal threat confronting us and to cre-
ate a setting in which crime is neither a permanent fixture, a predominant fear, nor
a promising alternative to those that feel that all other approaches are closed off
or too difficult.  Moreover, those who out of desperation move into a life of crime
must be assured the opportunity for access to the benefits of society through normal
and lawful channels.

We must address ourselves to the anarchy which has erupted the past several years
in ghettos throughout the Nation.  Such mass repudiations of law and order strike at
the very core of a free and civilized society.  We must plan and take the necessary
steps now so that personnel adequately trained and equipped for riot prevention and
control can deter underlying and sometimes understandable frustrations from erupting
into blind mob violence once again. We must not, however, delude ourselves into be-
lieving that improved prevention and control is an adequate or just alternative to
dealing with the underlying problems which beset many of our major cities.

The Omnibus Crime Control and Safe Streets Act of 1967 (S. 917), the major and
most comprehensive legislative proposal in the field of law enforcement and criminal
justice, substantially meets the needs I have discussed and has my strongest sup-
port.  After extensive hearings, before the Senate Judiciary Subcommittee on Crimin-
al Laws and Procedures, an impressive hearing record and blueprint for action were
developed.  As a result, the Subcommittee and full Committee made several additions
and changes in the bill as introduced and has reported legislation which truly rep-
resents an effective overall anti-crime program.

Several sections of this legislation deserve individual attention because they
concern areas that can be of extreme importance in improving our law enforcement and
criminal justice systems.  I will briefly refer to these sections and then discuss
them in detail.

I strongly favor the section in Title II of this legislation which will permit
voluntary statements made by the accused to be admitted into evidence at trial where
the trial judge determines that such statements were truly voluntary under all the
circumstances and facts in the specific case.  Such a procedure is a marked improve-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

ment over the recent Supreme Court decision in the Miranda case which while aimed at preventing abuses of the accused's Constitutional rights-- and rightly so-- seemed to overlook the right of the public to be free of abusive activities committed by criminals. The provisions in Title III authorizing the use of electronic surveillance by specified law enforcement officials under strict Court supervision will prove invaluable in this Nation's fight against the increasing threat posed by organized criminal syndicates.

There are, however, two sections of the Omnibus Crime Control and Safe Streets Act which should be altered to make this an even more **\*2261** effective anti-crime measure. I do not support the system of direct Federal grants to individual units of local government with the opinion of the 'State crime agency' being given merely advisory status as to the benefits of the program in question. On the contrary, I believe the bloc grant approach would enable the States to plan and to coordinate law enforcement activities more effectively. I also oppose setting any statutory limit on the resources which should be allocated for the purposes of our criminal justice system.

CONFESSIONS

Title II of this legislation makes the test of admissibility of a confession in a Federal Court the 'totality of circumstances' and the voluntariness with which it was given. This would restore the test which had been in use and considered constitutional until recent Supreme Court decisions, most notably Miranda v. Arizona.

In Miranda the Court held that an otherwise voluntary confession made after a suspect was taken into custody could not be admitted into evidence unless the suspect was given four warnings prior to questioning:

(1) He has the right to remain silent.
(2) Any statement he makes may be used as evidence against him.
(3) He has the right to the presence of an attorney.
(4) If he cannot afford an attorney one will be appointed for him.

The Court further stated that only a voluntary knowing and intelligent waiver of these rights by the defendant will make the confession admissible.

I express my views not to find fault with Court decisions, but to observe that recent decisions of great importance to the protection of the individual accused of crime have in themselves raised new questions of criminal law enforcement. In Miranda the Court sets up a new standard not supported by law, not supported by valid precedent, but very tortuously worked out in order to staple in what it is justly concerned about, the prevention of abuses.

As a citizen, it is my duty to respect the law of the land. As a Senator and legislator, it is my duty to uphold the Court whenever I conscientiously can; where I cannot, I seek to explore possible alternatives within the orderly framework of our governmental system. I think one thing that shakes public and Congressional confidence in the Court is the Court's seeming determination to make broad Constitutional findings which establish entirely new directions for the law on these narrow 5-to-4 decisions. As lawyers, many of us are seriously concerned that our higher Courts seem so rarely to be impressed by the need for some disciplines or some restraint on Courts as Courts until a true test can be found, that Courts can do more than to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

make their decisions depend upon the narrow shading of a single man's opinion, know-
ing as the Court has to know, that the very next appointee to The court may, in the
very next test case, reverse the whole procedure under that particular constitution-
al decision. We need something better than the 'last guess' doctrine.

   If the Court will not exert self-discipline, then it is the role of the legislat-
ive branch to express its concern as to that very unfortunate aspect of the Court's
attitude toward vast and fundamental changes in constitutional **\*2262** viewpoints.
This responsibility is aptly stated by the late Chief Justice Harlan F. Stone:

   Where the courts deal, as ours do, with great public questions, the only protec-
tion against unwise decisions, and even judicial usurpation, is careful scrutiny of
their action, and fearless comment upon it.

   The Court's itself in the Miranda decision urges Congress to examine this whole
problem and encourages it to come up with a solution, which, I can only read into
the Supreme Court's language, is a better proposed solution.  The Court couples its
encouragement to Congress with a judicial warning that the solution must be in con-
sonance with the Constitution, the Bill of Rights, and presumably with the Court's
disposition and composition at that time.  But the latest decision, the Miranda
case, is far from an ultimately satisfactory conclusion of a matter which affects
not only the life and liberty of the accused, but also affects the life and security
of all American citizens in this process.

   The Senate Judiciary Subcommittee on Criminal Laws and Procedures has responded
positively to this 'urging' and has developed an impressive body of opinion from
judges, lawyers, sociologists, academicians and private citizens.  Title II repres-
ents a fair and effective solution more in keeping with the 'genius of the people.'
As a general principle it should be noted that Congressional Committees and Subcom-
mittees are better situated to explore human experience, to analyze the impact of
judicial decisions, to conduct detailed hearings, and to make extensive findings on
the total situation than is a Court considering a single factual situation and a
specific legal issue. When fundamental changes in constitutional law on criminal
procedure are contemplated, there can be no doubt that such extensive considerations
as just outlined are most desirable.

   Regrettably, the President's Crime Commission-- another excellent forum-- did not
examine the question of recent confession and interrogation decisions.  The addi-
tional views of seven members of the Commission appear at the end of the Report and
declare that these decisions have tilted the balance of justice too far in favor of
defendants.  While these members state, and rightly so, that these decisions are the
law of the land, they go on to make the point that a body such as the Commission
should have studied this important area.  I agree wholeheartedly.

   As stated earlier, my purpose is not an attack on the Court, but rather a reasoned
discussion of its action and its impact.  In this, I do not speak alone-- there were
four dissenters in Miranda.  The words of one of these, Justice John Harlan, bear
repeating at this juncture:

   There is, in my view, every reason to believe that a good many criminal defend-
ants, who otherwise would have been convicted on what this Court has previously
thought to be the most satisfactory kind of evidence, will not, under this new ver-
sion of the Fifth Amendment, either not be tried at all or acquitted if the State's
evidence, minus the confession, is put to the test of litigation.  I have no desire

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

whatsoever to share the responsibility for any such impact on the present criminal
process.  In some unknown number of cases the Court's rule will return a killer, a
rapist or other criminal **\*2263** to the streets and to the environment which produced
him, to repeat his crime whenever it pleases him.  As a consequence, there will not
be a gain, but a loss, in human dignity.

To those who say that a Court decision cannot 'cause' crime, I would remind them
of the excellent communications system of the underworld, the so-called 'grapevine'
of the prison 'sea lawyers.'  One need not be a legal scholar to sense the tendency
of the law, and where it is felt that a 'technicality' will prevent prosecution, the
result is bolder action.  There has been a sharp decrease in confessions and concom-
itant decline in convictions and these developments cannot be ignored.

How should we approach this most vexing and important problem?  For one, our crim-
inal laws must seek to create and maintain an equitable balance between the rights
of the individual and society.  Laws must be drafted with as full purpose to protect
the innocent as to preserve the rights of those charged with offenses.  Of course,
the innocent can either be a victim of the crime or a person wrongly accused of com-
mitting it.

An appropriation consideration in attempting to strike this balance are the words
of Judge Learned Hand:

Our dangers do not lie in too little tenderness to the accused.  Our procedure has
always been haunted by the ghost of the innocent man convicted. It is an unreal
dream.  What we need to fear is the archaic formalism and the watery sentiment that
obstructs, delays, and defeats the prosecution of crime.

As was so aptly stated by Justice Cardozo:

Justice, though due to the accused, is due the accuser also.  The concept of fair-
ness must not be strained until it is narrowed to a filament if we are to keep the
balance true.

Title II keeps the balance true.  The trial judge is required to take into account
all the surrounding circumstances in determining whether the statement under consid-
eration was voluntary.  He is specifically required to examine certain enumerated
factors which historically have been considered relevant in this area.  If the judge
finds the statement involuntary, he does not even allow it in evidence before the
jury.  Should he find the statement voluntary, he will permit the jury to consider
it with the instruction that it should be given no more weight than the circum-
stances warrant.  I believe these safeguards will enable the judge and the jury to
search for the truth within the bounds of constitutional guarantees.  This, in my
way of thinking, is the purpose of our criminal law.

I hope that the President, in his search for a better system of law enforcement in
this country, may provide a little encouragement to the legislative branch as he is
perhaps called upon to fill vacancies on the High Court.  By the action of the Pres-
ident in his selection of the candidates to make these judgments, the Court perhaps
may someday be able to formulate some fundamental rules of law or, as some would
think, changes in the law, by something more than the assumption of rather seismic
risks when judgment depends upon the hairline decision of a single Justice.

**\*2264** WIRETAPPING

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

   Title III of the bill would authorize carefully circumscribed and strictly con-
trolled electronic surveillance (eavesdropping and wiretapping) by duly authorized
law enforcement officials under a Court order procedure for the purpose of investig-
ating specified crimes involving national security and serious offenses.  This Title
also prohibits the utilization of wiretapping and bugging by all private persons and
by all public officials where there is no compelling law enforcement need as dis-
cussed above.  In those circumstance, there can be no justification for the use of
such techniques.
   This legislation is vitally important if we are successfully to encounter the most
insidious threat to the continued existence of American Society as we know it-- the
threat of organized crime.
   While I have a natural reluctance to authorize the overhearing of private conver-
sations, even where there is the possibility that evidence concerning criminal
activity may be uncovered, I must admit some doubt as to whether any wiretapping le-
gislation should prevent the use of this weapon in society's struggle against organ-
ized crime-- especially in view of the unique evidence gathering problems in this
area.
   The impact of the Crime Commission Reports, revealing testimony before the Senate
Judiciary Subcommittee on Criminal Laws and Procedures on which I serve, and discus-
sions with many persons expert in the criminal justice system lead me to believe
that if such organized criminal activity is permitted continued immunity from sur-
veillance while it infests all of our lives, it may well destroy our society.  As
stated in the report of the President's Commission on Law Enforcement and Adminis-
tration of Justice and in the Task Force report on Organized Crime:
   Organized crime is a society that seeks to operate outside the control of the
American people and their governments.  It involves thousands of criminals working
within structures as complex as those of any large corporation, subject to laws more
rigidly enforced than those of legitimate governments.  Its actions are not impuls-
ive but rather the result of intricate conspiracies, carried on over many years and
aimed at gaining control over whole fields of activity in order to amass huge
profits.
   The core of organized crime activity is the supplying of illegal goods and ser-
vices-- gambling, loan sharking, narcotics, and other forms of vice-- to countless
numbers of citizen customers.  But organized crime is also extensively and deeply
involved in legitimate business and in labor unions. Here it employs illegitimate
methods-- monopolization, terrorism, extortion, tax evasion-- to drive out or con-
trol lawful ownership and leadership and to exact illegal profits from the public.
And to carry on its many activities secure from governmental interference, organized
crime corrupts public officials.
   It should be patently clear that organized crime does not operate in a vacuum.  We
can ill afford to stand aside and shake our collective heads at the effects of such
criminal activity, for in one way or another, every individual is affected when such
activities are permitted to exist **2265 in our society. Indeed, some are affected
more harshly than others, with the primary victims of organized crime being the dis-
advantaged persons in our urban areas. For the most part, it is not the upper or
middle class who are lured into the web of narcotics addiction, victimization by
loan sharks, and the numbers racket, to name a few-- it is the urban poor. And when

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097
S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

illegal profits are extracted from the public, as described in the above-quoted pas-
sage, it stands to reason that the burden falls heaviest on those who can least
shoulder it and have the least share in the advantages of our society.

I firmly believe that any so-called War on Crime that falls short of a total at-
tack on the roots and infrastructure of organized crime is a limited war, being
fought for an unrealistically limited objective, with no chance of success in its
declared purpose.  There is no sound basis for giving organized crime immunity from
pursuit and prosecution. Moreover, no matter how well-intentioned and thoughtfully
conceived and administered are our efforts to assist those caught-up in a cycle of
poverty, no program will be successful unless the effects of organized crime on
these very persons are neutralized. It has been estimated that the revenue of na-
tionwide crime syndicates reaches nine billion dollars a year.  The chief brunt of
this tribute is paid by the poor in the big cities and far outweighs the benefits of
the anti-poverty programs.

However, the mere conviction and intent to mount an effective assault on organized
crime will not suffice.  The very nature of the criminal syndicate increases the
difficulty of dismantling it.  Due to the complex structures and intricate overlays
of authority described above, law enforcement officials have a difficult time in
ever really reaching the high command of organized crime. Underlings 'on errands'
for the boss often come within the ready grasp of alert law enforcement officials,
but they are the 'expendables.'  When they neither know exactly who their real boss
is or are fearful of discussing such matters, law enforcement work is stymied.  The
reluctance and fear of victims and witnesses do not ease the task.

How then do you break into this core and get to the center of this cancer?  How do
you obtain the necessary when an organization is dedicated to protecting its masters
through a Code of Silence?  What do you look for when almost all communication is by
word of mouth, and there are not telltale records or memoranda of illicit enter-
prises? There can be no doubt as to the extent of the problem, the question is how
successfully to combat it.

It is against this unique background that I turn to probably the most controver-
sial means of obtaining evidence-- the techniques referred to as bugging and
wiretapping.  There are those who say that these techniques are the only effective
tools to fight such criminal privacy.  There are valid arguments on both sides.  But
there should be no doubt that the final decision on how to proceed in this area must
be based on both the rights of individuals and the need to protect society, not an
emotional harangue which too often accompanies these electronic surveillance de-
bates.  It should also be noted that the present United States law on wiretapping
**\*2266** and bugging is totally unsatisfactory.  Neither the right of privacy nor en-
forcement of the law is adequately served.

Anyone who has ever attempted an intelligent discussion of wiretapping and bugging
will undoubtedly find himself confronted with a major problem at the outset:  the
sinister connotation and fear of Big Brother and 1984 which has become attached to
the very terms themselves due to the amazing scientific developments in the field of
electronic surveillance in the past fifty years. If we only devise a word to mean
'scientific techniques to combat crime,' I believe the issue would be placed in much
clearer perspective and discussion could proceed unhampered by the distorted images
which are conjured up by the very terms themselves.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**


   One should realize that the need to balance the competing interests of privacy and
law enforcement occurs at a number of points in our criminal justice system and the
decision as to where to strike the balance must depend on the specific circumstances
involved.  But the concept of balance is not new and can in fact be traced by a
reading of the United States Constitution.  The framers of the Bill of Rights did
not establish the privacy of the individual in his person and effects as an absolute
right nor his home as an impenetrable sanctuary.  Safety was only guaranteed against
unreasonable-- not every-- search and seizure and institutions of law enforcement
were afforded the privilege of such search and seizure under carefully circumscribed
criteria. This is the recognition of a basic precept of civilized society:  There is
a point at which individual privacy and rights yield to the public safety.  The dif-
ficulty of striking this balance should not deter us from our responsibility as le-
gislators.

   There is overwhelming evidence that we have reached the 'crisis point.  '  Modern
surveillance techniques are urgently needed if law enforcement institutions are suc-
cessfully to perform their sworn duty of protecting the public.  New York County
District Attorney Frank Hogan-- whose office has made the most sophisticated use of
the techniques under consideration-- believes that telephonic interception pursuant
to Court order and under proper safeguards is the single most valuable and effective
weapon in the arsenal of law enforcement particularly in the battle against organ-
ized crime.  A distinguished array of witnesses before the Senate Judiciary Subcom-
mittee on Criminal Laws and Procedures also urged the need and propriety of such
techniques.  All members of the President's highly respected Commission on Law En-
forcement and Administration of Justice agree both on the difficulty of striking the
balance between the benefits to law enforcement versus the threat to privacy, and
the belief that if authority to employ electronic surveillance techniques is granted
it must be done with stringent limitations.  But a majority of the members favored
enacting legislation 'granting carefully circumscribed authority for electronic sur-
veillance to law enforcement officers to the extent it may be consistent with the
decision of the Supreme Court in People v. Berger . . .'

   A telling point is made by District Attorney Hogan when he points out that no re-
sponsible critic of wiretapping-- not even the Attorney General of the United
States-- urges that it should be abandoned in national security situations. District
Attorney Hogan views this as a concession **\*2267** that wiretapping and electronic sur-
veillance are vital weapons of detection against elaborate criminal conspiracies.

   In response to those who believe such surveillance activity would lead to excess-
ive invasions of privacy and a Big Brother Society, I would point out the practical
considerations which rule out the arbitrary use of wiretapping and electronic sur-
veillance devices and which therefore reduce possible invasions of privacy to a min-
imum: difficulty of installation, 'maintenance' of the equipment once installed,
properly monitoring conversations and adequately covering 'rendezvous,' overhead
through surveillance.  Thus, in view of the effort, time, and manpower required for
the proper use of such modern surveillance techniques, these methods-- far from be-
ing a substitute for good police legwork-- are frequently a preliminary to a great
deal of it.

   Moreover, Title III contains an elaborate system of checks and safeguards whereby
criminal and civil remedies would be available to percent abuses and unauthorized

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

surveillance by public officials and private persons.

Congressional concern and activity in the organized crime-surveillance area are somewhat recent.  Following World War II, the Congress attempted to pass a wiretap bill on several occasions. However, the primary concern in the 1950s was subversive activities, and it was not until the 1960's that such legislation was envisioned as a means to combat crime.  In 1961, the Kennedy Administration endorsed proposals for a wiretapping law authorizing federal agencies to tap in cases of national security, organized crime, and other serious crimes, placing no limits on State wiretapping.

In 1962, the Kennedy Administration sent a somewhat more restricted bill to the Congress.  It authorized federal wiretapping in cases of national security, organ- ized crime, and other serious crime, i.e., narcotics violations, murder, kidnaping, extortion, bribery, interstate transportation in aid of racketeering, interstate communication of gambling information, and a conspiracy to commit any of the forego- ing. It limited State wiretapping to certain serious crimes and outlawed all other wiretapping.  Congress took no action on the proposal.  The Kennedy Administration recommended passage of similar legislation in 1962, but again Congress took no ac- tion.

In 1965, 1966 and 1967, several bills on wiretapping and eavesdropping were intro- duced in both the House and the Senate, but the Administration of President Johnson has not endorsed any that would extend electronic surveillance to organized criminal activities.  In fact, by Executive Order promulgated in July 1965, President Johnson ordered all federal agencies except the Justice Department to cease wiretapping. The presidential order permitted the Justice Department to continue to tap wires only in cases of national security, but prior approval of the Attorney General was necessary.

In the recent Berger v. New York decision, the Supreme Court reversed a State con- viction for conspiracy to bribe based on a Court-approved eavesdrop.

The Court found the statute failed to meet the constitutional standard because it did not require sufficient particularity in the orders concerning **\*2268** the place to be searched, the person's conversations to be overheard, and the expected nature of the conversations and the time at which they will be hears.  Significantly, the Court indicated that a statute meeting these standards would meet constitutional re- quirements.  Therefore, I read this case as an invitation to the Congress to work its legislative will on the difficult problem of drafting a just, effective and com- prehensive wiretapping and electronic surveillance statute.

The legislation under consideration has responsibility answered that invitation and deserves our support.  This Title was drafted with the Berger decision specific- ally in mind and every effort was mode to conform to the criteria set forth by the Court and to develop a proposal which would fully comply.  This Title is also in ac- cord with the Court's more recent decision in Katz v. U.S. which dealt with the is- sue of electronic eavesdropping.  I believe this Title can provide our law enforce- ment authorities a useful tool in their investigations of organized crime while not unduly disturbing the privacy of the ordinary, law-abiding citizen.

In short, the advantages to society of this legislation outweigh its disadvant- ages.  If flaws appear in its administration, they can-- and must-- be corrected.

BLOC GRANTS

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**


Parts B and C of Title I provide for direct Federal planning and law enforcement
grants to individual units of local government, largely bypassing the Governors of
the States.  The creation of this nationwide competition for funding will lead the
way to Federal control and restrictions while encouraging fragmentation and confu-
sion among existing State law enforcement agencies and services.  Moreover, units of
local government hurriedly attempting to submit their applications for funds will
have little time for the thoughtful analysis necessary to formulate innovative pro-
grams of law enforcement and criminal justice.

The President's Commission on Law Enforcement and Administration of Justice poin-
ted out that one of the major problems of effective law enforcement is in the frag-
mentation of police efforts.  As an example, in my own State of Pennsylvania, one
county-- a metropolitan area needing highly coordinated law enforcement services--
has approximately 129 police departments.  Imagine the results if each local polit-
ical subdivision could apply individually for Federal assistance without any overall
coordination.  I am sure similar instances can be found across the Nation.

I therefore urge that we stimulate intrastate activity and interstate cooperation
by adopting the bloc grant approach (so-called Cahill Amendment) incorporated into
the House-passed crime bill, the Law Enforcement and Criminal Justice Assistance Act
of 1967 (H.R. 5037), and proposed during Committee consideration by Senator Roman
Hruska.  Under this approach, Federal financial assistance to State and local law
enforcement would be channeled through 'State planning agencies' created or desig-
nated by the Governors of the several States.  These funds would be allocated by the
State agencies to State and local law enforcement activities pursuant to current
comprehensive plans which must be approved **\*2269** annually by the Federal Law En-
forcement Administration.  Each State agency would determine its own priorities for
expenditures consistent with its comprehensive plan.

To participate in the bloc grant system, a State must indicate its commitment to a
statewide program of law enforcement and criminal justice as well as its willingness
to contribute to such a program. Moreover, where a State is unable or refuses to
meet the necessary conditions, the bloc grant approach provides for a bypass of the
State by direct Federal grants to units of local government. By thus giving those
States that are willing to meet their responsibilities the opportunity to formulate
and implement comprehensive plans of action, this method of providing crime-fighting
funds would encourage the pooling of services, effective regionalization and in-
creased coordination in law enforcement activities.  Moreover, it would enable the
States, who are more familiar than the Federal Government with local needs and are
directly responsible to their constituents, to apply funds to the specific projects
most urgently needed in their areas rather than permitting the National Government
to set priorities. My views on this matter are in line with the able recommendations
of Attorney General William C. Sennett of the Commonwealth of Pennsylvania.

CRIMINAL JUSTICE SYSTEM

Section 520 in Part E of Title I limits to 20% of the authorized funds the amount
of money which can be spent on grants for purposes of 'correction, probation, and
parole'-- what I call the criminal justice system. This limitation is unfortunate

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097                                                        Page 344

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

because our law enforcement and criminal justice systems must represent a unified
assault on crime based on a meaningful distribution of resources to be effective.

Today, there is imbalance between criminal justice and law enforcement.  To in-
crease the effectiveness of law enforcement while limiting the funds for criminal
justice will reinforce this imbalance and prevent the very type of planning and ac-
tion that this legislation envisions.  By establishing this standard of imbalance by
statute, we may run the risk of forcing a judge to select a sentence-- be it prison,
probation or rehabilitation-- on the basis of what is available as opposed to what
is best suited for society and the criminal in each particular case.

It should be remembered that the President's Commission on Law Enforcement and Ad-
ministration of Justice found that 'the most striking fact' about persons convicted
of serious crimes is that they continue to break the law.  It is imperative that
when these people are within the criminal justice system, we devote all necessary
resources and do all under our control to break this cycle of recidivism.  Rather
than setting any limit, I believe the decision on the allocation of resources in an
anticrime program should be left as a matter of judgment to those persons directly
dealing with the problem.

I believe my record is clear.  When I argue for a balanced system of criminal
justice and law enforcement, I do not argue for a 'soft' or 'hard' policy on crimin-
als.  I argue for a rational approach that will enable us to meet and overcome the
major crime problem facing this Nation.

     HUGH SCOTT.

                    ***2270** INDIVIDUAL VIEWS OF MR. EASTLAND

I strongly favor the general purpose and object of S. 917, which is to provide
Federal financial assistance for local law enforcement agencies to aid them in pre-
venting and combatting crime.

In my judgment, the sharp and steady increase in violent crimes against persons
and property, which results in a constantly spiralling rate of crime constitutes our
most serious domestic crisis.

In 1967, the United States experienced an increase of 16 percent in the number of
serious crimes committed compared to the number of serious crimes committed the pre-
ceding year.  Yet, the population of the Nation is reliably estimated to have in-
creased by only 1 percent in 1967.  Crime is increasing at a rate of 16 times that
of population.

It is of the first order of business for this Congress to enact effective legisla-
tion to combat crime.  I will wholeheartedly support such legislation.

However, I believe that Title I of the bill, if enacted in its present form, would
undermine a basic premise of our Federal Republic; that is, that there should be
local control and supervision over law enforcement.  In my judgment, this undermin-
ing of local control of law enforcement could lead to a national police force, and
perhaps to a national police state.

I wholeheartedly support the provisions of Title II which deal with the admissib-
ility of confessions in criminal cases, the admissibility of eye-witness testimony
when there has been a viewing by the witness of the defendant in a police line-up,
and post-conviction remedies available in the Federal courts.  I believe that all of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, Page 145

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

these provisions of Title II will measurably strengthen law enforcement and respect
for the law by helping to assure that the guilty will be convicted and punished.
The hyper-technical decisions of the Supreme Court of the United States in the field
of criminal law have encouraged the criminal elements to feel that no matter what
they do they will escape conviction and punishment.  Of course, this creates a gen-
eral disrespect for the law.

I concur in the views of the Committee Report on Title II.

Likewise, I support the provisions of and concur with the Report of Title III,
which sets up procedures for law enforcement officers to obtain court orders in cer-
tain cases to engage in wiretapping or electronic surveillance. It is absolutely ne-
cessary that our law enforcement officers have this right, especially in order to
combat the sinister activities of organized crime.  This will result in more effect-
ive law enforcement without violating any of the constitutional rights of our cit-
izens.  This wiretapping or electronic surveillance would always be under strict
court supervision.

I oppose the provisions of Title IV, the gun control amendment, and concur in the
individual views of Senator Hruska as to that title.

I will now briefly detail my objections to the language of Title I, and will un-
dertake to document my statement that its enactment could lead to a Federal take-
over of local law enforcement.

Section 101 establishes within the Department of Justice under the general author-
ity of the Attorney General of Law Enforcement Assistance**\*2271** Administration, to be
composed of an Administrator and two Associate Administrators, who shall be appoin-
ted by the President by and with the consent of the Senate.  The Administration is
given the power to administer the entire program of Federal financial assistance to
local law enforcement agencies.

Section 501 gives the Administration the authority, after consultation with State
and local officials, to establish rules, regulations, and procedures necessary to
the exercise of its functions. This would give this Administration at a Federal
level, a general rule-making power to establish 'guidelines', compliance with which
would be a condition for the granting of Federal funds. Our local schools, hospit-
als, and other institutions have had painful experiences in attempting to comply
with guidelines laid down by other Federal agencies in the disbursement of Federal
funds.  In my judgment, it would be most unwise to have these experiences repeated
in the delicate area of local law enforcement.

It is significant that although the Administration is directed to 'consult  ' with
State and local authorities in establishing rules, regulations, and procedures, Sec-
tion 501 does not mandate the Administration to give this advice any weight in for-
mulating its 'guidelines'.

Section 502 exhibits a further disregard for State and local law enforcement au-
thorities by giving the Administration the right to delegate any of its functions to
any of its officers or officials, or, with the consent of the Attorney General, to
any officer of the Department of Justice.  Thus, any staff member of the Administra-
tion or any Assistant Attorney General of the United States can be delegated the
awesome authority of formulating 'guidelines ' compliance with which would be a con-
dition for the granting of vast sums of Federal money. Such functionaries could also
be delegated the power to enforce these 'guidelines'.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097
Page 2246
S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

It has been a hallmark of the movement to exalt Federal power and debase the power of the States and local communities to place high State and local officials in an inferior position to lower-ranking members of the Federal Establishment.  I strongly condemn this practice.  It is destructive of healthy Federal-State relationships.

Section 509(b) is the 'chopping block' provision.  It states, in essence, that whenever the Administration, after reasonable notice and opportunity for hearing to an applicant or a grantee, finds that there is a substantial failure to comply with regulations promulgated by the Administration, the Administration shall notify such applicant or grantee that further payments shall not be made until there is no longer such failure.  This is the 'stick ' of the 'carrot stick' approach to enforcing compliance with the 'guidelines'.

Section 515 authorizes the Administration to collect, evaluate, publish and disseminate statistics and other information on the condition and progress of law enforcement in the several States.  It does not require much imagination to envision the effect of the publication by the Administration of critical comments about the condition of law enforcement in a particular State or locality while applications for funds with the Administration were pending from such State or locality, or while the Administration **2272** was in the process of determining whether the payment of Federal funds should be terminated to such State or locality.  Predictably, there would be a great local pressure for the criticized State or locality to 'fall in line' with the recommendations contained in the 'evaluation' of the Administration.  There is no guarantee that any evaluation made by the Administration of the condition and progress of law enforcement in the several States would be an objective one, and if recent experience teaches us anything, it is that such an evaluation is likely to be a highly subjective one.

The Attorney General candidly admitted in testimony before the Sub committee on Criminal Laws and Procedures on this bill that the 'rulemaking ' power would vest almost unlimited discretion in the Federal authorities administering the program.  At that time, the program was to be administered directly by the Attorney General, rather than by a three-man Administration under his supervision.  The Attorney General acknowledged that he would have the power under the 'rule-making' authority to prescribe the type of shoes and uniforms to be worn by local law enforcement officers, the type or brand of ammunition to be purchased and used by police departments, and many other vital matters pertaining to the day-to-day operation of local law enforcement.  He disavowed any intent to use the 'rule-making power' in any such far-reaching and arbitrary manner.  I am certain that the Attorney General was completely sincere in making these disavowals.

However, there is no assurance that the present Attorney General will be succeeded in office by persons of equal sincerity.  This great power may be used in the future by a man who is lacking in judgment, virtue, or self-restraint.  We should not take that chance.

In his last writings, the late Justice Robert H. Jackson cogently warned of the danger of a Federal take-over of local law enforcement. In preparing his notes for the Godkin Lectures at Harvard, which were never given because of his untimely death, Justice Jackson drew on his experiences as a prosecutor at the Nuremberg Trials to issue this timely warning:

The Court has been drawing into the federal system more and more control by feder-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

al agencies over local police agencies.  I have no doubt that the latter are often
guilty of serious invasions of individual rights.  But there are more fundamental
question involved in the interpretation of the antiquated, cumbersome, and vague
civil rights statutes which give the Department of Justice the right to prosecute
state officials.  If the Department of Justice must prosecute local officials, the
FBI must investigate them, and no local agency which is subject to federal investig-
ation, inspection and discipline is a free agency.  I cannot say that our country
could have no central police without becoming totalitarian, but I can say with great
conviction that it cannot become totalitarian without a centralized national police.
At his trial Hermann Goering, with great candor, related the steps by which the Nazi
Party obtained complete domination of Germany, and one of the first was the estab-
lishment **\*2273** of the supremacy of the national over the local police authorities.
So it was in Russia, and so it has been in every totalitarian state.  All that is
necessary is to have a national police competent to investigate all manner of of-
fenses, and then, in the parlance of the street, it will have enough on enough
people, even if it does not elect to prosecute them, so that it will find no opposi-
tion to its policies.  Even those who are supposed to supervise it are likely to
fear it.  I believe that the safeguard of our liberty lies in limiting any national
policing or investigative organization, first of all to a small number of strictly
federal offenses, and secondly to nonpolitical ones.  The fact that we may have con-
fidence in the administration of a federal investigative agency under its existing
heads does not mean that it  may not revert again to the days when the Department of
Justice was headed by men to whom the investigatory power was a weapon to be used
for their own purposes.  (The Supreme Court in the American System of Government,
Robert H. Jackson, 1955, pages 70-71).

For these reasons, I will support on the Floor the so-called 'Block Grant' amend-
ment, which would provide for Federal grants to State law enforcement planning agen-
cies, which, in turn, would disburse these funds to local law enforcement agencies.
In my judgment, the 'Block Grant' approach is superior, in that it would place con-
trol at the State level rather than at the Federal level of government.

    JAMES O. EASTLAND.

    INDIVIDUAL VIEWS MESSRS. DIRKSEN, HRUSKA, SCOTT, AND THURMOND ON TITLE I,
                          II, AND III

Since 1960, serious crime in the United States has increased an alarming 88 per-
cent.  This fact is cause for the gravest national concern.
This is not a partisan issue.  It is an American tragedy.
In consideration of the omnibus crime bill, we have sought to strengthen and im-
prove the proposal sent to Congress.  To a limited extent, these efforts have been
successful.  The committee bill, still needs further upgrading and refinement.

                          MINORITY CONTRIBUTIONS

The Omnibus Crime Control Act reported by the Senate Judiciary Committee bears an
unmistakable imprint of constructive Republican contributions.  These contributions
range from new substantive provisions to perfecting technical changes.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

ORGANIZED CRIME

The most significant Republican contributions to the bill are those which increase significantly the tools and financial resources to combat the **\*2274** scourge of organized crime.  In this regard, two major provisions were added at our insistence.

First, the substance of Amendment 223, introduced on June 29, 1967, by Senators Dirksen, Hruska, Scott, Thurmond and several others, has been approved.  The amendment creates a category of special financial assistance to state and local governments.  Such assistance has two purposes:

(1)  To assist in the establishment or expansion of special prosecuting groups on a local level to ferret out and prosecute the multifarious illegal activities of organized crime.

(2)  To provide special federal assistance in establishing a coordinated intelligence network among states including computerized data banks of syndicate operations and activities.  These efforts would be under the direction and control of State Organized Crime Councils. A special authorization up to $15 million for fiscal year 1969 would be available for this purpose.

ELECTRONIC SURVEILLANCE

Another major contribution to efforts to combat organized crime is found in  Title III of the committee bill.  To a great degree, this title reflects the provisions of S. 2050, the proposed Electronic Surveillance Act of 1967, which was introduced by Senators Dirksen, Hruska, Scott, Thurmond, Percy, Hansen and others in June of 1967.  Included in the committee bill is the formula for strict impartial court authorization and supervision of surveillance and a broad prohibition on private snooping.  S. 2050 was introduced in the wake of the Supreme Court's decision of Berger v. New York.  It was tailored to meet the constitutional requirements imposed by that decision.

Specifically, the sponsors of S. 2050 drew heavily upon the recommendations of the President's Crime Commission.  Also, the services of the Commission's expert consultants on organized crime were secured in preparing the bill.  Since S. 2050 was incorporated into the subcommittee bill, it has been further refined and changed to reflect the clear guidance of the Supreme Court decision in Katz v. U.S. and constructive comments from interested parties.

The original bill which provided the foundation for Title III was  S. 675, a bill introduced by Senator McClellan in January 1967 for himself and Senator Hruska.

The electronic surveillance title will provide an essential tool to law enforcement officials in waging all-out war against organized crime.  Yet, the right of privacy of our citizens will be carefully safeguarded by a scrupulous system of impartial court authorized supervision.  Such court supervision will monitor and control use of these techniques by law enforcement officials.  A broad prohibition is imposed on private use of electronic surveillance, particularly in domestic relations and industrial espionage situations.

Special emphasis on organized crime was essential because of the tragic lack of progress made in recent years in bringing the kingpins of organized crime before the bar of justice.  Testimony by Professor Robert **\*2275** G. Blakey before the Criminal

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097
S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

Laws Subcommittee last summer indicated:

If you examine the work that was done a number of years ago, I think you can say
the existing program is a success.  But if you examine the existing program in ref-
erence to what could be done, I think you are going to have to say it is a colossal
failure.  Let me give you a measuring stick to test this judgment.

The Department (of Justice) has identified an estimated 5,000 members of La Cosa
Nostra.  Between 1961 and 1966, the Department has succeeded in indicting approxim-
ately 200 of them and convicting approximately 100.  That gives them against the
hard core in organized crime about a 2-percent batting average. With the best we
have to offer, that is, the FBI, the Internal Revenue, the top lawyers of the De-
partment of Justice, with an expenditure of $20 million a year over a 5-year period,
we have not secured the conviction of more than 2 percent of the hard core of iden-
tified people.  I think there is an indication of failure.  And the reason we
haven't been able to get beyond that point is simply because we haven't given the
best men the necessary legal tool.

As evidence of the Administration's superficial and indifferent understanding of
the threat of organized crime, the Attorney General recently described the mass of
organized crime as a 'tiny part' of the entire crime problem.  It is earnestly
hoped, however, that the new arsenal of tools which this bill provides will be ef-
fectively used; Senator Scott does not necessarily support this amendment.

We associate ourselves fully with the comments on organized crime which are con-
tained in the committee report in Titles I and III.  In doing so, we pay tribute to
the long dedication and hard work of the chairman of the Criminal Laus Subcommittee,
Senator John L. McClellan.

Further, we urge early hearing on S. 2048, S. 2049, and S. 2051. These bills were
introduced by Senator Hruska and others to provide additional legal tools to combat
organized crime.

STATE AND LOCAL CORRECTIONAL INSTITUTIONS

In the original drafts of the omnibus bill circulated to members of the Criminal
Laws Subcommittee, state and local correctional systems were either prohibited from
participating in the various assistance programs made available for this purpose or
such participation was severely limited.  At our insistence, this vital but tragic-
ally neglected area of law enforcement was restored to an appropriate place within
the statutory framework.

Our nation's prisons must become something more than mere way stations in criminal
careers.

CONTINUATION OF THE LAW ENFORCEMENT ASSISTANCE PROGRAM

On Senator Hruska's motion, language was added to the crime control bill in com-
mittee to insure that the activities and functions of the **\*2276** Office of Law En-
forcement Assistance would be continued until the appropriations become available to
establish and operate the new program.

The Office of Law Enforcement Assistance was established pursuant to the Law En-
forcement Assistance Act of 1965.  This act, which received substantial minority
support in both houses of the Congress, provided for federal support of research and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097                                                            Page 196

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

development into the problems associated with the law enforcement and criminal
justice systems.  Even though the existing program has been grossly under-funded at
a third of its present $20 million authorization and is substantially undermanned,
we feel that it is essential that it be continued until the new program gets under-
way.  Otherwise, there would be a significant break in continuity.  The staff of 25
would have to be discharged, transferred to other positions or similar objectionable
readjustments made.

   The amendment approved by the committee will insure an orderly transition.

                         DEFICIENCIES OF TITLE I

   Although we are in substantial agreement with many of the provisions of  Title I
which authorize federal assistance to state and local law enforcement agencies, we
are not satisfied with the title as reported from the committee.  We offered three
major amendments to the measure in full committee which were narrowly defeated.  The
first amendment included the so-called block grants provisions similar to those of
the House-passed bill.  The second amendment would reinstate the provisions of the
Senate subcommittee-approved bill in which the Law Enforcement Assistance Adminis-
tration would be independent of the control of the Attorney General.  Finally, we
attempted to remove the provisions of the committee bill which provide for federal
supplements to policeman's salaries.

   We will offer these amendments for consideration by the Senate.

                            BLOCK GRANTS

   The overriding deficiency of the committee bill is the failure to retain the so-
called block grant provisions of the House-passed bill. We offered amendments to re-
instate the block grant features in the full committee, but they were defeated by a
one vote margin.  We will offer them again on the floor of the Senate.

   It is the purpose of these amendments to insure that federal assistance to state
and local law enforcement does not bring with it federal domination and control nor
provide the machinery or potential for the establishment of a federal police force.
Frankly, we fear that S. 917, without such provisions, could well become the vehicle
for the imposition of federal guidelines, restrictions and eventual domination.

   Our block grant amendments would revise Parts B and C of Title I, to adopt, with
some changes, the provisions of Title II and III of the bill as it was passed by the
House of Representatives.  The amendments provide that federal financial assistance
to state and local law enforcement be channeled through 'state planning agencies'
created or designated by the several states.  These moneys would be allocated by the
state authority **\*2277** to state and local enforcement activities pursuant to compre-
hensive plans which must be approved annually by the federal Law Enforcement Admin-
istration.  Each state agency would determine its own priorities for expenditures
consistent with its comprehensive plan.

   Local activities could apply directly to the Law Enforcement Assistance Adminis-
tration if a state planning agency is not designated or created within six months
after the effective date of the Federal Act.  Specific criteria for comprehensive
state plans are set forth in the amendment to Part C.  Funds appropriated for Part C
grants would be available to the states according to their respective populations,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

except that 15 percent of the funds would be reserved for allocations as the Admin-
istration may determine.

Of the funds made available to the states 75 percent must be spent at the local
level unless there is no local demand.

We offer this amendment for many reasons, reasons which the House of Representat-
ives has recognized and overwhelmingly approved.

The House very wisely did not pass a local police forces bill, but a law enforce-
ment and criminal justice bill.  Criminal justice is a system covering law enforce-
ment, court judgments, and corrections. Better protection and security for every in-
dividual American necessitates coordinated and simultaneous improvement in the sys-
tem, and not just a single-shot effort to improve some local police forces. The
House chose to require that states give written evidence of their intentions to im-
prove their criminal justice systems, in cooperation with local governments, before
federal funds could be spent. This is a call for state responsibility.

The administrative complexities and long delays associated with too many federal
grants made directly to local governments are well documented.  Every member of the
Senate has spent long hours trying to beg, bludgeon or cajole some bureaucrat to pry
loose from voluminous dusty files grant applications which have been pending for
months or years.

The federal government should concern itself with the coordination of 50 state
programs rather than trying to evaluate, judge, and fund the projects of thousands
of local governments.

The states are ready to assume their responsibilities for action. In 1966 when
limited federal funds were offered to the states to establish planning commissions
to combat crime, 16 states established these commissions, and eight others have had
applications pending with the Justice Department for varying lengths of time.  Dur-
ing the same 18 month period, the Justice Department with the active cooperation of
national organizations representing cities and counties, only managed to approve a
total of 11 grants to both cities and counties, plus eight grants for the District
of Columbia, out of a potential of over 18,000 cities and 3,000 counties.  The pub-
lished Justice Department facts show that the states more than other jurisdictions
are assuming their responsibilities.  In all, more than one-half of the states have
already received state planning grants.  Several more have applications pending.

Within the last month, 47 Governors meeting in Washington unanimously recommended
that Congress push forward with these bills, but with due regard for required
statewide planning and project coordination, including **2278** provisions for local
officials to participate with the state officials in the development of these pro-
grams. The National Association of Attorneys General recently passed a resolution in
support of the Law Enforcement and Criminal Justice Act as amended and passed by the
House.  The unanimous judgment of these state officials plus a substantial majority
of the members of the House of Representatives is that if creative federalism is to
become workable federalism, then it must move away from direct project grants to
local governments that would bypass state financial and technical assistance related
to the solution of the same problem.  Seldom does the solution of a problem involve
only one functional area; in most cases other functional elements are directly re-
lated.

New York City may have 29,000 policemen, but New York City's problems of law en-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

forcement, courts and corrections, and juvenile delinquency extend into the juris-
diction of three states and over 14,400 separate taxing authorities in the New York
metropolitan area. Direct federal aid for police functions in New York City without
proper requirements for concerted action on the part of New York State would be a
simple distribution of more federal money with no regard for the multiplication of
benefits that would result from a requirement that the state approve the grant while
at the same time relating the grant to all existing and proposed state programs.

   Most direct grants that bypass the states are project-oriented stop-gap measures,
which never approach the level of comprehensive program orientation and fail to
provide measurable evidence that problems are actually being solved.  With $100 mil-
lion in federal funds for law enforcement and criminal justice programs, about 350
project grants are proposed.  The House very wisely foresaw the fruitlessness of
scattering these funds mong such a minute number of uncoordinated separate projects.
Consequently, the House required that a coordinated action plan be submitted by each
state before the funds are released.

   Administratively, most cities and counties have a greater chance of getting some
of the $20 billion of federal aid funds when they are processed through a state
agency.  When they must deal directly with Washington, the premium is on the new art
of 'Grantsmanship.' Certainly, large cities with several fulltime Grantsmanship Of-
ficers would prefer direct relations with Washington.  However, our national concern
should be problem solving, with workable programs to meet local needs.  The state
will always be the primary administrative unit that can see that funds are going
where they are needed, not where the Grantsmen are operating.

   The prestigious National Council of Crime and Delinquency, in a recent policy
statement on block grants observed:

   A serious program of law enforcement assistance will promote at least pooling of
police departments in the major metropolitan areas. The President's Commission re-
commended this, and there really cannot be a question of doing it.  Regionalization,
sharing of facilities and services, and realistic planning are going to occur.  The
real question is who will decide how and which combinations will take place.  Cit-
ies, even those with a population of 50,000, cannot **\*2279** do it.  Metropolitan areas
are beyond the jurisdiction of cities.  It must be done either by the state or Fed-
eral governments.

   The Administration's new bill would leave this decision to the Attorney General
and the 331 cities with populations over 50,000.  For the law enforcement agencies
serving the other 58 percent of the population, state governments would make the de-
cisions.  The bill passed by the House would leave to the state planning body the
decision in all jurisdictions.  To choose between these it is necessary to look bey-
ond law enforcement, narrowly construed, to see it as what it is-- part of a larger
system.

   It is inconsistent to expand direct federal-local relationships at a time when the
crucial need is for more and better state-local relations.  Direct federal-local ac-
tions generate unnecessary misunderstandings, confusions, and endless debate at a
time when local governments are in need of home rule powers, model court systems,
greater state financial and technical assistance, and modernization of a wide vari-
ety of laws for every functional activity.

   The days are long overdue when the unmanageable and unworkable proportion of 495

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:07-cv-02538-VRW     Document 5     Filed 06/23/2007     Page 274 of 303

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

separate authorizations for federal aid programs should be revamped, repackaged, and
consolidated where feasible, in the form of block grants to the states in broad pro-
gram categories.  At the very least, when it comes to adding new grant programs to
the total such as Law Enforcement, Criminal Justice, and Juvenile Delinquency, state
responsibility in urban affairs should be required, and not optional as encouraged
by all bypassing proposals.

But the most persuasive argument in support of increasing state responsibility for
law enforcement was well stated by the distinguished director of the Federal Bureau
of Investigation when he said:

America has no place for, nor does it need, a national police force. It should be
abundantly clear by now that in a democracy such as ours effective law enforcement
is basically a local responsibility.  In the great area of self government reserved
for States, counties and cities, the enforcement of the laws is not only their duty
but also their right.

We agree.

### INDEPENDENT LAW ENFORCEMENT ASSISTANCE ADMINISTRATION

In pursuit of one of the same objectives of the block grant provisions, namely the
prevention of federal domination and control of state and local law enforcement, the
Criminal Laws Subcommittee, upon the initiative of Chairman McClellan, added a pro-
vision to its bill for the establishment of an independent Law Enforcement Assist-
ance Administration to administer the federal aid program.  The administering agency
was to be headed by a three-man board appointed by the President with the advice and
consent of the Senate.  Minority party representation was assured by the requirement
**\*2280** that one of the three men would be a representative of the party out of power.

The subcommittee bill provided:

In the exercise of its functions, powers, and duties, The administration shall be
independent of the Attorney General and other offices and officers of the Department
of Justice.

This was deemed essential to insure that, as much as possible, the law enforcement
assistance program would be administered impartially and free from political pres-
sures.  Also, it was considered to be important to refrain from placing in the hands
of one man the potential power of granting or denying federal financial assistance
in very large amounts to state and city law enforcement agencies.

It is regrettable that the provision for the independent status of the Administra-
tion was dropped from the bill.  We attempted unsuccessfully to reinstate the provi-
sion in the full committee, and will urge its adoption on the floor of the Senate.

In short, we don't want the Attorney General, the so-called 'Mr. Big' of federal
law enforcement to become the director of state and local law enforcement as well.
It is true that the Attorney General is chief law enforcement officer of the federal
government. But he is not chief law enforcement officer of states or cities.  We be-
lieve America does not want him to serve in this latter capacity.

Organization and management experts may object to a dilution of executive author-
ity, but we want no part of a national police force. Such dilution, if a price at
all, is a small price to pay to preserve a fundamental balance of police power.

We don't want this bill to become the vehicle for the imposition of federal

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

guidelines, controls, and domination.

POLICE SALARY SUPPORT

The Administration's original proposal to Congress in early 1967 contained a fea-
ture allowing up to one-third of each federal grant to be utilized for compensation
of law enforcement personnel.  In the hearing record of both the House and Senate
Judiciary Committees, this provision proved to be quite controversial.  When the
House Committee reported the bill, the provision for salary support was deleted.
Commenting on this action, the committee report on page 6 stated:

The committee deleted all authority to use grant funds authorized by the bill for
the purpose of direct compensation to police and other law enforcement personnel
other than for training programs or for the performance of innovative functions.
Deletion of authority to use Federal funds for local law enforcement personnel com-
pensation underscores the committee's concern that responsibility for law enforce-
ment not be shifted from State and local government level.  It is anticipated that
local governments, as the cost for research, innovative services, training, and new
equipment developments are shared by the Federal Government in the programs author-
ized in the bill will be able to devote more of their local resources to the solu-
tion of personnel compensation problems.

**\*2281** The committee recognizes that adequate compensation for law enforcement per-
sonnel is one of the most vexing problems in the fight against crime.

We wholeheartedly subscribe to the House committee's view.  There is indeed a
grave concern that responsibility for law enforcement not be shifted from the state
and local levels.

The Senate Criminal Laws Subcommittee also deleted a similar provision by an over-
whelming vote, but subsequently a somewhat modified salary provision was reinstated.
In modified form, up to one-third of each grant could be made available to pay one-
half the cost of salary increases for law enforcement personnel.  Even with this
modification, we must strongly oppose the provision.  This is not because we are in-
different to the low pay of the nation's law enforcement officers. It is because we
fear that 'he who pays the piper calls the tune' and that dependence upon the feder-
al government for salaries could be an easy street to federal domination and con-
trol.

In addition, this provision would not have equal application or provide equal be-
nefits to all law enforcement officials.  In fact, most of the nation's 400,000 po-
lice officers would not be eligible because under the committee bill only local jur-
isdictions or groups of local jurisdictions with populations of mor than 50,000
would be eligible to apply for grant aid.  Thus, those smaller jurisdictions, some
80 percent of the nation's total with 58 percent of the population, would not be
eligible for grant assistance.  Who is to say that the officers of City A which
meets the population standard could receive federal salary supplements whereas the
officers of City B, perhaps an adjoining community whose population requirements do
not meet the test, could not qualify.

The unfairness of the Administration proposal becomes crystal clear when it is
considered that not all large cities and policemen will be beneficiaries of federal
law enforcement grants.  This is so because there is simply not enough federal money

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

to go around.  Thus, City C which perhaps got its application in early or whose
political leadership was in favor with the Department of Justice received a grant
and salary support, while City D with the same needs, the same crime problems and
same low pay scales was left out because its application was tardy or not in compli-
ance with contemporary federal notions on what a good application should contain.
What could be more manifestly unfair?

   Finally, it should be noted that once salary support is granted, it would be dif-
ficult if not impossible for the federal government to abandon its assistance, thus
leaving a permanent dependence on the federal treasury.


                              TITLE II


   The spectre of American society-- the greatest in the history of the world
plunging into chaos as the national fabric unravels into lawlessness is alarming.
It is that spectre that urges us to support this omnibus measure in hopes to reverse
that ever-quickening trend. No honest and conscientious effort to restore effective
law enforcement and fair criminal justice-- no matter how many dollars are spent or
wires tapped or guns controlled **2282** can hope for success without dealing with the
technical problems of admissibility of evidence and appellate review of criminal
cases.

   To control criminal conduct, our American system requires some means of getting
control of the criminal-- the person breaking the law. Society has no more effective
means of controlling a criminal than laws and penalties for violations of those
laws.  To impose the penalties requires conviction of the criminal.  To convict
criminals, relevant, competent and material proof, rising to the degree of beyond a
reasonable doubt, must be admitted into evidence for the trier of the facts-- judge
or jury-- to weigh and determine.  Without such evidence, no intelligent, competent,
and above all, fair decision can be made. In an increasing number of cases, such
evidence is unavailable, not because it does not exist or cannot be discovered, but
because it is inadmissible for certain court created reasons.

   The exclusion of voluntary confessions, including admissions against interest, is
perhaps the most significant problem in obtaining criminal convictions.  Members of
the Subcommittee on Criminal Law and Procedure have heard scores of respected and
competent witness testify that such exclusion has seriously crippled law enforce-
ment.  Not only is the actual confession rendered useless but any 'lead' or 'clue'
to other independent evidence provided by the confession is so 'tainted' that it is
inadmissible and therefore useless. District attorneys and State Attorneys General
from cities and states that are in serious trouble in the war on rising lawlessness,
shocked the sensibilities of many of us on the Committee with reports of the ever-
increasing numbers of criminals who are patently guilty and who walk out of
courtrooms because the principal evidence against them was ruled inadmissible. This
result was attributed to the rigid and technical application of exclusionary rules
laid down by appellate courts.  Distinguished judges, appellate and trial, voiced
similar concern in urging Congressional action.  Our hearing record is replete with
such pleas for help.  In our own self-defense, this destructive trend must be re-
versed.  Are we to sit idly by while, through the operation of a legal technicality,
innocent people are ravaged by self-confessed marauders?  Is society to render it-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

self incapable of self-protection? Should it be as the famed jurist, Benjamin Car-
dozo, once asked, that 'the criminal is to go free because the constable has
blundered?'

  The provisions of Title II attempt to right the imbalance in the scales of justice.
We have agonizingly weighed the rights and equities of the individual against those
of society.  We have tried to the best of our consciences to strike the balance
true.

  This title would restore the test for the admissibility of confessions in criminal
cases to that time-tested and well-founded standard of voluntariness. It would avoid
the inflexible rule of excluding such statements solely on technical grounds such as
delay or failure to warn the accused as to his rights to silence or to counsel. We
have not nullified, however, the rights of defendants to the safeguards of federal
law or the Constitution.  On the contrary, we have provided a more reasonable rule
in that the judge shall consider all the defendant's rights (speedy arraignment, si-
lence, counsel, knowledge of offense charged) and their possible violation in decid-
ing as to the voluntariness of the confession and thus its admissibility.

  **\*2283** We also have attempted to deal with the imbalance in our delicate federal
system caused by the ever-growing tendency of federal courts to disrupt the finality
of state court adjudications, particularly with respect to the admissibility of con-
fessions.

  Never-ending proceedings are continuously sought in federal courts to overturn the
final adjudications of state courts in criminal cases. This dissolution and disrup-
tion of state criminal law enforcement is part of the serious deficiency in dealing
with criminal conduct.  In this respect, Title II provides for the Congress to exer-
cise its very clear authority under the Constitution to create the appellate juris-
diction of the federal courts.  Such jurisdiction would be limited by excluding the
issue of admissibility of confessions that have been adjudicated in the highest
court of the state. [FN8]

  Another area in which we have reached a ridiculous stage in criminal process is
where eye-witnesses and victims of crime are not permitted to identify the criminal
in court.  Such a situation arises when a witness happens to see the defendant sub-
sequent to the commission of the crime at a time when the defendant is in police
custody and when he does not have a lawyer present. This rule finds no direct or in-
direct support in the Constitution.  Justice Black pointed out such lack of preced-
ent in dissenting from the decision that established the rule. The majority of the
court strained the Sixth Amendment's right to counsel concept in order to find the
power to exclude such testimony. The result offends the conscience and erodes the
law of evidence.  The justice also pointed out that the court has no power to estab-
lish such a constitutional rule of evidence for a state court.

  Title II would permit the admission of eye-witness testimony in federal courts
without regard to intermediate observations by the witness of the defendant.  It
also would limit the federal appellate jurisdiction in state cases where that issue
is sought to be reviewed. [FN8a]

  The disruptive influence that federal courts have had in state criminal prosecu-
tions is reflected in the area of federal habeas corpus.  Our Subcommittee hearings
revealed extensive abuse of the federal habeas corpus proceeding, since it results
in the continuous litigation and relitigation of issues settled in the state courts.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**


The appaling figures that demonstrates the explosive growth of such petitions in the
federal courts are set out in the hearings and in this report.  The statistics are
staggering to us and to the courts. Orderly administration of criminal justice is
impeded by the proliferation of such a device to escape the final adjudication of
state courts.  All are agreed that most applications are frivolous and without mer-
it.  To allow indiscriminate use of this device to frustrate other legitimate func-
tions of the courts thwarts our efforts to obtain justice. Again, the federal courts
will not discipline themselves with self-restraint. To return balance to the admin-
istration of justice it is necessary for the Congress to use its power under the
Constitution and clearly regulate the jurisdiction of the federal courts.  Thus, we
would limit federal court jurisdiction to direct appeal and certiorari in certain
state criminal cases. The practice of abusing federal habeas corpus procedures as a
substitute for direct appeal must cease to overburden our system of criminal
justice. [FN8b]

                              **\*2284** TITLE III

   While we strongly agree with the report of the Committee on Title III, we feel
that it is necessary to add certain additional comments.

                         HISTORY OF THE LEGISLATION

   Title III, as the report notes, is essentially a combination of S. 675 introduced
by Senator McClellan and S. 2050 introduced by Senator Hruska. S. 675 was, of
course, modeled on the wiretapping bill first introduced under the Kennedy Adminis-
tration.  It had the strong support of Nicholas deB. Katzenbach, when he was attor-
ney general. Indeed, it was not until the present Attorney General assumed his posi-
tion of the Department of Justice changed.
   S. 2050, on the other hand, finds its origin in the proposal which the President's
Commission on Law Enforcement and Administration of Justice had before it when it
made its recommendation that 'legislation should be enacted granting carefully cir-
cumscribed authority for electronic surveillance to law enforcement officers. . .'
   This proposal was put into legislative form, prior to the Supreme Court's decision
in Berger v. New York, 87 S.Ct. 1873, 388 U.S. 41 (1967), and it was introduced in
the House of Representatives as the Ford-McCullock bill, H.R. 13275.  Because of the
opposition of the Administration, no action has been taken on this proposal in the
House. Following the Supreme Court's decision in Berger, which laid down the Consti-
tutional criterion for electronic surveillance legislation. H.R. 13275 was reworked
and introduced as S. 2050.  The Republican and thus bipartisan character of Title
III thus is clear.

                        THE NEED FOR THE LEGISLATION

   The report itself admirably documents the pressing need for the proposed legisla-
tion.  Certain additional comments are, however, necessary.
   The question of need divides itself into two broad areas:  national security and
organized crime.
   The need to use these techniques in the national security area seems all but obvi-

                © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097                                                    Page 198
S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

ous.  The reason were noted by Herbert Brownell, when he was attorney general during
the Eisenhower Administration.  He said:

It is almost impossible to 'spot' (communists and spies) since they no longer use
membership cards or other written documents which will identify them for what they
are.  As a matter of necessity they turn to the telephone to carry on their in-
trigue.  The success of their plans frequently rests upon piecing together shreds of
information received from many sources . . .  The participants in the conspiracy are
often dispersed and stationed in various strategic positions.

Attorney General Brownell also commented on the need to deal with these individu-
als in the traditional American way.  He observed:

(I)t is not enough merely to uproot (them) from government or out of other sensit-
ive positions in industry or commerce.  They **\*2285** should be fairly with all the
constitutional safeguards to an accused that our law provides. But if the evidence
establishes their guilt, be it from their overt acts or from the lips of the confed-
erates, or from intercepted evidence obtained by federal officers, . . . these
wrongdoers, too, should be put away where they will no longer continue to prey on
the liberty and freedom of (the) nation. The mere fact that they have cleverly re-
sorted to the telephone . . . to carry out their treachery should no longer serve as
a shield to punishment.

Indeed, every Attorney General since 1931 has thus recognized this need.  Former
Attorney General Tom C. Clark, for example, put it this way.  'It seems to me imper-
ative to use (wiretapping) in cases vitally affecting domestic security or where hu-
man life is in jeopardy. . .' He also observed:  'It seems incongruous that existing
law should protect our enemies and hamper our protectors.'  With the case for need
in this area, we take it, therefore, no one seriously doubts it any longer.

Organized crime cases stand on a similar footing. The President's Crime Commis-
sion, aptly summed it up in these terms:

In many ways organized crime is the most sadistic kind of crime in America.  The
men who control it have become rich and powerful by encouraging the needy to gamble,
by luring the troubled to destroy themselves with drugs and extortion the profits of
honest and hardworking businessmen, by collecting usury from those in financial
plight, by maiming or murdering those who oppose them, by bribing those who are
sworn to destroy them.  Organized crime is not merely a few preying upon a few.  In
a very real sense it is dedicated to subverting not only American institutions, but
the very decency and integrity that are the most cherished attributes of a free so-
ciety.  As the leaders of Cosa Nostra pursue the conspiracy unmolested in open and
continuous defiance of the law, they preach a sermon that all too many Americans
heed:  the government is for sale; lawlessness is the road to wealth; honesty is a
pitfall and morality a trap for suckers.

That electronic surveillance techniques are necessary to meet this challenge also
seems clear.  This was the conclusion of the President's own Crime Commission.

When the President called together his Commission on Law Enforcement and the Ad-
ministration of Justice, he asked it 'to determine why organized crime has been ex-
panding despite the Nation's best efforts to prevent it.'  The Commission identified
a number of factors.  The major problem, however, related to matters of proof.
'From a legal standpoint, organized crime,' the Commission concluded, 'continues to
grow because of defects in the evidence gathering process.'  The Commission reviewed

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097                                                      Page 199
S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

the difficulties experienced in developing evidence in this area in these terms:

  Usually, when a crime is committed, the public calls the police, but the police
have to ferret out even the existence of organized crime. The many Americans who are
compliant 'victims' have no incentive to report the illicit operations.  The mil-
lions of people who gamble illegally are willing customers, who do not wish to **\*2286**
see their supplier destroyed.  Even the true victim of organized crime, such as
those succumbing to extortion, are too afraid to inform law enforcement officials.
Some misguided citizens think there is social stigma in the role of 'informer,' and
this tends to prevent reporting and cooperating with police.

  Law enforcement may be able to develop informants but organized crime uses torture
and murder to destroy the particular prosecution at hand and to deter others from
cooperating with police agencies. Informants who do furnish intelligence to the po-
lice often wish to remain anonymous and are unwilling to testify publicly.  Other
informants are valuable on a long-range basis and cannot be used in public trials.
Even when a prosecution witness testifies against family members, the criminal or-
ganization often tries, sometimes successfully, to bribe or threaten jury members or
judges.

  Documentary evidence is equally difficult to obtain.  Bookmakers at the street
level keep no detailed records.  Main offices of gambling enterprises can be moved
often enough to keep anyone from getting sufficient evidence for a search warrant
for a particular location. Mechanical devices are used that prevent even the tele-
phone company from knowing about telephone calls.  And even if an enforcement agent
has a search warrant, there are easy ways to destroy written material while the
agent fulfills the legal requirements of knocking on the door, announcing his iden-
tity and purpose, and waiting a reasonable time for a response before breaking into
the room.

  The Commission then concluded, simply enough, that under 'present procedures, too
few witnesses have been produced to prove the link between criminal group members
and the illicit activities that they sponsor.'  It was in this context, therefore,
that the Commission examined the testimony of law enforcement officials that elec-
tronic surveillance techniques were indispensable to develop adequate strategic in-
telligence concerning organized crime, to set up specific investigations, to develop
witness, to corroborate their testimony, and to serve as substitutes for them.  The
Commission then reviewed the arguments for and against the use of these techniques,
examining in particular the New York experience, and concluded:

  All members of the Commission agree on the difficulty of striking the balance
between law enforcement benefits from the use of electronic surveillance and the
threat to privacy its use may entail . . .

  All members of the Commission believe that if authority to employ these techniques
is granted it must be granted only with stringent limitations.  All private use of
electronic surveillance should be placed under rigid control, or it should be out-
lawed.

  A majority of the members of the Commission believe that legislation should be en-
acted granting carefully circumscribed authority for electronic surveillance to law
enforcement officers to the **\*2287** extent it may be consistent with the decision of
the Supreme Court in People v. Berger. . .

  The conclusion of the President's Crime commission echoes the similar findings of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

the English Privy Councillors.

In June of 1957, three Privy Councillors were appointed to inquire into the interception of communications in Great Britain.  Their Report dealt only with wiretapping, but its conclusions are equally applicable to all forms of electronic surveillance.  The practice over a twenty year period was examined. After reviewing the British experience in great depth, they concluded.:

If it should be said that at least the citizen would have the assurance that his own telephone would not be tapped, this would be of little comfort to him, because if the powers of the Police are allowed to be exercised in the future, as they have been in the past under the safeguards we have set out, the telephone of the ordinary law-abiding citizen would be quite immune . . .  (I)f it is said that when the telephone wires of a suspected criminal are tapped all messages to him, innocent or otherwise, are necessarily intercepted too, it should be remembered that this is really no hardship at all to the innocent citizen.  This cannot properly be described as an interference with liberty; it is an inevitable consequence of tapping the telephone of the criminal; but it has no harmful results . . .  The citizen must endure this inevitable consequence in order that the main purpose of detecting and preventing crime should be achieved.  We cannot think, in any event, that the fact that innocent messages may be intercepted is any ground for depriving the Police of a very powerful weapon in their fight against crime and criminals ...  To abandon the power now would be a concession to those who are desirous of breaking the law in one form or another, without any advantage to the community whatever.

It is this context that we find so wholly without support the position of the present Attorney General, Ramsey Clark.  Mr. Clark has publicly taken the position that electronic surveillance is 'neither effective nor highly productive.'  He has testified that 'there are only a small proportion of all crimes where it could be utilized at all and as to these it would not be a significant investigative device.'  Finally, he has suggested that his position is somehow based on a review of 'hundreds and hundreds of bug and wiretap' records.

We find this conclusion incredible.  Indeed, it is not even supported by others within the Department of Justice itself.  J. Edgar Hoover, the Director of the Federal Bureau of Investigation, has publicly stated that 'we would never know what we do (know) about the Cosa Nostra without electronic surveillance.'  William O. Bittman, who successfully prosecuted James Hoffa and Bobby Baker, described the effectiveness of electronic surveillance in these terms:

In Las Vegas, the Government learned from bugging the amount of money that was being skimmed, who was doing the skimming, how the skimming was done, who the couriers were **\*2288** that were delivering the money around the country, when they were leaving and who was going to receive the money.

He then observed:

How can you say this was no help to law enforcement?

Finally, the Committee received conclusive evidence stemming from the files of the Department itself which rebuts the Attorney General's position. Professor G. Robert Blakey during the hearings presented to the Committee the comprehensive analysis of ten documents made public during an organized crime prosecution which represents the product of approximately three weeks of electronic surveillance of only one organized crime boss.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**


SCOPE OF THE LEGISLATION


   While we agree in broad outline with Title III as it is presently drafted, two as-
pects of it seem to us on further reflection to be unwise.

   First, as now drafted, Title III will limit on the federal level the use of elec-
tronic surveillance techniques to certain designated offenses.  As an isolated issue
this approach has much to say for it. The use of these techniques should be care-
fully limited.  Placing a category limitation on the kinds of investigations in
which they may be employed is one obvious way of limiting their use.  Yet when this
limitation is placed in the context of the other limitations in the bill, it seems
to us to be both unnecessary and unwise.  First, there is, of course, no Constitu-
tional reason why these techniques may not be used in the investigation of any of-
fense.  Nothing the Supreme Court said in either Berger or Katz indicates that such
a limitation is necessary or desirable.  Second, if all of the other standards set
out in the Title can be met, we fail to see why the use of these techniques should
be further restricted.  We note particularly the requirement that other investigat-
ive procedures have been tried or reasonably appear to be unlikely to succeed if
tried or to be too dangerous.  Can we seriously suggest to the American people that
all constitutional methods of law enforcement should not be used to attack our
mounting crime problem?  How can we justify enacting legislation which recognizes
safe havens for certain kinds of criminal behavior? Organized crime has not seen fit
to limit itself to any set of fixed list of offenses.  Why should we so tie the
hands of law enforcement? Third, present search and seizure law does not draw a dis-
tinction in the kinds of cases in which search warrants may be issued.  Why should
electronic surveillance, which is but another form of search and seizure, be so lim-
ited? Should we have one standard for the routine case and another, more strict
standard for the organized crime or national security case?  This kind of double
standard cannot be justified.  Finally, New York has had a court order electronic
surveillance system for a number of years now which has not been so limited and it
has not been shown that its absence has caused any difficulty. For these reasons, we
intend to propose to offer on the Senate floor an amendment to Title III which would
eliminate the distinction in the kinds of cases in which electronic surveillance may
be used. [FN8c]

   Second, as now drafted, Title III will set federal standards for the use of these
techniques by State law enforcement officers.  At the time S. 2050 **2289** was drafted
and introduced there was little or not state activity in this area.  Concern was ex-
pressed that if the Congress acted some States might be encouraged to act and they
might not act responsibly.  Loose or inadequate legislation might be enacted.  Re-
cent activity on the State level, however, has proven that fear unfounded.  Legisla-
tion is now pending in California, Rhode Island, Pennsylvania, and New Jersey which
would set up court order systems.  Legislations, too, has passed at least one house
of the State legislatures in New York and Michigan.  This legislation appears to
have been carefully drawn.  This Body has no superior wisdom in this area.  Indeed,
as Mr. Justice Brandeis rightly observed in New State Ice Co. v. Liebmann, 52 S.Ct.
371, 285 U.S. 262, 280-311 (1932) that:

   It is one of the happy incidents of the federal system that a single courageous
State may, if its citizens choose, serve as a laboratory, and try experiments

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

without risk to the rest of the country.

    This is not, of course, to say that the States should have a free hand.  But it is
to say that it is not necessary for us to intervene, for the States are already sub-
ject to the same basic constitutional limitations that we are.  The teaching of the
Supreme Court in Berger v. New York makes that unquestionably clear.  Any State le-
gislation in this area must pass muster in the Supreme Court.  We see no good reason
why it should pass review here too. A healthy federalism demands that the States be
left unfettered within the same constitutional limitations that we ourselves are
free to act.  No one has established a need for the Congress to set federal stand-
ards in this area any different than those already set by the Supreme Court.  Apart
from wiretapping, where the experience with Congressional action in the past has not
been happy anyway, the States are now free to act.  It is not necessary for us to
authorize them to act.  We see no good reason why we should now step in and prevent
them from following their own judgments.  Consequently, we intend to offer on the
Senate floor an amendment which will eliminate from Title III those aspects of the
bill which now set federal standards for state law enforcement. [FN8d]

        EVERETT McKINLEY DIRKSEN.

        ROMAN L. HRUSKA.

        HUGH SCOTT

        STROM THURMOND.

    INDIVIDUAL VIEWS OF MESSRS. DIRKSEN, HRUSKA, THURMOND, AND BURDICK ON TITLE IV


    The need for up-dating federal legislation regulating firearms is generally recog-
nized.  The issue is not whether a bill on this subject be enacted, but rather what
kind of measure should be adopted.

    The National Firearms Act dealing with destructive devices and popularly known as
the 'Machine Gun' Act, was enacted in 1934.  The Federal Firearms Act dealing with
firearms for sporting purposes was enacted in 1938.

    **\*2290** No general revision or comprehensive amendments have been made since origin-
al enactment.  The passage of time as well as the vast and alarming increase in
crime combine to make it necessary that an up-dating be made of both Acts.

    Purposes of such legislation should be directed to--

    (1)  Regulate more effectively interstate commerce in firearms so as to reduce the
likelihood that they fall into the hands of the lawless or those who might misuse
them.

    (2)  Assist the States and their subdivisions to enforce their firearms control
laws and ordinances.

    (3)  Help combat the spiralling increase in serious crime in the United States

    (4)Strictly regulate the manufacture, sale, transfer and possession of destructive
devices by federal registration and heavy transfer taxes.

    In the process, care should be exercised not to interfere with the legitimate uses
of firearms by the millions of law-abiding citizens who acquire, transport and pos-
sess them for hunting citizens who acquire, transport, and possess them for hunting

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

and other recreational pursuits, self-protection, and other lawful uses.

It is submitted that Title IV of the pending bill is fundamentally objectionable in its approach and in its provisions.  It would be ineffective to achieve the declared objectives.  It would be harmful to a greater degree than helpful.

The undersigned intend to propose a substitute which will more effectively achieve the declared goals and which will result in better enforcement.

OBJECTIONS TO TITLE IV AS REPORTED

1.  The Title embraces and joins in one measure the subject matter of both destructive devices and firearms for sporting purposes.  This is faulty from a legislating technique since it departs from the logical division of subject matter which has prevailed for a third of a century.  Separate Amendment of the two Statutes would be preferred procedure.  The Subject matter is different in each Act.  Its treatment is different.  Our substitute would preserve the differentiation between destructive devices and sporting firearms.

2.  In resorting to a prohibition concept by outlawing mail order sales of firearms, difficult enforcement problems are created for the federal authority.  Federal jurisdiction is made to invade an area which should be reserved to state and local authorities.  The federal law should undertake to deal with interstate shipment and movement of firearms in such a way as to enable and assist state enforcement officials to enforce their laws in this field, and without needless and undue prejudice and hardship to the millions of lawful owners and users.  This Title IV fails to do.

3.  The Title prohibits some presently legitimate methods and avenues of commerce in firearms.  This is an objectionable and harmful approach for several basic reasons.  It would be a precedent for leading to further elimination of additional legitimate sales channels. It confers a monopoly power in remaining avenues of commerce.  It would substantially prejudice the lawful owner and uses because of increased cost incurred in buying new **\*2291** arms; and because in parts of America it would make purchases of guns difficult; and in same instances would prevent acquisition.  This latter situation would result from the Title's imposition on dealers of severe burdens of assuring that sales are made only to persons who would mot misuse their purchases, but does not confer upon the dealer the means by which he can get reliable, informed information upon which to make a decision.  In many ways there is less assurance that a sale over the counter would be to an ineligible purchaser than if the sale were by mail order under procedures set out in the proposed substitute to Title IV.

4.  Another basic defect of the regulatory scheme in Title IV and in the Administration proposal is the fact that the remaining commercial firearms dealers would be subjected to severe federal criminal sanctions without the ability to safeguard or protect themselves against liability.  Under the proposed Section 922(b) of Section 901, it would be a federal crime for any licensed dealer to sell any firearm to any purchaser (over-the-counter or through the mails) who the licensee knows or has reasonable cause to believe is not lawfully entitled to receive or possess a firearm because of the operation of any state or local law applicable at the place of sale or delivery, or to non-residents and persons under 21 in the case of handguns.  At his peril, the dealer is charged with the responsibility for establishing the bona

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

fides of the transaction.  There is no provision for the requirement of a sworn
statement from the purchaser.  There is no provision to send a copy of the statement
to the purchaser's local police for verification of the information contained in the
application.  The dealer is on his own.  Many jurisdictions impose stringent or
vague restrictions on the sale of firearms.  The District of Columbia forbids sales
of handguns to felons, narcotics addicts, vagrants or prostitutes.  Texas law for-
bids sales to 'undesirable ' persons.  In many instances these laws are not rigidly
enforced or dealers are given relief if reasonable precautions were taken to estab-
lish the identity and qualifications of the purchaser.  But in Title IV, the dealer
is not even given the benefit of a sworn statement from the purchaser or a police
check.

Under Title IV all sales in technical violation of state law or city ordinance
would become federal offenses.  This means imposition of duties and burdens on deal-
ers far beyond reasonable commercial practice.  The caution that would be forthcom-
ing from dealers would certainly lead to inability of many lawful users of guns to
purchase new ones.

LICENSE FEE SCHEDULES

The license fee schedule proposed in Title IV is unreasonable and discriminatory
against small business.  First, it must be noted that there is common agreement on
the fee schedule for dealers.  Both Title IV and our amendment provide that there
should be an initial license fee of $25 and a $10 renewal charge annually there-
after.  This point is not an issue.  This represents an increase over the existing
Federal Firearms Act which requires a $1 dealer fee.

There is strong disagreement, however, as to license fees for manufacturers, and
importers.  Existing law specifies a $25 fee.  Our amendment raises this charge to
$50.  In Title IV, the fee would be elevated to **\*2292** $500 for manufacturers and im-
porters of firearms, and $1,000 for manufacturers and importers of destructive
devices and ammunition for destructive devices.

No justification was ever submitted in the hearings for this drastic manufacturers
and importers of destructive devices and ammunition for destructive devices.

No justification was ever submitted in the hearings for this drastic increase.
Undoubtedly, the large New England manufacturers would not be adversely affected by
the increases.  However, it would grossly discriminate against small business, par-
ticularly those who engage in special order and customizing work.

Federal gun control legislation is not a revenue measure; it seeks to regulate le-
gitimate firearms commerce.  License fees should be set at reasonable and non-
discriminatory levels.

STANDARDS FOR OBTAINING FEDERAL FIREARMS LICENSES

In the existing Federal Firearms Act of 1938, there are minimal requirements for
obtaining a federal manufacturer's or dealer's license.  As a result, many persons
who are not genuinely engaged in the business of manufacturing and selling firearms
have obtained licenses by payment of the nominal fees.  There is general agreement
that these requirements should be strengthened. Section 3 of our amendment imposes
three new requirements:

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

  1.  An applicant must be 21 years of age.
  2.  The applicant must not be prohibited from transporting, shipping, selling or
receiving firearms in interstate commerce by the provisions of the act.
  3.  The applicant must not have willfully failed to disclose any material informa-
tion required or made any false statement in connection with this application.
  These requirements are also contained in the amendment offered by Senator Dodd.
In addition, three other requirements are imposed by Dodd.
  The Secretary of the Treasury shall deny the issuance of a manufacturer's, import-
er's, or dealer's license if he finds that--
  1.  The applicant has willfully violated any of the provisions of the act or regu-
lations issued thereunder.
  2.  The applicant does not have or does not intend to have and maintain business
premises for the conduct of his business.
  3.  The applicant, by reason of his business experience, financial standing or
trade connections, is not likely to commence business operations or to maintain op-
erations in compliance with the act.
  We do not strongly object to the provision pertaining to wilful violation of the
act.  However, it is felt that this was covered in the standard denying a license to
a person who is prohibited from transporting, shipping, or receiving firearms under
the provisions of the act.  As for the requirement of maintaining or intending to
maintain business premises, it is noted that under existing regulations implementing
the Federal Firearms Act, a similar requirement is already in existence.  This re-
quirement apparently is only selectively enforced.  A memorandum submitted to the
House and Senate committees by the Treasury Department last year during the firearms
hearings indicated that in one survey conducted by the Treasury in the Middle At-
lantic Region, of approximately 5,000 licenses checked, approximately **\*2293** 1,500
licenses were either revoked or not renewed because of failure to maintain business
premises or to be engaged in the firearms business.
  There is a real problem of definition as to just what constitutes a business
premise.  This could be the basis for arbitrary or capricious action on the part of
those charged with enforcement of the act.
  Most objectionable and strongly objected to is the requirement that the applicant,
by reason of his business experience, financial standing or trade connections, will
be likely to commence operations or maintain operations in compliance with the act.
This provision was strongly opposed to by several witnesses during the 1967 hear-
ings.  There seems to be little question but that it does arm the Secretary of
Treasury or his delegate with very broad authority to issue or deny licenses. Al-
though there is opportunity for appeal and a hearing procedure, this remedy would be
of little consolation to the small businessman such as a rural general store or
crossroads gas station which conducted a very small business for the convenience of
his customers.  Such persons would lack financial resources to take advantage of
whatever remedies the appeal procedure might offer.
  The colloquy between Senator Hruska and the Attorney General at pages 930 and 931
of the 1967 Senate firearms hearings is pertinent.
  When asked by Senator Hruska to comment on the 'not likely to comply  ' standard,
the Attorney General replied:
  'This points up another respect in which this bill in my judgement is superior to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**


yours, because yours does not require the licensee have any place of business or any
regular establishment.  We think that is important.  We think the licenses should be
issued to dealers, to dealers with a regular place of business.  We believe that the
Government can enforce this and can enforce it effectively, and the Secretary can
proceed through inquiries and regulations.'

  When asked again to comment by Senator Hruska, the Attorney General replied:

  'He has recourse through the Administrative Procedure Act.'

  In the proposed substitute, the three requirements of S. 1853 have been retained.
Furthermore, we have added the 'willful violation' requirement, while rejecting the
other proposed requirements for the reasons stated above.

                         CONTROL OF DESTRUCTIVE DEVICES

  Universal agreement exists that the so-called destructive devices such as rockets,
mortars, bazookas, crew-served artillery should be the subject of strict federal
regulation.  A few collectors of firearms find these articles interesting.  They are
also found in museums, but there are no legitimate sporting purposes for these
devices.

  But there is a fundamental disagreement as to the most appropriate and effective
method of regulation.  In the 89th Congress, Senator Dodd introduced S. 1591 on be-
half of the Administration.  This bill would place destructive devices within the
framework of the National Firearms Act of 1934.  This act presently regulates ma-
chine guns, other fully automatic **2294 weapons, and sawed-off rifles and shotguns
by providing a system of federal registration and heavy transfer taxes ($200) on
each sale or transfer. Subsequently, Senator Hruska also introduced amendments to
the National Act in the89th Congress; S. 3878.  This bill was similar to S. 1591,
but it was somewhat stronger in several provisions.  For example, the penalty provi-
sions were substantially increased to provide maximum penalties of up to 10 years
imprisonment and $10,000 fine.

  In the 90th Congress Senator Hruska introduced S. 1854, a measure identical to his
previous National Act bill.  All three measures, S. 1591, S. 3787, and S. 1854 have
received strong public endorsement and support from interested sporting groups, in-
cluding the National Rifle Association the National Shooting Sports Foundation, the
National Wildlife Federation, the Wildlife Management Institute, and others.

  For unexplained reasons, S. 1591 was not reintroduced in the90th Congress.  In-
stead, Senator Dodd introduced, on behalf of the Administration, a highly controver-
sial and strongly objectionable feature of S. 1, Amendment 90 (which is incorporated
into Title IV) which would control destructive devices by requiring prior approval
of local police in the form of a sworn statement before a person could purchase one
of these weapons.  First, it must be questioned whether or not the federal govern-
ment can constitutionally impose a state or local official to perform an affirmative
act, such as the execution of a sworn statement.  Yet this is what the provision ap-
parently requires. In response, it may be argued that there is no burden to act im-
posed on the law enforcement official, but that the burden is placed only on dealers
and purchasers who must obtain the statements.  This may be technically correct, but
the practical effect is to place a burden on the local police.

  However, the provision is strongly objectionable, since there is no requirement

                © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097
S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

that an officer act upon the request for the required statement, nor is there any
appeal procedure even if he does respond.

Even more objectionable is the imposition of the requirement of prior approval by
a law enforcement officer before a firearm of any kind could be obtained.  Although
this provision applies only to destructive devices, it could be a precedent for fur-
ther legislation in the future which would have more general application.

The affidavit procedure of our amendment has been criticized by supporters of
President Johnson's bill as being too burdensome on local police.  Apparently, they
overlook the burdens which the Title IV means of regulation places on police.  Ex-
plosives are included in the definition of 'destructive device '.  Thus, every sale
of dynamite, gunpowder for reloading use and even fireworks could need police clear-
ance.

All kinds of 'rockets' are included in this scheme, from ICBMS manufactured for
use by foreign governments to model rockets built under the sanction of the National
Association of Rocketry.

Talk about burdens on police.

IMPORTS

In the new Section 925(d) of Title IV, severe restrictions are placed on the im-
portation of firearms.  In the case of destructive devices National Act weapons, and
military surplus handguns, there are total prohibitions. **\*2295** In the case of milit-
ary surplus longguns and other commercially manufactured firearms, they are import-
able only if they are generally recognized as 'particularly suitable for or readily
adaptable to sporting purposes.'

Under existing law (Section 414 of the Mutual Security Act of 1954) the Department
of State presently grants import licenses for all firearms and other implements of
war.  Since 1965, the Department has not issued import licenses, for destructive
devices.  Under the provisions of the Hruska amendments, imports are treated the
same as any other firearms.

For more than a decade, the New England firearms manufacturers have been engaged
in various attempts to restrict or eliminate competition from foreign sources.  In
the past several years, however, with imports of military surplus on the decline and
many of the manufacturers obtaining firearms from foreign subsidiaries, interest by
the industry in banning imports or restricting them is somewhat waned.  However,
since President Kennedy was assassinated with a military surplus weapon, repeated
attempts have been made to justify embargoes because this particular type of weapon
was used in the commission of the heinous crime.

Domestic gun control legislation is no place to impose protectionist views on for-
eign trade policy.  More importantly, the standard imposed for allowing imports
would arm the Secretary of the Treasury with broad discretionary powers, but would
be virtually meaningless.

One of the most important law enforcement problems is the so-called starter pistol
or 'Saturday night special.'  These are small caliber handguns, usually of foreign
commercial manufacture, that sell for a few dollars  on the retail market.  They are
generally made of pot metal or other inferior materials. Their legitimate use is for
firing blank cartridges to 'start' races at track meets and other athletic contests.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**


They are widely used by juveniles and others in the commission of crimes according
to the testimony presented to the committee.  It is noted that there are domestic
manufacturers of similar items which sell at competitive prices to the foreign im-
ports.

  Assuming that it could somehow be found that the starter pistols were not being
brought into this country for lawful sporting purposes (track meets and other con-
tests), still the market would be supplied by domestic sources.  The proper way to
deal with this problem is the imposition of the affidavit requirement for mail-order
sales and over-the-counter sales to out-of-state residents.  It is probable that the
'red tape', inherent delay, and notification of local police would be sufficient re-
straints to minimize and control the problem.

                      REPEAL OF THE FEDERAL FIREARMS ACT

  One of the more objectionable features of Title IV, is the fact that the Federal
Firearms Act of 1938 is repealed and replaced by a new chapter in the Federal Crim-
inal Code, Title 18.  This provision of Title IV is in keeping with the approach of
S. 1-- Amendment 90 and its companion House bill, H.R. 5384.  Prior bills dealing
with the Federal Firearms Act introduced by Senator Dodd for himself and on behalf
of the Administration amended the Federal Firearms Act rather than repealed it.  (S.
1975 of the 88th Congress, S. 14 and S. 1592 of the 89 Congress, and S. 1 of **\*2296**
the 90 Congress as introduced.)  Also, Senator Hruska's bills of the 89th and 90th
Congress took a similar approach.

  The statutory transposition has met with very stiff opposition. Strong objections
were raised to placement of the regulation of legitimate firearms commerce in the
Criminal Code.  Second, since the new act would continue to be administered by the
Secretary of the Treasury rather than the Attorney General, no advantage could be
gained from the shift from Title 14 to Title 18.  Most important, however, is the
fact that there are sound legal reasons why the shift should not be made.  Title IV
contains provisions which replace many provisions of the Federal Act, some of which
have been previously subjected to court scrutiny and have been upheld.  Why risk the
abandonment of decisional precedents that have been built up through the years under
existing law?

  Even more crucial, however, is the fact that the measure as reported from commit-
tee apparently would leave a six-months transition period in which existing federal
law would be repealed but the new law would not be in effect. Section 406 provides:

  The Federal Firearms Act (52 Stat. 1250; 15 U.S.C. 901-910), as amended, is re-
pealed.

  Yet Section 407 provides:

  The Amendment made by this Title shall become effective one hundred and eighty
days after the date of its enactment; except that repeal of the Federal Firearms Act
shall not in itself terminate any valid license issued pursuant to that Act and any
such license shall be deemed valid until it shall expire according to its terms un-
less it be sooner revoked or terminated pursuant to applicable provisions of law.

  In short, the new law would not become effective for six months, even though the
existing law would be repealed immediately.  However, licenses issued under the old
law would continue to be valid despite the fact that there was no longer any law im-

                © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**


posing duties upon the licensees.  If interpreted literally, a ludicrous situation
would obtain.

### FINDINGS AND DECLARATION

   If there were no other aspects of title IV that are objectionable to legitimate
gun owners-- and there are many-- Section 901(a) alone would ensure their violent
opposition to this bill.
   There appears to be no legislative need or justification for such a section.  The
nature of this tirade-- no other word does it justice-- can be inferred from the re-
petition three times in the first paragraph of the word 'traffic, ' with all of its
noxious connotations.
   The 9 paragraphs of subsection (a) are replete with highly colored expressions of
opinion and one-sided half-truths.
   Paragraph (2) asserts as fact that accessibility of firearms 'is a significant
factor in the prevalence of lawlessness.'  Paragraph (6) avers that 'there is a
causal relationship between the easy availability of firearms and criminal behavi-
or.'  Primitive peoples and children **\*2297** have been known to ascribe to their mis-
deeds to inanimate objects.  The FBI Uniform Crime Reports lists many factors that
promote crime; availability of firearms is not on the list.  The 1966 list includes:

### CRIME FACTORS

   Uniform Crime Reports give a nationwide view of crime based on police statistics
made possible by the voluntary cooperation of local law enforcement agencies.  Since
the factors which cause crime are many and vary from place to place, readers are
cautioned against drawing conclusions from direct comparisons of crime figures
between individual communities without first considering the factors involved.  The
national material summarized in this publication should be used, however, as a
starting point to determine deviations of individual cities from the national aver-
ages.
   Crime is a social problem and the concern of the entire community. The law en-
forcement effort is limited to factors within its control. Some of the conditions
which will affect the amount and type of crime that occurs from place to place are
briefly outlined below:
   Density and size of the community population and the metropolitan area of which it
is a part.
   Composition of the population with reference particularly to age, sex and race.
   Economic status and mores of the population.
   Relative stability of population, including commuters, seasonal, and other transi-
ent types.
   Climate, including seasonable weather conditions.
   Educational, recreational, and religious characteristics
   Effective strength of the police force.
   Standards governing appointments to the police force.
   Policies of the prosecuting officials and the courts.
   Attitude of the public toward law enforcement problems.
   The administrative and investigative efficiency of the local law enforcement

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

agency, including the degree of adherence to crime reporting standards.

Paragraph (3), ironically enough in a measure titled the 'State Firearms Control
Assistance,' proposes 'Federal control * * * over all persons engaging in the busi-
ness of * * * dealing in firearms.'  In other words, assist the States by taking
firearms control out of their hands.

Paragraphs (4) and (5) appear to advocate the complete Balkanization, as far as
firearms are concerned, of the United States into 50 principalities.  It ignores the
possibility of regulating interstate sales in favor of their outright prohibition.

Paragraph (7) lumps together surplus military weapons and 'inexpensive pistols and
revolvers' as 'contributing greatly to lawlessness.'  There is no statistical evid-
ence of this regarding surplus rifles and, while cheap handguns (including those of
domestic and foreign sources of manufacture) are involved in a major portion of the
unlawful uses of firearms, they can hardly be said to cause lawlessness, for the
reasons noted above.

**\*2298** Paragraph  8) perpetuates the fiction that there is a connection between de-
ductive devices (such as bazookas, mortars, antitank guns, etc.) and firearms nor-
mally used by sportsmen.  Strict control of 'destructive devices ' is long overdue,
but this has been properly accomplished for imports under the Mutual Security Act of
1954.  This action should be complimented by amendment to the National Firearms Act.

Paragraph (9) constitutes an admission that the Federal Firearms Act is not being
enforced adequately.  While the need for higher license fees is not questioned, it
certainly is no excuse for non-enforcement of existing law.

Subsection (b) is evidently intended as a sop to legitimate gun owners.  It recog-
nizes the possession of firearms for 'personal protection, or any other lawful
activity' even though this premise is denied in the provisions of the bill that reg-
ulate importation of firearms.

Taken as a whole, the 'Findings and Declaration' is an unnecessary irritant that
makes an objectionable bill even more unpalatable to legitimate gun owners.

### MAJOR PROVISIONS OF AMENDMENT 708

### PART A-FEDERAL FIREARMS ACT AMENDMENTS

1.  The act of a manufacturer or dealer shipping any firearm (including rifles and
shotguns) in interstate commerce to any person in any State or locality where the
receipt of the firearm by such person would violate any statute or published ordin-
ance of that State is prohibited.

2.  No manufacturer or dealer may ship any handgun in interstate or foreign com-
merce to any person, except a licensed manufacturer or dealer, unless that person
submits to the shipper a sworn statement that he

(a)  is at least 21 years of age;

(b) is not prohibited by Federal or State law or local ordinance from receiving or
possessing the handgun;

(c)  discloses the title, true name and address of the principal law enforcement
officer of the locality to which the handgun will be shipped.

If a purchase permit or license is required, a true copy must be attached to the
sworn statement.  Prior to the shipment of a handgun under provisions of the act,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

the manufacturer or dealer must forward a copy of the customer's sworn statement by registered or certified mail (return receipt requested) to the law enforcement officer named in the statement containing a full description (excluding serial number) of the handgun to be shipped, and must receive a return receipt evidencing delivery of the letter, or notice that the law enforcement officer has refused to accept the letter. A dealer then must delay delivery to thepurchaser for 7 days after he has received the return receipt or notice of refusal.

   3.  The act of transporting into or receiving a firearm by a resident of any State from outside the State if it were unlawful for him to purchase or possess a firearm in his own State or locality is prohibited.

   4.  The act of knowingly making a false statement, furnishing false or deceiving identification to any licensed dealer or manufacturer for the purpose of obtaining a firearm is prohibited.

   **\*2299** 5.  No carrier in interstate or foreign commerce may deliver any handgun to any person under 21 years of age or a long gun to any person under 18.

   6.  No manufacturer or dealer may sell a handgun over-the-counter to out-of-state residents unless a sworn statement is submitted by the prospective recipient containing the same information required of the mail-order purchaser.

   7.  A person must be at least 21 years of age to obtain a Federal firearms license as dealer, manufacturer, or pawnbroker. The applicant must not be prohibited from receiving a firearm by the provisions of the act. The applicant must not have failed to disclose any material fact or made false statements in connection with the application. He must not have willfully violated any provisions of the act.

   8.  The fee for a manufacturer's or pawnbroker's license shall be $50 a year; for a dealer's license $25 for the first year and $10 for each renewal year.

   9.  The existing penalty provisions of the Federal Firearms Act (a maximum fine of $5,000 and a maximum term of imprisonment of 2 years) are increased to maximums of $10,000 and 10 years, but all sentenced offenders are made eligible for parole as the U.S. Board of Parole may determine.

PART B-NATIONAL FIREARMS ACT AMENDMENTS

   1.  The Act is amended to include 'destructive devices' within the scope of those weapons which must be registered and upon which a $200.000 transfer tax is imposed.

   2.  'Destructive devices' are defined to include bombs, grenades, rockets and weapons having a bore of more than 0.78 inches in diameter.

   a.  Specifically excluded are rifles, shotguns, signaling and line-throwing devices, black powder firearms, firearms provided by the National Board for the promotion of Rifle Practice, and other weapons not likely to be used as destructive devices.

   3.  The definition of 'machinegun' is amended to include frames, receivers and sets of parts which will convert a weapon into a machinegun, as well as weapons which can be readily restored to shoot as machineguns.

   4.  The definitions of rifle and shotgun are amended to include any such weapons that can be restored to firing condition.

   5.  Firearms without serial numbers may be required to be identified as prescribed by the Secretary.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097                                                    Page 172
S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

6.  The second sentence of the registration provision (Sec. 5841) is stricken and new language added to overcome that section's unconstitutionality as recently proscribed by the Supreme Court.

7.  Persons under 21 may not possess 'National Act' weapons.

8.  A copy of the transfer application for a 'National Act' weapon must be sent to the purchaser's local chief of police.

9.  The penalty provision is increased from a maximum of $2,000 and 5 years to $10,000 and 10 years.

### Statistics on firearms used in crimes

Federal Bureau of Investigation statistics delineate the handgun as the firearms problem.

**\*2300** The 1965 FBI Uniform Crime Reports state that 59 percent of the willful killings during that year were committed with firearms.  Thus, out of a total of 10,920 such killings, firearms were used in 6,476 cases.  Writing to Senator Roman L. Hruska on July 27, 1966, FBI Director J. Edgar Hoover supplemented the Reports.  Indicating that handguns were used in 70 percent of the murders committed with firearms, the Director stated:

Based on the submission of police reports under the uniform crime reporting program, 70 percent of the murder by gun in this country is committed with a handgun, 20 percent by the use of a shotgun, and 10 percent with a rifle or other firearm.  This will supplement the data available to you in Uniform Crime Reports-- 1965.

In regard to aggravated assaults, approximately 19 percent of the total  (231,800) were committed with firearms.  However, Mr. Hoover advised that,

There is no available breakdown of the type of firearms used in these attacks.

In 1966, there were 153,420 robberies.  Of this figure, 39 percent, or about 59,680, were armed robberies committed with firearms.  In regard to this category, Mr. Hoover stated in the above mentioned letter:

Although we do not make a regular collection of the type of weapon used in armed robbery, from special surveys in the past we have determined about two-thirds are firearms and most of these the handgun.

From these statistics, as well as treatment accorded handguns by State and city statutes and ordinances, it is quite clear that the principal offender in the unlawful use of firearms is the handgun.

The Federal Bureau of Investigation Uniform Crime Reports show that the number of serious crimes reported in the United States for 1966 came to a total of approximately 3,243,370.

In crimes of violence, statistics showing use of firearms in their commission are available in only three classes; willful killings, aggravated assaults, and robbery.  The total of crimes of these 3 classes in 1966 was 396,140.

It becomes very pertinent to inquire how many of those 396,140 crimes of violence were committed with firearms.  The answer for the uninitiated is rather spectacular-- only one in every four.  Firearms were used in about 109,000 of this number.  This means about a 27-percent use of firearms in these crimes of violence.

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097
S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
(Cite as: 1968 U.S.C.C.A.N. 2112)

**\*2301** THE PRINCIPAL PROBLEM:  HANDGUNS

The handgun as the most formidable and most frequently used tool of the criminal
is well recognized and established by first, the existence in many States of laws
controlling it; and, second, by statistics showing its dominance as the weapon used
in unlawful activities.

### State control of handguns

While 2 States require an identification card for the purchase of rifle or shotgun
and 22 States prohibit the carrying of a loaded rifle or shotgun in a moving
vehicle, compare the much greater extent of control over handguns by the States.
These controls are of two classes-- the positive and the negative.  In those States
with positive handgun controls.
  Twenty-three States require a license to sell at retail.
  Twenty-nine States require a license to carry a handgun on or about the person.
  Eight States require a permit or its equivalent to purchase a handgun.
  Ten States prescribe a waiting period between purchase and delivery of a handgun.
  Eighteen States require a license to carry a handgun in a vehicle. As to States
with negative controls:
  Twenty-one States prohibit the carrying of a handgun concealed on the person.
  Four States require registration of handguns.
  Twenty-two States prohibit carrying a loaded handgun-- and in some instances other
firearms-- in a vehicle.
  **\*2302** In addition, many municipalities have similar ordinances.
  The lawmakers of each State are best able to determine the conditions and needs
within their own borders and to pass appropriate legislation in regard to the use of
handguns.  Thus, we have drafted legislation which would give state and local offi-
cials notice of the flow of handguns into their jurisdictions to enable them to en-
force applicable local laws.

### ENFORCEMENT OF EXISTING FEDERAL LAW

Experience and testimony indicate that the operation of the Federal Firearms Act
over the years has demonstrated certain weaknesses which call for correction. The
object is to remove these weaknesses in the interest of more effective and efficient
law enforcement.
  Many of the problems which some persons ascribe to the present Federal firearms
statutes are, in reality, not the fault of the law itself but a result of the yet
unsolved problem of uniform and effective administration of the criminal law.  This
problem has several factors, not the least of which are overworked and understaffed
enforcement agencies and similarly overworked, but frequently too lenient, prosec-
utors and courts.  The record shows that indictments and convictions under the ex-
isting Federal firearms statutes have been relatively few, and the comparative rar-
ity of successful action in the courts by the Federal Government have contributed to
a compounding of the problems of reasonable and effective firearms regulation.
  An indictment handed down by a Federal grand jury in the Southern District of New
York against a firearms dealer is demonstrative of the rarity of prosecutions under

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097    Page 194

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**


the Federal Firearms Act of 1938. Section 2(c) of the Act declares it unlawful for a dealer to ship a firearm in interstate commerce to any person in any state where the laws require that a license be obtained for the purchase of such firearms, unless such license is exhibited to the dealer. As testified to by police officials before the Committee, mail-order shipments of firearms made by a few unscrupulous dealers constitute a real problem for local law enforcement officials. Despite evidence of long-term continued violations of the Act, the New York grand jury indictment is held to be the first Federal prosecution, in the 34 year history of the Act, of a dealer for unlawful interstate shipment of firearms. This is an encouraging yet woefully tardy, utilization of existing firearms controls.

Similarly, in a number of instances, the public authorities are not fully utilizing the other tools, available to them at present under Federal law. Testimony has been presented that a State conservation agency, in the course of apprehending individuals in violation of game laws or in routine checking, has had occasion to turn over to Federal enforcement personnel weapons in violation of the National Firearms Act. To its knowledge, this conservation agency has never heard of a Federal prosecution resulting from those seizures. Further, testimony before the committee has brought out that in a number of instances Federal agents have apprehended individuals in serious violation of various provisions of the Federal firearms laws but that no action has resulted from the arrest of these individuals. This is a matter of concern to us and ought to be considered in evaluating the desirability and necessity for additional firearms controls.

**\*2303** A police official of a large American city testified before the committee that in the first 6 months of 1965, police officers 'stopped and searched and found 256 persons carrying, in most instances, handguns. The arrested persons were charged with carrying a concealed weapon and warrants were applied for in all these cases. However, due to frailties in the law, only 81 warrants were issued.'

We are fully aware that the foregoing examples could be amplified many times. If this be the case, and the evidence points in that direction, then we believe that the solution to the problem of firearms in crime lies not in highly restrictive legislative controls but in the understanding and proper handling of all operative factors in the field of crime and criminal administration.

LAWFUL USE OF FIREARMS

As detailed earlier in this report, specific needs for amendment of the Federal Firearms Act have been demonstrated in the hearings before the committee. S. 1853 addresses itself to these problems which must be resolved. Yet, it avoids any undue restrictions upon the legitimate, proper, and beneficial use of firearms, for when taken in the entire context and on balance, the place and role of privately owned and used firearms are necessary and wholesome; a position they have always held in the history of this Nation. Their legitimate role should be maintained.

Any legislation intended to deal with those who unlawfully use firearms must be made to concentrate on them as effectively as possible without unnecessarily encroaching upon the vast preponderance of the public who use firearms in a lawful and beneficial manner.

In seeking to protect the constitutionally guaranteed right of our citizenry to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097
S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
(Cite as: 1968 U.S.C.C.A.N. 2112)

keep and bear arms for lawful purposes, we have considered a factor in our society of no mean proportion.  Best estimates indicate that there are, within the United States, over 100 million privately owned firearms in the possession of over 20 million citizens.

We must consider the hundreds of thousands of shooters who enter into formal rifle, pistol, and shotgun competitive shooting, and the millions who use these same types of firearms for informal skeet, trap, and target shooting.  Not only does this use of firearms provide a healthy recreational activity, but it provides, as a valuable national asset, a great number of young men who are, prior to their entering our Armed Forces, familiar with firearms and skilled in their use.  In Vietnam, as in every armed conflict, it is evident that, in spite of spectacular advances in weaponry systems, we are still faced with a need for skilled riflemen capable of aimed fire.  The plain fact that preinduction firearms training produces more capable and effective soldiers was made clear by a 1965 Department of Defense study.

The study, which was conducted for the Department of the Army by the Arthur D. Little, Inc., a private industrial and management research firm, undertook to review completely the Army's civilian marksmanship program conducted by the National Board for the promotion of Rifle Practice.

A brief summary of the findings of that evaluation follows:

The result of our study indicate that the civilian marksmanship program contributes significantly to the development of **2304** rifle marksmanship proficiency and confidence in the ability to use a rifle effectively in combat on the part of those who participate in the program or benefit indirectly from it.

We believe that those aspects of the DCM program which relate to the broader interest and participation in rifle shooting among the youth of our country (primarily club activities) should be emphasized more and pursued even more effectively to reach a greater percentage of those young men likely to enter military service.

This study indicates clearly that a continuation and implementation of the program is necessary for the defense of our country.

We are cognizant of the many collectors of legitimate firearms of all types; the students of firearms history and development who are just as serious abut their respectable hobby as those who collect stamps, automobiles, or works or art.

While in no way advocating that individuals take the law into their own hands, we are aware that there are millions of homes where firearms have a proper place for self-protection.

Finally, we seek legislation which would not unnecessarily restrict the activities of the more than 15 million hunters in this country. Hunting provides a healthy outdoor recreation which can be enjoyed throughout the lifetime of an active adult. This activity is an effective instrument of wildlife management utilized by Federal and State wildlife managers.  In addition, these sportsmen fund, in large part, Government programs of wildlife management through the purchase of hunting licenses, through the allocated Federal excise taxes paid upon the sales of sporting arms and ammunition.

Furthermore, the recent report by the U.S. Department of the Interior Bureau of Sport Fisheries and Wildlife, is noteworthy.  Its 1965 National Survey of Fishing and Hunting revealed that during this period, 13,583,000 hunters spent a total of $1,121,135,000 in pursuit of their sports.  They took 169,377,000 trips in spending

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

185,819,000 recreation days afield.  They traveled 8,659,034,000 passenger miles,
principally by auto, to reach and return from hunting areas. Collectively and indi-
vidually, hunting supports a significant portion of the economy.

  The lawful and legitimate use of firearms by our citizenry is a widespread and
worthwhile activity which must not be unnecessarily impaired.  We believe that S.
1853 preserves the freedom of activity for these more than 40 million lawful fire-
arms users while effectively confronting the infinitesimal fraction of this number
which represents those who use firearms in an antisocial manner.

## DESTRUCTIVE DEVICES

  During the 1965 Senate firearms hearings, much attention was devoted to the so-
called destructive devices-- rockets, mortars, bazookas, grenades, mines, bombs,
missiles, field artillery and the like. Imports of such military hardware were fea-
tured at the hearings as a major reason for authorizing an embargo on military sur-
plus of all kinds and other categories of firearms.

  **\*2305** While these devices do not appear to be used significantly in the commission
of serious crime, it was not contended by any of the sportsmen's groups whose rep-
resentatives testified in opposition to S. 1592 that there were legitimate sporting
uses for them.

  One of the larger importers of firearms recommended that import licenses be denied
such military ordnance under section 414 of the Mutual Security Act, as amended.
The Munitions Control Office of the State Department advised that it has not allowed
permits imports of this type since 1965.

  Serious objections were raised to the inclusion in the Federal Firearms Act of
prohibitions designed to take this or any other category of firearms out of com-
merce.  This law was enacted primarily for the regulation of commerce in firearms
generally used for sporting purposes-- rifles, shotguns, and handguns.  The National
Firearms Act of 1934 (ch. 53 of the Internal Revenue Code of 1954) has long been the
vehicle for removing from commerce weapons which are peculiarly susceptable to crim-
inal use and not generally used for recreation.

  This act provides for the registration and prohibitory taxes on the transfer of
automatic weapons such as machineguns and sawed-off rifles and shotguns. Also in-
cluded are firearms mufflers and silencers.  The National Firearms Act appears to
have regulated effectively so-called gangster-type weapons in the years since its
enactment.  Persuasive testimony at the hearings brought out the advantages of pre-
serving the essential difference between the two acts. Obviously, it would be more
effective to restruct commerce in all destructive devices, not merely imports, and
to subject all prohibited weapons to the same enforcement and regulatory machinery.

## IMPORTS

  We have given a good deal of consideration to the question of whether the Federal
Firearms Act should be amended to authorize the Secretary of the Treasury to place
embargoes on certain categories of imported firearms and special restrictions on
others.  We have concluded that needed firearms regulation will be adequately accom-
plished through regulation of domestic commerce in firearms and that no clear basis
has been established to defined types of firearms which particularly aggravated the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097
S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

crime problem and which are not also readily available from domestic sources.  We
feel strongly that discriminatory treatment of commerce and interference with con-
sumer preference without a clear showing of overriding necessity should be avoided.

The idea of an embargo on imports, which has recurred in most of the firearms
bills sponsored by Senator Dodd, has been largely publicized and justified by the
commerce in heavy military surplus ordnance; that is, 'destructive devices.'

For example, considerable attention was attracted at the hearing to the rather
shocking idea that anyone can buy a bazooka, antitank gun, or other high-caliber
military ordnance.  Taking destructive devices out of commerce is no justification
whatsoever for an embargo on imports because (a) imports of these devices have
already been cut off by the State Department under existing law, and (b) the need is
for restrictions which **\*2306** reach destructive devices already in the United States.
Amendments to the National Firearms Act to include destructive devices will far more
effectively accomplish the desired objective.

The proposed import restrictions of title IV would give the Secretary of the
Treasury unusually broad discretion to decide whether a particular type of firearm
is generally recognized as particularly suitable for, or readily adaptable to,
sporting purposes.  If this authority means anything, it permits Federal officials
to differ with the judgment of sportsmen expressed through consumer preference in
the marketplace.  Substantial imports would not exist in the absence of important
consumer preference.  We are not prepared to make the unlikely assumption without
evidence that substantial markets for imported products are composed of irrespons-
ible or criminal citizens. No justifiable criteria have been proposed for the impor-
ted firearms; on the contrary, the statements of the proponents of embargoes would
encourage the Secretary to use this broad discretion to curtail the availability of
firearms in general within the practical limitations of domestic politics.  The fact
that Treasury witnesses expressed no sensitivity to this problem further suggests
the need for caution.

The hearings failed to establish inherent differences, which might bear on crimin-
al use, between military and sporting small arms or between firearms manufactured
abroad or in the United States.  Despite a general tendency toward lower prices for
imports and military surplus, the hearings revealed a considerable overlap with the
retail prices of equality lethal domestic sporting firearms.

The conclusion is inescapable that the purpose of proposing any embargo would be
twofold:  (a) remove lower cost firearms from the market, and (b) discriminate
against imports because they are politically vulnerable and might enlist the support
of competing domestic manufacturers.  We reject the discriminatory implications of
both justifications in a bill designed to meet the problem of crime in the United
States.  It is both impractical and unfair to legislate against low prices.  Where
should the line be drawn?  Why should low-income sportsmen, frequently farmers and
other country people to whom hunting is most important, bear the burden of Federal
intervention in the marketplace?

The device of an embargo on international trade raises complex questions with re-
gard to U.S. treaty obligations.  It could prejudice the future bargaining positions
of our country if we oppose the misuse by other countries of public safety justific-
ations for otherwise unacceptable protectionist moves.  Import restrictions con-
sidered by the committee would require the Treasury Department to overlap a State

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097                                                        Page 198
S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**


Department import licensing system authorized by section 414 of the Mutual Security
Act, as amended, which is working well and makes full use of the overseas investig-
atory facilities of the State Department. Such duplication would waste Government
man-hours and unduly burden those affected by the overlapping regulation; no neces-
sity for this inherently undesirable approach has been demonstrated.

  For these reasons, it seemed plain to us that the foreign source of a firearm is
no basis to outlaw it because, like a similar domestic firearm, **\*2307** it might be
used in a crime.  If nondiscriminatory restrictions on mail-order distribution and
firearms dealers are adequate methods of firearms control for domestic products,
they are adequate for imports.  To declare an import somehow more evil than its com-
parable domestic product is not only illogical but it would be misunderstood by many
as inspired by the collateral purpose of protecting American industry from foreign
competition.  Any such misunderstanding must be avoided.


                           THE SECOND AMENDMENT

  One of the great pillars upon which the constitutional framework of this Nation
rests is the second amendment to the Constitution.  This amendment reads:

  A well-regulated militia being necessary to the security of a free state, the
right of the people to keep and bear arms shall not be infringed.

  There are two highly significant aspects about this provision of our Bill of
Rights.  This first is a specific command of the language:  '* * right of the people
to keep and bear arms shall not be infringed.' The second is the place the amendment
occupies:  it comes immediately after the amendment respecting religion, free
speech, free press, peaceable assembly and petition for redress of grievances.  The
position of the second amendment certainly indicates its preferred status in the
constitutional scheme.

  The Attorney General presented no testimony on the second amendment in the 1967
Senate hearings on S. 1 and S. 1853.  However, he did submit a memorandum on this
amendment in the House hearings.  This memorandum was similar to that submitted by
the Department of Justice in the 1965 hearings on the various firearms bills.

  In essence, the position of the Department of Justice with respect to the second
amendment may be stated as follows:  (1) that the amendment applies only to the or-
ganized militia; (2) that individual rights were not contemplated at the time of ad-
option of the amendment; and (3) that a ban on interstate sale of firearms to indi-
viduals is not objectionable as an infringement on the right of the people to keep
and bear arms because there would still be intrastate commerce in these items.

  The following paragraphs will treat of the individual and collective aspects of
the right affirmed by the second amendment.  As to the question of regulation within
the area of a right, we do not dispute the proper exercise of the regulatory power;
but we do contend that any law which regulates to the point of practical negation of
a right is fundamentally wrong and cannot be justified either in the theoretical or
operative realms.

  There have been only four Supreme Court decisions involving the second amendment.
These decisions do not give a view of the application of the Bill of Rights
presently in favor.  Three of the four cases-- United States v. Cruikshank, 92 U.S.
542 (1875), Presser v. Illinois, 6 S.Ct. 580, 116 U.S. 252 (1886) and Miller v.

                  © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097
S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

Texas, 14 S.Ct. 874, 153 U.S. 535-- hold that the second amendment operates as a
limitation on the Federal Government and not on the States. It hardly need be said
that this view does not prevail today. In recent years, the trend of Supreme Courts
decisions has **\*2308** been toward making specific provisions of the Bill of Rights ap-
plicable to the States through the 14th amendment. In point of fact, the rights of
the first eight amendments have been applied to the State in a series of cases, such
as the Mapp case in 1961 on search and seizure, the Gideon case in 1963 on the right
to counsel in all criminal cases, and the Malloy case in 1964 on the right against
compulsory self-incrimination. The Supreme Court has carried the applicability
principle even further. In 1965, the Court held in the Griswald case that a State
statute which conflicted with the right of privacy, a right not specifically men-
tioned in the Bill of Rights, was unconstitutional. To be sure, if the right of
privacy can be made applicable to the States, the mandate of the second amendment
could-- and should-- also apply.

Some historical arguments can be offered for the thesis that the second amendment
guarantee is both an individual and collective right. The c constitutions of several
States prior to the adoption of the Federal Constitution contain provisions declar-
ing that every citizen has a right to bear arms in defense of himself and the State.
If the State constitutions were so explicit in this respect, those States surely
would not have accepted the wording of the second amendment had it at the time been
intended to be more limited than their own. Therefore, it would appear that the
second amendment guaranteed an already existing right in the people to possess and
use the Commonwealth. Moreover, it is common knowledge that ratification of the
U.S. Constitution depended upon the basic assurance of the safeguarding of individu-
al rights.

In his commentaries, Blackstone has this to say on the absolute rights of indi-
viduals:

* * * to vindicate these rights (i.e., 'the liberties of Englishmen'), when actu-
ally violated or attacked, the subjects of England are entitled, in the first place,
to the regular administration and free course of justice in the courts of law; next
to the right of petitioning the King and Parliament for redress of grievances; and
lastly to the right of having and using arms for self-preservation and defense.

Justice Story wrote in 1833 in his commentaries on the Constitution of the United
States:

The right of the citizen to keep and bear arms has justly been considered, as the
palladium of the liberties of the Republic; since it offers a strong moral check
against the unsurpation and arbitrary power of rulers; and will generally, even if
these are successful in the first instance, enable the people to resist and triumph
over them.

Justice William O. Douglas in speaking of the erosion of the Constitution by the
courts said in a lecture on the Bill of Rights at New York University in 1963 that
'the courts have diluted the specific demands of the Constitution. ' He commented
further that 'the closest the framers came to the affirmative side of liberty was in
'the right of the people to bear arms'. Yet this too has been greatly modified by
judicial construction.'

**\*2309** Justice Hugo Black in his discussion of the 1939 case of United States v.
Miller, 59 S.Ct. 816 (307 U.S. 174) in the New York University Law Review (1960)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097
S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

said:  'Although the Supreme Court has held this amendment (i.e., the second amend-
ment) to include only arms necessary to a well-regulated militia, as so construed,
'its prohibition is absolute'.'

One of our great Presidents, Woodrow Wilson, is reported to have said:  'We must
depend in every time of national peril, in the future as in the past, not upon a
standing army, nor yet upon a reserve army, but upon a citizenry trained and accus-
tomed to arms . . . and this, also not because the time or occasion specially call
for such measure, but because it should be a constant policy to make these provi-
sions for our national peace and safety.'

Justice William J. Brennan, Jr., stated  in a lecture on 'The Bill of Rights and
the States' at the New York University School of Law in 1962:  'The constitutions of
the original States anticipated the National Constitution in declaring the doctrine
that there are human liberties which are inalienable. This doctrine has ever since
been the center and core of the American idea of limited government.  The government
of each State was a creation of the people of the States; the source of power was
the people of that State.  The only end and aim of government was to secure the
people in their natural and civil rights.'  We know and recognize, of course, that
natural rights are concomitant with man's existence while civil rights derive from a
person's membership in society.  Hence, natural rights exist whether or not guaran-
teed by written or unwritten constitutions.

The Chief Justice of the United States, writing in a 1962 issue of the New York
University Law Review, discussed the formulation and adoption of the Constitution.
He drew attention to the safeguards to the people in it in these words:

Despite these safeguards, the people were still troubled by the recollection of
the conditions that prompted the charge of the Declaration of Independence that the
King had 'effected to render the military independent and superior to the civil
power.'  They were reluctant to ratify the Constitution without further assurances,
and thus we find in the Bill of Rights amendments Nos. 2 and 3, specifically author-
izing a decentralized militia, guaranteeing the right of the people to keep and bear
arms, and prohibiting the quartering of troops in any house in time of peace without
the consent of the owner.

Hence, at least two Supreme Court Justices would seem to take a somewhat differing
view from that of the Attorney General.

In our view, the interpretation of the second amendment as applying only to the
National Government and as encompassing only a collective right is not so well es-
tablished as many would have us believe.  There is substantial evidence to the con-
trary, and the foregoing touches upon certain points of this evidence.

Thomas Jefferson admonished his compatriots thus:  'Our peculiar security is in
the possession of a written Constitution.  Let us not make it a blank paper by con-
struction.'

FN1  Parenthetical page references to hearings are the hearings before the Special
Subcommittee on Criminal Laws and Procedures of the Committee on the Judiciary, U.S.
Senate.  'Controlling Crime Through More Effective Law Enforcement,' 90th Cong.,
first sess., 1967.

FN2  Escobedo held that where 'the investigation is no longer a general inquiry
into an unsolved crime but has begun to focus on a particular suspect, the suspect

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**

has been taken into police custody, the police carry out a process of interrogations
that lends itself to eliciting incriminating statements, the suspect has requested
and been denied an opportunity to consult with his lawyer, and the police have not
effectively warned him of his absolute constitutional right to remain silent, the
accused has been denied 'the assistance of counsel' in violation of the sixth amend-
ment to the Constitution as 'made obligatory upon the States by the 14th amendment
(cit. omitted) and that no statement elicited by the police during the interrogation
may be used against him at a criminal trial.'

   FN3  Sobel.  'The Exclusionary Rules in the Law of Confessions:  A Legal Perspect-
ive-- A Practical Perspective,' N.Y.L.J., November 1965, p. 1.  See also, 'The Con-
fession Debate Continues,' Irving R. Kaufman, the New York Times Magazine, Oct. 2,
1966.

   FN4  Oaks, 'Legal History in the High Court-- Habeas Corpus,' 64 Mich.Law Review
451 (1966); Mayers, 'The Habeas Corpus Act of 1867: The Supreme Court as Legal His-
torian,' 33 Univ.of Chicago Law Review 31 (19-5).

   FN5  Oaks, op. cit.; Mayers, op. cit.; Daniel Meador, Habeas Corpus and Magna
Carta-- Dualism of Power and Liberty (Charlottesville (1966)).

   FN6  In the Miranda opinion, the Supreme Court actually decided four separate
cases-- Mirand v. Arizona, Vignera v. New York, Westover v. United States, and Cali-
fornia v. Stewart.  See 86 S.Ct. 1602, 384 U.S. 436 (1966).

   FN7  Decisions like Stovall indicate that, contrary to the suggestions of the pro-
ponents of title II, the Supreme Court is in fact highly sensitive to the problems
and needs of law enforcement.  In a series of recent constitutional decisions, the
Court has moved gradually to a position of almost completely prospective application
of new constitutional principles.  The Court has explicitly stated that it attaches
'overriding significance' to such factors as the reliance by law enforcement of-
ficers on the prior law and the severe burden on law enforcement and administration
of justice if the new principles are to be applied retroactively to grant new trials
to defendants already convicted under the prior law.  See Linkletter v. Walker, 85
S.Ct. 1731, 381 U.S. 618 (1965); Tehan v. Shott, 86 S.Ct. 459, 382 Denno, 87 S.Ct.
1967, 388 U.S. 293 (1967).

   FN8  Senator Scott does not associate himself with those views in support of lim-
iting the appellate jurisdiction of federal courts and curtailing habeas corpus pro-
ceedings.  For an extended statement of his position on this legislation, see his
Individual Views at p. 1781 of this Report.

   FN8a  Senator Scott does not necessarily support this amendment.

   FN8b  Senator Scott does not necessarily support this amendment.

   FN8c  Senator Scott does not necessarily support this amendment.

   FN8d  Senator Scott does not necessarily support this amendment.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968
U.S.C.C.A.N. 2112, 1968 WL 4956 (Leg.Hist.)
**(Cite as: 1968 U.S.C.C.A.N. 2112)**


(Note:  1.  PORTIONS OF THE SENATE, HOUSE AND CONFERENCE REPORTS, WHICH ARE
DUPLICATIVE OR ARE DEEMED TO BE UNNECESSARY TO THE INTERPRETATION OF THE LAWS,
ARE OMITTED.  OMITTED MATERIAL IS INDICATED BY FIVE ASTERISKS:  *****.
        2.  TO RETRIEVE REPORTS ON A PUBLIC LAW, RUN A TOPIC FIELD SEARCH
USING THE PUBLIC LAW NUMBER, e.g., TO(99-495))

 S. REP. 90-1097, S. Rep. No. 1097, 90TH Cong., 2ND Sess. 1968, 1968 U.S.C.C.A.N.
2112, 1968 WL 4956 (Leg.Hist.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.